**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ) | |
| IN RE: BLOOD REAGENTS ANTITRUST ) | MDL Docket No. 09-2081 |
| LITIGATION ) | |
| ) | HONORABLE JAN E. DUBOIS |
| ) | |
| THIS DOCUMENT RELATES TO ALL ) | |
| ACTIONS ) | |
| ) | JURY TRIAL DEMANDED |
| ) | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for treble damages and costs of suit under the antitrust laws of the United States against Immucor, Inc. ("Immucor"), Ortho-Clinical Diagnostics, Inc. ("Ortho") and Johnson & Johnson Health Care Systems, Inc. ("JJHS") (collectively "Defendants") and allege, on information and belief, but on personal knowledge as to allegations relating to Plaintiffs, as follows:

## NATURE OF CLAIM

1.      "Blood Reagents" are substances designed and manufactured to test, match, detect, screen, diagnose and/or otherwise identify certain properties of the cell and serum components of human blood.

2.      Every year, more than four million people in the United States need blood transfusions.  Blood must be tested with Blood Reagents before a successful transfusion.  Blood Reagents are also necessary for other medical uses including, *inter alia*, in platelet antibody detection, paternity testing, prenatal care, and to test blood for infectious diseases.

3.      Most of the Blood Reagents sold by Defendants are "traditional" reagents used for the manual testing of blood, where an individual assesses each specimen by hand, one at a time.

Defendants also manufacture and sell proprietary "automated" Blood Reagents, which are used in conjunction with the automated blood testing systems they sell.

4.       Defendants are the primary developers, manufacturers and sellers of Blood Reagents in the United States and its Territories.  While other companies occupy an insignificant share of the Blood Reagents market, only two companies offer a complete line of Blood Reagents in the United States: Defendants Immucor and Ortho/JJHS.  Defendants are essentially a duopoly who account for nearly all of the sales of Blood Reagents in the United States.

5.       Defendants collectively sell hundreds of millions of dollars worth of Blood Reagents every year in the United States to hospitals, clinical laboratories, blood donor centers and blood banks.  Most blood testing in the United States is done manually using traditional Blood Reagents.

6.       During the Class Period (defined below), Defendants engaged in a conspiracy to artificially fix, raise, maintain and/or stabilize the price of Blood Reagents sold in the United States.  As a result of this illegal conspiracy, Defendants were able to charge supra-competitive prices for Blood Reagents sold in the United States, thereby injuring Plaintiffs and members of the proposed Class.

7.       This Action follows a criminal investigation by the Antitrust Division of the United States Department of Justice ("DOJ").  In or about October 2007, the Federal Trade Commission ("FTC") commenced an investigation of potential antitrust violations by Immucor involving restrictions on price competition.  The FTC then transferred the investigation to the DOJ, which opened a criminal grand jury investigation into the pricing conduct of Defendants Immucor and Ortho in the Blood Reagents market.

## JURISDICTION AND VENUE

8.      This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 1, 15 and 26).

9.      This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

10.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d).  Defendants are found and transact business in the District and/or the claims arose at least in part in the District.  Defendants regularly and continuously conduct business in interstate and foreign commerce between and among the United States and foreign countries.  The interstate trade and commerce relevant to this action has been carried out, in part, within the District.

11.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Blood Reagents throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

12.      Plaintiff F. Baragaño Pharmaceuticals, Inc. is a Puerto Rico corporation with its principal place of business in San Juan, Puerto Rico.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

13.     Plaintiff Professional Resources Management, Inc. d/b/a Bullock County Hospital is an S-corporation with its principal place of business in Union Springs, Alabama.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

14.     Plaintiff Community Medical Center Health Care System is a Pennsylvania non-profit corporation operating a hospital system located in Scranton, Pennsylvania. During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

15.     Plaintiff Professional Resources Management of Crenshaw LLC d/b/a Crenshaw Community Hospital is a limited liability corporation with its principal place of business in Luverne, Alabama.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

16.     Plaintiff Douglas County Hospital is a community hospital with its principal place of business in the City of Alexandria, Minnesota.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

17.     Plaintiff Health Network Laboratories L.P. is a limited partnership with its principal place of business in Allentown, PA.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

18.     Plaintiff Larkin Community Hospital is a Florida corporation with its principal place of business located in Miami, Florida.  During the class period, Plaintiff purchased Blood

Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

19.      Plaintiff Legacy Health System is a non-profit corporation organized under the laws of the State of Oregon with its principal place of business in Portland, Oregon.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

20.      Plaintiff Mary Hitchcock Memorial Hospital Inc. is a New Hampshire non-profit corporation with its principal place of business located in Lebanon, New Hampshire.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

21.      Plaintiff Regional Medical Center Board d/b/a Northeast Alabama Regional Medical Center has its principal place of business in Anniston, Alabama.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

22.      Plaintiff Niagara Falls Memorial Medical Center is a New York non-profit corporation with its principal place of business in Niagara Falls, New York.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

23.      Hospital Sisters Health System is a multi-institutional health care system that sponsors the following 13 hospitals in 12 communities across Illinois and Wisconsin:

(a)      Plaintiff Sacred Heart Hospital of the Hospital Sisters of the Third Order of St. Francis is a Wisconsin non-stock corporation with its principal place of business in Eau

Claire, Wisconsin.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   (b) Plaintiff St. Anthony's Memorial Hospital, of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Effingham, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   (c) Plaintiff St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Belleville, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   (d) Plaintiff St. Francis Hospital, of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Litchfield, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   (e) Plaintiff St. John's Hospital of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Springfield, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   (f) Plaintiff St. Joseph's Hospital, Breese, of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Breese, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

(g)      Plaintiff St. Joseph's Hospital of the Hospital Sisters of the Third Order of St. Francis is a Wisconsin non-stock corporation with its principal place of business in Chippewa Falls, Wisconsin.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

(h)      Plaintiff St. Joseph's Hospital, of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Highland, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

(i)      Plaintiff St. Mary's Hospital Medical Center of Green Bay, Inc. is a Wisconsin non-stock corporation with its principal place of business in Green Bay, Wisconsin. During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

(j)      Plaintiff St. Mary's Hospital, Streator, of the Hospital Sisters of the Third Order of St. Francis is an Illinois non-profit corporation with its principal place of business in Streator, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

(k)      Plaintiff St. Mary's Hospital, Decatur, of the Hospital Sisters of the Third Order of St. Francis is an Illinois corporation with its principal place of business in Decatur, Illinois.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

(l)      Plaintiff St. Nicholas Hospital of the Hospital Sisters of the Third Order of St. Francis is a Wisconsin non-stock corporation with its principal place of business in Sheboygan, Wisconsin.  During the class period, Plaintiff purchased Blood Reagents directly

from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   (m) Plaintiff St. Vincent Hospital of the Hospital Sisters of the Third Order of St. Francis is a Wisconsin non-stock corporation with its principal place of business in Green Bay, Wisconsin.   During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   24. Plaintiff Schuylkill Medical Center - East Norwegian Street is a Pennsylvania non-profit corporation with its principal place of business in Pottsville, Pennsylvania.  Schuylkill Medical Center - East Norwegian Street was previously known as Good Samaritan Regional Medical Center.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   25. Plaintiff Schuylkill Medical Center - South Jackson Street is a Pennsylvania non-profit corporation with its principal place of business in Pottsville, Pennsylvania.  Schuylkill Medical Center - South Jackson Street was previously known as Pottsville Hospital & Warne Clinic.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   26. Plaintiff Warren General Hospital is a Pennsylvania non-profit corporation with its principal place of business located in Warren, Pennsylvania.  During the class period, Plaintiff purchased Blood Reagents directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

   27. Defendant Immucor, Inc. ("Immucor") is a Georgia corporation with its principal place of business in Norcross, Georgia.  Immucor is a developer, manufacturer and distributor of

Blood Reagents. During the class period, Immucor sold Blood Reagents in the United States, including in this District.

28.     Defendant Ortho-Clinical Diagnostics, Inc. ("Ortho") is a New York corporation that has its principal place of business in Raritan, New Jersey. Ortho is a wholly-owned subsidiary of Johnson & Johnson a global conglomerate of companies involved in the design and manufacture of numerous products used in the healthcare industry. During the class period, Defendant Ortho sold Blood Reagents in the United States, including in this District.

29.     Defendant Johnson & Johnson Health Care Systems, Inc. ("JJHS") is a New Jersey corporation with its principal place of business in Piscataway, New Jersey. JJHS, a subsidiary of Johnson & Johnson, provides account management, contracting, supply chain and e-business services to key health care customers, including hospital systems and group purchasing organizations, leading health plans, pharmacy benefit managers and government health care institutions. JJHS was instrumental in facilitating the sale and distribution of Blood Reagents manufactured by Ortho during the class period.

30.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporations' business or affairs.

31.     All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of the corporations' business or affairs.

## UNNAMED CO-CONSPIRATORS

32.    Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements in furtherance of the unlawful conduct.

## INTERSTATE TRADE AND COMMERCE

33.    Throughout the class period, there has been a continuous and uninterrupted flow of transactions in and shipments of Blood Reagents in interstate and international commerce throughout the United States and the world.

34.    The unlawful activities of Defendants and their co-conspirators have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## THE BLOOD REAGENTS MARKET

35.    Defendants are part of the immunohematology industry, which generally seeks to prevent or cure certain diseases or conditions through the transfusion of blood and blood components.  In the United States, the Food and Drug Administration ("FDA") regulates human blood as a drug and as a biological product, and it regulates the transfusion of blood as the administration of a drug and of a biological product.  The FDA regulates all phases of the immunohematology industry, including donor selection and the collection, classification, storage, handling and transfusion of blood and blood components.  The FDA requires all facilities that manufacture products used for any of these purposes, and the products themselves, to be registered or licensed by the FDA.

36.    The principal components of blood are plasma (the fluid portion) and cells.  Blood also contains antibodies and antigens.  Antibodies are proteins that are naturally produced by the

human body in response to the introduction of foreign substances (antigens).  Antigens are substances that stimulate the production of antibodies.

37.     Red blood cells, which transport oxygen from the lungs to other parts of the body, and return carbon dioxide to the lungs, are categorized by four blood groups (A, B, AB and O) and two blood types (Rh positive and Rh negative), based on the presence or absence of certain antigens on the surface of the cells.

38.     It is crucial that healthcare providers correctly identify the antibodies and antigens present in patient and donor blood before a blood transfusion takes place.  For example, if a donor's red blood cells contain antigens that could react with the corresponding antibody in the patient's plasma, the transfusion of the red blood cells may result in the life threatening destruction of the patient's red blood cells.

**Blood Reagents**

39.     Blood Reagents are products used, *inter alia,* in tests performed prior to blood transfusions to determine the blood group and type of patients' and donors' blood, in the detection and identification of blood group antibodies, in platelet antibody detection, in paternity testing and in prenatal care.  Blood Reagents are also used to test blood for infectious diseases. In blood banks, donor blood is also screened for the surface antigen of hepatitis B virus, antibodies to HBV (hepatitis B virus) core, hepatitis C virus, HIV types 1 and 2, human T cell lymphotropic virus types I and II, HCV (hepatitis C virus) and HIV RNA (Ribonucleic acid).

40.     The FDA requires the accurate testing of blood and blood components prior to transfusions using only FDA-licensed Blood Reagents.

41.     Defendants market and manufacture traditional Blood Reagents that are used to conduct manual blood testing, and proprietary Blood Reagents that are used in semi-automated and automated blood testing.

42.     In 2008, the worldwide market for traditional Blood Reagents was estimated to be approximately $700-800 million per year.  The United States Blood Reagents market is approximately $250 million per year.

43.     The market for traditional Blood Reagents has been described as relatively mature, given current technology, and manufacturers claim to be competing on price, quality, and service.

**Manual Blood Testing**

44.     Because of the critical importance of matching patient and donor blood, compatibility testing procedures are generally performed by highly educated technologists in hospitals, blood banks, and laboratories.

45.     Manual blood testing is time-consuming and labor-intensive.  Depending on the technical proficiency of the person performing the test, the process can take from 30 minutes to one hour, and if the test results are ambiguous, the entire process may need to be repeated.  Thus, a significant amount of expensive labor is involved in manual blood testing.  Labor costs are the largest component of the total cost of operating a hospital blood bank.

46.     Under current manual blood testing techniques, the technologist mixes serum with red blood cells in a test tube, performs several additional procedures, and then examines the mixture to determine whether there has been an agglutination reaction.  A positive reaction will occur if the cells are drawn together in clumps by the presence of corresponding antibodies and

antigens.  However, when the mixture remains in a fluid state, it is sometimes difficult for the technologist to determine whether a positive reaction has occurred.

47.     Manual testing uses traditional Blood Reagents, which are a highly regulated but fungible product.  Though there may be some barriers to switching between products, such as the need to perform a validation study, one Defendant's traditional Blood Reagent can be substituted for a traditional Blood Reagent made by the other Defendant.  As of 2008, traditional Blood Reagents accounted for approximately 75% of the total U.S. Blood Reagents market.

**Automated Blood Testing**

48.     Automated and semi-automated blood testing is done by placing a large number of blood samples in a machine, which can conduct multiple blood tests or screens at once, with less need for technicians and with a quicker turn-around time.  This method uses Defendants' proprietary Blood Reagents.  Generally, a Defendant's proprietary Blood Reagent can only be used in automated machines produced by that Defendant.

49.     In or about 1998, Immucor developed and patented proprietary capture technology for full automation of blood typing and antibody screening assays.  Since then, Immucor has received FDA clearance for second and third generation automated proprietary capture technology.  When Immucor sells its proprietary technology, its customers commit to a multi-year contract to purchase a large percentage of Immucor's Blood Reagent products. Immucor's Capture technology works only with Immucor's proprietary Capture Blood Reagents.

50.     Ortho also has developed and patented proprietary gel technology for full automation of blood typing and antibody screening assays.  When Ortho sells its proprietary technology, its customers commit to a multi-year contract to purchase a large percentage of its

Blood Reagents from Ortho.  Ortho's gel technology works only with Ortho's proprietary gel Blood Reagents.

51.     Proprietary Blood Reagents are more profitable than traditional Blood Reagents. Proprietary Blood Reagents have the added important advantage to Defendants of enabling them to "lock in" customers who have already made a significant investment in a Defendant's proprietary automation technology.

52.     Defendants collusively raised the price of traditional Blood Reagents to exorbitant levels in order to, among other things, force their customers either to stop or to reduce their traditional manual tube testing, and to instead purchase their automated blood testing systems and, more importantly, their proprietary automated Blood Reagents, which were more profitable. Defendants informed their clients that they should purchase Defendants' proprietary Blood Reagent technologies, because traditional reagent prices would be increasing significantly.

## THE GEOGRAPHIC MARKET

53.     The relevant geographic market for Blood Reagents is the United States and its Territories ("the United States").

## THE CONSPIRACY

### The Blood Reagents Market Prior to 2000

54.     In the late 1990s, Defendants were losing money in the traditional Blood Reagents business.  As Edward Gallup, one of Immucor's founding partners, and its former CEO and Chairman of the Board, publicly complained, prices of traditional Blood Reagents were falling every year.

55.     Prior to the coordinated price increases that would happen in 2000, both Immucor and Ortho were in significant financial trouble with regard to their Blood Reagents businesses.

Immucor was in dire financial straights and had started breaking covenants with its banks.  Ortho was considering leaving the Blood Reagents business entirely because it was too unprofitable.

56.     Rather than seeking to raise profits through innovation or better management, however, Defendants decided to eliminate competition in the market so that they could charge supra-competitive prices.  In a 1999 Atlanta Business Journal Article, Mr. Gallup of Immucor admitted that the company's effort to eliminate its competitors was part of a concerted strategy to raise the prices of Blood Reagents products: "I've been in this business since 1964.  It's the only business where prices have gone down every year.  Prices go down because of all the competition.  But by buying up its competition and consolidating the marketplace into two key players, Immucor can raise its prices."

**Massive Consolidation In The Industry**

57.     Into the mid-1990s, the U.S. Blood Reagents market was highly competitive, with over a dozen Blood Reagent producers occupying the market.  While Defendants were some of the largest players in the market – with Defendant Ortho historically enjoying the most substantial market share – the market in the mid-1990s did not allow Defendants to engage in the type of anticompetitive conduct that has marked the Blood Reagent industry since the beginning of their conspiracy in 2000.

58.     In 1994, Dr. Gioacchino "Nino" De Chirico left his position as Ortho's worldwide General Manager of Immunocytometry and joined Immucor.  Shortly thereafter, Immucor embarked on an aggressive campaign to eliminate competition in the Blood Reagents industry, by acquiring six of its competitors.  For example, Immucor acquired Dominion Biologicals, Ltd. in 1996; Gamma Biologics, Inc. in 1998; and Biopool International Inc.'s blood bank division in 1999.  By 1998, with the acquisition of Gamma Biologics, one of the last major competitors in

the market, Immucor became the market leader in the manufacture and sale of Blood Reagents in the United States.

59.     Immucor publicly acknowledged that its multiple acquisitions were designed to eliminate competition.  Immucor's statements on this subject include the following: "During fiscal 1999 the Company implemented its strategic plans to consolidate the U.S. blood bank market, leaving Immucor and Ortho Clinical Diagnostics as the only two companies offering a complete line of blood banking reagents in the U.S."

60.     It was not enough for Defendants to control the existing industry.  Defendants also took steps to ensure that new entities would not enter the market.  On or about March 18, 2002, shortly after Defendants began increasing the prices of Blood Reagents, Ortho undertook an additional effort to eliminate potential sources of competition in the Blood Reagents market by acquiring Micro Typing Systems, Inc. ("MTS"), a manufacturer of Blood Reagents.  Ortho had previously acted as the exclusive distributor of Blood Reagents for MTS, but by acquiring MTS, Ortho ensured that it – and not MTS – would reap the benefits of the coordinated price increases Ortho and Immucor were determined to extract from the market.

61.     Concentration in the Blood Reagents market has been recognized by financial analysts.  A Susquehanna Financial Group analyst recently remarked that "[t]he market domestically is essentially a duopoly between Immucor and J&J."

**Forcing Customers to Purchase Proprietary Reagents**

62.     In addition to their scheme to consolidate the market and fix prices for traditional Blood Reagents, Defendants also hoped to move customers from their less profitable traditional Blood Reagents products to their more profitable proprietary products.

63.     Defendants agreed to drastically raise the price of traditional Blood Reagents to exorbitant levels in order to, among other things, force their customers away from traditional manual blood testing and into automated blood testing by purchasing, pursuant to multi-year contracts, Defendants' proprietary automated blood testing systems and related high-margin proprietary Blood Reagents.

64.     In its 2007 Annual Report, Immucor analogized its business model to that of a "razor/razorblade" in which the Company's automated instruments "are designed to operate *only* with [Immucor's] proprietary reagents. Therefore, once a customer procures an instrument from [Immucor], the customer is likely to continue to purchase [Immucor's] proprietary reagents for all of its needs." (emphasis added)

**Defendants Agree to Implement Drastic Price Increases**

65.     In the Fall of 2000, at the annual conference of the American Association of Blood Banks ("AABB"), Ortho conducted a presentation regarding Blood Reagents costs and announced significant upcoming price increases. Ortho knew that it was Immucor's practice to have representatives attend their presentations, and that they would be in the audience. Shortly after this conference, Ortho did implement its first significant price increase, and Immucor followed with its own increases.

66.     At the beginning of the class period, immediately after the industry consolidation, Immucor began a "significant market price adjustment," as part of a successful and anticompetitive effort to "utilize its market leadership position in the United States to realign its prices with its costs." However, Immucor's new pricing strategy was implemented not as an effort to "realign its prices with its costs" – the false public rationale used by Defendants to

"explain away" their conspiracy – but was rather a manifestation of Defendants' illegal price-fixing conspiracy.

67.     Beginning in 2000, Defendants commenced a series of drastic price increases that continued throughout the class period, during which time the price of traditional blood bank products increased for the first time in more than 15 years.

68.     One analyst at Susquehanna Financial Group stated that Immucor started raising prices in or about 2000 and that the price increases occurred in close proximity to Ortho's price increases.  The analyst explained that "while some of the tests cost only $5 or $6 each, some prices doubled in the course of a year."

69.     By the end of 2001, Immucor began signing three-year contracts with groups which contained built-in price hikes of as much as 200%.  Average test prices rose from a previous average of $.25 per test to $1.25 per test.

70.     After 2000, Defendants raised their prices of traditional Blood Reagents between at least 100-300% a year.  For example:

        (a)     In late 2004, Defendants substantially increased prices for a wide variety of Blood Reagents from 87% to as much as 254% for some products;

        (b)     In November 2005, Defendants increased prices for Blood Reagents in ranges from 24% to 42%; and

        (c)     In April 2008, Defendants increased prices for Blood Reagents in ranges from 50% to 100%.

71.     In early 2003, Ortho admitted that Defendants had implemented significant and coordinated price increases for traditional Blood Reagents, which in some cases were as high as 300 %.  To that effect, in February 2003, an Ortho Account Manager discussed a "presentation"

he had made, which went "into a lot of detail regarding why OCD and Immucor implemented this significant price increase."

72.     All of these collusive price increases have substantially increased Defendants' profit margins – far above the level necessary to achieve Defendant Immucor's pretextual explanation that it needed to "realign its prices with its costs."  The following chart shows how Immucor's profitability exploded as a result of coordinated price increases of Defendants' Blood Reagents during the Class Period:

| Year[1] | Profit Margin for Sales of Traditional Reagents (as a % of sales) | Profit Margin for Sales of Proprietary Reagents (as a % of sales) |
|---|---|---|
| 2001 | 45% (estimated) | |
| 2002 | 56% | 71% |
| 2003 | 60% | 69% |
| 2004 | 59% | 65% |
| 2005 | 63% | 80% |
| 2006 | 72% | 81% |
| 2007 | 76% | 84% |
| 2008 | 78% | 85% |
| 2009 | 78% | 85% |

73.     Prior to 2000, the sales of Blood Reagents were so unprofitable that Defendants were considering abandoning the industry entirely.  At the beginning of the class period, for example, Immucor was able to retain approximately 45% of each dollar in Blood Reagents sales as profit.  Today, the price of these products has increased so much that Immucor is now able to retain nearly 80% of each dollar in revenue as profit, for traditional Reagents, and 85% for proprietary Reagents.  Defendants' windfall profits have come at the expense of Plaintiffs and

---

[1] Immucor's fiscal year is June 1-May 31, *i.e.*, FY 2009 ended May 31, 2009.  Source:  Immucor 10-K filings.

members of the proposed Class, and are a direct and proximate result of the unlawful, anticompetitive conspiracy.

74.    Defendants acknowledge that these substantial price increases have resulted in a significant rise in revenues and gross margins.  For example, Immucor's 2007 Annual Report recognized that "[t]he 20% growth in traditional reagent revenue . . . in fiscal 2007 as compared to fiscal 2006 occurred mainly as a result of price increases in the United States.  Traditional reagents sales have historically been our primary source of revenue and still constitute roughly 70% of our revenue."  With respect to gross margins, Immucor stated, "Gross margin on traditional reagents improved by 4% to 76% primarily due to price increases."

75.    Defendants' ability to raise the prices of Blood Reagents year after year without losing market share to each other is not consistent with free competition.  As profit margins increase, so does the opportunity for one competitor to undercut another's pricing in order to gain market share.  That has not occurred in the Blood Reagents market.  To the contrary, Defendants have refused to compete with each other on price for nearly a decade – something that did occur prior to the class period and the consolidation within the industry.

**Unilateral Cancellation of GPO Contracts in Order to Increase Prices**

76.    As part of their unlawful scheme, Defendants also took the unusual step of canceling contracts with two of the nation's largest group purchasing organizations ("GPOs") in order to raise prices of their Blood Reagents.  The GPOs' substantial collective negotiating power was insufficient to overcome Defendants' illegal antitrust conspiracy.

77.    In or about late September 2004, Immucor demanded that Premier and Novation, both large GPOs, agree to an average price increase of 105-110% for its Blood Reagents products.  In October 2004, Premier and Novation refused to agree to the increase.  Immucor

promptly invoked a cancellation clause in the contracts and gave Premier and Novation 90 days notice of contract termination, as required by the terms of the agreements.

78.    Also in September 2004, Ortho demanded that Premier agree to an average price increase of 110%, essentially the same amount that Immucor demanded.  As it did with Immucor, Premier also refused to agree to Ortho's demand for a price increase.  As a result, Ortho immediately invoked the contract's cancellation clause and canceled the contract.

79.    In December 2004, Immucor stated that it was terminating the Premier and Novation contracts, effective January 2005, "for the purpose of increasing prices to the members of each group which will occur simultaneously with the cancellation."

80.    Premier and Novation negotiate contracts which set pricing and other terms on behalf of some purchasers of Blood Reagents.  In a market free of collusion, these entities should have had the leverage necessary to avoid (or at least minimize) Defendants' non-negotiable price increases.  Indeed, contracts with Novation and Premier provided Immucor with approximately $23.7 million in annual revenues.  A frustrated Premier spokeswoman stated at the time that "[i]t's a very difficult issue .... They will not offer any discounts to anyone."

81.    Immucor boasted that it did not expect to lose any business because of the price increases.  In a competitive market, however, there could be no assurance that one competitor's sudden and economically unjustified demand to more than double prices would not result in a substantial loss in market share due to the price competition of another competitor.  That is particularly true where, as here, the demands are made to the largest and most sophisticated groups in the market – groups that have the means and motivation to avoid such increases by playing competitors off each other.

82.     Defendants' nearly simultaneous demands to substantially raise prices in late 2004 and then jointly terminate their relationships with the two largest groups in the market were extremely unusual.  As one industry publication noted, "it is rare for a health care supplier to invoke [a cancellation clause] just to raise prices, and even more unusual to announce the fact."

83.     In conjunction with the terminations of these contracts, and in order to effectuate price increases, Immucor implemented a new tiered standardized pricing structure which was made applicable to all customers who were not members of GPOs.

84.     Following the termination of its contracts with Premier and Novation, Immucor converted at least four additional group purchasing contracts to a standardized pricing structure.

**Customer and Market Allocation**

85.     Defendants' price fixing scheme has been aided by a customer-allocation scheme that has restricted competition in what should be a competitive market.  At least some of each Defendant's customers have attempted to secure Blood Reagents from the other Defendant, but were unable to do so, either because the customers were quoted unreasonably high prices for the other Defendant's products, or the other Defendant simply refused to entertain customers' requests to purchase Blood Reagents products.

86.     Immucor has also effected its anticompetitive conspiracy with Ortho by contracting with potential competitors in the U.S. Blood Reagents market to restrict or eliminate competition in both the U.S. and abroad.  Between at least 2003 and 2006, Immucor entered into a joint manufacturing agreement with Celliance, Ltd., a Blood Reagents supplier to, and potential competitor of, Immucor, pursuant to which Celliance was prohibited from marketing its branded monoclonal antibody-based Blood Reagents products in North America and Western Europe.

87.     At or around this time, Defendants raised prices for Blood Reagents between 200-400%.  These price increases, combined with the other conduct alleged, plausibly demonstrate that Defendants expressly reached an understanding concerning the pricing of these products at supra-competitive levels.

## GOVERNMENT ANTITRUST INVESTIGATIONS

88.     On April 24, 2009, Immucor announced that the Antitrust Division of the DOJ had opened a criminal grand jury investigation into its pricing conduct in the Blood Reagents market.  According to the company, "The Justice Department is looking into possible violations of the federal criminal antitrust laws in the blood reagents industry."  Immucor further stated that documents dating back to September 2000 were subpoenaed by government investigators.

89.     On May 5, 2009, Johnson & Johnson disclosed that in April 2009, Ortho had also "received a grand jury subpoena from the U.S. Department of Justice, Antitrust Division, requesting documents and information for the period beginning September 1, 2000 through the present, pertaining to an investigation of alleged violations of the antitrust laws in the blood reagents industry."

90.     The DOJ's actions follow an investigation by the FTC that was commenced in or about October 2007.  Immucor disclosed that the FTC investigation concerns whether the company "or others" have "violated federal antitrust laws or engaged in unfair methods of competition through three acquisitions made in the period from 1996 through 1999, and whether Immucor or others engaged in unfair methods of competition by restricting price competition."

91.     According to Immucor, government regulators initially "requested that the Company provide certain documents and information to the FTC concerning those acquisitions and concerning its product pricing activities since then."  The FTC's initial investigation was

23

upgraded to a formal investigation in July 2008. Indeed, Immucor acknowledges that "[i]n July 2008, the FTC formalized its document and information requests into a Civil Investigative Demand" and asked for additional information "within the same general scope of its previous requests."

92.     The FTC does not have the authority to pursue criminal penalties against antitrust violators and must refer cases involving criminal activity to the DOJ. "The FTC also may refer evidence of criminal antitrust violations to the DOJ. Only the DOJ can obtain criminal sanctions." *An FTC Guide to The Enforcers, available at* http://www.ftc.gov/bc/antitrust/ factsheets/FactSheet_FedEnforcers.pdf.

93.     It is significant that Defendants' anticompetitive behavior is now the subject of a criminal grand jury investigation by the DOJ. In order for the DOJ to institute a grand jury investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memo to that effect. "If a Division attorney believes that a criminal violation of the antitrust laws has occurred, he should prepare a memorandum requesting authority to conduct a grand jury investigation." *Antitrust Grand Jury Practice Manual*, Vol. 1, Ch. I.B.1. Furthermore, following a review of the memorandum, the request for a grand jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred. *See id.*

94.     In addition, the fact that the DOJ investigation is criminal, as opposed to civil, is significant as well. The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements

such as price fixing, bid rigging and horizontal customer and territorial allocations." *See*

*Antitrust Division Manual*, Ch. III.C.5.

## OTHER MARKET FACTORS SUPPORTING THE EXISTENCE OF THE CONSPIRACY

95.     Various factors make the Blood Reagents market susceptible to an illegal

conspiracy.

### Highly Concentrated Industry

96.     A high degree of concentration in a particular industry facilitates the operation of

a price-fixing cartel because it makes it easier to coordinate behavior among co-conspirators, and

more difficult for customers to avoid the effects of collusive behavior.   The Herfindahl-

Hirschchman Index ("HHI") is a widely-accepted measure of industry concentration that

economists often use to quantify the degree of market concentration.   The HHI is calculated by

summing the squares of companies' individual market shares within an industry.   The U.S.

Department of Justice considers an HHI higher than 1800 to be a highly concentrated market.

97.     At all relevant times during the class period, Defendants controlled virtually all

Blood Reagents sales in the United States, in effect operating as a duopoly.   During the class

period, Immucor controlled approximately 54% of the market for Blood Reagents in the U.S. and

Ortho controlled approximately 46%.   Thus, the HHI for the Blood Reagents market approached

5032 [*i.e.*, $(54 \times 54) + (46 \times 46)$], which indicates that the Blood Reagents market is extremely

concentrated and is therefore highly susceptible to collusion by manufacturers.

### Significant Barriers To Entry

98.     A collusive arrangement that raises product prices above competitive levels

would, under normal circumstances, attract new entrants seeking to benefit from the supra-

competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the operation of a cartel.

99.    There are significant barriers to entry in the Blood Reagents market. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including those for manufacturing facilities and equipment, energy, transportation, distribution infrastructure and skilled labor. As one potential competitor considering entering the market commented: "With our current involvement in the blood donor market, we are an obvious choice as a distributor. However, when we investigate the potential for these products versus the cost of bringing them to market, we cannot justify the expenditure. Paying millions of dollars in user fees [to the FDA] is cost-prohibitive. Unfortunately, the customer and the US blood bank industry will be denied innovative products that are available elsewhere in the world."

100.    New entry into the Blood Reagents market is also difficult because of the significant regulatory hurdles in getting products approved by the FDA. In order to be competitive, a manufacturer must offer a full line of Blood Grouping Antisera, Reagent Red Cells and Anti-human globulin. This includes numerous rare antisera that can be considered "esoteric." The return on investment for most manufacturers takes a long time to realize. Moreover, the cost of submitting Biologic Licensing Applications, as required by the FDA, for an entire product line would be cost-prohibitive for new market entrants.

101.    Immucor has stated publicly that the requirement to register Blood Reagents with the FDA, and have them produced at an FDA-licensed facility, acts as a barrier to entry into the Blood Reagents market. As a result, the FDA licensing process takes years to complete and is exceedingly expensive. Only a determined competitor with the specialized knowledge needed to

manufacture Blood Reagents and the capital and patience necessary to meet the FDA's strict licensing requirements can compete in this market.

102.   In addition, new entry is inhibited by patents and technological know-how. Immucor has publicly stated that "we believe our remaining patents, together with our trade secrets and know-how, will prevent any current or future competitor from successfully copying and distributing our . . . products."

103.   In December 2003, Olympus America, Inc. submitted comments to the FDA in response to a request involving bundling of multiple devices in a single premarket submission. In its comments, Olympus stated:

> As you may know, there are two main suppliers of blood group reagents in the United States, Ortho Clinical Diagnostics and Immucor/Gamma. . . . The current lack of suppliers not only inhibits innovation among competitors; but it also threatens the safety of the blood supply and transfusion medicine in general. . . . While everyone in the blood bank industry agrees that new blood bank reagent suppliers are needed, there are significant obstacles to new entrants in this market.  Regulatory hurdles in getting products approved and the subsequent FDA lot release requirements are huge as compared to in vitro diagnostic reagents reviewed by [the Center for Devices and Radiological Health].  To be competitive, the manufacturer must offer a full line of Blood Grouping Antisera, Reagent Red Cells and Anti-human globulin. . . . The return on investment for most manufacturers takes a long time to realize.

104.   In light of these substantial barriers to entry, Defendants have not had to face substantial new competition during the class period.

**Inelastic Demand**

105.   Inelastic demand means that an increase in the price of a product results in only a small, if any, decline in the quantity sold of that product.  In other words, consumers have nowhere to turn for alternative, cheaper products of similar quality.  In order for a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits.

106.     Demand for Blood Reagents is highly inelastic.  First, as Immucor has repeatedly stated during the class period, the cost of Blood Reagents is a small component of the overall cost of a health care provider's bill.  It is well-established that goods which form a small share of a larger consumer purchase exhibit inelastic demand.  Consumers are less likely to change consumption patterns when the overall effect of a price increase is small.

107.     Moreover, Blood Reagents are critical to the safety of the nation's blood supply. Accordingly, Blood Reagents are considered medical necessities which must be purchased by hospitals and blood banks at whatever cost Defendants offer them for sale.  Thus, Blood Reagents manufacturers have been able to raise prices without losing sales revenues, rendering it profitable for Defendants to illegally fix prices.

**Lack Of Reasonable Substitutes**

108.     The lack of available substitute products gives a potential cartel a greater chance of being successful.  When few or no substitutes for a price-fixed item are available, producers of the item can raise a product's price and maintain it over time without losing significant sales. Consumers have little choice but to pay the higher price.

109.     There are no available substitutes for Blood Reagents at any price.  Only FDA-approved Blood Reagents can be used to screen blood and, accordingly, these health care providers must purchase them no matter how expensive they become.

**Standardized Product With A High Degree Of Interchangeability**

110.     Traditional Blood Reagents used for manual testing of blood tend to be interchangeable across manufacturers.

111.     When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier to unlawfully agree on the price for the product in question, and it is easier

to effectively monitor agreed-upon prices.  This makes it easier to form and sustain an unlawful cartel.

112.    Here, although Defendants have endeavored to create proprietary Blood Reagents to be used in their proprietary, automated testing systems in recent years, during the class period the vast majority of Blood Reagent sales were traditional, non-proprietary Blood Reagents used for the manual testing of blood.  Defendants' traditional Blood Reagents for manual testing are functional equivalents.

**Conspiracy Furthered Through Trade Associations**

113.    Participation in trade associations can be used to foster and facilitate an unlawful conspiracy.  Defendants participate in numerous trade association activities and events together, which have provided ample opportunities to conspire and share information.  Defendants are members of various Blood Bank associations and medical technology associations, including the Advanced Medical Technology Association ("AdvaMed").  Defendants are also involved in supporting functions of the AABB (f/k/a American Association of Blood Banks), the California Blood Bank Society, Heart of America Association of Blood Banks, the Indiana State Association of Blood Banks, the Michigan Association of Blood Banks, the South-Central Association of Blood Banks, and other similar industry organizations.

**Conspiracy Furthered Through Inter-Competitor Hiring and Communications**

114.    Defendants hired high-level employees who formerly held strategic positions with their competitor.  Such conduct is particularly troublesome from a conspiracy perspective when there are only two competitors, such as here.  Such inter-competitor hiring facilitates the opportunity for tacit and express agreements between competitors.  This is particularly true where the employees hired had previously held important senior-level positions with their competitor.

115.     Due in part to the cross-hiring of high level employees, there was very likely direct communication between these employees and their former colleagues at the competing Defendant.

116.     For instance, Immucor's Chief Executive Officer, Dr. Gioacchino "Nino" De Chirico, was formerly employed by Ortho in Italy and the United States from 1979-1994.  While he was employed at Ortho, he was the company's worldwide General Manager of Immunocytometry.  De Chirico then moved to Immucor, where he was president of Immucor's Italian subsidiary, Immucor Italia, S.r.l., from February 1994 to 1998.  In May 1998, De Chirico was promoted to Director of Immucor's entire European operations, and then was named President and Chief Operating Officer in July 2003.  He was elevated to Chief Executive Officer in September 2006.  De Chirico has been a member of Immucor's Board of Directors since joining the company in 1994.

117.     In addition, Hiroshi Hoketsu, the former President of Ortho-Clinical Diagnostics, K.K. in Japan from 1981 until his retirement in 2002, joined Immucor's Board of Directors in 2005.

118.     The movement of these senior (and long-serving) executives from Ortho to Immucor heightens the potential for an express or tacit meeting of the minds between them and their former colleagues at Ortho.

**Corporate History of Improprieties**

119.     A company's failure to effectively discipline breaches of ethical or legal standards, especially those that occur publicly and by senior management, sends a message to employees that results are more important than the methods used to achieve them.

120.     For years, Immucor has overlooked and failed to discipline illegal and otherwise improper behavior by its current CEO, Dr. De Chirico.  In 2005, Immucor's audit committee

concluded that Dr. De Chirico had violated a "technical" provision of the Foreign Corrupt Practices Act when he caused Immucor to make a cash payment to Dr. Federico Mercuriali, the former head of Immunohaematology at Niguarda Cà Grande Hospital in Milan, in order to induce the hospital to enter into valuable supply contracts with Immucor. As a result of the incident, Dr. De Chirico was found guilty of bribery in an Italian court on or about April 17, 2008. Dr. Mercuriali committed suicide after being placed under house arrest for his participation in the bribery scheme. News reports indicated that Dr. Mercuriali had deposited the bribe money in Swiss bank accounts.

121.    During its investigation, Immucor's audit committee found evidence of six additional instances where De Chirico had caused Immucor to make questionable payments to doctors with influence over purchasing decisions.

122.    Despite Dr. De Chirico's criminal conviction and the other misconduct unearthed by Immucor's audit committee, Immucor failed to discipline its CEO. To the contrary, following Dr. De Chirico's conviction last year, Immucor's Chairman of the Board, Joseph E. Rosen, publicly stated that "[i]t has always been and continues to be the Board's strong desire that Nino should continue to lead Immucor and he remains the company's CEO with the full support of the Board." Rosen continued: "The reasons for supporting him are straightforward: the company has excelled under his leadership . . . . His results speak for themselves: in revenue, EPS and profitability, all have been phenomenal during his tenure as President and CEO . . . ."

123.    Immucor's support of a CEO that has been determined to have engaged in repeated instances of illegal conduct by the Board's audit committee and by an Italian criminal court sends the message to all employees that revenues and profits are valued more than legal

compliance.  It also makes it substantially more plausible that Immucor participated in the

collusion alleged herein.

124.    In addition, Ortho may also have been involved in the Italian bribery scheme.

Ortho's parent, Johnson & Johnson, has stated:

> In February 2007, Johnson & Johnson voluntarily disclosed to the
> DOJ and the SEC that subsidiaries outside the United States are
> believed to have made improper payments in connection with the
> sale of medical devices in two small-market countries, which
> payments may fall within the jurisdiction of the Foreign Corrupt
> Practices Act (FCPA).  In the course of continuing dialogues with
> the agencies, other issues potentially rising to the level of FCPA
> violations in additional markets have been brought to the attention
> of the agencies by the Company.

## CLASS ACTION ALLEGATIONS

125.    Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated.  The

"Class" is defined as:

> All persons or entities in the United States who purchased Blood
> Reagents directly from the Defendants or their co-conspirators (the
> "Class"), at any time from at least January 1, 2000 through the
> present (the "Class Period").  Excluded from the Class are
> Defendants, subsidiaries or affiliates of Defendants, and
> Defendants' co-conspirators, whether or not named as a Defendant
> in this Complaint.

126.    The Class is so numerous that joinder of all members is impracticable.  Due to the

nature of the trade or the commerce involved, Plaintiffs believe that the members of the Class are

geographically dispersed throughout the world, including throughout the United States, and that

joinder of all Class members would be impracticable.  While the exact number of Class members

is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least hundreds of

members of the Class and that their identities will be learned from Defendants' and their co-

conspirators' books and records.

127.   Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class directly purchased Blood Reagents from Defendants or their co-conspirators during the Class Period at artificially maintained, non-competitive prices, established by the unlawful actions of Defendants and their co-conspirators.  Plaintiffs and members of the Class have sustained damages in that they paid inflated prices for Blood Reagents during the Class Period due to Defendants' conduct in violation of federal law, as set forth below.

128.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

129.   Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)   Whether Defendants conspired to raise, fix, maintain and/or stabilize the price of Blood Reagents in the United States, which were purchased by the Class;

(b)   The identity of the participants in the conspiracy;

(c)   The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   The effect of Defendants' conspiracy on the prices of Blood Reagents sold in the United States during the Class Period;

(e)   Whether Defendants undertook actions to conceal their unlawful conspiracy; and

(f)     Whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiffs and the members of the Class and, if so, the proper measure of damages.

130.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

131.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## DEFENDANTS' ANTITRUST VIOLATIONS

132.     Beginning at least as early as January 1, 2000, and continuing until at least the date of the filing of the first Complaint in this action, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially raise, fix, maintain and/or stabilize the price of Blood Reagents in the United States.

133.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain and/or stabilize the price of Blood Reagents sold in the United States.  These activities included the following:

(a)    Defendants participated in meetings and/or conversations to discuss the price of Blood Reagents in the United States;

(b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and to otherwise increase and/or maintain prices of Blood Reagents sold in the United States;

(c)    Defendants agreed during those meetings and conversations to fix the price of Blood Reagents;

(d)    Defendants issued price announcements and price quotations in accordance with their agreements; and

(e)    Defendants allocated customers in furtherance of their conspiracy.

134.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful anticompetitive agreement described in this Complaint.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFFS AND THE CLASS

135.    Defendants' unlawful conspiracy had and is having the following effects, among others:

(a)    prices charged to Plaintiffs and the Class for Blood Reagents have been fixed, maintained, and/or stabilized at higher, artificially-derived, non-competitive levels;

(b)    Plaintiffs and the Class have been deprived of the benefits of free, open and unrestricted competition in the sale of Blood Reagents; and

(c)      competition in establishing Blood Reagent prices in the United States and worldwide has been unlawfully restrained, suppressed and eliminated.

136.    By reason of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the Class have sustained injury to their business or property. The injury sustained by Plaintiffs and the Class is the payment of supra-competitive prices for Blood Reagents.  This is an injury of the type that the antitrust laws were meant to punish, prevent, and redress.

### FRAUDULENT CONCEALMENT

137.    Defendants fraudulently concealed their participation in the alleged conspiracy by, among other things, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiffs, and to each member of the Class.  Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiffs and the Class could not have discovered the existence of this conspiracy absent the public disclosure of a DOJ grand jury investigation on April 24, 2009.

138.    Throughout the Class Period, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiffs and the Class to prevent Plaintiffs and the Class from suing them for the anticompetitive behavior alleged in this Complaint.

139.    Defendants wrongfully concealed their conspiracy by various means and methods that precluded detection, including but not limited to: secret meetings; misrepresentations to their Blood Reagent customers concerning the reasons for increases in the prices of Blood Reagents; and surreptitious communications among Defendants via telephone, in-person meetings or trade

association gatherings (and elsewhere) in order to prevent the creation of written records, limit any explicit reference to competitor pricing communications on documents, and conceal the existence and nature of their competitor pricing discussions from non-conspirators.  During these secret meetings, Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

140.     Defendants' publicly-stated purported reasons for price increases of Blood Reagent were materially false and misleading and were made for the purpose of concealing Defendants' anticompetitive scheme as alleged in this Complaint.  Plaintiffs and members of the Class reasonably relied on the Defendants' materially false or misleading explanations for increases in the prices of Blood Reagents, and Plaintiffs and members of the Class were lulled into believing that the increases were the result of normal competitive market forces, rather than the product of Defendants' collusive activity.

141.     Defendants' public statements about the reasons for the price increases of Blood Reagents were designed to, and did, put Plaintiffs and Class members off guard and caused them to accept the increases without undertaking further inquiry.  Even had such inquiry been undertaken, it would have proven futile because Plaintiffs and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' claimed justifications for the price increases were pretextual.  Further, because Plaintiffs and members of the Class considered Defendants' articulated reasons for their price increases during the Class Period to be both normal and legitimate, a reasonable person under the circumstances would not have been alerted to investigate the legality of Defendants' price increases.

142.    Moreover, by its very nature, Defendants' conspiracy was inherently self-concealing, and indeed the success of the conspiracy depended on its self-concealing nature.

143.    At all relevant times and in all relevant respects, Plaintiffs and other members of the Class exercised reasonable diligence.

144.    None of the facts or information available to Plaintiffs and members of the Class until shortly before the filing of the initial Complaint in this action, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged in this Complaint.

145.    As a result of Defendants' conduct and concealment of their conspiracy, Plaintiffs and members of the Class were prevented from suing for Defendants' anticompetitive conduct alleged in this Complaint until shortly before the filing of the initial Complaint in this action.

146.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy, to prevent Plaintiffs and members of the Class from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

147.    The running of any applicable statute of limitations has been equitably tolled as to any claims of Plaintiffs and members of the Class as a result of the anticompetitive conduct alleged in this Complaint.

## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

148.    Plaintiffs incorporate by reference the preceding allegations.

149.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

150.    The conspiracy consisted of a continuing agreement, understanding and/or concerted action between and among Defendants and their co-conspirators to fix, maintain, and/or stabilize prices for Blood Reagents in the United States.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

151.    Defendants' conspiracy, and the resulting impact on the market for Blood Reagents, occurred in and/or affected interstate and international commerce.

152.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid supra-competitive prices for Blood Reagents during the Class Period.

## **RELIEF SOUGHT**

Accordingly, Plaintiffs demand relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.    That the unlawful conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce, in violation of Section 1 of the Sherman Act;

C.    That Plaintiffs and the members of the Class recover the damages determined to have been sustained by each of them, trebled as provided by law, and that judgment be entered against Defendants, jointly and severally, on behalf of Plaintiffs and each and every member of the Class;

D.    That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

E.    That the Court grant such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: February 16, 2009                    Respectfully submitted,

_____

Eugene Spector
Jeffrey J. Corrigan
Jay S. Cohen
Jonathan M. Jagher
**SPECTOR ROSEMAN KODROFF
& WILLIS, P.C.**
1818 Market Street – Suite 2500
Philadelphia, PA   19103
Tel:  (215) 496-0300
Fax:  (215) 496-6611
Email:  espector@srkw-law.com
            jcorrigan@srkw-law.com
            jcohen@srkw-law.com
            jjagher@srkw-law.com

*INTERIM LEAD COUNSEL
FOR PLAINTIFFS*

Bernard Persky
Hollis L. Salzman
Ryan Kriger
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel:  (212) 907-0700
Fax:  (212) 818-0477
Email:  hsalzman@labaton.com
            bpersky@labaton.com
            rkriger@labaton.com

Michael D. Hausfeld
Robert G. Eisler
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, D.C. 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
       reisler@hausfeldllp.com

Michael P. Lehmann
Christopher L. Lebsock
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA   94104
Tel:  (415) 633-1908
Fax:  (415) 358-4980
Email:  mlehmann@hausfeldllp.com
        clebsock@hausfeldllp.com

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Tel:(612) 339-6900
Fax:(612) 339-0981
Email: wjbruckner@locklaw.com
       erodette@locklaw.com

Steven A. Kanner
Douglas A. Millen
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL   60015
Tel:  (224) 632-4500
Fax: (224) 632-4521
Email:  skanner@fklmlaw.com
        dmillen@fklmlaw.com

Vincent J. Esades
Dylan J. McFarland
Katherine T. Kelly
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN   55403
Tel: (612) 338-4605
Fax: (612) 338-4692
Email: vesades@heinsmills.com
          dmcfarland@heinsmills.com
          kkelly@heinsmills.com

Lisa J. Rodriguez
TRUJILLO RODRIGUEZ & RICHARDS, LLC
258 Kings Highway East
Haddonfield, NJ 08033
Tel: (856) 795-9002
Fax: (856) 795-9887
Email: lisa@trrlaw.com

Ira Neil Richards
TRUJILLO RODRIGUEZ & RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA   19103
Tel: (215) 731-9004
Fax: (215) 731-9044
Email: ira@trrlaw.com

Steven A. Asher
WEINSTEIN, KITCHENOFF & ASHER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, P A 19103
Tel: (215) 545-7200
Fax: (215) 545-6535
Email: asher@wka-law.com

Jonathan W. Cuneo
Daniel M. Cohen
CUNEO, GILBERT & LADUCA, LLP
507 C Street NE
Washington, D.C. 20002
Phone: (202) 789-3960
Fax: (202) 789-1813
Email: jonc@cuneolaw.com
          danielc@cuneolaw.com

Allan Steyer
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH, LLP
One California Street, Third Floor
San Francisco, CA
Tel: (415) 421-3400
Fax: (415) 421-2234
Email: asteyer@steyerlaw.com

Steven J. Greenfogel
Daniel B. Allanoff
MEREDITH COHEN
GREENFOGEL & SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
Tel: (215) 564-5182
Fax: (215) 569-0958
Email: sgreenfogel@mcgslaw.com
        dallanoff@mcgslaw.com

Simon B. Paris
Patrick Howard
SALTZ MONGELUZZI
BARRETT & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 496-8282
Fax: (215) 496-0999
Email: sparis@smbb.com
        phoward@smbb.com

Michael P. Perry
O'MALLEY, HARRIS, DURKIN &
PERRY, P.C.
345 Wyoming Ave.
Scranton, PA 18503
Tel: (570) 348-3711
Fax: (570) 348-4092
Email: mperry@omalleyandharris.com

Gerald J. Rodos
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA 19103
Tel: (215) 963-0600
Fax: (215) 963-0838
Email: grodos@barrack.com
        jgittleman@barrack.com

Thomas A. Muzilla
THE MUZILLA LAW FIRM, LLC
Tower at Erieview, Suite 1100
1301 East 9th Street
Cleveland, OH   44114
Tel:  (216) 458-5880
Fax:  (216) 928-0016
Email:  tom@muzillalaw.com

Roberta D. Liebenberg
Donald L. Perelman
FINE, KAPLAN AND BLACK, R.P.C.
1835 Market Street, Suite 2800
Philadelphia, PA   19103
Tel:  (215) 567-6565
Fax:  (215) 568-5872
Email:  rliebenberg@finekaplan.com
        dperelman@finekaplan.com

Timothy P. Flaherty
FLAHERTY & HOOD, P.A.
525 Park Street, Suite 470
St. Paul, MN   55103
Tel:  (651) 225-2840
Fax:  (651) 225-9088
Email:  tpflaherty@flaherty-hood.com
        swnyhus@flaherty-hood.com

Christian M. Sande
CHRISTIAN SANDE LLC
2116 Second Avenue South, Suite 300
Minneapolis, MN   55404-2606
Tel:  (612) 387-1430
Fax:  (612) 677-3078
Email:  Christian@christiansande.com

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI
706 Sansome Street
San Francisco, CA  94111
Tel:  (415) 217-6810
Fax:  (415) 217-6813
Email: guido@saveri.com
       rick@saveri.com
       cadio@saveri.com

Jason J. Thompson
SOMMERS SCHWARTZ, P.C
2000 Town Center, Suite 900
Southfield, MI  48075
Tel:  (248) 355-0300
Fax:  (248) 415-3206
Email: jthompson@sommerspc.com

H. Laddie Montague, Jr.
Ruthanne Gordon
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
Email:  hlmontague@bm.net
        rgordon@bm.net

Augusto Jose Rosario-Chaves
CHAVES CARABALLO LAW OFFICES, P.S.C.
203 Eleanor Roosevelt, Suite 1
San Juan, PR  00918-3006
Tel:  (787) 767-1919
Fax:  (787) 764-9120
Email:  rosario@fc-law.com

David C. Idiano-Vicic
INDIANO & WILILAMS P.S.C.
207 Del Parque, Third Floor
San Juan, PR  00907
Tel:  787-641-4545
Fax:  787-641-4544
Email: david.indiano@indianowilliams.com

Christopher M. Pacitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ  07701
Tel: (732) 747-9003
Fax: (732) 747-9004
Email: cplacitella@cprlaw.com

Stewart L. Cohen
William Marvin
COHEN, PLACITELLA & ROTH, P.C.
Two Commerce Square – Suite 2900
Philadelphia, PA   19103
Tel:  (215) 567-3500
Fax:  (215) 567-6019
Email: scohen@cprlaw.com
         wmarvin@cprlaw.com

Steven D. Irwin
David V. Weicht
LEECH TISHMAN FUSCALDO
& LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA   15219
Tel:  (412) 261-1600
Fax:  (412) 227-5551
Email: sirwin@leechtishman.com
         dweicht@leechtishman.com

Joseph C. Kohn
William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA   19107
Tel:  (215) 238-1700
Fax:  (215) 238-1968
Email: jkohn@kohnswift.com
         whoese@kohnswift.com

Charles J. Bloom
John M. Hogan
STEVENS & LEE, P.C.
620 Freedom Business Center
Suite 200
P.O. Box 62330
King of Prussia, PA   19406
Tel:  (610) 205-6000
Fax:  (610) 337-4374
Email:  cjb@stevenslee.com
         jho@stevenslee.com

Bryan L. Clobes
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philadelphia, PA   19103
Tel:(215) 864-2800
Fax : (215) 864-2810
Email:  bclobes@caffertyfaucher.com

John G. Felder, Jr.
MCGOWAN, HOOD & FELDER
1517 Hampton Street
Columbia, SC   29201
Tel:  (803) 779-0100
Fax:  (803) 787-0750
Email: jfelder@mcgowanhood.com

Russell T. Burke
NEXSEN PRUET
1230 Main Street, Suite 700
Columbia, SC   29201
Tel: (803) 771-8900
Fax: (803) 727-1417
Email: rburke@nexsenpruet.com

Peter S. Pearlman
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 Plaza West – One
Saddle Brook, NJ   07663
Tel: (201) 845-9600
Fax: (201) 845-9423
Email:psp@njlawfirm.com

Barry S. Taus
TAUS, CEBULASH & LANDAU, LLP
1515 Broadway, 11th Floor
New York, NY 10036
Email: btaus@tcllaw.com

Kevin Bruce Love
Michael E. Criden
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Suite 515
South Miami, FL   33143
Tel:  (305) 357-9010
Fax:  (305) 357-9050
Email: mcriden@cridenlove.com
          klove@cridenlove.com

Julie W. Allison
LAW OFFICES OF JULIE W. ALLISON, P.A.
1814 N.E. Miami Gardens Drive, Suite 801
North Miami Beach, FL 33179
Tel:  (305) 428-3093
Fax:  (305) 397-2211
Email:  Julie@allisonlaw.net

Allyn Z. Lite
Joseph J. DePalma
LITE DEPALMA GREENBERG &
RIVAS, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel:  (973) 623-3000
Fax:  (973) 623-0858
Email: alite@ldgrlaw.com
          jdepalma@ldgrlaw.com

Burton H. Finkelstein
Mila F. Bartos
FINKELSTEIN THOMPSON LLP
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Tel:  (202) 337-8000
Fax:  (202) 337-8090
Email:  bfinkelstein@finkelsteinthompson.com
          mbartos@finkelsteinthompson.com

Manual J. Dominguez
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel: (561) 835-9400
Fax: (561) 835-0322
Email: jdominguez@bermandevalerio.com

J. Douglas Richards
Seth R. Gassman
COHEN MILSTEIN SELLERS &
TOLL PLLC
150 East 52nd Street, 30th Floor
 New York, NY 10022
Tel: (212) 838-7797
Fax: (212) 838-7745
Email: drichards@cohenmilstein.com
           sgassman@cohenmilstein.com

Richard A. Koffman
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: rkoffman@cohenmilstein.com

Andrew D. Manitsky
GRAVEL & SHEA
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT 05402
Tel: (802) 658-0220
Fax: (802) 658-1456
Email: amanitsky@gravelshea.com

David L. Cleary
CLEARY SHAHI & AICHER, PC
110 Merchants Row, Suite 3
P.O. Box 6740
Rutland, VT   05701
Tel: (802) 775-8800
Fax: (802) 775-8809

Email: dlc@clearyshahi.com

Lynne M. Kizis
Kevin P. Roddy
WILENTZ, GOLDMAN & SPITZER, P.A.
90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095
Tel: (732) 636-8000
Fax: (732) 855-6117
Email: lkizis@wilentz.com
        kroddy@wilentz.com

M. Stephen Dampier
VICKERS, RIIS, MURRAY &
CURRAN L.L.C.
Regions Bank Building, 11th Floor
106 St. Francis Street
Mobile, AL 36602
Fax: (251) 432-9781
Email: sdampier@vickersriis.com

Mark S. Goldman
Theodora A. Swansen
GOLDMAN SCARLATO & KARON, P.C.
101 W. Elm Street, Suite 360
Conshohocken, PA 19428
Tel: (484) 342-0700
Fax: (484) 342-0701
Email: goldman@gsk-law.com
        swansen@gsk-law.com

Michael Goldberg
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Ste. 311
Los Angeles, CA   90067
Tel: (310) 201-9150
Fax: (310) 201-9160
Email : mmgoldberg@glancylaw.com

Kimberly R. West
William B. Stewart
WALLACE, JORDAN, RATLIFF
& BRANDT, LLC
P.O. Box 530910
Birmingham, AL 35298
Tel:  (205) 874-0352
 Fax: (205) 871-7534
Email: kwest@wallacejordan.com
            wstewart@wallacejordan.com

A. Hoyt Rowell, III
T. Christopher Tuck
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
Tel: (843) 727-6500
Fax: (843) 216-6509
Email:  hrowell@rpwb.com
            ctuck@rpwb.com

Marc H. Edelson
EDELSON & ASSOCIATES, LLC
45 West Court Street
Doylestown, PA  18901
Tel:  (215) 230-8043
Fax:  (215) 230-8735
Email: medelson@edelson-law.com

Kendall S. Zylstra
Stephen E. Connolly
FARUQI & FARUQI LLP
2600 Philmont Avenue,
Suite 324
Huntingdon Valley, PA 19006
Tel: (215) 914-2460
Fax: (215) 914-2462
Email: kzylstra@faruqilaw.com
            sconnolly@faruqilaw.com

Richard Schwartz
Nadeem Farqui
FARUQI & FARUQI LLP
369 Lexington Avenue
New York, NY   10017
Tel:  (212) 983-9330
Fax:  (212) 983-9331
Email: rschwartz@faruqilaw.com
          nfaruqi@faruqilaw.com

Anthony J. Bolognese
BOLOGNESE & ASSOCIATES, LLC
Two Penn Center
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
Tel: 215-814-6750
Fax: 215-814-6764
Email: abolognese@bolognese-law.com

David Balto
LAW OFFICES OF DAVID BALTO
1350 I Street, N.W.
Washington, DC 20005
Tel: (202) 789-5424
Email: david.balto@yahoo.com

Krishna Narine
LAW OFFICES OF KRISHNA B. NARINE, P.C.
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA   19006
Tel: (215) 914-2460
Fax: (215) 914-2462
Email: knarine@kbnlaw.com

Garret D. Blanchfield, Jr
REINHARDT WENDORF & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: 651-287-2100
Fax:  651-287-2103
Email:  g.blanchfield@rwblawfirm.com

Lee Albert
MURRAY FRANK & SAILER
275 Madison Ave. 8th Floor
New York, NY 10016
Tel: 212-682-1818
Fax: 212-682-1892
Email:  lalbert@murrayfrank.com

Warren Rubin
LAW OFFICES OF BERNARD M.
GROSS, P.C.
John Wanamaker Building, Suite 450
Juniper and Market Streets
Philadelphia, PA 19107
Tel: (215) 561-3600
Fax: (215) 561-3000
Email: warren@bernardmgross.com

Gilbert T. Adams
Gilbert T. Adams, III
LAW OFFICES OF GILBERT T. ADAMS
1855 Calder Ave.
Beaumont, Texas 77701
Tel: (409) 835-3000
Fax:  (409) 832-6162
Email: gta@gta-law.com
        gilbert@gta-law.com

Michael J. Flannery
James J. Rosemergy
CAREY & DANIS, LLC
8235 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Tel: (314) 725-7700
Fax: (314) 721-0905
Email: mflannery@careydanis.com
        jrosemergy@careydanis.com

Eric D. Holland
Steven J. Stolze
HOLLAND, GROVES, SCHNELLER
& STOLZE, LLC
300 N. Tucker, Ste. 801
St. Louis, MO   63101
Tel:  (314) 241-8111
Fax:  (314) 241-5554

Email:  eholland@allfela.com
        sstolze@allfela.com

Michael M. Buchman
POMERANTZ HAUDEK
GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, NY 10117
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: mbuchman@pomlaw.com

Robert Wild
Frederick Miller
GARFUNKEL, WILD & TRAVIS, P.C.
111 Great Neck Road, Suite 503
Great Neck, NY 11021
Tel: (516) 393-2200
Fax: (516) 466-5964
Email:  rwild@gwtlaw.com
         fmiller@gwtlaw.com

David A. Nester
NESTER & CONSTANCE, P.C
123 W Washington St.
Belleville, IL 62220
Tel: (618) 234-4440
Fax: (618) 234-6193
Email: dnester.nestcon@sbcglobal.net

Jeffrey J. Lowe
THE LOWE LAW FIRM
8235 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Tel: (314) 678-3400
Fax: (314) 678-3401
Email: jeff@jefflowepc.com

Gary E. Mason
Donna F. Solen
THE MASON LAW FIRM, LLP
1225 19th Street, N.W.
Washington, DC   20036
Tel:  (202) 429-2290
Fax:  (202) 429-2294
Email: gmason@masonlawdc.com

dsolen@masonlawdc.com

B.J. Wade
GLASSMAN, EDWARDS,
WADE & WYATT, P.C.
26 N. Second Street
Memphis, TN 38103
Tel: (901) 527-4873
Fax: (901) 521-0940
Email: bwade@gewwlaw.com

Christopher A. Seeger
SEEGER WEISS LLP
One William Street
New York, NY 10004
Tel: (212) 584-0700
Fax: (212) 584-0799
Email: cseeger@seegerweiss.com

Edward M. Gergosian
Robert J. Gralewski, Jr.
GERGOSIAN & GRALEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA   92101
Tel:  (619) 237-9500
Fax:  (619) 237-9555
Email:  ed@gergosian.com

D. Aaron Rihn
Robert N. Peirce, III
ROBERT PEIRCE & ASSOCIATES, P.C.
2500 Gulf Tower
707 Grant Street
Pittsburgh, PA 15219
Tel: (800) 543-9859
Fax: (412) 281-4229
Email: arihn@peircelaw.com
            rpeircejr@peircelaw.com

Natalie Finkelman Bennett
James C. Shah
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
35 East State St.
Media, PA 19063
Tel: (610) 891-9880

Fax: (610) 891-9883
Email: nfinkelman@sfmslaw.com
jshah@sfmslaw.com

Michael J. Boni
Joshua D. Snyder
BONI & ZACK, LLC
15 St. Asaphs Road
Bala Cynwyd, P A 19004
Tel: (610) 822-0200
Fax: (610) 822-0206
Email: mboni@bonizack.com
jsnyder@bonizack.com

John C. Cabaniss
CABANISS LAW
10200 N Port Washington Rd.
Mequon, WI 53092
Tel: (262) 240-0635
Fax: (262) 240-0669
Email: john@cabanisslaw.com

Howard J. Sedran
Austin B. Cohen
LEVIN FISHBEIN SEDRAN
& BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Email: hsedran@lfsblaw.com
acohen@lfsblaw.com

John C. Evans
David Manogue
SPECTER SPECTER EVANS
& MANOGUE, P.C.
436 Seventh Avenue
26th Floor, Koppers Building
Pittsburgh, PA   15219
Tel: (412) 642-2300
Fax: (412) 642-2309
Email: jce@ssem.com
dmanogue@ssem.com

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street
Jamestown, NY   14701
Tel:  (716) 664-2967
Fax:  (716) 664-2983
Email:  artlaw@windstream.net

Robert T. Dassow
HOVDE, DASSOW & DEETS, LLC
201 W. 103rd Street, Suite 500
Indianapolis, IN   46290
Tel:  (317) 818-3100
Fax:  (317) 818-3111
Email:  rdassow@hovdelaw.com