## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
| --- | --- | --- |
| **IN RE: BLOOD REAGENTS ANTITRUST** | : | **MDL No. 09-2081** |
| **LITIGATION** | : | |
|  | : | **ALL CASES** |
|  | : | |

**DuBOIS, J.**

**August 23, 2010**

## MEMORANDUM

### I. INTRODUCTION

These are consolidated antitrust cases involving allegations that the two major producers of

blood reagents, Immucor, Inc. and Ortho-Clinical Diagnostics, Inc., engaged in a continuing

conspiracy in unreasonable restraint of trade and commerce—a violation of § 1of the Sherman

Antitrust Act, 15 U.S.C. § 1. Presently before the Court are the defendants' respective motions to

dismiss the Consolidated Amended Class Action Complaint ("the Complaint" or "CAC") and their

joint motion for a stay of discovery pending a ruling on the motions to dismiss and the completion

of parallel a criminal investigation. The Court heard oral argument on the motions on July 28, 2010.

For the reasons set forth below, Immucor's motion to dismiss is denied, the motion to dismiss filed

by Ortho-Clinical and Johnson & Johnson Health Care Systems is granted as to defendant Johnson

& Johnson Health Care Systems and denied in all other respects, and the motion to stay is denied.

### II. BACKGROUND[1]

Blood reagents are used to detect and identify certain properties of human blood, including

blood group, blood type, and the presence of antibodies and infectious diseases. (CAC ¶¶ 1, 39.)

This allows medical professionals to test for infectious diseases like HIV and hepatitis, to match

---

[1] The facts are taken from the Consolidated Amended Class Action Complaint and are
presented in the light most favorable to plaintiffs.

blood profiles before a transfusion occurs, and to test for paternity, among other things. (CAC ¶ 39.) Blood reagents are regulated by the Food and Drug Administration, which requires that blood be tested before it is used in many common medical procedures. (CAC ¶¶ 35, 40.)

The use of blood reagents to test blood takes two forms: manual testing or automated testing. Manual tests are the most common. (CAC ¶¶ 3, 47.) In this form of testing, a medical technologist mixes serum with red blood cells in a test tube, performs several additional procedures, and then examines the mixture to see if a reaction has occurred. (CAC ¶¶ 45, 46.) This is a time-consuming and labor-intensive task. (CAC ¶ 46.) The blood reagents used in manual testing are fungible: one producer's blood reagents can be used just as effectively as another's. (CAC ¶ 47.)

Automated and semi-automated blood reagents use proprietary technology to test several blood samples at once. (CAC ¶ 48.) This form of testing consumes less time and labor, but requires investment in the technology and a multi-year contract. (CAC ¶¶ 49, 50.) These multi-year contracts obligate purchasers of blood reagents to purchase their blood reagents from an exclusive supplier for a fixed period. (CAC ¶¶ 49 - 51.)

Defendants Immucor and Ortho-Clinical are the major producers of traditional blood reagents. (CAC ¶ 4.) They also market and sell proprietary, automated, blood reagents, which are more profitable than traditional reagents. (CAC ¶¶ 49-51.) Defendant Johnson & Johnson Health Care Systems, Inc. is a subsidiary of Johnson & Johnson, Inc. that provides administrative services to large health care customers, such as hospital systems and group purchaser organizations. The services provided by Johnson & Johnson Health Care Systems facilitate the sale and distribution of blood reagents manufactured by Ortho-Clinical, which is also a subsidiary of Johnson & Johnson. (CAC ¶ 29.)

2

## A. The Relevant Market Before the Alleged Conspiracy

Immucor and Ortho-Clinical struggled to maintain financially viable blood reagents businesses throughout the 1990s. (CAC ¶ 54.) Although the two companies maintained the largest market share, they competed against over a dozen other producers. (CAC ¶ 57.) During the first half of the 1990s, Immucor became so financially stressed that it began breaking covenants with its banks; Ortho-Clinical considered leaving the blood reagents market entirely because it was too unprofitable. (CAC ¶ 55.)

This changed in the last half of that decade. Between 1994 and 1998, Immucor purchased six of its competitors. (CAC ¶ 58.) In a public statement describing its 1999 fiscal year, Immucor declared that "the Company implemented its strategic plans to consolidate the U.S. blood bank market, leaving Immucor and Ortho Clinical Diagnostics as the only two companies offering a complete line of blood banking reagents in the U.S." (CAC ¶ 59.) In 2002, Ortho-Clinical purchased Micro-Typing Systems, a manufacturer of blood reagents, in order to further consolidate the market. (CAC ¶ 60.)

## B. The Alleged Conspiracy

The Complaint alleges that a conspiracy to raise the price of traditional blood reagents began in the year 2000. In the fall of that year, at the annual conference of the American Association of Blood Banks, Ortho-Clinical announced significant price increases to an audience that it knew would likely include representatives from Immucor. (CAC ¶ 65.) Shortly after Ortho-Clinical implemented this price increase, Immucor did so. (CAC ¶ 66.)

The 2000 prices increases, implemented by Immucor and Ortho-Clinical in close proximity to one another, were the first in a series. By the end of 2001, Immucor was signing three-year

3

contracts with built-in price increases of up to 200%. (CAC ¶ 69.) Average test prices rose from an average of $0.25 per test to $1.25 per test. (CAC ¶ 69.) In 2004, defendants increased prices on a wide variety of blood reagents products from 87% to as much as 254%; in November 2005, defendants increased prices in ranges from 24% to 42%; and in April 2008, prices were increased in ranges from 50% to 100%. (CAC ¶ 70.)

According to the Complaint, defendants did more than just raise prices on their blood reagents. For instance, in September 2004, Immucor demanded that Premier and Novation, two of the largest group purchaser organizations in the blood reagents market, accept price increases of 105-110%. (CAC ¶¶ 76, 77.) The two groups refused. (CAC ¶ 77.) Immucor then cancelled its contracts with each of them. (CAC ¶ 77.) In December, 2004, Immucor issued a statement announcing that it was cancelling its contracts with Premier and Novation, effective January 2005, "for the purpose of increasing prices to the members of each group which will occur simultaneously with the cancellation." (CAC ¶ 79.) During this same time period, Ortho-Clinical demanded a price increase of 110% from Premier. (CAC ¶ 78.) When Premier refused, Ortho-Clinical cancelled its contract. (CAC ¶ 78.) The defendants also allocated customers by refusing to entertain offers from one another's customers, either by quoting unreasonably high prices or by simply ignoring the customer's requests. (CAC ¶ 85.)

## D. The Government's Investigations and Plaintiffs' Lawsuits

The Federal Trade Commission commenced an investigation into the blood reagents market in or about October 2007 to determine whether Immucor or others "violated federal antitrust laws or engaged in unfair methods of competition through three acquisitions made in the period from 1996 through 1999, and whether Immucor or others engaged in unfair methods of competition by

4

restricting price competition." (CAC ¶ 90.) This initial investigation was upgraded to a formal investigation in July 2008. (CAC ¶ 91.)

On April 24, 2009, Immucor announced that the Antitrust Division of the Department of Justice ("DOJ") had opened a criminal grand jury investigation into its pricing in the blood reagents market. (CAC ¶ 88.) A little over a week later, on May 5, 2009, Johnson & Johnson announced that Ortho-Clinical had also received a grand jury subpoena. (CAC ¶ 89.)

Plaintiffs, direct purchasers of blood reagents, each quickly followed news of the grand jury investigation by filing, in scattered states across the United States, civil lawsuits against defendants alleging violations of antitrust law. By Orders dated August 17, 2009, and August 19, 2009 the Judicial Panel on Multidistrict Litigation transferred twenty-three of these cases to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. Another ten cases were originally filed in this Court. By Order dated December 23, 2009, this Court consolidated these thirty-three cases pursuant to Federal Rule of Civil Procedure 42(a).

Pursuant to Case Management Order No. 1, dated January 19, 2010, by agreement, plaintiffs filed a Consolidated Amended Class Action Complaint, on February 15, 2010. In that Complaint plaintiffs aver that defendants violated § 1 of the Sherman Act by entering into and engaging in a conspiracy in unreasonable restraint of trade. (CAC ¶¶ 148-152.) Presently before the Court are defendants' motions to dismiss and defendants' joint motion to stay discovery pending resolution of the motions to dismiss and completion of the parallel criminal investigation. This Court has jurisdiction pursuant to 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1131 and 1337.

## III. DEFENDANTS' MOTIONS TO DISMISS

Section One of the Sherman Act declares that "[e]very contract, combination . . ., or

5

conspiracy, in restraint of trade" is illegal. 15 U.S.C. § 1. In order to plead a claim under this section a plaintiff must plausibly allege (1) a contract, combination or conspiracy, (2) in restraint of trade, (3) affecting interstate commerce. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 356-57 (3d Cir. 2004). Defendants' motions argue that the Complaint fails to plausibly plead the first element of conspiracy. Plaintiffs counter that the allegations in the Complaint, when viewed as a whole, plausibly suggest a conspiracy.

## A. The Legal Standard Set Forth in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal

The Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). By motion under Rule 12(b)(6), a defendant may raise the defense of "failure to state a claim upon which relief can be granted." In determining whether the Complaint fails to state a claim (i.e., whether it contains a statement of the claim showing entitlement to relief), the Court is guided by the standard set forth in in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). In that case, the Supreme Court explained that stating a claim under § 1 "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Id. at 556. In other words, the allegations of conspiracy must be "plausible." Id.; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Twombly defines plausibility in terms of what it is not. It is not a probability requirement; "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 556. Nor does it require "heightened fact pleading of specifics[.]" Id. at 555, 570. And in the specific context of a complaint alleging violations of § 1, an allegation of parallel conduct plus a bare assertion of conspiracy "stops short of the line between possibility and

6

plausibility of 'entitlement to relief.'" Id. at 556 (internal brackets omitted).

To state a plausible entitlement to relief under § 1, a complaint must allege parallel conduct plus "some further factual enhancement." Id. at 557. Allegations of parallel conduct "must be placed in a context that raises a suggestion of preceding agreement, not merely parallel conduct that could just as well be independent action." Id. In a footnote, the Supreme Court gave examples of parallel conduct allegations that might state a § 1 claim under the plausibility standard: (1) "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli or mere interdependence unaided by an advance understanding among the parties," (2) "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," and (3) "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." Id. at 557 n.4.

In determining whether the Complaint states a plausible entitlement to relief, the Court must first identify, and then disregard, those factual allegations which constitute nothing more than "legal conclusions" or "naked assertions." Iqbal, 129 S. Ct. at 1950; Twombly, 550 U.S. at 555, 557. The resulting "nub" of plaintiff's Complaint must describe more than parallel conduct; it must include "factual enhancements" that raise the entitlement to relief about the speculative level. Finally, the allegations in the Complaint must be viewed as a whole and, in order to survive a motion to dismiss, "must be placed in a context that raises a suggestion of a preceding agreement." Id. at 557; see also In re Insurance Brokerage Antitrust Litig., — F.3d —, 2010 WL 3211147, at * 6-13 (3d Cir. Aug. 16, 2010) (discussing the standard for pleading a conspiracy in light of Twombly and Iqbal).

7

## B. The Complaint's Plausible Entitlement to Relief Against Immucor and Ortho-Clinical

### 1. The Factual Enhancements Alleged in the Complaint

Plaintiffs allege parallel conduct in the form of harmonized price increases in the blood reagents market beginning in the year 2000. (CAC ¶¶ 65 - 75.) In addition, the Complaint avers several factual enhancements designed to show that the allegation of a conspiracy between Immucor and Ortho-Clinical is plausible. The first is common membership in trade associations such as the Advanced Medical Technology Association and the American Association of Blood Banks, which plaintiffs assert can be used to foster and facilitate an unlawful conspiracy. (CAC ¶113.)

As a second factual enhancement, the Complaint alleges that the conspiracy was aided by defendants' hiring of employees from one another. (CAC ¶¶ 114-118.) Specifically, the Complaint states that Immucor hired Dr. Giocacchino De Chirico in 1994, just before Immucor began purchasing its competitors. (CAC ¶ 116.) Before working at Immucor, Dr. De Chirico was Ortho-Clinical's worldwide General Manager of Immunocytometry. (CAC ¶ 116.) After joining Immucor, he served as President of one of the company's Italian subsidiaries from February 1994 to 1998. (CAC ¶ 116.) He then became Director of Immucor's European operations before being named President and Chief Operating Officer in July 2003. (CAC ¶ 116.) Dr. Chirico has served as Immucor's Chief Executive Officer since September 2006. (CAC ¶ 116.) Hiroshi Hoketsu—the former president of Ortho-Clinical Diagnostics, K.K. in Japan—joined Immucor's board of directors in 2005. (CAC ¶ 117.) The hiring of these high-ranking officials, the Complaint explains, accentuates the potential for direct communication between the firms resulting in an express or tacit meeting of the minds. (CAC ¶ 118.)

8

The third factual enhancement is the existence of the government's investigation into defendants' conduct, which, the Complaint avers, is significant because it demonstrates that a DOJ Antitrust Division attorney believes that a crime has been committed. (CAC ¶¶ 88-94.)

Fourth, the Complaint alleges that a corporate history of improprieties at Immucor fostered disrespect for the law, creating an environment conducive to the formation of an illegal agreement. (CAC ¶¶ 119-124.) According to the Complaint, a 2005 internal Immucor audit committee found that Dr. De Chirico violated a provision of the Foreign Corrupt Practices Act. (CAC ¶ 120.) And, in April 2008, Dr. De Chirico was found guilty of bribery by an Italian court. (CAC ¶ 120.)

Finally, the Complaint avers that the blood reagents industry exhibits the tell-tale signs of a market conducive to price fixing, increasing the plausibility of the allegation of conspiracy. In particular, the market (1) is highly concentrated, which makes it easier to coordinate behavior (CAC ¶¶ 96, 97); (2) contains significant barriers to entry, which mitigates the risk that defendant's illegal conduct would cause new companies to enter the market with lower prices (CAC ¶¶ 98-104); (3) is characterized by inelastic demand, which means that increasing prices on blood reagents does not decrease demand (CAC ¶¶ 105-107); (4) lacks reasonable substitutes for blood reagents, which creates a captive market (CAC ¶¶ 108, 109); and (5) is based on a standardized product with a high degree of interchangeability, which makes it easier for defendants to unlawfully agree upon and maintain prices, (CAC ¶¶ 110-112).

Defendants counter that the allegations in the Complaint are a complete non-starter because the conduct alleged is not even parallel. Furthermore, because the price increases are stated in percentage terms, it is impossible to determine whether the same reagents were offered by one defendant at a lower price than the other defendant during periods of the alleged conspiracy. And

9

even if the conduct alleged is parallel and even if the range of price increases is specific enough to show price-fixing, defendants assert that not one of the factual enhancements presented in the Complaint, by itself, is enough to nudge the complaint across the line from possibility to plausibility. See Twombly, 550 U.S. at 567 n.12 (casting doubt on dissent's suggestion that common membership in a trade association makes the allegation of conspiracy more plausible); St. Clair v. Citizens Fin. Group, 340 F. App'x 62, 62 (3d Cir. 2009) (concluding that allegations of high-level hiring among defendants insufficient to state a plausible claim); In re Hawaiian and Guamanian Cabotage Antitrust Litig., 647 F. Supp. 2d 1250, 1258-59 (W.D. Wash. 2009) (concluding that allegations of parallel government investigation, along with allegations of misconduct in another geographic area insufficient to state a plausible claim).

### 2. Parallel Conduct, Factual Enhancements, and a Plausible Conspiracy Between Immucor and Ortho-Clinical

The Court concludes that the allegations in the Complaint state a plausible entitlement to relief under § 1 of the Sherman Act. As a threshold matter, what Immucor describes as the "arguably somewhat parallel price increases" detailed in the Complaint, (Reply Mem. of Law in Support of Immucor, Inc.'s Mot. to Dismiss the Consolidated Am. Compl. at 12), is an allegation of parallel conduct. Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical— in order to demonstrate parallel conduct. See In re Baby Food Antitrust Litig., 166 F.3d 112, 132 (3d Cir. 1999) (recognizing that parallel pricing need not be uniform and may occur within an agreed upon range.) Nor are they required to plead with specificity the price by which each reagent was increased at a particular time. Paragraph 65 explains that Ortho-Clinical raised its prices in the fall of 2000 and that Immucor followed; paragraph 66 cites a financial analyst

10

describing price increases by Immucor and Ortho-Clinical in close proximity with one another; and although paragraph 70, discussed in detail at oral argument, does not explicitly describe parallel conduct, counsel for plaintiffs pointed out that, for two instances, it states the exact month of the price increases and avers near-parallel price movements. (Transcript of Oral Argument, July 28, 2010 at 44.) (Hereinafter "Tr.") The Court is satisfied that plaintiffs have alleged parallel conduct.

Whether the factual enhancements in the Complaint lend plausibility to the allegations of conspiratorial parallel conduct is a closer question, but one which the Court concludes must be answered in the affirmative. Defendants' briefing attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility. However, as defendants ultimately conceded at oral argument, the allegations in the Complaint must be viewed as a whole. (Tr. at 61.) See In re Aftermarket Filters Antitrust Litig., No. 08-4883, 2009 WL 3754041, at * 3 (N.D. Ill.Nov. 5, 2009) ("[D]efendants may not 'cherry pick' specific allegations in the complaint that might be insufficient standing alone."); In re Pressure Sensitive Labelstock Antitrust Litig., 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) (rejecting "dismemberment" approach to assessing the sufficiency of a complaint). When viewed in its entirety, the Complaint's allegations of conspiracy are plausible.

Twombly emphasized context. Accordingly, the Court begins by exploring the unique context of the alleged conspiracy, namely the allegations concerning the nature of the blood reagents market before and after the conspiracy allegedly began in the year 2000. Prior to 2000, blood reagents were unprofitable. (CAC ¶ 54.) Each defendant was experiencing significant financial difficulty. (CAC ¶ 55.) In 1994, Dr. De Chirico left his job as Ortho-Clinical's worldwide General Manager of Immunocytometry and joined Immucor. Thereafter, Immucor began purchasing its

11

competitors. By 1999, Immucor had significantly diminished the ranks of its competitors. That year, one of Immucor's founding partners, Edward Gallop, stated "I've been in this business since 1964. It's the only business where prices have done down every year. Prices go down because of all the competition. But by buying up the competition and consolidating the marketplace into two key players, Immucor can raise its prices." (CAC ¶ 56.) In 2000, the prices increased for the first time in fifteen years. (CAC ¶ 67.) And they kept increasing, sometimes by triple-digit percentages, through 2008. (CAC ¶ 70.) In 2001, the profit margin for sales of traditional blood reagents was approximately 45%. By 2009, the profit margin was approximately 78%. (CAC ¶ 72.)

The Complaint describes other unusual behavior after the year 2000. In early 2003, Ortho-Clinical admitted that it had implemented significant price increases along with Immucor and, in February of that year, an Ortho-Clinical Account Manager "discussed a presentation he had made which went into a lot of detail regarding why [Ortho-Clinical Diagnostics] and Immucor implemented this significant price increase." (CAC ¶ 71.) In September, 2004 — around the same time defendants increased prices on a wide variety of blood reagents from 87% to as much as 254%, (CAC ¶ 70) –defendants cancelled contracts with the same group purchasing organization, Premier, in order to raise prices for individual customers. (CAC ¶¶ 77, 79.) Despite the increase, Immucor boasted that it did not expect to lose any business. (CAC ¶ 81.) An industry publication noted "it is rare for a health care supplier to invoke [a cancellation clause] just to raise prices, and even more unusual to announce the fact." (CAC ¶ 82.)

The allegation that Immucor was losing so much money before the conspiracy that it broke bank covenants, and that Ortho-Clinical was losing so much money it considered leaving the market altogether, provide the motive for a conspiracy to raise prices. See In re Flat Glass Litig., 385 F.3d

12

350, 360 (3d Cir. 2004) (describing motive as a "plus factor" to be used to determine whether an illegal agreement has occurred). The salient features of the blood reagents market—described in the Complaint as one that is highly concentrated, contains high barriers to entry, has inelastic demand, lacks reasonable substitutes, and is based on a standardized product—are each conducive to transforming that motive into action. See Todd v. Exxon Corp., 275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is the most realistic in concentrated industries."); In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 551 (M.D. Pa. 2009) (describing as "material" the allegation of high barriers to entry); U.S. v. Alcoa, Inc., No. CIV. A. 2000-954, 2001 WL 1335698, at *12 (D.D.C. June 21, 2001) (describing product homogeneity and inelastic demand as characteristics conductive to anticompetitive coordination). So is common membership in trade associations, which, while not enough by itself to confer plausibility on an allegation of conspiracy, is yet another feature of the factual background. See, e.g., Flat Glass, 2009 WL 331361, at *3. And, although Immucor's hiring of high-ranking Ortho-Clinical employees occurred before and after the conspiracy began in 2000— De Chirico was hired in 1994, Hoketsu in 2002—the personal networks and relationships that these employees brought with them from Ortho-Clinical to Immucor makes the allegations of conspiracy more plausible. When viewed in this context, the triple-digit percentage increases in prices, closely aligned cancellations of contracts with group purchaser organizations, and substantially improved profit margins after 2000, constitute the sort of "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reasons," that render an allegation of conspiracy plausible. Twombly, 550 U.S. at 557 n.4. Add to this the existence of a parallel criminal investigation—an allegation demonstrating that the government believes a crime

13

may have occurred— and the result is "enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Twombly, 550 U.S. at 556. See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 324 (2d Cir. 2010) (concluding that allegation of pending investigation by New York State Attorney General, and two separate investigations by the Department of Justice, were part of context raising a plausible suggestion of illegal agreement).[2]

Twombly increased the burden antitrust plaintiffs must bear in order to satisfy Rule 8(a). However, it does not require "heightened fact pleading of specifics" and expressly disclaimed an approach focusing on the probability that a complaint's allegations will ultimately be vindicated. See Twombly, 550 U.S. at 556 ("And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."). Whether plaintiffs are able to actually prove their allegations or not, the Complaint's charge of a conspiracy between Immucor and Ortho-Clinical is set within a context that renders it plausible. Accordingly, Immucor's motion to dismiss is denied and the motion to dismiss filed by

_____

[2] The Court rejects plaintiff's assertion that allegations of unrelated corporate improprieties in Europe help to bestow plausibility on the allegations of conspiracy in the Complaint. The allegation that Dr. De Chirico violated the Foreign Corrupt Practices Act at some unspecified time after the conspiracy allegedly began in 2000—conduct for which he was found guilty of bribery by an Italian Court in 2008—is insufficiently linked to the allegation of a domestic conspiracy to fix the prices of blood reagents, first because it has no bearing on Ortho-Clinical's agreement to participate in the conspiracy, and second because it relies on a chain of tenuous assumptions regarding the effect of this violation on the corporate culture of Immucor. Cf. In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir. 2007) (rejecting plaintiff's allegations of anticompetitive conduct overseas, combined with argument that "if it happened there, it could have happened here," as supporting a plausible inference of a domestic antitrust conspiracy); American Copper & Brass, Inc. v. Halcor S.A., 494 F. Supp. 2d 873, 876-78 (W.D. Tenn. 2007) (rejecting plaintiff's use of facts from a European Commission decision to enhance their allegations of a domestic conspiracy).

14

Ortho-Clinical and Johnson & Johnson Health Care Systems is denied as it relates to defendant Ortho-Clinical.

## 3. The Allegations of Johnson & Johnson Health Care Systems's Participation in a Conspiracy

The factual context surrounding the allegation of a conspiracy between Immucor and Ortho-Clinical lends that allegation plausibility. The same cannot be said of the allegation that Johnson & Johnson Health Care Systems was a member of such a conspiracy. Paragraph 29 of the Complaint, the only paragraph which describes its role in the alleged conspiracy, explains that

[Johnson & Johnson Health Care Systems], a subsidiary of Johnson & Johnson, provides account management, contracting, supply chain and e-business services to key health care customers, including hospital systems and group purchasing organizations, leading health plans, pharmacy benefit managers and government health care institutions. [Johnson & Johnson Health Care Systems] was instrumental in facilitating the sale and distribution of Blood Reagents manufactured by Ortho during the class period.

(CAC ¶ 29.)

This allegation is conclusory and, under Iqbal, must be disregarded. See Iqbal, 129 S. Ct. at 1950. Once disregarded, the "nub" of the Complaint contains no allegations against Johnson & Johnson Health Care Systems and cannot support a plausible entitlement to relief against it. Accordingly, the motion to dismiss filed by Ortho-Clinical Diagnostics and Johnson & Johnson Health Care Systems is granted as it relates to defendant Johnson & Johnson Health Care Systems.

## IV. DEFENDANTS' MOTION TO STAY DISCOVERY

Defendants have filed a motion to stay discovery pending the court's ruling on their motions to dismiss and completion of parallel criminal investigation. Case Management Order No. 1, dated January 19, 2010, stayed fact discovery until further order of this Court. Because no order vacating

15

the stay has been issued, the Court has effectively stayed discovery pending resolution of the motion to dismiss. Accordingly, the Court denies as moot defendants' motion to stay discovery pending the Court's ruling on their motions to dismiss.

Defendants oppose fact discovery on several grounds, including cost, the possibility that grand jury secrecy could be compromised, and the prejudice that might result from having to navigate through civil discovery in the midst of a criminal investigation. Plaintiffs have countered with a compromise. Cognizant of defendants' concerns, plaintiffs' have preliminarily called only for the documents defendants have already turned over to the Federal Trade Commission and the Department of Justice. Plaintiffs argue that the costs of discovery can be managed, that grand jury secrecy will not be jeopardized, and that they would be prejudiced by a long stay. The Court addresses each of these arguments in turn.

## A. Costs

Defendants argue that the costs associated with discovery are enormous. They aver that documents already submitted to the government would have to be reviewed before being turned over to plaintiffs in order to redact personal employee information and ensure the confidentiality of lawyer-client communications and attorney work product. Affidavits submitted on their behalf estimate that it would take thousands of hours of attorney time to review the tens of thousands of documents provided to the Federal Trade Commission. Plaintiffs respond that defendants likely prepared detailed indices of these documents, which would expedite any review.

"[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim.

16

Twombly, 550 U.S. at 559-60 (brackets in original) (internal quotation marks omitted). The Court has addressed this concern in its analysis concluding that the allegations of conspiracy in the Complaint are plausible: because the allegations are plausible, plaintiffs are entitled to discovery. However, because no formal requests have been made, the Court need not rule on the issues of costs related to any future discovery requests.

The Court is sensitive to the cost of discovery and directs the parties to do all that is feasible to keep those costs to a minimum. Any future issues related to the cost of discovery should be presented to the Court by letters, as provided in Case Management Order No. 1, if warranted by the facts.[3]

## B. Grand Jury Secrecy

Defendants object to discovery of the documents they have already turned over to a federal grand jury on the ground that doing so will threaten the public policy interest in the secrecy of grand jury proceedings. Plaintiffs disagree, arguing that other courts have rejected defendants' concerns in similar cases.

Federal Rule of Criminal Procedure 6(e) provides for the secrecy of grand jury proceedings by prohibiting certain categories of persons from disclosing "matter occurring before the grand jury." The United States Court of Appeals for the Third Circuit has interpreted this rule to mean that disclosure of documents by a grand jury witness runs afoul of the rule if it has the effect of disclosing "the essence of what takes place in the grand jury room." In re Grand Jury Investigation (SCI), 630 F.2d 996, 1000 (3d Cir. 1980). Rule 6(e) does not protect materials that are created independently

---

[3] Paragraph E.4 of Case Management Order No. 1, issued on January 19, 2010, describes the procedure to be used by the parties in resolving discovery disputes.

17

of the grand jury process. In re Grand Jury Matter (Garden Court), 697 F.2d 511, 513 (3d Cir. 1982). See also United States v. Chang, 47 F. App'x 119, 121-22 (3d Cir. 2002) (non-precedential) ("[I]nformation does not become a matter occurring before the grand jury simply by being presented to the grand jury, particularly where it was developed independent of the grand jury.")[4]

According to defendants, a request for all documents submitted to the grand jury would permit a discerning attorney to learn the pattern of the grand jury's investigation and, therefore, the essence of what is occurring before the grand jury. They cite In re Sulfuric Acid Antitrust Litigation, in which a district court denied a request for "all documents relating to Sulfuric Acid which you have provided to . . . any government agency or legislative body or representative . . . ." on the grounds that such a sweeping request would threaten grand jury secrecy. No. 1536, 2004 WL 769376, at *3-*4 (N.D. Ill. Apr. 9, 2004). However, the case on which the Sulfuric Acid court relied to reach this conclusion, Board of Education of Evanston Township High School District No. 202, Cook County, Illinois v. Admiral Heating and Ventilation, Inc., 513 F. Supp. 600, 604 (N.D. Ill. 1981), involved not only a request for all documents submitted to the grand jury, but a copy of the grand jury subpoenas as well. This fact "of course add[ed] to the danger . . . under which document disclosure effectively becomes disclosure of grand jury proceedings." Id.

A more persuasive case is In re Graphics Processing Units Antitrust Litigation, where the court noted that nothing in Rule 6(e) prevents defendants from responding to a discovery request seeking all documents turned over to the grand jury before ruling that grand jury secrecy would not be compromised by the production of such documents. No. 06-07417, 2007 WL 2127577, at *3 (N.D. Cal. July 24, 2007). Moreover, to the extent that the documents in question were prepared

---

[4] Although this opinion is not precedential, the Court nevertheless finds it instructive.

18

antecedent to and independent of the grand jury investigation, there is less likelihood that their production will reveal the essence of what is occurring in the grand jury room. See United States v. Dynavac, Inc., 6 F.3d 1407, 1411 (9th Cir. 1993) ("In sum, we think that the disclosure of business records independently generated and sought for legitimate purposes, would not seriously compromise the secrecy of the grand jury's deliberations." (internal quotation marks omitted)); In re Wirebound Boxes Antitrust Litig., 126 F.R.D. 554 (D. Minn. 1989) (ordering defendants to produce for plaintiffs documents created independently of a grand jury investigation).

Concerns of grand jury secrecy do not support a further stay of discovery on the present state of the record. The Court has not reviewed any documents requested by plaintiffs (indeed, the record is unclear as to whether plaintiffs have actually requested copies of the documents turned over to the grand jury) and, accordingly, it cannot rule on the merits of defendants' objections on this ground. Should a dispute arise over whether specific documents might reveal the essence of what occurs before the grand jury, it should be presented to the Court by letters as directed in Case Management Order No. 1.

## C. The Motion to Stay Discovery Pending Resolution of the Parallel Criminal Investigation

In deciding whether to stay a case pending a parallel criminal investigation, courts in this district typically consider five factors: (1) prejudice to plaintiff, (2) prejudice to defendant, (3) judicial efficiency, (4) interests of non-parties, and (5) the public interest. See Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc., 87 F.R.D. 53, 56 (E.D. Pa. 1980). Defendants argue that each of these factors weigh in favor of a stay: plaintiffs will not be prejudiced because they can be compensated for a delay in money damages, defendants will be greatly prejudiced by defending

19

civil and criminal suits at the same time, judicial efficiency will be enhanced because resolution of the criminal investigation may narrow the issues that must be decided in civil litigation, non-parties—such as employees of defendants - will not be forced to choose between invoking their right to remain silent under the Fifth Amendment and speaking out on their employer's behalf, and the public interest in the orderly administration of justice is furthered by preventing a civil proceeding from interfering with a criminal one.

Defendants' arguments are unpersuasive on the present state of the record. The stay of a civil case is an "extraordinary remedy appropriate for extraordinary circumstances." Weil v. Markowitz, 829 F.2d 166, 174 n.17 (D.C. Cir. 1987). At this time, the criminal grand jury investigation is still in its infancy. Because no criminal proceeding has been initiated, and may never be initiated, defendants are asking for a stay of an undetermined, but possibly prolonged, period of time. Under these circumstances, the prejudice to plaintiffs is great and courts are reluctant to order a stay. See, e.g., In re Plastics Additives Antitrust Litig., No. 03-2038, 2004 WL 2743591, at *5 (E.D. Pa. Nov. 29, 2004); In re Residential Doors Antitrust Litig., 900 F. Supp. 749, 756 (E.D. Pa. 1995); In re MGL Corp., 262 B.R. 324, 328 (Bankr. E.D. Pa. 2001). On the other side of the balance, the potential prejudice to defendants and third-parties is, at this pre-indictment period of time, speculative. See Plastics Additives, 2004 WL 2743591, at *6. The judiciary's interests are furthered by the "just, speedy, and inexpensive determination of every action and proceeding," a policy at odds with a stay of indeterminate length. See Fed. R. Civ. P. 1; see also Plastics Additives, 2004 WL 2743591, at *7 (noting, under similar circumstances, that it was uncertain "whether future criminal proceedings will alleviate the evidentiary and analytical burdens on the parties and on the court."). Finally, the public's interest in the enforcement of the antitrust laws is furthered by the expeditious resolution

20

of this class-action lawsuit. See Plastics Additives, 2004 WL 2743591, at * 7.

The Court concludes that a stay of discovery pending resolution of the parallel criminal investigation is inappropriate. Defendants' concerns regarding the Fifth Amendment, among other things, can be managed by the court on a case-by-case basis. For the foregoing reasons, the motion to stay discovery pending resolution of the parallel criminal investigation is denied.

## V. CONCLUSION

The allegations of a conspiracy between Immucor and Ortho-Clinical in the Complaint are plausible when viewed in context and as a whole. Accordingly, Immucor's motion is denied and the motion of Ortho-Clinical and Johnson & Johnson Health Care Systems is denied as it relates to Ortho-Clinical. The allegation that Johnson & Johnson Health Care systems was a member of a conspiracy is implausible; the motion to dismiss filed by Ortho-Clinical and Johnson & Johnson Health Care Systems is granted as it relates to Johnson & Johnson Health Care Systems.

Defendants' Motion for Stay of Discovery Pending the Court's Ruling on Their Motions to Dismiss is denied as moot. For the reasons set forth above, defendants' Motion for Stay of Discovery Pending Completion of Parallel Criminal Investigations is denied on the present state of the record. An appropriate order follows.