**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
|  | : |  |
| IN RE: BLOOD REAGENTS ANTITRUST | : | MDL No. 09-2081 |
| LITIGATION | : |  |
|  | : | ALL CASES |
|  | : |  |
| _____ | : |  |

DuBOIS, J.                                                      August 22, 2012

**M E M O R A N D U M**

**TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................................................... 2

II.  BACKGROUND ...................................................................................................... 3

  A.  Background on Blood Reagents ........................................................................ 3

  B.  Creation of Duopoly by Ortho and Immucor .................................................. 5

  C.  Post-Duopoly Price Increases .......................................................................... 5

    1.  Operation Create Value ............................................................................... 5

    2.  Blood Bank Leadership Program ................................................................. 7

  D.  The Alleged Price-Fixing Conspiracy .............................................................. 8

  E.  2005 Price Increases ......................................................................................... 9

  F.  2008 Price Increases ....................................................................................... 11

  G.  Procedural History .......................................................................................... 11

III. LEGAL STANDARD ........................................................................................... 12

IV.  DISCUSSION ........................................................................................................ 14

  A.  Rule 23(a) Requirements ................................................................................ 14

    1.  Numerosity .................................................................................................. 14

    2.  Commonality ............................................................................................... 15

    3.  Typicality .................................................................................................... 16

    4.  Adequacy of Representation ....................................................................... 16

  B.  Rule 23(b)(3) Requirements ........................................................................... 17

    1.  Predominance .............................................................................................. 17

**a.  Violation of § 1 of the Sherman Act**.................................................... 19

**b.  Antitrust Impact**............................................................................... 19

   **1.  Bogosian Shortcut**..................................................................... 20

   **2.  Market Structure Analysis**......................................................... 22

   **3.  Empirical Pricing Analysis**......................................................... 26

   **4.  Defendants' Documents**............................................................. 27

   **5.  Damages Calculation**................................................................ 28

**c.  Damages**.......................................................................................... 31

   **1.  Legal Standard**........................................................................ 31

   **2.  Damages Models Offered by Dr. Beyer**........................................ 32

   **3.  Ortho's Criticisms of Dr. Beyer's Damages Models**....................... 35

      **i.  Common Proof Versus Individualized Proof**............................ 36

      **ii.  General Reliability Arguments**........................................... 37

      **iii.  The RhoGAM Yardstick**.................................................. 40

**d.  Fraudulent Concealment**..................................................................... 42

  **2.  Superiority**.................................................................................. 44

**V.  CONCLUSION**...................................................................................... 45

# I.  INTRODUCTION

In these consolidated antitrust actions, plaintiffs allege that the two leading producers of blood reagents—Immucor, Inc. ("Immucor") and Ortho Clinical Diagnostics, Inc. ("Ortho")—conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Presently before the Court is Plaintiffs' Motion for Class Certification.  On July 26, 2012, the Court received evidence, including testimony from Ortho's economic expert, and held oral argument on the motion.  Plaintiffs' economic expert provided rebuttal testimony on August 6, 2012.[1]  For the reasons set forth below, Plaintiffs' Motion for Class Certification is granted.

---

[1] There were no objections to the documentary evidence received, and no <u>Daubert</u> motions were filed.  Reliability objections to the testimony of plaintiff's economic expert are addressed and rejected in this Memorandum.

## II.    BACKGROUND

Between 2000 and 2009, defendants drastically increased the prices of their blood reagent products.  Many products' prices rose by more than 2000% during that period.  (See Beyer Report, Pls.' Mot. Ex. 1, at 13, 14.)  The parties agree that some part of this increase resulted from the creation of a duopoly in the blood reagents industry in 1999 as a result of the acquisition of numerous manufacturers of blood reagents by defendants over a period of several years.  However, plaintiffs allege that an unlawful horizontal price-fixing agreement that began in November 2000 accounts for much of the increase.  Ortho argues primarily that even if there were such an agreement, the class should not be certified because plaintiffs have failed to offer a reliable methodology to distinguish between lawful and unlawful price increases.

### A.    Background on Blood Reagents

Blood reagents are used to identify properties of human blood.  Most large purchasers of blood reagents are blood donor centers and hospitals, which use them to test whether the blood of a potential donor is compatible with the blood of a potential recipient.  (See Report of Teresa Harris ("Harris Report"), Pls.' Mot. Ex. 2, at 3.)  Under applicable FDA regulations, Blood Bank and Transfusion Standards promulgated by the American Association of Blood Banks ("AABB"), and other rules, a blood donor center must test a donor's ABO group and Rh type and perform an antibody screen each time he or she donates.  (Id. at 9.)  A hospital must conduct similar tests on a recipient before providing a blood transfusion.  (Id.)

There are two basic categories of blood reagents: traditional and automated.  Although both Ortho and Immucor sold products in both categories throughout the class period, the putative class in this case includes only purchasers of traditional blood reagents ("TBR").  When using TBR, laboratory technicians test blood manually in test tubes and interpret the results.  (Id. at 6.)  "Automated" or "proprietary" blood reagents ("ABR"), on the other hand, are often used

with specialized equipment.  (Id.)  They allow quicker testing while requiring less skill and decreasing the risk of technician error.  (See, e.g., Pls.' Mot. Ex. 22, at 13 (citing the benefits of ABR as "[s]ignificant labor reduction," "[i]ncreased productivity/efficiency," and "[i]ncreased patient safety").)  ABR tend to be more expensive than TBR.  (See, e.g., Weiss Decl., Pls.' Reply Ex. 149, ¶ 14.)  The parties dispute the extent to which defendants' customers were able to use TBR and ABR interchangeably.

During the class period, Ortho and Immucor each sold more than forty different TBR products.  (See, e.g., Harris Report Ex. C.)  A list provided by plaintiffs' industry expert, Teresa Harris, shows that most Ortho TBR products had an equivalent Immucor TBR product, and vice versa.  (See id.; see also, e.g., Poynter Decl. ¶ 29.)  Ms. Harris testified in her deposition that a few of the products that she paired in the list are not identical.  (See Harris Dep., Def.'s Opp. Ex. B, at 64-65, 143-44.)  However, she opines that those nonidentical pairs "perform exactly the same function."  (Harris Reply Report, Pls.' Reply Ex. B, at ¶ 3.)

The blood-reagents market features significant barriers to entry.  Most importantly, a prospective entrant must obtain FDA approval before beginning to market and sell blood reagents.  This process takes several years.  (See, e.g., Pls.' Mot. Ex. 9, at 4 (2003 interview in which Immucor CEO Edward Gallup stated, "[T]he FDA is very often our friend . . . . [S]ix years is a long time—but, even if it were half that, it's still a huge barrier to entry."); Pls.' Mot. Ex. 62, at 1 (Immucor strategy document stating that "[t]here are high barriers to entry.  To enter the market, a company must meet FDA Regulations, which takes approximately five to six years to gain approval.").)  Toward the end of the class period, in or around 2008, two new TBR producers entered the market.  (See, e.g., Def.'s Opp. 18-19.)

B.     Creation of Duopoly by Ortho and Immucor

In the 1980s and 1990s, the TBR market was highly competitive, with more than a dozen competitors.  (Pls.' Mot. Ex. 9, at 2.)  During that period, there was intense price competition, (see, e.g., id.; Pls.' Mot. Ex. 10, at 1), and TBR prices and profitability were low, (see, e.g., Pls.' Mot. Ex. 5, at 4 (showing Immucor's gross profits declining steadily between 1995 and 2000)).  As a result, Immucor approached bankruptcy, (see, e.g., Pls.' Mot. Ex. 7), and Ortho considered exiting the TBR industry, (see, e.g., Pls.' Mot. Ex. 12, at 12), in those years.

In the 1990s, Immucor began to acquire competing TBR producers.  (See, e.g., Pls.' Mot. Ex. 9, at 3; Pls.' Mot. Ex. 19, at 1.)  After Immucor acquired Gamma Biological in 1998 and the Biological Corporation of America in 1999, Immucor and Ortho had a duopoly in the United States TBR market.  (See, e.g., Pls.' Mot. Ex. 10, at 1; Pls.' Mot. Exs. 22-24.)  Defendants anticipated that this market consolidation would allow them to raise prices and increase their profitability.  (See, e.g., Pls.' Mot. Ex. 19 (statement of Immucor CEO that "by buying up its competition and consolidating the marketplace into two key players, Immucor can raise its prices"); cf. Pls.' Mot. Ex. 21.)  Immucor's market share in North America was slightly larger than Ortho's throughout the class period.  (See, e.g., Pls.' Mot. Exs. 22-24 (showing Immucor with a market share of approximately 55% and Ortho with a market share of approximately 45% in 1999 and 2007).)

C.     Post-Duopoly Price Increases

**1.     Operation Create Value**

Shortly after Ortho and Immucor created their duopoly, Ortho developed a pricing strategy it called "Operation Create Value" ("OCV").  (See, e.g., Pls.' Mot. Ex. 43, at 1.)  Ortho began work on OCV at least as early as October 1999.  (Id.)  With the assistance of a consulting firm, Ortho decided to increase the prices it charged all TBR customers by 25% in 2000 and by

5

an additional 25% in 2001.  (Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 47, at 13.)  Ortho

anticipated that it would impose additional "increases yearly thereafter until profitability

achieved."  (Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 54, at 10 (describing OCV as

consisting of "5+ years of annual 25% price increases").)  In developing the strategy, Ortho

focused heavily on whether Immucor would follow its price increases and, if so, when the

Immucor price increases would take place.  (See, e.g., Pls.' Mot. Ex. 47, at 20-22, 39.)  Ortho

rejected larger proposed price increases—as large as 100% per year—because of the risk of

customer loss.  (See, e.g., Def.'s Opp. Ex. 46.)

Ortho implemented the first 25% price increase under OCV in April 2000.  (Pls.' Mot.

Ex. 49, at 1; Pls.' Reply Ex. 156.)  Many customers did not actually experience a price increase

at that time, however, because Ortho could not increase customers' prices until their existing

contracts expired.  (See Beyer Reply Report, Pls.' Reply Ex. A, at ¶ 73; 7/26/12 Hr'g Tr. 97;

Poynter Decl., Pls.' Reply Ex. 150, at ¶ 31.)  As a result, Ortho's average TBR prices increased

by less than 25% in 2000.  (See, e.g., 7/26/12 Hr'g Tr. 188-91 (testimony of Dr. Bronsteen that

average prices of particular TBR products increased by about 10% between 1999 and 2000).)

Immucor implemented similar price increases around the same time.  For example, in an

October 2000 email, Immucor's CEO, Edward Gallup, told a shareholder that Immucor had

begun to increase customers' prices in June 2000 as their existing contracts ended.  (Pls.' Mot.

Ex. 50, at 1; see also Poynter Decl. ¶ 4 (stating that "Immucor implemented an approximately

20% price increase on traditional blood reagents in June 2000").)  Gallup wrote that it was

Immucor's goal "to affect [sic] a 10-20% price increase over the next 12 months to all domestic

customers."  (Id.; see also Pls.' Mot. Exs. 51-52; Poynter Decl. ¶ 5 ("Immucor wanted to target

20% price increases on blood reagents over the next 12 months.").)  Gallup further explained,

"While there is always some risk of losing customers, early indications are that our only competitor in the U.S. (Ortho Clinical Diagnostics division of [Johnson & Johnson]) is doing the same."  (Pls.' Mot. Ex. 50, at 1-2.)

### 2.    Blood Bank Leadership Program

In the fall of 2000, Ortho considered a different, more aggressive pricing strategy that came to be known as the Blood Bank Leadership Program ("BBLP").  An internal Ortho document dated September 15, 2000, enumerated three options: (1) "stay the course" by continuing the 25% annual price increases planned under OCV, (2) exit the TBR market altogether, or (3) enact the BBLP.  (Pls.' Mot. Ex. 54, at 2.)  Ortho hoped that the larger price increases under the BBLP would increase gross profit margins on all of its TBR products to at least 40%.  (Id. at 4.)  In considering whether to implement the BBLP, as with OCV, Ortho focused on the risk that Immucor might not "follow aggressively."  (Id. at 11.)  As early as October 30, 2000, Ortho developed price lists under the BBLP and prepared to inform its customers of the price increases.[2]  (Pls.' Mot. Ex. 56.)  The BBLP price increases varied by TBR product but resulted in an overall increase of 200 to 300 percent in TBR prices between 2000 and 2002.  (Pls.' Mot. Ex. 11, at 3; see also Pls.' Mot. Ex. 56.)

---

[2]    As detailed in Section II.D, infra, plaintiffs presented evidence that Ortho did not charge the BBLP prices to any customer until after it allegedly engaged in unlawful price-related conversations with Immucor.  At the class certification hearing, the parties disputed the probative value of a slide contained in an October 30, 2000, Ortho presentation regarding the BBLP.  The slide is labeled "Communication with Customers," and it lists the names of seven major customers alongside dates ranging from September 27, 2000, to October 20, 2000.  (Pls.' Mot. Ex. 56, at 5.)  The record contains no evidence regarding the nature of any communications between Ortho and those customers.  Ortho contends that the slide establishes that it had already implemented the BBLP prior to the alleged price-fixing conspiracy, which plaintiffs contend began in November 2000.  Plaintiffs argue that, even if Ortho engaged in some kind of discussion with select customers in September and October of 2000, Ortho did not finalize the BBLP until after its allegedly unlawful communications with Immucor.  On the present state of the record, the Court finds that the slide does not establish that Ortho implemented the BBLP before the AABB meeting, which began on November 4, 2000.

D.      The Alleged Price-Fixing Conspiracy

Plaintiffs allege that defendants began to engage in unlawful pricing-related

communications at an annual meeting of the American Association of Blood Banks ("AABB").

The meeting took place in Washington, D.C., between November 4, 2000, and November 8,

2000, and Ortho and Immucor executives were in attendance.  (See, e.g., Pls.' Mot. Ex. 59, at 1.)

At the AABB meeting, Immucor executives watched a presentation in which Ortho

announced the BBLP price increases.[3]  (See, e.g., Thorne Dep., Pls.' Mot. Ex. 60, at 206;

DeMezzo Dep., Pls.' Mot. Ex. 153, at 88.)  Ortho's president, Catherine Burzik, also stopped by

the Immucor booth and introduced herself to Mike Poynter, an Immucor executive.  (Poynter

Decl. ¶ 7.)  She asked Poynter to "pass [her business card] along to Ed Gallup, [Immucor's

CEO,] because she wanted to speak with him."  (Id.)  "Ms. Burzik told [Poynter] that she had

recently joined Ortho, that Ortho's margins on traditional blood reagents were terrible, and that

she wanted to understand the margin situation regarding traditional blood reagents.  She also

asked if [Poynter] had seen Ortho's presentation and invited [him] to come to the Ortho booth to

see it."  (Id.)

In mid-November 2000, shortly after the AABB meeting, Gallup, Immucor's CEO, asked

Judy Thorne, Immucor's Director of Marketing, to meet with an Ortho employee to "find out a

range of where Ortho may be considering putting the pricing."  (Thorne Dep. 206.)  Shortly after

Gallup made that request, Thorne had lunch with David Gendusa, a Regional Vice President for

Ortho.  (Id. at 206, 208.)  At the lunch meeting, Gendusa "showed [Thorne] the range that [Ortho

---

[3]      At the class certification hearing, Ortho provided the Court with the Supplemental
Declarations of Mike Poynter and Bill Weiss, two Immucor executives.  In those declarations,
Poynter and Weiss aver that they do not "remember anything being said during [Ortho's]
presentation about a 2001 price increases or anything about Ortho's future pricing plans."  (Supp.
Poynter Decl. ¶ 8; see also Supp. Weiss Decl. ¶ 5.)  However, other Immucor employees who
attended the AABB meeting testified to the contrary.

was] considering" for about twenty-five TBR products but did not give her a copy of the price list.  (Id.)  Thorne wrote down the prices for several categories of products, returned to the office, and gave the information to Gallup.  (Id. at 207-09.)  Gallup instructed Thorne to "expense the lunch as if he was the person [she] had lunch with," presumably to conceal her communications with Gendusa.  (Cangiamilla Dep., Pls.' Reply Ex. 152, at 45-46.)

Immucor changed its pricing strategy drastically after learning of Ortho's plans.  On November 17, 2000, Immucor's Vice-President of Sales sent an email stating, "We are going to increase prices around the first of the year so look out.  We are going to piss off a lot of people, but Ortho is going to do the same!!!  So maybe we will start getting profitable!"  (Pls.' Mot. Ex. 64, at 1.)  Ortho sent its customers a letter with the BBLP price list on November 21, 2000.  (Def.'s Opp. Ex. 27, at ORTHOCD-0834002.)  Immucor received a copy of the price list from a customer on December 1, 2000.  (Def.'s Opp. Ex. 39.)  In 2001 and 2002, Immucor raised prices on its TBR products by between 247% and 400%.  (See, e.g., Pls.' Mot. Ex. 62, at 1.)  Ortho raised prices on its TBR products by between 200% and 300% during the same period.  (See, e.g., Pls.' Mot. Ex. 11, at 3, 5.)  The price increases became effective for different customers at different times, depending on when their existing contracts expired.  (See, e.g., Def.'s Opp. 27-28, 30-31.)

E.    2005 Price Increases

Plaintiffs allege that the November 2000 communications initiated a lengthy conspiracy through which defendants colluded to impose substantial price increases throughout the class period.  While prices rose somewhat between 2002 and 2004, (see, e.g., Beyer Report figs.1-4), the next "major price increase initiative[]" was implemented in 2005, (id. ¶ 29).

Both firms increased the prices of their TBR products significantly in 2005.  (See, e.g., Pls.' Mot. Ex. 67 (12/20/04 email from Immucor sales representative stating that "Blood Bank

reagents went up approximately 300% in 2001 and now they are rising another 125%"); Pls.'
Mot. Ex. 88 (4/12/06 internal Ortho email referring to Ortho's 125% price increase in 2005 and
"the fact that Immucor also followed"); Beyer Report tbl.7 (showing that the 2005 increase
raised the prices of Immucor's top ten TBR products by 115% to 316%).)  Plaintiffs have
presented evidence that each defendant was confident that the other would not deviate from this
strategy.  (See, e.g., Pls.' Mot. Ex. 91.)

     Plaintiffs also note that both defendants cancelled contracts with important group
purchasing organizations ("GPOs") in order to implement the price increase.  (See, e.g., Pls.'
Mot. Ex. 94, at 2.)  According to plaintiffs, the GPOs comprised a large share of sales for
Immucor and Ortho, which would have made those cancellations highly risky absent collusion.
(Pls.' Mot. 21-22; Beyer Report ¶ 36.)  The cancellations were nearly simultaneous: for example,
both Ortho and Immucor decided to terminate their contracts with one GPO, Premier, during the
fall of 2004.  (Pls.' Mot. Ex. 94, at 2.)  The cancellations of the Premier contract by Ortho and
Immucor became effective on December 31, 2004, and January 26, 2004, respectively.  (Pls.'
Mot. Ex. 96.)  Both defendants also cancelled their contracts with another GPO, Novation,
around the same time.  (Id.)

     With its 2005 price increases, Immucor introduced two new TBR pricing programs.
First, in October 2004, Immucor informed its remaining GPO customers that they could obtain
"price protection," freezing their TBR prices at 2004 levels for five years, if they purchased
Immucor's ABR instrument.  (Def.'s Opp. Ex. 70.)  Second, Immucor introduced a "Customer
Loyalty Program" that separated customers into three pricing tiers depending on their
"commitment" to purchasing Immucor's TBR.  (See Def.'s Opp. Ex. 71.)  Customers that
promised to purchase 90% of their TBR from Immucor received "Level II" prices.  (Id.)

Customers that promised to purchase 70% of their TBR from Immucor received "Level I" prices. (Id.)  Customers that did not make such a commitment received "Base" prices.  (Id.)  In 2005, Base, Level I, and Level II prices increased by 95%, 70%, and 58%, respectively.  (Def.'s Opp. Ex. 72.)

F.      2008 Price Increases

In March 2008, Ortho implemented a final significant price increase, raising TBR prices by an average of 100%.  (Def.'s Opp. Ex. 80, at 2.)  Ortho notified customers of the increase in December 2007 and January 2008.  (Def.'s Opp. Ex. 81, at 7.)  In July 2008, Immucor implemented its own price increase.  Having reconfigured its pricing tiers since 2004, Immucor increased prices by 20% for customers in its "Automation" tier and by 50% for customers in its "Base" tier.  (Def.'s Opp. Ex. 99.)  The price increase did not apply to GPOs.  (Id.)

G.      Procedural History

Plaintiffs began to file civil lawsuits against Ortho and Immucor in 2009, shortly after the Antitrust Division of the Department of Justice opened a criminal grand jury investigation into blood reagents pricing.  By Orders dated August 17, 2009, and August 19, 2009, the Judicial Panel on Multidistrict Litigation transferred twenty-three of those cases to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.  Another ten cases were originally filed in this Court.  By Order dated December 23, 2009, this Court consolidated these thirty-three cases pursuant to Federal Rule of Civil Procedure 42(a).

Plaintiffs filed a Consolidated Amended Class Action Complaint on February 15, 2010. On August 23, 2010, the Court denied Ortho and Immucor's motion to dismiss the Amended

Class Action Complaint.[4]  See In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 623 (E.D. Pa. 2010).  The Court denied their motion for reconsideration of that ruling on December 14, 2010.  See In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 637 (E.D. Pa. 2010).

On March 5, 2012, the Court granted preliminary approval of a proposed settlement between Immucor and plaintiffs.  Plaintiffs filed a motion for final approval of the settlement on May 23, 2012, and a fairness hearing was held on June 15, 2012.  Although the Court has not yet ruled on the motion for final approval of the Immucor settlement, the response and surreply to Plaintiffs' Motion for Class Certification were filed in Ortho's name only.

The Court held a hearing on Plaintiffs' Motion for Class Certification on July 26, 2012.  Counsel for plaintiffs and for Ortho presented argument at the hearing.  Ortho's economic expert, Dr. Peter Bronsteen, testified, and plaintiffs' counsel cross-examined him.  Plaintiffs' economic expert, Dr. John C. Beyer, was unable to attend the July 26, 2012, hearing due to health issues.  However, plaintiffs presented Dr. Beyer's rebuttal testimony to the Court by video, which was recorded on August 6, 2012.  Counsel for Ortho also cross-examined Dr. Beyer during the August 6, 2012, proceedings.

## III.    LEGAL STANDARD

Subsection (a) of Federal Rule of Civil Procedure 23 sets out four prerequisites for a class action.  The Rule 23(a) requirements are known as numerosity, commonality, typicality, and adequacy.  Subsection (b) provides additional requirements for each type of class action.  To obtain certification under Rule 23(b)(3), as plaintiffs seek to do in this case, the moving party must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available

---

[4]     The Court dismissed plaintiffs' claims against Ortho's parent company, Johnson & Johnson Health Care Systems.  See In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 623, 633 (E.D. Pa. 2010).

methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These requirements are known, respectively, as predominance and superiority.

The Third Circuit recently emphasized that a district court must conduct a "rigorous analysis" in deciding whether to certify a class.  See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 306 (3d Cir. 2008).  "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met." Id. at 307.  "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."  Id.

Moreover, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action."  Id. at 307.  However, "there is no 'claims' or 'merits' litmus test incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof."  Sullivan v. DB Invs., Inc., 667 F.3d 273, 305 (3d Cir. 2011).  "[A] district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied."  Id.

"Finally, the court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it."  Hydrogen Peroxide, 552 F.3d at 307.  "The court must . . . examine critically expert testimony on both sides and may be persuaded by either side as to whether a certification requirement has been met."  Behrend v. Comcast Corp., 655 F.3d 182, 190 (3d Cir. 2011).[5] "Performing a rigorous analysis may require the district court to weigh conflicting expert

---

[5] The Supreme Court granted certiorari in Behrend on June 25, 2012.  See 80 U.S.L.W. 3707 (U.S. June 25, 2012) (No. 11-864).

testimony at the certification stage and determine whether an expert's opinion is persuasive or unpersuasive." Behrend v. Comcast Corp., 264 F.R.D. 150, 155 (E.D. Pa. 2010) (citing Hydrogen Peroxide, 552 F.3d at 323-24).

## IV.   DISCUSSION

Ortho does not dispute that the Rule 23(a) requirements and the Rule 23(b)(3) superiority requirement are satisfied in this case. The Court thus addresses those issues only briefly and focuses its analysis on the Rule 23(b)(3) predominance requirement, which is hotly contested. After a rigorous analysis of the evidence and argument offered by both parties, the Court finds that plaintiffs have established the Rule 23(a) and Rule 23(b)(3) requirements by a preponderance of the evidence.

     A.     Rule 23(a) Requirements

          **1.**     **Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Satisfaction of this standard "does not require evidence of the exact number or identification of the members of the proposed class." In re Linerboard Antitrust Litig., 203 F.R.D. 197, 205 (E.D. Pa. 2001). "'Generally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met.'" In re OSB Antitrust Litig., No. 06-826, 2007 WL 2253418, at *2 (E.D. Pa. Aug. 3, 2007) (quoting Ketchum v. Sunoco, Inc., 217 F.R.D. 354, 357 (E.D. Pa. 2003)).

In this case, transactional data produced by defendants shows that thousands of customers purchased TBR directly from defendants during the class period. (See, e.g., Beyer Reply 54-55.) This renders joinder highly impracticable and satisfies the numerosity requirement.

2.        **Commonality**

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class."

Satisfaction of the commonality requirement requires that plaintiffs demonstrate that their claims

"depend upon a common contention," the resolution of which "will resolve an issue that is

central to the validity of each one of the claims in one stroke."  Wal-Mart Stores, Inc. v. Dukes,

131 S. Ct. 2541, 2551 (2011).  "Commonality does not require an identity of claims or facts

among class members; instead, [t]he commonality requirement will be satisfied if the named

plaintiffs share at least one question of fact or law with the grievances of the prospective class."

Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 184 (3d Cir. 2011) (internal quotation marks

omitted); see also Marcus v. BMW of N. Am., LLC, Nos. 11-1193, 11-1192, 2012 WL 3171560,

at *10 (3d Cir. Aug. 7, 2012).

"Courts interpreting the commonality requirement in the antitrust area have held that

allegations concerning the existence, scope and efficacy of an alleged conspiracy present

questions adequately common to class members to satisfy the commonality requirement."

Linerboard, 203 F.R.D. at 205 (internal quotation marks omitted); see also, e.g., In re Bulk

(Extruded) Graphite Prods. Antitrust Litig., No. 02-6030, 2006 WL 891362, at *5 (D.N.J. Apr. 4,

2006).  In this case, plaintiffs' allegations include a number of common issues, including (1)

whether defendants conspired to raise, fix, maintain and/or stabilize the price of blood reagents

in the United States, (2) the duration of the conspiracy, and (3) the nature and character of the

acts performed by defendants in furtherance of the conspiracy.  "Resolving the allegations

surrounding" defendants' alleged conduct in conspiring to fix TBR prices "will resolve issues

that are 'central to the validity of each one of the claims in one stroke.'"  In re Flonase Antitrust

Litig., No. 08-3301, 2012 WL 2277840, at *8 (E.D. Pa. June 18, 2012).  This suffices to satisfy

the commonality requirement.

### 3.      Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  To conduct the typicality inquiry, the court must examine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006).  "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."  Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631 (3d Cir. 1996).  "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class."  Marcus, 2012 WL 3171560, at *11.

In this case, plaintiffs allege that the same unlawful conduct injured the class representatives and the absent class members.  All members of the putative class are direct purchasers of TBR and allege that they made their purchases at supracompetitive prices.  This is sufficient to satisfy the typicality requirement.  See, e.g., In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 480 (W.D. Pa. 1999) ("[T]he named class members' claims, as well as the claims of the proposed classes, arise from the alleged price-fixing scheme perpetrated by defendants[,] [which is] the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid.").

### 4.      Adequacy of Representation

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class."  "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to

conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" <u>McDonough v. Toys R Us, Inc.</u>, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (quoting <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 313 (3d Cir. 2007)). "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.'" <u>Id.</u> (quoting <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 532 (3d Cir. 2004)).

The first element—the qualification of plaintiffs' attorneys—is satisfied. Plaintiffs' lead counsel has extensive experience in complex antitrust class actions and has ably performed his duties as interim class counsel. The Court concludes that plaintiffs' counsel are "qualified, experienced, and generally able to conduct the proposed litigation." <u>New Directions</u>, 490 F.3d at 313.

As to the second element, there is no evidence of any conflict of interest between the named plaintiffs and the absent members of the putative class. Each class member allegedly purchased TBR directly from Ortho or Immucor during the class period at a supracompetitive price. "Each class member holds a strong common interest in establishing [defendants'] liability for these alleged overcharges." <u>Flonase</u>, 2012 WL 2277840, at *9.

The Court thus finds that the adequacy requirement is satisfied.

B.    <u>Rule 23(b)(3) Requirements</u>

To obtain class certification under Rule 23(b)(3), plaintiffs must also demonstrate predominance and superiority by a preponderance of the evidence.

### 1.    **Predominance**

Predominance is the only certification requirement contested by the parties. Ortho argues that plaintiffs have failed to present a reliable method of proving two elements of their claim—antitrust impact and the amount of damages—using predominantly common proof. Ortho also

contends that the individual issues involved in evaluating whether individual plaintiffs are entitled to tolling of the statute of limitations based on fraudulent concealment preclude a finding of predominance.

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  "It 'is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws,' but a court may not relax its certification analysis as to each element of Rule 23."  Behrend, 655 F.3d at 191 (quoting Amchem, 521 U.S. at 625); see also Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 815 (7th Cir. 2012) ("[C]areful application of Rule 23 is necessary in antitrust cases, as in all cases, and . . . in antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification." (internal quotation marks omitted)).

Certification is "only appropriate in antitrust cases where plaintiffs can show, by a preponderance of the evidence, that proof of the essential elements of the cause of action, including antitrust injury, do not require individual treatment."  In re K-Dur Antitrust Litig., Nos. 10-2077, 10-2078, 10-2079, 10-4571, 2012 WL 2877662, at *17 (3d Cir. July 16, 2012); see also In re Am. Int'l Grp., Inc. Sec. Litig., No. 10-4401, 2012 WL 3264048, at *6 (2d Cir. Aug. 13, 2012) ("'A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof.'" (quoting Sullivan, 667 F.3d at 335)).  Thus, to obtain certification, plaintiffs must establish by a preponderance of the evidence that common proof will predominate at trial with respect to each of the essential elements of their antitrust claim: (1) that defendants violated § 1 of the Sherman

Act, (2) the fact of damages arising from the unlawful activity ("antitrust impact"), and (3) the amount of damages sustained because of the unlawful activity. See, e.g., Linerboard, 203 F.R.D. at 214. The Court analyzes each of these essential elements and then addresses Ortho's defense of statute of limitations and the issue of fraudulent concealment.

a.    Violation of § 1 of the Sherman Act

In horizontal price-fixing cases, courts routinely hold that common proof predominates in determining whether an unlawful conspiracy existed. See, e.g., Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 105 (2d Cir. 2007); McDonough, 638 F. Supp. 2d at 479-80; Lumco Indus., Inc. v. Jeld-Wen, Inc., 171 F.R.D. 168, 172 (E.D. Pa. 1997). Ortho does not argue that evaluation of the particular allegations of concerted action in this case might require individual proof. The Court thus concludes that the predominance requirement is satisfied with respect to proof of an antitrust violation.

b.    Antitrust Impact

Antitrust impact is the "fact of damage" resulting from a violation of the antitrust laws. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977). "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." Hydrogen Peroxide, 552 F.3d at 311. "Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits each class member must do so." Id. at 311-12; see also Behrend, 655 F.3d at 197 (holding that, at the certification stage, a court need not "reach into the record and determine whether [p]laintiffs actually have proven antitrust impact" but must determine whether plaintiffs "demonstrated by a preponderance of the evidence that they could prove antitrust impact through common evidence at trial"). Instead, at the certification stage, plaintiffs must show that their theory of impact is

"plausible in theory" and "susceptible to proof at trial through available evidence common to the class." Behrend, 655 F.3d at 198.

In this case, plaintiffs assert that they will prove antitrust impact using five elements of common proof: (1) application of the so-called "Bogosian shortcut," (2) Dr. Beyer's analysis of the structure of the TBR market, (3) Dr. Beyer's empirical analysis of TBR prices during the class period, (4) documents produced by defendants, and (5) Dr. Beyer's proposed methods of calculating the amount of damage each class member suffered. Ortho heavily criticizes these alleged elements of common proof. The Court concludes, however, that plaintiffs have presented a theory of impact that is "plausible in theory" and susceptible to proof through common evidence, which is sufficient at the class-certification stage. Id.

### 1.      **Bogosian Shortcut**

In Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977), the Third Circuit recognized that under certain circumstances, a court considering a class certification motion may presume antitrust impact. Specifically, the Bogosian court held as follows:

> If . . . a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

Id. at 455.

Courts often apply this presumption in horizontal price-fixing cases. See, e.g., OSB, 2007 WL 2253418, at *4-5; In re Bulk (Extruded) Graphite Prods. Antitrust Litig., No. 02-6030,

2006 WL 891362, at *11-13 (D.N.J. Apr. 4, 2006).  However, a court must rigorously analyze the evidence to determine whether Bogosian applies to a particular case.  See Hydrogen Peroxide, 552 F.3d at 326 (expressing doubt about whether Bogosian applied where prices were "lower, not higher, at the end of the class period than at the beginning," production increased during the class period, and defendants presented evidence of "substantial price disparities among similarly situated customers").  Moreover, Bogosian alone does not suffice to satisfy the predominance requirement; plaintiffs must present additional evidence that they can prove impact using common proof.  Id.; see also Am. Seed Co., Inc. v. Monsanto Co., 271 F. App'x 138, 141 (3d Cir. 2008) ("[I]t is important that a putative class's presumption of impact under Bogosian be supported by some additional amount of empirical evidence.").

    In many ways, this is a straightforward horizontal price-fixing case brought by direct purchasers of TBR.  The anticompetitive effects of horizontal price-fixing are obvious.  See, e.g., Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010).  Many cases in which courts reject application of Bogosian involve alleged conduct whose anticompetitive effect is less straightforward.  See, e.g., Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, No. 04-5898, 2010 WL 3855552, at *21-22 (E.D. Pa. Sept. 30, 2010) (refusing to apply Bogosian to the claims of indirect purchasers).

    Ortho argues, however, that Bogosian is inapplicable for two reasons.  First, it relies on the fact that "the alleged conspiracy . . . coincided with a substantial reduction in the number of competitors and the formation of a duopoly market."  (Def.'s Opp. 58.)  Therefore, while there were substantial price increases during the class period, those increases cannot be presumed to have resulted solely from collusion.  However, defendants' creation of a duopoly by the acquisition of a number of competitors shortly before the alleged conspiracy began does not

mitigate the fact that prices on many TBR products rose by more than 2000% during the class period, that those huge increases occurred very shortly after the alleged collusion began, and that those huge price increases applied to all customers.  Unlike in Hydrogen Peroxide, there is no evidence that prices decreased at any time during the class period.  Moreover, the benchmark methodology detailed in Dr. Beyer's reports, see infra Section IV.B.1.c.2, estimates the but-for prices that would have been charged in a lawful duopoly market and calculates those additional price increases that resulted from the alleged anticompetitive activity.

Second, Ortho argues that the conspiracy in alleged in this case "encompass[es] dozens of different products, each with different demand and cost factors."  (Def.'s Opp. 58-59.)  However, courts have applied Bogosian even in cases involving multiple varieties of products.  See, e.g., Bulk (Extruded) Graphite, 2006 WL 891362, at *11.  In this case, where Ortho manufactured an analogue of most TBR products manufactured by Immucor, and vice versa, it is logical that a horizontal price-fixing conspiracy encompassing all of those products would impact all purchasers.

There is thus a strong argument that Bogosian applies to the facts of this case.  Nevertheless, as set forth below, the Court concludes that other elements of common proof offered by plaintiffs—most importantly, Dr. Beyer's market structure analysis and his damages models—suffice to establish that plaintiffs can prove impact using common evidence regardless of whether Bogosian applies.

### 2. Market Structure Analysis

Plaintiffs' second element of proof of impact is Dr. Beyer's analysis of the structure of the TBR market.  Based on his review of relevant documents and deposition testimony in this case, Dr. Beyer concludes that several features of the blood reagents industry gave "defendants . . . the incentive to form the alleged conspiracy" and made it impossible for

individual purchasers to "avoid[] impact from a conspiracy." (Beyer Report 26.)  In particular, Dr. Beyer cites (1) the consolidated market, (2) high barriers to entry, (3) inelastic demand for TBR, (4) the interchangeability of defendants' TBR products, (5) defendants' ability to monitor each other's pricing behavior by obtaining price lists from customers, and (6) defendants' unwillingness to deviate from their pricing policies for particular customers.  (Id. at 26-35.) Many of these conclusions are reinforced by the reports of Ms. Harris, plaintiffs' industry expert. (See Harris Report ¶¶ 16, 20, 33.)

In its brief, Ortho disputes some of Dr. Beyer's conclusions regarding market structure, arguing that (1) TBR are not interchangeable and, as such, are not commodity products, (2) demand for TBR is not inelastic because TBR and ABR are interchangeable, and (3) recent market entry shows that plaintiffs overstate their claims regarding barriers to entry.  However, the report of Ortho's expert, Dr. Bronsteen, does not dispute that the TBR market possessed the structural features Dr. Beyer identifies.  Instead, Dr. Bronsteen argues that those structural features are just as consistent with tacit coordination as with unlawful collusion.  (Bronsteen Report 34.)  He opines that such a market structure "generally make[s] it easier for firms to refrain from aggressive competition and to coordinate their pricing either from an explicit cartel agreement or from tacit coordination."  (Id. at 35.)  Dr. Bronsteen then concludes that firms often prefer to engage in tacit coordination because, unlike explicit collusion, it is not unlawful.  (Id. at 35-36.)

Many courts have accepted market-structure analyses in finding predominance with respect to antitrust impact.  See, e.g., Linerboard, 305 F.3d at 153-55; Behrend, 264 F.R.D. at 160-61; OSB, 2007 WL 2253418, at *4-7.  However, before accepting such an analysis, the Court must be persuaded that the market-structure factors identified by the plaintiffs' expert do,

in fact, exist.  See, e.g., In re Plastics Additives Antitrust Litig., No. 03-2038, 2010 WL 3431837, at *7 (E.D. Pa. Aug. 31, 2010) ("While a market with the characteristics described by [the expert] may in theory be vulnerable to a price-fixing conspiracy, we find that the markets at issue in this case do not actually possess those characteristics.").  In this case, after weighing the evidence presented by both parties, the Court is persuaded by Dr. Beyer's conclusions regarding the structure of the TBR market.

First, Ortho does not dispute many of the market characteristics Dr. Beyer identified.  Dr. Bronsteen disputes even fewer; his primary argument is that the characteristics are consistent with lawful conduct as well as unlawful conduct.  However, the question for the Court at this stage is not whether defendants actually engaged in a price-fixing conspiracy but whether, if plaintiffs establish such a conspiracy, they will also be able to prove impact through predominantly common proof.  Dr. Bronsteen's testimony thus does not discredit Dr. Beyer's market-structure analysis at this stage of the litigation.

Second, the Court is persuaded that most customers viewed TBR as commodity products during the class period.  (See, e.g., Gallup Dep., Pls.' Reply Ex. 151, at 59-60 (stating that most customers "believed that [TBR] [were] like plain white bread: all the products were the same"); Weiss Decl., Pls.' Reply Ex. 149, ¶¶ 11-12 (stating that customers can use TBR "interchangeably" as long as they have FDA approval and that TBR "are almost identical 'commodity' products").)  Ortho presented anecdotal evidence that a few purchasers preferred one defendant's TBR for nonprice reasons.  (See, e.g., Carbaugh Dep., Def.'s Opp. Ex. C, at 36; Fennema Dep., Defs.' Opp. Ex. D, at 57-59.)  The Court finds that isolated testimony less persuasive than the expert report and evidence that plaintiffs offered to the contrary.[6]

---

[6]      At the class certification hearing, Dr. Bronsteen testified that the evidence regarding whether TBR are commodities is "mixed."  (7/26/12 Hr'g Tr. 182.)  He argued that differences

Third, Ortho disputes Dr. Beyer's conclusions regarding the inelasticity of TBR demand because ABR constituted a "potential substitute product[]" for TBR.  (Def.'s Opp. 13.)  Ortho explains that, although ABR are more expensive than TBR, they are more efficient and more accurate, which gave customers an incentive to switch despite the increased expense.  (Id. at 15-16.)  Moreover, Ortho presents evidence that some class members did switch from TBR to ABR during the class period.  (Id. at 14-15.)  However, as plaintiffs' counsel argued persuasively at the certification hearing, the decision of some purchasers to switch from TBR to ABR when faced with enormous price increases does not establish elastic demand for TBR.  (See 7/26/12 Hr'g Tr. 30-31.)  Even where demand is highly inelastic, customers will eventually stop purchasing a product if there is a sufficiently large price increase.  See generally IIA Phillip E. Areeda et al., Antitrust Law ¶ 507 (3d ed. 2007).  The Court also credits Dr. Beyer's conclusion that, because Ortho and Immucor dominated both the TBR and ABR markets, the possibility that customers would switch from TBR to ABR did not threaten the success of the alleged conspiracy.  (See Beyer Report ¶ 63.)

Finally, the entry of two new TBR manufacturers in 2008—eight years after the alleged price-fixing conspiracy began—does not discredit Dr. Beyer's conclusion that the TBR market features high barriers to entry.  A barrier to entry need not prevent competitors from ever entering the market.  See generally IIB Areeda et al., supra, at ¶ 420.  Dr. Bronsteen agrees with Dr. Beyer that FDA regulation delays entry to the TBR market.  (Bronsteen Dep., Pls.' Reply Ex.

---

in the prices of Ortho's and Immucor's TBR during the class period show that some customers preferred one defendant's TBR to the other.  (Id. at 182-83.)  However, Dr. Beyer's analysis shows that, even if Ortho and Immucor prices were not identical for all products, they were similar.  (See, e.g., Beyer Reply fig.1.)  Moreover, Dr. Bronsteen compares average prices charged by Immucor and Ortho.  Those average prices are very similar through 2004.  (See Bronsteen Report Exs. 9A-9D.)  The Court concludes that divergence in prices after 2004 is explained, at least in part, by the discounts Immucor gave some of its customers through price protection and pricing tiers.

148, at 56, 242-23.)  It is undisputed that it takes several years for a new competitor to obtain

FDA approval and begin to sell TBR.  This is a substantial delay, sufficient to render the TBR

market conducive to collusion that would impact all customers.

The Court thus accepts Dr. Beyer's analysis of the structure of the TBR market as

persuasive evidence supporting a finding of predominance with respect to impact.

### 3.      Empirical Pricing Analysis

Third, plaintiffs rely on Dr. Beyer's empirical analysis of pricing patterns in the TBR

industry during the class period.  There are two parts to this analysis.  First, Dr. Beyer observes

that TBR prices "skyrocketed" during the class period.  (Beyer Report ¶ 29 & tbls. 3-4.)  Second,

he analyzes the prices defendants charged to individual customers and concludes that prices rose

somewhat uniformly.  Most Ortho customers paid "identical or nearly identical" prices

throughout the class period.  (Id. ¶ 77, figs. 5-6.)  Because of Immucor's pricing tiers, Immucor

prices exhibit more dispersion.  Moreover, some Immucor customers were able to obtain price

protection, which locked their 2004 prices in place for five years.  Nonetheless, Dr. Beyer states

that the prices for Immucor's TBR "tended to cluster at a handful of pricing points."  (Id. ¶ 76.)

Further, in his Reply Report, he demonstrates that customers in each of Immucor's pricing tiers

and even its price-protected customers paid more than but-for prices.  (Beyer Reply Report

¶¶ 77-88.)

Clearly, the fact that prices rose does not, in and of itself, demonstrate antitrust impact—

at trial, plaintiffs will need to show that they experienced price increases that resulted from

anticompetitive conduct.  However, a showing that prices behaved similarly across groups of

customers contributes to a finding of predominance at the certification stage.[7]  Because Ortho's

---

[7]      Variation in the prices paid by individual customers does not preclude a finding of
predominance.  See, e.g., K-Dur, 2012 WL 2877662, at *19-20; McDonough, 638 F. Supp. 2d at

prices were more uniform than Immucor's, this element of proof is more persuasive with respect to Ortho sales than Immucor sales.  (Compare Beyer Report fig.5, with id. figs.10-11.)  As described below, however, Dr. Beyer has showed that, despite price variation, he can demonstrate impact to Immucor purchasers using common proof.  Therefore, while the Court does not find Dr. Beyer's empirical pricing analysis as persuasive as his market analysis or the results of his damages models, the analysis provides additional support for his assertion that plaintiffs will be able to prove impact using common proof.

### 4.      Defendants' Documents

Fourth, plaintiffs rely on defendants' internal documents for the proposition that the price increases affected all customers.  Most importantly, the documents support plaintiffs' contention that defendants were generally unwilling to negotiate prices with their customers.  (See, e.g., Pls.' Mot. Ex. 138, at 4 (email from an Immucor sales representative stating that "[u]nfortunately, the pricing change is firm.  It was an increase that was shared with our entire customer base and at this time, there aren't any exceptions being made"); Pls.' Mot. Ex. 139 (email from an Ortho executive stating that "everyone pays the same" for TBR).)  Moreover, the documents provide evidence that even where defendants provided discounts from list prices, the discounts remained related to the list prices.  (See, e.g., Pls.' Reply Ex. 143 (Ortho document stating that "[a]s list price increases all customer prices change in lock step"); Heflin Decl. ¶ 16 (stating that Immucor's list prices and tiered pricing were set based on Ortho's list prices).)  This gives rise to an inference that anticompetitive increases in list prices would also impact customers who were purchasing TBR at a discount.  See, e.g., McDonough, 638 F. Supp. 2d at

---

486.  However, plaintiffs must be able to account for such variation using common proof—which they have persuaded the Court that they will be able to do in this case.  See infra Part IV.B.1.c.3.i.

486 ("[W]hen list prices have been artificially inflated, fixed or proportional discounts from them are equally inflated.").

While these documents would not suffice to prove impact on their own, they lend support to a finding of predominance.

### 5.    Damages Calculation

Plaintiffs offer an additional element of common proof of impact: Dr. Beyer's proposed methodologies for calculating the damages incurred by individual plaintiffs.  Those methodologies, which are explained in more detail below, see infra Section IV.B.1.c.2, distinguish between price increases resulting from the creation of a duopoly and price increases resulting from the alleged price-fixing conspiracy.  Specifically, Dr. Beyer utilizes a benchmark model to estimate the pricing that would have occurred in a lawful duopoly.  He concludes that any differences between those estimated prices and the actual prices charged by defendants resulted from the alleged price-fixing conspiracy.  The important point for purposes of the impact analysis is that, by applying one variation of this benchmark model to transactional data produced by defendants, Dr. Beyer has demonstrated that "virtually all customers paid more for traditional reagents than they would have paid in the absence of the alleged anticompetitive conduct."  (Beyer Reply Report ¶ 102.)  Dr. Beyer's calculations show that virtually all of defendants' customers purchased at least one TBR product for more than the but-for price during the class period.  (Id. ¶¶ 105-106 & tbls. 18-19.)  The calculations are persuasive evidence that antitrust impact is "susceptible to proof at trial through available evidence common to the class." Behrend, 655 F.3d at 198.

As is explained in more detail below, Ortho focuses its argument on the assertion that Dr. Beyer's damages methodologies are speculative and unreliable.  For reasons that will be

discussed <u>infra</u> Section IV.B.1.c, the Court concludes that these arguments do not defeat plaintiffs' case at the class certification stage.

In addition to its arguments regarding the merits of plaintiffs' damages formula, Ortho argues that Dr. Beyer's conclusions are based on a faulty understanding of antitrust impact. Ortho asserts that it is not enough for plaintiffs to show that a customer paid more than the but-for price for at least one item in at least one transaction.  Instead, according to Ortho, plaintiffs must analyze "whether the <u>net</u> effect of the alleged antitrust violation is positive or negative." (Def.'s Surreply 16 (emphasis added).)  They must offset class members' losses from the alleged conspiracy against any benefits they received from it.  (<u>Id.</u> at 17.)  For example, Ortho contends that Dr. Beyer wrongly "overlooks the prospect that higher prices for traditional reagents led to lower prices or lower price increases for proprietary reagents and equipment."  (<u>Id.</u>)

The Court rejects this argument.  The case on which Ortho relies involved a merger, not a horizontal price-fixing conspiracy.  <u>See</u> <u>Kottaras v. Whole Foods Market, Inc.</u>, 281 F.R.D. 16 (D.D.C. 2012).  Mergers frequently produce pro-competitive efficiencies that outweigh their anti-competitive harm, and courts routinely weigh these countervailing effects as an integral component of merger analysis.  <u>See, e.g.</u>, <u>id.</u> at 24; <u>see also</u> U.S. Dep't of Justice & Fed. Trade Comm'n, <u>Horizontal Merger Guidelines</u> § 10 (issued Aug. 19, 2010).  It is far less plausible, on the other hand, that a price-fixing conspiracy would have offsetting benefits to consumers.  <u>See</u> <u>Deutscher Tennis Bund v. ATP Tour, Inc.</u>, 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price-fixing . . . , 'because of their pernicious effect on competition and <u>lack of any redeeming virtue</u> are conclusively presumed to be unreasonable.'" (emphasis added) (quoting <u>United States v. Brown Univ.</u>, 5 F.3d 658, 669 (3d Cir. 1993))).

Ortho cites no case in which a court required plaintiffs to account for potential decreases in the price of some products as the result of an alleged horizontal price-fixing conspiracy.

At the class certification hearing, Dr. Bronsteen stated that the alleged conspiracy might have caused the prices of some TBR or ABR products to decrease because it gave defendants an incentive to "cheat" on the cartel by cutting prices on products not subject to the conspiracy. (7/26 Hr'g Tr. 218-19.)  He presented evidence that, while TBR prices were increasing sharply, the prices of some of defendants' leading ABR products were "essentially flat."  (Id. at 220.) Moreover, he argued that defendants hoped that increases in the prices of TBR would induce customers to switch from TBR to ABR.  (Id.)

The argument that defendants were cheating on the cartel is speculative, at best.  Ortho has not persuaded the Court that the "essential flatness" of ABR prices resulted from its alleged conspiracy to fix TBR prices; Ortho has merely suggested that that is a possibility.  Second, as a practical matter, Ortho's theory—which could be raised in every price-fixing case—would be very difficult to model.  Without stronger evidence that a price-fixing conspiracy did, indeed, have offsetting benefits to consumers, plaintiffs in this type of case should not be saddled with analyzing whether a price-fixing conspiracy might possibly have had any negative effect on the price of any product sold by the defendants.  Ortho has not cited any nonmerger cases in which courts imposed such a requirement, and this Court will not do so in this case.  The Court thus accepts the results of the damages models as persuasive evidence of impact.

In summary, after a rigorous analysis of the evidence offered by both parties, the Court concludes that plaintiffs have shown by a preponderance of the evidence that they will be able to demonstrate antitrust impact using predominantly common proof.

c.      Damages

## 1.      Legal Standard

Plaintiffs must also establish by a preponderance of the evidence that they "will be able to measure damages on a class-wide basis using common proof." Behrend, 655 F.3d at 204. At the class certification stage, the court must "address only whether [p]laintiffs have provided a method to measure and quantify damages on a class-wide basis." Id. at 206. The Court has not "reached the stage of determining on the merits whether the methodology is a just and reasonable inference or speculative." Id. The Court must find that the model "could evolve to become admissible evidence," but the model need not be "perfect."[8] Id. at 204 n.13; see also, e.g., McDonough, 638 F. Supp. 2d at 490 ("[P]redominance requires only a viable method whereby damages can be reasonably estimated based on common evidence."); In re Neurontin Antitrust Litig. No. 02-1390, 2011 WL 286118, at *25 (D.N.J. Jan. 25, 2011).

In Behrend, the Third Circuit rejected the defendant's criticisms of the reliability of the damages model proposed by the plaintiffs' expert. The Court held that those criticisms constituted "attacks on the merits of the methodology that have no place in the class certification inquiry." Behrend, 655 F.3d at 206-07. Behrend makes this point repeatedly, stating, for example, that "at the class certification stage, [courts] are precluded from addressing any merits inquiry unnecessary to making a Rule 23 determination." Id. at 190. This is consistent with Hydrogen Peroxide's interpretation of Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974),

---

[8]      Even at the merits stage, plaintiffs need not measure damages with complete certainty, because courts recognize the "inherent difficulty of identifying a 'but-for world.'" Behrend, 655 F.3d at 203. At the merits stage, plaintiffs must demonstrate damages only "as 'a matter of just and reasonable inference.'" Id. (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)).

as "preclud[ing] . . . a merits inquiry that is not necessary to determine a Rule 23 requirement."
Hydrogen Peroxide, 552 F.3d at 317.

As explained below, Ortho devotes little energy to arguing that individual proof will
predominate in calculating damages.  Virtually all of Ortho's arguments go to the merits of the
models Dr. Beyer has constructed: the question whether the models give rise to "a just and
reasonable inference or [are] speculative."  Behrend, 655 F.3d at 206.   These merits arguments
have some force, and they may prove persuasive at the summary judgment stage.  However, they
do not overlap with the Rule 23 requirements, because they neither implicate a need for
individual proof nor convince the Court that Dr. Beyer's models could not "evolve to become
admissible evidence."  Id. at 204 n.13.  Thus, applying Behrend, Hydrogen Peroxide, and Eisen,
the Court concludes that it must defer analysis beyond that offered in this Memorandum until it
addresses the issues at the summary judgment stage.  See In re Online DVD Rental Antitrust
Litig., No. 09-2029, 2010 WL 5396064, at *10 (N.D. Cal. Dec. 23, 2010) (rejecting arguments
that plaintiffs failed "to discuss or explain the importance of certain competitive variables in the
but for world" because those arguments "are ultimately directed to the merits of plaintiffs' ability
to prove impact"; they "do not . . . establish that plaintiffs' methodology for proving impact will
necessarily require individualized evidence").

### 2.  Damages Models Offered by Dr. Beyer

To calculate damages, each plaintiff must estimate the overcharge that it paid as a result
of the alleged conspiracy: that is, the difference between the prices it actually paid for TBR and
the prices it would have paid in the absence of a price-fixing conspiracy ("but-for prices").  In
this case, plaintiffs' damages model must distinguish between price increases resulting from
defendants' creation of a duopoly and price increases resulting from the anticompetitive conduct
in which defendants are alleged to have engaged.  In his Reply Report, Dr. Beyer formulates and

applies several variations on a benchmark model to estimate the but-for prices that would have resulted from creation of a lawful duopoly in the absence of anticompetitive conduct.  He then measures the amount by which actual prices exceeded but-for prices, which he concludes is attributable to the anticompetitive conduct alleged by plaintiffs.

As a general matter, the benchmark methodology is widely accepted for calculating overcharges in antitrust cases.  See, e.g., Linerboard, 305 F.3d at 153-55; McDonough, 638 F. Supp. 2d at 490 & n.19; IIB Areeda et al., supra, at § 392d.  Estimating but-for prices is particularly difficult in this case, however, because defendants' duopoly was created only a short time before they allegedly conspired to fix prices.  Market consolidation tends to increase prices, even in the absence of coordinated conduct.  See, e.g., Horizontal Merger Guidelines, supra, at § 6.  The parties agree that this would make it very difficult to make reliable use of empirical data regarding pre-conspiracy prices to estimate but-for prices.[9]  (See Beyer Report ¶ 93; 7/26/12 Hr'g Tr. 165-67.)  Moreover, because the damages period extends to the present, there is no "after" period that can serve as a benchmark.  (Beyer Report ¶ 92.)  Dr. Beyer thus cannot use the familiar "before-and-after" benchmark that courts have approved in many cases.  See, e.g., Linerboard, 305 F.3d at 153-55; In re Wellbutrin XL Antitrust Litig., No. 08-2431, 2011 WL 3563385, at *14-16 (E.D. Pa. Aug. 11, 2011).

As an alternative, Dr. Beyer bases his benchmark on the price increases defendants planned and partially implemented after the duopoly was created but before they allegedly formed their price-fixing conspiracy.  Dr. Beyer asserts that defendants' planned price increases provide a good estimate of but-for prices because (1) they account for the market's consolidation

---

[9]     For the same reason, the parties agree that it would be difficult to apply multiple regression analysis, another technique often used to isolate anticompetitive effects, reliably in this case.  (See Beyer Reply ¶ 52-53; 7/26/12 Hr'g Tr. 164-66.)

to duopoly, (2) they are "based on Immucor's and Ortho's own projection of the but-for prices of [TBR]," and (3) "the basis for the increase does not appear to include cooperative behavior between the two defendants." (Beyer Report ¶ 97.)

For the period between 2001 and 2005, Dr. Beyer assumes that both defendants' TBR prices would have increased by 25% per year, as Ortho had planned under OCV.[10] Plaintiffs assert that 25% is a reasonable figure for both defendants because it reflects Ortho's carefully considered OCV strategy and because Immucor (1) implemented a 20% increase around the same time and (2) consistently followed Ortho's pricing strategies. Plaintiffs further contend that, based on Ortho strategy documents, it is reasonable to estimate that the increases would have lasted for five years. (See, e.g., Pls.' Mot. Ex. 54, at 10 (Ortho planning document stating that the OCV plan would include "5+ years of annual 25% price increases").) Moreover, Dr. Beyer points out that after five years of 25% increases, Ortho would have more than achieved the level of gross profitability that its president, Catherine Burzik, set as a goal after defendants obtained their duopoly.[11] (8/6/12 Tr. at 336.)

---

[10]    Dr. Beyer also presents a variation on this methodology in which he adjusts the size of the but-for price increases of individual TBR products to reflect the distribution of actual price increases on different TBR products. (Beyer Reply ¶ 74.) The weighted average price increase, however, remains 25%. (Id.)

[11]    At the class certification hearing, Dr. Bronsteen testified that it did not make sense for the 25% price increases to stop after five years. In his opinion, defendants would have continued raising prices in the but-for world "until they reach[ed] the level of [the prices actually charged]." (7/26/12 Hr'g Tr. 194.) Dr. Bronsteen oversimplifies this point. There are a number of reasons that the price obtained by noncolluding duopolists might be lower than that obtained by a cartel. See, e.g., IIB Areeda et al., supra, at ¶ 405c ("[W]ith any market of given structural and other characteristics, the probability of effective cooperation in raising price and restricting output is much greater with express collusion than with mere reliance on recognized interdependence."); In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 656 (7th Cir. 2002) (Posner, J.) ("[S]ellers would not bother to fix list prices if they thought there would be no effect on transaction prices.").

For the period between 2006 and the end of the damages period, Dr. Beyer proposes two alternative methods of estimating but-for prices. The first option is to assume that TBR prices would have risen at the same rate that Immucor's standard costs rose.[12] The second option makes use of a proposed non-TBR "yardstick" product, RhoGAM. RhoGAM is Ortho's brand of Rho(D), a prescription pharmaceutical that is administered to pregnant women. Dr. Beyer asserts that Rho(D) is a good yardstick for TBR because of the following similarities: (1) the Rho(D) market is a "highly concentrated oligopoly," (2) demand for Rho(D) is inelastic, (3) the Rho(D) market features high barriers to entry due to FDA regulation, (4) RhoGAM is interchangeable with other Rho(D) products, (5) the same hospitals that were the largest TBR customers also purchased Rho(D), (6) demand for Rho(D) was relatively stable throughout the damages period, and (7) prices for Rho(D) were set based on "the level of competitiveness in the market rather than on cost or demand factors." (Beyer Reply ¶¶ 61-67.)

In sum, in all variations of his proposed damages models, Dr. Beyer uses a benchmark methodology to estimate the but-for prices that defendants would have charged in a lawful duopoly, in the absence of collusion. Dr. Beyer then calculates the differences between those estimated but-for prices and the actual prices charged to plaintiffs, which he concludes are attributable to the alleged price-fixing conspiracy.

### 3. Ortho's Criticisms of Dr. Beyer's Damages Models

Ortho criticizes Dr. Beyer's proposed damages models on a number of grounds. As stated above, most of these criticisms go to the <u>reliability</u> of the models—their alleged failure to

---

[12]   Dr. Beyer uses Immucor's standard costs for both defendants because Ortho has represented that its cost data is unreliable. Because both defendants manufactured the same products from similar raw materials and were subject to the same regulations, Immucor's costs are a reasonable proxy for Ortho's costs. (Beyer Reply ¶ 56.) At the very least, using Immucor's standard costs is sufficient to "give 'a reasonable estimate' of damages. And nothing more is required." <u>McDonough</u>, 638 F. Supp. 2d at 491 (quoting <u>Rossi v. Standard Roofing, Inc.</u>, 156 F.3d 452, 484 (3d Cir. 1998)).

account for important competitive variables—rather than whether their application will require the use of individualized proof at trial.

i.    <u>Common Proof Versus Individualized Proof</u>

A few of Ortho's arguments go to the heart of the predominance inquiry—whether plaintiffs will rely on individual evidence to prove their case.  First, Ortho asserts that Dr. Beyer's damages model is insufficient because (1) it assumes that there would have been one but-for price for each TBR product in each year and (2) in reality, different customers paid different prices, and a model that accounted for that would require extensive use of individualized proof.  The Court rejects that argument.  Ortho may be correct that, if feasible, it would be more accurate to estimate but-for prices for each individual transaction separately.  However, estimating a single but-for price for each product in each year is sufficient to estimate damages "'as a matter of just and reasonable inference.'"  <u>Behrend</u>, 655 F.3d at 203 (quoting <u>Story Parchment</u>, 282 U.S. at 563).  What Ortho proposes would exponentially complicate the calculation of damages in this type of case.  As Dr. Beyer testified, it would require plaintiffs to estimate "almost a million" different but-for prices.  (8/6/12 Tr. at 351.)  Ortho has cited no case—and the Court has found none—in which plaintiffs were required to do this.  In contrast, the Court has found cases that featured variable pricing in the real world but in which courts accepted the calculation of only one price for all customers in the but-for world.  <u>See, e.g.</u>, <u>McDonough</u>, 638 F. Supp. 2d at 490-91.  "[I]t is important not to let a quest for perfect evidence become the enemy of good evidence."  <u>Flonase</u>, 2012 WL 2277840, at *24 (quoting <u>Messner</u>, 669 F.3d at 808).

Plaintiffs have also rebutted Ortho's contention that Immucor's variable pricing will necessitate the use of individualized evidence to calculate damages.  It is well established that "variation of damages among class members does not defeat certification" so long as that

36

variation does not raise "[c]omplex and individual questions."  Id. at 204; see also 7AA Charles

Alan Wright et al., Federal Practice & Procedure § 1781 (3d ed. 2005).  In his Reply Report, Dr.

Beyer shows that the prices paid by most Immucor customers after 2005 corresponded to one of

the standard pricing tiers, and it is straightforward to calculate an overcharge percentage for each

pricing tier.  (See Beyer Reply ¶¶ 77-84.)  Moreover, Dr. Beyer calculates damages for a random

sample of Immucor and Ortho customers using data regarding their actual transactions.  (Id.

¶¶ 90-93.)  Despite variation in the prices the customers may have paid, the damages model

produces results—and shows antitrust impact—for all of them.  (Id.)  It would be straightforward

to perform a similar calculation for the rest of the class.  Dr. Beyer has thus shown that, despite

variation in the actual prices paid by purchasers, his damages formula is "able to measure

damages on a class-wide basis using common proof."  Behrend, 655 F.3d at 204.

ii.      General Reliability Arguments

At the present stage of the litigation, the Court also rejects Ortho's arguments regarding

the reliability of plaintiffs' damages models.  Even if Dr. Beyer's models have some

deficiencies, the Court concludes that those deficiencies are remediable; Ortho has not

established that the models could not "evolve to become admissible evidence."  Behrend, 655

F.3d at 204 n.13.

First, Ortho argues strenuously that the 25% price increase envisioned under OCV is not

a reliable benchmark for prices between 2001 and 2005.  Ortho contends that it implemented the

BBLP before the alleged price-fixing conspiracy began.  As a result, according to Ortho, neither

OCV nor the BBLP is a product of the price-fixing conspiracy alleged in this case, rendering it

wholly arbitrary for Dr. Beyer to select OCV prices, instead of BBLP prices, as a benchmark.

The Court rejects this argument.  Plaintiffs' theory—that Ortho began to consider the BBLP

37

before the AABB meetings but would not have executed the plan without explicit assurance that Immucor would follow—is highly plausible and is consistent with documents showing that the BBLP only became fully operational after the meetings.  Moreover, even if Dr. Beyer used BBLP prices, rather than OCV prices, as a benchmark, the damages methodology would still utilize common proof.  See Behrend, 655 F.3d at 206-07 (explaining that if the defendant's criticisms were taken into account, "only the final amount of estimated damages would change"; the criticisms thus "do not impeach the . . . ultimate holding that damages are capable of common proof on a class-wide basis").  This is a merits argument that does not overlap with a Rule 23 requirement.

Ortho's more persuasive argument is that the OCV benchmark is unreliable because it fails to take crucial competitive variables into account: it does not adequately control for changes in standard costs, demand, or market structure.  Dr. Bronsteen presented persuasive testimony on this point at the class certification hearing.  First, however, Ortho did not present any evidence that plaintiffs would need to rely on individualized proof to account for these competitive variables.  Dr. Bronsteen's testimony did not rebut the fundamental point that standard costs, demand, and market structure are all common variables that Ortho asserts plaintiffs should have included in their common damages formula.

Second, Dr. Bronsteen did not persuade the Court that plaintiffs' damages models could not evolve to become admissible at trial.  Dr. Bronsteen argued persuasively that Dr. Beyer's models would be more accurate if, for example, he added annual percentage increases in standard costs to his benchmark to account for the likelihood that defendants would have passed increased costs on to purchasers.  (See 7/26/12 Hr'g Tr. 196-97.)  He also opined that Dr. Beyer should adjust the benchmark annually to account for changes in aggregate demand.  The parties

have presented data regarding both costs and aggregate demand, so, if deemed necessary by Dr.

Beyer, both of these criticisms can be addressed and rectified before the merits stage of the

litigation.[13]

In addition, contrary to Dr. Bronsteen's report and testimony, the damages models

account for market structure.  The 25% OCV-based benchmark reflects plans defendants formed

after their duopoly was created, thus reflecting their estimate of the prices they would be able to

impose given the change in market structure.  (Beyer Report ¶ 95.)  Likewise, both of the

alternative benchmarks Dr. Beyer proposes for the post-2005 period take market structure into

account.  His assumption that "the full amount of variable costs of manufacturing blood reagents

would be passed on to purchasers" reflects defendants' market power as duopolists.  (Id. ¶ 101.)

Likewise, he selected RhoGAM as a yardstick because, like the TBR market, the RhoGAM

market was a highly concentrated oligopoly in which Ortho had a large market share.  (Beyer

Reply ¶ 61.)  Ortho argues that, even if Dr. Beyer's damages formulas attempt to account for

market share in this way, they are fatally speculative and unreliable.  However, as stated above,

the models present a viable method of calculating damages using common proof, and "[w]e have

not reached the stage of determining on the merits whether the methodology is a just and

reasonable inference or speculative."[14]  Behrend, 655 F.3d at 206.

---

[13]     Dr. Bronsteen also testified at the certification hearing that he "suspect[ed]" that if Dr.
Beyer made this type of adjustment, but-for prices would fall below average prices and plaintiffs
would be unable to prevail on the merits.  (7/26/12 Hr'g Tr. 197.)  The Court notes that Dr.
Bronsteen did not perform any analysis to support his suspicion.  More fundamentally, "a district
court has limited authority to examine the merits when conducting the certification inquiry"; the
"ability of the named plaintiff to succeed on his or her individual claims has never been a
prerequisite to certification of the class."  Sullivan, 667 F.3d at 305.

[14]     In his original Report, Dr. Beyer stated that the first increase in but-for prices would
occur in 2000.  (Beyer Report ¶ 95.)  His Reply Report shifts the first increase to 2001.  (Beyer
Reply ¶ 73.)  Ortho contends that this change makes Dr. Beyer's methodology "even more ad
hoc and speculative."  (Def.'s Surreply 11.)  However, Dr. Beyer provides a persuasive

iii.    The RhoGAM Yardstick

Finally, Ortho argues that RhoGAM is too different from TBR to serve as a yardstick for the post-2005 period.  In particular, according to Ortho, the RhoGAM and TBR markets feature different demand and cost factors and different competition levels.  (See, e.g., Def.'s Surreply 11-13; see also Bronsteen Report 19-22.)  Moreover, prices for RhoGAM and TBR moved very differently prior to the alleged price-fixing conspiracy.  (Id.)  Plaintiffs respond that the markets are comparable because they both feature, inter alia, Ortho as a major competitor, inelastic demand, barriers to entry created by FDA requirements, homogeneous products, and relatively stable demand.  (See, e.g., Beyer Reply ¶¶ 61-67.)  Pre-conspiracy prices of TBR and RhoGAM are different because, for most of that period, the TBR market was competitive, while the RhoGAM market was a duopoly.  (Id. ¶ 68.)

To succeed at the merits stage, the yardstick business or product "'must be as nearly identical to the plaintiff's as possible.'"  Loeffel Steel Prods. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005).  "[E]xact correlation is not necessary," however; the products need only be "fair congeners."  Id.; see also Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow." (emphasis added)).  Few cases discuss the showing of similarity that is required at the class certification stage, but courts have rejected proposed yardsticks on certification where the party proffering them failed to perform a substantive analysis of the

---

explanation for the change.  He explains that he shifted the first but-for price increase because the alleged price-fixing conspiracy did not begin to impact customers until 2001; neither defendant imposed its substantial price increases until early 2001.  (Beyer Reply ¶ 73.)  Thus, since plaintiffs do not allege that prices increased in 2000 due to unlawful collusion, "it is more accurate for but-for prices to equal actual prices in 2000 and to have but-for prices only start diverging from actual prices in 2001."  (Id.)

products' similarity.  See In re Live Concert Antitrust Litig., No. 06-1745, 2012 WL 1021081, at *7-9 (C.D. Cal. Mar. 23, 2012); Weiner v. Snapple Beverage Corp., No. 07-8742, 2010 WL 3119452, at *7-10 (S.D.N.Y. Aug. 5, 2010).

Under these standards, as well as the more general standards set forth in Behrend, the Court concludes that the proposed RhoGAM yardstick supports a finding that plaintiffs will be able to prove the amount of damages using common evidence.  Ortho points out important differences between the TBR and RhoGAM markets—most persuasively, the fact that the RhoGAM market featured three competitors, rather than two, during the period for which Dr. Beyer proposes to use it.  However, these arguments do not persuade the Court that individualized evidence will be necessary to RhoGAM's use as a yardstick or that a damages model incorporating a RhoGAM yardstick could not evolve to become admissible at trial.[15] Although RhoGAM and TBR are not identical, they appear, on the present state of the record, to be "fair congeners."  Loeffel, 387 F. Supp. 2d at 812.  Moreover, even if the Court rejects the RhoGAM yardstick at the merits stage, the yardstick is merely one proposed method for calculating post-2005 damages; Dr. Beyer has proposed the use of Immucor's standard costs as an alternative.

In conclusion, under the standards set forth in Behrend and Hydrogen Peroxide, plaintiffs have satisfied the predominance requirement with respect to the amount of damages.  Dr. Bronsteen's criticisms of Dr. Beyer's models are not so fundamental that the models could not "evolve to become admissible evidence."  Plaintiffs have presented and applied viable methodologies to calculate damages using common proof.

---

[15] On the present state of the record, the Court is not entirely persuaded by Dr. Beyer's explanation for why he uses RhoGAM as a yardstick only when the RhoGAM market had three competitors.  However, that issue does not require the Court to reject the RhoGAM yardstick at the certification stage.

d.      Fraudulent Concealment

Finally, Ortho argues that individual issues related to fraudulent concealment will

predominate at trial.  To avoid the four-year statute of limitations on civil antitrust actions under

15 U.S.C. § 15b, plaintiffs must show "(1) fraudulent concealment; (2) failure on the part of the

plaintiff to discover his cause of action notwithstanding such concealment; and (3) that such

failure to discover occurred [notwithstanding] the exercise of due care on the part of the

plaintiff."  Linerboard, 305 F.3d at 160 (alteration in original) (internal quotation marks omitted).

The first of plaintiffs' class action complaints was filed on May 18, 2009.  Thus, claims for

damages based on pre–May 18, 2005 purchases of TBR are time-barred unless the purchaser can

establish fraudulent concealment.  Ortho argues that a finding of predominance is barred by the

myriad individual issues that will be involved in analyzing all three elements of fraudulent

concealment.

The Court rejects this argument.  It is true that an action implicating fraudulent

concealment raises some individual issues, including whether an individual plaintiff knew of the

alleged violation and whether he exercised due diligence.  However, in Linerboard, the Third

Circuit held that, in general, "[i]t is the fact of concealment that is the polestar in an analysis of

fraudulent concealment."  Linerboard, 305 F.3d at 163.  The weight of authority is in accord with

that holding.  See, e.g., In re Pressure Sensitive Labelstock Antitrust Litig., No. 03-1556, 2007

WL 4150666, at *21-22 (M.D. Pa. Nov. 19, 2007); In re Flat Glass Antitrust Litig., 191 F.R.D.

472, 488 (W.D. Pa. 1999); see also Newberg on Class Actions § 4:26 (4th ed. 2002)

("Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or

reliance often are rejected and will not bar predominance satisfaction because those issues go to

the right of a class member to recover, in contrast to underlying common issues of the

defendant's liability.").

Nonetheless, there is no per se rule that individual issues regarding fraudulent concealment can <u>never</u> defeat a finding of predominance.  If a case presented particularly complex or important individual issues, it might be appropriate to deny class certification.  However, this is not such a case.  Ortho has not persuaded the Court that here, unlike the typical price-fixing case, individualized issues are the "polestar" of the fraudulent-concealment inquiry.  In this case, the fraudulent-concealment issue involves the same mix of individualized and common proof that was present in <u>Linerboard</u> and other cases.  There is substantial common evidence that defendants took affirmative acts to conceal their alleged conspiracy—for example, the acts of concealment that surrounded the Thorne/Gendusa lunch in November 2000.  Ortho cites evidence regarding individual plaintiffs' suspicions and due diligence.  However, that evidence is highly similar to, and no more complex than, the individual evidence that failed to preclude certification in <u>Linerboard</u>.  <u>See Linerboard</u>, 305 F.3d 161-62 & n.13.  In this case, as in many others, individual issues relating to fraudulent concealment "can be resolved at a later damages phase" if necessary.  <u>Linerboard</u>, 305 F.3d at 163.  They do not defeat a finding of predominance.[16]

---

[16]     Ortho argues in its surreply brief that requiring it to litigate individual plaintiffs' fraudulent concealment defenses in separate damages proceedings would "infringe Ortho's substantive rights and thereby violate the Rules Enabling Act."  (Def.'s Surreply 22-23.)  Ortho cites two cases for this proposition: <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541 (2011), and <u>Hohider v. United Parcel Service, Inc.</u>, 574 F.3d 169 (3d Cir. 2009).  Neither case supports Ortho's argument.

In <u>Dukes</u>, the Supreme Court held that it would violate the Rules Enabling Act to calculate individual plaintiffs' damages by applying a formula, without conducting <u>any</u> "individualized proceedings."  131 S. Ct. at 2561.  That is very different from the procedure envisioned in this case, in which each individual plaintiff would be required to show that it was entitled to tolling of the statute of limitations.

In <u>Hohider</u>, the district court erroneously concluded that it did not need to determine whether individual employment-discrimination plaintiffs were qualified for their jobs in order to determine whether they were entitled to relief.  574 F.3d at 198.  Based on that conclusion, the court certified a class under Rule 23(b)(2).  The Third Circuit reversed, holding that an individualized analysis of each plaintiff's qualifications was, in fact, necessary to the

Thus, for the reasons stated above, the Court concludes that plaintiffs have satisfied the Rule 23(b)(3) predominance requirement with respect to fraudulent concealment.

### 2. Superiority

With respect to superiority, Rule 23(b)(3) requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." To determine whether the requirement is satisfied, a court must "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." Amchem, 83 F.3d at 632. "[S]imilar to the predominance requirement, the requirement of superiority ensures that resolution by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision without sacrificing procedural fairness or bringing about other undesirable results.'" Flonase, 2012 WL 2277840, at *25 (quoting Amchem, 521 U.S. at 615).

The superiority requirement is satisfied in this case, and Ortho does not dispute that point. Certification of the class will promote fairness and efficiency. If the class were not certified, "the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies." Id. at *26. Many courts have recognized that the cost of maintaining individual actions is frequently prohibitive in this type of antitrust litigation. See, e.g., Wellbutrin, 2011 WL 3563835, at *17; Linerboard, 203 F.R.D. at 223. Due to the many common questions of law and fact involved in the class members' claims, class treatment will

---

adjudication of their claims and was fundamentally "incompatible with the requirements of Rule 23." Id. at 196. In this case, in contrast, there is no question that the essential elements of plaintiffs' claims and each plaintiff's entitlement to tolling of the statute of limitations will be adjudicated on the merits. Moreover, unlike in Hohider, analysis of those issues in a class action is compatible with the requirements of Rule 23. See, e.g., Linerboard, 305 F.3d at 163.

promote efficiency.  For these reasons, plaintiffs have satisfied the superiority requirement under

Rule 23(b)(3).

**V.      CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Class Certification is granted.  An

appropriate Order follows.