```
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF PENNSYLVANIA
 2

 3   IN RE:                )  Case No. 09-md-02081
                           )
 4                         )  Philadelphia, PA
                           )  July 22, 2015
 5   BLOOD REAGENTS ANTITRUST  )
     LITIGATION             )  9:46 a.m.-6:46 p.m.
 6

 7                   ORAL ARGUMENTS
            BEFORE THE HONORABLE JAN E. DUBOIS
 8

 9   APPEARANCES:

10   For Plaintiffs:        JEFFREY CORRIGAN, ESQ.
                            JEFREY SPECTOR, ESQ.
11                          JAY COHEN, ESQ.

12   For Defendants:        PAUL ST. ANTOINE, ESQ.
                            JOANNE LEWERS, ESQ.
13                          RICHARD COE, ESQ.

14   Others Present:        JEFFREY KODROFF, ESQ.
                            JONATHAN SCHWARTZ, ESQ.
15                          SETH R. GASSMAN, ESQ.
                            RACHEL KOPP, ESQ.
16                          AVIVA REINFELD, ESQ.
                            CHANDA MILLER, ESQ.
17                          ALLISON CROW, ESQ.
                            JEROME SWINDELL, ESQ.
18

     ESR Operator:          MICHAEL COSGROVE
19

20

21

22

23        Veritext National Court Reporting Company
                     Mid-Atlantic Region
24          1801 Market Street - Suite 1800
                    Philadelphia, PA 19103
25                      1-888-777-6690
```

```
 1                    P R O C E E D I N G S

 2               THE CLERK:  All rise.

 3               THE COURT:  Good morning, everyone.

 4               ALL:  Good morning, Your Honor.

 5               THE COURT:  Please be seated.

 6               I call the case of In Re: Blood

 7    Reagents Antitrust Litigation, MVM No. 09-2081.  You

 8    scheduled day two of oral argument on the issues on

 9    remand for today.

10               Is the plaintiff's side ready to

11    proceed?

12               MR. CORRIGAN:  Yes, Your Honor.

13               THE COURT:  Is the defense ready to

14    proceed?

15               MR. ST. ANTOINE:  Yes, Your Honor.

16               THE COURT:  Before we proceed with

17    phase 2 or bucket 2, I have some concerns about what

18    developed yesterday.  And I'm focused on the handling

19    of costs by Dr. Beyer and the difference between the

20    standard costs and the CNIS cost not included in

21    standard costs.

22               I'm also concerned about what Dr.

23    Bronstein (ph) said regarding Dr. Beyer's handling of

24    costs.  Liz, let's start there.  Where is that?  It

25    wasn't here.
```

```
 1          (Court and clerk confer)

 2               THE COURT:  And I should add a fourth

 3   concern.  As far as I can determine, with all the

 4   briefing and in all the years that have transpired

 5   since class certification was first addressed, this is

 6   the first time this issue has been raised.  Not only

 7   that, but the difference between standard costs and

 8   costs not included in standard costs, apparently was

 9   set forth in a letter that never was provided to the

10   Court until yesterday.  And we've given back the

11   letter to the defense side.

12               Yesterday I asked that two things be

13   provided to me today.  One is a copy of that letter.

14   It was a letter written by you -- well, it was written

15   by the defense side.  I don't know whether Mr. St.

16   Antoine wrote the letter, I think he did.  I think

17   it's your letter.

18               MR. ST. ANTOINE:  I did, Your Honor.

19               THE COURT:  All right, good.

20               MR. ST. ANTOINE:  And we do have copies

21   of it.

22               THE COURT:  Fine, I'd like that.

23   Number one.  And number two, from the defense, from

24   the plaintiff's side, I want the list of the documents

25   that support the plaintiff's position on the extension
```

1   of the OCV from two years to the end of 2005.

2              All right.  And I gather you don't have

3   that.

4              MR. CORRIGAN:  Not at the moment, Your

5   Honor.  I wasn't sure when you wanted that, but we'll

6   certainly get it to you shortly.

7              THE COURT:  Well, let me tell you,

8   everything I want in this case, I want quickly.

9              MR. CORRIGAN:  Okay.

10             THE COURT:  Only because as I said

11  earlier we're on a tight schedule.

12             MR. CORRIGAN:  Understood.

13             THE COURT:  In some situations, we can

14  take our time, not with respect to this -- these

15  issues that were raised on remand.  So, Mr. St.

16  Antoine, you can hand up that letter.

17             First, let me address my concerns and

18  we'll decide when to handle --

19             MR. ST. ANTOINE:  Your Honor, can I add

20  something with respect to the September letter?  Just

21  for the record, my understanding that it is Exhibit

22  172 to plaintiff's class certification, Plaintiff's

23  Exhibit 172.  So I believe it is already part of the

24  Court's record.

25             THE COURT:  Well, the record is

1   voluminous, and the record on -- I don't recall any

2   focus on this.  I know I didn't mention it in my class

3   certification opinion.  And the exhibits, the way the

4   exhibits were presented yesterday made it very

5   difficult to follow because a number of the exhibits

6   were not included in the books of exhibits to be

7   considered on remand.  They were considered -- they

8   were in the exhibits submitted in connection with the

9   original class certification briefing.

10              MR. ST. ANTOINE:  Yes.  Your Honor, I

11   think we are partly responsible with plaintiff's

12   counsel for that.  I think it was an effort

13   collectively to streamline the number of documents

14   that we would address at yesterday's and today's

15   hearing, but I think it may have backfired.

16              THE COURT:  Well, maybe a little bit.

17   I'm not finding fault.  My goal is to get to the heart

18   of this issue.  And so I have the letter, good.

19              MR. CORRIGAN:  Your Honor, may I just

20   make one point?

21              THE COURT:  Yes.

22              MR. CORRIGAN:  Just one.  In your

23   opinion, and we have a slide of this later, you said

24   Dr. Beyer used Immucor standard costs for both

25   defendants because Ortho has represented that its cost

1   data is unreliable.

2             THE COURT:  I'm not sure.  That was

3   based on what the plaintiffs argued, but we're going

4   to get to the heart of the under liability.  There

5   were a lot of issues that were raised in the remand

6   briefs.  This, in my judgment, is the most important

7   of those issues.  And I want to get to the heart of

8   it.

9             First, Bronstein testified, and I'm

10  looking at defense exhibit -- well, it's his -- I

11  think it's his -- at the hearing?  Yes, at the class

12  certification hearing on July 26th, 2012, at the top

13  of page 245, and it appears on Plaintiff's slide 37.

14  I don't think the entire part of the transcript that

15  I'm going to read appears.

16             This is the defense expert,

17                 "What was the basis of Dr. Beyer's

18                 conclusion that he wasn't going to rely

19                 on Ortho's cost data?

20                 "A   There was information

21                 provided from Ortho that they

22                 recharacterized costs from time to time

23                 and as a result, the cost data that you

24                 had requested wouldn't be comparable

25                 from year to year.

1                    "Q   So would that be unreliable

2                    data for the purpose of Dr. Beyer --

3                    for the purposes Dr. Beyer was

4                    seeking?"

5                    (Pause)

6                    "A   I would say he made the right

7                    decision in not using Ortho's cost

8                    data, yes."

9              With respect to what transpired

10    yesterday, I noted and these were the two hand-ups.  I

11    think the plaintiff handed them up.  Paragraph 55 of

12    Dr. Beyer's reply or rebuttal brief, rebuttal report,

13    page 22 and page 23.  And I'm referring to page 23,

14    the Ortho but for gross profit.

15              That table, Table 3 includes only

16    standard costs.  And it identifies but for sales first

17    and standard costs and the but for gross profit based

18    only on standard cost.

19              I compared those figures to the figures

20    in Exhibit 171 and I guess it was included in

21    plaintiff's slides at page 28, we referred to it a

22    number of times.  But it appears to be Exhibit 171 in

23    the original class certification brief filed by

24    plaintiff.

25              If we factor in the cost not included

1    in standard costs, there would be no profit in those

2    years, and the years are 2003, 4 and 5, and that would

3    dramatically impact Dr. Beyer's but for figures for

4    those years.  I can't find any comparable data for

5    2001, 2002.

6                     A dramatic issue raised for the first

7    time clearly, I don't know whether -- I don't recall,

8    I haven't gone through all the original briefing, but

9    I don't recall this argued any -- to any great extent

10   initially.  And I didn't go back over my opinion last

11   night, but I don't think I focused on it in the

12   opinion.

13                    I want this addressed.  I'll leave to

14   you when, and of course, how.  If you want to get on

15   with -- I think it's easy to use RICO instead of

16   phases, we'll call them buckets, bucket 2, we can do

17   that, address bucket 3, and at the end of the

18   proceeding go back to this, so that you can think it

19   through.

20                    It was also raised specifically on Mr.

21   St. Antoine.  He raised the question whether, well,

22   what happens if buyers' model is deemed unreliable

23   under Daubert.  And we would certainly address it then

24   because this raises an issue for me, as to the

25   reliability of Dr. Beyer's model for the year -- well,

1    the first phase, 2000, 2001 through 2005.

2                    All right.  Preference?

3                    MR. CORRIGAN:  Your Honor, I'd like to

4    address it right now directly, and also as part,

5    ironically, maybe pressuredly, I was going to direct

6    this at the very beginning of my presentation anyway.

7                    THE COURT:  Okay.

8                    MR. CORRIGAN:  But I'd like to address

9    it right now which I think might be helpful to the

10   Court.

11                   THE COURT:  Fine.

12                   MR. CORRIGAN:  Your Honor, if I might,

13   I'll hand up some slides.  I wouldn't want you to be

14   without any slides.

15                   THE COURT:  New slides?

16                   MR. CORRIGAN:  Yes, new slides.  Some

17   of them are old, but we've filed them for today's

18   purposes.

19                   THE COURT:  Have you provided them?

20                   MR. CORRIGAN:  Sorry, Your Honor.

21                   THE COURT:  No, that's fine, having a

22   lot of exhibit books is better than having none.  Have

23   you provided a copy?  I'm sure Mr. St. Antoine has

24   received a copy of it.  I note that the new slides are

25   almost as voluminous as the old slides.

1                    MR. ST. ANTOINE:  Actually, Your Honor,

2      I don't think we do have a copy of the slides.

3                    THE COURT:  You have this?  I'm sure

4      you've got a copy of --

5                    MR. CORRIGAN:  We'll provide it right

6      now, Your Honor.  Yesterday was difficult to provide

7      copies because we weren't sure which ones we were

8      ultimately using and which ones we weren't.

9                    A couple of points directly, Your

10     Honor, on Your Honor's concern, and then I have a

11     slide I'd like to show, but the main points are these.

12     Your Honor is correct that that point that was made

13     yesterday about the costs, was made for the first

14     time, it was not made in briefs or in expert reports

15     or anywhere.  It's the first time we've heard that.

16                    Secondly --

17                    THE COURT:  But, of course, you had the

18     letter.

19                    MR. CORRIGAN:  We had the letter, yes,

20     and Dr. Beyer addresses that very cost point in

21     footnote 120 in page 56 of his reply report.  The

22     Bates number, the Ortho CB, that's the FTC document

23     itself.  So Dr. Beyer does address this in his report.

24                    THE COURT:  Tell me, because I've got

25     exhibits all over, where is that report?

1                    MR. CORRIGAN:  It's the --

2                    THE COURT:  Which --

3                    MR. CORRIGAN:  It's Exhibit A to our

4    motion.

5                    MR. COE:  I'm sorry, Jeff, is that the

6    reply report?

7                    MR. CORRIGAN:  I'm sorry.  Your

8    Honor -- I'm sorry, Exhibit A to the reply report.

9                    THE COURT:  Oh, I have the reply

10   report.  I have it.  It's not -- Exhibit A is --

11                   MR. CORRIGAN:  I thought Exhibit A was

12   Beyer's reply report.  Yeah, page 24, paragraph 56 and

13   it's footnote 120.

14                   THE COURT:  Now, Exhibit A, Ortho

15   Exhibit A -- oh, Ortho's Exhibit A appears to be

16   Beyer's videotape that was issued.  Okay.  Where are

17   you on --

18                   MR. CORRIGAN:  I'm at footnote 120 at

19   the bottom.  And the sentence that the footnote

20   follows is, "Furthermore, the financial statement

21   presented to the FTC shows no material cost increases

22   between '03 and '08."

23                   THE COURT:  Now what --

24                   MR. CORRIGAN:  That's in the middle of

25   paragraph 56, Your Honor, and then at the bottom,

1   footnote 120.

2           THE COURT:  The total costs -- well,

3   those figures run from 24-A in 2003 which -- no, 36.

4   4 in 2006 is the high to -- no, 40.  Well, that's not

5   so.  The FTC data doesn't corroborate that.  The FTC

6   data, and let me read the figures.  I'm looking at

7   Exhibit 171 to Plaintiff's original class cert brief

8   and slide 28, Plaintiff's slide, original slide 28,

9   cost data, 2003, 24,880,000.  I won't read the -- or

10  some odd dollars.

11          2004, 20,965,000; 2005, 21,987,000;

12  2006, 23,605,000; two thousand -- that's 6.  2007,

13  20,751,000; 2008, 40 -- I'm sorry, 16,415,000.

14          Well, that's the range of costs.  Is

15  that -- are those the figures you're referring to?

16          MR. CORRIGAN:  Yes, Your Honor, yes.

17          THE COURT:  When I made the earlier

18  statement, I moved over a column.  This exhibit is

19  very hard to read.  The profit figures have changed

20  because of 2008, for example is 48,8, whereas in 2003,

21  it's 24,8.

22          All right.  Now, let's go back to page

23  24 of the Beyer report.  "Furthermore, the financial

24  statements presented to the Federal Trade Commission

25  show no material cost increases between 2003 and 2008.

1    And now the footnote.  I'm reading the footnote.

2        (Pause)

3                MR. CORRIGAN:  And, Your Honor, I have

4    a slide that can help explain the footnote, why the

5    footnote is correct, and the analysis yesterday is

6    incorrect.

7                THE COURT:  All right.  Go ahead.

8                MR. CORRIGAN:  Okay.  Your Honor, I

9    preface that this cost data can get jumbled.  My

10   information is that we were not provided CNIS cost

11   data from Ortho.  So that when we see it for the first

12   time yesterday, this is coming out of the blue.  If

13   this happens earlier, there are things that can be

14   done to take advantage of that.  But when it happens

15   at the remand hearing for the first time, I -- my

16   impression, my information from our expert is that we

17   were not provided CNIS data.

18               THE COURT:  Well, you were provided

19   with the FTC exhibit.  It was part of your class

20   certification.

21               MR. CORRIGAN:  The exhibit itself, but

22   I --

23               THE COURT:  Which referred to CNIS.

24               MR. CORRIGAN:  It does.  But let me

25   just show you this slide.

1                    THE COURT:  Well, you just said you

2    were not provided with.  You had the totals, what

3    you're saying is, you don't have the back-up.

4                    MR. CORRIGAN:  Yes.

5                    THE COURT:  Did you ask for it?

6                    MR. CORRIGAN:  I'm not sure, Your

7    Honor, to be honest with you, I'm not sure.  What we

8    do normally is we ask for cost data, and then there's

9    a give and take between the sides, what do you have,

10   what do we need, that.

11                   But Immucor was very simple, they gave

12   us the cost data, it seemed to be all there.  Now,

13   with Ortho they gave us some cost data, along with a

14   letter sort of explaining it was unreliable.

15                   So it may have got lost in transfer.

16                   THE COURT:  Well, the letter did and

17   not something else.  It explained the difference

18   between standard cost data --

19                   MR. CORRIGAN:  Uh-huh.

20                   THE COURT:  -- and costs not included

21   in the standard cost data.

22                   MR. CORRIGAN:  Uh-huh.  Unclear to me,

23   Your Honor.  I'm not saying Ortho did anything wrong,

24   what I'm saying is that we were provided it, it was

25   possible that it got lost in the shuffle, that's

1    possible.  But I do want to talk about this analysis,

2    because I think this is at the heart of the Court's

3    concern.

4                    THE COURT:  Okay.  And you're referring

5    me to a new slide?

6                    MR. CORRIGAN:  Yes.  That's a new

7    slide, which is slide number 2 in the presentation for

8    today.  Okay.

9                    Now, it's going to take a minute to

10   walk through.

11                   THE COURT:  Do it.

12                   MR. CORRIGAN:  Now, the --

13                   THE COURT:  This is a slow walk.

14                   MR. CORRIGAN:  Yes, I'm walking slowly

15   along with you, Your Honor.

16                   THE COURT:  Because it's a very -- I

17   think it's -- well, it's a very significant issue.  I

18   said that once, I'm not going to keep saying it.  Go

19   ahead.

20                   MR. CORRIGAN:  Okay.  So the graph at

21   the top again is this infamous FTC document, okay, and

22   we've tried to blow that up as much as we can.  It has

23   the sales, we have the sales blown-up there from 2003,

24   2004, 2005.  Do you see that?

25                   THE COURT:  Yes.

1                    MR. CORRIGAN:  Okay.  Now, the sales

2     are important because it gives us some sense on the

3     data that was used to produce the FTC document.  When

4     we saw this for the first time yesterday, we were

5     wondering what data, what set of information went into

6     preparing the FTC document, and how does it comport

7     with the data that we have, that Dr. Beyer used.

8                    We wondered that ourselves.  We got

9     back last night, and we took a look.  Okay.  So we

10    have the sales number, 31 million, in '04, it's 34

11    million and in '05, it's 54 million.

12                   And Ortho counsel compared that

13    document to Table 3 in Dr. Beyer's reply report as the

14    Court acknowledged.  Okay.  They compared it to Table

15    3, and they said that the costs were grossly out of

16    whack, and the costs went way up, and therefore

17    Beyer's methodology is all wrong.

18                   THE COURT:  Costs went way up and

19    profits --

20                   MR. CORRIGAN:  Right.

21                   THE COURT:  -- went way down because of

22    that.

23                   MR. CORRIGAN:  So we took a look at Dr.

24    Beyer's Table 2 in his initial report, and that's on

25    the bottom of this graph.  And what Table 2 gives us

1    is Ortho's sales numbers.  It tells us the sum total

2    of the sales that was included in the data that we

3    received from Ortho.

4                    And if you look at the sales in Table 2

5    for '03, they're 22,250,000 -- I'm sorry, 22,530,000.

6    If you compare that to the sales in '03 in the FTC

7    document, those are 31 million.  So if there were that

8    many more sales, of course, there are going to be many

9    more costs.  This is not an apples-to-apples

10   comparison.

11                   Let's look at 2004.  The sales at 2004,

12   we have 23 million in Beyer's report.  Again, that

13   means that the data we got from Ortho, the

14   transactional data totaled 23 million in revenue, in

15   sales.

16                   But look at '04 of the FTC document,

17   it's 34,9.  11 million more dollars, 11 million in

18   sales, again with 11 million more in sales, you're

19   going to get more in costs.  It's not a comparison,

20   it's not an apples-to-apples comparison.

21                   Look again at '05, our sales and

22   Beyer's data set 41 million.  The data that was used

23   to put this FTC document together is 54 million.  13

24   million off.  So you're comparing costs associated

25   with 41 million in sales, and costs in conjunction

1    with 54 million in sales.  It's no wonder they're off,

2    they're not comparing the same data sets.

3                    THE COURT:  What information, if any,

4    do you have for the discrepancy in the sales figures?

5                    MR. CORRIGAN:  Your Honor, we just

6    don't know what figures went into preparing this FTC

7    document.

8                    THE COURT:  Was this not flagged before

9    today?

10                   MR. CORRIGAN:  We haven't seen this

11   argument before today.  Dr. Beyer analyzed --

12                   THE COURT:  But you've seen the

13   documents.  You had them.

14                   MR. CORRIGAN:  We had Dr. Beyer analyze

15   them in footnote 120 -- I think it's -- yeah, in

16   footnote 120.

17                   THE COURT:  Did he not pick this up?  I

18   guess he didn't.

19                   MR. CORRIGAN:  Well, he saw the

20   document, he analyzed the cost.  I mean, he says

21   there, based on his analysis of cost, Ortho's cost in

22   that document increased by 6.4 percent.  So he did

23   analyze that document.  But what Ortho counsel did

24   yesterday as not analyze that document, they analyzed

25   in comparison with Dr. Beyer's table, and that's where

1    we have a problem.

2                      Dr. Beyer analyzed the FTC document in

3    that footnote, and he says that Ortho's costs over

4    that four year period increased 6.4 percent.  So he

5    did analyze it.  But the problem is, when you analyze

6    it in comparison with his other table, that's where we

7    have a major disconnect.  It's not apples to oranges,

8    it's apples to door knobs, they're not close, and that

9    explains the significant discrepancy in the costs.

10                     THE COURT:  Apples to door knobs.

11                     MR. CORRIGAN:  Keep that in mind, Your

12   Honor.  If you want to use it in your opinion, you're

13   welcome to.

14                     THE COURT:  I might decline that.

15                     MR. CORRIGAN:  I have a funny feeling

16   you might, yes.  So that should --

17                     THE COURT:  Well, what do you think we

18   should do about that?

19                     MR. CORRIGAN:  I think that Dr. Beyer's

20   analysis is legit, 120.  Ortho's costs went up 6.4

21   percent over four years, that's not a significant

22   number, that's not going to throw anything off.

23   That's not going to tell Your Honor that Dr. Beyer

24   doesn't have good grounds for his opinions.  I mean,

25   we knew costs were going up slightly, and he says it

1  right in this report.

2              The problem comes when you compare

3  apples to door knobs, you've got a major discrepancy

4  and obviously the Court was concerned about.  And

5  we're --

6              THE COURT:  Was this discrepancy in the

7  sales figures covered in any of the depositions or any

8  of the discovery, other than depositions?

9              MR. CORRIGAN:  Well, we don't see it as

10  a discrepancy in the sales figures, it's just we've

11  got a data set, they used a different data set.

12             THE COURT:  Well, there's a

13  discrepancy.  Two different figures reported as sales

14  for a given year, that's a discrepancy.

15             MR. CORRIGAN:  Your Honor, you're

16  correct.  We didn't see the importance of it.  Dr.

17  Beyer got the data set from Ortho, I mean, we went

18  back and forth, he got his data, he worked with the

19  data.

20             You know, the FTC, they have different

21  concerns with the FTC, they used different data, he

22  analyzed the document, but he didn't say -- he didn't

23  think it was necessary to perform the analysis to get

24  the extra data that they may have used from the FTC.

25  But he did analyze the document and show it again,

1    modest 6.4 percent over a four year period.

2              My guess is if the Court had seen a

3    modest 6.4 increase over the four year period, you

4    wouldn't have been concerned, as you were by viewing

5    this document, which has now been shown at the --

6              THE COURT:  Well, the comparison of the

7    two documents, the FTC document with Dr. Beyers' chart

8    at page I guess it's 23, wiped out the profits, it

9    would've been either minimal profits or losses.

10             MR. CORRIGAN:  And now we see why that

11   it is, and it's not just right, it's not so.

12             THE COURT:  Because the sale figures

13   are not the same as the sales figures on which he

14   relied in Table 3.

15             MR. CORRIGAN:  Which means -- so when

16   the sales figures are off, that means everything's

17   off.  The costs measured with those sales figures are

18   also off.  So you really can't tell anything from that

19   comparison, Your Honor.

20             Whatever can be told from that document

21   is told in footnote 120 right there.  Dr. Beyer had

22   good grounds for his opinion and he still does,

23   despite that discrepancy.

24             THE COURT:  And the good grounds are

25   based on his analysis of the figures submitted to the

1  FTC in your Slide 28, your Exhibit 171 in the original

2  class certification --

3              MR. CORRIGAN:  Yes, Your Honor.

4              THE COURT:  -- briefing.

5              Have you calculated or tried to

6  calculate the effect of a 6.4 percent increase in

7  costs over the years?  I guess the years he's

8  referring to there, not the whole spread --

9              MR. CORRIGAN:  It's '03 to '07, so it

10 does conclude sort of periods, pieces of both periods

11 of the benchmark.

12             THE COURT:  Yes.

13             MR. CORRIGAN:  I can't point you right

14 now, Your Honor, the place where it was done, but

15 obviously Dr. Beyer was aware.  He factored in costs

16 adequately in all of his benchmarks, and all of his

17 benchmarks reflected market structure as Your Honor

18 has found.

19             THE COURT:  Who -- all right.  And

20 that's an explanation, which is what I was seeking.

21             Who took Dr. Bronstein's deposition?

22 Did you take it?

23             MR. CORRIGAN:  I did.

24             THE COURT:  When he gave those answers,

25 what -- I haven't reread the whole deposition, I read

1   parts of it.  What was your thinking, what was your

2   conclusion?

3                   MR. CORRIGAN:  On the -- the part the

4   Court just read about the unreliability of Ortho's

5   data?

6                   THE COURT:  Yes.

7                   MR. CORRIGAN:  It tells me that Dr.

8   Beyer has good grounds for what he's done.  When their

9   own expert is saying he agrees that Dr. Beyer

10   shouldn't have used Ortho's costs, good grounds, I

11   mean, that's right on Daubert, they don't even have a

12   conflicting opinion on that.  Their own expert says he

13   did that, after a pause as you saw.  He may have been

14   trying to think of another answer.  I didn't put that

15   pause in, Your Honor, the court reporter did that,

16   although I'm glad it's there.  He thought long and

17   hard about it, and he said, you know, Dr. Beyer was

18   right in not using Ortho's costs.  It's Daubert in a

19   nutshell, good grounds.

20                   THE COURT:  Well, you've provided an

21   answer to the --

22                   MR. CORRIGAN:  I hope it was the right

23   answer, Your Honor.  You didn't say that.

24                   THE COURT:  Well, it was.  It was an

25   answer.  Mr. St. Antoine, or Mr. Coe, who is going to

1    respond?

2                    MR. ST. ANTOINE:  Your Honor, could we

3    have one moment to confer?

4                    THE COURT:  And because we're jumping

5    around, although I don't ordinarily allow a two on

6    one, Corrigan is doing such a good job of explaining,

7    because you've divided this aspect of the argument,

8    I'll permit both of you to speak.

9                    MR. ST. ANTOINE:  It could very well be

10   one, but that's -- let me -- if I may have just a

11   moment?

12                   THE COURT:  Fine, absolutely.

13        (Pause)

14                   THE COURT:  All right, Mr. Coe.

15                   MR. COE:  Good morning, Your Honor.

16   Before I start, there's one document that we showed on

17   the screen yesterday in connection with this

18   conversation that I'd like to provide to the Court,

19   and that was the blow-up we did of the 2004 and 2005

20   FTC data.

21                   And then someone on the fly yesterday,

22   we were drawing this comparison between Dr. Beyers'

23   numbers and the FTC data, so we've also created a new

24   slide that just shows those numbers on the same

25   document.

1              So the first point I wanted to address,

2    Your Honor, is this point about whether this was the

3    first time we made this argument, and it was not.

4    This was in our reply brief at page 18.  We said that

5    Ortho decided to increase price in 2005 after it

6    learned in 2004 that its actual costs, costs not in

7    standard or CNIS were significantly higher than the

8    costs as predicted in 2003, and we cited I believe to

9    --

10             THE COURT:  This is the reply brief?

11             MR. COE:  Correct, Your Honor, on

12   remand.

13             MR. CORRIGAN:  On remand.

14             THE COURT:  Fine.

15             MR. CORRIGAN:  Which was just submitted

16   two weeks ago.

17             THE COURT:  It was submitted July 10th.

18             MR. CORRIGAN:  Yes.

19             MR. COE:  Correct, Your Honor.

20             And then we go on to say the cost data

21   --

22             THE COURT:  Well, that's just three

23   years since my class certification opinion and maybe

24   three and a half -- well, not quite because the

25   briefing was rather -- was done in a timely fashion,

1   I'm talking about the original brief.

2                   MR. COE:  Right.

3                   THE COURT:  But we're still talking

4   three plus years.

5                   MR. COE:  Correct, Your Honor.

6                   THE COURT:  To raise an issue.

7                   MR. COE:  Correct, Your Honor.  On that

8   point --

9                   THE COURT:  But did you flag the issue?

10                   MR. COE:  Well, if you remember, Your

11   Honor, we played excerpts from Mr. Kashen Schmidt's

12   (ph) deposition yesterday, where he talked about this

13   issue, of the reason for the 2005 price increases

14   being at these costs not in standard, show that raw

15   material costs were much higher than expected.

16                   THE COURT:  When was that deposition

17   taken?  In 2012?

18                   MR. COE:  2012, April 3rd, 2012, Your

19   Honor.  And as Mr. Corrigan said, they never asked for

20   this actual cost data.

21                   THE COURT:  Well, they asked for cost

22   data.

23                   MR. COE:  Your Honor, what happened

24   was, Dr. Beyer was told the standard cost data they

25   asked for was not reliable, but he didn't do anything

1   to follow-up on that, he took that as an excuse to

2   say, I'm going to make some unscientific assumptions

3   about costs, and we're going to use Immucor costs with

4   Ortho's costs, he didn't dig in deeper as he should

5   have.  As a scientist, he didn't ask for this actual

6   cost data or do any analysis based on this actual cost

7   data, Your Honor.

8               THE COURT:  I'll pass that for the

9   minute, but how do you explain, I'm sorry to get you

10  off track, Dr. Bronstein's testimony?

11              MR. COE:  He was talking about standard

12  costs, Your Honor, the standard cost data that Ortho

13  has said was unreliable.

14              THE COURT:  No, that's not the

15  question.  What was the basis of Dr. Beyer's

16  conclusion that he wasn't going to rely on Ortho's

17  cost data?  Cost data includes everything presented on

18  cost.  And his answer, and I'm skipping,

19                   "I would say that he made the

20                   right decision in not using Ortho's

21                   cost data, yes."

22              MR. COE:  Again, Your Honor, he goes on

23  to say,

24                   "There was information provided

25                   from Ortho that they recharacterized

1          cost from time to time."

2          THE COURT:  Yes.

3          MR. COE:  "And as a result the cost --"

4    it says dated, but I'm sure it's supposed to be data,

5    "that you requested wouldn't be comparable from year

6    to year."

7          And that goes directly back to the

8    letter that we handed up to Your Honor as Exhibit 172

9    where Ortho said that it's standard cost data --

10         THE COURT:  Yes, but your expert has

11   said, Beyer was correct in not considering costs.

12         MR. COE:  He was correct in not using

13   the standard cost data, Your Honor.  I don't read that

14   to say that Dr. Beyer was correct in not using any of

15   Ortho's cost data.  This data that we've been relying

16   on, this FTC submission, was submitted to the federal

17   government, Your Honor.  I don't think anyone's --

18         THE COURT:  But there's no reference in

19   Bronstein's testimony here, and you can point to other

20   testimony, I'm referring to page 245 to the phrase,

21   standard cost data, the reference is to cost data.

22   And you've said, they had -- they requested cost data

23   and we gave them what we had.  I don't know what that

24   was, but Bronstein didn't limit his answer to standard

25   cost data.  He agreed with Beyer on this issue.

1                    MR. COE:  Well, he was responding to a

2        question, Your Honor --

3                    THE COURT:  That's normally what

4        happens at depositions.

5                    MR. COE:  Right, exactly.  It wasn't,

6        you know, an exact artful answer, but --

7                    THE COURT:  I should tell you that your

8        team is smiling now, they're glad that you're up here

9        being peppered with questions.  St. Antoine doesn't

10       smile very much during oral argument, but he's smiling

11       now, and you're doing very well, Mr. Coe, but you

12       still have to explain this.

13                   MR. COE:  As Your Honor knows very

14       well, you know, when you're asked a question at a

15       deposition, you're not thinking about all the

16       permeations of the words you're using, I mean, I think

17       it ties in very well to the letter that we sent that

18       addresses standard cost data.  I don't believe actual

19       costs, he was ever asked the question about actual

20       cost data at his deposition, Your Honor.

21                   THE COURT:  Well, he wasn't asked a

22       specific question of which I've been pointed to on

23       actual cost data versus standard cost data.  He's just

24       asked a question about cost data.  This is a big

25       hurdle for the defense.  And I -- but I still can't

1    understand why this issue wasn't flagged much, much

2    earlier.  It seems to me to be a significant issue,

3    and what you've said, well, we did flag it earlier, we

4    flagged it 12 days ago on an issue that was raised

5    over three years ago.

6                        Well, I don't want to beat a dead

7    horse.

8                        MR. COE:  We have had three years to

9    think about it, Your Honor, and I think some new

10   things did come up in those three years.

11                       But -- you know, I think the more -- I

12   want to address a couple of the other points Mr.

13   Corrigan made if that's okay.  You know, the main

14   point he made was relying on this data or the

15   statement that Dr. Beyer made talking about price

16   increases from 2003 to 2008.  And that's not a

17   relevant time period to the two points that we were

18   trying to make yesterday.

19                       If we could show our, I believe it's

20   slide 31.

21                       THE COURT:  Original slide 31?

22                       MR. COE:  I'm sorry, 34.  We only have

23   one slide deck, Your Honor, so.

24                       THE COURT:  Yes, I have --

25                       MR. COE:  So that the first point that

1    we made was that Ortho's gross profit margin did not

2    surpass this 40 percent goal in 2004.

3                    THE COURT:  We're looking at different

4    -- oh, it's not the slide on the screen.  Slide --

5                    MR. COE:  34, Your Honor.  3-4, I might

6    have misspoke when I gave you --

7                    THE COURT:  I thought you said 31.

8                    MR. COE:  I did say 31, Your Honor.

9                    THE COURT:  31, all right, yes, I have

10   that.

11                   MR. COE:  As we explained why we

12   thought 2004 was a relevant year, both in our brief

13   and yesterday, but then we also do the comparison of

14   2005, and that's the document that I just handed up to

15   Your Honor.

16                   So the numbers Mr. Corrigan showed

17   about these revenues being different and these costs

18   might have been different -- well, actually he talked

19   about revenue, Your Honor, he didn't say anything

20   about what Ortho's actual costs were in 2005 or 2004,

21   all we know is that Dr. Beyer didn't account for them,

22   and that renders his analysis of what their gross

23   profit margin --

24                   THE COURT:  Yes, but Dr. Beyer does

25   account for them in footnote 120, looking at the

1    corrected sales figures, the -- based on the FTC

2    submission.  He says, "costs increased by a modest 6.4

3    percent over --" he uses a four year period, and --

4                     MR. COE:  And he's looking at that cost

5    data in a different context, Your Honor.  So in this

6    paragraph of his reply report, he's talking about his

7    use of Immucor's standard costs as a proxy for Ortho's

8    standard costs in this post 2006 time period.

9                     THE COURT:  The footnote refers only to

10   Ortho's costs.

11                    MR. COE:  Correct.  If you read --

12                    THE COURT:  And what he says is, if

13   using the correct figures, what you're arguing now,

14   are the correct figures, the figures submitted to the

15   FTC, the costs over this period and I keep referring

16   to quote this period because we're talking about --

17   let me get the FTC report.

18                    The FTC report covers 2003 through

19   2008, and I think that's what Beyer is --

20                    MR. COE:  That's the time period he's

21   using, Your Honor.

22                    THE COURT:  Yes.

23                    MR. COE:  Maybe I should put this --

24   let's back up a little bit.

25                    THE COURT:  Well, what he's saying is,

1    that the costs and I'd like you to answer this, the
2    costs of this period, total costs increased by a
3    modest 6.4 percent.  Then he says over the four year
4    period.  But the bottom line --
5                MR. COE:  Well --
6                THE COURT:  -- Corrigan argues that 6.4
7    percent increase in costs over that period is not
8    sufficient to throw out Beyer's model for that period.
9                MR. COE:  So he doesn't have a model
10   for the 2003 to 2008 period, Your Honor, he has a
11   model --
12               THE COURT:  Well, he has a model for
13   the entire --
14               MR. COE:  -- for 2001 to 2005, and then
15   he has a second set of models for 2006 to 2010.
16               THE COURT:  Well, but this argument
17   would apply to both.
18               MR. COE:  It wouldn't, Your Honor, and
19   that's -- I've switched to slide 35, which is the
20   second point we were making with this FTC data
21   yesterday, and that's that costs did increase from the
22   time of the BBLP plan through 2005.  So this first
23   half of the class period costs increased, and Dr.
24   Beyer should have accounted for costs in his benchmark
25   the benchmark used for the first half of the class

1  period.

2                    And the FTC data doesn't have any

3  actual cost data for 2000, 2001 or 2002, so you can't

4  use this FTC cost data to determine what happened

5  between 2001 and 2005.

6                    THE COURT:  For what reason was cost

7  data not submitted by Ortho to the FTC for those

8  earlier years?

9                    MR. COE:  I don't know, Your Honor, we

10  can get back to you on that.  I would imagine they

11  didn't ask for it, but I'm not sure.

12                    THE COURT:  That was what occurred to

13  me.

14                    MR. COE:  So if you see on this slide,

15  Ortho is predicting back in 2000 --

16                    THE COURT:  And now you're referring to

17  slide 35.

18                    MR. COE:  Right.  That it's standard

19  costs or its costs were going to be $10.2 million.

20  It's actual costs by 2003 were 24.88 million, Your

21  Honor.  So the question is, did costs increase from

22  2000 to 2005 and we would argue the evidence is that

23  they did, Your Honor, and that Dr. Beyer's comment in

24  paragraph 56 doesn't address that, because he only

25  talks about 2003 to 2008.

1                    THE COURT:  What are the cost figures,

2      the comparable cost figures for 2000, 2001 and 2002,

3      and where are those figures found?

4                    MR. COE:  I don't believe we have them,

5      Your Honor.  What we have is this prediction that

6      Ortho made in 2000 in connection with the Blood Bank

7      Leadership Program.

8                    THE COURT:  And that's the quote

9      prediction, end of quote on the bottom part of the

10     slide identified on page 35?

11                   MR. COE:  That's correct, Your Honor.

12                   THE COURT:  And again, let's go over

13     those, the costs.

14                   MR. COE:  Sure.  So -- if I may

15     approach, Your Honor?

16                   THE COURT:  Yes.

17                   MR. COE:  I've got a demonstrative.  So

18     this would've been September 15th document,

19     Plaintiff's Exhibit 54 that we've shown one page of on

20     slide 35.  It's at the bottom half of the screen, and

21     the first column is base case 2001 --

22                   THE COURT:  They are actual.

23                   MR. COE:  -- year one.

24                   THE COURT:  That's actual.

25                   MR. COE:  That's actually a prediction,

1   Your Honor, because this is 2000.  They're predicting

2   what they thought their sales and costs and profit

3   would be in 2001.

4                   THE COURT:  And they predict in 2001

5   total costs of 11,784?  No.

6                   MR. COE:  Correct, Your Honor, although

7   I will say --

8                   THE COURT:  Yes.

9                   MR. COE:  -- just to confuse us a

10  little more, this is the prediction without the price

11  increase.  This is if they had not implemented the

12  Blood Bank Leadership Program.

13                  The next column, year one --

14                  THE COURT:  Do costs increase with a

15  price increase?

16                  MR. COE:  They might go down, Your

17  Honor, and that's why -- adding on another layer, but

18  if you increase prices, and you lose sales to Immucor

19  --

20                  THE COURT:  Oh, the second half of that

21  equation is you lose sales.

22                  MR. COE:  Correct, Your Honor.  Or --

23  but you don't lose revenues, because your prices are

24  so much higher.  So your revenue actually goes up, but

25  the number of units you're selling goes down.

1                    THE COURT:  Could go down.

2                    MR. COE:  Correct, Your Honor.

3                    THE COURT:  If --

4                    MR. COE:  Especially if Immucor doesn't

5    follow in the price increase.  If you remember --

6                    THE COURT:  Well, that's if demand is

7    elastic.

8                    MR. COE:  Correct, Your Honor.  We have

9    to go back to Mr. St. Antoine's demand curves, Your

10   Honor.  So I think Dr. Beyer recognizes in the

11   footnote that we've been talking about that as --

12                   THE COURT:  Let him finish.

13                   MR. COE:  -- prices go up, sales go up,

14   it's possible that units go down, and therefore the,

15   you know, the price per unit might not be changing or

16   may be going up or going down, and that might not

17   necessarily be reflected in this total cost.

18                   THE COURT:  And so relate your argument

19   to --

20                   MR. COE:  Sure.

21                   THE COURT:  -- these figures.  What

22   you're saying is, the prediction in 2000 for costs, I

23   guess the only comparable year would be -- I'm turning

24   --

25                   MR. COE:  Year three, Your Honor.  This

1    --

2                    THE COURT:  2003 would be --

3                    MR. COE:  Correct.

4                    THE COURT:  -- the actual costs in

5    2003, according to the FTC document.

6                    MR. COE:  The 24 million --

7                    THE COURT:  24,8.

8                    MR. COE:  Right.  And Ortho had

9    predicted this 10.2 million dollar number at the

10   bottom right-hand corner of Plaintiff's 54, Your

11   Honor.

12                   THE COURT:  All right.  What were the

13   actual costs for the years -- I think I asked this

14   question and I don't think I --

15                   MR. COE:  I don't know off the top of

16   my head, Your Honor.  We can go back to the record and

17   see.

18                   THE COURT:  Isn't that important?

19   Because if the actual costs in those years were in

20   line with the costs that Dr. Beyer analyzed in his

21   footnote 120, wouldn't the result be the same, a

22   modest?

23                   MR. COE:  It is important, Your Honor,

24   and Dr. Beyer should have taken actual costs into

25   account in his methodology.

1                THE COURT:  But this is -- now you're

2      in Daubert mode.

3                MR. COE:  Yes, Your Honor.

4                THE COURT:  And what you're telling me

5      is you don't have the data.

6                MR. COE:  Well, Your Honor, Daubert

7      mode is not our burden to have this data, it's Dr.

8      Beyer's burden.

9                THE COURT:  It's a Daubert challenge.

10               MR. COE:  Correct, Your Honor.

11               THE COURT:  So what you're saying is,

12     Dr. Beyer's statement in footnote 120 is not -- does

13     not cover everything that he needs to cover.  And then

14     I asked you, well, what figures does he need to cover,

15     what are you relying on to argue that the 6.4 percent

16     cost increase over this period and this period appears

17     to be 2003 to -- through 2007, doesn't state the full

18     picture?  You can argue that, but what are the -- what

19     cost data do you have that should tell me, according

20     to your argument, that Beyer was wrong, that the cost

21     fluctuation was more substantial?  Is it what you've

22     just argued from slide 35 or do you have more?

23               MR. COE:  I believe we have more, Your

24     Honor, but I'll have to go back into the record, so we

25     might need to supplement the record maybe after the

Page 40

1    hearing on that, Your Honor.  I don't have that in

2    front of me today.

3                    THE COURT:  Fine.  Should we let him

4    finish, Mr. Corrigan?

5                    MR. CORRIGAN:  I had one point that I

6    thought was –– and I don't mean to interrupt, but the

7    point I would make on this graph while Mr. Coe is up

8    there, I don't believe they're using CNIS in the

9    bottom, I don't think that's the case.  I mean,

10   they're talking about standard costs, the infamous

11   unreliable standard costs in the bottom, and the top

12   graph is talking about CNIS.

13                   So again, we have apples to doorknobs.

14                   THE COURT:  Well, what are COGS?

15                   MR. CORRIGAN:  That's the costs of

16   goods sold, don't know whether that includes CNIS or

17   not.

18                   THE COURT:  A good point.  Mr. Coe, can

19   you answer that?

20                   MR. COE:  I believe that's standard

21   costs, and we made this point yesterday, Your Honor,

22   but the standard cost prediction had also gone up by

23   2003, so that was at 14.1 million by 2002 when they

24   made this 2003 prediction, which was about $4 million

25   higher than what they predicted two years earlier in

1   2000.

2                    THE COURT:  Isn't that the more --

3   well, if I were picking costs, wouldn't that be the

4   argument that you would want me to focus on?

5                    MR. COE:  No, Your Honor.  Our argument

6   is that Dr. Beyer should have taken actual costs into

7   account, it wasn't appropriate for him to --

8                    THE COURT:  But the figures that you're

9   referring to, costs of goods sold, doesn't tell me

10  whether that's actual costs or standard costs.

11                   MR. COE:  That's correct, Your Honor.

12                   Your Honor, again I go back to the

13  point that I've already made that there is a big

14  difference between standard costs and actual costs.

15                   THE COURT:  I'm getting that

16  impression.

17                   MR. COE:  And something that Dr. Beyer

18  should have taken into account, and his failure to do

19  that renders his --

20                   THE COURT:  But you're all over the

21  place in the figures that you're arguing.

22                   MR. COE:  As is Dr. Beyer, Your Honor.

23  As we talked about yesterday, in some places he uses

24  standard costs, some places he uses -- sometimes he

25  uses Immucor's standard costs --

1                    THE COURT:  Well, he uses actual --

2                    MR. COE:  -- or Ortho's, sometimes he

3    uses Ortho's standard cost, in this footnote we just

4    read, he's looking at Ortho's actual costs.

5                    THE COURT:  Well, he's explaining why

6    he need not use or refer to Ortho's actual costs.

7                    MR. COE:  And let me address that, Your

8    Honor.

9                    THE COURT:  And that's issue we're

10   talking about.

11                   MR. COE:  Right.

12                   THE COURT:  Because Corrigan says, he

13   didn't use costs, standard costs or actual costs, and

14   it's not significant.  If we're talking about standard

15   costs, they did not increase dramatically.  If we're

16   talking about actual costs, referring to footnote 120,

17   he didn't use them because Ortho's costs, actual

18   costs, I'm adding the word actual, increased by a

19   modest 6.4 percent over the four year period.

20                   MR. COE:  And, Your Honor, if I can go

21   back to this paragraph of Dr. Beyer's report.  I'd

22   like to start with the third sentence, it starts after

23   footnote 118, paragraph 56.

24                   It starts with Dr. Bronstein also

25   criticizes me.

Page 43

1                    THE COURT:  Your page 23?

2                    MR. COE:  24, Your Honor.

3                    THE COURT:  Oh, yes.  Yes, yes, I have

4      it.

5                    MR. COE:  So I think this will put this

6      footnote in context.  It says, "Dr. Bronstein also

7      criticizes me for using changes in Immucor's costs as

8      a proxy for the change in Ortho's costs.  There is,

9      however, no evidence to support Dr. Bronstein's

10     speculation that Ortho's costs may have been rising

11     faster than Immucor's costs.  In fact, the standard of

12     cost data produced by Ortho actually shows costs

13     falling, which would result in lower but for prices

14     than would result from relying on Immucor's costs.

15                    "Furthermore, the financial statement

16     presented to the Federal Trade Commission shows no

17     material cost increases between 2003 and 2008."

18                    So the reason he's citing this FTC data

19     is to buttress his use of Immucor's costs as a proxy

20     for Ortho's costs in the second half of the class

21     period.

22                    Now, as we'll get to later eventually,

23     one of our primary arguments or criticisms of Dr.

24     Beyer's use of Immucor's standard costs in the second

25     half of the class period is that they are flat.  We

1  admit that the costs in the second half of the class

2  period don't go up.

3           If you go back to paragraph 55, which

4  is on pages 22 and 23, and this is where Dr. Beyer

5  goes through his calculations of Ortho's but for

6  profit margins, he says in the second to last sentence

7  at the -- on page 22 in paragraph 55, he says, "I

8  performed similar calculations in Table 3 subtracting

9  Ortho's standard costs from its but for sales to

10  arrive at Ortho's margins in the but for world."

11           So for purposes of doing these gross

12  profit calculations that we talked about, he used

13  Ortho's standard costs and did not take these actual

14  costs --

15           THE COURT:  Well, that's obvious from

16  the table, that's what we're talking about.  Table 3

17  refers to just standard costs.

18           MR. COE:  So I think what this shows

19  us, Your Honor, is that Dr. Beyer knew that actual

20  costs were different than standard costs.  He decided

21  to take them into account or address them in one

22  context, but he ignored them in this other context,

23  where he was supposedly justifying his decision to cut

24  off these price increases after five years, Your

25  Honor.

1                    THE COURT:  Do that again.

2                    MR. COE:  Sure.  So when he's

3    justifying the use of his benchmark in the second half

4    of the class period, this Immucor cost benchmark --

5                    THE COURT:  Well, that's because

6    Immucor did not differentiate between standard costs

7    and actual costs.

8                    MR. COE:  I don't know if that's the

9    case, Your Honor.

10                   THE COURT:  There's no evidence,

11   there's been no argument that they did.

12                   MR. COE:  I don't know one way or the

13   other, Your Honor.

14                   THE COURT:  Corrigan said they did not.

15                   MR. COE:  I'm not sure that's what he

16   said, but --

17                   THE COURT:  Did you, Mr. Corrigan?

18                   MR. CORRIGAN:  There's been no

19   challenge to the Immucor costs.

20                   THE COURT:  That's not what I asked.  I

21   asked, does Immucor differentiate between actual costs

22   and standard costs?

23                   MR. CORRIGAN:  I'd have to check with

24   my expert, Your Honor, but the key point is that

25   there's been no challenge to Immucor's costs.  They

1    were fine, they were even by transaction, they were

2    very easy to work with.  Ortho's costs were exactly

3    the opposite.

4                    THE COURT:  All right.  Thank you.  Not

5    quite an answer, but thank you.

6                    MR. COE:  So he books that Immucor, or

7    I'm sorry, Ortho's actual costs in that context to

8    justify the use of Immucor's costs as a proxy for

9    Ortho's costs.

10                   THE COURT:  Show me that statement

11   again.  I missed it.

12                   MR. COE:  Sure.  This is in paragraph

13   56, Your Honor.  And he's responding to Dr.

14   Bronstein's criticism about using Immucor's costs as a

15   proxy for the change in Ortho's cost.  And just to

16   summarize he says, well, Ortho's costs were actually

17   going down or going up by less than Immucor's costs.

18   So this is actually --

19                   THE COURT:  But there's nothing in that

20   paragraph that says anything about actual costs versus

21   standard costs.

22                   MR. COE:  Well, it's in the footnote,

23   Your Honor.  So he says, the financial statements --

24   first, he looks at Ortho's standard costs --

25                   THE COURT:  Well, he looks at -- okay.

1    Where does it say that?

2                    MR. COE:  Sure.  If you start with

3    footnote 119, Your Honor, skip the next sentence, and

4    start with the sentence that starts, "in fact."

5                    THE COURT:  I'm reading footnote 119.

6                    MR. COE:  Oh, I'm sorry, Your Honor,

7    I'm --

8                    THE COURT:  In the bottom.

9                    MR. COE:  I was giving that as a place

10   holder.

11                   THE COURT:  All right.  In fact, I have

12   it.

13                   MR. COE:  "In fact, the standard of

14   cost data produced by Ortho actually shows costs

15   falling, which would result in lower but for prices

16   than would result from relying on Immucor's costs."

17                   THE COURT:  Then he drops to footnote

18   120, where he says, Ortho -- he refers to Ortho's

19   total costs, and then says, they increase by a modest

20   6.4 percent.

21                   MR. COE:  Exactly, Your Honor.  So he's

22   saying, I looked at the standard cost data, it's going

23   up by less than Immucor's standard costs of what the

24   actual cost data is going up by less than Immucor's

25   standard of costs, so I should be able to use

Page 48

1    Immucor's standard of costs as a proxy for Ortho.

2                    THE COURT:  For the second period.  For

3    the second period.

4                    MR. COE:  Correct, Your Honor, for the

5    second period.

6                    THE COURT:  But you're using the same

7    data for a different argument now.

8                    MR. COE:  Correct, Your Honor.  I'm

9    talking about Dr. Beyer's decision -- two points, they

10   both relate to Dr. Beyer's decision to ignore actual

11   cost data in the first half of the class period.  And

12   we argue that that led him to make two errors.  The

13   first was, he ignored costs in his benchmark for the

14   first half of the class period.

15                   And one of his justifications for that

16   was, costs weren't going up that much, or they weren't

17   going up at all, and we've tried to show here that --

18                   THE COURT:  What you -- you haven't

19   shown the actual cost figures for those earlier years.

20                   MR. COE:  Correct, Your Honor.  Second

21   point we're --

22                   THE COURT:  But that's a big correct.

23   Isn't that --

24                   MR. COE:  I don't think it is, Your

25   Honor, I think, you know, I think we'll be able to

1    show that costs did, in fact, go up during this time

2    period, but you're right, we'll have to supplement the

3    record on that point.

4              THE COURT:  All right.

5              MR. COE:  The second point is, Dr.

6    Beyer came up with this calculation of gross profit

7    margin to justify his decision to cut off the 25

8    percent price increases after five years.  And he said

9    that Ortho would've far surpassed this 40 percent

10   profit margin in 2005, so there was no need to

11   continue these price increases.

12             THE COURT:  And your answer is taking

13   into consideration actual costs --

14             MR. COE:  That's not the case, correct,

15   Your Honor.

16             THE COURT:  -- the cost -- the costs

17   not included in standard costs.

18             MR. COE:  If you took into account the

19   actual costs, actually we're still losing money in Dr.

20   Beyer's but for world in 2005.

21             THE COURT:  Thank you.

22             MR. CORRIGAN:  Your Honor, may I be

23   heard?  I have one or two brief points.

24             THE COURT:  Yes.  You'll address that

25   last point.  We've sort of beaten the first point to

1   death, but the last point.

2               MR. CORRIGAN:  I will.  The points are

3   brief, and then I'll move on with the rest of what we

4   have.

5               A minor point, Dr. Bronstein's

6   testimony that the Court has cited several times, he

7   was being cross-examined, but it wasn't at the

8   deposition.  It was live testimony in front of this

9   Court.

10              So if you ever want to carefully think

11  about an answer, that's a good time to do it.

12              Secondly, the way that costs and

13  transactional data works is beginning in the case,

14  beginning this effort, we say we want your

15  transactional data, your cost data.  They give us

16  something, we go through it, we take a look what's

17  wrong and ask them questions.  Immucor did that, and

18  we went on our way.  The data made sense.

19              Ortho then sends this letter, which I

20  have not seen before.  I've not -- no, I've seen the

21  letter, I'm sorry.  I have not seen a company of that

22  size and sophistication come into a case and say oh,

23  by the way, our standard costs are unreliable.  I have

24  not seen that.

25              But what we did think was, well,

1   they've announced their costs were unreliable, we can

2   use Immucor costs.  What I have to admit, I didn't

3   foresee, is they say their costs are unreliable, and

4   now they're spending all this time and effort on what

5   issue, costs.  You said your issue was costs were

6   unreliable.  We thought that might have been a dead

7   issue, but that's the most live issue in their

8   argument now.  How is that a live issue?

9               Now, the Story Parchment quote I

10  mentioned yesterday --

11              THE COURT:  I'm trying to predict what

12  the Court of Appeals is going to say --

13              MR. CORRIGAN:  I'll bet.

14              THE COURT:  -- on this issue.

15              MR. CORRIGAN:  Story Parchment says

16  "the wrongdoer should not get the benefit of any

17  imprecise damages because --"

18              THE COURT:  I'm aware of that.

19              MR. CORRIGAN:  "-- of its wrong --"

20              THE COURT:  I'm aware of that.  I'm

21  aware of that law.

22              MR. CORRIGAN:  This is the same

23  situation.  Ortho's trying to get the benefit of their

24  own unreliable costs.  That shouldn't be allowed to

25  happen, and that's last point on this, unless the

Page 52

1    Court has questions, I'll move on with the rest of my

2    presentation.

3                    THE COURT:  Well, the last point that

4    Coe made is that, taking profits, focused on profits,

5    and use of the CNIS, there were no profits in many of

6    the years that we're addressing.  Can you -- in any of

7    the years.

8                    MR. CORRIGAN:  Under the -- under Dr.

9    Beyer's benchmark?

10                   THE COURT:  Yes.  That in the but for

11   world if we --

12                   MR. CORRIGAN:  Okay.  The --

13                   THE COURT:  -- use actual costs, there

14   were no profits.

15                   MR. CORRIGAN:  Well, we saw the tables

16   that Dr. Beyer used.  The profit margin for both Ortho

17   and Immucor was going up.  I mean, Ortho started in

18   the negative, it went into a smaller negative, and it

19   went up and up and up.  So there were profits being

20   shown in Dr. Beyer's tables.  The profit margin in

21   Immucor and Ortho's tables were not significant.

22                   THE COURT:  We'll have to look again at

23   that, thank you.  All right.  Now, let's move to the

24   second category of arguments.

25                   MR. CORRIGAN:  Your Honor, as you know,

1   we've sort of broken this up, and I'm going to be

2   handling the Court's issues on 5, 6 and 7, but I did

3   want to make one point from yesterday too, that Mr.

4   St. Antoine had said, I used the figure of 2,000

5   percent price increase, and he said where I got that

6   from.

7                   And actually where I got it from was

8   this Court's opinion, and I quote, "However,

9   defendant's creation of a duopoly --" this is page

10  236, "However, defendant's creation of a duopoly by

11  the acquisition of a number of competitors shortly

12  before the alleged conspiracy began, does not mitigate

13  the fact that prices on many TBR products rose by more

14  than 2,000 percent during the class period, that those

15  huge increases occurred very shortly after the alleged

16  collusion began, and that those huge increases applied

17  to all customers."

18                  So that's where I got the 2,000

19  percent.

20                  Your Honor, I'm going to handle the

21  Court's question, number 6 first, which was the --

22                  THE COURT:  Timing of the --

23                  MR. CORRIGAN:  -- timing of the

24  conspiracy, yes, thank you.  And we thought we would

25  go back and do something a little bit on the

1    conspiracy to talk about, the evidence has been

2    skirted around, and we've talked about, they've made

3    criticisms of Dr. Beyer, that he shouldn't be opining

4    on the conspiracy, that he should take the allegations

5    as such.

6                    So what we'll start with is the

7    allegations in the complaint.

8                    THE COURT:  This is a Daubert related

9    issue or not?

10                   MR. CORRIGAN:  I'm not sure, Your

11   Honor, I really am not.  But what I can say is, saying

12   that Dr. Beyer should have relied on the complaint is

13   just irresponsible.  I mean, the complaint is filed

14   before discovery, a great amount of discovery is

15   taken, and that leads you to follow the evidence which

16   is what Dr. Beyer did.

17                   Courts have been instructed in Hydrogen

18   Peroxide and Comcast to delve beyond the pleadings.

19   Dr. Beyer did just that.  He follows the evidence.  If

20   the evidence leads him to conclude in selecting a

21   benchmark, that there was collusive activity in the

22   fall of 2000, why would he go back to the complaint,

23   so that he came in here and I would have to explain to

24   Your Honor the reason he did that was because we told

25   him to do it, in contrast to what the evidence showed

1    him?

2                    Dr. Beyer followed the evidence, and

3    the evidence is clear, that there was conspiratorial

4    activities in the fall of 2000, polluting and tainting

5    the BBLP benchmark, therefore, he didn't use it as a

6    benchmark.  It's not a proper benchmark, and I want to

7    talk a little bit about why it's not in some detail.

8                    THE COURT:  Now, wait a minute.  The

9    criticism is the complaint describes the conspiracy as

10   having started on or about January 1st, 2000.  And in

11   the -- in your pleadings, you've -- well, you departed

12   from that.  I'm talking about the consolidated amended

13   complaint.  The evidence, according to the plaintiffs,

14   showed that the conspiratorial conduct began I think

15   November 4th at the first meeting, and continued

16   November 8th and thereafter, and it's really a

17   November start date.

18                    I don't know what the defense is going

19   to argue on that, but general law on pleadings versus

20   proofs is that pleadings are generally amended to

21   reflect what is established by the proofs.

22                    MR. CORRIGAN:  That's a fair point,

23   Your Honor.  We have could amended this complaint at

24   any time.  I'm not sure what the --

25                    THE COURT:  I said, treat it as

1    amended.  We're not amending the complaint.

2                    MR. CORRIGAN:  Thank you.

3                    THE COURT:  When -- I've forgotten when

4    that complaint was filed, two thousand --

5                    MR. CORRIGAN:  2010.

6                    THE COURT:  Yes, we're not amending a

7    complaint five years after the fact.  I don't think

8    it's necessary.  If I think after hearing argument on

9    this in the event that defense argues, I'll let you

10   respond.  But I'm not troubled, as troubled as I was

11   by the cost issue.  I am not troubled by the start

12   date of the conspiracy.

13                   But there is a fuzzy issue and it

14   relates to the second bucket on the selection of the

15   OCV plan over the BBLP plan, and the fact that some of

16   the documents on which you rely in using the OCV plan

17   are actually BBLP plan documents.

18                   MR. CORRIGAN:  They're BBLP plan

19   documents --

20                   THE COURT:  Yes.

21                   MR. CORRIGAN:  -- referring to the OCV.

22                   THE COURT:  So sayeth the plaintiffs.

23                   MR. CORRIGAN:  But the documents

24   themselves say, stay the course, stay the course was

25   the OCV plan.

1                    So just because it's a BBLP document,

2     and I'm putting that in quotes, it refers to the state

3     of course.  They're trying to figure out what they're

4     going to do.  And in trying to make that decision,

5     they refer to the OCV plan.

6                    So the fact that it's a BBLP document

7     doesn't mean that it has to just refer to them.  It's

8     referring to option 1, which was stay the course five

9     plus years of 25 percent increases.  So I think that's

10    immaterial, and the document is speaking of OCV and

11    you can't say that it doesn't.

12                   THE COURT:  Where is that?  I want to

13    go back to that.  Where is that stay the course

14    document?  Is it in your slides?  I don't think it is.

15                   MR. CORRIGAN:  I don't think it's in

16    our slides.

17                   THE COURT:  Okay.

18                   MR. CORRIGAN:  It's Plaintiff's Exhibit

19    54.  I think your clerk's got this one handy.

20        (Clerk confers with the Court)

21                   MR. CORRIGAN:  So this is a BBLP

22    document, but it's referring to the choice they have.

23    And one of the choices is, stay with the OCV plan.

24        (Pause – Court and clerk confer)

25                   THE COURT:  Okay.  Yes, I had it

1    numbered differently.  I thought so.  It talks about

2    traditional blood bank strategy options, that's what

3    you're referring to?

4                    MR. CORRIGAN:  Yes, Your Honor.

5                    THE COURT:  It says, stay the course,

6    continual, annual 25 percent increase.  You added a

7    little bit, for the next five years.  The next five

8    years is not in this particular document --

9                    MR. CORRIGAN:  Your Honor, I'll -- let

10   me --

11                   THE COURT:  blood bank market

12   correction plan to which you're referring is dated

13   September 15th, 2000.

14                   MR. CORRIGAN:  Your Honor, there's --

15                   THE COURT:  And what you're saying is,

16   stay the course means 25 percent increases for five

17   years.  That takes a lot of inventiveness.

18                   MR. CORRIGAN:  Your Honor, I have

19   another page from that very same document.

20                   THE COURT:  Okay.  Go there.

21                   MR. CORRIGAN:  What page number did you

22   --

23                   UNIDENTIFIED:  It ends in 70, Your

24   Honor.

25                   THE COURT:  I think I have it.  Yes.

Page 59

1              MR. CORRIGAN:  See the one at the

2   bottom?

3              THE COURT:  It says, "create a health

4   market."

5              MR. CORRIGAN:  Yes, that's another word

6   for the -- that's another name for the BBLP plan.  So

7   this is a BBLP plan document, but one of the options

8   is referred to in the last bullet point there.

9              THE COURT:  Is one market correction --

10  one major market correction versus five plus years of

11  annual 25 percent price increasing.

12             MR. CORRIGAN:  So that's what -- that's

13  one of the bases for Dr. Beyer extending the OCV plan.

14             Your Honor, he based it on Ortho's

15  documents.  And I've cited case law, and I'm going to

16  cite it again.  It has --

17             THE COURT:  No, no, you don't have to

18  cite that case law.  The question is, is the reliance

19  on the Ortho documents to reach the conclusions

20  reached by Dr. Beyer reasonable, and is it reliable.

21  Not for authority, certainly you can rely on Ortho

22  documents and the major market correction to which

23  reference is made in this latter document, the one

24  ending in Bates number 70, major market correction,

25  what does that --

1                 MR. CORRIGAN:  That's the BBLP, should

2    we do the BBLP and raise prices 2 to 300 percent in

3    one fell swoop, or should we do what we've been doing

4    and continue, you know, five plus years of annual 25

5    percent price increases.

6                 THE COURT:  Is this the best evidence

7    you have on the 5 plus years?

8                 MR. CORRIGAN:  This along with the stay

9    the course, the document you saw earlier.  But it's

10   also, Your Honor, it's a conservative estimate.  I

11   mean, 25 percent price increases over five years, at

12   the end of five years is more than 300 percent.

13                 As the Court pointed out in its

14   opinion, that takes into account market structure.

15   Okay.  The but for world we have, gives them 300

16   percent price increase.  If they -- and we've talked

17   about some conspiratorial, where the but for world

18   diverts from the actual word, or what I call the

19   conspiracy world, they got higher increases, but Dr.

20   Beyer's OCV benchmark allows them for 300 plus price

21   increases in five years.  That accounts for the

22   structure, market structure.  That accounts for the

23   duopoly and it's reasonable.

24                 Under their method, there is no way to

25   do it, to find damages in this case.  You can't do it

1    by regression, you can't do it by the market plan, and

2    you can't do it by BLLP, and I do have some slides on

3    that.

4                    THE COURT:  All right.

5                    MR. CORRIGAN:  They've continually said

6    that BBLP meets Dr. Beyer's criteria for proper

7    benchmark, and that is absolutely false.  I said

8    yesterday, that the BBLP was riddled with conspiracy,

9    and I have some slides on that.

10                   THE COURT:  Fine.

11                   MR. CORRIGAN:  I didn't know we'd have

12   to use them, but we do I think.

13                   THE COURT:  Use them.

14                   MR. CORRIGAN:  Thank you, Your Honor.

15                   This is slide 7, Your Honor.  I'm

16   sorry, I've jumped around a little bit already --

17                   THE COURT:  No, that's all right.  Let

18   me get --

19                   MR. CORRIGAN:  If you can go to slide 7

20   of the day 2 that I handed you up today.  So I've got

21   to -- I'm sorry.

22                   Okay.  We have outline of a conspiracy.

23   This just sort of outlines the evidence, all right.

24   Number one there, do you have that, Your Honor?

25                   THE COURT:  I do.

1                    MR. CORRIGAN:  Ortho abandoned

2      extensively researched post duopoly pricing strategy,

3      OCV 25 percent in favor of a drastically more

4      aggressive pricing structure, BBLP 200 percent.

5      That's unchallenged.  They did that.

6                    Two, at the same time, Immucor

7      abandoned its post duopoly pricing strategy 20

8      percent, based on Ortho's change to aggressive

9      strategy, undisputed as well.

10                    Three, decisions to change to more

11     aggressive pricing strategy, not based on any change

12     in market structure, costs or demand, also

13     unchallenged.  There's a lot of talk about costs, but

14     they're not saying they went with a market correction

15     plan instead of OCV based on rising costs, even Ortho

16     didn't say that.

17                    And number four, the changes were

18     implemented immediately after direct communications

19     between defense.  Now, let's talk about some of those

20     direct communications.

21                    THE COURT:  You're talking about

22     between November 4th and 8th --

23                    MR. CORRIGAN:  Yes.

24                    THE COURT:  -- and thereafter?

25                    MR. CORRIGAN:  Yes.  See, the

Page 63

1   difference in what they did in OCV and what they did

2   in BBLP is important in Dr. Beyer's selection of

3   benchmark.  The OCV plan, they paid a consultant.

4   They debated, they thought about it.

5               The BBLP, they hold a presentation in a

6   booth right down the hallway from Ortho -- I'm sorry,

7   from Immucor, announcing a drastic pricing change.

8   That's very different from their behavior, including

9   with OCV.

10              Now, let's take a look at that.  Let's

11  take a look.  This is -- hold on one second.  This is

12  testimony from Ed Gallup.  Ed Gallup was the President

13  of Immucor, and he was talking -- he's talking here

14  about going to see Ortho's presentation at the AABB.

15  And there's several people who have been deposed that

16  said they hadn't seen a presentation like this at

17  AABB.  This was something different.

18              Let's see Mr. Gallup first.

19      (Video played)

20              MR. CORRIGAN:  Your Honor, this is the

21  President of Immucor watching an Ortho presentation

22  concerning the BBLP, okay.

23              Now, conspirators, the enemy of

24  conspirators is uncertainty.  Conspiracies rise in

25  uncertainty.  Now, Ms. Burzik, Cathy Burzik was the

1    President of Ortho at this time.  And we have some

2    testimony from Mike Poynter, okay, Mike Poynter was a

3    top sales official at Immucor, and he's talking about

4    what happened at this very same 2000 AABB meeting.

5                        "During the AABB meeting, Catherine

6    Burzik, Ortho's President came to the --"

7                        THE COURT:  You're referring to slide 9

8    now?

9                        MR. CORRIGAN:  Yes, Your Honor, I'm

10   sorry.

11                       THE COURT:  In the slides for today.

12                       MR. CORRIGAN:  Yes.

13                       "Catherine Burzik came to the Immucor

14            booth and introduced herself to me as the

15            President of Ortho.  She gave me her

16            business card and asked me to pass it

17            along to Ed Gallup because she wanted to

18            speak with him."

19                       Okay.  We go back to the highlighted

20   language down further the paragraph.

21                       "She also asked if I had seen Ortho's

22            presentation and invited me to come to the

23            Ortho booth and see it."

24                       That's the presentation Gallup was just

25   talking about, announcing a dramatic increase in

1   price.

2                    At the bottom of this, it says,

3                    "Later on, I did pass along Ms.

4          Burzik's business card to Mr. Gallup, and

5          conveyed her request to speak with him."

6                    The president of the company walks into

7    the booth of the same AABB and says she wants to talk

8    to the president of the only other competitor in the

9    business on the eve of a humongous price increase.  A

10   little unconventional.  But again, uncertainty, let's

11   try to get rid of the uncertainty.

12                   Okay.  So let's see what Ed Gallup

13   says.  We have a little testimony from Judy Thorne,

14   her name is Cangiamilla, that was her maiden name, and

15   she testifies about what Immucor people did after

16   seeing this presentation.

17      (Video played)

18                   MR. CORRIGAN:  So the presentation --

19                   THE COURT:  What was Judy Thorne's

20   position then?

21                   MR. CORRIGAN:  She was director of -- I

22   think she was director of sales.  She was an executive

23   at Immucor.  I think it was director of sales, but she

24   wasn't a lower level person, she was an executive.

25                   So the presentation has this desired

1    effect, all these Immucor people see it, and Ed Gallup

2    says, I want to go talk to the President of Ortho.

3    That was the whole point.

4              Now, we have another snippet of

5    testimony from a gentleman named David Gendusa.

6    Gendusa was an executive at Ortho.  Now, his testimony

7    was pretty -- was somewhat bizarre, in that he said

8    that someone from Ortho had asked him to introduce

9    them to Ed Gallup.  See, Gendusa knew Gallup, so

10   somebody at Ortho, and he couldn't remember who, said,

11   hey, I'd like to meet Ed Gallup.

12             All right.  So while he kept saying he

13   couldn't remember who, he did say something that sort

14   of clarified who he was talking about.  And let's see

15   the clip from Mr. Gendusa, please.

16   (Video played)

17             MR. CORRIGAN:  So he wouldn't say who,

18   but he refers to the two presidents, which only makes

19   sense because Burzik wants to meet Gallup, Gallup

20   wants to meet Burzik.  Okay.  So I've got another

21   slide there.  Okay.  So I sort of summarized that

22   testimony there, Your Honor, Gallup/Burzik, and we

23   quote Gendusa, two presidents get together.

24             Okay.  Poynter said, Burzik gave me

25   your business card, and asked me to pass it along to

1    Ed Gallup, because she wanted to speak with him.

2    Vaughn (ph) said, and Ed said he was going to try to

3    meet with the President of Ortho to see if they can

4    find out more information.  Gendusa then produced two

5    high ranking -- introduced high ranking Ortho

6    executive, Ed Gallup, the two presidents of a company

7    to get together just to say hello.

8              So these two presidents are going to

9    get together on the eve of the AABB, in light of the

10   presentation announcing the dramatic price increase.

11   That's just the beginning, Your Honor, there's more.

12             Now, the Court saw this evidence the

13   last time, it was a long time ago, but here's from the

14   Court's opinion on this very point.

15             THE COURT:  Where are you, what slide?

16             MR. CORRIGAN:  On slide number --

17             UNIDENTIFIED:  15.

18             MR. CORRIGAN:  -- 15, Your Honor.

19             This is a quote from the Court's

20   opinion, "Plaintiff's theory that Ortho began to

21   consider the BBLP before the AABB meetings, but would

22   not have executed the plan without explicit assurance

23   that Immucor would follow, is highly plausible and

24   consistent with documents showing that the BBLP only

25   became fully operational after the meetings."

1          That's a significant finding that was

2     untouched by the Third Circuit, has nothing to do

3     anything what Dr. Beyer said.  That's pure evidence.

4     But it's instructive on why Dr. Beyer selected OCV as

5     a benchmark and why the BBLP is totally inappropriate

6     as a benchmark.

7               Your Honor, there's more.  I want to

8     show you a little bit of clip.  Ed Gallup met with

9     Judy Thorne, but he didn't just stop at that.  Because

10    uncertainty is the enemy of conspiracy, he wanted more

11    information.  So he asked Judy Thorne to go meet with

12    her old friend, David Gendusa, who was an executive at

13    Ortho.  And here's what she said about that.

14               THE COURT:  What slide?

15               MR. CORRIGAN:  This is slide 13.

16      (Video played)

17               MR. CORRIGAN:  Your Honor, this is the

18    discussion of the BBL prices, which the letter hadn't

19    gone out yet, or it went out that day, but they hadn't

20    been implemented yet as the Court pointed out.  This

21    is about the BBLP.  This is about the pricing program

22    that Ortho says should've been used as a benchmark, or

23    could've been.

24               I have one more clip from Judy

25    Cangiamilla, if you could, please.  This is what

1    happens when she goes back to Ed Gallup and tells him

2    about her lunch.

3         (Video played)

4              THE COURT:  What slide?

5              MR. CORRIGAN:  I'm sorry, Your Honor,

6    14.  14.

7         (Video played)

8              MR. CORRIGAN:  Your Honor, I've said

9    this before, but the expense situation is a classic --

10   when I was a prosecutor, we used to call that

11   consciousness of guilt.  Also, Mr. Gendusa holding the

12   price list in his brief case, so no one would see what

13   he's doing.  They understand what's going on.  This is

14   the BBLP price list.  How on earth could Dr. Beyer

15   have used that as a proper benchmark?  The answer is,

16   he couldn't have.

17             So then the question comes up, how do

18   you say, how do you criticize Dr. Beyer from that.

19   Now, in Dr. Bronstein's deposition, I deposed Dr.

20   Bronstein in March of 2012.  And I asked him if he

21   read Judy Thorne's testimony in this case, and he said

22   he read a snippet of her employment action against

23   Immucor.

24             I asked him if he had read Ed Gallup's

25   testimony in this case, and it turns out he wasn't

1    even aware at that time that Ed Gallup had been

2    deposed.  Ed Gallup is the President of Immucor.

3                    So later at the Court's class

4    certification hearing, I asked him some similar

5    questions, and if you could take a look, Judge, at

6    slide 16.  This was the Court's hearing.  So I asked

7    him at the Court's hearing to see if he'd done

8    anything about it since.  If you'd follow along at the

9    top starting with line 22,

10                        "When I deposed back you in

11                        March, you had not read --"

12                        It says July, but it should be,

13                        "-- Judy Thorne's testimony,

14                        her deposition.  Have you read that

15                        since?

16                        "I believe what I said was that

17                        I read the excerpt that was cited by

18                        Dr. Beyer.

19                        "Have you read her deposition

20                        testimony that was taken in this case?

21                        "(Pause)

22                        "I don't believe I have, other

23                        than the excerpt that Dr. Beyers

24                        cited.

25                        "Q   Why not?

1               "It's not clear to me that there

2               is anything in that report that would

3               go to the issues that are relevant for

4               me in terms of evaluating Dr. Beyer's

5               report.  As I mentioned, I did read

6               the excerpt he relied on, but nothing

7               more than that."

8          Next page, Your Honor, slide 17,

9               "Q   Did you read Ed Gallup's

10              deposition testimony in this case?

11              "A   I looked at testimony

12              from him in the FTC case, but I don't

13              believe I saw his testimony in this

14              case.

15              "Did you read David Gendusa's

16              testimony in this case?

17              "A   I don't believe so.  I

18              don't recall Dr. Beyers citing

19              anything from that.  If he did, I

20              would have.  Essentially what I did

21              is look at his reply report, look at

22              the testimony cited, and I read

23              that.

24              "Q   Did you read Nino

25              Decurico's (ph) testimony in that

1                    case?

2                         "A    Yes.

3                         "Why did you read that and not

4                    the others?"

5                    And here's an important answer,

6                         "The attorneys gave me a set of

7                    depositions that I thought they

8                    thought I might want to look through

9                    and that was one of them."

10                   So the attorneys set him a set of

11   depositions that don't include the three I displayed.

12   They don't include Thorne, Gallup or Gendusa, which

13   involved a lot of conspiracy evidence.

14                   So you still have -- Dr. Bronstein

15   doesn't read the evidence.  He doesn't do his

16   homework, but yet he criticizes Dr. Beyer for

17   selecting the wrong benchmark.  And if the Court will

18   look, we see at the top of that, the last two slides,

19   our heading is "Dr. Bronstein's opinions don't fit the

20   facts."  We're talking in language of Daubert.  And

21   his opinions clearly don't fit the facts.

22                   We have one more slide on Dr.

23   Bronstein, Your Honor, and that would be slide 18.

24   Now, this is from Dr. Bronstein's report, and Ortho

25   cites it in their brief.  But it's page 30 of Dr.

1    Bronstein's report, note 85.

2                    And if you look at the highlighted

3    portion there, it says, "First, Dr. Beyer does not

4    address the possibility that the alleged cartel would

5    be concerned that its illicit activities would be

6    detected."

7                    Now, you saw Ed Gallup phonying up the

8    expense voucher, you saw David Gendusa holding the

9    price list in his briefcase, so there were concerns of

10   illicit activity would be detected, but Bronstein

11   didn't read that testimony.  And if you follow along,

12   it gets better.

13                   In parenthesis there, "A conservative

14   duopoly would not share, and therefore, would have

15   opted for more modest price increases than

16   contemplated by Ortho's market correction plan."

17                   What Bronstein is saying is, the size

18   of the increases means that they're duopolists.

19   Because if they were conspirators, they wouldn't have

20   had the nerve to do such incredibly high price

21   increases.

22                   So I guess if Immucor and Ortho had

23   known this, if they'd had the benefit of this

24   testimony when they were raising prices 2,000 percent,

25   maybe they would've raised it 10,000 percent just to

1    really throw us off the scent.  And that's the kind of

2    opinion you give when you don't do your homework, when

3    you haven't read the conspiratorial evidence, but you

4    still feel comfortable criticizing the other expert

5    for selecting the wrong benchmark.

6                    I have one more slide, Your Honor, I

7    know the Story Parchment has been beaten to death, but

8    let's try it one more time.

9                    The actual quote there -- this is slide

10   No. --

11                   THE COURT:  What --

12                   MR. CORRIGAN:  -- 19, Your Honor, I'm

13   sorry.

14                   THE COURT:  Fine.

15                   MR. CORRIGAN:  Slide No. 19.  Now, the

16   actual quote there is the wrongdoer, but after the

17   testimony we just saw, we feel comfortable inserting

18   Ortho in there.  Ortho is not entitled to complain

19   that damages cannot be measured with the exactness and

20   precision that would be possible if the case, which he

21   alone is responsible for making, or otherwise.

22                   THE COURT:  Well, we've been over that,

23   and Mr. St. Antoine made the point that that's talking

24   about damages, and that's separate and apart from the

25   antitrust injury.

1                    MR. CORRIGAN:  That's separate, but

2    they're criticizing his damages model in the impact

3    arena.  And the reason they're trying to do that is

4    because that's the standard of the damage.

5                    All the Court's citations to this -- to

6    the Beyer language, which has now been excised, all

7    your citations to that language are in your damages

8    section, not surprising.

9                    The other evidence we provided for

10   impact is largely untouched.  We did use Dr. Beyer's

11   damages methodology to confirm impact as a fifth

12   source of common impact, so it's true, we did use it

13   as evidence of impact, but it's his damages

14   methodology.  They like to attack the impact, because

15   they think the standards don't.  They don't like to

16   attack the damages, because they understand the

17   standard as well as we do.

18                    Your Honor, that will be number 6.

19   That's all I have on number 6.  And I would like to go

20   to number 5.

21                    THE COURT:  Let's take a very brief

22   recess.  It's 11 -- almost 11:30, let's take a ten

23   minute recess.

24                    MR. CORRIGAN:  Thank you, Your Honor.

25                    THE CLERK:  All rise.

1          (Recessed at 11:28 p.m.; reconvened at 11:49

2     p.m.)

3                    THE CLERK:  All rise.

4                    THE COURT:  Be seated, everyone.

5                    You may proceed.

6                    MR. CORRIGAN:  Thank you, Your Honor.

7     I'm going to start with the Court's issue number 5,

8     which I believe was using Dr. Beyer's OCV benchmark as

9     he -- the reliability of using a business plan as a

10    benchmark.  And to start the --

11                   THE COURT:  Well, the cases are legend

12    that you can use a business plan, and you've addressed

13    the question -- well, you -- I thought you'd addressed

14    it already.  There's a certain overlap between the

15    arguments.  I've tried to distill the arguments from

16    defendant's lead brief.  But haven't you argued that?

17                   MR. CORRIGAN:  I have.

18                   THE COURT:  The question is, is what he

19    did reliable, and that's what we spent all day

20    yesterday and much of today on.

21                   MR. CORRIGAN:  You're right, Your

22    Honor, I'm sort of -- yes, I'm going to address the

23    reliability of his benchmark.  I thought that part of

24    the issue was whether you could use a bench plan as a

25    benchmark -- I'm sorry a business plan as a benchmark.

1              THE COURT:  No, you can.  The cases say

2      you can.  The question is whether this was an

3      appropriate business plan and whether he relied on it,

4      whether there was evidence of the things that he said

5      in the report, for example, extending the plan from --

6      a two year plan to a five year plan.  I think that's

7      the issue that -- a major issue, and that was

8      addressed yesterday and again this morning.

9              But you're right, there is some overlap

10     between, as the arguments have unfolded between that

11     argument and the argument relating to selection of the

12     OCV plan or the BBLP plan, but I'll hear what you have

13     to say.

14             MR. CORRIGAN:  Your Honor, one point of

15     clarification in my earlier remarks, I said that the

16     Judy Thorne/David Gendusa meeting took place on

17     November 1st, the same day that Ortho's price and

18     letters went out.  Let me just modify that.  Those

19     letters only went to a few select customers, they

20     didn't go to all Ortho's customers.  I wanted to

21     clarify that.

22             Your Honor, I thought that one of the

23     best way of doing this was to have a clip of Dr.

24     Beyer, sort of explaining why he thinks that the OCV

25     benchmark is reliable.  It's a little longer than I

1    normally like, but I thought that this was an

2    important point for the Court so I'd like to play a

3    clip from Dr. Beyer please.

4                    THE COURT:  Do you have it in here or

5    no?

6                    MR. CORRIGAN:  Yes, Your Honor.  It's

7    slide number 3 and as we go through it, slides number

8    4 and slides number 5 will appear on the screen.

9    Slide number 3 is the testimony, slide 4 is an outline

10   that he's referring to as he testifies, and slide

11   number 5 is something he refers to at one point in his

12   testimony.

13                    THE COURT:  All right.

14                    MR. CORRIGAN:  So if we could have

15   that, let's see what Dr. Beyer says.

16        (Video played)

17                    MR. CORRIGAN:  And that's slide number

18   4, Your Honor.

19        (Video played)

20                    MR. CORRIGAN:  Your Honor, two points

21   I'll make about Dr. Beyer's testimony.  That last part

22   about the coordinated conduct, that's in direct

23   contrast to what we saw surrounding the BBLP, which I

24   demonstrated a few minutes ago.

25                    Secondly, Dr. Beyer upon the transfer

1    on screen 3 -- on slide 3, towards the top, and I know

2    it's a little hard to see, but Dr. Beyer talks about

3    the explicit concern about Immucor's response, and

4    Ortho had said before, what the BBLP was concerned

5    about Immucor's response as well.

6                    The significant differences --

7                    THE COURT:  Well, I didn't understand

8    that.  I have not seen any evidence of Ortho's concern

9    about Immucor's response to OCV.

10                   MR. CORRIGAN:  In some of the documents

11   they do model, and as Dr. Beyer said they rejected

12   larger increases.  They looked at a hundred percent

13   increase and said, you know what, too risky.  If we do

14   a hundred percent increase and Immucor doesn't follow

15   us, we're going to lose a lot of business.

16                   So that was part of the modeling that

17   Norbridge helped them with, to try to figure out, do

18   we ask for a lot but not too much.  They settled on

19   the 25 plus 25, okay.

20                   Now, they did -- they were concerned

21   about Immucor response, and they did, as he said,

22   accept moderate risk.  Ortho counsel has pointed out

23   but also the BBLP documents also talk about concern

24   with Immucor's response.

25                   THE COURT:  Yes.

1               MR. CORRIGAN:  The significant

2      difference is that -- and OCV they took no action on

3      that other than modeling it.  And the BBLP they took

4      significant action to make sure Immucor followed.  So

5      the -- all the communications that we saw before, that

6      was the BBLP plan for dealing with Immucor's potential

7      response; go meet with the president, and go show him

8      the price list.

9               So even though some of the earlier BBLP

10     documents say the same things that the OCV documents,

11     the actions are very different.

12               And as the Court's pointed out, I said

13     there was two years of 25 percent, but later on, of

14     course, we saw the BBLP documents talked about annual

15     increases and five (ph) costs, but we've been through

16     that before.

17               Your Honor, I just -- as I've shown

18     before, I did have that last screen up and I've shown

19     you this before, I won't spend much time on this, but

20     the one about the law, the case law.

21               THE COURT:  About the what?

22               MR. CORRIGAN:  The case law, I'm

23     looking for it now.  The ZF Meritor, way back, I'm

24     sure I've messed this up.

25               UNIDENTIFIED:  I don't think it's 6.

 1                    MR. CORRIGAN:  Did you have --

 2                    UNIDENTIFIED:  6.

 3                    MR. CORRIGAN:  Yeah, I'm sorry.  I

 4    won't belabor this because the Court's already said

 5    there's case law that says this.  And the second case

 6    there is this Auto S (ph) case.  Now again, that's a

 7    Second Circuit 1970 case.  I would not normally have

 8    cited that.

 9                    THE COURT:  But it was cited in --

10                    MR. CORRIGAN:  Cited in the Third

11    Circuit.  Mr. Coe tried to distinguish that case

12    yesterday, but the language -- ZF Meritor --

13                    THE COURT:  Let me see the language.

14    What slide?

15                    MR. CORRIGAN:  It's slide number --

16                    UNIDENTIFIED:  6.

17                    MR. CORRIGAN:  -- 6.

18                    THE COURT:  Of the original slides?

19                    MR. CORRIGAN:  Yes.  No, I'm sorry,

20    today's slides.  I'm just -- I'm fumbling around to

21    throw you off, but it's today -- it's slide 6 of

22    today's slides.

23                    THE COURT:  All right.  I have it.

24                    MR. CORRIGAN:  Okay.  The top -- the

25    heading of this is also a quote from ZF Meritor which

1    again is a Third Circuit case, 2012.  And this

2    demonstrates exactly what Dr. Beyer's talking about.

3                  The first bullet point, "businesses are

4    generally well informed about the industries in which

5    they operate, and have incentives to develop accurate

6    projections.  As such, experts frequently use a

7    business plan to estimate expected profits in the

8    absence of misconduct."

9                  Now, the top -- the heading is where ZF

10   Meritor cites the Auto West case.  So they've revived

11   this 1970 Second Circuit case.  The Auto West case is

12   a good read also.  The Auto West case is analogous to

13   the Ortho situation.

14                 We saw in one of those BBLP planning

15   docs that one of Ortho's options was to exit the

16   business.  So this is not a decision that is being

17   made lightly.  When one of the options is to exit the

18   business, you better have your projections right.

19                 The Auto West case says, Your Honor,

20   and it's slightly different.  I have a quote there

21   saying, "damages testimony admissible because the

22   financial projections on which the testimony was based

23   were the product of deliberation by experienced

24   businessmen, charting their future course."

25                 The case goes on to say, "These

1    projections were no mere interested guests prepared

2    with an eye on litigation.  In December 1965, Auto

3    West reached a critical juncture.  The officers had to

4    decide whether it would be profitable than to remain

5    in California as a Puget distributor, or if there were

6    no sale (indiscernible).  The projections were used to

7    arrive at the conclusion to keep and they acted upon

8    it."  It's right out of this case.

9                  They're on the brink of whether we go

10   out of business or not, so this better be reliable,

11   you better sharpen your pencils on this one.

12                  And the last case I just mentioned,

13   Your Honor, is the chocolate case, again the Court

14   just decided, a defendant generated analysis, there

15   was a Daubert motion filed in that case in chocolate,

16   the expert survived, and the Court said that Dr.

17   Tollison addressed the impact of branding his opinion

18   based on the evidentiary record, which was a defendant

19   generated analysis.

20                  Your Honor, if you have no more

21   questions, I'll move to the last segment, which is

22   number 7, which was I believe the Court's --

23                  THE COURT:  Averaging.  I'm sorry, no,

24   no --

25                  MR. CORRIGAN:  Shifting the OCV

1    benchmark date from January of 2000 to January of

2    2001; is that right?  I believe.

3                    THE COURT:  Yes.

4                    MR. CORRIGAN:  Okay.  Your Honor, I

5    have a screen -- a slide up there, and this is slide

6    number 20.  Now, Dr. Beyer's initial report set the

7    beginning of the but for world in January of 2000.

8                    In his reply report, he changed it to

9    January of 2001.  And Ortho was consistently said he

10   did that to gerrymander and skew the results.  But I

11   think it was -- I'm not sure if it was Dr. Bronstein's

12   deposition or his hearing testimony, but I asked the

13   question,

14                    "If you had a model and you had

15                    some time to make it better and improve

16                    it, would you do it?"

17                    And he said,

18                    "Of course, you have an obligation

19                    to do so."

20                    So between the initial report and this

21   report, Dr. Beyer improved his model, and here's why

22   it's justified.

23                    In the highlighted portion,

24                    "Since I concluded that the impact

25                    from price cooperation began only in

1          2001,"

2                Okay, there's conspiratorial activity

3     in 2000 but the price increase wasn't charged to

4     anyone until January 2001.  So essentially it makes no

5     sense to start the but for prices before the

6     conspiracy had any impact.  And that's what he said.

7                     "It is more accurate for but for

8                prices to equal actual prices in 2000,

9                and to have but for prices only start

10               diverging in actual prices in 2001.

11               This is because it appears that the

12               initiations of the larger price

13               increase which began in 2001 did not

14               cause a delay to the price increases

15               that were already on the way in 2000."

16               And the last highlighted portion,

17                    "Thus setting the but for prices

18               equal to actual prices in 2000, and

19               beginning the but for prices in 2001

20               instead of 2000 results in a more

21               realistic model of the but for world."

22               That's the business he's in, making it

23     as realistic as possible, and this change which he's

24     demonstrated why he did it makes it more reliable.

25                Now, Ortho has criticized him for this

1    change in the date.  Now, let's take a look at the

2    next slide, number 21.  And that's also in Dr. Beyer's

3    hearing testimony presentation.  And the title is

4    "Base year change does not affect conclusions on

5    impact."

6                 Your Honor, at the bottom, there are

7    two lines and you can barely see them because they

8    overlap.  There's a very thin red line and a very thin

9    green line, and those are the but for prices.  The red

10   line is if you start the but for pricing in 2001, and

11   the green line is if you start the but for price in

12   2000.

13                Of course, the skyrocketing blue line

14   is the actual price.  And as you can see, whether you

15   start it in 2000 or 2001 makes no difference to the

16   conclusion.  All it does is make the model more

17   accurate.

18                And not only does Dr. Beyer think that

19   it made it more accurate, let's take a look at the

20   next slide, which is slide number 22.

21                THE COURT:  There's no explanation of

22   this on that chart.

23                MR. CORRIGAN:  He does testify about

24   it, Your Honor --

25                THE COURT:  Oh, I'm sorry, I'm sorry, I

1    didn't --

2                    MR. CORRIGAN:  Okay.  I did not include

3    his testimony on that, but it is in the record.

4                    THE COURT:  I don't need it, I just

5    need a magnifying glass.

6                    MR. CORRIGAN:  Yes, I'm sorry about

7    that.

8                    THE COURT:  Blue is the actual price.

9                    MR. CORRIGAN:  Yes.

10                    THE COURT:  Red is the but for price

11   starting in 2001.

12                    MR. CORRIGAN:  Yes.

13                    THE COURT:  And the green is the but

14   for price starting in 2000.  I see that now.

15                    MR. CORRIGAN:  Your Honor, the last

16   slide, which is slide number 22, involves this Court's

17   finding on this very issue.  And the title, "Ortho

18   disagrees with this Court's factual finding which was

19   untouched by the Third Circuit."

20                    Ortho has a hard time making this

21   argument in light of the Court's opinion, so what they

22   do is they just disagree with it.  The Court said, Dr.

23   Beyer provides a persuasive, that's the language of

24   Hydrogen Peroxide which I argued yesterday, is higher

25   than the standard of Daubert, persuasive explanation

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000  ~  302-571-0510  ~  610-434-8588  ~  888-777-6690

1    for his decision to change the start of the but for

2    pricing from 2000 to 2001, which he did "because the

3    alleged pricing fixing conspiracy did not begin to

4    impact customers until 2001, neither defendant imposed

5    a substantial price increases until early 2001, thus

6    plaintiffs do not allege prices increased in 2000, due

7    to unlawful collusion.  It is more accurate for but

8    for prices to equal actual prices in 2000 than to have

9    but for prices only start diverging from actual prices

10   in 2001."

11              Makes perfect sense.  What's Ortho's

12   response?  Dr. Beyer acknowledged that the

13   gerrymandered the start of the date, and he did so in

14   order to reduce the number of reagents of actual

15   prices that were below his but for prices between 2000

16   and 2001.

17              So even in light of the Court's

18   opinion, they disagree with your finding, which again

19   was untouched by the Third Circuit.

20              Your Honor, that's all I have for 5, 6

21   and 7, unless the Court has any questions.

22              THE COURT:  I don't.

23              MR. CORRIGAN:  Thank you.

24              THE COURT:  Mr. St. Antoine.

25              MR. ST. ANTOINE:  Good afternoon, Your

1   Honor.

2                    THE COURT:  Afternoon.

3                    MR. ST. ANTOINE:  Paul St. Antoine on

4   behalf of Defendant, Ortho Clinical Diagnostics.

5                    I want to begin by making the

6   observation that what we were discussing in terms of

7   benchmark or a but for price, we're discussing Dr.

8   Beyer's selection of a benchmark.  We're not talking

9   about plaintiff's view of the world, we're not talking

10  about Mr. Corrigan's arguments about what the evidence

11  means in terms of a conspiracy.  We're asking

12  ourselves whether Dr. Beyer made a reliable selection

13  of a benchmark relying on his information and what he

14  took into account in selecting that benchmark.

15                   And what Dr. Beyer has done in this

16  case is something extraordinary.  Different from what

17  he's done in other cases, Your Honor.  What Dr. Beyer

18  has done is he's created his own timetable for the

19  actionable conduct.

20                   This is unlike what experts do

21  including Dr. Beyer in other cases.  In other cases,

22  Your Honor, experts will accept not just the existence

23  of a conspiracy, but also the timing of a conspiracy.

24  And if I might, Your Honor, I'd like to illustrate

25  this point by showing you a timetable from the

1    linerboard case, which I know this Court is very

2    familiar with, and which also included Dr. Beyer as

3    the class expert.

4                    And if we could pull up that slide.

5                    THE COURT:  Which slide is it?

6                    MR. ST. ANTOINE:  It's number 6, Your

7    Honor.

8                    THE COURT:  I have it.

9                    MR. ST. ANTOINE:  Your Honor, in

10   linerboard, the conspiracy, as the Court may recall

11   was to take down time in the production of linerboard.

12   Linerboard was the hard product that was used to

13   create corrugated boxes and corrugated sheets.  And

14   the theory was that by the companies engaging in a

15   conspiracy to reduce supply of linerboard beginning in

16   late June and early July 1993.  That led to an

17   inflation of prices of corrugated boxes and sheets

18   from October 1st, 1993 through November 30th, 1995.

19                   Dr. Beyer was retained as the expert on

20   anti-trust impact and damages by the class plaintiffs.

21   And in his declaration submitted to the Court, he

22   opined that he could build a model of but for prices

23   using market data that preceded the alleged

24   conspiracy.

25                   And in that case, Your Honor, he didn't

1    have to come up with his own date of when the

2    conspiracy began.  He certainly didn't have to assume

3    that the conspiracy ever incepted.  He simply had a

4    period of time when nobody was alleging a conspiracy,

5    certainly not the defendants and not the plaintiffs.

6    This was a period of time when everyone agreed the

7    market prices and the inputs were untainted by

8    conspiracy.

9                    In contrast, Your Honor, in this case,

10   this is the next page on the slide presentation, we

11   have a much different circumstance.  We've talked

12   about the inception of the alleged duopoly in April of

13   1999.  On that basis, Dr. Beyer opines that he cannot

14   rely upon data in a before period, so --

15                   THE COURT:  Because the market

16   structure changed, so you're not quarreling with that.

17                   MR. ST. ANTOINE:  We're not -- we

18   understand his position and we accept the proposition

19   that he absolutely has to account for the change in

20   market structure.

21                   What we're not necessarily accepting,

22   Your Honor, is that it rules out the use of market

23   data entirely, whether from blood reagents or from

24   some other comparable product.

25                   But what Dr. Beyer does is he takes a

1    business plan, as we've talked about to a great extent

2    during this hearing, the operation to create value

3    plan which was adopted by Ortho in January of 2000.

4              But there is a problem on -- in

5    squaring that use of the operation to create value

6    plan with the allegations in the complaint, because

7    according to the plaintiffs, the conspiracy began at

8    least by January 1, 2000.

9              And using Dr. Beyer's own benchmark

10   selection criteria, he can't pick a benchmark that

11   overlaps with the period of the alleged conspiracy.

12             THE COURT:  Well, the plaintiff's

13   answer to that is, that was what they thought when

14   they filed the complaint, but as the evidence

15   unfolded, it developed, at least from the plaintiff's

16   perspective with the conspiratorial conduct, did not

17   begin until November of 2000.

18             MR. ST. ANTOINE:  Well, there's two

19   responses to that first.  Your Honor, that's actually

20   not the position that the plaintiff's counsel took at

21   the earlier hearing on class certification when the

22   discovery at that point was complete.

23             THE COURT:  Is the position he's taking

24   now.

25             MR. ST. ANTOINE:  But nothing in terms

Page 93

1    of fact discovery and the development of the record

2    has changed.

3                    THE COURT:  All right.  What position,

4    refresh my recollection, on the position plaintiff's

5    counsel took on the inception of the conspiracy when

6    we argued class certification in 2012?

7                    MR. ST. ANTOINE:  On page 148, Your

8    Honor, of the hearing transcript, the Court asked Mr.

9    Corrigan this question,

10                          "Is there any reason why you

11                          haven't changed the date of the class

12                          definition to correspond to the

13                          damages?"

14                    And Mr. Corrigan responds,

15                          "The main reason, Judge, is that

16                          there is conduct in 2000 that we think

17                          is appropriate to the conspiracy, so

18                          while the damages period starts in '01

19                          we kept 2000 to keep some of the

20                          conspiratorial -- what we think is

21                          conspiratorial conduct earlier than

22                          that.  I don't think there's a major

23                          problem with changing the date,

24                          because when it comes time to figure

25                          out damages, either from the Immucor

1               settlement or from something with Ortho

2               we're going to start at January of

3               '01.

4                    "So we've lost a year's worth of

5               damages there, generally plaintiff's

6               counsels don't like to do that, but we

7               follow the evidence as our economist

8               tells us it is.  And he says it starts

9               in '01, and that's when the damages

10              will be calculated."

11         THE COURT:  But the class definition

12    says January 1st, 2000.

13         MR. ST. ANTOINE:  Correct.  So we have

14    Dr. Beyer in this case, in his benchmark selection,

15    doing something that he didn't do in linerboard and

16    didn't do in other cases, he came up with his own

17    timetable for when the conduct began.  And what is

18    that timetable?  I want to turn to another slide, Your

19    Honor.

20         THE COURT:  Is it --

21         MR. ST. ANTOINE:  It's 14.  14 of my

22    slide deck.

23         THE COURT:  All right.

24         MR. ST. ANTOINE:  So we talk about how

25    he rejects the plaintiff's alleged date, and then he's

1    asked, and I will play a video clip for Your Honor,

2    when Dr. Beyer believes that the conduct, the

3    actionable conduct began.  And he, at the video clip

4    will reflect, admits to no evidence of cooperative

5    conduct before November 1st, 2000.

6                    And can we play clip 37?

7        (Video played)

8                    MR. ST. ANTOINE:  So that's the first

9    date on --

10                   THE COURT:  But I don't really see the

11   point.  The evidence presented by defendant -- by

12   plaintiff in this proceeding, is that the -- and in

13   the remand briefs is that the cooperative behavior

14   began in November of 2000.  And Beyer has to take the

15   evidence as he finds it, as it's presented to him.  I

16   don't -- I really don't see the issue.

17                   I see the issue if the collusion, if

18   there was evidence of collusion beginning in January

19   of 2000, because that would wipe out the use of OCV as

20   a benchmark.  But there is no evidence of collusion of

21   which I'm aware between January 1st of 2000 and

22   November 1st, 2nd or 3rd -- I guess it's the 4th of

23   2000; isn't that correct?

24                   MR. ST. ANTOINE:  Your Honor, that is

25   absolutely correct.  What Your Honor has identified is

1    the first -- what I'll call first of two problems.  So

2    the first is the problem of dealing with operation

3    create value, legitimizing that as a benchmark and

4    he's got to deal with that by moving away from the

5    plaintiff's earlier allegations.

6                    THE COURT:  But he's focused on the

7    evidence not the allegation.

8                    MR. ST. ANTOINE:  All right.  Let's

9    take him at his word on that issue.  But what he has

10   done, is he's moved on his own, which is something

11   experts typically do not do.  So he has looked at the

12   evidence, and he's decided that November 1 is a begin

13   date.

14                   THE COURT:  He has to find a benchmark

15   that's free of collusion.  He looked at the evidence

16   and concluded that albeit for a very short time, OCV

17   was free of collusion, and the short time is from the

18   time it incepted, I guess initial discussions were, I

19   have a chart, but so many documents in the case, I

20   think it was April of 1999; is that correct?  Until it

21   was implemented and after implementation through

22   November of 2000, there was no evidence of collusion.

23                   And based on that evidence, he opts to

24   use OCV as a benchmark.  And what you're saying is

25   he's changed the start date of the conspiracy?  The

1    January 1st, 2000 quote start date is the allegation

2    in the consolidated amended complaint, and if that was

3    the only evidence of conspiracy, I would not be

4    finding any collusive conduct at all.

5                    MR. ST. ANTOINE:  So --

6                    THE COURT:  The allegation standing

7    alone is not enough.  So I really don't get the point,

8    that's the point of this comment.

9                    MR. ST. ANTOINE:  So there's two

10   points, Your Honor, and I'll get to the second in a

11   moment.  But the first point is that Dr. Beyer in this

12   case, unlike other cases, is stepping into the realm

13   of deciding when the conspiratorial conduct began.  He

14   is taking on that burden, which is not a burden that

15   experts on impact and damages normally assume.

16                    That is not something that experts --

17   they take the timing and the existence of the

18   conspiracy as a given.

19                    THE COURT:  Well, what he's doing is

20   finding a benchmark period, which in his opinion, is

21   free of collusion.

22                    MR. ST. ANTOINE:  The second half, Your

23   Honor, and maybe this will clarify things.  The second

24   half is that window of time when the conspiracy needs

25   to begin, so that he can both accept operation great

1    value, and at the same time, reject --

2                   THE COURT:  The BBLP.

3                   MR. ST. ANTOINE:  -- precisely is three

4    weeks.

5                   THE COURT:  You're right.  And if the

6    evidence supports that, it seems to me that's

7    appropriate.  If there is no evidence to support that,

8    it's inappropriate.  And the fact that the

9    consolidated amended complaint identifies at least by

10   January 1st, 2000 as the start date is of no legal

11   significance.  That's where I am now.

12                  MR. ST. ANTOINE:  So now we're in a

13   much different case than any other case that Dr. Beyer

14   has cited.  He has now created a three week window of

15   time when his model works, according to him, or it

16   doesn't work.

17                  Now, what happens if the jury comes

18   back and finds that the evidence in the minds of the

19   jury is that the conspiracy between Ortho and Immucor

20   began on January 1, 2001.  We now have a case in which

21   Dr. Beyer, his methodology, the basis for his

22   selection of a benchmark is gone.  That is --

23                  THE COURT:  I think his benchmark would

24   still be appropriate.  There's no evidence of

25   collusion during his benchmark period.  Some of his

Page 99

1  other figures would be thrown off, at least for the

2  year 2000.

3           MR. ST. ANTOINE:  The point is, even

4  Dr. Beyer acknowledges that if there was no

5  conspiratorial conduct or cooperative conduct prior to

6  November 21st, he acknowledges that he would have to

7  reconsider the exclusion of the blood bank leadership

8  pricing as an appropriate duopoly price benchmark.

9  And there's a clip, I would like to show you where he

10  makes this acknowledgement.

11           And if we could play clip 45.

12    (Video played)

13           MR. ST. ANTOINE:  So Dr. Beyer is

14  acknowledging that, of course, you would have to

15  reevaluate the benchmark for lawful duopoly pricing if

16  there wasn't a finding of conspiratorial conduct

17  between January -- incepting between November 1, 2000

18  and November 21, the date I gave him, 2000.

19           THE COURT:  Well, under those

20  circumstances, Mr. St. Antoine, two things occur to

21  me.  Number one, then there might be a basis for two

22  benchmarks, the benchmark selected by Dr. Beyer, and a

23  benchmark based on the non-conspiratorial adoption of

24  the blood black leadership program.  And he would have

25  to recalculate the but for world starting from a

1    different date, starting from the time of the

2    conspiratorial conduct.

3              MR. ST. ANTOINE:  He would have under

4    those -- under that scenario, you would have two price

5    plans.

6              THE COURT:  And he can pick one.

7              MR. ST. ANTOINE:  No, he can't.

8    Because he --

9              THE COURT:  What if he picked one that

10   he thinks is reliable, he'd have to identify it and --

11             MR. ST. ANTOINE:  Because they both,

12   Your Honor, they both at that point, they both fit Dr.

13   Beyer's criteria for a but for benchmark.

14             THE COURT:  Well, isn't the answer to

15   your question, though, based on the evidence presented

16   to Dr. Beyer and the evidence presented to the Court

17   today, there is simply no evidence of conspiratorial

18   or cartel conduct before November -- I think the date

19   is 4th, 2000.  That's an issue, and it's an issue in

20   every case.

21             If an expert opines, and the expert's

22   opinion is based on evidence, which the jury doesn't

23   find, and that's the way we charge the jury with

24   respect to evaluation of expert testimony, then the

25   jury is to disregard the testimony.  But that's not an

```
 1   issue that I can address and resolve today.  Unless
 2   there's evidence of conspiratorial or cartel conduct -
 3   -
 4                 MR. ST. ANTOINE:  But even if we assume
 5   --
 6                 THE COURT:  -- that begins not
 7   November, but later.  What you're saying is, assume,
 8   Judge, that a jury finds no evidence of unlawful
 9   conspiratorial conduct in November of 2000, and
10   further assume that that unlawful conduct doesn't
11   begin until January 1st of 2001.  What then?  Well,
12   the what then is how we resolve it at trial, not at a
13   hearing addressing class certification.
14                 MR. ST. ANTOINE:  Your Honor,
15   respectfully, that's where I would disagree because
16   it's the plaintiff's burden to demonstrate that they
17   have reliable common proof on impact and damages.  And
18   in that scenario, you would have a jury finding a
19   conspiracy but you would have no basis to conclude
20   that there is a methodology of class Y proof on these
21   separate essential elements of impact and damages.
22                 THE COURT:  Well then I might decertify
23   the class.
24                 MR. ST. ANTOINE:  But that, Your Honor,
25   is letting a case go forward all the way to a jury
```

1    trial without knowing whether or not the plaintiffs

2    are going to be capable of proving anti-trust impact

3    or damages.

4              THE COURT:  Well, the plaintiffs say

5    under all the evidence you've presented and discovery

6    is complete, under all the evidence, there is no

7    evidence of conspiratorial conduct other than the

8    evidence between -- of the contacts and much of that

9    was summarized by Mr. Corrigan today between I think

10   all of those dates were in November of 2000.

11             You're conjuring up a what if the jury

12   found no such evidence.

13             MR. ST. ANTOINE:  It's actually, Your

14   Honor, it's not a hypothetical because much of the

15   conduct that the plaintiffs have presented in support

16   of class certification as well as in other papers

17   submitted at court, concerns conduct after November

18   21st.

19             Plaintiffs, to my knowledge, has never

20   taken the position that they're not going to submit

21   evidence of conduct on November 21st or thereafter.

22   In fact, today --

23             THE COURT:  But that doesn't change the

24   analysis.

25             MR. ST. ANTOINE:  It does change the

1   analysis.  Because Dr. Beyer recognizes that if

2   there's no conduct before November 21st, he can't

3   knock out blood bank leadership program as a

4   benchmark.

5                THE COURT:  No, the evidence on which

6   he relies is the evidence summarized by the plaintiffs

7   today, of collusive conduct in early November of 2000.

8                MR. ST. ANTOINE:  But there is an

9   important distinction, Your Honor.  There's the

10  evidence that Dr. Beyer, because it's his benchmark,

11  he's the one selecting it, he's been proffered as the

12  expert, and the evidence that Mr. Corrigan presented

13  to this Court --

14               THE COURT:  But that's the same

15  evidence that was presented to Beyer.

16               MR. ST. ANTOINE:  But not when asked,

17  you know, what is he relying upon.  He's relying upon

18  -- his conclusions drawn from the evidence between

19  November 1st and November 21st.  And let me show a few

20  more clips, because this is an important point.  And

21  there's two points to be drawn from this.

22               He's actually not opining on when the

23  conspiracy began.  He's talking about cooperative

24  conduct between those two dates, and I want to show a

25  couple of clips.

1              THE COURT:  Well, isn't what he's

2    doing, an effort on his part, to find a period of time

3    during which there was no collusive conduct in order

4    to come up with a benchmark against which to compare

5    the but for prices?

6              MR. ST. ANTOINE:  So, Your Honor, there

7    is --

8              THE COURT:  Isn't that right?  Isn't

9    that what he was doing?

10             MR. ST. ANTOINE:  He's trying to come

11   up -- he's come up with a three week period of time in

12   order to make a selection --

13             THE COURT:  That's the conspiracy.

14   He's come up with an end to the non-conspiratorial

15   conduct of Ortho.

16             MR. ST. ANTOINE:  And --

17             THE COURT:  And he's using everything

18   that precedes the beginning of the conspiratorial

19   conduct, and follows the creation of the duopoly as

20   his benchmark period.  Isn't that what he's doing?

21             MR. ST. ANTOINE:  But he is also

22   acknowledging as he did in that clip, that if the

23   evidence leads a trier of fact to regard November 21st

24   as the inception of the alleged conspiracy, then his

25   model doesn't work, which is an extraordinary thing

1   for an economist to do.

2              THE COURT:  But the evidence on which

3   he relied tells him and it tells me more importantly,

4   that the conspiratorial conduct began at the time the

5   plaintiffs are alleging it began.

6              MR. ST. ANTOINE:  But let's put aside

7   for a moment, Your Honor, the November 1st date.  That

8   is his beginning date, and let's focus on the November

9   21st date.  The date in which he says, that's the end

10  date for when the --

11             THE COURT:  Well, there's no -- well,

12  that's when it was -- the conspiratorial conduct

13  resulted in the adoption of these high prices, that's

14  what the plaintiffs are arguing.  I don't think

15  they're arguing that the conspiracy ended.

16             MR. ST. ANTOINE:  No, no, no,

17  absolutely, Your Honor.  Let me clarify, Your Honor,

18  because it's important.

19             What Dr. Beyer is saying is in order to

20  disqualify the other price plan, BBLP, he's

21  acknowledging that the conspiratorial conduct had to

22  begin before November 21st.  Otherwise, it would meet

23  the same criteria as operation create value.

24             THE COURT:  He has to -- he has found

25  that there's evidence that the blood bank leadership

1  program was the product of conspiratorial conduct that

2  began at the first of the meetings of the association

3  on November 4th.  That's what causes him to disqualify

4  or to reject the blood bank leadership program as a

5  benchmark.

6              MR. ST. ANTOINE:  Actually it's -- he

7  actually hasn't done exactly that, Your Honor.

8  Because -- and can I play one, it's not a long clip?

9              THE COURT:  Absolutely.

10             MR. ST. ANTOINE:  Okay.

11             THE COURT:  But I'm not -- as concerned

12 as I am about costs, I'm not concerned about this.  I

13 don't see your point.  I don't think --

14             MR. ST. ANTOINE:  Your Honor, I

15 understand that the Court's sort of identification of

16 the strengths of the arguments, I believe that this is

17 an equally important point, and I'm afraid that it's

18 my failure to articulate it clearly that is the reason

19 it's --

20             THE COURT:  Well, we're going to recess

21 for lunch soon, you can regroup, and --

22             MR. ST. ANTOINE:  Okay.

23             THE COURT:  -- can present it again.

24 I'm not rushing through this.  I'll give you a chance

25 to argue.  But I do not see the difference between

1    Beyer in linerboard and Beyer in this case that you're

2    focused on.  I do not think this is -- based on what

3    you've argued so far, outrageous conduct on the part

4    of Dr. Beyer.

5                    MR. ST. ANTOINE:  Well, let me -- can

6    we jump back to the linerboard clip, and I don't know

7    what Your Honor's timetable is for lunch.

8                    THE COURT:  Maybe we ought to lunch

9    before we jump back.

10                   MR. ST. ANTOINE:  Okay.

11                   THE COURT:  It's a quarter of, we'll be

12   in recess until 1:30.

13                   MR. ST. ANTOINE:  Thank you, Your

14   Honor.

15                   THE CLERK:  All rise.

16                   THE COURT:  We're in recess.

17       (Recessed at 12:42 p.m.; reconvened at 1:45 p.m.)

18                   THE CLERK:  All rise.

19                   THE COURT:  Good afternoon, everyone,

20   please be seated.

21                   Mr. St. Antoine, you may continue.

22                   MR. ST. ANTOINE:  Thank you, Your

23   Honor.

24       (Pause)

25                   MR. ST. ANTOINE:  Your Honor, before

1    getting back to the three week window of time between

2    November 1st and November 21st, I want to explain and

3    argue about the importance of this issue in terms of

4    the ultimate opinion on anti-trust impact and damages.

5                    And the point is this, if Dr. Beyer is

6    going to use a business plan for price as his

7    benchmark for but for pricing, and if the evidence

8    leads to the conclusion that the blood bank leadership

9    program price is during a non-conspiratorial time

10   period, then Dr. Beyer has no basis to opine that

11   there was any anti-trust impact for any class members

12   or any damages.

13                   THE COURT:  Two comments on that.

14   Number one, there is no such evidence in the case at

15   this time, and I can only decide what I've been asked

16   to decide, based on the evidence presented, number

17   one.

18                   And number two, it seems to me, and I

19   looked at some cases over the noon recess that what

20   we're talking about is referred to in the cases as

21   benchmark shopping.  And it's an argument that can be

22   made, but here there's no evidence of any improper

23   benchmark shopping or indeed other than the issues

24   that we've addressed already, and there might be some

25   others, I don't see what you're talking about as an

1    issue at all.

2                    MR. ST. ANTOINE:  Well, let me --

3                    THE COURT:  There is no evidence of

4    conspiratorial -- of -- well, the only evidence of

5    cartel or conspiratorial conduct presented to me is

6    the evidence in what occurred between November 1st or

7    4th, 2000 and November 20th or 21st, 2000, period.

8    Isn't that the answer?

9                    MR. ST. ANTOINE:  Well, let's start

10   with that.

11                   THE COURT:  All right.

12                   MR. ST. ANTOINE:  And there's a -- in

13   terms of the record, one of the issues that Dr. Beyer

14   has to deal with is that blood bank leadership pricing

15   is reflected in September and October business plans.

16                   THE COURT:  But it was not distributed.

17   There was some distribution to some few customers of

18   Ortho, not all Ortho customers in the period before

19   November 21st, but the evidence is that until November

20   21st when Ortho and Immucor had coordinated their

21   pricing, it was not until then or after that date that

22   the blood bank leadership program was fully

23   implemented and the new prices went out to all Ortho

24   and Immucor customers.

25                   MR. ST. ANTOINE:  Well, two follow-ups

1   on that, Your Honor.  First --

2                    THE COURT:  Is that a correct statement

3   of the facts on which the plaintiffs rely?

4                    MR. ST. ANTOINE:  Not quite, Your

5   Honor.

6                    One, even Dr. Beyer recognizes that in

7   order for a plan to be implemented, you don't have to

8   send out an invoice to a customer for an actual

9   purchase.  In his testimony, he references

10  communication of the pricing to customers, and there

11  was evidence, there is evidence in the record,

12  including the September and October plans that Ortho,

13  prior to November 1st, had met with customers, and

14  explained to them that they were going to receive

15  price increases.

16                    THE COURT:  I said that.  There is

17  evidence that Ortho distributed the price list to some

18  customers.

19                    MR. ST. ANTOINE:  And although

20  plaintiffs referred to nine pilot customers, actually

21  the price list that went out in November was to a

22  significant number of customers.  It included nine

23  pilot customers, but it also included 138 distributor

24  accounts, and it also included 180 federal government

25  accounts.  This was not a trial balloon.  This was the

1    implementation of an adopted price plan by Ortho.

2              The other problem, Your Honor, dates to

3    the foundation for his distinction.  Dr. Beyer -- I

4    want to show Your Honor some testimony about what Dr.

5    Beyer believes took place in November.  And the first

6    clip I want to show you, Your Honor, is about his

7    general view on a conspiracy, and this is clip 43.

8              THE COURT:  23?

9              MR. ST. ANTOINE:  43, it's his hearing

10   testimony.  We have a clip of that.

11       (Video played)

12             MR. ST. ANTOINE:  So, Your Honor, Dr.

13   Beyer isn't identifying anything specific that he, and

14   it's his opinion regards as definitive cartel

15   behavior.

16             THE COURT:  Does that matter?  Doesn't

17   what matters -- well, no, let me put it this way.

18   Isn't what matters whether or not there's evidence of

19   collusion during the benchmark period he has selected,

20   the OCV benchmark period?  That it seems to me

21   matters.  And if Beyers says there is or is not

22   evidence of collusion and that's an important issue,

23   it's what the evidence shows, it's not what Beyer

24   thinks.

25             If there was evidence of collusion

1    earlier, and evidence that tainted the OCV, even if

2    Beyer concluded that the OCV was the product of non-

3    collusive behavior by Ortho, if he thought that, and

4    the evidence was to the contrary, his opinion would

5    not be reliable on this issue.

6              So it's not what Beyer thinks about the

7    collusive conduct, it's what really is.

8              MR. ST. ANTOINE:  But he -- but in

9    order to do two things, which he needs to do to opine

10   on impact and damages, he not only needs to qualify

11   under his own criteria and it's his criteria,

12   operation great value, but he also has to disqualify

13   the blood bank leadership program under his own

14   criteria.

15             THE COURT:  He's done that.

16             MR. ST. ANTOINE:  He needs his own

17   factual understanding, and he has testified it's his

18   analysis of the timing of the conspiracy that is

19   drawing him to accept one price plan and reject

20   another.

21             THE COURT:  Yes.  And it's the evidence

22   on that score, not what he thinks.  He might think

23   anything.

24             MR. ST. ANTOINE:  But if the --

25             THE COURT:  But if the evidence is to

1    the contrary, his opinion on that score, on that issue

2    is going to be rejected.

3                   MR. ST. ANTOINE:  And it should be

4    rejected now --

5                   THE COURT:  But --

6                   MR. ST. ANTOINE:  -- because when you

7    ask Dr. Beyer, what are you pointing to, to accept

8    operation great value and reject blood bank leadership

9    program, he's not pointing to anything specific, and

10   he's not even regarding the activities of --

11                  THE COURT:  Oh, he's pointing to the

12   collusive conduct, he describes it in his testimony.

13                  MR. ST. ANTOINE:  Well, let me play you

14   one -- if I may, Your Honor --

15                  THE COURT:  But what -- isn't what

16   matters, what the evidence shows?  Again, I don't want

17   to sound like a broken record, but if Beyer thinks the

18   conspiracy started later or earlier, and the evidence

19   is to the contrary --

20                  MR. ST. ANTOINE:  But he has to provide

21   a foundation for opining on anti-trust impact at the

22   class certification stage.

23                  THE COURT:  Well, he has to --

24                  MR. ST. ANTOINE:  He needs to --

25                  THE COURT:  -- express an opinion.

1                    MR. ST. ANTOINE:  He can't simply in a

2      conclusory way say, this plan is lawful and this plan

3      is unlawful.  He has to explain why he thinks --

4                    THE COURT:  Well, he said it.

5                    MR. ST. ANTOINE:  Only in the most

6      conclusory way has he said this plan is plausibly

7      independent, and this plan is plausibly the subject of

8      cooperative behavior.

9                    THE COURT:  Well, I don't think so.  I

10     think the cites to his -- and I'm just looking for

11     them, the OCV reliability, I don't know that they've

12     talked about the -- specifically about the blood bank

13     leadership program unreliability, but I think the

14     reason that --

15                    MR. ST. ANTOINE:  Can I play another

16     clip, Your Honor, on this very point?

17                    THE COURT:  Yes.  But it seems to me,

18     and we disagree, that it's the evidence that trumps,

19     and if there's no evidence of collusion, then yes,

20     you've got a point; no evidence of collusion then

21     you've got a point, but there's evidence of collusion,

22     and the evidence of collusion before me occurred in

23     November, some time between -- I don't want to keep

24     repeating those dates --

25                    MR. ST. ANTOINE:  Understood, Your

1    Honor.

2                    THE COURT:  -- in November of 2000.

3                    MR. ST. ANTOINE:  But it is Dr. Beyer

4    who's been charged with selecting an appropriate

5    benchmark.  And he's the one that has come up with a

6    criteria, and beyond the most conclusory statements

7    that one was the subject of independent action, and

8    one was the subject of cooperative behavior, he has

9    not provided the foundation for ruling out the blood

10   bank leadership pricing.

11                   If I could play just one more short

12   clip on how he describes the distinction in those

13   conclusory terms.

14                   THE COURT:  All right.  Go ahead.

15                   MR. ST. ANTOINE:  Yes, clip 42.

16        (Video played)

17                   MR. ST. ANTOINE:  All Dr. Beyer --

18                   THE COURT:  Excuse me.

19                   MR. ST. ANTOINE:  Yes.

20                   THE COURT:  Yes, Mr. Corrigan?

21                   MR. CORRIGAN:  Your Honor, I just want

22   to make a point, Dr. Beyer -- just for the Court's

23   benefit, in paragraph 98 in his original report and

24   paragraph 51 of his reply report, he does detail the

25   evidence, some of which the Court saw earlier today,

1    makes this exact point, paragraph 98 of his original

2    report and 51 of his reply report.

3         (Pause)

4              THE COURT:  Well, I'm not even certain.

5    I've been looking at slide 3 of the July 22nd slides

6    presented by the plaintiffs.  And there he explains

7    why he thinks OCV is a reliable benchmark.  He doesn't

8    talk in that document about why the blood bank

9    leadership program is not reliable.

10              MR. ST. ANTOINE:  Your Honor --

11              THE COURT:  But again, I think it's

12   what the evidence shows.  And if -- you apparently

13   think that Beyer has to say it, and Mr. Corrigan has

14   said Beyer does say it, these two paragraphs of his

15   reports --

16              MR. ST. ANTOINE:  At his hearing

17   testimony, Your Honor, we showed you a clip.  The

18   other thing that we asked him about was, you heard Mr.

19   Corrigan played a fairly long clip about the

20   announcement of a dramatic price increase at the AABB

21   meeting.

22              It's important to keep in mind, this is

23   a trade association meeting attended by customers and

24   vendors.  It isn't just a meeting between competitors.

25   And in fact, it is correct that Ed Gallup, the

1    President of Immucor testified, conflicting evidence,

2    testified that there was an announcement of a -- that

3    Ortho was going to have a dramatic price increase.

4              So I did bring up since that's

5    something that plaintiffs have pointed to, I did bring

6    that up at the hearing, testimony with Dr. Beyer.  And

7    I think it's important to hear it, since it's him,

8    it's not the plaintiffs, it's Dr. Beyer who's

9    selecting the benchmark.

10             I asked him about his interpretation of

11   those events, and if I could, I'd like to play clip

12   38.  Let me make sure I have the right clip.  No, it's

13   clip 44.  And it is valid -- the events on -- at the

14   AABB meeting, and what Immucor learned or did not

15   learn from that meeting.

16             THE COURT:  And what you're saying is,

17   it's what Beyer thinks about that meeting and not what

18   actually happened at that meeting that controls?  Is

19   that what you're telling me?

20             MR. ST. ANTOINE:  It's does he have a

21   foundation for picking one benchmark and rejecting

22   another.  And --

23             THE COURT:  Or is the question, is

24   there a foundation for picking one benchmark and

25   rejecting another?

1              MR. ST. ANTOINE:  But he is the one,

2    Your Honor, that is opining on whether or not this is

3    a capable method of common proof of --

4              THE COURT:  He might reject a benchmark

5    for all the wrong reasons.  If he accepts a benchmark

6    for all the wrong reasons, the same thing applies, as

7    long as the benchmark is acceptable or rejected for

8    reasons the Court finds are supported by the evidence,

9    doesn't that trump what you are arguing?

10              MR. ST. ANTOINE:  Well, it is the

11    expert when -- and it's part of the Court's

12    gatekeeping function, you evaluate what the expert

13    relies upon, in deciding whether or not something is

14    an appropriate benchmark or not.

15              THE COURT:  Yes.  But if he relies on

16    an appropriate benchmark in the eyes of the Court for

17    the wrong reason, if the Court says, well, that

18    benchmark is appropriate, but he hasn't quite

19    articulated all of the reasons or the reason the Court

20    thinks is most significant in adopting that benchmark,

21    are you saying I should reject the benchmark?

22              MR. ST. ANTOINE:  I say if -- when

23    asked to explain himself --

24              THE COURT:  No, no, answer the question

25    then explain it.

1                    MR. ST. ANTOINE:  I think the answer,

2     if I understand the question, Your Honor, is --

3                    THE COURT:  The question is, I'll

4     repeat it.

5                    MR. ST. ANTOINE:  Okay.

6                    THE COURT:  If an expert adopts a

7     benchmark for the wrong reasons, and the Court

8     concludes that the benchmark is an appropriate

9     benchmark for all of the right reasons and is

10    supported by the evidence, are you saying the Court

11    should reject the benchmark?

12                   MR. ST. ANTOINE:  Yes.  Because this --

13    it's the expert's whose opinion, and based on his

14    economic qualifications and his --

15                   THE COURT:  His opinion is, this is an

16    appropriate benchmark and if the Court agrees it's an

17    appropriate benchmark but for different reasons than

18    articulated, you're saying the opinion should be

19    rejected?

20                   MR. ST. ANTOINE:  As unreliable, yes.

21                   THE COURT:  I'd like a case on that

22    tomorrow morning.  I don't think you'll find one.

23                   MR. ST. ANTOINE:  I think what we will

24    find is that --

25                   THE COURT:  No, I want a case on that

1   issue.  I don't want a lot of cases, I don't want a

2   brief, I want a case, a cite, we'll read it.

3                   MR. ST. ANTOINE:  Okay.

4                   THE COURT:  Or more than one.

5                   MR. ST. ANTOINE:  Your Honor, on -- we

6   will do our best to find a case that fits within the

7   contours of --

8                   THE COURT:  You've just made a

9   statement and I disagree with you.

10                  MR. ST. ANTOINE:  And -- but --

11                  THE COURT:  But I haven't researched

12  it.  I think it's so far out that it -- you're not

13  going to find anything.  And I think what you're

14  talking about is -- it falls generally into the

15  category of --

16                  MR. ST. ANTOINE:  What we think --

17  Ortho's position --

18                  THE COURT:  -- benchmark shopping, but

19  I can't conceive of a Court saying, and I might be

20  wrong, and you'll tell me if I am, with cases that if

21  an expert again, I'll repeat, accepts -- adopts a

22  benchmark, but for the reason -- wrong reasons in the

23  eyes of the Court, and the benchmark is nevertheless

24  an appropriate benchmark, you're saying that the Court

25  should reject the benchmark.  So we'll see.

1                    MR. ST. ANTOINE:  Your Honor, I want to

2       make a -- I'll leave a point as well about Dr. Beyers,

3       and then I'll move on, about his distinction.  Because

4       I do think this is a related but separate point.  He

5       is careful not to think about conspiracies versus non-

6       conspiracies.  He frames everything in terms of

7       independent conduct versus cooperative conduct.

8                    And as the Courts have recognized,

9       there is a form of cooperative conduct between

10      duopolists that is lawful.  An example is price

11      leadership.  So to regard conduct as unlawful, and

12      therefore, preclusive of an appropriate benchmark, you

13      need to do more than simply conclude that it was

14      cooperative conduct.

15                   And the Courts have been clear about

16      this.  They recognize the concept of tacit collusion.

17      When there's market concentration --

18                   THE COURT:  No, I'm trying to think of

19      the phrase, is it conscious parallelism?

20                   MR. ST. ANTOINE:  That's a formulation

21      of it.  But in the context of duopolies, it's also

22      framed in terms of tacit collusion or price

23      leadership.  It's a form of cooperative conduct where

24      the duopolists because there's such a limited number

25      of competitors in the marketplace, recognize their

1   inner-dependence in their own pricing decisions.

2   That's not unlawful, Your Honor.

3                    THE COURT:  You're right.

4                    MR. ST. ANTOINE:  So to say that one

5   price plan was independent, and to say another one was

6   cooperative is not to say that one took place or was

7   part of a conspiracy.  And that's all Dr. Beyer has

8   said in his testimony.

9                    THE COURT:  Well, you're back to the

10  same point.  I think Coe is working on it by the way.

11  He better because I think the point very simply is I

12  articulated it, if he says the conduct was

13  cooperative, which in your eyes, can be illegal or

14  legal, and I conclude that the conduct was cooperative

15  but legal, then that part of his opinion which is

16  based on that issue goes out, regardless of what he

17  thinks.

18                    If he's reached the right conclusion

19  for the wrong reasons, you say the opinion, the

20  conclusion, the proper benchmark conclusion or the

21  rejection of something as a benchmark should go out,

22  and I disagree with you.  And you're going to get me a

23  case or two or more, I don't want a brief, I've got

24  enough briefs, I'm surrounded by briefs, none of which

25  I think hit the issues that I think are really

1    critical.

2                    I shouldn't say that.  They touch them,

3    touch on them, but peripherally.  You're going to get

4    me just cases.  I don't want to read a lot of

5    argument, and I'll conclude, I'll decide whether what

6    I'm saying is correct or not.

7                    MR. ST. ANTOINE:  Your Honor --

8                    THE COURT:  But right now I disagree

9    with you.

10                   MR. ST. ANTOINE:  Understood.

11                   THE COURT:  I think it's what the

12   evidence shows.  Beyer may reach the right conclusion

13   and the evidence supports him, I think that carries

14   the day.  And I think that's in essence what I've said

15   in my first opinion.  I look to the evidence to

16   support, his selection, for example, and that's

17   generally what we're talking about, OCV over the BBLP.

18   And I concluded in the first opinion that it was

19   reasonable.

20                   MR. ST. ANTOINE:  Your Honor --

21                   THE COURT:  And again, I fall back on

22   the phrase benchmark shopping, I think you might be

23   doing a little of that, but for the fact that if we

24   take the BBPL (sic) plan out of the collusive conduct

25   area, there's another set of issues that you haven't

1    addressed.  I'll have to address those.

2                     MR. ST. ANTOINE:  Okay.  On the -- I

3    want to follow-up, I know we've touched upon the

4    general use of business plans.  Your Honor defalled

5    (ph) Mr. Corrigan's points.  It's not the position of

6    Ortho that experts can't make use of business plans in

7    developing their opinions.

8                     What our position is, is that they

9    cannot take from the business plans ultimate decisions

10   or projections, including price plans, without their

11   own independent verification.  And there's been

12   citation to the Third Circuit's Meritor case and it is

13   true that the Third Circuit's not saying that experts

14   cannot make use of business plans in appropriate

15   context.

16                     But to simply take a company's

17   projections, and that's essentially what Dr. Beyer has

18   done has taken a statement from a business plan at 25

19   percent -- prices should go up by 25 percent for two

20   years, and adopted that as his own without doing his

21   own independent economic investigation.

22                     He's essentially reading from a

23   document and that, as an expert's work in that regard,

24   isn't assisting the trier of fact.  He's not acting as

25   an expert in that sense.

1          THE COURT:  He's using that business

2    plan, although I was surprised by his testimony that

3    it wasn't a business plan, but he's using that

4    testimony as the basis for his benchmark

5    determinations.

6          I don't know what kind of research

7    you'd have to do.  He's taking Ortho -- well, we'll

8    call it a business plan, and using it.  That's what he

9    says he's doing, and I'll have to decide whether he

10   is.  But he says, so as in Ortho, I considered

11   corporate project increase not a document, not a

12   business plan, Ortho decided to do it and it did

13   implement this plan and he used it, just the document.

14          MR. ST. ANTOINE:  I think the

15   distinction, Your Honor, is just like in the Meritor

16   case where the expert who was excluded took the

17   company's projections and used them as his own without

18   doing independent verification.  Dr. Beyer is taking a

19   price percentage and using it as his own without doing

20   his own independent economic investigation.

21          If he had taken data from a business

22   plan and run his own empirical economic analysis, it

23   would be a different story.

24          THE COURT:  He did that based on the

25   business plan.  I don't understand what empirical

1   analysis you say he should have done with respect to

2   the Ortho -- and I'll call it a business plan, it

3   appears to be that.

4                    MR. ST. ANTOINE:  Well, he's taken the

5   25 percent, and he's taken that without increasing it

6   or decreasing it, or evaluating whether that should be

7   the right percentage.

8                    THE COURT:  But that's what Ortho said

9   it should be, and that's what he's relying on.

10                   MR. ST. ANTOINE:  But that's simply

11  reading from a document and not doing your own

12  independent economic analysis.

13                   THE COURT:  What kind of economic

14  analysis do you say he should have done to determine

15  what Ortho planned to do according to the OCV?

16                   MR. ST. ANTOINE:  Well, we've -- I

17  don't want to retread old ground, Your Honor, but on -

18  - there were information about, you know, costs that

19  are actual market data, and --

20                   THE COURT:  You're talking about

21  Ortho's costs.

22                   MR. ST. ANTOINE:  You could take

23  Ortho's costs, you could take Immucor's, you could

24  take somebody's cost information --

25                   THE COURT:  I must be missing this

1    point too.  He's using that document as Ortho's

2    business plan in a non-collusive atmosphere.  And he's

3    determining -- he has determined that that will be his

4    benchmark.  A business plan adopted in a non-collusive

5    atmosphere.

6                    MR. ST. ANTOINE:  But he's not taking

7    the -- he's not taking that number and subjecting it

8    to his own evaluation about in the years subsequent to

9    that plan, would that be a good estimate of but for

10   pricing.

11                   THE COURT:  Oh, it might be a terrible

12   estimate.  But it's Ortho's estimate, and he's relying

13   on it.

14                   MR. ST. ANTOINE:  In January of 2000.

15   And he's taking that in January of 2000, their plan

16   without doing economic analysis, he's simply using

17   that number to say what they would have priced for

18   2001 and 2002, and for five years.  And he hasn't done

19   his own economic analysis to decide whether that's

20   what a company would likely do in a non-conspiratorial

21   environment.

22                   THE COURT:  All right.

23                   MR. ST. ANTOINE:  Thank you, Your

24   Honor.

25                   THE COURT:  Thank you.  Have you

Page 128

1   finished all of the points?  Let me get that.

2                   MR. ST. ANTOINE:  You're right, Your

3   Honor, there is --

4                   THE COURT:  Let me go get that.

5                   MR. ST. ANTOINE:  There's one more

6   point.

7                   THE COURT:  The issues that I think

8   you're addressing in bucket 2 are the timing of the

9   conspiracy, I think you've covered that, selection of

10  OCV over BBLP, and I think you've addressed that.  And

11  the shift of the data of conspiracy, I guess you have.

12                  MR. ST. ANTOINE:  Yeah, I --

13                  THE COURT:  And the but for pricing

14  based on OCV.

15                  MR. ST. ANTOINE:  The one issue that I

16  don't know if it came up earlier in the hearing, it's

17  on the shift.  I'll be brief on that, Your Honor.

18                  The point there is that although he's

19  adopted operation create value as his benchmark, the

20  thing that he's hanging his hat on, he actually hasn't

21  applied that on -- consistently with what the plan was

22  in January of 2000.  The plan in January of 2000 was a

23  25 percent price increase --

24                  THE COURT:  For two years.

25                  MR. ST. ANTOINE:  -- for two years.

1                    Now, Mr. Corrigan is correct in

2       pointing out that there were contracts on -- that may

3       have interfered with the full implementation.  But

4       once you recognize that reality, he is now departing

5       from what the plan was.  So if the plan was a 25

6       percent price increase in those two years, that's not

7       in fact, what Dr. Beyer is doing.  He's not treating

8       that plan as an accurate or a complete analysis of

9       what pricing would be in subsequent years.  Because

10      price plans change.  And once you factor in subsequent

11      developments, like the fact that contracts got in the

12      way, you're losing the integrity of the benchmark that

13      you, yourself, are pointing to for the foundation of

14      your model.

15                   Price plans change, and that's our --

16      essentially that's our larger point, is that Ortho

17      recognized in the course of 2000 the difficulties of

18      rolling out a price plan.

19                   THE COURT:  Well, he says the price

20      plan changed either because of continuing contracts or

21      for other reasons, and says, the implementation of the

22      plan did not actually take effect until 2001.  Is that

23      the argument you're making?  And then he takes -- then

24      he adds that, and the evidence is the evidence that

25      Mr. Corrigan addressed this morning that to stay the

1   course statement in the September 15th, 2000 document,

2   coupled with the statement in that same Ortho document

3   that the choice is one dramatic or large, I've

4   forgotten the word, price increase versus $25,000

5   price increases for five years, he says those are

6   changes in the plans, which he's utilized.

7              His benchmark includes an effective

8   start date of the implementation of the plan, OCV plan

9   of January 1st, 2000.  And certainly as we've argued,

10  as you've argued, and as Corrigan has argued, the plan

11  started out as a two year plan, but it became a five

12  year plan.  So he's done that.

13             MR. ST. ANTOINE:  What he's not doing,

14  Your Honor, is having identified the plan in 2000 as a

15  good model for what price increases should be.

16             THE COURT:  Oh, I don't think he has to

17  do a good model as to what price increases should be.

18  It's what Ortho said, their price increases would be.

19  Isn't that what the plan is all about?

20             MR. ST. ANTOINE:  He is using -- he's

21  pointing to this January 2000 plan as a benchmark for

22  predicting what in a non-conspiratorial world price

23  increases would be.  But then he's making his own

24  adjustments from that plan.

25             So he, in fact, not being entirely

1    faithful to the very plan that is his benchmark.

2              THE COURT:  Well, that's one of the

3    issues in the case.  He says the implementation of the

4    plan was changed, it was really 2001 in which the plan

5    was implemented.  And then he says, again, I don't

6    want to sound like a broken record, that the -- and

7    we've got some other issues to address, so we don't

8    want to beat a dead horse, but then he says that the

9    plan was extended from two years to five years, based

10   on the presentation on September 15th, 2000.

11             MR. ST. ANTOINE:  And, Your Honor, one

12   follow-up point because I -- you know, I know I may be

13   kind of beating a dead horse is, the plan that he's

14   referencing is only changed to five years, as we've

15   discussed at length, was the BBLP plan.  That was the

16   planning document that where he talks about the five

17   plus years.

18             THE COURT:  Corrigan argues that

19   although it was in the BBLP plan description, the

20   choice was dramatic price increase which was the BBLP

21   price increase versus the five years at $25,000 a

22   year, which Corrigan argues, and I think there's

23   support for this, that was reference to the OCV plan.

24   That coupled with stay the course, the statement in

25   the same document, Corrigan argues is the basis, at

1    least the major basis for the conclusion that the OCV

2    plan was extended from a two year plan to a five year

3    plan.

4                    MR. ST. ANTOINE:  Right, Your Honor.

5                    THE COURT:  That's what Corrigan says.

6                    MR. ST. ANTOINE:  That's what he says,

7    and he's pointing to an Ortho document to make that

8    point.

9                    THE COURT:  You're right.  But the

10   document, and as I articulate this, I know -- I really

11   don't like to well hammer a lawyer appearing before

12   me.  I'm sort of reminded of something that then Judge

13   Bechtel did to me when I did something that he didn't

14   quite want me to do.  He made me stand there in front

15   of him in this building, not in this courtroom, and he

16   proceeded to hammer me, and I don't want to do that to

17   you, but let me just end this argument on -- this part

18   of the argument on this note.

19                    It seems to me a strong argument can be

20   made that the document to which you refer, the

21   September 15th document, 2000 document which is a BBLP

22   document, when it references, with this choice we have

23   to make is a dramatic price increase, a single price

24   increase, that part -- that statement refers to the

25   BBPL (sic) price increase versus five years at $25,000

1   a year -- 25 percent a year, pardon me.  That refers

2   to, although it's in the BBPL document.  That refers

3   to OCV.  I think there's -- that argument has been

4   made, there's evidence to support it, I'll have to

5   determine how significant that is.  I think it's

6   pretty significant.  But I don't think anything else

7   needs to be said on this point.

8                   MR. ST. ANTOINE:  Thank you, Your

9   Honor.

10                  THE COURT:  Have we covered all of the

11  bucket 2 points?

12                  MR. ST. ANTOINE:  I believe so.

13                  THE COURT:  Bucket 3, as I look at it,

14  is averaging, the averaging issue.  It's also and I

15  identified it as my point 3, and it's also post-2005.

16  We haven't really talked much about -- well, we

17  haven't said anything about RhoGAM as a yard stick

18  number one.  But we haven't talked about post-2005 at

19  all, the use of the Immucor costs, and was that

20  reasonable, particularly in view of the fact that Dr.

21  Beyer did not use costs at all in his establishing the

22  pre-2005 benchmark.  And let's see what else we have

23  on this issue.  This might be all.  No.  Yes.  Yes,

24  that's it.

25                  MR. CORRIGAN:  Your Honor, I think what

1   I have identified as 1(b) was -- is use of Immucor's

2   costs as a proxy for Ortho's costs, is that fair?

3                THE COURT:  Yes.  And I guess one --

4   yes, yes.

5                MR. CORRIGAN:  I've got 1(b) -- I have

6   1(b) which is Immucor costs as a proxy for Ortho's

7   costs.  Frankly --

8                THE COURT:  And RhoGAM, and that's part

9   of this argument as well.

10                MR. CORRIGAN:  Yes.  I'm just -- yes.

11   1(b) is that.  2 I had was the averaging issue using

12   the one but for price.

13                THE COURT:  Yes.

14                MR. CORRIGAN:  And then 3, had the

15   RhoGAM issue.

16                THE COURT:  Well, did averaging apply

17   only to the post-2005 period?

18                MR. CORRIGAN:  No.  No, I don't believe

19   so.

20                THE COURT:  Well, you can argue them in

21   whatever order you think appropriate, but your 1(b)

22   and RhoGAM cover the same period of time, the post-

23   2005 issue.

24                MR. CORRIGAN:  Your Honor, on 1(b), the

25   sum of what I have is the fact that Ortho's costs are

1    unreliable, and we've been over that yesterday and

2    we've been over that today.  I can do some of that

3    again.  I mean, the Court actually found -- the

4    Court's finding at page 242, note 12 of your opinion,

5    sort of finds that was reasonable.  I can read that,

6    but otherwise --

7                    THE COURT:  No, let me --

8                    MR. CORRIGAN:  Yeah, I have a slide

9    too.

10                    THE COURT:  Let me see it.  What page

11   again?

12                    MR. CORRIGAN:  It's 242, note 12 of

13   your opinion, and I have it up on there on the screen

14   now, Your Honor.  It's also slide 25 of today's

15   presentation.

16                    THE COURT:  Let me look at the whole

17   thing.  242 note 12?

18                    MR. CORRIGAN:  Yes, sir.

19                    THE COURT:  Okay.  "Dr. Beyer uses

20   Immucor standard costs for both defendants, because

21   Ortho has represented that its cost data is

22   unreliable.  Because both defendants manufactured the

23   same products from similar raw materials, and were

24   subject to the same regulations, Immucor's costs are a

25   reasonable proxy for Ortho's costs.  At the very

1    least, Immucor's standard costs is sufficient to give

2    reasonable estimate of damages and nothing more is

3    required."  Well, more might be required now.

4    Although, according to you, there's a difference

5    between damages -- well, the defense argues there's a

6    difference between damages and anti-trust impact.

7                    The reasonable impact -- the reasonable

8    estimate comes from the --

9                    MR. CORRIGAN:  That's in Story

10   Parchment.

11                   THE COURT:  Yes.

12                   MR. CORRIGAN:  It comes from Rossi in

13   this particular instance, but it's using language

14   that's similar to Story Parchment.

15                   THE COURT:  All right.  What point are

16   you making using this footnote?

17                   MR. CORRIGAN:  I'm just making the

18   point that you found that this was reasonable, because

19   Ortho -- again Ortho says their costs were unreliable,

20   and then goes on defensive -- the offensive, and says,

21   well, you can't use our costs, so you have no reliable

22   cost data.  I mean, it's got to be one way or the

23   other.  They can't get the benefit of their unreliable

24   costs, but Dr. Beyer does, these two companies they

25   manufacture very similar products.  As we've seen,

1   there's a lot of information in the record on the

2   homogenous nature of these products.  They're subject

3   to similar FDA restrictions and regulations, we have a

4   fair -- we have a lot of evidence in the record on

5   that point.

6            There are cross-walk documents, Your

7   Honor, which are in the record as well, which show

8   that there were corresponding products for each

9   company.  So while they may not have the exact same

10  costs, there were reasonable proxy for them,

11  particularly in light of Ortho's statements that their

12  costs, their own costs were unreliable.

13            THE COURT:  Well, I have -- I really

14  wasn't -- well, that's an issue that has to be

15  addressed and you've addressed it.  But this issue

16  also raises the question of the inconsistency between

17  the models used by Dr. Beyer in the 2000 to 2005

18  period and post-2005 period, he rejects costs in the

19  first period, and relies on them exclusively in the

20  second period.

21            MR. CORRIGAN:  Well, I wouldn't say he

22  rejects them.  What he says is they've already been

23  properly accounted for, in connection with the OCV.

24            THE COURT:  Well, you've made that

25  argument, but wasn't that argument at least undercut

1    by what the defense said about the standard costs,

2    first of all actual costs were not considered at all,

3    and standard costs were –– what was the word used in

4    Dr. Beyer's –– no, not in Beyer's report.  Standard

5    costs were –– and I've forgotten the word.

6                    When I asked you a question when you

7    were working for me, you were much faster.

8                    MR. COE:  Much faster (indiscernible)

9    Your Honor.

10                   THE COURT:  What's the word, standard

11   costs were ––

12                   MR. COE:  Frozen, Your Honor?

13                   THE COURT:  Yes.  Was it frozen or ––

14   they were not considered.

15                   MR. CORRIGAN:  Well, they ––

16                   MR. COE:  They were soon to be frozen,

17   Your Honor, yes.

18                   MR. CORRIGAN:  And Beyer says, it makes

19   perfect sense, that they're frozen because you have to

20   keep costs constant to make an apples to apples

21   comparison on the revenue impact of various different

22   price increases.  If you're doing ––

23                   THE COURT:  But he's trying to

24   determine revenue impact in the post 2005 period.

25                   MR. CORRIGAN:  Right.

1                    THE COURT:  And he's using costs as his

2    benchmark.

3                    MR. CORRIGAN:  Well, what he does, he

4    has to select an appropriate benchmark.  So what he

5    does in the first period was the most appropriate

6    benchmark was OCV.  As the Court pointed out, he had a

7    reasonable plausible, he had good rounds for seeing

8    the 25 percent extend five years.

9                    He didn't have good grounds in his mind

10   for doing that further, although there was some

11   evidence in the record of that.  At that point in

12   time, he's got to select the next benchmark.

13                   THE COURT:  Or maybe he doesn't.  Maybe

14   there's no evidence on which to select, quote, a next

15   benchmark.

16                   MR. CORRIGAN:  Well, he has to -- if

17   there's -- he does find two, so he doesn't say this

18   isn't the only one, he finds two.

19                   THE COURT:  He finds RhoGAM.

20                   MR. CORRIGAN:  He finds RhoGAM and he

21   finds the costs.

22                   THE COURT:  We're talking now about

23   costs.

24                   MR. CORRIGAN:  Yes.  So his job as a

25   economist is to specify a benchmark, and the one he

1    specifies is appropriate from 01/05.  At the end of

2    '05, he does another investigation, or it's part of

3    the same investigation.  Are there any appropriate

4    benchmarks from this point on, and that's what he's

5    done.

6              Now, the costs as we demonstrated I

7    think in our briefs, he says that the costs, and the

8    Court agrees with this in its opinion, both

9    benchmarks, and I know I'm getting into RhoGAM a

10   little bit, but we'll stick with costs.  Both

11   benchmarks reflect market structure, because he says

12   that most industries, you can't just pass your costs

13   along as they come, most industries you may have to

14   eat some of your costs in a competitive industry.

15             Because this is a duopoly, in his

16   benchmark, they are allowed all their cost increases.

17   Now, that's conservative for a couple of reasons.  One

18   reason is if the costs go down, Dr. Beyer's but for

19   world doesn't make the but for prices go down.

20             So if costs go down, they don't suffer

21   a price increase -- they don't suffer a but for price

22   decrease.  So it takes market structure into account,

23   and it's a conservative estimate because there's no

24   cost decrease.

25             Now, what Dr. Bronstein said, and this

1    is an ironic point that they make, that Ortho makes.

2    Ortho makes two points, one is they say, you really

3    shouldn't extend these 25 percent increases more than

4    two years.  Their other point, which is directly

5    conflicting is why would you stop after five years.

6                     The Court pointed out there are a

7    number of reasons why one would have to stop after

8    five years.

9                     THE COURT:  Pointed out in --

10                    MR. CORRIGAN:  In your opinion, yes.

11                    THE COURT:  Okay.

12                    MR. CORRIGAN:  That it's a simplistic -

13   - I can find the language, it's a simplistic statement

14   for Dr. Bronstein to say, it could go on forever.

15   There are a number of reasons why it can't go on

16   forever.  Competition is one of them.  It's a novel

17   concept in this case, but competition is one of them.

18                    So the Court found that that was

19   reasonable, I'll look for the language, but to say

20   that -- to allow for costs to be passed on does

21   account for market structure, and obviously the cost -

22   - it accounts for costs specifically.

23                    Now, we have an article cited in our

24   brief which talks about this method, you know, the

25   cost mark-up method.  The article is an economic

1   article, the articles says that demand doesn't has to

2   be specifically addressed in this method.  So we have

3   an economic article backing this methodology.  And

4   it's the most reasonable one at the time, along with

5   the RhoGAM.

6            THE COURT:  I have a footnote, my law

7   clerk points out, footnote 11 in the opinion which

8   addresses Dr. Bronstein's testimony.

9            MR. CORRIGAN:  Yes, thank you, Your

10  Honor.

11           Dr. Bronstein oversimplifies this.

12  There are a number of reasons of price if a non-

13  colluding duopolist might be lower than that obtained

14  by a cartel.  I mean, the point is basic on that.

15           THE COURT:  Well, Bronstein's point is

16  that it did not make sense for the 25 percent

17  increases to stop after five years.  In his opinion,

18  defendants would have continued raising prices in the

19  but for world until they reached the level of the

20  prices actually charged.

21           MR. CORRIGAN:  We see that's not always

22  the case in the RhoGAM and we'll get to that in a

23  minute.  But just because it's a duopoly doesn't mean

24  you can charge whatever you want whenever you want.

25  Okay.  The RhoGAM market is a good example of that.

1    It became flat.  Why did it become flat?  Because a

2    duopoly there were -- no, it became flat because some

3    of the firms in that market were competing, as opposed

4    to the TBR market when both firms were colluding.

5                It's not just why couldn't we charge 25

6    forever.  As the Court said, that's simplistic.  And

7    the RhoGAM market shows that.  So this -- the

8    methodology adopted by users with costs takes market

9    structure into account, it takes costs into account,

10   as the article -- which we cite is, it doesn't have to

11   independently take demand into account.

12               So it's a rational, reasonable

13   benchmark based on good grounds, Your Honor.  And I

14   think Your Honor pointed out the flaws in Dr.

15   Bronstein's criticism of it.

16               If the Court has no more questions on

17   that, then I'd like to -- I can move on to RhoGAM now.

18               THE COURT:  Because it's related, why

19   don't we do that, and then go back to the final issue,

20   the averaging issue.

21               MR. CORRIGAN:  Okay.  Let's see.  I'll

22   use a slide or two here, Your Honor.

23               Can we start with slide 29?

24               THE COURT:  Are we looking at the

25   original slides or today's?

Page 144

1                    MR. CORRIGAN:  Today's slides, Your

2    Honor.  Now, Your Honor, I want to start with -- I was

3    looking forward to telling you this.  But I actually

4    looked up the word congener, and it's pronounced

5    congener.

6                    THE COURT:  Congener?

7                    MR. CORRIGAN:  Yes, not congener, but

8    congener, okay.  Now, I've seen the word twice, in

9    that case and in the dictionary I looked it up, I see

10   it, but it is congener, I can confirm.

11                   So I start my RhoGAM presentation on

12   this point --

13                   THE COURT:  With what slide now?

14                   MR. CORRIGAN:  29 of today's.  Okay.

15   And I start -- where I'd like to start with the

16   Court's opinion and the heading of this, is that Ortho

17   disagrees with this Court's factual finding, which was

18   untouched by the Third Circuit.  We've used this form

19   of slide several times.

20                   But the Court's statement is, "Although

21   RhoGAM and TBR are not identical, they appear on the

22   present state of the record to be fair congeners."

23   And that's the case, the Lofal (ph) case, which Ortho

24   originally cited.

25                   What has Ortho say on that?  Well, they

1   say Rho-D is not a fair congener for blood reagents.

2   Okay.  So they just disagree with the Court's opinion.

3   This remand is not about disagreeing with this Court's

4   factual findings.  Those remain untouched by the Third

5   Circuit.

6               THE COURT:  Well, the question is, is

7   that a factual finding based on expert testimony, or

8   is it independent of the expert testimony?

9               MR. CORRIGAN:  Well, I want to review

10  what the testimony was, Your Honor, and let's talk a

11  little bit about that, okay.

12              So let's take a look at the next slide.

13  Just go to slide 30.  Okay.  Now, the heading on this

14  one, this is slide 30, Your Honor, is TBR and RhoGAM

15  markets are fair congeners.  Now, let's go to the

16  next, it says "reasonable similarities between

17  markets," and I have reasonable similarities in quotes

18  there, because that is this Court quoting from another

19  case in your opinion.  And that's at page 245.

20              And you're quoting from another case

21  that I believe Ortho cited, that would be the 11 Line

22  (ph) case in the Fifth Circuit, reasonable similarity.

23              THE COURT:  Let me find it.

24              MR. CORRIGAN:  Your Honor, it is on

25  page 245 of your opinion.

 1                    THE COURT:  I'm there, tell me --

 2                    MR. CORRIGAN:  Okay.  Right after the

 3    local cite, you have a parenthetical there saying, "An

 4    anti-trust plaintiff who uses the yard stick method of

 5    determining lost profit bears the burden to

 6    demonstrate the reasonable similarity."  Doesn't have

 7    to be exact, reasonable similarity.

 8                    So how did we go about --

 9                    THE COURT:  Let me just find that.

10                    MR. CORRIGAN:  Sure.

11                    THE COURT:  This is the paragraph that

12    begins, "To succeed"?

13                    MR. CORRIGAN:  Yes.  If you see the 11

14    Line cite there, Your Honor, Fifth Circuit --

15                    THE COURT:  Yes.

16                    MR. CORRIGAN:  -- there's a

17    parenthetical after that.  And you have emphasis

18    added, "reasonable similarity."

19                    THE COURT:  Yes, I see that.

20                    MR. CORRIGAN:  Okay.  So that's why I

21    start the heading, "reasonable similarities between

22    markets."  Okay.  So we review the reasonable

23    similarities.  Dr. Beyer mentioned this so we're

24    mentioning it.

25                    It's expert testimony to some extent,

1   Your Honor, but it's just the facts.  Ortho was a

2   major competitor in both industries.  Okay.  Next.

3   The same Ortho executives are responsible for pricing

4   in both industries.  The next one, no substitutes for

5   either one.  Next, (indiscernible) demand; next, FDA

6   approval as a barrier to entry, both products have to

7   be approved by the FDA.  Next, homogenous products,

8   both are considered commodities.

9                Next, relatively stable demand, and one

10  is based on blood transfusions, and the other is based

11  on pregnancies, births.  And the next one, highly

12  concentrated oligopolies.  And I left this one for

13  last because the Court expressed that it wasn't

14  entirely persuaded on this point.  I mean, why did Dr.

15  Beyer -- is it reliable to use a three firm market as

16  a yard stick for a two firm market.

17                So I wanted to emphasize that one a

18  little more because the Court had expressed concern

19  about it.  So if we could just take a look at slide

20  31.  Now, slide 31 is a pretty stark example of

21  pricing in the duopoly as the TBR which is going up

22  and up and up, and the green pricing is the RhoGAM

23  pricing.

24                Now, that is a tight oligopoly, a

25  heavily concentrated market.  That is flat.  Those

1  prices are not going up 25 percent every year or

2  anything remotely like that.  So you wonder why is one

3  way and why is the other the other way?  Is it just

4  that there's three companies in one market and two in

5  the other?  No, you have to look at the conduct.

6           What are the two firms doing in one?

7  Well, in the RhoGAM market, you have three firms, and

8  at least two of them are competing, that's why the

9  line is flat.  And in the TBR market, you have two

10  firms and they are colluding, that's why the price

11  line looks like that.

12           Now, to explain it a little bit, we

13  have a clip from Dr. Bronstein.  He helps us

14  understand the structural definition versus the

15  conduct.  So please play the Dr. Bronstein clip.  And

16  this is slide 32, Your Honor.

17      (Video played)

18           MR. CORRIGAN:  Your Honor, I just want

19  to point out this is slide 32 just to give you a heads

20  up.

21           THE COURT:  Thank you.

22           MR. CORRIGAN:  Thanks.  I'm sorry, I

23  should have mentioned it earlier.

24      (Video Played)

25           MR. CORRIGAN:  He's making that point

1   exactly, Your Honor.  It's not how many firms are in

2   the market, technically, definitionally two means a

3   duopoly, but if they were two large ones and a smaller

4   one, the smaller one, even though now technically not

5   a duopoly, might not have any impact on prices.

6                  THE COURT:  Is that the situation in

7   RhoGAM?  I know that there were three manufacturers of

8   RhoGAM.

9                  MR. CORRIGAN:  It's not quite, but the

10  effects are the same.

11                 In RhoGAM you have three firms.  It was

12  originally a duopoly.  One firm came in.  The firm

13  that came in, the new one, started competing heavily.

14  One of the two, not Ortho, but the other one, Bayer,

15  was not competing heavily.  So while they weren't a

16  smaller firm, but they were not competing much, and

17  the effects were the same.

18                 And we have some testimony that Fran

19  Kleinbard was an Ortho employee, and we deposed her,

20  and she showed up with a very large declaration on the

21  suggest of RhoGAM.

22                 So while Ortho in their brief says

23  Dr. Beyer relied on the opinion or the testimony of

24  some Ortho employee, she wasn't just any Ortho

25  employee.  They basic proposed her as a RhoGAM expert.

 1                So let's see what she had to say about

 2      the subject of what the firms in this market were

 3      doing.  And this -- Your Honor, this is slide 33.

 4         (Video Played)

 5                MR. CORRIGAN:  So, Your Honor, the key

 6      statements --

 7                THE COURT:  Before you go on --

 8                MR. CORRIGAN:  Sure.

 9                THE COURT:  -- I gather that the

10      product BayRho-D is the bare product?

11                MR. CORRIGAN:  You know, I think, Your

12      Honor, we start -- we were calling this RhoGAM, but

13      yes, BayRho-D is the bare product, I believe, yes.

14      Yes.  You're only competing with BayRho-D in the --

15      yes.

16                So the key statement she makes there,

17      you know, one is it was not a product that Bayer

18      really focused much on.

19                Secondly, she said they wouldn't -- she

20      wouldn't say they competed on price.

21                    "Would you say that BayRho-D

22                    competed against Ortho price?  No.  And

23                       what's the source of the

24          competition?

25                    My experience was they didn't do much

1    at

2              all."

3              So it's not a pure two versus three,

4    it's a two versus three where the third is not doing

5    much.

6              THE COURT:  Who is the two?

7              MR. CORRIGAN:  The two is the ZLB is

8    the new participant, and I have some information on

9    them, which I'll show you in a second.  But Bayer and

10   Rho-D were the two, ZLB came into the market in '04.

11   And ZLB started taking market share from Ortho, who

12   was competing, as far as we can tell, and from Bayer

13   who was -- really didn't do much at all.  So a pure

14   three versus two on the numbers doesn't tell the

15   story.

16             Dr. Bronstein (ph) explains that the

17   structure is definitional and you've got to look at

18   the conduct.  And Fran Kleinbard talks about the

19   conduct.  Bayer wasn't doing much at all -- anything

20   at all.

21             So, Your Honor, if we could go to the

22   next slide, it's slide 34, and that Dr. Beyer's

23   paragraph 61 of his report where he sort of ties this

24   all together.  And what's the basis for his opinion?

25   Well he takes a look at and he bases it partly on

1    Bronstein testimony, and partly on Kleinbard's

2    testimony, and partly on some documents that Kleinbard

3    -- Ms. Kleinbard provided.  But the market -- you

4    know, in the highlighted portion the market for OD was

5    a duopoly between Ortho and Bayer Talecris.  Bayer

6    sold to Talecris sort of in the middle of this.  It

7    was the same product.

8                    Until ZLB entered in '04, even after

9    ZLB entered the market was still effectively a duopoly

10   because Talecris did not actively compete for sales in

11   the hospital channel, Ortho's principal focus, and

12   made no efforts to expand its market share.

13                   Bayer Talecris market share dropped

14   from 23 percent in '03 to 18 percent in '07.

15   Furthermore its share of the important hospital

16   segment fell from 25 percent to 12 percent during this

17   time.  Consistent with what Ms. Kleinbard said, they

18   weren't doing much of anything at all.

19                   Dr. Bronstein confirms in his

20   deposition that the presence of a third small firm

21   that is capacity constrained does not have much impact

22   on the structure of a market compared to a duopoly.

23                   ZLB was an aggressive competitor

24   successfully taking market share from Ortho.  Its

25   share rose from six percent in '05 to 17 in '07, while

1    Ortho's share fell from 70 percent to 65 percent

2    during the same time frame.

3              Thus the difference in pricing behavior

4    between traditional reagents and Rho-D is not because

5    one is a duopoly and one is a three-firm market.

6    Rather the difference is that the market of a

7    traditional reagents is a duopoly where joint conduct

8    is alleged -- and not just alleged but we've seen that

9    -- and Rho-D is effectively a duopoly characterized by

10   price competition.

11             So that explains the graft, Your Honor.

12   Two of the three are competing, and in the other TVR

13   market the other two are colluding.  These are fair

14   congeners, there's reasonable similarities, and

15   actually I just thought of another one I forgot to

16   put.

17             The customers in both market are

18   largely the same.  Hospitals are a very significant

19   piece of both markets.  There's one more similarity in

20   the analysis of whether it's a fair congener or not.

21             And one other point, Your Honor,

22   yesterday I think -- I'm not sure if it was

23   Mr. St. Antoine or Mr. Coe referenced the RhoGAM

24   market as having sort of an 83 percent margin I

25   believe, and because they said that that was a duopoly

1    that the blood reagent should have 83, or they made a

2    comparison that RhoGAM -- we were treating RhoGAM to -

3    - I can't remember the exact comparison obviously.

4              But the point is that Dr. Bronstein

5    testifies -- and I have his testimony if you need to

6    see it -- that in the late '90s similar to his

7    definition that it was a duopoly but one of the two

8    was capacity constrained.

9              So, I believe in the time frame that

10   Ortho counsel is referring to RhoGAM having an 83

11   percent margin, at that time frame, even according to

12   Dr. Bronstein, who was effectively a monopoly, one of

13   the two wasn't doing much comparing.

14             So when they use that comparison that's

15   not a comparison, that's a monopoly.

16             And, Your Honor, unless -- do you have

17   any other questions on the RhoGAM analysis?

18             THE COURT:  No.

19             MR. CORRIGAN:  I'll end just with this

20   last slide, Your Honor, and it's one more conclusion

21   the judge made which Ortho disagrees with.  This is a

22   comment from page 235 of your opinion.  In many ways

23   this is a straightforward horizontal price fixing case

24   brought by direct purchasers of TBR.  The

25   anticompetitive effects of horizontal price fixing are

Page 155

1    obvious.

2                     And what's Ortho's response to that?

3    Plaintiffs in their memorandum on their remand echoed

4    their oft repeated mantra that this is a

5    straightforward horizontal price fixing case.  It

6    certainly is not.  That's what they have to do, they

7    have to disagree your factual findings, but that's not

8    what this remand is about.

9                     If the Court has no further questions,

10   Your Honor, that's all I have.

11                    THE COURT:  I don't.  But a word on

12   that last comment.  Factual findings that are based on

13   the expert testimony of Dr. Beyer are not as

14   sacrosanct as other factual findings.

15                    MR. CORRIGAN:  I understand that.  I

16   understand your thinking, Your Honor.  And you've

17   corrected me several times.

18                    THE COURT:  And of course from your

19   perspective everything is a factual finding

20   independent of what Dr. Beyer said.

21                    MR. CORRIGAN:  You've corrected me a

22   few times on that, Your Honor.

23                    Thank you.

24                    THE COURT:  Thank you, Mr. Corrigan.

25                    Who will argue the third set of issues?

1                    MR. COE:  It's back to me, I'm afraid,

2      Your Honor.

3                    THE COURT:  Oh, averaging.

4                    MR. CORRIGAN:  Oh, I'm sorry, Your

5      Honor.

6                    THE COURT:  I'm sorry, Mr. Coe.

7                    MR. CORRIGAN:  I'm sorry, we got

8      carried away.

9                    MR. COE:  I was going to cover it, Your

10     Honor.  I figured Mr. Corrigan, he said all he has to

11     say on it.

12                   MR. CORRIGAN:  I appreciate that.  I

13     had RhoGAM last, but we skipped over averaging.  I'm

14     sorry.

15                   THE COURT:  Yes, and that's my doing.

16     I asked you to handle the post-2005 issues at the same

17     time.

18                   MR. CORRIGAN:  I can't blame a judge,

19     Your Honor, so I'll have to take the hit on that one.

20                   If I could have slide -- let's see --

21     let's have slide 26, please.  No, is that the one?

22     Yes, 26, please.

23                   Your Honor, this is about -- I think --

24     I believe the subject is whether it's reliable to use

25     one but for price as opposed to but for price for

1    everyone.  But what Dr. Beyer has done, and I'm going

2    to play a clip of his testimony, he estimated a but

3    for price for each reagent for each year.  So there's

4    almost 2200 but for prices that were estimated.

5                     So, I want to play a clip of Dr.

6    Beyer's testimony, and that's slide 26, and the -- and

7    slide 27 will come up on the screen.  It's kind of an

8    outline to his testimony as he's testifying.  So it's

9    26 and you'll see 27 along with that.

10    (Video Played)

11                     MR. CORRIGAN:  Your Honor, if you take

12    a look at page 27, which was shown while Dr. Beyer was

13    testifying --

14                     THE COURT:  Page 27 of --

15                     MR. CORRIGAN:  Slide 27 of today's

16    presentation, yes.

17                     Again, he talks about almost 2200 but

18    for prices.  One for each reagent for each year.  And

19    it accounts -- it acknowledges there would be some

20    price dispersion in the but for market, but the third

21    bullet point, if they did -- if he did what Ortho is

22    asking he figures there would be 984,523 customer

23    agent a year combinations.  So instead of 2200 but for

24    prices you have almost a million but for prices, and

25    his estimation is that's sheer speculation and

 1    unscientific.  We haven't seen that.

 2                    The last bullet point is a linerboard

 3    (ph) example, Mr. St. Antoine made points there.  I

 4    mean he used one but for price in a linerboard case,

 5    which passed mustard.

 6                    And we're not says it's okay in every

 7    case, because again, Daubert is fitness for each case,

 8    but a million is just unscientific and it's

 9    unworkable, and it's not necessary.

10                    Let's take a look at the next slide,

11    please, and that's slide 28.  Now, I already know -- I

12    already can anticipate this Court's reaction to this,

13    but I'll try it any way.

14                    This is a finding of the Court in your

15    opinion, okay, and it's page 243 of your opinion.

16                        "Estimating a single but for price

17                        for each product in each year is

18                        sufficient to estimate damages as a

19                        matter of just and reasonable

20                        inference."

21                    Quoting Behrend there, but that's a

22    place where Behrend is quoting Story Parchment.

23                    So the Court in this opinion found, and

24    I understand that is partly based on Dr. Beyer's

25    testimony, but doing a million but for prices is

Page 159

1   unworkable and it's unscientific and it makes no

2   sense, and under the damages standard it's

3   unnecessary.

4                  Unless the Court has any other

5   questions that's my presentation on the averaging and

6   the one but for price.

7                  THE COURT:  I do not have any further

8   questions.

9                  MR. CORRIGAN:  Thank you, Your Honor.

10                 THE COURT:  Thank you.

11                 And now Mr. Coe.

12                 MR. COE:  Good afternoon, Your Honor.

13  We're going to kind of start with the last issue that

14  Mr. Corrigan addressed if that's okay with Your Honor.

15                 THE COURT:  That's fine.

16                 MR. COE:  This price aspersion issue.

17                 THE COURT:  Fine.

18                 MR. COE:  If we could turn to slide 25

19  of our presentation.  And, Your Honor, this is a slide

20  that Dr. Bronstein had in his report as Exhibit 9-A to

21  his report, but it's taken from Dr. Beyer's data, this

22  is essentially an illustration of the average price --

23  average actual price of this one product, anti-A

24  Bioclone, 15 times 10 milliliter of Ortho and Anti-A

25  Monosarah-1, 10 times 10 milliliter for Immucor, which

Page 160

1    Dr. Beyer's said is comparable products, and it's

2    compare the price per milliliter of those products

3    over the course of the class period.

4                    And if you'll notice in January 2005

5    this graph changes.  And if I could approach to

6    monstrator, Your Honor?

7                    THE COURT:  Oh, I certainly see the

8    dramatic change.

9                    MR. COE:  So there's a big gap starting

10   in January of 2005, and it begins to close a little

11   bit over the course of the class period, but by

12   January 2009 again the gap is even wider.

13                   So if you look at Immucor's price in

14   January 2009 it's about $3 per milliliter, and if you

15   look at Ortho's price in January 2009 it's more than

16   $6 per milliliter.  So Ortho's average price is more

17   than twice Immucor's price by January of 2009.  And

18   we'll talk about why that was in a minute, but that's

19   why we would argue that the second half of the class

20   period is very different from the first half of the

21   class period.

22                   And another difference is that Dr.

23   Beyer is not aware of any communications between the

24   two defendants after this November 2000 time period

25   that we spent so much time talking about, Your Honor.

1    We'd like to play a clip from Dr. Beyer's deposition

2    where he talks about that.

3        (Video Played)

4            MR. COE:  Go back to the slide for a

5    second.  So the pricing data doesn't suggest at all

6    that Ortho and Immucor were coordinating prices.

7    Dr. Beyer is not aware of any communications between

8    the two parties that would enable them to coordinate

9    prices, and yet he still opines that this conspiracy

10   period extended for ten years based on these

11   communications in a one-month or a three-week period

12   in November 2000, and we don't think that makes sense,

13   Your Honor, and he doesn't have a reliable basis for

14   that opinion.

15           THE COURT:  In what way is that

16   significant?

17           MR. COE:  Your Honor, we're talking

18   about price dispersion here, so there's two forms of

19   price dispersion.

20           One there's this price gap between

21   Ortho and Immucor, second there's dispersion of prices

22   for Immucor customers.  And we think he should have

23   accounted for both of these sets of price aspersion or

24   the price gap, because they would have existed in this

25   competitive but for world, and we don't think Dr.

1    Beyer has a reliable basis for not addressing this

2    Ortho/Immucor price gap, Your Honor.

3                    THE COURT:  What about the sheer

4    numbers of calculations that would be required?

5                    MR. COE:  I'll get to that, Your Honor.

6    Why don't we turn to the next slide.  We'll get into

7    this Immucor pricing dispersion, which I think is

8    where that concern comes in.

9                    THE COURT:  Fine.

10                   MR. COE:  So we know why this price gap

11   started to open up in January 2005, that's because

12   Immucor implemented two programs to compete and take

13   share from Ortho.

14                   The first was the price protection

15   strategy, and Your Honor found in its earlier opinion

16   that Immucor offered to freeze traditional reagent

17   prices for five years for customers that agreed to

18   lease its automated equipment, and that also can be

19   found in Ortho Exhibit 70.

20                   The second program is this pricing

21   differentiation strategy, and we've -- this is on

22   slide 26.  We've taken one page from that presentation

23   and blown it up, but this is Ortho Exhibit 69, Your

24   Honor, which is a copy of this pricing differentiation

25   strategy program.

1              And the first thing that's important to

2    note on this document is the first bullet which says,

3    "Increase Immucor market share by 20 percent.  Ortho

4    takeaways."  So the purpose of this program was to

5    steal customers from Ortho.

6              Pause it for a second there.

7              The third bullet -- sorry -- is the

8    next place that you should focus on, and that's, you

9    know, an explanation of what this pricing

10   differentiation strategy was.

11             So they were setting up these price

12   tiers, as I think everyone has referred to them,

13   starting in this January 1st, 2005, based on the

14   percentage of reagents a customer would commit to

15   buying from Ortho.

16             So at the time they were called base

17   Level I, Level II, the names of the tiers changed over

18   time, a new tier was added for customers that leased

19   the automated equipment, but the concept was generally

20   the same, that Immucor had at least four, and at times

21   six tiers of prices, for its customers.

22             And we asked Dr. Beyer why Immucor

23   implemented this pricing differentiation strategy, and

24   we'll play his response to that for Your Honor.

25        (Video Played)

1                    MR. COE:  So, Your Honor, as Dr. Beyer

2      himself admits, this was a program Immucor implemented

3      to compete with Ortho.  So in creating his but for

4      world that's supposed to reflect perfect competition

5      he should have accounted for these price tiers.  And I

6      think our next slide will show you what these tiers

7      look like.  Slide 27.

8                    And this is a slide from Dr. Beyer's

9      report, this is figure 7, and Dr. Bronstein walked

10     through -- used this chart in his presentation at the

11     first class cert hearing in 2012, and if you'll

12     recall, Your Honor, he pointed to the difference in

13     price between the lowest tier and the highest tier.

14     And I can try and recreate that for Your Honor.

15                    This lowest price tier here is the

16     price protected tiers, so these are the customers who

17     had their prices frozen for five years, and --

18                    THE COURT:  Is that -- how is that

19     identified?

20                    MR. COE:  Your Honor, the legend is up

21     at the top, so --

22                    THE COURT:  I'm looking at it.

23                    MR. COE:  -- second from the left is

24     the red with the square and it says price P.  Now I'll

25     admit the squares get a little squashed up.

1                    THE COURT:  All right.  I see it.

2                    MR. COE:  Sure.  So -- I don't have my

3     copy where I've written this all out, but -- so I'm

4     trying to do this from memory.

5                    The second price tier would be the

6     automation tier, so you'll see the orange with the

7     triangle is the automation tier.  I believe the blue

8     line is what was called the market tier at that time.

9     there's that ME which I --

10                   THE COURT:  It looks like it's the pre-

11    2004 quarter three tier.

12                   MR. COE:  I believe that's this one,

13    Your Honor.

14                   THE COURT:  Yes.

15                   MR. COE:  Oh, here's mine.  So, I think

16    this blue right here, the one, two, three, four, fifth

17    from the left, ME.

18                   THE COURT:  I see we have two blues.

19                   MR. COE:  We do -- we actually have

20    three blues, Your Honor.  There are only so many

21    colors to deal with all these tiers, Your Honor.

22                   The purple line is the market price.

23    So the fourth from the left, the purple line with the

24    X is the market price.  And the top line, the orange

25    line with the circles, is the list price.  So the list

Page 166

1    price in January 2009 was approximately $300.

2                    Now, I don't want to leave aside the

3    points that there was also a price dispersion both

4    before the class period and during the first half of

5    the class period, and Dr. Bronstein at the class cert

6    hearing had some slides made of Dr. Beyer's bubble

7    charts where he kind of blew up the numbers for the

8    first half of the class period and show there was

9    price aspersion earlier, but it was a little bit

10   smaller.  For example, Immucor's prices for this

11   product in 1999 ranges from about $5 to $20 or a

12   difference of the highest was about four times the

13   lowest.  By 2009 that difference was six times the

14   lowest, as we'll get to in a minute.

15                    Believe it or not Mr. Corrigan played a

16   clip I was going to play, so I'll refer you back to

17   the plaintiff's slides, I believe it's slide 26.  I

18   won't replay the whole thing for Your Honor, the point

19   of course that I want to focus on starts at line 10.

20                    THE COURT:  Let me get there.

21                    MR. COE:  Sure.

22                    THE COURT:  26?

23                    MR. COE:  Correct, Your Honor.

24                    THE COURT:  No, 26 is Beyer's

25   testimony.

1                    MR. COE:  Correct, Your Honor.

2                    THE COURT:  Oh.

3                    MR. COE:  And I just want to read one

4     excerpt from that testimony.

5                    THE COURT:  All right.  I'm sorry.  Go

6     ahead.

7                    MR. COE:  He says:

8                         "The reality is of course there

9                    would be some price dispersion in the

10                   but for market for good reasons.

11                   Smaller firms would     receive higher

12                   prices, strategic firms would most

13                   likely receive lower prices."

14                   But then he goes on to say, "It would

15    just be too complicated for me to account for this."

16                   And Your Honor asked about that

17    question, you know, would he have to come up with a

18    million different but for prices to account for this,

19    and I want to point to one thing from your opinion,

20    Your Honor, that suggests that might not be the case.

21                    THE COURT:  What page?

22                    MR. COE:  It's page 243, Your Honor.

23                    THE COURT:  I'm there.  Tell me what --

24                    MR. COE:  It's after the first cite to

25    the Behrend's opinion, what Ortho proposes.

1                    THE COURT:  I have 243.  Quoting Story

2    Parchment?  That?

3                    MR. COE:  Correct.  Right after -- the

4    next sentence after that cite, Your Honor.

5                    THE COURT:  Let me -- yes, I see it.

6                    MR. COE:  So the Court found:

7                         "What Ortho proposes would

8                         exponentially complicate the

9    calculation

10                        of damages in this type of case.  As

11                        Dr. Beyer testified it would require

12                        plaintiffs to estimate almost a million

13                        different but for prices."

14                   So that's the point plaintiffs made

15   earlier today.

16                   But I want to also point you to a

17   sentence in the next paragraph, and this is after Your

18   Honor's cite to -- there's a -- it cites McDunna (ph)

19   and then you also cite to Professor Wright's (ph)

20   treatise, and I'm reading the sentence after that.

21                   THE COURT:  In his reply?  Is that

22   what --

23                   MR. COE:  Correct, Your Honor.  So in

24   his reply report Dr. Beyer shows that the prices paid

25   by most Immucor customers after 2005 corresponded to

1    one of the standard pricing tiers and is a

2    straightforward to calculate an overcharge percentage

3    for each pricing tier.

4              So in the real world it would be

5    straightforward for Dr. Beyer to account for these

6    pricing tiers, but he claims it would be unbelievably

7    complicated in requiring to calculate a million but

8    for prices to account for these ties in the but for

9    world.  That doesn't make sense to me, Your Honor.

10   But even if it's true this he needs to calculate a

11   million but for prices, that does not excuse Dr. Beyer

12   from using an unrealistic, an unreasonable methodology

13   that does not result in the calculation of damages as

14   a matter of a just and reasonable inference.

15             And turning to your next slide, Your

16   Honor.  In your opinion the Court excused Dr. Beyer's

17   use of one but for price on the grounds that other

18   courts had accepted Dr. Beyer's -- or expert's failure

19   to account for price aspersion even through there was

20   variable prices in those cases as well.  And one of

21   the cases the Court cited to was Judge Brody's opinion

22   in the McDunna case, and I know how much respect you

23   have for Judge Brody, and we have a former Judge Brody

24   clerk in the room, so we'll assume that she got it

25   right, Your Honor, and that the level of price

Page 170

1    dispersion in the McDunna case was acceptable.  But as

2    we walk through in our brief, the level of dispersion

3    in that case ranged from about 135 percent to about

4    150 percent.

5              We also cited to Your Honor the Reed

6    (ph) case where the judge found that there was too

7    much price dispersion to allow for the calculation of

8    damages as a just and reasonable inference, and in

9    that case the dispersion was about 190 percent, or the

10   lowest wages were about -- I'm sorry -- the highest

11   wages were about two times the lowest wages.

12             As we just showed to Your Honor, here

13   the difference between the highest price and the

14   lowest price is 600 percent, where the highest price

15   is 6 times the lowest price.

16             THE COURT:  Mr. Coe, turning to Reed,

17   wasn't averaging used in both the but for world and

18   the real world in Reed?

19             MR. COE:  That's probably correct, Your

20   Honor, I'd have to go back and -- I'd have to go back

21   and look at it.

22             THE COURT:  Does anyone in the room,

23   including Judge Brody -- Judge Brody was involved in

24   McDunna.

25             MR. COE:  Correct, Your Honor.

1                    THE COURT:  The Toys R Us case.  I'm

2      familiar with that case.  And Reed I'm not -- I

3      haven't reread Reed.

4                    MR. COE:  I have copy, Your Honor, I'd

5      be happy to read it at the next break.  I'm not sure

6      it makes a difference is I guess where I come out,

7      because you're still trying to determine how much

8      price dispersion is, and there is a limit because --

9                    THE COURT:  Does it matter -- well what

10     is the significance?

11                   MR. COE:  And I will touch on that,

12     obviously, Your Honor.

13                   THE COURT:  I'm sorry, let me finish.

14     Significance between using it -- using the averaging

15     only in the but for world as opposed to both in the

16     real world and the but for world?  You don't have to

17     answer it right now if you think the answer is in Reed

18     or some other --

19                   MR. COE:  Right.  I'm not sure there a

20     difference, Your Honor, because we're still looking at

21     how much variation there is on price and how much of

22     that variation is acceptable, but I'll go back and

23     look at that passage, Your Honor.

24                   We have one more slide I wanted to show

25     you on this, and this is just some math we did from a

1    table in Dr. Beyer's report And Dr. Beyer's chart of

2    the prices in four of these tiers in 2009.  He does

3    not include the price protected tier in his chart.

4    And this chart is at -- it's Table 10 of Dr. Beyer's

5    reply report, Your Honor.

6                    THE COURT:  Paragraph 18.  Yes, I see

7    that.

8                    MR. COE:  So this actually

9    underestimates the amount of price aspersion, because

10   he's not including the lowest prices in that chart,

11   he's eliminating that price protected tier that was at

12   the bottom of the (indiscernible) chart we showed you

13   earlier.  But even eliminating that lowest price and

14   just taking the gap between the automated price and

15   the list price, for every single one of these products

16   the highest price is four times the lowest price.

17                   So, Your Honor, asked what's the

18   problem with this price dispersion, and there's two

19   problems.

20                   The first is if you assume in the but

21   for world that the same amount of price dispersion

22   exists then these customers who are paying a higher

23   actual price would also be paying a higher but for

24   price.  So their damages would be much smaller and

25   possibly they would have no damages or there would be

1    no impact.

2                   The converse of that problem is the

3    customers who are paying the lower actual price would

4    also be paying a lower but for price.  So their

5    damages would actually be bigger.

6                   And you might ask why would Ortho care

7    about that?  And maybe Ortho doesn't care about that,

8    but I think it is a concern the Third Circuit has

9    raised in the Karara (ph) case, and in that case they

10   said the court -- the certification requirements are

11   meant not to just protect defendants, but they're also

12   designed to protect class members -- absent class

13   members.  And if the recovery of an absent class

14   member is going to be diluted then a class should not

15   be certified.  And that's what's going to happen here

16   to these strategic customers, as Dr. Beyer called

17   them, the large customers, they're going to have their

18   recovery diluted.

19                   So on the one hand you have the smaller

20   customers who might not have been impacted, on the

21   other hand you have the larger customers whose

22   recovery is going to be diluted because they're

23   basically sending their damages to the smaller

24   customers, Your Honor.

25                   That's all I have on that topic, Your

 1   Honor.

 2                   THE COURT:  Thank you.

 3                   MR. COE:  Now would be a good time for

 4   that break, Your Honor, and then we could start up

 5   with RhoGAM and the Immucor costs?

 6                   THE COURT:  Absolutely.  We're in

 7   recess for ten minutes.

 8                   THE BAILIFF:  All rise.

 9          (Recessed at 3:25 p.m.; reconvened at 3:41 p.m.)

10                   THE COURT:  Please be seated.

11                   Mr. Coe, before we switch gears, during

12   the recess I took a look at some exhibits, and I noted

13   that the variation in pricing of the ten leading,

14   products, Immucor's top ten products for years other

15   than 2009 seem to be less than that in 2009.  Do you

16   agree?

17                   MR. COE:  I agree that they did

18   increase over time, Your Honor.  If we can go back to

19   --

20                   THE COURT:  I'm looking at --

21                   MR. COE:  Right, we can go back to

22   slide 27, Your Honor.  You'll notice from 2005 to

23   2008, I guess you would call it, there's --

24                   THE COURT:  Very little.

25                   MR. COE:  -- less dispersion.  Well,

Page 175

1    Your Honor, I think part of the problem here is the

2    scale of these charts, so as Dr. Bronstein showed when

3    you blow these up and change the scale that the charts

4    obviously look very different.  But as compared to

5    from 2000 -- July 2008 forward I would agree that

6    there is less price dispersion, Your Honor.

7                THE COURT:  The dispersion in 2005, I'm

8    looking at exhibit -- no, it's the reply.  It's your

9    reply in support of plaintiff's motion for plan cert.

10   So it's the bottom in 2012.  But it's Beyer's report

11   and it's Table 6, and for 2005, for example, one

12   product it shows the dispersion is between customers

13   84 to 120, another 200 to 270, another 28 to 36,

14   another 72 to 95.  That's for 2005.  And the same is

15   generally true of 2006.  Much more dramatic in 2009.

16   Of what significance is that?  It's still -- it

17   doesn't change your argument, it just changes the --

18               MR. COE:  Only as a matter of degree,

19   Your Honor.  As we said, we do think this is a problem

20   that increases with time, particularly after January

21   2005 in these price increases -- I'm sorry -- these

22   pricing tiering are implemented and it's obviously

23   much more pronounced after --

24               THE COURT:  All right.  You can move

25   now --

Page 176

1                    MR. COE:  -- July 2007, I guess is when

2     it appears to separate out if we're on this -- at

3     least on this slide, Your Honor.

4                    THE COURT:  Yes.  And you're referring

5     to slide 27.

6                    MR. COE:  Correct, Your Honor.

7                    THE COURT:  All right.  You may proceed

8     to the post-2005 issues.

9                    MR. COE:  Before I do, Your Honor, I

10    did go back and read the Reed case.  Fairly quickly,

11    so I'm sure you'll want to -- or Liz will want to read

12    it herself -- but my reading of this case -- there's

13    two points -- two pages or two excerpts that I think

14    are relevant.

15                   The first is on page 585 when they --

16    the court describes Dr. Rouser's (ph) fourth wedge

17    analysis.

18                   My first observation, Your Honor, is

19    Dr. Rouser did a lot more than Dr. Beyer did in this

20    case, a number of analysis, but I believe the fourth

21    wedge was the one that the Court says it actually

22    based its certification decision on, so, I believe

23    that's the one that is most relevant.

24                   And my reading of this is that there

25    was a difference in the methodology that Dr. Rouser

1   was using.  Instead of subtracting the actual price --

2   I'm sorry -- the but for price from the actual price

3   he actually calculated an overcharge percentage, which

4   was based on the average difference between the

5   average competitive wage or the average but for wage

6   and the average actual wage.  That came out to be 11.3

7   percent, and he said everyone in the class, their wage

8   was suppressed by that 11.3 percent, and that's how

9   I'm going to calculate damages.

10              But when we talk about the use of

11   averages, which is on page 591, what the Reed court

12   points to is the aspersion in wages in the actual

13   world, and it's that wage aspersion in the actual

14   world that renders Dr. Rouser's methodology

15   unreliable, Your Honor.

16              THE COURT:  Was averaging used in both

17   actual world calculations and real world -- and but

18   for world calculations?

19              MR. COE:  Yes, Your Honor.

20              THE COURT:  All right.

21              MR. COE:  So, Your Honor, we're going

22   to be going back to talking about costs again in

23   connection with the Immucor cost benchmark, and before

24   we did that I wanted to clean up some of the argument

25   from this morning, because I think we were talking

1   about a lot of different costs, and I wanted to go

2   back to which costs were important and why we were

3   talking about them.  And I would say we used cost

4   yesterday to illustrate three points.

5           The first point was that Dr. Beyer ignored

6   costs in the first half of this -- of the class period

7   in his operation to create value benchmark, and that

8   was unscientific.  And I think what's important to go

9   back to there is that when Dr. Beyer used the standard

10  cost in the second half -- I'm sorry -- uses cost in

11  the second half of the class period to estimate how

12  much prices would go up he used these Immucor standard

13  costs.

14          THE COURT:  You said standard costs.

15          MR. COE:  Immucor standard costs,

16  correct, Your Honor.

17          THE COURT:  Did Immucor differentiate

18  between standard costs and actual costs?

19          MR. COE:  I don't know, Your Honor.

20          THE COURT:  Well then you -- how can

21  you say that he used Immucor standard costs?

22          MR. COE:  That's how Immucor described

23  them, Your Honor, was their standard costs, and that's

24  how Dr. Beyer describes them in his report.

25          THE COURT:  Well then what you're

1    telling me is you don't know whether standard costs

2    for Immucor are the same as actual costs.

3                    MR. COE:  That's correct, Your Honor.

4    But why I'm telling you this is -- Joshu, do you have

5    Dr. Bronstein's presentation from the class cert

6    hearing?  I think it's our Exhibit 120.

7                    THE COURT:  I probably -- I'm sure I

8    have it.  Yes, I have it.  What page?

9                    MR. COE:  It's page 7, but

10   unfortunately the pages were not numbered, Your Honor,

11   so -- it has the changes in standard costs is the

12   title.

13                   THE COURT:  We're looking at

14   Dr. Bronstein's testimony, July 26th, 2012?

15                   MR. COE:  Correct, Your Honor.

16                   THE COURT:  And it's page?

17                   MR. COE:  I believe it's 7, Your Honor,

18   but there's not a page number on it.

19                   THE COURT:  Across the top, changes in

20   standard costs.  Yes, I have it.

21                   MR. COE:  So these are what Dr. Beyer

22   decided the increases in Immucor standard costs were

23   throughout the class period.  And as you can see in

24   2001, 2002, 2003, and 2004 those cost increases were

25   significant.  They range from 18 percent to 25

1   percent.

2            So our first criticism of Dr. Beyer on cost

3   is that he could have accounted for these costs in his

4   operation to create value benchmark in the first half

5   of the class period.

6            Now while we're going get very shortly

7   to the Immucor cost benchmark, and he did use these

8   Immucor standard costs in the second half of the class

9   period, and one of our arguments is that he did that

10  purposefully to flatten out prices, and you can see

11  there's a sharp difference between the price increases

12  in the first half of the class period and the second

13  half of the class period.  In the second half of the

14  class period their range from three percent to six

15  percent, Your Honor.

16           And Joshu, if you can pull up slide 35.

17           THE COURT:  Those percentages are

18  basically the same.  Not quite the same, but basically

19  the same for Ortho in the post-2005 period.

20           MR. COE:  Correct, Your Honor, though I

21  believe he was using Immucor standard cost data to

22  estimate the increase in Ortho's standard policy you

23  would expect them to be pretty close.

24           THE COURT:  Well you keep saying

25  Immucor's standard costs.  There's no -- there is a

1    difference between Ortho's standard costs and Ortho's

2    costs.   Total costs are more.

3                    MR. COE:  And that's exactly the point

4    here, Your Honor.  We're not -- we will quibble later

5    with the use of Immucor's standard costs as a proxy

6    for Ortho's costs, but -- and we'll also quibble with

7    whether you can use just cost to measure but for

8    prices, but I don't believe we are challenging

9    Dr. Beyer's use of Immucor's standard costs to account

10   for Immucor's increases in cost in the second half of

11   the class period.  Does that make any sense to Your

12   Honor?

13                   What we're trying to illustrate here is

14   that when Dr. Beyer was deciding that he didn't want

15   to account for costs in his first half of the class

16   period, in part because these cost increases did not

17   entirely explain the price increases, these are the

18   numbers that he was looking at when he made that

19   decision.

20                   THE COURT:  All right.

21                   MR. COE:  So now I want to turn to my

22   second point.  And that second point that we made was

23   that it's inappropriate to rely on a 1999 business

24   plan to predict what Ortho was going to do for five

25   years.  And that was the -- we talked about the Tunis

1    case when -- because there are changes in the market

2    many courts have rejected an expert's reliance on a

3    business plan, it's inconsistent with what happened in

4    the real world.  So we showed you this slide 35, Your

5    Honor, which compared Ortho's prediction of what its

6    costs would be.

7                    THE COURT:  Yes, I -- for the years

8    2001, 2002 --

9                    MR. COE:  Correct, Your Honor.

10                   THE COURT:  -- 2003.

11                   MR. COE:  So the point we were making

12   here is that in 2000 -- in the year 2000, on

13   September 15th, 2000, to be exact, in Plaintiff's

14   Exhibit 54, Ortho is predicting that its standard cost

15   would be $10.2 million in 2003, but in hindsight after

16   2003 --

17                   THE COURT:  What did you say 10.?

18                   MR. COE:  Right here, Your Honor.

19                   THE COURT:  I'm just looking at the --

20   that's total COGS.

21                   MR. COE:  Correct, Your Honor.

22                   THE COURT:  The standard costs were I

23   thought 10.9.

24                   MR. COE:  Well if you do the math, Your

25   Honor, they start with this 10.9 standard costs.

1                 THE COURT:  Yes.

2                 MR. COE:  Then they have a line for

3    reduction and costs of goods sold from lien savings

4    and other favorable variances.

5                 THE COURT:  All right.  Okay.  You end

6    up with 10.2.  I see.

7                 MR. COE:  Right.  But when they got to

8    -- when 2003 was over and they actually looked at what

9    their actual costs were it was 24.88 million, which is

10   this number in the top half of the screen, Your Honor.

11                So the point of all that was to show

12   you that things changed in the real world and it's not

13   appropriate, as Mr. Bronstein opined, for an

14   economist, to completely substitute his judgment for

15   the judgment in a business plan, especially when that

16   business plan is inconsistent with what happened in

17   the real world.

18                THE COURT:  Well what you're talking

19   about is a long-term plan where predictions at the

20   inception of the long-term plan turn out to be

21   incorrect.

22                MR. COE:  Correct, Your Honor.  And of

23   course we would argue that it was not a long-term

24   plan.  And I don't want to belabor that point, but

25   there is no evidence that when Ortho was spending all

1    this time and effort in 1999 and early 2000 to come up

2    with operation to create value that they ever looked

3    beyond two years.  Plaintiff's counsel has made --

4                THE COURT:  Except for that one

5    statement, and we keep referring to it in the BB --

6                MR. COE:  Again, Your Honor, that's in

7    the blood bank leadership program, so that's --

8                THE COURT:  Yes, but we've covered

9    that.  I don't want to -- I've got that --

10               MR. COE:  I understand.  But the only

11   point I want to make, that's nine months later,

12   plaintiffs can't rely on the thought and effort that

13   went into the operation to create value plan, which

14   was this two-year plan, and apply it to that five plus

15   years prediction that was in blood bank create value.

16   There's no evidence that anyone spent any time or

17   effort to come up with that number.  Because at that

18   point they're focused on the next plan, the blood bank

19   leadership program.  But you're right, Your Honor,

20   we've covered that in exhaustive detail.  So let me

21   turn --

22               THE COURT:  But what -- are there any -

23   - you cited a case, and I don't recall that we've

24   talked about cases on this issue.  The cases that

25   address the question of reliance on a business plan

1    over a long-term or over a period of years, it doesn't

2    necessarily have to be a long-term plan, where real

3    life, real world situations change.

4              MR. COE:  I'll give you those

5    citations, Your Honor.  I have the wrong binder.

6         (Pause)

7              MR. COE:  Right, that's the Tunis

8    Brothers versus Ford Motor Company, it's a Third

9    Circuit case from 1991, and it's -- the citation is

10   952 F.2d 715.  We cite that -- I think all these cases

11   at page 13 of our brief, Your Honor.  The other two

12   cases we cite are the Advent Systems Ltd. versus

13   Unisys Corp. case, another 1991 Third Circuit opinion,

14   and the citation of that is 925 F.2d 670.  And then

15   the JMJ Enterprises Inc. versus VO Benito Italian Ice,

16   Inc., and that's a Lexis unreported decision in 1998,

17   U.S. Lexis 5098, that was out of the Eastern District

18   in 1998, Your Honor.

19              And do you have our Exhibit 10 Joshu?

20   And, Your Honor, the last point that came up this

21   morning was did Ortho's prices actually go up during

22   this first half of the class period?  And Your Honor

23   pointed out that that page we showed you from

24   Plaintiff's Exhibit 54 was a prediction of standard

25   costs, it didn't include costs not in the standard.

Page 186

1                    THE COURT:  Yes.

2                    MR. COE:  And you asked if there was

3     any evidence in the record of what costs not in the

4     standard were at that time.

5                    So before I get to that, I mean I think

6     the first point is Dr. Beyer wasn't looking at Ortho's

7     actual costs, he was looking at Immucor standard

8     costs, and he thought they were going up.

9                    THE COURT:  This is for the post?

10                   MR. COE:  This is for the first half of

11    the class period, Your Honor.  So this is an

12    August 26th, 1999 documents, our -- Ortho's Exhibit

13    No. 10, Your Honor.

14                   THE COURT:  Exhibit 10 for what?  In

15    what proceeding?

16                   MR. COE:  It's Ortho's exhibit, I

17    believe it was to our original brief, Your Honor, our

18    original opening brief.

19                   THE COURT:  Oh, the remand brief.

20                   MR. COE:  No, the 2012 opening brief,

21    Your Honor.  We had to dig this out in response to

22    Your Honor's question.

23                   THE COURT:  And do I have that?

24         (Clerk confers with the Court)

25                   THE COURT:  All right.  I have

1   Exhibit 10.

2                 MR. COE:  Joshu do you remember what

3   page we were looking at?  The Bates number on the last

4   -- the page we're focusing on is 1487, Your Honor.

5                 THE COURT:  All right.  I have 1487.

6                 MR. COE:  So this is a document that

7   came from Norbridge's production, Your Honor.

8   Norbridge is the consultant working on operation to

9   create value, it appears to be a document Ortho

10  provided to Norbridge, and it does have a standard

11  cost and a cost non-standard number.  If you look

12  under the total traditional blood bank column the

13  standard costs I believe were $12.47 million.

14                THE COURT:  What?  12.47?  Yes, I have

15  -- I have total traditional blood bank.  Is that the

16  column you're looking at?

17                MR. COE:  Yes, Your Honor.  In the

18  second number down --

19                THE COURT:  Standard costs are 12.474.

20                MR. COE:  Exactly, Your Honor.  And

21  then a few more numbers down is other costs not in

22  standard.

23                THE COURT:  Yes.

24                MR. COE:  And that's 2.22 million.

25                THE COURT:  Yes.

1                    MR. COE:  So, I did the math, and I'm

2    sure plaintiffs will second check me, but adding those

3    numbers I got 14.694 million in actual costs for Ortho

4    in 1999.  So that's just adding the 12.74 million to

5    the 2.22 million.

6                    THE COURT:  Well it's evidence that

7    Ortho used cost not included in standard costs in this

8    chart.  Is that what you're --

9                    MR. COE:  And it's also evidence of

10   that Ortho's actual costs were in 1999 for traditional

11   reagents.

12                   THE COURT:  Okay.

13                   MR. COE:  And going back to the FTC

14   data, which I believe was slide 35 -- maybe we

15   actually want to go back to that exhibit, Joshu, it's

16   Plaintiff's Exhibit 171.

17                   THE COURT:  Yes.  I have it.

18                   MR. COE:  The actual costs in 2005,

19   Your Honor, were 21.987 million, which is higher than

20   the 14.694 million from 1999.

21                   So over this period of time in the

22   first half of the class period the evidence is that

23   Ortho's actual costs did in fact increase, and we

24   would argue that argues for Dr. Beyer having to

25   account for Ortho's cost in his operation to create

1    value benchmark for the first half of the class

2    period.

3                   THE COURT:  Do we have the same figures

4    for -- the figures that I'm looking at in Exhibit 171,

5    which is -- well it's identified -- it's the FTC

6    submission, we have the figures for 2003 through 2008.

7    Do we have figures for 2000 and 2001 and '02?

8                   MR. COE:  We don't, Your Honor, and you

9    asked that question earlier --

10                  THE COURT:  I think --

11                  MR. COE:  -- and I went back to the --

12   this was actually an attachment to Ortho's submission,

13   and I don't know if I have the exhibit number, but one

14   of plaintiff's exhibits was the rest of Ortho's

15   submission.

16                  THE COURT:  Well why are we looking at

17   the 1999 figures when they're not included in any of

18   Dr. Beyer's reports?

19                  MR. COE:  Because Your Honor asked the

20   question if we had any data about what Ortho's actual

21   costs were in 1999 or 2000 or earlier in this class

22   period.

23                  THE COURT:  I think I asked whether

24   there was any evidence of cost not included in the

25   standard cost.  But the 1999 figures are not relevant

1   to Dr. Beyer's calculations are they?

2                 MR. COE:  They are, Your Honor, because

3   Dr. Beyer ignored costs in the first half of the class

4   period.

5                 THE COURT:  Yeah, but 1999 costs are

6   not included in the first half of the class period.

7                 MR. COE:  You're right, Your Honor.  So

8   there's two points here.

9                 One, he thought -- he uses Immucor's

10  standard costs as his goal standard, Immucor's

11  standard costs were going up --

12                THE COURT:  Not for the first --

13                MR. COE:  -- for the first half of the

14  class period.

15                THE COURT:  But he doesn't use them in

16  the first --

17                MR. COE:  But he does use them in the

18  second half of the class period.

19                THE COURT:  Yes.

20                MR. COE:  So he thought those were

21  going up in the first half of the class period, but he

22  still decided to ignore them.  And we also have

23  evidence that Ortho's actual costs were going up in

24  the first half of the class period.  So --

25                THE COURT:  Not according to Dr. Beyer.

Page 191

1    I think we've discussed this.  Doesn't he conclude

2    that they went up only 6.4 percent?

3              MR. COE:  Your Honor, he was looking at

4    this 2003 to 2008 time period, so it overlaps.

5              THE COURT:  That's because he didn't

6    have the 2001.

7              MR. COE:  Well it was in the record,

8    Your Honor.  And he didn't have the -- going back to

9    your question about whether this data exists for --

10             THE COURT:  This data being the 1999

11   data.

12             MR. COE:  Well or in this format of

13   what Ortho submitted to the FTC.  Anyone know the

14   exhibit?  I have it in my head as Plaintiff's Exhibit

15   165, but I'm not --

16             THE COURT:  I'm looking -- is it 171

17   or --

18             MR. COE:  I'm looking for the narrative

19   submission to the FTC, Your Honor, where Ortho

20   responded -- you know, it looks like a subpoena

21   essentially, Your Honor.

22             THE COURT:  It's dated October 17th,

23   2008, but not -- that's not the letter of transmittal.

24             MR. COE:  Correct, Your Honor.  This

25   was an attachment to the letter of -- essentially to

1  Ortho's subpoena response, and we'll try and find the

2  actual document, but in that response Ortho said we

3  did not maintain this data in the normal course of

4  business before 2003.  So the FTC had asked for

5  earlier data, but Ortho said it did not have that

6  data, Your Honor.

7          So one more point about costs following

8  up from this morning.  So the last point we wanted to

9  make was Ortho had set -- or I'm sorry -- Dr. Beyer

10 had set this 40 percent -- I'm sorry -- Dr. Beyer set

11 a 50 percent gross margin goal for Ortho, plaintiffs

12 lowered it to 40 percent, and we've spent a lot of

13 time arguing why that wasn't a realistic goal, but we

14 also wanted to make the point that if you include

15 actual costs in 2005 Ortho had not met that 40 percent

16 goal that Dr. Beyer made up for Ortho.  And if we go

17 back to slide --

18          THE COURT:  That's only if you include

19 the costs that were known for --

20          MR. COE:  The non-standard.  Correct,

21 Your Honor.

22          So if you go back to that document I

23 handed up this morning, which compared Dr. Beyer's

24 table with the FTC submission for 2005, that was the

25 last point we were trying to make about cost.  And for

1  that point it doesn't really matter what Ortho's costs

2  were in 2000 or 2001 or 2003, the question is what

3  were they in 2005?  Because the calculation, revenues

4  minus costs for that year, and going -- you know, we

5  went through this yesterday, but if you use the actual

6  costs or costs non-standard you would actually have a

7  negative, you'd be losing money in Dr. Beyer's but for

8  world, Your Honor.

9          THE COURT:  Yeah, but comparing those

10  two documents -- we talked about this this morning --

11  the sales jumped in the -- increased dramatically in

12  the second document.

13          MR. COE:  Correct, Your Honor -- well

14  there was -- the revenues in the FTC data were higher

15  than what Dr. Beyer said his total sales were in his

16  data or transaction data.

17          THE COURT:  So what significance is

18  that?

19          MR. COE:  I don't know that it has any,

20  Your Honor, because we're looking at costs, and I

21  haven't seen any translation of that into costs, Your

22  Honor.  I haven't seen any challenge of the cost data

23  in the FTC submission, Your Honor.

24          THE COURT:  Well except that the

25  plaintiffs say they never got it.  The actual cost.

Page 194

1                    MR. COE:  That's correct, Your Honor.

2      That's correct.  They also said they didn't ask for

3      it.

4                    THE COURT:  Well --

5                    MR. COE:  And I know --

6                    THE COURT:  -- not --

7                    MR. COE:  -- we went back and forth on

8      that.

9                    THE COURT:  -- exactly.  Not exactly.

10     Corrigan said he asked for costs, he didn't -- he

11     doesn't think he specifically asked for the costs not

12     included in standard costs.  Is that a fair statement,

13     Mr. Corrigan?

14                   MR. CORRIGAN:  Yes, Your Honor.  I can

15     elaborate a little bit on that.

16                   THE COURT:  No you don't have to.

17                   MR. CORRIGAN:  Okay.  Yes, that's fair.

18     The give and take on that is more general.

19                   MR. COE:  That letter to the FTC was

20     Exhibit 165?  We'll follow up with that, Your Honor.

21                   So I want to move on to the Immucor

22     cost benchmark, Your Honor, which is slide 38 of our

23     presentation.

24                   At the top of this chart, this

25     demonstrative we have what Dr. Bronstein and I believe

1    most economists -- all economists, including Dr. Beyer

2    would say are the three major determinants of price.

3    Market structure, cost, and demand.

4               And for the first half of the class

5    period this OCB benchmark we have already argued and

6    we won't go back into this, that the only one they

7    took into account was market structure and they

8    ignored cost and demand.

9               And for this Immucor cost benchmark

10   we'll argue that the only determinant or variable they

11   took into account was cost and they ignored market

12   structure and demand.

13              THE COURT:  And you're talking about

14   the -- in the Immucor cost column you're talking about

15   the post-2005 period.

16              MR. COE:  Correct, Your Honor.

17   Starting January 1, 2006 through 2006.  Correct, Your

18   Honor.

19              So the way I look at this is that each

20   one of these factors contributes in some way to costs.

21   So you have your cost in 2006, how much is it going go

22   up to 2007?  Well the first building block you have,

23   Your Honor, is demand, and demand -- if demand goes up

24   price is going to go up by some amount.

25              The second building block --

1                    THE COURT:  Wait a minute, demand goes

2    up, price --

3                    MR. COE:  Right.  Exactly, Your Honor.

4                    THE COURT:  Okay.

5                    MR. COE:  If there's more demand the

6    price is going to go up.

7                    THE COURT:  All right.  I have it.

8                    MR. COE:  Right.  The second building

9    block is cost, Your Honor.  If cost goes up --

10                   THE COURT:  Oh, and you're --

11                   MR. COE:  Your Honor, it's a little --

12   I have a two year old and a four year old so these are

13   the materials I have to work with, Your Honor, but I

14   thought I'd illustrated a point.

15                   THE COURT:  No, you're illustrating

16   with large LEGO blocks on the second day of a two-day

17   hearing at 4:10.

18                   MR. COE:  So we have cost then we have

19   market structure.  The less competition there is in a

20   market cost will go up, as Your Honor recognized in

21   his earlier opinion.  Those are the first three.

22                   Now plaintiffs have argued that there's

23   a fourth building block, that the cartel contributed

24   to even more of price increase than what have happened

25   in this but for world that only accounted for these

 1   first three factors.  Market structure, cost, and

 2   demand.

 3                 So there'd be -- the total cost would

 4   be, if they're right that there was a conspiracy, it

 5   would be made up of demand, cost, market structure,

 6   and whatever additional price increase was the result

 7   of this cartel.

 8                 After Comcast v. Behrend the Court

 9   needs to separate out each one of those factors, and

10   Dr. Beyer needs to separate out each one of those

11   factors in calculating a price.  Because if he fails

12   to account for cost, demand, or market structure he's

13   awarding damages to plaintiffs for factors that have

14   nothing to do with this caral, this top piece.  So --

15                 THE COURT:  Except it's the top piece

16   that sets the price.

17                 MR. COE:  It's not, Your Honor, it's

18   all four pieces that lock together to set the price.

19                 THE COURT:  I read Comcast and Behrend.

20   Is there a specific statement to that effect or

21   instead --

22                 MR. COE:  I'm --

23                 THE COURT:  Oh, you're on --

24                 MR. COE:  I'm glad you asked, Your

25   Honor.

```
 1                    THE COURT:  Uh-oh, I may --
 2                    MR. COE:  So, I'll read you --
 3                    THE COURT:  The record should show that
 4    everyone on the left side of the room is smiling.  You
 5    laid this trap for the Court and --
 6                    MR. COE:  I don't know, it's certainly
 7    not described as a trap, Your Honor.  But I would like
 8    to read from pages 1434 and 1435 of the Supreme
 9    Court's opinion.  It was talking about Dr. McClay's
10    (ph) methodology for demonstrating impact -- or I'm
11    sorry -- demonstrating damages.
12                    THE COURT:  Well what he said was it
13    didn't match the liability theory.
14                    MR. COE:  Correct, Your Honor.  So what
15    the Supreme Court said is, and I'll start to read
16    here:
17                         "This methodology might have been
18                         sound and might have produced
19                         commonality of damages if all four of
20                         those alleged distortions remain in
21    this              case."
22                    So all four of those theories of impact
23    if they had stayed in the case Dr. McClay's
24    methodology might have worked.
25                    The court goes on to say --
```

1            THE COURT:  No, there were four

2    separate theories of damages in Comcast.

3            MR. COE:  Four theories of impact, Your

4    Honor, correct.  Four --

5            THE COURT:  But that's --

6            MR. COE:  -- causes of prices going up,

7    Your Honor.

8            THE COURT:  All in the eyes of the

9    plaintiffs unlawful.

10            MR. COE:  Correct, Your Honor.

11            THE COURT:  And you're analogizing

12    those four theories of -- you're saying antitrust

13    impact.  You're saying that they're analogous to

14    market structure, cost --

15            MR. COE:  I am, Your Honor.  Because --

16            THE COURT:  -- and demand?

17            MR. COE:  And here's what -- maybe I'll

18    skip forward to all I was going read -- but I think

19    the key point of this passage is that they walk

20    through what the Third Circuit said that -- the third

21    circuit said:

22                "At the class certification stage

23                we do not prior plaintiffs tie each

24                theory of      impact to an exact

25    calculation

1                  of damages."

2                  THE COURT:  Yes, but the plaintiffs are

3    only offering one theory of impact.

4                  MR. COE:  I'll keep reading, Your

5    Honor.

6                       "But such assurances are not

7                       provided by a methodology that

8                       identifies damages that are not the

9                       result of the wrong."

10                 And that's the key sentence here.

11   That's from the Supreme Court.  You are only entitled

12   to damages tied to the wrong.  The only piece of the

13   damages here that are tied to the wrong are on this

14   top yellow block, this cartel activity.  Ortho had

15   nothing to do with demand going up, cost going up,

16   market structure changing.  The only thing that even

17   possibly could be tied to this theory of harm is that

18   additional amount that was caused by this alleged

19   cartel activity.

20                 Going on from this opinion --

21                 THE COURT:  Isn't that what Dr. Beyer

22   has done, although you criticize the way he did it, in

23   his but for world?

24                 MR. COE:  He has, Your Honor, because

25   he has not accounted for two of the three major

1   variables that determine price.

2                    So for the Immucor cost benchmark he's

3   taking all the increase that was the result of the

4   market structure and making that damages, he's taking

5   all of the price increase that was a result of

6   increased demand and making that damages.

7                    And let me read one more passage, Your

8   Honor.

9                    THE COURT:  That's not what was going

10  on in Comcast and Sprint.  As I understand it Judge

11  Padova and I were working on those opinions at about

12  the same time.  I don't know how his got out ahead of

13  mine, I think maybe our hearing was later, but the

14  issues had been framed, and I don't recall us ever

15  talking about market structure, cost, and demand.

16                   MR. COE:  They didn't use those words,

17  Your Honor, I don't want to suggest that.

18                   THE COURT:  Well they used there were

19  four separate theories of damages -- or I don't want

20  to confuse damages and antitrust impact asserted in

21  Comcast and Behrend -- and the Supreme Court said that

22  the theory of liability did not match those theories -

23  - all of those theories of damages.

24                   MR. COE:  But why was that, Your Honor?

25  And the reason for that is that -- and this is a

1    quote:

2                           "Prices use level above what an

3                    expert deems competitive has been

4    caused

5                    by factors unrelated to an accepted

6                    theory of antitrust harm are not

7                    anticompetitive in any sense relative

8                    here."

9                    And then the court goes on to quote the

10   federal judicial center's reference manual and

11   scientific evidence, which says:

12                          "The first step in a damages study

13                   is the translation of the legal theory

14                   of the harmful event into an analysis

15   of

16                   an economic impact of that event."

17                   And I think that ties over to our

18   discussion here, Your Honor.  Because the point is

19   you're only entitled to damages that are related to

20   the harm, and here because of Dr. Beyer's unscientific

21   and unreliable methodology he's giving damages to

22   plaintiffs that are not related to the cartel.

23                   As Your Honor said and at the first

24   class certification opinion, prices are going to go up

25   in a duopoly regardless of whether there's collusion

1    or not or whether there's cartel activity or not.

2    Well Ortho -- that increase in price is not the result

3    of the cartel activity, and plaintiffs --

4                THE COURT:  So what you're saying is

5    his but for prices have to take into consideration

6    lawful price increases and separate out only those

7    price increases which are due to cartel activity.

8                MR. COE:  That's exactly right, Your

9    Honor.

10                THE COURT:  How would that be done?

11                MR. COE:  If he had used scientific

12   methodology and accounted for all three major

13   variables he wouldn't be able to do that.

14                THE COURT:  Tell me how that would have

15   been done.

16                MR. COE:  He would have, for example,

17   in the operation to create value benchmark, first of

18   all he would have started with a more reliable

19   methodology for estimating the impact of duopoly, but

20   we'll leave that one alone for the moment.  He starts

21   with that 25 percent price increase per year.  He

22   would have had to add on top of that a factor for the

23   increase in price because of the influence of

24   increases in cost, and then he would have added on top

25   of that another addition for the increase in demand.

1            So basically he would have had to take

2    that but for price and increase it two times because

3    he had only -- he started the market structure but

4    ignored cost and demand, he would have had to take it

5    up two more times to get to a but for price that was

6    the price that would have existed in a competitive

7    market without cartel activity.

8            THE COURT:  And that's what he said he

9    was doing, you're saying he didn't.

10           MR. COE:  Yes, Your Honor.

11           THE COURT:  There must be an answer to

12   that, but I can't think of it right now.

13           MR. COE:  I'm sure you'll come up with

14   it, Your Honor.

15           I'm not going to spend -- it's been a

16   long day, so I'm not going to spend too much time on

17   this, but I think the two of us quibbled a little bit

18   about whether prices actually flattened out in the

19   second half of the class period.  This was Dr. Beyer's

20   chart to show that they continue to go up, but I think

21   you can see that certainly --

22           THE COURT:  Which --

23           MR. COE:  This is -- I'm sorry --

24           THE COURT:  I see it.

25           MR. COE:  -- slide 39, Your Honor.

1                    THE COURT:  No, I think it's -- it
2     looks -- yes, it is -- it's 39.
3                    MR. COE:  We cherry picked a product on
4     slide 40 that shows that for this product at least
5     there were no increases in cost in the second half of
6     the class period.
7                    I think the numbers that probably are
8     most useful to the Court are the ones that we showed
9     earlier in Dr. Bronstein's class cert presentation
10    that showed this three to six percent kind of average
11    cost increase over the second half of the class
12    period.
13                   We're finally getting to one of the
14    first questions Your Honor asked.  What about this
15    inconsistency between Dr. Beyer's treatment of costs
16    in the first half of the class period and his
17    treatment of costs in the second half of the class
18    period?  So we have two quotes, Your Honor, to
19    illustrate this tension.  And the first bullet is --
20                   THE COURT:  You're --
21                   MR. COE:  This is -- I'm sorry, Your
22    Honor --
23                   THE COURT:  -- at slide 41?
24                   MR. COE:  -- it's slide 41.
25                   THE COURT:  41 I think.

 1                    MR. COE:  So the first bullet is from

 2       paragraph 54 of Dr. Beyer's reply report, and that's

 3       when he's talking about his operation to create value

 4       benchmark that he used for the first half of the class

 5       period.  And he says, "Cost and demand did not

 6       influence the price of traditional blood reagents."

 7                    Now he hasn't done a scientific study

 8       to demonstrate that, he's taken some quotes out of

 9       context, and one of those is this quote from Bill

10       Weiss (ph), who's an Immucor employee, and all he said

11       was, "Costs -- increases in costs did not fully

12       explain the increases in price."

13                    So -- and I don't think we're arguing

14       today that these whatever number you want to say

15       prices increased was entirely caused by increases in

16       costs, but we are arguing that they were a substantial

17       factor in those increases in costs that should have --

18                    THE COURT:  What about Dr. Bronstein,

19       we talked about him this morning, and his statement

20       that Dr. Beyer was entirely correct in excluding cost

21       from his benchmark for the first period we're

22       addressing?

23                    MR. COE:  That's not correct, Your

24       Honor.  What -- all that Dr. Bronstein said was that

25       Dr. Beyer was correct in ignoring Ortho's standard

Case 2:09-md-02081-JD   Document 256   Filed 07/29/15   Page 207 of 356

Page 207

1    cost data.  Dr. Bronstein opined -- criticized Dr.

2    Beyer for failing to account for cost in the first

3    half of the class period.

4              THE COURT:  Where is that?

5              MR. COE:  I'm sure we could get you a

6    cite on that, Your Honor.

7              THE COURT:  No, it's -- I've got it

8    here at least twice.  Mr. Corrigan, where is it in

9    your -- I think it's day one or is it day two?  But

10   that's not the whole -- I have Bronstein's testimony.

11   Or Liz, did you take it back?

12             THE CLERK:  You have it.

13             THE COURT:  No, I think --

14        (Clerk confers with the Court)

15             MR. CORRIGAN:  Your Honor, it's slide

16   23 in today's presentation.

17             THE COURT:  I have the whole thing.

18   That's not what he said, Mr. Coe.  Not what he said.

19   The question:

20                  "Q    What was the basis of

21                  Dr. Beyer's conclusion that he wasn't

22                  going rely on Ortho's cost data?

23                  A    There was information

24                  provided from Ortho that they

25                  characterized costs from time to time -

215-241-1000  ~  302-571-0510  ~  610-434-8588  ~  888-777-6690

1    -

2                     they recharactered costs from time to

3                     time and as a result the cost data that

4                     you had requested wouldn't be

5    comparable

6                     from your year.

7                         Q     So would that be unreliable

8                     data for the purposes Dr. Beyer was

9                     seeking it?"

10                   And the answer:

11                       "I would say he made the right

12                    decision in not using Ortho's cost

13   data,

14                    yes.  No reference to standard cost,

15                    reference to cost data."

16                   MR. COE:  You're right, Your Honor, we

17   had that conversation this morning, but you know,

18   it's --

19                   THE COURT:  But you --

20                   MR. COE:  -- not clear if he's talking

21   about standard costs or actual costs, but --

22                   THE COURT:  Well the language is clear.

23   And what you're saying is there's room for wiggling,

24   and --

25                   MR. COE:  Well not really, Your Honor.

Page 209

1    If we turn to page 195 of Dr. Bronstein's transcript.

2                    THE COURT:  All right.  Tell me where?

3                    MR. COE:  Just doing something quickly.

4    So Dr. Beyer -- this was the direct examination -- I'm

5    sorry, the direct examination of Dr. Bronstein, and

6    start at line 4 I asked Dr. Bronstein:

7                    "Q    You've been talking about

8                    Dr. Beyer's failure to account for a

9                    duopoly market structure, which was the

10                   first of the three factors.  I want to

11                   turn now to the second factor, which is

12                   cost production, was the second of the

13                   three economic factors that influenced

14                   price.  Does Dr. Beyer account for cost

15                   changes when he predicts prices for the

16                   first five years of his damages

17   period?"

18                   Dr. Bronstein's response was:

19                    "No, he's ignoring cost entirely.

20                   The only fact that he considers he is

21   25

22                   percent price increase from the OCB

23                   business plan."

24                   Next question:

25                    "Q    How do you know that the

1    OCB

2                        business plan didn't account for

3                        increases in cost?

4                    A    When you read the OCB

5                        business plan the assumptions that are

6                        embodied in the plan and one of the

7                        assumptions is is that they assume the

8                        prices are fixed."

9                    THE COURT:  Prices are fixed or cost?

10                    MR. COE:  It should be cost, Your

11    Honor.  Line 20 my next question is:

12                        "Q    Do you know what was

13                        actually happening to the cost during

14                        the first five years of Dr. Beyer's

15                        damages period?

16                    A    Yes, I have some data that

17                        Dr. Beyer produced in the second report

18                        that illustrates this."

19                    And asked him to walk through the

20    slide, and that's the slide that we showed earlier

21    with the Immucor standard cost data percentage

22    increases throughout the class period.

23                    So, I'll skip forward through his

24    discussion because essentially this next colloquy is

25    his description of that slide.

1                    THE COURT:  But then he goes on to say

2     Dr. Beyer was correct in ignoring costs.

3                    MR. COE:  That's not correct, Your

4     Honor.  He was saying Dr. Beyer was -- let me go to

5     line 15 at page 196.

6                    THE COURT:  "If Dr. Beyer had accounted

7     for these cost increases in his benchmark for the

8     first five years of the damages period how would that

9     have changed his analysis?"  And then he says, "well

10    since Dr. Beyer used a 25 percent" -- well I won't

11    read it all.  What it says is, is it would have added

12    to the percentage, it would be up to 34 percent per

13    year so that he would have but for prices rising by up

14    to 59 percent instead of 25 percent.  I don't quite

15    understand that arithmetic.  But in any event the but

16    for prices would be up.

17                    MR. COE:  Right.  And then going to

18    1997, Your Honor, I asked Dr. Bronstein, "what reason"

19    -- this is line 7:

20                         "What reason did Dr. Beyer give

21    for

22                         ignoring cost during the first five

23                         years of the damages period?"

24                    And Dr. Bronstein said:

25                         "The reason he gave was the

1                    argument that cost didn't account for

2                    100 percent of the price increases that

3                    we see across the entire class period."

4                    Then I asked him, "Does that

5       explanation make sense?"  And the response is:

6                         "It doesn't make sense to me as an

7                    economist.  Just because changes in

8       cost

9                    don't explain 100 percent of the

10      changes

11                   in price this is not a factor that an

12                   economist would fee comfortable in

13                   ignoring in his analysis, particularly

14                   when you see cost changes that are as

15                   significant as the ones that Dr. Beyer

16                   has calculated here."

17                   So what Dr. Bronstein said is, Dr.

18      Beyer can ignore costs, but in accounting for cost he

19      agrees that Dr. Beyer couldn't use Ortho standard cost

20      data to account for those.

21                   THE COURT:  I don't think he says that.

22      He says:

23                        "There was information provided by

24                   Ortho that they recharacterized cost

25                   from time to time and as a result the

Page 213

1              cost data -- it says date -- that you

2              had requested wouldn't be comparable

3              from year to year."

4              MR. COE:  And, Your Honor --

5              THE COURT:  And then he goes onto say -

6  -

7              MR. COE:  -- getting back to the --

8              THE COURT:  -- "I made the right

9  decision -- he made the right decision in not using

10 the cost."

11             I don't think the two are inconsistent.

12 I think if he had been provided with what could have

13 been described as accurate cost data that didn't --

14 that wasn't recharacterized that would have been

15 entirely different.  Then I think the first part of

16 the and deposition transcript, 195, 96, and 97 --

17 excuse me -- would have come into play.  But in any

18 event it's an explanation for what was intended.

19             MR. COE:  Well, I don't want there to

20 be any confusion there, Your Honor, I think that

21 testimony was pretty clear from Dr. Bronstein that in

22 his opinion Dr. Beyer should have accounted for cost

23 in the first half of the class period.

24             THE COURT:  I disagree.  I think the

25 first part of the testimony was clear standing alone,

Page 214

1    but when matched with the cross I think there's a

2    question, and I don't have to pick the part that

3    favors one side or the other, I have to determine

4    whether there's evidence to support something that was

5    done, and I think the statement by Dr. Bronstein on

6    page 245 is damaging.

7                    MR. COE:  Well, Dr. Bronstein didn't

8    challenge Dr. Beyer's use of Immucor's standard costs

9    for Immucor, and Dr. Beyer could have at least used

10   Immucor's standard costs of account for standard

11   costs --

12                   THE COURT:  Arguably, yes.  Yes.

13                   MR. COE:  -- in the first half of the

14   class period.

15                   THE COURT:  Yes, that's an argument,

16   but don't we have here have competing benchmark

17   issues?

18                   MR. COE:  We don't, Your Honor.  What

19   we have is a data problem, and I think we've cited

20   some cases in our briefs that if you don't have the

21   data that doesn't excuse you from applying an

22   unscientific methodology.  The Lauman (ph) case and

23   there was also an Eastern District case from Judge

24   Schiller that we cited  as well, Your Honor.

25                   THE COURT:  Okay.

Page 215

1                    MR. COE:  So let's get to this second

2      statement.

3                    So in the first half of the class

4      period he says I can ignore cost and demand.  But in

5      the second half of the class period he says:

6                            "Costs -- using only costs

7      accounts

8                    entirely for changes -- not only

9                    accounts for changes in price due to

10                   changes in costs, but also fully

11                   accounts for the market structure."

12                   And if you go back to Dr. Beyer's reply

13     report where he makes this statement, at paragraph 56.

14                   THE COURT:  We have that somewhere.

15     It's exhibit -- let me see.  Oh, here it is.  Let me

16     turn to 56.  All right.

17                   MR. COE:  So Dr. Beyer says, this is in

18     paragraph 56:

19                       "Dr. Bronstein claims I did not

20                   control for market structure after

21     2004;

22                   however, by allowing price to change by

23                   the same percentage as cost I am in

24     fact

25                   controlling for market structure.  The

1                          ability to pass through cost increases

2                          is in direct contrast with how the

3                          traditional reagents market operated

4                          prior to the beginning of the class

5                          period when there is intense

6      competition

7                          and an inability to increase price as

8                          cost rose."

9                    So the first point I want to make, Your

10     Honor, is he cites nothing in support of the

11     statement.  This is --

12                    THE COURT:  He cites footnote 118.

13                    MR. COE:  And you can read that, Your

14     Honor, it has nothing to do with his statement --

15                    THE COURT:  Yes, it --

16                    MR. COE:  -- in that sentence.  Well it

17     does, but it certainly isn't any authoritative support

18     for that conclusion.

19                    And going back to slide 41, which is

20     basically just this same statement, it's a logical

21     fallacy, Your Honor, that just because Ortho couldn't

22     pass along all of its cost in a competitive market

23     doesn't mean that when it was in a duopoly it would be

24     limited to just passing along costs.

25                    And we'll -- as we pointed out in your

1  briefs, Your Honor, Dr. Beyer and the plaintiffs have

2  not pointed to a single example of another expert in

3  any other case using this cost pass through

4  methodology or any court in any other case accepting

5  this cost pass through methodology.  And one of Your

6  Honor's tasks in evaluating this methodology is to

7  apply Daubert, and we'll get to these Daubert factors,

8  Your Honor.

9              And as I'm sure Your Honor is aware

10  there's eight of them that are set forth -- and this

11  is slide 42, Your Honor -- in the Helcot (ph) decision

12  of the Third Circuit.  And on the left-hand side I

13  have four.  And your slide might look different, Your

14  Honor, because we have what we call an animation in

15  the slide, so it'll eventually match up with your

16  slide, but we're going to start in a different place.

17              So these factors that I have currently

18  listed on the left-hand side whether it's peer

19  reviewed, whether their standard is governing the

20  technique, whether it's related to reliable methods,

21  whether it's ever been put to a non-judicial use,

22  plaintiffs do not address any of those factors in

23  their brief, so they all weigh in Ortho's favor.

24              They do address the second set of four

25  factors in the right-hand column to start.  The first

1    one is, is it a testable hypothesis.  Well plaintiffs

2    admit it cannot be tested at page 12, footnote 42 of

3    their brief, so that moves over to Ortho's column,

4    Your Honor.

5              The next factor they address is the

6    rate of error, and plaintiffs claim that another

7    expert could repeat Dr. Beyer's methodology to

8    ascertain its accuracy, and they cite to Your Honor's

9    opinion in the Smulo v. Hafer (ph) case, and that's

10   very distinguishable.  In that case the expert had

11   conducted interviews that the defendant's challenged,

12   and the Court said that, well another expert could

13   have done that and reconducted all those interviews to

14   see if there were any errors.

15             Well here we have Dr. Beyer's

16   construction of a hypothetical but for world.  There's

17   no way for anyone -- another expert to go back and see

18   whether this was consistent with actual results,

19   because we don't have this hypothetical but for world.

20   So we would argue that that factor does not weigh in

21   plaintiff's favor either, Your Honor.

22             I'm going to come back to generally

23   accepted in a minute.

24             The next one I'll talk about is

25   expert's qualifications, and I think we've both said

1    in all of our points on Dr. Beyer's experience and

2    qualifications we obviously have argued that his

3    experience is a mixed bag at best.  We would argue

4    that that weighs in Ortho's favor as well.

5              So we're left with only one factor that

6    plaintiff's argue supports Dr. Beyer's use to this

7    cost pass through methodology, and in order to support

8    that argument they cite to this article from two

9    European economists, Van Dyke (ph) and Verboven, and I

10   have a copy of this for the Court, Your Honor.

11     (Pause)

12              MR. COE:  So, Your Honor, I just handed

13   up a copy of an article from issues and competition

14   under policy law by Theon (ph) Van Dyke and Frank

15   Verboven entitled, "Quantification of Damages," and

16   this is the article that plaintiffs cite in their

17   brief to support the article that Dr. Beyer's use of

18   this cost pass through methodology is generally

19   accepted.  And the discussion of this methodology is

20   in page 2336, Your Honor.

21              The first point I want to make, Your

22   Honor, is that Dr. Beyer did not cite this article in

23   his report so we don't know that he actually did apply

24   this cost pass through method, and I'll talk -- give

25   you two examples of why it's questionable that he did.

Page 220

1                    The other point on that is, you know,

2     we had not have a chance to cross-examine Dr. Beyer

3     with this document because we just got it in

4     connection with the reply remand brief, Your Honor.

5                    So the first point I wanted to point

6     out is this comment under the cost mark-up method, it

7     says:                          "This method involves

8     collecting

9                    information on production costs and

10                   estimating the competitive price on the

11                   basis of some measure of cost per unit

12                   plus a mark up for reasonable profit."

13                   So this mark up for reasonable profit

14    is the first example of Dr. Beyer's failure to explain

15    -- or to apply this methodology in accordance with

16    this article.  Dr. Beyer doesn't mention this

17    reasonable profit mark up in his discussion of the

18    Immucor cost benchmark.

19                   Second, the second highlights portion

20    says:

21                   "Cost data are typically derived

22                   from the accounting systems or

23                   management information systems of the

24                   companies involved; however, attention

25                   should be given to the fact that

1                    accounting cost data are not the same
2      as
3                    economic cost data."
4                    And then it gives an example here of
5      why they might be different.  And again, Dr. Beyer
6      doesn't discuss how he's -- whether he's accounted for
7      this fact that the standard cost data, for example, is
8      the accounting cost data, not the cost data the
9      economic -- an economist could use.
10                    So we would say that's the second
11     example of Dr. Beyer to apply this methodology as set
12     forth in this article.
13                    But the last point, and the one that I
14     think is most important, is this sentence that we have
15     highlighted on the screen, and it's actually in this
16     last paragraph, I've highlighted the second sentence.
17     It says:
18                         "In utilizing this method one must
19                         keep in mind that the but for world may
20                         be characterized by imperfect
21                         competition and that the non-collusive
22                         price may be well above both long-run
23                         marginal and average cost."
24                    And that's the key sentence, Your
25     Honor.  This method only works in a competitive

Page 222

1  market, in a perfectly competitive market.  But that's

2  not what we have here.  We have a duopoly.  And as the

3  Court already found on page 241 of its opinion,

4  "Market consolidation tends to increase prices even in

5  the absence of coordinated conduct."  And these two

6  authors of this article agree with that.  They say if

7  there's imperfect competition the non-collusive price,

8  the price that has nothing to do with cartel activity,

9  may be well above the cost.

10              So this method does not separate out

11  the difference between market structure's influence on

12  price and cost influence on price, it only looks at

13  costs.  It does not account for market structure as

14  Dr. Beyer has argued.

15              And we've already gone through the

16  Comcast decision that we cite in support for that

17  comity to separate out or account for each one of

18  these factors separately, Your Honor.

19              And this is a fifth problem under

20  Daubert.  This methodology might be useful in another

21  case where there was perfect competition, but that's

22  not what we have here, we have a duopoly, imperfect

23  competition.  So this methodology cannot be used to

24  estimate but for prices here.

25              So we would argue that the -- for all

Page 223

1  the reasons I just cited this generally accepted

2  factor is also in Ortho's favor, Your Honor.

3              Just one more point on the fit, as the

4  Supreme Court said in Daubert, "Just because a method

5  is valid for one purpose does not mean that it's valid

6  for all purposes."  That's page 591 of the Supreme

7  Court's Daubert opinion, Your Honor.

8              One last quick point on cost -- Immucor

9  cost, and we've talked about Dr. Beyer's use of

10  Immucor's cost as a proxy for Ortho's cost, and this

11  is a slide from -- I'm on slide 45, Your Honor, of our

12  presentation.

13              Oh, one more point on this article,

14  Your Honor.  Plaintiff's counsel also said that this

15  article says Dr. Beyer does not need to account for

16  demand, and I read through this discussion and I did

17  not see that comment.  I'm sure plaintiff's counsel

18  will point it out to you, but I could not find it,

19  Your Honor.

20              So back to slide 45.  This is a page

21  from that operation to created value presentation from

22  December 29th, 1999, which is Ortho Exhibit 18, it's a

23  very heavy document so we've just taken out this one

24  page.  And if I could approach, Your Honor, this at

25  least shows the difference in Ortho's costs and

 1   Immucor's costs prior to the beginning of the class

 2   period in 1999.

 3              THE COURT:  But this is not for -- it

 4   says ABO reagents, they're not traditional blood

 5   reagents.

 6              MR. COE:  They are, Your Honor, and --

 7   there's -- generally ABO reagents are the reagents

 8   that are used for testing blood type.  So whether

 9   you're A, B, or O type blood, so those are --

10              THE COURT:  Oh, I'm with you.

11              MR. COE:  -- a subcategory of

12   traditional reagents.

13              THE COURT:  What was I think of, the

14   other --

15              MR. COE:  Automated or --

16              THE COURT:  Automated.

17              MR. COE:  -- or IBNTS.

18              THE COURT:  All right.  Thank you for

19   telling me what I was think of.

20              MR. COE:  So this is just an example of

21   one product that's Ortho's anti-A product that's

22   compared to Immucor's product.  And in the slide

23   Norbridge is pointing out the basis of analysis

24   Norbridge did that Ortho's costs are much different

25   than Immucor's costs.  So its raw material costs

1    appear to be this $4 plus packaging plus $47 for

2    ingredients as compared to Ortho only apparently paid

3    -- or I'm sorry -- Immucor only paid 3.60 for

4    packaging and $30 for ingredients.  So you have about

5    $33 as compared to $51.

6              And then on the bottom they separately

7    break out labor and overhead, and Ortho's labor and

8    overhead to make this product as $32, and Immucor's is

9    only $12, or Ortho's is almost three times Immucor's

10   cost just for labor and overhead.

11             And as Dr. Bronstein opined, this is

12   important, because the fact that the companies had two

13   different cost positions at the beginning of the class

14   period suggests that their costs weren't the same,

15   that they were influenced by different factors.  And

16   this is at pages 200 to 201 of the hearing transcript.

17   And he also pointed to some other things that changed

18   over time that were different between Ortho and

19   Immucor.

20             Dr. Beyer's response to this criticism

21   was that he used Immucor's crosses of proxy because

22   Ortho's cost data was not available and said that "he

23   could use it as a proxy because both companies had

24   similar raw materials and were subject to the same

25   regulatory environment."

1              Well if that was true, Your Honor, then

2    why were Immucor -- or I'm sorry -- Ortho's costs, raw

3    ingredient costs so much higher than Ortho's at the

4    beginning of the class period?  And if the regulatory

5    requirements were so similar why are Ortho's labor and

6    overhead costs so much higher than Immucor's?

7              Dr. Beyer didn't do anything to verify

8    his conclusory statements.  When told in this letter

9    that the categories of standard cost changed over time

10   he didn't ask for my additional data.  He used that as

11   an excuse to use this proxy.  And under Daubert

12   Dr. Beyer is required to have good grounds for his

13   opinions.  And we would cite Your Honor's opinion in

14   the Robinson v. Hartzell case in support of that

15   standard.  Page 16 of the decision in Lexis.

16             He doesn't have any back up for this

17   statement, it's not the testimony of a scientist, Your

18   Honor.  He hasn't done his home work just like Dr. --

19   I'm sorry -- Mr. Corrigan accused Dr. Bronstein of,

20   and he doesn't have good grounds for his opinions, and

21   that's not enough under Daubert, and that's why we

22   would argue that those Immucor cost benchmark should

23   be rejected, Your Honor.

24             And I'll move on to RhoGAM, which I

25   believe is the last topic.  Slide 42, please.  Nope,

1    that's wrong.  Sorry, Your Honor, we're at slide 47.

2        (Pause)

3             MR. COE:  So the first argument we

4    wanted to respond to, Your Honor, was plaintiff's

5    argument that Your Honor had already ruled on this

6    issue, so we've excerpted a couple of statements from

7    Your Honor's opinion that we think express some doubt

8    or that at most Your Honor was conducting a

9    preliminary assessment, which is no longer adequate

10   after the Third Circuit's blood reagents opinion.

11            You know, one of these comments, Your

12   Honor, was that you were not entirely persuaded by

13   Dr. Beyer's explanation.  As I'm sure Your Honor knows

14   in Hydrogen Peroxide the Third Circuit said that at

15   the class certification stage the court does need to

16   be persuaded and the court should not suppress any

17   doubt about expert testimony.  And that's on pages 321

18   and 323 of that opinion, Your Honor.

19            This comment that you did not need to

20   reject RhoGAM am the certification stage and it could

21   evolve to become admissible evidence suggests that

22   maybe the Court applied some kind of focused or

23   limited Daubert inquiry like the -- in the Zern (ph)

24   case that plaintiffs cite and also that the Third

25   Circuit cited in the Blood Reagents opinion.

1           The reason that the Zern court said it

2  was appropriate to do this more targeted inquiry is

3  because there was still a significant amount of

4  discovery to be done in that case.  Here plaintiffs

5  have admitted that discovery is essentially closed

6  where they've got all the documents they want, so I

7  don't think there's any reason for Your Honor to apply

8  anything less than the full Daubert inquiry at this

9  hearing, Your Honor.

10           Your Honor had also asked whether -- I

11  think to start off yesterday whether Daubert applied

12  to the question of whether Dr. Beyer chose an

13  appropriate yardstick, and we'd cite the Lofal (ph)

14  case where that court rejected the yardstick that was

15  proposed in that case under the -- on a Daubert

16  ruling, Your Honor, in response to a Daubert motion.

17           So there's a couple ways that Daubert

18  comes in here.  The first point is, you know, an

19  expert's opinion must be based on sufficient facts or

20  data.  So if he does not have a reliable yardstick --

21  if he hasn't found a comparable yardstick market his

22  opinion is not based on reliable facts or data.

23           Another requirement is that the -- he

24  has to apply principals and methods reliably to the

25  facts of the case.

1                So we're not arguing, Your Honor, that

2     an expert can never use a yardstick, we're just saying

3     the yardstick that Dr. Beyer selected in this case was

4     not comparable or was not a fair congener to the

5     traditional blood reagents market, Your Honor.

6                And plaintiffs have thrown that Lofal

7     case back in our face a few times and that fair

8     congener statement, but I think it's worth pointing

9     out that the court in Lofal rejected the yardstick

10    because it was not comparable to the market at issue.

11                The next slide is one -- page 48, Your

12    Honor, and this is another one that you've already --

13    this is the one you've already seen today, and this is

14    a comparison of actual prices to the prices -- to the

15    price of Ortho's RhoGAM product.  And I don't think

16    there can be any argument that the price of RhoGAM was

17    flat during the second half of the class period, and

18    we'll explain why that is in a minute.  Plaintiffs

19    have argued that the increases in the traditional

20    blood reagents market were the result of collusion,

21    but we would certainly argue, and Dr. Bronstein has

22    argued, that that's the result of price leadership,

23    not collusion, Your Honor.

24                So, I have one more article I wanted to

25    hand up, Your Honor, this is another one that Dr.

Page 230

1    Beyer cites in his report.

2                   THE COURT:  Thank you.

3         (Pause)

4                   MR. COE:  So, Your Honor, this is the

5    article that Dr. Beyer cites in his first report when

6    he talks about the yardstick method, he relies on this

7    article by Dr. Rubenfeld to say that -- to agree that

8    the cost competition and demand in the yardstick

9    market in the market at issue must be similar is what

10   Mr. Beyer actually says.  But if you turn to page 4 of

11   this article, Your Honor, and for the record this is

12   an article by Dr. Rubenfeld entitled, "Antitrust

13   Damages," dated November 21st, 2009.  And I'm turning

14   to page 4.  What Dr. Rubenfeld actually says is:

15                      "Ideally the comparable market

16                      product should reflect the same degree

17                      of competition, the same costs, and the

18                      same demand conditions that would have

19                      prevailed in the market at issue had

20                      there been no wrongful behavior."

21                   That's our first bullet.  But of course

22   that's not always going to be possible.  So what do

23   you do if they're not the same?  And that's the second

24   bullet here or in the next sentence we have

25   highlighted.

1                    "If an appropriate yardstick is

2                    available it is important to take into

3                    account any differences in costs and

4         the

5                    extent of competition between the

6                    yardstick market and the market at

7         issue

8                    in the but for world."

9              So you can pick a yardstick that has

10        slightly different cost, demand, and competition

11        factors, but you need to account for those

12        differences.  Well how do you do that?  That's what

13        the next bullet and the next highlight addresses, Your

14        Honor, it says:

15                   "Regression analysis offers one

16                    tool that can be useful in a yardstick

17                    analysis.

18                        To illustrate suppose that there

19                    are available price data in the market

20                    at issue in the yardstick market,

21                    suppose also the yardstick market and

22                    the market at issue are both

23                    differentiated product markets subject

24                    to (indiscernible) and computation;

25                    however, the yardstick market has fewer

1                    firms and a lesser degree of

2     competition

3                    among those firms, then a regression

4                    analysis relating price in the

5     yardstick

6                    market to one or more measures of the

7                    degree of competition could allow one

8     to

9                    predict what prices in the yardstick

10                   market would be when the degree of

11                   competition was the same in the market

12                   at issue."

13                   Now we're going to walk through, Your

14    Honor, why competition, cost, and demand were all

15    different in the traditional blood reagents market and

16    the RhoGAM market, and Dr. Beyer has done nothing to

17    try and account for those differences.  He's ignored

18    those differences, Your Honor.

19                   Going backwards, Your Honor, to

20    slide 49.

21        (Pause)

22                   MR. COE:  So plaintiffs and Dr. Beyer

23    argue that this difference in two and three

24    competitors was not significant, and we think the best

25    evidence of that -- the significance of that

1  difference is what actually happened to RhoGAM prices

2  when the number of competitors in the Rho-D market

3  changed.

4              So as Ms. Kleinbard walks through in

5  her declaration there's -- the first significant event

6  was in the mid-1990s, Your Honor, we have a box in the

7  slide that talks about the FDA's implementation of

8  this viral removal process which resulted in a

9  significant expense for the manufacturers of these

10  Rho-D products, a number of those manufacturers went

11  out of business as a result, they could not invest

12  this additional cost that would have been required to

13  comply with these FDA requirements.  So this went from

14  a competitive market in the 1990s to a duopoly by the

15  year 2000.

16              And what happened to price when the

17  market shifted from a competitive market to a duopoly?

18  The prices went from $15.17 to -- in the early 1990s -

19  - and actually I think that price is from 1997, Your

20  Honor, to $79.14 in 2000.  And Ms. Kleinbard explained

21  in her affidavit that this is actually the prices

22  charged to one customer, Premier, which is this GPO

23  you've heard about, because they don't have this

24  average price data going back to the 1990s, Your

25  Honor.

Page 234

1          So what's the next -- and then I should

2    point out, Your Honor, that prices continue to

3    increase through 2003.  So from 2000 and 2003 the

4    price went -- this Premier price, which probably would

5    have been a lower price because Premier was the GPO

6    with some bargaining power, but regardless this --

7    from the Premier price to the average price there was

8    an increase to $82.59.

9          Well what was the next significant

10   event in this market?  It was the entry of a third

11   competitor on February 12th, 2004, and this was the

12   competitor that offered this Rhophylac product and it

13   changed names over the course of this time period,

14   Your Honor, from ZLB to CSL, so I think that's why you

15   saw in

16   Dr. Beyer's report he said ZLB/CSL.

17          So this time period does not appear on

18   the slide we showed you earlier, slide 48, when the

19   RhoGAM price is flat, because that price has flattened

20   out after 2004 because there was additional

21   competition in the Rho-D market, there were three

22   competitors instead of two.

23          Now as you've heard Dr. Beyer disputes

24   that and says effectively there are only two

25   competitors in the Rho-D market in the second half of

1    the class period, which is this 2006 to 2010 time

2    period.  Mr. Corrigan talked about that at some

3    length.

4                Two reasons -- and the reason he gave

5    for that is because Talecris did not actively compete

6    in the hospital channel.

7                So to give a little more background

8    Rho-D is definitely -- is typically marketed in two

9    channels.  To hospitals because it's given to pregnant

10   women in the hospital, or it's marketed to

11   gynecologists, some of them administer this drug in

12   their office.  This is a drug that has to be

13   administered twice during pregnancy to prevent the

14   death of children, Your Honor.

15               So let's talk first about this opinion

16   that this hospital channel was somehow separate from

17   this OBGYN channel where apparently Dr. Beyer thinks

18   Talecris competed.

19               Well as we cited to Your Honor the

20   courts require an economist who's going to opine on a

21   separate market to actually do independent economic

22   analysis.  And we've cited the Third Circuit's opinion

23   in U.S. Horticultural Supply versus Scotts in our

24   brief, an example of a court rejecting an opinion on

25   product market because the expert had not done any

1    independent economic analysis.

2                   Well what's the economic analysis that

3    experts apply?  It's this snip test, Your Honor.  The

4    significant -- small but significant non-transitory

5    increase in price test, and that's the test that the

6    antitrust enforcement agencies apply -- I'm sorry, I'm

7    on slide 50, Your Honor.  It's in the 2010 Department

8    of Justice and FTC horizontal merger guidelines, we

9    also have a citation to a New Jersey case that applied

10   this test, and even Dr. Beyer in the context of

11   explaining why he thinks he didn't -- he did not need

12   to take into account automated reagents in this case,

13   says that the reason he didn't is because that was --

14   there was no -- that was a separate market under this

15   snip test, Your Honor.  But he didn't apply that test

16   there -- this test here, instead he just points to

17   Ms. Kleinbard's testimony, and that's not a sufficient

18   basis for his opinion under the case law, Your Honor.

19                   But more importantly we would argue

20   that he mischaracterized Ms. Kleinbard's testimony.

21   And first I want to pull out the excerpt that

22   plaintiffs played for you.

23        (Pause)

24                   MR. COE:  This is page 33 of

25   plaintiff's slide, Your Honor.

1          (Pause)

2                    MR. COE:  And what I want to point out

3     in this testimony, Your Honor, is the first question

4     is:

5                         "Q     You were U.S. Product

6                         director from June 2001 to December of

7                         2003, correct?

8                         A      That is correct.

9                         Q      So during that time frame

10    you

11                        were only competing with BayRho-D in

12    the

13                        RhoGAM market."

14                   So this entire line of questioning and

15    testimony, Your Honor, is about this 2001 to 2003 time

16    period, which is before Dr. Beyer uses RhoGAM as a

17    benchmark for traditional blood reagents prices.

18                   So we would argue that none of this

19    testimony is relevant to Your Honor's assessment of

20    whether RhoGAM is an adequate yardstick, because it

21    doesn't apply to the time period when Dr. Beyer is

22    using it as a yardstick.

23                   So we'll play another excerpt from

24    Ms. Kleinbard's testimony, and even reading this

25    excerpt, Your Honor, essentially what Ms. Kleinbard

Page 238

1  testifies to is that Bayer at the time, it hadn't been
2  acquired by Talecris yet, was the low cost provider.
3  They competed by offering the lowest price.  And I
4  think that's a pretty well accepted method of
5  competition, Your Honor.  Ms. Kleinbard says they
6  didn't spend a lot of money on marketing because they
7  were trying to get the lowest price.
8           But let's listen to what she said, and
9  I think you'll see that she describes during the time
10 period we're talking about the market as a three-
11 competitor market, and again says that Talecris
12 competed by offering the lowest price.
13     (Video Played)
14           MR. COE:  So how do they compete, Your
15 Honor?  By offering the lowest price.
16           Now if you picked up on it, Your Honor,
17 in the beginning of that excerpt she mentioned that
18 Bayer sold this business line to a company called
19 Talecris, which is actually owned by a private equity
20 firm, in April of 2005.  So it doesn't really make any
21 sense that this firm would pay to buy this line of
22 business from Bayer and then not actively compete, and
23 that's certainly not consistent with the record.
24           In response to the testimony we pulled
25 up one document, I'm not -- that was not in our

1    slides.  Joshu, could you pull up Kleinbard Exhibit

2    10?

3                    So this is a marketing plan -- an Ortho

4    marketing plan for RhoGAM from 2008, Your Honor, which

5    is actually dated October 2007.  As we talked about

6    Ortho typically made its business plans months before

7    the year in question.  This document obviously is

8    relevant to what the competition was like in the

9    market in the period of time when Dr. Beyer is using

10   RhoGAM as a yardstick.

11                   And we turn to page 5 of this document.

12   And Joshu, I'm going ask you to just highlight BayRho-

13   D now HyperRho-D.  So this is where they're walking

14   through the competitors in this market, and one of

15   these competitors is BayRho-D, they had actually --

16   Talecris when it acquired the product line from Bayer

17   changed the name to HyperRho-S/D, but it's essentially

18   the same product, Your Honor.  And it says and they

19   had recently received approval for latex reclaim, so

20   in other words they're investing money to try and get

21   a different use of their product.  No major changes to

22   price or promotion strategy.

23                   If you could turn to page 7.  This is

24   where Ortho walks through what they call the

25   competitive landscape.  And again, they include --

Page 240

1    they actually include four competitors, one only

2    having three percent of the market, but again, the

3    second firm listed is Talecris.

4                      What's their market strategy?  Compete

5    on price to protect market share.

6                      The last column, acquired former

7    business from Bayer, old brand name was BayRho-D.  So

8    they had to invest some money in changing the brand

9    name.

10                     And the last page I'll show you this

11   document is page 10, Your Honor.  This is a slide from

12   this presentation where they walk through the

13   strengths, weaknesses, opportunities, and threats for

14   HyperRho-S/D or Talecris.  I'm sure Your Honor has

15   seen this type of document in other cases, essentially

16   measuring the competitive threat from this company.

17                     So why would Ortho spend time putting

18   together an assessment of the threat from this company

19   if it wasn't a competitor in this market?

20                     THE COURT:  And what is the exhibit

21   we're -- we've been looking --

22                     MR. COE:  This the Kleinbard Exhibit

23   10, Your Honor.

24                     THE COURT:  And -- have you seen it

25   before?  I don't think we've seen it.

1                    MR. COE:  This was submitted with our

2     original class cert brief in 2012, Your Honor.  As

3     Mr. Corrigan mentioned, Ms. Kleinbard submitted an

4     affidavit, along with a number of exhibits, Your

5     Honor.

6                    THE COURT:  Yes.

7                    MR. COE:  If you go back to slide 51.

8     And, Your Honor, this is -- now turn to slide 51 of

9     our presentation.

10                    THE COURT:  Yes.

11                    MR. COE:  And the -- what we have on

12    the left is the cover page or the first page of this

13    document, then we've pulled out paragraph 71 to 73,

14    and what this is a 2009 CSL, the Rhophylac

15    manufacturer announced that it was acquiring Talecris,

16    including obviously this BayRho-D product line.  So

17    the number of competitors in the Rho-D market was

18    going to go from three competitors to two competitors,

19    and the FTC challenged that merger.  And this is an --

20    this is the FTC's explanation -- or description of the

21    Rho-D market in 2009, Your Honor, during this period

22    when Dr. Beyer proposes to use RhoGAM as a yardstick.

23                    So turning to paragraph 71 first of all

24    it describes it has a three competitor market, and

25    goes on to say, "The market will be significantly more

1   concentrated and less competitive with the elimination

2   of the Talecris as an independent competitor."  And

3   Talecris is the competitor that Dr. Beyer says didn't

4   compete, had nothing to do with prices in this market.

5               Turning to paragraph 72 the FTC further

6   alleges, "Since their entry into this market in 2004

7   CSL and Talecris have competed aggressively with one

8   another as the only two low price suppliers of Rho-D."

9               And finally paragraph 73 we have

10  highlighted as following the merger CSL Talecris would

11  be less likely to have engaged in competitive pricing.

12        So the FTC challenged this merger because

13  they believe there was a significant difference

14  between three competitors and two competitors.

15      (Pause)

16            MR. COE:  So that's -- that was all

17  about the first of the three factors, Your Honor, and

18  the competition between the two markets from

19  Dr. Rubenfeld's article, and again going back to this,

20  because the competition was different in the Rho-D

21  market and the traditional blood reagents market

22  Dr. Beyer should have accounted for that difference in

23  some way.

24            Let's move on to the other two factors,

25  cost and demand that we've said from the beginning are

1    the important variables that determine price.

2               Ms. Kleinbard in declaration points out

3    a number of differences between the RhoGAM business

4    and the traditional blood reagents business that would

5    result in different costs and different demands.

6               Well the first one actually goes back

7    to the competition, Your Honor.  RhoGAM had two

8    competitors as opposed to the traditional reagents

9    business obviously only had one competitor.  This is

10   slide 53, Your Honor.

11              Second, RhoGAM is a pharmaceutical and

12   subject to more stringent regulatory requirements than

13   traditional blood reagents, and that would obviously

14   result in higher costs.

15              Three, demand for Rho-D products or

16   RhoGAM was determined by birthrate.  On the other hand

17   demand for traditional reagents is determined by the

18   number of blood transfusions, as we've talked about

19   earlier.

20              Fourth, RhoGAM's primary raw material

21   was obtained from donors at a donor center that Ortho

22   ran in Buffalo and they used these same donors year

23   after year to get this plasma they needed, and as a

24   result of that Ms. Kleinbard said the costs for RhoGAM

25   were stable from 2005 and 2005.  And as we've talked

1   about, the traditional blood reagents costs increased

2   during that period of time.

3              And then finally the RhoGAM business

4   was much more profitable than the traditional blood

5   reagents business.  And as Dr. Bronstein opined at

6   pages 21 and 22 of his report, the fact that the

7   profits are different shows that the prices of RhoGAM

8   and traditional blood reagents are enclosed by

9   different cost and demand factors, Your Honor.

10             So turning to the next slide, what was

11  Dr. Beyer's response to these differences?  Did he do

12  anything to control for them?  No.

13             So first of all he says -- he admits he

14  did not analyze RhoGAM cost data in his report, and

15  that's from paragraph 58, footnote 124.

16             He makes another one of his conclusory

17  statements in paragraph 63, he says there's difference

18  in regulations, there's difference between the

19  regulation that a pharmaceutical company would be

20  under as opposed to Rho-D manufacturers was

21  immaterial, but this statement is not supported by a

22  citation to anything in the record or any research.

23             Three, Dr. Beyer does not talk about

24  RhoGAM demand or volume data in his report.  Instead

25  he makes the conclusory statement that Rho-D and

1    traditional blood reagents markets were stable.  Well
2    in this last bullet we point out that even Dr. Beyer
3    admits there was a difference in demand.  And this may
4    venture into a discussion we had yesterday, but he
5    says that demand for Rho-D was increasing at 0.8
6    percent per year and the demand for traditional blood
7    reagents was increasing at two to three percent per
8    year.
9                    Now, I've done the math here to extend
10   it over the class period to show that even though that
11   looks like a fairly small difference if you're looking
12   at a ten-year period that could be significant, but
13   either way Dr. Beyer made no effort to analyze any
14   data on demand to actually see whether this had
15   influence on price or whether this difference was
16   significant as you're required to do to use the
17   yardstick methodology as Dr. Rubenfeld explains.
18                   So what does he come back to?  Well he
19   comes back to the same place he came back to when he
20   was talking about the operation to create value
21   benchmark.  He says, "I don't need to account for cost
22   and demand because competition in the Rho-D market is
23   what drove price, not cost and demand."  And as we've
24   explained that's not a satisfactory answer.  Just
25   because cost and demand don't entirely explain price

1   doesn't mean you could ignore them.  But leaving that

2   aside there are two problems with his statement.

3                 The first is that the levels of

4   competition were different in the Rho-D market than

5   the traditional blood reagents market.  So by him

6   saying that the cost -- I'm sorry -- the price is

7   determined by competition he's essentially admitting

8   he needs to throw out RhoGAM as a yardstick.

9                 Second even if -- I've already said

10  this I guess -- but even if cost and demand are not

11  the sole determinants of price, as Dr. Bronstein

12  opined, they must be accounted for.

13                Dr. Beyer fails to account for any of

14  these three determinants of price -- differences in

15  any of these three determinants of price, market

16  structure, cost, and demand, and his failure to

17  adequately to account for any of these variables

18  renders his RhoGAM yardstick inadmissible, Your Honor.

19                THE COURT:  Thank you.

20                MR. CORRIGAN:  Your Honor, I'm not sure

21  if you're scowling at me, I hope not, but --

22                THE COURT:  No, I'm not.

23                MR. CORRIGAN:  Okay.  I understand it's

24  late in the day.  Could we take a -- well let me just

25  ask would I -- could I be allowed to respond briefly?

1                    THE COURT:  Yes.  I think what I'd like

2       to do, because there's one issue that Mr. St. Antoine

3       raised, and that is what happens if for any reason I

4       decide that Beyer does not meet the requirements of

5       Daubert, can the plaintiff's side prove antitrust

6       impact by evidence common to the class?  That was an

7       issue that you raised on -- or yesterday.

8                    MR. ST. ANTOINE:  Yes, Your Honor.

9                    THE COURT:  In your introduction.  And

10      we have to talk about that briefly.

11                   Why don't we take a very brief recess,

12      mainly because I've got so many exhibit books piled on

13      my lap I can barely move.

14                   MR. CORRIGAN:  Your Honor, when we come

15      back from recess should I respond and then discuss the

16      Court's question about Beyer surviving Daubert or do

17      you want to do that first or how do you want to

18      proceed?

19                   THE COURT:  I'll leave that to you.

20      You're given an opportunity to -- no -- oh, no, let's

21      continue with the last part of the proceeding and then

22      get to what happens if I scrap Dr. Beyer's report.

23                   MR. CORRIGAN:  Thank you, Your Honor.

24                   THE COURT:  So we're in recess for ten

25      minutes.

1                    THE BAILIFF:  All rise.

2          (Recessed at 5:19 p.m.; reconvened at 5:34 p.m.)

3                    THE COURT:  Be seated everyone.  We'll

4    wait for --

5                    UNIDENTIFIED SPEAKER:  I think he gave

6    up, Your Honor.

7                    THE COURT:  I think we should --

8                    UNIDENTIFIED SPEAKER:  It might move

9    things along, Your Honor.

10         (Laughter)

11                   THE COURT:  Wait 'til you hear what I

12   have to say.

13                   UNIDENTIFIED SPEAKER:  Apologize, Your

14   Honor.

15                   THE COURT:  No, that's fine.

16                   UNIDENTIFIED SPEAKER:  I'm juggling the

17   exhibits as are you.

18                   THE COURT:  Well, I put mine off to the

19   side, but I have a new one.

20                   UNIDENTIFIED SPEAKER:  Uh-oh.

21                   THE COURT:  The Third Circuit just

22   handed down a decision which bears on Mr. Coe's very

23   words.  They've handed down a decision in Neo versus

24   Valbolon (ph), I'm sure you followed it, it's a New

25   Jersey case.  It was argued in June, it's certainly on

1    a faster track than this case.  They've explained

2    their interpretation of Comcast and Behrend in the

3    Supreme Court this way:

4                    "Because the evidence could not

5                    translate the relevant legal theory of

6                    the harmful event, the liability issues

7                    into an analysis of the economic impact

8                    of that event the Court determined that

9                    common questions could not

10   predominate."

11                   Citing the judicial center manual to

12   which you referred.  I'm looking at page 44 of the

13   slip opinion.  We haven't read it completely.

14                   All right.  Mr. Corrigan --

15                   MR. CORRIGAN:  Thank you, Your Honor.

16                   THE COURT:  -- I think you should

17   respond to each of the issues raised, but in

18   particular --

19                   MR. CORRIGAN:  Your Honor, I think it's

20   going to be a hodgepodge.

21                   THE COURT:  Well, I certainly want to

22   hear from you on the use of damages.

23                   MR. CORRIGAN:  Your Honor, if I might I

24   wanted to respond to what Mr. Coe said first and

25   then --

1                    THE COURT:  He said this too.  I'm

2    talking about don't forget I want to hear from you on

3    the article --

4                    MR. CORRIGAN:  Okay.

5                    THE COURT:  -- that appeared in --

6    issues in competition on policy, particularly with

7    respect to the type of market structure required for

8    use of this method and specifically the statement that

9    the method only works with competition, does not

10   account for where a market -- where an opinion --

11                   MR. CORRIGAN:  Your Honor --

12                   THE COURT:  Well let me just read my --

13   I can't even read my notes.  There's no accounting for

14   a market structure in a duopoly.  No fit says this

15   article.

16                   MR. CORRIGAN:  I'm sorry, Your Honor,

17   what article is that?

18                   THE COURT:  The one -- the first one to

19   which Mr. Coe referred.

20                   MR. CORRIGAN:  Is that the one that was

21   called quantification of damages?

22                   THE COURT:  Exactly.

23                   MR. CORRIGAN:  Okay.

24                   THE COURT:  All right.  You may proceed

25   in whatever order you deem appropriate.

Page 251

1                    MR. CORRIGAN:  All right.  Your Honor,

2       I'm looking at a cell phone here.  It's shorted out on

3       me again.

4                    I just want to -- just because it's

5       been a little unclear I just want to read to the Court

6       our initial interrogatory to Ortho on costs.

7                           "List -- on A list all costs both

8                           actual and estimated and standard and

9                           non-standard associated with the

10                          production, sales, and marketing of

11                          blood reagents."

12                   So we do what we generally do, we ask

13      for everything and then it becomes a dialogue, but to

14      say we didn't ask for it is not right.

15                   THE COURT:  Well, I don't -- I don't

16      think the defense quite said that.

17                   MR. CORRIGAN:  They may not have quite

18      said that, Your Honor, I just wanted to make it clear.

19      That's been talked about --

20                   THE COURT:  No, I've been under the

21      impression, based on what you said, that you asked for

22      cost data and they gave you what they gave you, but

23      they explained it.

24                   MR. CORRIGAN:  I'm not sure that's

25      correct, Your Honor.

 1                    THE COURT:  Well they certainly

 2      explained in the letter that Mr. St. Antoine sent you.

 3                    MR. CORRIGAN:  Well --

 4                    THE COURT:  They differentiated between

 5      standard costs, and it appears that the data that they

 6      send you made specific reference to standard costs.

 7                    MR. CORRIGAN:  Yeah, it's -- I can't

 8      speak to the colloquy, Your Honor, because I'm not --

 9      it's been a long time, but it's highly unlikely that

10      we are told there's a bunch of costs that are not

11      coming to you and we say we're not interested in

12      those.  That's just generally not how it works.

13                    Now, I do want to talk about one

14      other --

15                    THE COURT:  Well what was the reply to

16      the letter?

17                    MR. CORRIGAN:  I don't -- I just don't

18      recall, Your Honor.  I don't recall, but what I do

19      recall is that we asked for all costs.

20                    THE COURT:  That could have really sent

21      a red flag up.  I'm putting myself in the position of

22      a litigant -- lawyer for a litigant.  I receive a

23      letter like that and it appears I'm getting some of

24      the costs but not all of them.  I either want an

25      agreement that we don't use these costs or I want

1  these quote non-reliable costs.  I would certainly

2  have asked for that.

3          MR. CORRIGAN:  Well we did send up a

4  red flag and Dr. Bronstein agrees that the red flag

5  was correct, that we didn't use Ortho's costs.  They

6  were unreliable, we didn't use them, and Dr. Bronstein

7  agrees that was the proper course.

8          THE COURT:  Well we don't have to redo

9  that argument.

10          MR. CORRIGAN:  We won't, Your Honor.

11          THE COURT:  I --

12          MR. CORRIGAN:  That would be one place

13  where I don't redo.

14          THE COURT:  I'm on top of that

15  argument.  I haven't decided it yet.

16          MR. CORRIGAN:  Your Honor, I do want to

17  put up a slide that relates to something that Mr. Coe

18  just put up.  Can I get footnote 124?  And if we could

19  blow that up.

20          Now Mr. Coe just put up on one of his

21  slides in regarding the RhoGAM market he's referenced

22  footnote 124 in Dr. Beyer's report, then he glossed

23  over it and said Dr. Beyer said he didn't analyze the

24  costs.  But I'm not sure what slide it was.  The

25  slides were coming pretty quickly, Your Honor.  Let me

Page 254

1    see.

2                    THE COURT:  Yes.  Well, I'm sure it's

3    at the end of the --

4                    MR. CORRIGAN:  It's towards the end.

5                    THE COURT:  Yes.

6                    MR. COE:  It's the last one, Your

7    Honor.

8                    THE COURT:  It's slide 54 and it refers

9    to Dr. Beyer's report paragraph 58, note 124.

10                    MR. CORRIGAN:  Yes.  And the first

11   bullet point says, "Dr. Beyer did not analyze RhoGAM

12   cost data in his report."  And Mr. Coe referenced that

13   and just said --

14                    THE COURT:  Yeah.

15                    MR. CORRIGAN:  -- he just said he

16   didn't analyze it.  But what he didn't say was the

17   first sentence in that footnote.  "Ortho has not

18   produced cost data for RhoGAM."

19                    Here we are back to the point, Ortho

20   doesn't produce the cost data and then intends to use

21   it on the offensive.  Okay?  They don't produce the

22   cost data and then they say Beyer hasn't done anything

23   with the cost data.  They didn't produce it.  This has

24   been a game of smoke and mirrors with the cost from

25   the get go.

1                    THE COURT:  Was that requested?

2                    MR. CORRIGAN:  Yes, it was requested.

3     This -- RhoGAM came up later on in the process when we

4     identified it as a benchmark.

5                    THE COURT:  Well if cost data is

6     required in the analysis and it's not produced,

7     whether because it doesn't exist or because the

8     defense is stonewalling, what's your position with

9     respect to a Beyer opinion that excludes cost data?

10                   MR. CORRIGAN:  Our opinion is that we

11    meet the standard.  We have good grounds, they're fair

12    congeners.  We cited a --

13                   THE COURT:  Even though there's a lack

14    of evidence?

15                   MR. CORRIGAN:  Well they don't have to

16    be perfect substitutes, they have to relative -- I

17    can't remember -- relative -- I can't remember the

18    quote, Your Honor, I'm getting punchy, but they have

19    to be close.  They don't have to be similar on every

20    single point.  We cited a large number of -- a long

21    list of -- a long laundry list of points on where they

22    are similar.  Do they have to be similar to every

23    point especially when the cost data we don't have as a

24    result of the defendant not producing it?  They don't

25    have to be -- the standard is not that they have to be

```
 1    identical on every single point.  They have to be fair

 2    congeners, and I think we've given enough evidence

 3    that they are, including on the market structure.

 4              The Court was not entirely satisfied in

 5    the initial opinion and we've tried to go beyond that

 6    and cite testimony on RhoGAM from Ms. Kleinbard.

 7              There were a few other points --

 8              THE COURT:  The problem with the

 9    Kleinbard evidence is that it stopped before the

10    period at issue in your use of the RhoGAM.

11              MR. CORRIGAN:  Well several points that

12    were made.  Ms. Kleinbard was -- she was employed --

13    she was -- she showed up with a large declaration on

14    RhoGAM, and the declaration she showed up with was not

15    just from all (indiscernible), she also had a

16    position --

17              THE COURT:  Was she a 30(b)(6) witness?

18              MR. CORRIGAN:  No, she wasn't.  I asked

19    the same question today.  She wasn't, but again, she

20    showed up with a large declaration of RhoGAM, so

21    effectively she was Ortho's RhoGAM expert.

22              THE COURT:  But she had not handled

23    RhoGAM according to her affidavit after 2003.

24              MR. CORRIGAN:  Well her affidavit -- I

25    just had it.  She also had a position in the RhoGAM
```

1   market from '05 to '08, but her declaration cites

2   documents that don't stop at '03.  The documents that

3   Dr. Beyer cites in the paragraph I put up before

4   showing market share drop from '03 to '07.

5            Now Mr. Coe pointed out that at some

6   point there was a sale from Bayer to Talecris in '04,

7   but the point where market share is going down is from

8   '03 to '07, that covers the period when both companies

9   owned that.

10            The first paragraph of her declaration,

11  "From June '05 to December '08 I was worldwide product

12  director for the RhoGAM brand."  So she didn't just

13  stop her involvement with RhoGAM in '03, her own

14  declaration --

15            THE COURT:  It was just that the

16  document that Mr. Coe -- well he didn't reference the

17  document, you offered it.

18            MR. CORRIGAN:  Yes.

19            THE COURT:  And she described herself

20  as out of the RhoGAM business in 2003.  Read that back

21  -- read that again, please.

22            MR. CORRIGAN:  She says:

23                "In June 2001 to December 2003 I

24                was U.S. Product director for Ortho's

25                RhoGAM brand.  From June 2005 to

```
 1                    December 2008 I was the worldwide

 2                    product director for the RhoGAM brand."

 3                    So she's RhoGAM -- she's up there to

 4      talk about RhoGAM not the specific --

 5                    THE COURT:  The latter point was not

 6      included in the -- part of the affidavit that you

 7      offered -- or the statement -- I guess it was her

 8      testimony.

 9                    MR. CORRIGAN:  It was her testimony,

10      Your Honor.  Now she was talking about it in an

11      earlier time frame, but again, the market share

12      dropped that Dr. Beyer got not just from her

13      testimony, but from documents in her declaration were

14      from '03 to '07.

15                    Now another document, I think it was

16      slide 34 in Mr. Coe's presentation, one of the points

17      that was made in there in terms of Bayer and Talecris,

18      it says, "No major changes to the price and promo

19      strategy."

20                    THE COURT:  I don't think it was 34.

21      The RhoGAM exhibits were --

22                    MR. COE:  Just to clarify the record,

23      it wasn't in the slides, Your Honor, it's Kleinbard

24      declaration Exhibit 10 is the --

25                    MR. CORRIGAN:  Okay.
```

Page 259

1                    MR. COE:  -- document Mr. Corrigan is
2     referring to.
3                    THE COURT:  Thank you.
4                    MR. CORRIGAN:  In Kleinbard Exhibit 10
5     then there was talk of no major changes to the price
6     promo strategy.  According to Ms. Kleinbard's
7     testimony their promo strategy was nothing.  No promo.
8     So if there's no change in the promo strategy there's
9     no change.
10                   Now the other thing that was in --
11    again, it was the document Mr. Coe cited where there
12    was four squares, the threats, weaknesses.  In the
13    lower right-hand corner of that under the threat,
14    aggressive pricing by ZLB, which is what we said.  ZLB
15    was the new competitor and they came in and they
16    aggressively priced, whereas Bayer and Talecris,
17    according to Ms. Kleinbard, basically their strategy
18    was nothing.
19                   THE COURT:  What about the FTC --
20                   MR. CORRIGAN:  Well the FTC -- again,
21    it was -- I was kind of looking at this on the fly,
22    but there was one document that kind of stuck out that
23    made by list.  Paragraph 72 of the FTC document, and
24    Mr. Coe again highlighted the part that said basically
25    that Bayer and ZLB were aggressively competing, but

1    the part he didn't highlight was that Ortho had stayed

2    out of the fray.

3                   So even in that instance he's

4    signifying -- he's highlights the two of the three

5    that are competing and the FTC document itself says

6    Ortho stayed out of the fray.  Even that document

7    shows that only two of the three were competing, but

8    they were citing to that.

9                   So again, as Dr. Bronstein said, three

10   firms is a label.  Two or three or one, it's a label.

11   It's not an insignificant factor, we're not saying

12   it's no factor, what we're saying is it's part of the

13   analysis, the other part is what are those

14   participants doing?  And we saw from that, that's a

15   highly concentrated market.  Only three players.  Why

16   is there no price increases there?  It's competition.

17   It's not that there's three, it's not that there's two

18   or there's ten, whoever is in that market is

19   competing, and it's quite obvious from the TBR market

20   whoever is in that market is colluding, at least not

21   competing.  Okay?

22                  Now one other thing that Mr. Coe said,

23   he said that Dr. Bronstein opined that that market --

24   that that graph doesn't show conspiracy, it shows

25   duopoly pricing, passive collusion.  But Dr. Bronstein

1    is the one that didn't read the conspiracy evidence.

2    It's very easy to say that that's the result of

3    passive collusion when you haven't read the collusion

4    evidence.  It makes it much, much easier to have that

5    opinion.

6              THE COURT:  No, I don't remember that.

7    What I do recall is argument that there can be -- I

8    think I referred to it a conscious parallelism and

9    Mr. Coe brought that into the duopoly context.  And

10   what's that phrase?  The duopoly phrase for conscious

11   parallelism?

12             MR. ST. ANTOINE:  We've used price

13   leadership or even tacit collusion at places, Your

14   Honor.

15             THE COURT:  Yes, I think it was both of

16   those.  Thank you.  Thank you, Mr. St. Antoine.

17             MR. COE:  He does that often, Your

18   Honor.

19             MR. CORRIGAN:  Your Honor, at the merit

20   stage we'll have to prove it was conspiracy versus

21   passive collusion or duopoly pricing or something.  I

22   just made note that Dr. Bronstein is the one opining

23   that it's tacit collusion or conscious parallelism

24   when he never read the conspiracy evidence.  That

25   makes it so much easier to hold that opinion.

Page 262

1                    THE COURT:  I don't think he said
2     that's what it was, I think he said you could have it
3     in a duopoly.
4                    MR. CORRIGAN:  I thought he said that
5     that's what it was, but I could be wrong, Your Honor.
6     Either way Dr. Bronstein is not exactly in a great
7     position to opine on what it is when you haven't read
8     the conspiracy evidence.
9                    Your Honor, a couple of points.  I do
10    want to address that article.  It's interesting that,
11    you know, in this Daubert world that we read the
12    article exactly the opposite of how Mr. Coe reads it.
13    It says -- the paragraph he talked about says, "In
14    utilizing this method one must ..." -- I'll let you
15    get to it, Your Honor.
16                   THE COURT:  I'm there.
17                   MR. CORRIGAN:  Page -- the paragraph
18    starts with, The cost per unit ...," and I'm reading
19    the second sentence.
20                   THE COURT:  Yes.
21                   MR. CORRIGAN:  "In utilizing this
22    method one must keep in mind that the but for world
23    may be characterized by imperfect competition."  We
24    read that to say that this model is applicable in a
25    duopoly.  I mean --

Page 263

1                    THE COURT:  Wait a minute, I don't --
2      on what page are you?
3                    MR. CORRIGAN:  I'm on page 2337.
4                    THE COURT:  All right.  Okay.  It's the
5      last sentence that's highlighted.  Go ahead.
6                    MR. CORRIGAN:  Yeah, that second
7      sentence, "The but for world may be characterized by
8      imperfect competition."
9                    So Mr. Coe and Mr. St. Antoine
10     yesterday said that basically this doesn't apply to a
11     duopoly, it only applies to a competitive marketplace.
12     But to be frank, we read that in exactly the opposite
13     way, that the but for world involving this cost market
14     method can be used with imperfect competition, which
15     means duopoly.  So it is applicable to a duopoly.
16     That's how we read it.
17                    Now to say that a but for world --
18                    THE COURT:  Let me read that again.
19                    MR. CORRIGAN:  Okay.
20        (Pause)
21                    THE COURT:  All right.
22                    MR. CORRIGAN:  I mean to suggest that a
23     but for world has to have perfect competition is kind
24     of ludicrous.  Most price fixing conspiracies involve
25     oligolopies of some sort, so you're never -- you're

1   almost never, but we don't know of any case --

2                   THE COURT:  Going to have perfect --

3                   MR. CORRIGAN:  -- when you're modeling

4   a but for world there's perfect competition.  It's

5   never that.  Or I shouldn't say it's never that, Your

6   Honor, it's rarely that.  Usually it's in a

7   marketplace that's conducive to collective behavior.

8   So that even in the but for world it's not perfect

9   competition.

10                   Now the other point, and I may have

11  slightly misspoken, I said that there was something in

12  this report that said you didn't need demand.  What I

13  meant was --

14                   THE COURT:  You didn't need, I'm sorry?

15                   MR. CORRIGAN:  You didn't need demand,

16  demand didn't have to be factored into method.  So

17  what I said was slightly off.  What I should have said

18  and what I meant was in a mark up, okay, when a mark

19  up is constant as this is in this approach, when a

20  mark up is constant over time that means no demand,

21  it's not going with the flow of demand, it's a

22  constant mark up over time.  So implicit in this type

23  of methodology it assumes there's no demand.

24                   So that's what I have on this article,

25  Your Honor, and we read it in exactly the opposite

Page 265

1    way.

2                    THE COURT:  And now I'm reading it

3    again, that last sentence -- next to the last

4    sentence.

5                        "In utilizing this method one must

6                        keep in mind that ..." -- well you have

7                        to read the two sentences together.

8                        "The cost per unit of production ..." -

9    -

10                       it's the first sentence -- "plus a

11                       reasonable profit mark up are then

12   taken

13                       as an estimate of the competitive

14                       price."

15                       And then the next sentence, the one

16   we're talking about:

17                       "In utilizing this method one must

18                       keep in mind that the but for world may

19                       be characterized by imperfect

20                       competition and that the non-collusive

21                       price may be well above both long run,

22                       marginal, and average cost."

23                   MR. CORRIGAN:  Your Honor, we've

24   submitted this article to basically say that there's

25   good grounds for this methodology.  Perfect?  No,

1   probably not, but it doesn't have to be.  There's

2   economic literature that shows that this is an

3   accepted methodology, and we read it in exactly the

4   opposite way so that this would be an accepted

5   methodology in the type of duopoly case that -- the

6   duopoly/conspiracy case that we have here.  And we

7   think it shows good grounds under Daubert.

8                    A couple of points, Your Honor, on the

9   Daubert, and we've read a number of opinions by this

10  Court on Daubert, so we know you're well familiar with

11  it.  I did want to cite one quote from the Robinson

12  case, it's an '07 case.

13                   THE COURT:  You keep referring to

14  Robinson, that was an aircraft case I believe.

15                   MR. CORRIGAN:  You're right, it was.

16  It was an aircraft case.

17                   THE COURT:  It was almost as difficult

18  to resolve as this one.

19                   MR. CORRIGAN:  That's unfortunate, Your

20  Honor.

21                   THE COURT:  Well it was difficult

22  because the standard to be applied was an air crash

23  case resulting in serious injuries.  The standard

24  under the Third Circuit law was the regulations of the

25  federal aviation board and the FAA regulations were to

1    form the basis of the charge to the jury.  And the FAA

2    regulations were about three inches thick and they

3    were never designed for that purpose.  The Third

4    Circuit had ruled on a case called Abdula (ph), that

5    that's the law that must be applied.

6                    We were here on the Saturday morning

7    with someone who now features rather prominently in

8    the investigation and follow up of -- well it has to

9    do with Temple and the board share and the spokesman

10   for --

11                   MR. CORRIGAN:  I have some idea I might

12   know what you mean, Your Honor.

13                   THE COURT:  -- and the bottom line.

14   Now you've brought all of that back to me.  I can see

15   --

16                   MR. CORRIGAN:  Oh, I'm sorry.

17                   THE COURT:  -- I can see this room

18   filled.  We were here on a Saturday morning and the

19   now chairman of the board decided he would treat us

20   all to Dunkin' Donuts, and there must have been 20 of

21   us at work on Saturday trying to put together a

22   charge.

23                   The case was settled fortunately for me

24   before I had to instruct the jury.

25                   Thank you for reminding of Robinson

1    versus Hartzell.

2                    MR. CORRIGAN:  No, Your Honor, don't

3    hold that against me too much, please.

4                    THE COURT:  I think Hartzell was the

5    propeller manufacturer, but wow.

6                    MR. CORRIGAN:  Uh-huh.

7                    THE COURT:  All right.  Now tell me

8    what lesson you learned from Hartzell.

9                    MR. CORRIGAN:  Maybe I ought not

10   mention that, but --

11                   THE COURT:  What was the year --

12                   MR. CORRIGAN:  -- I guess the damage

13   has been done, right?

14                   THE COURT:  Just out of curiosity how

15   long ago was that?

16                   MR. CORRIGAN:  It's '07.

17                   THE COURT:  Okay.

18                   MR. CORRIGAN:  So right around the

19   corner.  I just pointed to one thing where the --

20                   THE COURT:  No, it was -- Mr. Coe is

21   nodding, it was not your year.

22                   MR. COE:  I was involved in that case

23   many years earlier, Your Honor, in 2003.

24                   THE COURT:  Yes, because your year was

25   the year of three Harvard clerks and I recall that the

1    clerk in that case came from Columbia.

2                    MR. COE:  I believe I helped you with

3    the earlier summary judgment opinion in that case,

4    Your Honor.

5                    THE COURT:  Go ahead.

6                    MR. CORRIGAN:  Okay.  One point, it's

7    page 9.  I'm sorry.  Finally this court:

8                        "New England asserts that

9                    Dr. McSwain's (ph) proposed testimony

10                   does not fit the fact of the case.

11                   Specifically New England argues that no

12                   evidence supports Dr. McSwain's

13                   conclusions that it overhauled or

14                   performed any work in the area of the

15                   propeller to fail.

16                       The Court rejects this assertion.

17                   And here's the quote:

18                       "Dr. McSwain is permitted to base

19                   his opinion on a particular version of

20                   disputed facts and the weight to be

21                   accorded to that opinion is for the

22                   jury."

23                       That's what we have here.  Disputed

24    facts, okay?  Dr. Beyer has -- we've shown evidence

25    that his version of the facts is certainly not off

1   base, but even if there's a dispute on the facts he

2   can still have good grounds.

3                THE COURT:  Well what you're quoting

4   from Robinson is certainly good law.  That's not

5   exactly what we're talking about here.

6                MR. CORRIGAN:  Not exactly, but I think

7   that he's on more solid grounds than that, but I just

8   thought the disputed of facts kind of pointed that to.

9                Your Honor, a couple of -- just a

10  moment on the Elcock factors.  As this Court is well

11  familiar with the case law, Elcock included, says that

12  the eight Elcock factors, which are the -- actually

13  eight Daubert factors, they're not exhausted, they're

14  not exhausted in any case, it's not necessary to apply

15  them in every case, that the district court has

16  discretion not only to find testimony admissible but

17  how to find it admissible.

18                And the Mitchell case is instructive on

19  them.  Mitchell has some interesting language.  They

20  say that the gatekeeper is not the only protector of

21  the castle, and in fact the other protection of the

22  castle is what this Court has referenced several times

23  today, cross-examination.  Dr. Beyer has been cross-

24  examined twice in this case at class cert.

25                THE COURT:  Yes.  And do you really

1  think this comment is helping me?  I mean I focused on

2  that, I've made reference to that time and time again,

3  that I have to decide.

4                    MR. CORRIGAN:  Yes.  But we're just

5  saying -- Mr. Coe used a screen on the Elcock factors

6  and we're just says that this Court has discretion.

7                    In the Avonguard (ph) case, we cite

8  that on page 2 of our reply memo on remand.

9                    THE COURT:  Is that my Avonguard case?

10                   MR. CORRIGAN:  Yes, and that's one from

11  April.  I hope that wasn't as unpleasant of an

12  experience as the Robinson case was.

13                   THE COURT:  No, that's still very much

14  around.

15                   MR. CORRIGAN:  Oh, okay.

16                   THE COURT:  I think it's in my trial

17  pool.

18                   MR. CORRIGAN:  Okay.

19                   THE COURT:  If you're familiar with it

20  you might want to accept it has an amicus or

21  something.

22                   MR. CORRIGAN:  Well we'll see how we do

23  on this case, Your Honor.  We'll see if my opinion

24  makes any difference to you based on this case.

25                   We quote some language from Avonguard

1    and we insert Dr. Beyer, but here Dr. Beyer, and the

2    quote is, "A particular methodology in rendering his

3    opinions as opposed to merely relying on his own

4    intuition."  Okay?  The proposed methodology based on

5    the expert, I won't say -- the expert's quote:

6                        "Review of the relevant parts of

7                        the record, his professional background

8                        and experience and his review of

9                        numerous materials in his field, and

10                       thus his opinions weigh on good

11                       grounds."

12                       And that's the standard.  It doesn't

13   have to be perfect.  They don't have to agree with

14   him.  Even the Court doesn't have to agree with him,

15   it just has to be good grounds.  And all of what Dr.

16   Beyer has been on the good grounds.

17                       Your Honor, one more point, I'm going

18   to read your opinion one more time and I'm trying to

19   select a portion that doesn't necessarily deal with

20   Dr. Beyer, and this is the Court opining on an issue

21   the Court is somewhat familiar with, which is case

22   law.

23                       THE COURT:  What --

24                       MR. CORRIGAN:  It is --

25                       THE COURT:  -- page?

1                    MR. CORRIGAN:  -- page 243.

2                    THE COURT:  I'm there.

3                    MR. CORRIGAN:  In Section 1 -- I'm

4    sorry -- Section I, common proof versus individualized

5    proof.

6                    THE COURT:  I'm there.

7                    MR. CORRIGAN:  You go about three

8    quarters of the way down and it's a sentence starting,

9    "What Ortho proposes ..."

10                   THE COURT:  I have it.

11                   MR. CORRIGAN:  Okay.  It says, "What

12   Ortho proposes ..." -- and this is jumping around a

13   little bit, but this gets on the single price, Your

14   Honor.

15                       "What Ortho proposes would

16                       exponentionally complicate the

17                       calculation of damage ins this type of

18                       case.  As Dr. Beyer testified it would

19                       require plaintiffs to estimate almost a

20                       million different but for prices."

21                   And here's the part:

22                       "Ortho has not -- has cited for

23                       case and the Court has found none in

24                       which plaintiffs were required to do

25                       this.

1                    In contrast the Court has found

2                    cases that featured variable pricing in

3                    the real world but in this courts

4                    accepted the calculation of only one

5                    price for all customers in the but for

6                    world."

7                    Citing McDunna as an example.

8                    And then the next quote:

9                         "It is important not to let a

10   quest

11                   for perfect evidence become the enemy

12   of

13                   good evidence."

14                   THE COURT:  Yeah, I note that both of

15   those cases, McDunna and Flonase, are Judge Brody

16   cases, and that's certainly good law, but I don't

17   think that's quite the issue here.

18                   The issue Mr. Coe raised was two

19   inconsistent -- or arguably inconsistent statements by

20   Dr. Beyer on the need for almost a million different

21   but for prices, and I think it was a comparison of the

22   pre-2005 -- the first period, 2005 period with the

23   post-2005 period where he said in a footnote, am I --

24   do I recall incorrectly?  Didn't Dr. Beyer say in a

25   footnote that that --

1                    MR. COE:  Your Honor, he said that in

2     the actual world it would be straightforward to

3     account for these price tiers, but he could not do it

4     in the but for world because he would need to do a

5     million but for prices.

6                    THE COURT:  All right.

7                    MR. COE:  And it's both the same time

8     periods, Your Honor.

9                    THE COURT:  Fine.  In the -- he was

10    talking about the pre-2005 period?

11                   MR. COE:  No, Your Honor, he was

12    talking about the post-2005 --

13                   THE COURT:  Post.

14                   MR. COE:  -- period, but the actual

15    world.  So to determine damages he subtracts the but

16    for price from the actual.

17                   THE COURT:  Yeah.

18                   MR. COE:  So on one side of that

19    equation he says it's no problem to account for these

20    price tiers in the actual world because all these

21    prices in the tiers are in -- you know --

22                   THE COURT:  The government saves money

23    by turning off the lights.

24         (Pause)

25                   MR. CORRIGAN:  They don't know you very

1    well, Your Honor.

2                    THE COURT:  Thank you, that's what I

3    was thinking of.  Go ahead, Mr. Corrigan.

4                    MR. CORRIGAN:  Your Honor --

5                    THE COURT:  Thank you, Mr. Cosgrove.

6                    MR. COSGROVE:  You're welcome.

7                    MR. CORRIGAN:  Your Honor, I think that

8    -- I'm not sure exactly -- Dr. Beyer in my opinion --

9    in my estimation has been consistent on that.  I mean

10   he's come up --

11                   THE COURT:  Well that statement, what

12   about that statement?

13                   MR. CORRIGAN:  Well he's come up with

14   22 -- again, 2200 but for prices, which is complex

15   enough, but a million but for prices it's just

16   unscientific, and as the Court pointed out, no court

17   has ever asked anyone to do that.

18                   THE COURT:  Well but the footnotes, and

19   I think they were both in footnotes, that were relied

20   upon by Mr. Coe, in those footnotes Dr. Beyer treated

21   real world prices and but for prices differently.

22                   MR. CORRIGAN:  Your Honor, I must admit

23   I don't recall which footnotes; however, they might be

24   in my notes, but I just don't recall that.

25                   I did want to cite footnote 6 of the

1  Court's opinion, I'm not sure that gets at it, but it

2  does get at the price dispersion --

3                THE COURT:  Let me --

4                MR. CORRIGAN:  -- that Mr. Coe

5  referenced.  I'm not sure if it's what you're talking

6  about.  Footnote 6 of the Court's opinion.

7                THE COURT:  Let me look.

8                MR. CORRIGAN:  It's on page --

9                THE COURT:  No, I can find footnote 6.

10                MR. CORRIGAN:  Okay.  Now the Court --

11                THE COURT:  I have it.

12                MR. CORRIGAN:  Okay.

13                MR. CORRIGAN:  Now the Court points out

14  here that again we're being criticized for average

15  prices, but as the Court points out in the middle of

16  that footnote:

17                     "Moreover, Dr. Bronstein compares

18                average prices ..." -- and the Court

19                used the illalics -- "charged by

20  Immucor

21                and Ortho.  The average prices are very

22                similar through 2004."

23                The Court concludes:

24                     "The diversions in prices after

25                2004 is explained at least in part by

1                      the discounts Immucor gave some of its

2                      customers through price protection and

3                      pricing tiers."

4              But Dr. Beyer describes all that, as

5      the Court points out -- well actually I think it's

6      paragraph 77 through 85 I was -- no, you cite

7      Dr. Bronstein's report --

8                      THE COURT:  Yes.

9                      MR. CORRIGAN:  -- pointing out that he

10     himself is using average prices in there.

11                     THE COURT:  He compares average prices

12     charged by Immucor and Ortho.

13                     MR. CORRIGAN:  Yes.

14             Could I have slide 24 of our initial

15     presentation?  Your Honor, I have one more slide and

16     then I'm obviously available for questions, and I

17     think that would wrap it up for me.

18                     THE COURT:  Before we address the issue

19     of what happens.

20                     MR. CORRIGAN:  Yes.

21             Your Honor, if you could take a look at

22     slide 24 of yesterday's slide presentation.  It's kind

23     of -- I just like ending with this one because again

24     it focuses on Ortho's use of costs, which we think is

25     somewhat ironic considering the amount of argument

1    that's been on costs so far in this remand.

2                    Your Honor, if you see this is an email

3    from Jeremy Stackowitz (ph) who was an executive at

4    Ortho, it's from October of 2007, and the highlighted

5    language in paragraph 2 says:

6                        "I'm becoming increasingly

7                        uncomfortable leaning heavily on the

8    our

9                        costs are all going up

10                       disproportionately to our price

11   increase

12                       and thus we're raising price as part of

13                       the message."

14                   The next highlight, "In general it's

15   not."

16                   And here's the key point, "And it's not

17   why we're taking price any way."

18                   They're taking price, they say duopoly,

19   we say conspiracy.  They're not taking price because

20   of a cost.  Now they're telling their customers that,

21   but that's not why we're taking price any way.

22                   And then the very last highlighted

23   part, "But I don't think the cost going up piece feels

24   very true or relevant right now."  And I'd say that's

25   a good summary of some of what we've seen here as

1    well.  And the last thing he signs off, "Sorry to be
2    difficult."  And here's a voice in the wilderness
3    saying that the cost piece doesn't feel true.
4              THE COURT:  Who is Richard
5    Trastinschmit (ph)?
6              MR. CORRIGAN:  Trastinschmit is another
7    Ortho executive, I believe you saw some testimony from
8    Ortho counsel yesterday, some live --
9              THE COURT:  Oh, yes, yes, yes.
10             MR. CORRIGAN:  -- a depo clip.  And
11   Stackowitz kind of summed up, he's sorry to be
12   difficult.  Sorry to be sort of calling us out on our
13   phony cost explanation.
14             Your Honor, unless you have any
15   questions of me other than the question you want to
16   talk about at the end that's all I have.
17             THE COURT:  No, the major question I
18   had concerned the article.
19             MR. CORRIGAN:  Would you like me to
20   respond to that first?
21             THE COURT:  You've done it.  You've
22   responded.
23             MR. CORRIGAN:  Okay, yes.  I thought
24   the other issue.
25             THE COURT:  No.  No, no.  What I think

1    we should address now, and there might be some other

2    additional issues.  I think we've covered the eight

3    items on my original list.

4                    The additional item, referenced by

5    Mr. Antoine, yesterday concerns the case if I conclude

6    that Dr. Beyer's model fails the Daubert testing, is

7    there evidence of antitrust impact common to the

8    class?  Do I frame your issue properly?

9                    MR. ST. ANTOINE:  Yes, Your Honor.

10                   THE COURT:  Thank you.

11                   MR. CORRIGAN:  Your Honor, we would --

12   to be frank it's unclear, but what we would say is we

13   have cited five different pieces of common impact,

14   five different types of evidence which the Court has

15   credited to some extent, not all.  Now Ortho has

16   continually said none of these stand on their own, but

17   of course none of them were proposed on their own.

18                   The market structure and the pricing

19   analysis, defendant's documents, the Bogosian

20   shortcut, and then the damages methodology was used to

21   prove impact, which goes beyond what the standard is.

22                   No case, even at this climate, says you

23   have to prove impact at the class cert stage.  But

24   that's what we did in this case, and that's given them

25   sort of the opportunity to challenge our damages

1    methodology in the impact arena.

2                     But what our market structure and the

3    other evidence shows is something I've said time and

4    again, whatever happened in this case, Your Honor,

5    happened to all people and all entities.  Ortho has

6    never suggested that the duopoly pricing affected

7    different customers differently, and we say the same

8    about conspiracy pricing.  So whatever happened to

9    customers by duopoly or by conspiracy happened to them

10   all.  That's a common question and it's clearly a

11   merits question that doesn't have to be decided at

12   this time.

13                    Now at trial we'll have to prove the

14   conspiracy, but if we do prove a conspiracy it'll be

15   evidence that there's -- that all the market -- all

16   the customers were impacted by the conspiracy.

17                    Now, I know Mr. St. Antoine will say,

18   but how do we measure?  That's what a damages

19   methodology does.  Not just in this case, in every

20   case.  In every case the damages methodology has to

21   distinguish between lawful conduct and unlawful

22   conduct.

23                    Now they say that this case is so

24   unusual because of its duopoly, but every damages

25   methodology has to distinguish the illegal effects and

1  the legal effects, whether it's duopoly or anything

2  else.  So, I would say that there still is common

3  impact.

4           Now we -- you know, we certainly hope

5  that the damages methodology doesn't get bounced, but

6  we've offered significant evidence.

7           The Bogosian shortcut, although it was

8  disparaged somewhat by Hydrogen Peroxide, basically

9  just distinguish it.  So the Bogosian shortcut -- and

10  the Bogosian shortcut, I'm attempted to show you one

11  more slide, Your Honor, but I won't.  The Bogosian

12  shortcut is captured by a document in this case better

13  than any document I've seen, and that's the choo choo

14  train.

15           Ortho has a choo choo train pricing, it

16  came with the BBLP and it shows the choo choo train

17  and the engine is the list price, and all the other

18  cars are discounted off list price, and in case you

19  were wondering what it meant, they say right on that

20  every

21  -- all prices changes lock step with the list price.

22  All cases -- it's a normal argument that plaintiffs

23  always say list price was fixed and defendants always

24  say the list price is too far attenuated from actual

25  prices.  But in this case that's not so.  Their own

1    document says whatever happened to list price happens

2    to all prices in the lock step.  That's what the

3    Bogosian shortcut says in one document.

4                    And then in addition to that --

5                    THE COURT:  What is that document?

6                    MR. CORRIGAN:  I'll show you, Your

7    Honor.  Oh, we have the slide, Your Honor, I'm sorry,

8    we can do that just by slide.  It's the last -- it's

9    slide 59 in yesterday's presentation.  The words are

10   somewhat blurry, Your Honor, but you know the second

11   and fourth -- first and third bullet points are

12   highlighted.  "Pricing expressed as a percentage

13   discount off list price."  So here's there's no

14   argument about the relationship from the list price to

15   the charged prices.

16                   And the third one makes it very plain,

17   "As list price increases by duopoly or conspiracy all

18   customer prices change in lock step."  That's common

19   impact in a nutshell.

20                   Now we add to that with a declaration

21   from Teresa Heplin (ph), she's an Immucor executive,

22   and what she says is, Immucor prices were based on

23   Ortho's list price.  So that gives us the caboose.

24                   Now this train is not only driving all

25   of Ortho's prices, it's also driving Immucor's prices.

1    That's common impact in a nutshell, Your Honor.

2              Now the short answer of that is if we

3    lose Dr. Beyer's damages methodology, which should be

4    viewed under the moral acts Story Parchment standard,

5    we still have common impact under the choo choo train

6    model, the market structure analysis, the defendant's

7    documents, the Bogosian shortcut, and Dr. Beyer's

8    pricing analysis.

9              THE COURT:  I'd like a legible copy of

10   this choo choo train.

11             MR. CORRIGAN:  Dr. Beyer cites another

12   version of this in his report.  I don't know if it

13   mentions the lock step language.  Do we have that?

14   Could you give me the cite on that, please.

15   Dr. Beyer's version so that the Court can get a little

16   bit better look at it.

17             THE COURT:  It's Exhibit 143.

18             MR. CORRIGAN:  Okay, Your Honor, it's

19   not -- the language is not as good in this version,

20   but on page 34 of Dr. Beyer's report -- not his reply

21   report -- at the very top of that talks about

22   traditional VB pricing strategy, and it's pretty clear

23   what it's talking about.  It's more legible, but it

24   doesn't have the lock step agreement -- lock step

25   language, which is why we used this as the slide.

1                    THE COURT:  Can you produce a better

2    copy of this exhibit or no?

3                    MR. CORRIGAN:  We can try, Your Honor,

4    but I doubt it.

5                    THE COURT:  By the way what does HOF in

6    the upper left --

7                    MR. CORRIGAN:  Oh, I'm sorry.  That was

8    a holdover.  In our initial presentation to Your Honor

9    almost three years ago I labeled all these documents

10   as hall of fame, caliber, common impact documents, and

11   for the hall of fame we put a little plaque on there

12   to give it the recognition we thought it deserved, and

13   that's a bit of a holdover.

14                   THE COURT:  I'm glad I forgot that.

15                   MR. CORRIGAN:  Yes.  That and the

16   Robinson case and I'm going to be out of here very

17   shortly.

18                   So, Your Honor, in a nutshell we say

19   even if Dr. Beyer's methodology -- damages methodology

20   doesn't survive that we still do have common impact,

21   but the damages methodology is reviewed under a more

22   relaxed standard as Story Parchment.

23                   THE COURT:  And you're relying on the

24   Bogosian shortcut, the proof of common impact --

25                   MR. CORRIGAN:  Yes.

1                    THE COURT:  -- through Beyer that does
2      not fall because of the damages model --
3                    MR. CORRIGAN:  Yes.
4                    THE COURT:  -- if that falls.  Market
5      structure analysis, empirical pricing, which is what
6      we're talking about in exhibit -- slide 59 and some
7      defendant's documents.
8                    MR. CORRIGAN:  Yes.
9                    So we cited quite a lot of different
10     types of evidence, all of which this Court credited to
11     some degree or another, and we confirmed Dr. Beyer's
12     initial conclusions with the damages methodology,
13     which is what every damages methodology does.  By
14     measuring damages it confirms common impact, but it's
15     not the only proof of common impact.
16                   Here it was, we went farther than we
17     had to, but it's not the only and it doesn't have to -
18     - it's not necessary.
19                   THE COURT:  Thank you.
20                   MR. CORRIGAN:  Thank you, Your Honor.
21                   THE COURT:  Mr. St. Antoine.
22                   MR. ST. ANTOINE:  Your Honor, I'm going
23     to try to make this argument without reference to
24     Mr. Coe's set of LEGOs, although I'm tempted to do so.
25                   THE COURT:  I note that Mr. Coe has

1    removed his LEGOs.

2         (Laughter)

3              THE COURT:  Good.  You can leave your

4    files here, I want to LEGOs out of here though.

5              MR. COE:  Be in trouble if I left the

6    LEGOs behind, Your Honor.

7              MR. ST. ANTOINE:  First I think it's

8    important to explain what antitrust impact is.  We've

9    used that word obviously a number of times.  It is the

10   fact of damage, and it's --

11             THE COURT:  Antitrust -- it's injury.

12             MR. ST. ANTOINE:  It's injury.  And in

13   economic terms what it means is showing that the

14   actual price is higher than the estimated but for

15   price.

16             If plaintiffs are able to demonstrate

17   that actual prices charged to the customers were above

18   a reliable estimate of but for prices they can show

19   the fact of injury.  And then you get into the

20   question about what is the quantity, the delta between

21   the actual and the but for price.

22             Conversely if there is no ability to

23   show what the but for price is --

24             THE COURT:  Through common evidence.

25             MR. ST. ANTOINE:  -- through common

1   evidence and all you have is the actual price, there's

2   no ability to show that element of common proof of the

3   case.

4                    And here it's particularly important to

5   have a reliable model, because as the courts

6   recognized and as Dr. Beyer acknowledges, with the

7   change in market structure to a duopoly you can

8   anticipate price increases even in the absence of the

9   conspiracy.  And when asked about this at his hearing,

10  Your Honor, and I'm referring to specifically pages --

11  page 384,

12  Dr. Beyer --

13                    THE COURT:  Of the hearing transcript.

14                    MR. ST. ANTOINE:  Of Dr. Beyer's

15  hearing transcript, correct.  He recognizes that

16  duolopists --

17                    THE COURT:  Wait Dr. Beyer's hearing?

18                    MR. ST. ANTOINE:  Dr. Beyer's hearing

19  testimony.

20                    THE COURT:  He didn't testify at the

21  class certification hearing, he testified later as I -

22  -

23                    MR. ST. ANTOINE:  That's right.

24                    THE COURT:  He was unable to attend.

25                    MR. ST. ANTOINE:  Exactly right.

1                    THE COURT:  So you're talking about his

2    deposition given at the end of July, according to my

3    records.

4                    MR. ST. ANTOINE:  Yes, but we -- both

5    sides I think they're referring to it as his hearing

6    testimony to distinguish it from --

7                    THE COURT:  Although it was a

8    deposition.  I understand.

9                    MR. ST. ANTOINE:  -- from his earlier

10   deposition, correct.

11                   THE COURT:  And it was conducted about

12   two or three weeks after the class certification

13   hearing.

14                   MR. ST. ANTOINE:  Exactly.

15                   THE COURT:  Right.  Go ahead.

16                   MR. ST. ANTOINE:  So Dr. Beyer

17   recognizes that even in the absence of a cartel that

18   duolopists, to use his colorful phrase, "Unless their

19   blind and deaf," will engage in interdependence --

20   mutual interdependence in their pricing decisions, and

21   as a result prices can increase in the absence of a

22   conspiracy between a competitive price all the way up

23   to a monopoly price.

24                   Now to be fair, Dr. Beyer wasn't

25   opining that in the absence of a conspiracy that

Page 291

1    Immucor and Ortho would charge a monopoly price, but

2    he is acknowledging that in the but for world that

3    price is going to be somewhere in that range.  Prices

4    are going to increase and they're going to be

5    somewhere between a competitive market price and a

6    monopolist price.  And the only source of common proof

7    proffered by the plaintiffs that purports to estimate

8    that but for

9    price --

10                   THE COURT:  Is Dr. Beyer.

11                   MR. ST. ANTOINE:  -- is Dr. Beyer's

12   model, which plaintiffs describe as his damages model,

13   but they have also labeled it as an element of

14   antitrust impact.

15                   And Mr. Corrigan is correct to point

16   out they've identified five types of proof that they

17   say are common evidence of impact, but number five is

18   his damages model, and is the only one that even

19   attempts to estimate what that but for price is.  How

20   much would prices go up in this duopoly market in the

21   absence of the alleged conspiracy?  And if you take

22   that away, and in this proceeding Ortho has advocated

23   that when they're a Daubert standard that element

24   should be taken away, plaintiffs don't have any basis

25   to establish that but for prices were lower than

1    actual prices.

2              Now let's talk about those other

3    elements.  The Bogosian presumption.  Mr. Corrigan is

4    right to reference Hydrogen Peroxide decision, because

5    in that decision it actually cited back to Your

6    Honor's decision in the linerboard where the Bogosian

7    presumption was treated as a belt and suspenders in

8    conjunction with Dr. Beyer's economic work in

9    linerboard.  And Hydrogen Peroxide casts serious doubt

10   about going forward based solely on the Bogosian

11   presumption, and specifically it cited the 2003

12   amendments to Rule 23 and the prospect of presuming

13   antitrust impact solely based on the fact that you

14   have an antitrust conspiracy.

15             In Hydrogen Peroxide there's not a

16   basis to rely solely on Bogosian presumption.  What

17   plaintiffs have done is coupled that argument on --

18   with a damages model.

19             We would also add to the legal

20   discussion of Hydrogen Peroxide by pointing out that

21   because of the change in market structure that we've

22   been discussing, it would be all the more

23   inappropriate to presume impact simply because there

24   have been a claim and even proof of a conspiracy.  You

25   have to separate that element of a conspiracy from the

1    separate element of antitrust impact.

2               Now as to the other elements, which the

3    Court did address in its earlier decision, I want to

4    cover those briefly as well, Your Honor.

5               So number one in Your Honor's earlier

6    decision and discussion was on the Bogosian

7    presumption.

8               Number two --

9               THE COURT:  What page?  Just tell me

10   what page you're referring to.

11              MR. ST. ANTOINE:  So the discussion of

12   the different elements of common proof start on -- at

13   the federal report decision at 235.  The decision of

14   the Bogosian presumption goes on to approximately --

15   it looks like 236.

16              THE COURT:  I'm there.

17              MR. ST. ANTOINE:  Then the Court

18   discusses market structure.

19              And I think it's first important to

20   identify that even in the earlier decision Your Honor

21   -- the finding wasn't that market structure alone

22   would be sufficient to establish impact, only that it

23   was supporting a finding of predominance, but more

24   specifically relating to the earlier discussion market

25   structure -- and we're talking about barriers to entry

1   and concentration -- specifically a duopoly can also

2   be conducive to lawful price increases like price

3   leadership.

4            So simply opining that the market

5   structure was conducive to price increases doesn't say

6   whether or not conspiratorial prices would be higher

7   than the but for price leadership prices.  It's not

8   enough again for a finder of fact to make the decision

9   about fact of injury.

10            Likewise, Your Honor, the third

11  element, the empirical pricing analysis -- well, I

12  think the most -- the clearest thing I can point to is

13  Your Honor's own finding that the Court does not find

14  that Dr. Beyer's empirical pricing analysis is

15  persuasive as his market analysis or the results of

16  his damages model.

17            And I think the most simple way to

18  explain that is that just observing that pricing went

19  up in the marketplace, given the change in market

20  structure, isn't going to allow you to conclude that

21  but for prices were lower than actual prices.  All you

22  can conclude from those empirical pricing documents,

23  as the Court earlier observed in its initial decision,

24  is that prices went up.

25            THE COURT:  Well, I don't think I said

Page 295

1    in my initial decision in the portion dealing with

2    antitrust impact beginning at page 235 that without

3    Dr. Beyer's damages evidence antitrust impact could

4    not be established did I?

5                    MR. ST. ANTOINE:  I don't think Your

6    Honor did say that.

7                    THE COURT:  I don't think I did.

8                    MR. ST. ANTOINE:  I don't think Your

9    Honor did say that.

10                   THE COURT:  Did I say that without his

11   -- and I'm reading it again.  When I reread this

12   opinion in connection with the argument I didn't focus

13   on this point.  But I don't think I -- well did I say

14   that antitrust impact could be established by evidence

15   other than Dr. Beyer's evidence of damages?

16                   MR. ST. ANTOINE:  I would -- my reading

17   of Your Honor's earlier decision is that the Court

18   didn't make a holding on either one of those points,

19   and of course it didn't need to because the Court

20   accepted --

21                   THE COURT:  Beyer.

22                   MR. ST. ANTOINE:  -- Beyer.  Exactly.

23                   Then lastly the fourth element on -- is

24   defendant's documents, and.

25                   THE COURT:  What I say there is:

1                    "These documents would not suffice

2                    to prove impact on their own, but they

3                    lend support to a finding of

4                    predominance."

5                    MR. ST. ANTOINE:  Yes.  Exactly.

6                    And again to reiterate, if you're

7     asking the question that must be asked to decide the

8     separate element of antitrust impact you have to ask

9     the question where actual prices above but for prices?

10    And if you take away Dr. Beyer's model you can't

11    answer that question.

12                   So we make the argument that a finding

13    under a Daubert standard that renders his model

14    unreliable precludes the plaintiff's ability to meet

15    their burden of showing predominance under Rule

16    23(b)(3).

17                   And we cite some cases at the end of

18    our opening brief where courts have gone from the

19    conclusion that the expert's testimony is unreliable

20    to the ultimate conclusion that the elements of Rule

21    23 have not been satisfied.

22                   Thank you.

23                   THE COURT:  Thank you.

24                   MR. COE:  Your Honor, can I respond to

25    two or three comments that Mr. Corrigan made going

1    back to the cost and RhoGAM benchmark?

2                    THE COURT:  Yes.

3                    MR. COE:  The first point I wanted to

4    make was the timing of Ms. Kleinbard's testimony.  And

5    plaintiffs are correct that Ms. Kleinbard came -- was

6    in the RhoGAM business from 2001 to 2003 and then came

7    back --

8                    THE COURT:  And then back in --

9                    MR. COE:  -- in 2005 and 2008.  But

10   what's important here is in the line of questioning

11   that plaintiffs point to, and also that Dr. Beyer

12   points to in his report as support for his opinion

13   that Talecris was not an active competitor, is this

14   line of questioning that they cite on page 33 of their

15   slides where she says she's just talking about 2001 to

16   2003.

17                   Later in the deposition, like any good

18   lawyer, Mr. Corrigan continued to the later time

19   period when she came back, and that was one of the

20   clips that we played, Your Honor, when she said that

21   in 2005 after the entry of Rhophylac there were three

22   competitors and that Talecris continued to compete on

23   price.  And that's the time period that's important,

24   Your Honor, that's the one where Dr. Beyer uses this

25   benchmark.

1               And Joshu, if you could pull up

2    slide 51.

3               Mr. Corrigan criticized me for

4    selectively highlighting from paragraph 72, which is

5    of course true, but now I want to read that whole --

6    this whole entire first two sentences.

7               MR. CORRIGAN:  I was shocked, Your

8    Honor.

9         (Laughter)

10              MR. COE:  "Since their entry into this

11   market in 2004 CSL and Talecris have competed

12   aggressively against one another as the only two ..."

13   -- this is in parens -- "(relatively low price

14   suppliers of Rho-D)."

15              It goes on to say:

16                   "The only other Rho-D supplier,

17                   Ortho Clinical Diagnostics, has stayed

18                   out of the fray maintaining its

19   position

20                   as a premium higher priced supplier."

21              So Ortho doesn't compete on price, it

22   competes by being a premium brand.

23              And if we go back to Kleinbard

24   Exhibit 10, which we looked at earlier, and go to page

25   3 of that document, under key objectives, what was

Page 299

1    Ortho's objective in 2008?  It was protect volume,

2    price, and growth profit by maintaining U.S.

3    leadership position, 70 percent market share, continue

4    to build the equity of the brand in current markets,

5    seek new market opportunities.  It's key strategy was

6    increase professional and patient brand awareness and

7    loyalty.

8              THE COURT:  So you're saying they were

9    an active competitor?

10             MR. COE:  First of all, Your Honor,

11   they had a 70 percent market share, so I think it's

12   pretty absurd to suggest they weren't a competitor in

13   this market.

14             But second this is J&J, this is their

15   strategy, they compete as the brand.  You can buy --

16   they make bandaids, for example, and Johnson & Johnson

17   Bandaids cost more than your CVS bandaids, because

18   Johnson & Johnson has a brand name that's important to

19   them.  Same thing with RhoGAM product.

20             Now I'll very quickly go back to this

21   article, Your Honor, and you know we referenced this

22   earlier but I think what's interesting here is that --

23   is Mr. Corrigan and I trying to interpret this

24   article, because Dr. Beyer didn't cite this article or

25   rely on this article, so We've made this point before,

1    but

2    Mr. Corrigan is a very good lawyer, but he's not

3    plaintiff's economic expert.

4              So we owe you a case on this point, but

5    we don't think Mr. Corrigan can build this case for

6    you.

7              but very quickly my reading of this

8    article is that the theory of this cost mark-up method

9    is that in the long run, in a competitive market, cost

10   determine price.  So if you have a competitive market

11   you look at cost to determine what price will be in

12   the future.  But as Your Honor read, if you're using

13   the method you have to keep in mind that if the but

14   for world has imperfect competition that non-collusive

15   price may be well above cost.  So --

16             THE COURT:  And what it doesn't say and

17   this method of proving the issue may not be used.

18             MR. COE:  It doesn't, Your Honor, but

19   we would argue it doesn't fit because it only fits in

20   a competitive market.

21             Last point, Your Honor, and I know I'm

22   really trying my luck here, but I want to go back to

23   Dr. Bronstein's testimony on cost.  Page 244 to 245.

24             THE COURT:  Yes, I have that.

25             MR. COE:  245 is where you were looking

Page 301

1    at.  Just to put it in context starting on page 244
2    this line of questioning was about Dr. Beyer's failure
3    to use regression analysis.  Mr. Corrigan says:
4                        "In your deposition back in March
5                    we discussed a little bit about
6                    regression and I asked if you could do
7                    regress and you said you thought it
8                    would not be easy."
9                    And this is -- that was starting at
10   line 16, Your Honor, and Dr. Bronstein agrees it would
11   be difficult.  And Mr. Corrigan says, "And that's
12   because regression depends on reliable data does it
13   not?"  Et cetera, et cetera.
14                    So the context of this quote you read
15   before is in this discussion of whether it's
16   appropriate to use or whether Dr. Beyer could have
17   used an regression analysis, he wasn't addressing the
18   question of whether it was important for Dr. Beyer to
19   ignore cost in the first half of the class period.
20                    On page 245 Mr. Corrigan -- at line 2
21   Mr. Corrigan asks:
22                        "What's the basis of Dr. Beyer's
23                    conclusion that he wasn't going to rely
24                    on Ortho cost data?"
25                    And this is the key sentence that you

Page 302

1    read, Your Honor.  It says:

2                        "There was information provided

3                    from Ortho that they recharacterize

4    cost

5                    from time to time and as a result the

6                    cost data that you had requested

7                    wouldn't be comparable from year to

8                    year."

9                    And we would again say the only

10   information in the record that any of Ortho's cost

11   data was unreliable was limited to standard cost, and

12   it -- the explanation of why it was unreliable matched

13   up almost exactly with Dr. Bronstein's testimony.

14                   THE COURT:  No the only answer to that

15   is in the testimony on page 244, I don't know that

16   we've read it before, after saying that -- I asked you

17   -- this is your question, Mr. Coe.

18                        "Q    I asked you if you could do

19                    a regression and you said you thought

20   it

21                    would be easy.  Is that fair to say?

22                        A    I said it would be --

23                        Q    It would not be easy; is

24   that

25                    fair to say?

Page 303

1                        A      I said it would be

2    difficult,

3                   yes.

4                        Q      And a regression depending

5    on

6                   reliable data does it not?

7                        A      Yes, of course."

8                   And then this raised, "As does any

9    benchmark that you're using."

10                  And then that -- you pointed out to

11   something -- some part of the evidence -- the

12   testimony that would suggest that he was answering

13   with respect to a regression model but for the fact

14   that he says yes without reliable data it would no be

15   easy to do regression.  But then he says that's true.

16   And I'll read it again.  "And of course -- yes, of

17   course, as does any benchmark that you are using."

18                  This is something I'm going to have to

19   think about.  I'm not ruling on it.

20                  MR. COE:  Thank you, Your Honor.

21                  THE COURT:  Good job in trying to

22   rehabilitate Dr. Bronstein years after his deposition

23   was taken.

24                  It's been a long several days.  We've

25   got some things that are owed.  A list of the

Page 304

1   documents.  We have a copy of the letter on costs.  I

2   think there was something else.

3       (Pause)

4               THE COURT:  We've done some research on

5   the cost to mark-up issue and have found no other

6   cases on cost mark up.  What we're talking about this

7   article that -- entitled, "Quantification of damages."

8               Two things.  Are there any other

9   articles or have you found any cases using the cost

10  mark-up method?

11              Now was there anything else that I

12  asked you during the course of these two days to --

13              MR. ST. ANTOINE:  Your Honor, you asked

14  for a case from us.

15              THE COURT:  Oh, yes.

16              MR. ST. ANTOINE:  On the benchmark.

17              THE COURT:  That was --

18              MR. ST. ANTOINE:  I have not forgotten.

19  I don't recall anything else, Your Honor.

20              THE COURT:  Okay.  And you'll get it to

21  me by tomorrow?

22              MR. ST. ANTOINE:  Yes, Your Honor.

23              THE COURT:  Good.  Well, I'm not

24  leaving you much time, it's almost tomorrow.

25              I've thoroughly enjoyed these two days.

1    Some people might think I'm nuts for thoroughly

2    enjoying these two days, but I have.  It's what I

3    thought of when I got the call from the president in –

4    – well many years ago asking me if I wanted to accept

5    the nomination, and I think it's the stuff that makes

6    this job very, very interesting.  It was very well

7    presented.

8                    First of all I started the proceeding

9    by telling you I didn't like the way you organized the

10   arguments in your briefs, and I came up with an

11   argument analysis or order of my own.  You quickly

12   adapted, and I think your presentation was thorough

13   and very depth, and I enjoyed every minute of it.

14                   I'm going to take the case under

15   advisement.  I'm going decide it very quickly,

16   hopefully.

17                   And I'm going to ask this question, is

18   there anything else that we need to address with the

19   case in this posture?  You've finished discovery.

20                   MR. CORRIGAN:  I don't think so, Your

21   Honor.  I'm not aware of anything.

22                   THE COURT:  I've got to rule on this

23   and then schedule further proceedings.

24                   MR. ST. ANTOINE:  Yeah, I agree with

25   Mr. Corrigan.

 1                    THE COURT:  Have there been any

 2      settlement discussions along the way?  I know the case

 3      was at rest after you argued it in the Court of

 4      Appeals, but did anyone suggest any settlement

 5      discussions?

 6                    MR. CORRIGAN:  I'm going let Paul

 7      handle that one, Your Honor.

 8                    MR. ST. ANTOINE:  There have not been

 9      since the case has been up on appeal.

10                    THE COURT:  Well now that the case is

11      back and before me again and you've heard -- we've had

12      two days of oral argument and you've heard my

13      questions -- and my questions were designed to just

14      feel the weaknesses and the strengths in your

15      respective positions, they shouldn't give you any

16      comfort you can't really determine much from the way

17      I've questioned you, and you shouldn't.

18                    Having said that is there anything

19      about the proceeding that have -- we've just ended

20      that tells you you might want to consider settling?

21      And would it be appropriate to ask that you discuss

22      this or to direct that you direct this and submit a

23      joint report telling me yes or no on settlement?  And

24      if no whether you think -- and I think this would

25      require a private

1   -- this is the type of case that would require some

2   form of alternative dispute resolution other than our

3   court annexed dispute resolution.  I don't think --

4   certainly not our mediation program.  We have a court

5   annexed mediation program.  I don't think it suits --

6   it's suitable for MDM category cases.  But there's

7   also other ADR.  Court annexed conferences with a

8   magistrate judge, and maybe this is too much to ask of

9   a magistrate judge, and then there's private ADR.

10              MR. ST. ANTOINE:  Your Honor, this is

11  one of those issues where I don't like to get out in

12  front of my client.

13              THE COURT:  You don't want to get out

14  ahead.  So supposing I issue an order directing that

15  you -- I'll frame the order -- any interest in

16  discussing settlement before I rule on the remand

17  issues or after I rule on the remand issues.  That way

18  -- that's the advantage of an order like that, it

19  forces you to address issues.  And you can say no, no

20  issue and no interest or yes.  I think I'll do that.

21              Let's discuss timing.  I'll get it out

22  right away and I'll talk about discussing settlement

23  before I rule or after I rule.  And you can -- I want

24  a joint report.  I'll frame the question.  But the

25  reason for the order is to avoid putting you in the

Page 308

1    position in which I have put you.

2                    MR. ST. ANTOINE:  I noticed that, Your

3    Honor.

4                    THE COURT:  Having you get out in front

5    of your client or having you make a statement about

6    settlement, which may or may not influence the way the

7    other side -- the way Mr. Corrigan thinks of the

8    defense position, so I won't do that.  I'll issue the

9    order.

10                   MR. ST. ANTOINE:  Thank you, Your

11   Honor.

12                   THE COURT:  Now is there anything else

13   we have to do?

14                   MR. ST. ANTOINE:  I don't believe so.

15                   MR. CORRIGAN:  I don't believe so, Your

16   Honor.

17                   THE COURT:  It's quarter of 7:00.

18   We're adjourned.  Thank you all very much.

19                   THE BAILIFF:  All rise.

20        (Proceedings concluded at 6:46 p.m.)

21                    *  *  *  *  *  *

22

23

24

25

1
                              CERTIFICATION
2

3              I, Sheila G. Orms, certify that the

4       foregoing is a correct transcript from the official

5       electronic sound recording of the proceedings in the

6       above-entitled matter.

7
        Dated:  July 26, 2015
8

9

10

11       Signature of Approved Transcriber

12

13

14
        AAERT Certified Electronic Transcriber CET**D-408
15

16

17

18

19

20

21

22

23

24

25

**A**

**AABB** 63:14,17
64:4,5 65:7 67:9
67:21 116:20
117:14
**AAERT** 309:14
**abandoned** 62:1,7
**Abdula** 267:4
**ability** 216:1
288:22 289:2
296:14
**able** 47:25 48:25
203:13 288:16
**ABO** 224:4,7
**above-entitled**
309:6
**absence** 82:8 222:5
289:8 290:17,21
290:25 291:21
**absent** 173:12,13
**absolutely** 24:12
61:7 91:19 95:25
105:17 106:9
174:6
**absurd** 299:12
**accept** 79:22 89:22
91:18 97:25
112:19 113:7
271:20 305:4
**acceptable** 118:7
170:1 171:22
**accepted** 169:18
202:5 218:23
219:19 223:1
238:4 266:3,4
274:4 295:20
**accepting** 91:21
217:4
**accepts** 118:5
120:21
**accorded** 269:21
**account** 31:21,25
38:25 41:7,18
44:21 49:18 60:14
89:14 91:19
140:22 141:21

143:9,9,11 167:15
167:18 169:5,8,19
181:9,15 188:25
195:7,11 197:12
207:2 209:8,14
210:2 212:1,20
214:10 222:13,17
223:15 231:3,11
232:17 236:12
245:21 246:13,17
250:10 275:3,19
**accounted** 33:24
137:23 161:23
164:5 180:3
196:25 200:25
203:12 211:6
213:22 221:6
242:22 246:12
**accounting** 212:18
220:22 221:1,8
250:13
**accounts** 60:21,22
110:24,25 141:22
157:19 215:7,9,11
**accuracy** 218:8
**accurate** 82:5 85:7
86:17,19 88:7
129:8 213:13
**accused** 226:19
**acknowledged**
16:14 88:12
**acknowledgement**
99:10
**acknowledges** 99:4
99:6 157:19 289:6
**acknowledging**
99:14 104:22
105:21 291:2
**acquired** 238:2
239:16 240:6
**acquiring** 241:15
**acquisition** 53:11
**acted** 83:7
**acting** 124:24
**action** 69:22 80:2,4
115:7
**actionable** 89:19

95:3
**actions** 80:11
**active** 297:13 299:9
**actively** 152:10
235:5 238:22
**activities** 55:4 73:5
113:10
**activity** 54:21
73:10 85:2 200:14
200:19 203:1,3,7
204:7 222:8
**acts** 285:4
**actual** 25:6 26:20
27:5,6 29:18,19
29:23 31:20 34:3
34:20 35:22,24
38:4,13,19,24
41:6,10,14 42:1,4
42:6,13,16,17,18
44:13,19 45:7,21
46:7,20 47:24
48:10,19 49:13,19
52:13 60:18 74:9
74:16 85:8,10,18
86:14 87:8 88:8,9
88:14 110:8
126:19 138:2
159:23 172:23
173:3 177:1,2,6
177:12,13,17
178:18 179:2
183:9 186:7 188:3
188:10,18,23
189:20 190:23
192:2,15 193:5,25
208:21 218:18
229:14 251:8
275:2,14,16,20
283:24 288:14,17
288:21 289:1
292:1 294:21
296:9
**adapted** 305:12
**add** 3:2 4:19
203:22 284:20
292:19
**added** 58:6 146:18

163:18 203:24
211:11
**adding** 36:17 42:18
188:2,4
**addition** 203:25
284:4
**additional** 197:6
200:18 226:10
233:12 234:20
281:2,4
**address** 4:17 5:14
8:17,23 9:4,8
10:23 25:1 30:12
34:24 42:7 44:21
49:24 73:4 76:22
101:1 124:1 131:7
184:25 217:22,24
218:5 262:10
278:18 281:1
293:3 305:18
307:19
**addressed** 3:5 8:13
76:12,13 77:8
83:17 108:24
124:1 128:10
129:25 137:15,15
142:2 159:14
**addresses** 10:20
29:18 142:8
231:13
**addressing** 52:6
101:13 128:8
162:1 206:22
301:17
**adds** 129:24
**adequate** 227:9
237:20
**adequately** 22:16
246:17
**adjourned** 308:18
**adjustments**
130:24
**administer** 235:11
**administered**
235:13
**admissible** 82:21
227:21 270:16,17

**admit** 44:1 51:2
164:25 218:2
276:22
**admits** 95:4 164:2
244:13 245:3
**admitted** 228:5
**admitting** 246:7
**adopted** 92:3 111:1
124:20 127:4
128:19 143:8
**adopting** 118:20
**adoption** 99:23
105:13
**adopts** 119:6
120:21
**ADR** 307:7,9
**advantage** 13:14
307:18
**Advent** 185:12
**advisement** 305:15
**advocated** 291:22
**affect** 86:4
**affidavit** 233:21
241:4 256:23,24
258:6
**afraid** 106:17 156:1
**afternoon** 88:25
89:2 107:19
159:12
**agencies** 236:6
**agent** 157:23
**aggressive** 62:4,8
62:11 152:23
259:14
**aggressively** 242:7
259:16,25 298:12
**ago** 25:16 30:4,5
67:13 78:24
268:15 286:9
305:4
**agree** 174:16,17
175:5 222:6 230:7
272:13,14 305:24
**agreed** 28:25 91:6
162:17
**agreement** 252:25
285:24

**agrees** 23:9 119:16
140:8 212:19
253:4,7 301:10
**ahead** 13:7 15:19
115:14 167:6
201:12 263:5
269:5 276:3
290:15 307:14
**air** 266:22
**aircraft** 266:14,16
**albeit** 96:16
**allegation** 96:7
97:1,6
**allegations** 54:4,7
92:6 96:5
**allege** 88:6
**alleged** 53:12,15
73:4 88:3 90:23
91:12 92:11 94:25
104:24 153:8,8
198:20 200:18
291:21
**alleges** 242:6
**alleging** 91:4 105:5
**ALLISON** 1:17
**allow** 24:5 141:20
170:7 232:7
294:20
**allowed** 51:24
140:16 246:25
**allowing** 215:22
**allows** 60:20
**alternative** 307:2
**amended** 55:12,20
55:23 56:1 97:2
98:9
**amending** 56:1,6
**amendments**
292:12
**amicus** 271:20
**amount** 54:14
172:9,21 195:24
200:18 228:3
278:25
**analogizing** 199:11
**analogous** 82:12
199:13

**analysis** 13:5 15:1
18:21 19:20 20:23
21:25 27:6 31:22
83:14,19 102:24
103:1 112:18
125:22 126:1,12
126:14 127:16,19
129:8 153:20
154:17 176:17,20
202:14 211:9
212:13 224:23
231:15,17 232:4
235:22 236:1,2
249:7 255:6
260:13 281:19
285:6,8 287:5
294:11,14,15
301:3,17 305:11
**analyze** 18:14,23
18:24 19:5,5
20:25 244:14
245:13 253:23
254:11,16
**analyzed** 18:11,20
18:24 19:2 20:22
38:20
**animation** 217:14
**annexed** 307:3,5,7
**announced** 51:1
241:15
**announcement**
116:20 117:2
**announcing** 63:7
64:25 67:10
**annual** 58:6 59:11
60:4 80:14
**answer** 23:14,21,23
23:25 27:18 28:24
29:6 33:1 40:19
46:5 49:12 50:11
69:15 72:5 92:13
100:14 109:8
118:24 119:1
171:17,17 204:11
208:10 245:24
285:2 296:11
302:14

**answering** 303:12
**answers** 22:24
**anticipate** 158:12
289:8
**anticompetitive**
154:25 202:7
**antitrust** 1:5 2:7
74:25 199:12
201:20 202:6
230:12 236:6
247:5 281:7 288:8
288:11 291:14
292:13,14 293:1
295:2,3,14 296:8
**anti-A** 159:23,24
224:21
**anti-trust** 90:20
102:2 108:4,11
113:21 136:6
146:4
**Antoine** 1:12 2:15
3:16,18,20 4:16
4:19 5:10 8:21
9:23 10:1 23:25
24:2,9 29:9 53:4
74:23 88:24,25
89:3,3 90:6,9
91:17 92:18,25
93:7 94:13,21,24
95:8,24 96:8 97:5
97:9,22 98:3,12
99:3,13,20 100:3
100:7,11 101:4,14
101:24 102:13,25
103:8,16 104:6,10
104:16,21 105:6
105:16 106:6,10
106:14,22 107:5
107:10,13,21,22
107:25 109:2,9,12
109:25 110:4,19
111:9,12 112:8,16
112:24 113:3,6,13
113:20,24 114:1,5
114:15,25 115:3
115:15,17,19
116:10,16 117:20

118:1,10,22 119:1
119:5,12,20,23
120:3,5,10,16
121:1,20 122:4
123:7,10,20 124:2
125:14 126:4,10
126:16,22 127:6
127:14,23 128:2,5
128:12,15,25
130:13,20 131:11
132:4,6 133:8,12
153:23 158:3
247:2,8 252:2
261:12,16 263:9
281:5,9 282:17
287:21,22 288:7
288:12,25 289:14
289:18,23,25
290:4,9,14,16
291:11 293:11,17
295:5,8,16,22
296:5 304:13,16
304:18,22 305:24
306:8 307:10
308:2,10,14
**Antoine's** 37:9
**anyone's** 28:17
**anyway** 9:6
**apart** 74:24
**Apologize** 248:13
**apparently** 3:8
116:12 225:2
235:17
**appeal** 306:9
**Appeals** 51:12
306:4
**appear** 78:8 144:21
225:1 234:17
**APPEARANCES**
1:9
**appeared** 250:5
**appearing** 132:11
**appears** 6:13,15
7:22 11:15 39:16
85:11 126:3 176:2
187:9 252:5,23
**apples** 19:7,8,10

20:3 40:13 138:20
138:20
**apples-to-apples**
17:9,20
**applicable** 262:24
263:15
**applied** 53:16
128:21 227:22
228:11 236:9
266:22 267:5
**applies** 118:6
263:11
**apply** 33:17 134:16
184:14 217:7
219:23 220:15
221:11 228:7,24
236:3,6,15 237:21
263:10 270:14
**applying** 214:21
**appreciate** 156:12
**approach** 35:15
160:5 223:24
264:19
**appropriate** 41:7
77:3 93:17 98:7
98:24 99:8 115:4
118:14,16,18
119:8,16,17
120:24 121:12
124:14 134:21
139:4,5 140:1,3
183:13 228:2,13
231:1 250:25
301:16 306:21
**approval** 147:6
239:19
**approved** 147:7
309:11
**approximately**
166:1 293:14
**April** 26:18 91:12
96:20 238:20
271:11
**area** 123:25 269:14
**arena** 75:3 282:1
**arguably** 214:12
274:19

**argue** 34:22 39:15
39:18 48:12 55:19
106:25 108:3
134:20 155:25
160:19 183:23
188:24 195:10
218:20 219:3,6
222:25 226:22
229:21 232:23
236:19 237:18
300:19
**argued** 6:3 8:9
39:22 76:16 87:24
93:6 107:3 130:9
130:10,10 195:5
196:22 219:2
222:14 229:19,22
248:25 306:3
**argues** 33:6 56:9
131:18,22,25
136:5 188:24
269:11
**arguing** 32:13
41:21 105:14,15
118:9 192:13
206:13,16 229:1
**argument** 2:8
18:11 24:7 25:3
29:10 33:16 37:18
39:20 41:4,5
45:11 48:7 51:8
56:8 77:11,11
87:21 108:21
123:5 129:23
132:17,18,19
133:3 134:9
137:25,25 175:17
177:24 212:1
214:15 219:8
227:3,5 229:16
253:9,15 261:7
278:25 283:22
284:14 287:23
292:17 295:12
296:12 305:11
306:12
**arguments** 1:7

43:23 52:24 76:15
76:15 77:10 89:10
106:16 180:9
305:10
**arithmetic** 211:15
**arrive** 44:10 83:7
**artful** 29:6
**article** 141:23,25
142:1,3 143:10
219:8,13,16,17,22
220:16 221:12
222:6 223:13,15
229:24 230:5,7,11
230:12 242:19
250:3,15,17
262:10,12 264:24
265:24 280:18
299:21,24,24,25
300:8 304:7
**articles** 142:1 304:9
**articulate** 106:18
132:10
**articulated** 118:19
119:18 122:12
**ascertain** 218:8
**aside** 105:6 166:2
246:2
**asked** 3:12 26:19
26:21,25 29:14,19
29:21,24 38:13
39:14 45:20,21
64:16,21 66:8,25
68:11 69:20,24
70:4,6 84:12 93:8
95:1 103:16
108:15 116:18
117:10 118:23
138:6 156:16
163:22 167:16
172:17 186:2
189:9,19,23 192:4
194:10,11 197:24
205:14 209:6
210:19 211:18
212:4 228:10
251:21 252:19
253:2 256:18

276:17 289:9
296:7 301:6
302:16,18 304:12
304:13
**asking** 89:11
157:22 296:7
305:4
**asks** 301:21
**aspect** 24:7
**aspersion** 159:16
161:23 166:9
169:19 172:9
177:12,13
**asserted** 201:20
**assertion** 269:16
**asserts** 269:8
**assessment** 227:9
237:19 240:18
**assisting** 124:24
**associated** 17:24
251:9
**association** 106:2
116:23
**assume** 91:2 97:15
101:4,7,10 169:24
172:20 210:7
**assumes** 264:23
**assumptions** 27:2
210:5,7
**assurance** 67:22
**assurances** 200:6
**atmosphere** 127:2
127:5
**attachment** 189:12
191:25
**attack** 75:14,16
**attempted** 283:10
**attempts** 291:19
**attend** 289:24
**attended** 116:23
**attention** 220:24
**attenuated** 283:24
**attorneys** 72:6,10
**August** 186:12
**authoritative**
216:17
**authority** 59:21

**authors** 222:6
**Auto** 81:6 82:10,11
82:12,19 83:2
**automated** 162:18
163:19 172:14
224:15,16 236:12
**automation** 165:6,7
231:2,19 278:16
**available** 225:22
231:2,19 278:16
**average** 159:22,23
160:16 177:4,5,5
177:6 205:10
221:23 233:24
234:7 265:22
277:14,18,21
278:10,11
**averages** 177:11
**averaging** 83:23
133:14,14 134:11
134:16 143:20
156:3,13 159:5
170:17 171:14
177:16
**aviation** 266:25
**AVIVA** 1:16
**avoid** 307:25
**Avonguard** 271:7,9
271:25
**awarding** 197:13
**aware** 22:15 51:18
51:20,21 70:1
95:21 160:23
161:7 217:9
305:21
**awareness** 299:6
**a.m** 1:5

————————————
**B**
————————————
**B** 224:9
**back** 3:10 8:10,18
12:22 16:9 20:18
28:7 32:24 34:10
34:15 37:9 38:16
39:24 41:12 42:21
44:3 53:25 54:22
57:13 64:19 69:1
70:10 80:23 98:18

107:6,9 108:1
122:9 123:21
143:19 156:1
161:4 166:16
170:20,20 171:22
174:18,21 176:10
177:22 178:2,9
188:13,15 189:11
191:8 192:17,22
194:7 195:6
207:11 213:7
215:12 216:19
218:17,22 223:20
226:16 229:7
233:24 241:7
242:19 243:6
245:18,19,19
247:15 254:19
257:20 267:14
292:5 297:1,7,8
297:19 298:23
299:20 300:22
301:4 306:11
**backfired** 5:15
**background** 235:7
272:7
**backing** 142:3
**backwards** 232:19
**back-up** 14:3
**bag** 219:3
**BAILIFF** 174:8
248:1 308:19
**balloon** 110:25
**bandaids** 299:16
299:17,17
**bank** 35:6 36:12
58:2,11 99:7
103:3 105:25
106:4 108:8
109:14,22 112:13
113:8 114:12
115:10 116:8
184:7,15,18
187:12,15
**bare** 150:10,13
**barely** 86:7 247:13
**bargaining** 234:6

**barrier** 147:6
**barriers** 293:25
**base** 35:21 86:4
163:16 269:18
270:1
**based** 6:3 7:17
18:21 21:25 27:6
32:1 59:14 62:8
62:11,15 82:22
83:18 96:23 99:23
100:15,22 107:2
108:16 119:13
122:16 125:24
128:14 131:9
143:13 145:7
147:10,10 155:12
158:24 161:10
163:13 176:22
177:4 228:19,22
251:21 271:24
272:4 284:22
292:10,13
**bases** 59:13 151:25
**basic** 142:14
149:25
**basically** 173:23
180:18,18 204:1
216:20 259:17,24
263:10 265:24
283:8
**basis** 6:17 27:15
91:13 98:21 99:21
101:19 108:10
125:4 131:25
132:1 151:24
161:13 162:1
207:20 220:11
224:23 236:18
267:1 291:24
292:16 301:22
**Bates** 10:22 59:24
187:3
**Bayer** 149:14
150:17 151:9,12
151:19 152:5,5,13
238:1,18,22
239:16 240:7

257:6 258:17
259:16,25
**BayRho** 239:12
**BayRho-D** 150:10
150:13,14,21
237:11 239:15
240:7 241:16
**BB** 184:5
**BBL** 68:18
**BBLP** 33:22 55:5
56:15,17,18 57:1
57:6,21 59:6,7
60:1,2 61:6,8 62:4
63:2,5,22 67:21
67:24 68:5,21
69:14 77:12 78:23
79:4,23 80:3,6,9
80:14 82:14 98:2
105:20 123:17
128:10 131:15,19
131:20 132:21
283:16
**BBPL** 123:24
132:25 133:2
**bears** 146:5 248:22
**beat** 30:6 131:8
**beaten** 49:25 74:7
**beating** 131:13
**Bechtel** 132:13
**becoming** 279:6
**began** 53:12,16
55:14 67:20 84:25
85:13 91:2 92:7
94:17 95:3,14
97:13 98:20
103:23 105:4,5
106:2
**beginning** 9:6
50:13,14 67:11
84:7 85:19 90:15
95:18 104:18
105:8 216:4 224:1
225:13 226:4
238:17 242:25
295:2
**begins** 101:6
146:12 160:10

**behalf** 89:4
**behavior** 63:8
95:13 111:15
112:3 114:8 115:8
153:3 230:20
264:7
**Behrend** 158:21,22
197:8,19 201:21
249:2
**Behrend's** 167:25
**belabor** 81:4
183:24
**believe** 4:23 25:8
29:18 30:19 35:4
39:23 40:8,20
70:16,22 71:13,17
76:8 83:22 84:2
106:16 133:12
134:18 145:21
150:13 153:25
154:9 156:24
165:7,12 166:15
166:17 176:20,22
179:17 180:21
181:8 186:17
187:13 188:14
194:25 226:25
242:13 266:14
269:2 280:7
308:14,15
**believes** 95:2 111:5
**belt** 292:7
**bench** 76:24
**benchmark** 22:11
33:24,25 45:3,4
48:13 52:9 54:21
55:5,6,6 60:20
61:7 63:3 68:5,6
68:22 69:15 72:17
74:5 76:8,10,23
76:25,25 77:25
84:1 89:7,8,13,14
92:9,10 94:14
95:20 96:3,14,24
97:20 98:22,23,25
99:8,15,22,23
100:13 103:4,10

104:4,20 106:5
108:7,21,23
111:19,20 115:5
116:7 117:9,21,24
118:4,5,7,14,16
118:18,20,21
119:7,8,9,11,16
119:17 120:18,22
120:23,24,25
121:12 122:20,21
123:22 125:4
127:4 128:19
129:12 130:7,21
131:1 133:22
139:2,4,6,12,15
139:25 140:16
143:13 177:23
178:7 180:4,7
189:1 194:22
195:5,9 201:2
203:17 206:4,21
211:7 214:16
220:18 226:22
237:17 245:21
255:4 297:1,25
303:9,17 304:16
**benchmarks** 22:16
22:17 99:22 140:4
140:9,11
**benefit** 51:16,23
73:23 115:23
136:23
**Benito** 185:15
**best** 60:6 77:23
120:6 219:3
232:24
**bet** 51:13
**better** 9:22 73:12
82:18 83:10,11
84:15 122:11
283:12 285:16
286:1
**Beyer** 2:19 5:24 7:2
7:3 10:20,23
12:23 16:7 18:11
18:14 19:2,23
20:17 21:21 22:15

23:8,9,17 26:24
28:11,14,25 30:15
31:21,24 32:19
33:24 37:10 38:20
38:24 39:20 41:6
41:17,22 44:4,19
49:6 52:16 54:3
54:12,16,19 55:2
59:13,20 68:3,4
69:14,18 70:18
72:16 73:3 75:6
77:24 78:3,15,25
79:2,11 84:21
86:18 87:23 88:12
89:12,15,17,21
90:2,19 91:13,25
94:14 95:2,14
97:11 98:13,21
99:4,13,22 100:16
103:1,10,15
105:19 107:1,1,4
108:5,10 109:13
110:6 111:3,5,13
111:23 112:2,6
113:7,17 115:3,17
115:22 116:13,14
117:6,8,17 122:7
123:12 124:17
125:18 129:7
133:21 135:19
136:24 137:17
138:18 146:23
147:15 149:23
155:13,20 157:1
157:12 160:23
161:7 162:1
163:22 164:1
168:11,24 169:5
169:11 173:16
176:19 178:5,9,24
179:21 180:2
181:14 186:6
188:24 190:3,25
192:9,10,16
193:15 195:1
197:10 200:21
206:20,25 207:2

208:8 209:4,14
210:17 211:2,4,6
211:10,20 212:15
212:18,19 213:22
214:9 215:17
217:1 219:22
220:2,16 221:5,11
222:14 223:15
226:7,12 228:12
229:3 230:1,5,10
232:16,22 234:23
235:17 236:10
237:16,21 239:9
241:22 242:3,22
244:23 245:2,13
246:13 247:4,16
253:23 254:11,22
255:9 257:3
258:12 269:24
270:23 272:1,1,16
272:20 273:18
274:20,24 276:8
276:20 278:4
285:11 287:1
289:6,12 290:16
290:24 291:10
295:21,22 297:11
297:24 299:24
301:16,18
**Beyers** 21:7 24:22
70:23 71:18
111:21 121:2
**Beyer's** 2:23 6:17
7:12 8:3,25 11:12
11:16 16:13,17,24
17:12,22 18:25
19:19 27:15 33:8
34:23 39:8,12
42:21 43:24 48:9
48:10 49:20 52:9
52:20 60:20 61:6
63:2 71:4 75:10
76:8 78:21 82:2
84:6 86:2 89:8
92:9 100:13 138:4
138:4 140:18
**Beyer's** 151:22

157:6 158:24
159:21 160:1
161:1 164:8 166:6
166:24 169:16,18
172:1,1,4 175:10
181:9 189:18
190:1 192:23
193:7 202:20
204:19 205:15
206:2 207:21
209:8 210:14
214:8 215:12
218:7,15 219:1,6
219:17 220:14
223:9 225:20
227:13 234:16
244:11 247:22
253:22 254:9
281:6 285:3,7,15
285:20 286:19
287:11 289:14,17
289:18 291:11
292:8 294:14
295:3,15 296:10
301:2,22
**beyond** 54:18 115:6
184:3 256:5
281:21
**big** 29:24 41:13
48:22 160:9
**bigger** 173:5
**Bill** 206:9
**binder** 185:5
**Bioclone** 159:24
**birthrate** 243:16
**births** 147:11
**bit** 5:16 32:24
53:25 55:7 58:7
61:16 68:8 140:10
145:11 148:12
160:11 166:9
194:15 204:17
273:13 285:16
286:13 301:5
**bizarre** 66:7
**black** 99:24
**blame** 156:18

**blew** 166:7
**blind** 290:19
**BLLP** 61:2
**block** 195:22,25
196:9,23 200:14
**blocks** 196:16
**blood** 1:5 2:6 35:6
36:12 58:2,11
91:23 99:7,24
103:3 105:25
106:4 108:8
109:14,22 112:13
113:8 114:12
115:9 116:8 145:1
147:10 154:1
184:7,15,18
187:12,15 206:6
224:4,8,9 227:10
227:25 229:5,20
232:15 237:17
242:21 243:4,13
243:18 244:1,4,8
245:1,6 246:5
251:11
**blow** 15:22 175:3
253:19
**blown** 162:23
**blown-up** 15:23
**blow-up** 24:19
**blue** 13:12 86:13
87:8 165:7,16
**blues** 165:18,20
**blurry** 284:10
**board** 266:25 267:9
267:19
**Bogosian** 281:19
283:7,9,10,11
284:3 285:7
286:24 292:3,6,10
292:16 293:6,14
**books** 5:6 9:22 46:6
247:12
**booth** 63:6 64:14
64:23 65:7
**bottom** 11:19,25
16:25 33:4 35:9
35:20 38:10 40:9

40:11 47:8 59:2
65:2 86:6 172:12
175:10 225:6
267:13
**bounced** 283:5
**box** 233:6
**boxes** 90:13,17
**brand** 240:7,8
257:12,25 258:2
298:22 299:4,6,15
299:18
**branding** 83:17
**break** 171:5 174:4
225:7
**brief** 7:12,23 12:7
25:4,10 26:1
31:12 49:23 50:3
69:12 72:25 75:21
76:16 120:2
122:23 128:17
141:24 149:22
170:2 185:11
186:17,18,19,20
217:23 218:3
219:17 220:4
235:24 241:2
247:11 296:18
**briefcase** 73:9
**briefing** 3:4 5:9 8:8
22:4 25:25
**briefly** 246:25
247:10 293:4
**briefs** 6:6 10:14
95:13 122:24,24
140:7 214:20
217:1 305:10
**bring** 117:4,5
**brink** 83:9
**Brody** 169:23,23
170:23,23 274:15
**Brody's** 169:21
**broken** 53:1 113:17
131:6
**Bronstein** 2:23 6:9
28:24 42:24 43:6
69:20 72:14,23
73:10,17 140:25

141:14 142:11
148:13,15 151:16
152:1,19 154:4,12
159:20 164:9
166:5 175:2
183:13 194:25
206:18,24 207:1
209:5,6 211:18,24
212:17 213:21
214:5,7 215:19
225:11 226:19
229:21 244:5
246:11 253:4,6
260:9,23,25
261:22 262:6
277:17 301:10
303:22
**Bronstein's** 22:21
27:10 28:19 43:9
46:14 50:5 69:19
72:19,24 73:1
84:11 142:8,15
143:15
**Bronstein's** 179:5
179:14 205:9
207:10 209:1,18
278:7 300:23
302:13
**Brothers** 185:8
**brought** 154:24
261:9 267:14
**bubble** 166:6
**bucket** 2:17 8:16
8:17 56:14 128:8
133:11,13
**buckets** 8:16
**Buffalo** 243:22
**build** 90:22 299:4
300:5
**building** 132:15
195:22,25 196:8
196:23
**bullet** 59:8 82:3
157:21 158:2
163:2,7 205:19
206:1 230:21,24
231:13 245:2

254:11 284:11
**bunch** 252:10
**burden** 39:7,8
97:14,14 101:16
146:5 296:15
**Burzik** 63:25,25
64:6,13 66:19,20
66:24
**Burzik's** 65:4
**business** 64:16 65:4
65:9 66:25 76:9
76:12,25 77:3
79:15 82:7,16,18
83:10 85:22 92:1
108:6 109:15
124:4,6,9,14,18
125:1,3,8,12,21
125:25 126:2
127:2,4 181:23
182:3 183:15,16
184:25 192:4
209:23 210:2,5
233:11 238:18,22
239:6 240:7 243:3
243:4,9 244:3,5
257:20 297:6
**businesses** 82:3
**businessmen** 82:24
**buttress** 43:19
**buy** 238:21 299:15
**buyers** 8:22
**buying** 163:15

_____

**C**

**C** 2:1
**caboose** 284:23
**calculate** 22:6
169:2,7,10 177:9
**calculated** 22:5
94:10 177:3
212:16
**calculating** 197:11
**calculation** 49:6
168:9 169:13
170:7 193:3
199:25 273:17
274:4

**calculations** 44:5,8
44:12 162:4
177:17,18 190:1
**caliber** 286:10
**California** 83:5
**call** 2:6 8:16 60:18
69:10 96:1 125:8
126:2 174:23
217:14 239:24
305:3
**called** 163:16 165:8
173:16 238:18
250:21 267:4
**calling** 150:12
280:12
**Cangiamilla** 65:14
68:25
**can't** 8:4 21:18
22:13 29:25 34:3
57:11 60:25 61:1
61:2 92:10 100:7
103:2 114:1
120:19 124:6
136:21,23 140:12
141:15
**capable** 102:2
118:3
**capacity** 152:21
154:8
**captured** 283:12
**caral** 197:14
**card** 64:16 65:4
66:25
**care** 173:6,7
**careful** 121:5
**carefully** 50:10
**carried** 156:8
**carries** 123:13
**cars** 283:18
**cartel** 73:4 100:18
101:2 109:5
111:14 142:14
196:23 197:7
200:14,19 202:22
203:1,3,7 204:7
222:8 290:17
**case** 1:3 2:6 4:8

35:21 40:9 45:9
49:14 50:13,22
59:15,18 60:25
69:12,21,25 70:20
71:10,12,14,16
72:1 74:20 80:20
80:22 81:5,5,6,7
81:11 82:1,10,11
82:11,12,19,25
83:8,12,13,15
89:16 90:1,25
91:9 94:14 96:19
97:12 98:13,13,20
100:20 101:25
107:1 108:14
119:21,25 120:2,6
122:23 124:12
125:16 131:3
141:17 142:22
144:9,23,23
145:19,20,22
154:23 155:5
158:4,7,7 167:20
168:10 169:22
170:1,3,6,9 171:1
171:2 173:9,9
176:10,12,20
182:1 184:23
185:9,13 198:21
198:23 214:22,23
217:3,4 218:9,10
222:21 226:14
227:24 228:4,14
228:15,25 229:3,7
236:9,12,18
248:25 249:1
264:1 266:5,6,12
266:12,14,16,23
267:4,23 268:22
269:1,3,10 270:11
270:14,15,18,24
271:7,9,12,23,24
272:21 273:18,23
281:5,22,24 282:4
282:19,20,20,23
283:12,18,25
286:16 289:3

300:4,5 304:14
305:14,19 306:2,9
306:10 307:1
**cases** 76:11 77:1
89:17,21,21 94:16
97:12 108:19,20
120:1,20 123:4
169:20,21 184:24
184:24 185:10,12
214:20 240:15
274:2,15,16
283:22 296:17
304:6,9 307:6
**castle** 270:21,22
**casts** 292:9
**categories** 226:9
**category** 52:24
120:15 307:6
**Catherine** 64:5,13
**Cathy** 63:25
**cause** 85:14
**caused** 200:18
202:4 206:15
**causes** 106:3 199:6
**CB** 10:22
**cell** 251:2
**center** 243:21
249:11
**center's** 202:10
**cert** 12:7 164:11
166:5 175:9 179:5
205:9 241:2
270:24 281:23
**certain** 76:14 116:4
**certainly** 4:6 8:23
59:21 91:2,5
130:9 155:6 160:7
198:6 204:21
216:17 229:21
238:23 248:25
249:21 252:1
253:1 269:25
270:4 274:16
283:4 307:4
**certification** 3:5
4:22 5:3,9 6:12
7:23 13:20 22:2

25:23 70:4 92:21
93:6 101:13
102:16 113:22
173:10 176:22
199:22 202:24
227:15,20 289:21
290:12 309:1
**certified** 173:15
309:14
**certify** 309:3
**CET** 309:14
**cetera** 301:13,13
**chairman** 267:19
**challenge** 39:9
45:19,25 193:22
214:8 281:25
**challenged** 218:11
241:19 242:12
**challenging** 181:8
**chance** 106:24
220:2
**CHANDA** 1:16
**change** 43:8 46:15
62:8,10,11 63:7
85:23 86:1,4 88:1
91:19 102:23,25
129:10,15 160:8
175:3,17 185:3
215:22 259:8,9
284:18 289:7
292:21 294:19
**changed** 12:19 84:8
91:16 93:2,11
96:25 129:20
131:4,14 163:17
183:12 211:9
225:17 226:9
233:3 234:13
239:17
**changes** 43:7 62:17
130:6 160:5
175:17 179:11,19
182:1 209:15
212:7,10,14 215:8
215:9,10 239:21
258:18 259:5
283:21

changing 37:15
  93:23 200:16
  240:8
channel 152:11
  235:6,16,17
channels 235:9
characterized
  153:9 207:25
  221:20 262:23
  263:7 265:19
charge 100:23
  142:24 143:5
  267:1,22 291:1
charged 85:3 115:4
  142:20 233:22
  277:19 278:12
  284:15 288:17
chart 21:7 86:22
  96:19 164:10
  172:1,3,4,10,12
  188:8 194:24
  204:20
charting 82:24
charts 166:7 175:2
  175:3
check 45:23 188:2
cherry 205:3
children 235:14
chocolate 83:13,15
choice 57:22 130:3
  131:20 132:22
choices 57:23
choo 283:13,15,15
  283:15,16,16
  285:5,5,10,10
chose 228:12
circles 165:25
circuit 68:2 81:7,11
  82:1,11 87:19
  88:19 144:18
  145:5,22 146:14
  173:8 185:9,13
  199:20,21 217:12
  227:14,25 248:21
  266:24 267:4
Circuit's 124:12,13
Circuit's 227:10

235:22
circumstance 91:11
circumstances
  99:20
citation 124:12
  185:9,14 236:9
  244:22
citations 75:5,7
  185:5
cite 59:16,18 120:2
  143:10 146:3,14
  167:24 168:4,18
  168:19 185:10,12
  207:6 218:8 219:8
  219:16,22 222:16
  226:13 227:24
  228:13 256:6
  266:11 271:7
  276:25 278:6
  285:14 296:17
  297:14 299:24
cited 25:8 50:6
  59:15 70:17,24
  71:22 81:8,9,10
  98:14 141:23
  144:24 145:21
  169:21 170:5
  184:23 214:19,24
  223:1 227:25
  235:19,22 255:12
  255:20 259:11
  273:22 281:13
  287:9 292:5,11
cites 72:25 82:10
  114:10 168:18
  216:10,12 230:1,5
  257:1,3 285:11
citing 43:18 71:18
  249:11 260:8
  274:7
claim 218:6 292:24
claims 169:6
  215:19
clarification 77:15
clarified 66:14
clarify 77:21 97:23
  105:17 258:22

class 3:5 4:22 5:2,9
  6:11 7:23 12:7
  13:19 22:2 25:23
  33:23,25 43:20,25
  44:1 45:4 48:11
  48:14 53:14 70:3
  90:3,20 92:21
  93:6,11 94:11
  101:13,20,23
  102:16 108:11
  113:22 160:3,11
  160:19,21 164:11
  166:4,5,5,8
  173:12,12,13,14
  177:7 178:6,11
  179:5,23 180:5,8
  180:12,13,14
  181:11,15 185:22
  186:11 188:22
  189:1,21 190:3,6
  190:14,18,21,24
  195:4 199:22
  202:24 204:19
  205:6,9,11,16,17
  206:4 207:3
  210:22 212:3
  213:23 214:14
  215:3,5 216:4
  224:1 225:13
  226:4 227:15
  229:17 235:1
  241:2 245:10
  247:6 270:24
  281:8,23 289:21
  290:12 301:19
classic 69:9
clean 177:24
clear 55:3 71:1
  121:15 208:20,22
  213:21,25 251:18
  285:22
clearest 294:12
clearly 8:7 72:21
  106:18 282:10
clerk 2:2 3:1 57:20
  57:24 75:25 76:3
  107:15,18 142:7

169:24 186:24
  207:12,14 269:1
clerks 268:25
clerk's 57:19
client 307:12 308:5
climate 281:22
Clinical 89:4
  298:17
clip 66:15 68:8,24
  77:23 78:3 95:1,3
  95:6 99:9,11
  104:22 106:8
  107:6 111:6,7,10
  114:16 115:12,15
  116:17,19 117:11
  117:12,13 148:13
  148:15 157:2,5
  161:1 166:16
  280:10
clips 103:20,25
  297:20
close 19:8 160:10
  180:23 255:19
closed 228:5
CNIS 2:20 13:10
  13:17,23 25:7
  40:8,12,16 52:5
Coe 1:13 11:5
  23:25 24:14,15
  25:11,19 26:2,5,7
  26:10,18,23 27:11
  27:22 28:3,12
  29:1,5,11,13 30:8
  30:22,25 31:5,8
  31:11 32:4,11,20
  32:23 33:5,9,14
  33:18 34:9,14,18
  35:4,11,14,17,23
  35:25 36:6,9,16
  36:22 37:2,4,8,13
  37:20,25 38:3,6,8
  38:15,23 39:3,6
  39:10,23 40:7,18
  40:20 41:5,11,17
  41:22 42:2,7,11
  42:20 43:2,5
  44:18 45:2,8,12

45:15 46:6,12,22
  47:2,6,9,13,21
  48:4,8,20,24 49:5
  49:14,18 52:4
  81:11 122:10
  138:8,12,16
  153:23 156:1,6,9
  159:11,12,16,18
  160:9 161:4,17
  162:5,10 164:1,20
  164:23 165:2,12
  165:15,19 166:21
  166:23 167:1,3,7
  167:22,24 168:3,6
  168:23 170:16,19
  170:25 171:4,11
  171:19 172:8
  174:3,11,17,21,25
  175:18 176:1,6,9
  177:19,21 178:15
  178:19,22 179:3,9
  179:15,17,21
  180:20 181:3,21
  182:9,11,18,21,24
  183:2,7,22 184:6
  184:10 185:4,7
  186:2,10,16,20
  187:2,6,17,20,24
  188:1,9,13,18
  189:8,11,19 190:2
  190:7,13,17,20
  191:3,7,12,18,24
  192:20 193:13,19
  194:1,5,7,19
  195:16 196:3,5,8
  196:11,18 197:17
  197:22,24 198:2,6
  198:14 199:3,6,10
  199:15,17 200:4
  200:24 201:16,24
  203:8,11,16
  204:10,13,23,25
  205:3,21,24 206:1
  206:23 207:5,18
  208:16,20,25
  209:3 210:10
  211:3,17 213:4,7

213:19 214:7,13
214:18 215:1,17
216:13,16 219:12
224:6,11,15,17,20
227:3 230:4
232:22 236:24
237:2 238:14
240:22 241:1,7,11
242:16 249:24
250:19 253:17,20
254:6,12 257:5,16
258:22 259:1,11
259:24 260:22
261:9,17 262:12
263:9 268:20,22
269:2 271:5
274:18 275:1,7,11
275:14,18 276:20
277:4 287:25
288:5 296:24
297:3,9 298:10
299:10 300:18,25
302:17 303:20
**Coe's** 248:22
258:16 287:24
**COGS** 40:14
182:20
**COHEN** 1:11
**collecting** 220:8
**collective** 264:7
**collectively** 5:13
**colloquy** 210:24
252:8
**colluding** 142:13
143:4 148:10
153:13 260:20
**collusion** 53:16
88:7 95:17,18,20
96:15,17,22 97:21
98:25 111:19,22
111:25 114:19,20
114:21,22 121:16
121:22 202:25
229:20,23 260:25
261:3,3,13,21,23
**collusive** 54:21
97:4 103:7 104:3

112:3,7 113:12
123:24
**colorful** 290:18
**colors** 165:21
**Columbia** 269:1
**column** 12:18
35:21 36:13
187:12,16 195:14
217:25 218:3
240:6
**combinations**
157:23
**Comcast** 54:18
197:8,19 199:2
201:10,21 222:16
249:2
**come** 30:10 50:22
64:22 91:1 104:4
104:10,11,14
115:5 140:13
157:7 167:17
171:6 184:1,17
204:13 213:17
218:22 245:18
247:14 276:10,13
**comes** 20:2 69:17
93:24 98:17 136:8
136:12 162:8
228:18 245:19
**comfort** 306:16
**comfortable** 74:4
74:17 212:12
**coming** 13:12
252:11 253:25
**comity** 222:17
**comment** 34:23
97:8 154:22
155:12 220:6
223:17 227:19
271:1
**comments** 108:13
227:11 296:25
**Commission** 12:24
43:16
**commit** 163:14
**commodities** 147:8
**common** 75:12

101:17 118:3
247:6 249:9 273:4
281:7,13 282:10
283:2 284:18
285:1,5 286:10,20
286:24 287:14,15
288:24,25 289:2
291:6,17 293:12
**commonality**
198:19
**communication**
110:10
**communications**
62:18,20 80:5
160:23 161:7,11
**companies** 90:14
136:24 148:4
220:24 225:12,23
257:8
**company** 1:23
50:21 65:6 67:6
127:20 137:9
185:8 238:18
240:16,18 244:19
**company's** 124:16
125:17
**comparable** 6:24
8:4 28:5 35:2
37:23 91:24 160:1
208:5 213:2
228:21 229:4,10
230:15 302:7
**compare** 17:6 20:2
104:4 160:2
**compared** 7:19
16:12,14 152:22
175:4 182:5
192:23 224:22
225:2,5
**compares** 277:17
278:11
**comparing** 17:24
18:2 154:13 193:9
**comparison** 17:10
17:19,20 18:25
19:6 21:6,19
24:22 31:13

138:21 154:2,3,14
154:15 229:14
274:21
**compete** 152:10
162:12 164:3
235:5 238:14,22
240:4 242:4
297:22 298:21
299:15
**competed** 150:20
150:22 235:18
238:3,12 242:7
298:11
**competes** 298:22
**competing** 143:3
148:8 149:13,15
149:16 150:14
151:12 153:12
214:16 237:11
259:25 260:5,7,19
260:21
**competition** 141:16
141:17 150:24
153:10 164:4
196:19 216:6
219:13 221:21
222:7,21,23 230:8
230:17 231:5,10
232:2,7,11,14
234:21 238:5
239:8 242:18,20
243:7 245:22
246:4,7 250:6,9
260:16 262:23
263:8,14,23 264:4
264:9 265:20
300:14
**competitive** 140:14
161:25 177:5
202:3 204:6
216:22 220:10
221:25 222:1
233:14,17 239:25
240:16 242:1,11
263:11 265:13
290:22 291:5
300:9,10,20

**competitor** 65:8
147:2 152:23
234:11,12 238:11
240:19 241:24
242:2,3 243:9
259:15 297:13
299:9,12
**competitors** 53:11
116:24 121:25
232:24 233:2
234:22,25 239:14
239:15 240:1
241:17,18,18
242:14,14 243:8
297:22
**complain** 74:18
**complaint** 54:7,12
54:13,22 55:9,13
55:23 56:1,4,7
92:6,14 97:2 98:9
**complete** 92:22
102:6 129:8
**completely** 183:14
249:13
**complex** 276:14
**complicate** 168:8
273:16
**complicated** 167:15
169:7
**comply** 233:13
**comport** 16:6
**computation**
231:24
**conceive** 120:19
**concentrated**
147:12,25 242:1
260:15
**concentration**
121:17 294:1
**concept** 121:16
141:17 163:19
**concern** 3:3 10:10
15:3 79:3,8,23
147:18 162:8
173:8
**concerned** 2:22
20:4 21:4 73:5

79:4,20 106:11,12
280:18
**concerning** 63:22
**concerns** 2:17 4:17
20:21 73:9 102:17
281:5
**conclude** 22:10
54:20 101:19
121:13 122:14
123:5 191:1 281:5
294:20,22
**concluded** 84:24
96:16 112:2
123:18 308:20
**concludes** 119:8
277:23
**conclusion** 6:18
23:2 27:16 83:7
86:16 108:8
122:18,20,20
123:12 132:1
154:20 207:21
216:18 296:19,20
301:23
**conclusions** 59:19
86:4 103:18
269:13 287:12
**conclusory** 114:2,6
115:6,13 226:8
244:16,25
**conditions** 230:18
**conducive** 264:7
294:2,5
**conduct** 55:14
78:22 89:19 92:16
93:16,21 94:17
95:2,3,5 97:4,13
99:5,5,16 100:2
100:18 101:2,9,10
102:7,15,17,21
103:2,7,24 104:3
104:15,19 105:4
105:12,21 106:1
107:3 109:5 112:7
113:12 121:7,7,9
121:11,14,23
122:12,14 123:24

148:5,15 151:18
151:19 153:7
222:5 282:21,22
**conducted** 218:11
290:11
**conducting** 227:8
**confer** 3:1 24:3
57:24
**conferences** 307:7
**confers** 57:20
186:24 207:14
**confirm** 75:11
144:10
**confirmed** 287:11
**confirms** 152:19
287:14
**conflicting** 23:12
117:1 141:5
**confuse** 36:9
201:20
**confusion** 213:20
**congener** 144:4,5,6
144:7,8,10 145:1
153:20 229:4,8
**congeners** 144:22
145:15 153:14
255:12 256:2
**conjunction** 17:25
292:8
**conjuring** 102:11
**connection** 5:8
24:17 35:6 137:23
177:23 220:4
295:12
**conscious** 121:19
261:8,10,23
**consciousness**
69:11
**conservative** 60:10
73:13 140:17,23
**consider** 67:21
306:20
**consideration**
49:13 203:5
**considered** 5:7,7
125:10 138:2,14
147:8

**considering** 28:11
278:25
**considers** 209:20
**consistent** 67:24
152:17 218:18
238:23 276:9
**consistently** 84:9
128:21
**consolidated** 55:12
97:2 98:9
**consolidation**
222:4
**conspiracies** 63:24
121:5,6 263:24
**conspiracy** 53:12
53:24 54:1,4 55:9
56:12 60:19 61:8
61:22 68:10 72:13
85:6 88:3 89:11
89:23,23 90:10,15
90:24 91:2,3,4,8
92:7,11 93:5,17
96:25 97:3,18,24
98:19 101:19
103:23 104:13,24
105:15 111:7
112:18 113:18
122:7 128:9,11
161:9 197:4
260:24 261:1,20
261:24 262:8
279:19 282:8,9,14
282:14,16 284:17
289:9 290:22,25
291:21 292:14,24
292:25
**conspiratorial** 55:3
55:14 60:17 74:3
85:2 92:16 93:20
93:21 97:13 99:5
99:16 100:2,17
101:2,9 102:7
104:18 105:4,12
105:21 106:1
109:4,5 294:6
**conspirators** 63:23
63:24 73:19

**constant** 138:20
264:19,20,22
**constrained** 152:21
154:8
**construction**
218:16
**consultant** 63:3
187:8
**contacts** 102:8
**contemplated**
73:16
**context** 32:5 43:6
44:22,22 46:7
121:21 124:15
206:9 236:10
261:9 301:1,14
**continual** 58:6
**continually** 61:5
281:16
**continue** 49:11
60:4 107:21
204:20 234:2
247:21 299:3
**continued** 55:15
142:18 297:18,22
**continuing** 129:20
**contours** 120:7
**contracts** 129:2,11
129:20
**contrary** 112:4
113:1,19
**contrast** 54:25
78:23 91:9 216:2
274:1
**contributed** 196:23
**contributes** 195:20
**control** 215:20
244:12
**controlling** 215:25
**controls** 117:18
**conversation** 24:18
208:17
**converse** 173:2
**Conversely** 288:22
**conveyed** 65:5
**cooperation** 84:25
**cooperative** 95:4

95:13 99:5 103:23
114:8 115:8 121:7
121:9,14,23 122:6
122:13,14
**coordinate** 161:8
**coordinated** 78:22
109:20 222:5
**coordinating** 161:6
**copies** 3:20 10:7
**copy** 3:13 9:23,24
10:2,4 162:24
165:3 171:4
219:10,13 285:9
286:2 304:1
**corner** 38:10
259:13 268:19
**Corp** 185:13
**corporate** 125:11
**correct** 10:12 13:5
20:16 25:11,19
26:5,7 28:11,12
28:14 32:11,13,14
35:11 36:6,22
37:2,8 38:3 39:10
41:11 48:4,8,20
48:22 49:14 94:13
95:23,25 96:20
110:2 116:25
123:6 129:1
166:23 167:1
168:3,23 170:19
170:25 176:6
178:16 179:3,15
180:20 182:9,21
183:22 191:24
192:20 193:13
194:1,2 195:16,17
198:14 199:4,10
206:20,23,25
211:2,3 237:7,8
251:25 253:5
289:15 290:10
291:15 297:5
309:4
**corrected** 32:1
155:17,21
**correction** 58:12

59:9,10,22,24
62:14 73:16
**correspond** 93:12
**corresponded**
168:25
**corresponding**
137:8
**Corrigan** 1:10 2:12
4:4,9,12 5:19,22
9:3,8,12,16,20
10:5,19 11:1,3,7
11:11,18,24 12:16
13:3,8,21,24 14:4
14:6,19,22 15:6
15:12,14,20 16:1
16:20,23 18:5,10
18:14,19 19:11,15
19:19 20:9,15
21:10,15 22:3,9
22:13,23 23:3,7
23:22 24:6 25:13
25:15,18 26:19
30:13 31:16 33:6
40:4,5,15 42:12
45:14,17,18,23
49:22 50:2 51:13
51:15,19,22 52:8
52:12,15,25 53:23
54:10 55:22 56:2
56:5,18,21,23
57:15,18,21 58:4
58:9,14,18,21
59:1,5,12 60:1,8
61:5,11,14,19
62:1,23,25 63:20
64:9,12 65:18,21
66:17 67:16,18
68:15,17 69:5,8
74:12,15 75:1,24
76:6,17,21 77:14
78:6,14,17,20
79:10 80:1,22
81:1,3,10,15,17
81:19,24 83:25
84:4 86:23 87:2,6
87:9,12,15 88:23
93:9,14 102:9
103:12 115:20,21
116:13,19 129:1
129:25 130:10
131:18,22,25
132:5 133:25
134:5,10,14,18,24
135:8,12,18 136:9
136:12,17 137:21
138:15,18,25
139:3,16,20,24
141:10,12 142:9
142:21 143:21
144:1,7,14 145:9
145:24 146:2,10
146:13,16,20
148:18,22,25
149:9 150:5,8,11
151:7 154:19
155:15,21,24
156:4,7,10,12,18
157:11,15 159:9
159:14 166:15
194:10,13,14,17
207:8,15 226:19
235:2 241:3
246:20,23 247:14
247:23 249:14,15
249:19,23 250:4
250:11,16,20,23
251:1,17,24 252:3
252:7,17 253:3,10
253:12,16 254:4
254:10,15 255:2
255:10,15 256:11
256:18,24 257:18
257:22 258:9,25
259:1,4,20 261:19
262:4,17,21 263:3
263:6,19,22 264:3
264:15 265:23
266:15,19 267:11
267:16 268:2,6,9
268:12,16,18
269:6 270:6 271:4
271:10,15,18,22
272:24 273:1,3,7
273:11 275:25
276:3,4,7,13,22
277:4,8,10,12,13
278:9,13,20 280:6
280:10,19,23
281:11 284:6
285:11,18 286:3,7
286:15,25 287:3,8
287:20 291:15
292:3 296:25
297:18 298:3,7
299:23 300:2,5
301:3,11,20,21
305:20,25 306:6
308:7,15
**Corrigan's** 89:10
124:5
**corroborate** 12:5
**corrugated** 90:13
90:13,17
**Cosgrove** 1:18
276:5,6
**cost** 2:20 5:25 6:19
6:23 7:7,18,25
10:20 11:21 12:9
12:25 13:9,10
14:8,12,13,18,21
18:20,21,21 25:20
26:20,21,24 27:6
27:6,12,17,17,18
27:21 28:1,3,9,13
28:15,21,21,22,25
29:18,20,23,23,24
32:4 34:3,4,6 35:1
35:2 37:17 39:16
39:19,20 40:22
42:3 43:12,17
45:4 46:15 47:14
47:22,24 48:11,19
49:16 50:15 56:11
126:24 135:21
136:22 140:16,24
141:21,25 177:23
178:3,10,10
179:24 180:2,7,21
181:7,10,16
182:14 187:11,11
188:7,25 189:24
189:25 192:25
193:22,25 194:22
195:3,8,9,11,14
195:21 196:9,9,18
196:20 197:1,3,5
197:12 199:14
200:15 201:2,15
203:24 204:4
205:5,11 206:5,20
207:1,2,22 208:3
208:12,14,15
209:12,14,19
210:3,9,10,13,21
211:7,22 212:1,8
212:14,18,19,24
213:1,10,13,22
215:4,23 216:1,8
216:22 217:3,5
219:7,18,24 220:6
220:11,18,21
221:1,3,7,8,8,23
222:9,12 223:8,9
223:10,10 225:10
225:13,22 226:9
226:22 230:8
231:10 232:14
233:12 238:2
242:25 244:9,14
245:21,23,25
246:6,10,16
251:22 254:12,18
254:20,22,23,24
255:5,9,23 262:18
263:13 265:8,22
279:20,23 280:3
280:13 297:1
299:17 300:8,9,11
300:15,23 301:19
301:24 302:4,6,10
302:11 304:5,6,9
**costs** 2:19,20,21,24
3:7,8,8 5:24 6:22
7:16,17 8:1 10:13
12:2,14 14:20
16:15,16,18 17:9
17:19,24,25 19:3
19:9,20,25 21:17
22:7,15 23:10,18
25:6,6,8 26:14,15
27:3,3,4,12 28:11
29:19 31:17,20
32:2,7,8,10,15
33:1,2,2,7,21,23
33:24 34:19,19,20
34:21 35:13 36:2
36:5,14 37:22
38:4,13,19,20,24
40:10,11,15,21
41:3,6,9,10,10,14
41:14,24,25 42:4
42:6,13,13,13,15
42:16,17,18 43:7
43:8,10,11,12,14
43:19,20,24 44:1
44:9,13,14,17,20
44:20 45:6,7,19
45:21,22,25 46:2
46:7,8,9,14,16,17
46:20,21,24 47:14
47:16,19,23,25
48:1,13,16 49:1
49:13,16,17,19
50:12,23 51:1,2,3
51:5,5,24 52:13
62:12,13,15 80:15
106:12 126:18,21
126:23 133:19,21
134:2,2,6,7,25
135:20,24,25
136:1,19,21,24
137:10,12,12,18
138:1,2,3,5,11,20
139:1,21,23 140:6
140:7,10,12,14,18
140:20 141:20,22
143:8,9 174:5
177:22 178:1,2,6
178:13,14,15,18
178:18,21,23
179:1,2,11,20,22
180:3,8,25 181:1
181:2,2,5,6,9,15
182:6,22,25 183:3
183:9 185:25,25

186:3,7,8 187:13
187:19,21 188:3,7
188:10,18,23
189:21 190:3,5,10
190:11,23 192:7
192:15,19 193:1,4
193:6,6,20,21
194:10,11,12
195:20 205:15,17
206:11,11,16,17
207:25 208:2,21
208:21 211:2
212:18 214:8,10
214:11 215:6,6,10
216:24 220:9
222:13 223:25
224:1,24,25,25
225:14 226:2,3,6
230:17 231:3
243:5,14,24 244:1
251:6,7 252:5,6
252:10,19,24,25
253:1,5,24 278:24
279:1,9 304:1
**couldn't** 66:10,13
69:16 143:5
**could've** 68:23
**counsel** 5:12 16:12
18:23 79:22 92:20
93:5 154:10 184:3
223:14,17 280:8
**counsels** 94:6
**couple** 10:9 30:12
103:25 140:17
227:6 228:17
262:9 266:8 270:9
**coupled** 130:2
131:24 292:17
**course** 8:14 10:17
17:8 56:24,24
57:3,8,13 58:5,16
60:9 80:14 82:24
84:18 86:13 99:14
129:17 130:1
131:24 155:18
160:3,11 166:19
167:8 183:23

192:3 230:21
234:13 253:7
281:17 295:19
298:5 303:7,16,17
304:12
**court** 1:1,23 2:3,5
2:13,16 3:1,2,10
3:19,22 4:7,10,13
4:25 5:16,21 6:2
9:7,10,11,15,19
9:21 10:3,17,24
11:2,9,14,23 12:2
12:17 13:7,18,23
14:1,5,16,20 15:4
15:11,13,16,25
16:14,18,21 18:3
18:8,12,17 19:10
19:14,17 20:4,6
20:12 21:2,6,12
21:24 22:4,12,19
22:24 23:4,6,15
23:20,24 24:4,12
24:14,18 25:10,14
25:17,22 26:3,6,9
26:16,21 27:8,14
28:2,10,18 29:3,7
29:21 30:21,24
31:3,7,9,24 32:9
32:12,22,25 33:6
33:12,16 34:6,12
34:16 35:1,8,12
35:16,22,24 36:4
36:8,14,20 37:1,3
37:6,12,18,21
38:2,4,7,12,18
39:1,4,9,11 40:3
40:14,18 41:2,8
41:15,20 42:1,5,9
42:12 43:1,3
44:15 45:1,5,10
45:14,17,20 46:4
46:10,19,25 47:5
47:8,11,17 48:2,6
48:18,22 49:4,12
49:16,21,24 50:6
50:9 51:11,12,14
51:18,20 52:1,3

52:10,13,22 53:22
54:8 55:8,25 56:3
56:6,20,22 57:12
57:17,20,24,25
58:5,11,15,20,25
59:3,9,17 60:6,13
61:4,10,13,17,25
62:21,24 64:7,11
65:19 67:12,15
68:14,20 69:4
72:17 74:11,14,22
75:21 76:4,11,18
77:1 78:2,4,13
79:7,25 80:21
81:9,13,18,23
83:13,16,23 84:3
86:21,25 87:4,8
87:10,13,22 88:21
88:22,24 89:2
90:1,5,8,10,21
91:15 92:12,23
93:3,8 94:11,20
94:23 95:10 96:6
96:14 97:6,19
98:2,5,23 99:19
100:6,9,14,16
101:6,22 102:4,17
102:23 103:5,13
103:14 104:1,8,13
104:17 105:2,11
105:24 106:9,11
106:20,23 107:8
107:11,16,19
108:13 109:3,11
109:16 110:2,16
111:8,16 112:15
112:21,25 113:5
113:11,15,23,25
114:4,9,17 115:2
115:14,18,20,25
116:4,11 117:16
117:23 118:4,8,15
118:16,17,19,24
119:3,6,7,10,15
119:16,21,25
120:4,8,11,18,19
120:23,24 121:18

122:3,9 123:8,11
123:21 125:1,24
126:8,13,20,25
127:11,22,25
128:4,7,13,24
129:19 130:16
131:2,18 132:5,9
133:10,13 134:3,8
134:13,16,20
135:3,7,10,16,19
136:11,15 137:13
137:24 138:10,13
138:23 139:1,6,13
139:19,22 140:8
141:6,9,11,18
142:6,15 143:6,16
143:18,24 144:6
144:13 145:6,18
145:23 146:1,9,11
146:15,19 147:13
147:18 148:21
149:6 150:7,9
151:6 154:18
155:9,11,18,24
156:3,6,15 157:14
158:14,23 159:4,7
159:10,15,17
160:7 161:15
162:3,9 164:18,22
165:1,10,14,18
166:20,22,24
167:2,5,21,23
168:1,5,6,21
169:16,21 170:16
170:22 171:1,9,13
172:6 173:10
174:2,6,10,20,24
175:7,24 176:4,7
176:16,21 177:11
177:16,20 178:14
178:17,20,25
179:7,13,16,19
180:17,24 181:20
182:7,10,17,19,22
183:1,5,18 184:4
184:8,22 186:1,9
186:14,19,23,24

186:25 187:5,14
187:19,23,25
188:6,12,17 189:3
189:10,16,23
190:5,12,15,19,25
191:5,10,16,22
192:18 193:9,17
193:24 194:4,6,9
194:16 195:13
196:1,4,7,10,15
197:8,15,19,23
198:1,3,5,12,15
198:25 199:1,5,8
199:11,16 200:2
200:11,21 201:9
201:18,21 202:9
203:4,10,14 204:8
204:11,22,24
205:1,8,20,23,25
206:18 207:4,7,13
207:14,17 208:19
208:22 209:2
210:9 211:1,6
212:21 213:5,8,24
214:12,15,25
215:14 216:12,15
217:4 218:12
219:10 222:3
223:4 224:3,10,13
224:16,18 227:15
227:16,22 228:1
228:14 229:9
230:2 235:24
240:20,24 241:6
241:10 246:19,22
247:1,9,19,24
248:3,7,11,15,18
248:21 249:3,8,16
249:21 250:1,5,12
250:18,22,24
251:5,15,20 252:1
252:4,15,20 253:8
253:11,14 254:2,5
254:8,14 255:1,5
255:13 256:4,8,17
256:22 257:15,19
258:5,20 259:3,19

261:6,15 262:1,16
262:20 263:1,4,18
263:21 264:2,14
265:2 266:10,13
266:17,21 267:13
267:17 268:4,7,11
268:14,17,20,24
269:5,7,16 270:3
270:10,15,22,25
271:6,9,13,16,19
272:14,20,21,23
272:25 273:2,6,10
273:23 274:1,14
275:6,9,13,17,22
276:2,5,11,16,16
276:18 277:3,7,9
277:10,11,13,15
277:18,23 278:5,8
278:11,18 280:4,9
280:17,21,25
281:10,14 284:5
285:9,15,17 286:1
286:5,14,23 287:1
287:4,10,19,21,25
288:3,11,24
289:13,17,20,24
290:1,7,11,15
291:10 293:3,9,16
293:17 294:13,23
294:25 295:7,10
295:17,19,21,25
296:23 297:2,8
299:8 300:16,24
302:14 303:21
304:4,15,17,20,23
305:22 306:1,3,10
307:3,4,7,13
308:4,12,17
**courtroom** 132:15
**courts** 54:17 121:8
121:15 169:18
182:2 235:20
274:3 289:5
296:18
**Court's** 4:24 15:2
53:2,8,21 67:14
67:19 70:3,6,7

75:5 76:7 80:12
81:4 83:22 87:16
87:18,21 88:17
106:15 115:22
118:11 135:4
144:16,17,20
145:2,3
**Court's** 158:12
198:9 223:7
247:16 277:1,6
**cover** 39:13,13,14
134:22 156:9
241:12 293:4
**covered** 20:7 128:9
133:10 184:8,20
281:2
**covers** 32:18 257:8
**crash** 266:22
**create** 59:3 90:13
92:2,5 96:3
105:23 128:19
178:7 180:4 184:2
184:13,15 187:9
188:25 203:17
206:3 245:20
**created** 24:23
89:18 98:14
223:21
**creating** 164:3
**creation** 53:9,10
104:19
**credited** 281:15
287:10
**criteria** 61:6 92:10
100:13 105:23
112:11,11,14
115:6
**critical** 83:3 123:1
**criticism** 46:14
55:9 143:15 180:2
225:20
**criticisms** 43:23
54:3
**criticize** 69:18
200:22
**criticized** 85:25
207:1 277:14

298:3
**criticizes** 42:25
43:7 72:16
**criticizing** 74:4
75:2
**cross** 214:1 270:23
**crosses** 225:21
**cross-examination**
270:23
**cross-examine**
220:2
**cross-examined**
50:7
**cross-walk** 137:6
**CROW** 1:17
**CSL** 234:14 241:14
242:7,10 298:11
**curiosity** 268:14
**current** 299:4
**currently** 217:17
**curves** 37:9
**customer** 110:8
157:22 163:14
233:22 284:18
**customers** 53:17
77:19,20 88:4
109:17,18,24
110:10,13,18,20
110:22,23 116:23
153:17 161:22
162:17 163:5,18
163:21 164:16
168:25 172:22
173:3,16,17,20,21
173:24 175:12
274:5 278:2
279:20 282:7,9,16
288:17
**cut** 44:23 49:7
**CVS** 299:17

---

**D**

**D** 2:1 239:13
**damage** 75:4
268:12 273:17
288:10
**damages** 51:17

60:25 74:19,24
75:2,7,11,13,16
82:21 90:20 93:13
93:18,25 94:5,9
97:15 101:17,21
102:3 108:4,12
112:10 136:2,5,6
158:18 159:2
168:10 169:13
170:8 172:24,25
173:5,23 177:9
197:13 198:11,19
199:2 200:1,8,12
200:13 201:4,6,19
201:20,23 202:12
202:19,21 209:16
210:15 211:8,23
219:15 230:13
249:22 250:21
275:15 281:20,25
282:18,20,24
283:5 285:3
286:19,21 287:2
287:12,13,14
291:12,18 292:18
294:16 295:3,15
304:7
**damaging** 214:6
**data** 6:1,19,23 7:2
7:8 8:4 12:5,6,9
13:9,11,17 14:8
14:12,13,18,21
16:3,5,7 17:2,13
17:14,22,22 18:2
20:11,11,17,18,19
20:21,24 23:5
24:20,23 25:20
26:20,22,24 27:6
27:7,12,17,17,21
28:4,9,13,15,15
28:21,21,22,25
29:18,20,23,23,24
30:14 32:5 33:20
34:2,3,4,7 39:5,7
39:19 43:12,18
47:14,22,24 48:7
48:11 50:13,15,15

50:18 90:23 91:14
91:23 125:21
126:19 128:11
135:21 136:22
159:21 161:5
180:21 188:14
189:20 191:9,10
191:11 192:3,5,6
193:14,16,16,22
207:1,22 208:3,8
208:13,15 210:16
210:21 212:20
213:1,13 214:19
214:21 220:21
221:1,3,7,8,8
225:22 226:10
228:20,22 231:19
233:24 244:14,24
245:14 251:22
252:5 254:12,18
254:20,22,23
255:5,9,23 301:12
301:24 302:6,11
303:6,14
**date** 55:17 56:12
84:1 86:1 88:13
91:1 93:11,23
94:25 95:9 96:13
96:25 97:1 98:10
99:18 100:1,18
105:7,8,9,9,10
109:21 130:8
213:1
**dated** 28:4 58:12
191:22 230:13
239:5 309:7
**dates** 102:10
103:24 111:2
114:24
**Daubert** 8:23 23:11
23:18 39:2,6,9
54:8 72:20 83:15
87:25 158:7 217:7
217:7 222:20
223:4,7 226:11,21
227:23 228:8,11
228:15,16,17

247:5,16 262:11
266:7,9,10 270:13
281:6 291:23
296:13
**David** 66:5 68:12
71:15 73:8
**day** 2:8 61:20 68:19
76:19 77:17
123:14 196:16
204:16 207:9,9
246:24
**days** 30:4 303:24
304:12,25 305:2
306:12
**dead** 30:6 51:6
131:8,13
**deaf** 290:19
**deal** 96:4 109:14
165:21 272:19
**dealing** 80:6 96:2
295:1
**death** 50:1 74:7
235:14
**debated** 63:4
**December** 83:2
223:22 237:6
257:11,23 258:1
**decertify** 101:22
**decide** 4:18 83:4
108:15,16 123:5
125:9 127:19
247:4 271:3 296:7
305:15
**decided** 25:5 44:20
83:14 96:12
125:12 179:22
190:22 253:15
267:19 282:11
**deciding** 97:13
118:13 181:14
**decision** 7:7 27:20
44:23 48:9,10
49:7 57:4 82:16
88:1 176:22
181:19 185:16
208:12 213:9,9
217:11 222:16

226:15 248:22,23
292:4,5,6 293:3,6
293:13,13,20
294:8,23 295:1,17
**decisions** 62:10
122:1 124:9
290:20
**deck** 30:23 94:22
**declaration** 90:21
149:20 233:5
243:2 256:13,14
256:20 257:1,10
257:14 258:13,24
284:20
**decline** 19:14
**decrease** 140:22,24
**decreasing** 126:6
**Decurico's** 71:25
**deem** 250:25
**deemed** 8:22
**deems** 202:3
**deeper** 27:4
**defalled** 124:4
**defendant** 83:14,18
88:4 89:4 95:11
255:24
**defendants** 1:12
5:25 91:5 135:20
135:22 142:18
160:24 173:11
283:23
**defendant's** 53:9
53:10 76:16
**defendant's** 218:11
281:19 285:6
287:7 295:24
**defense** 2:13 3:11
3:15,23 6:10,16
29:25 55:18 56:9
62:19 136:5 138:1
251:16 255:8
308:8
**defensive** 136:20
**definitely** 235:8
**definition** 93:12
94:11 148:14
154:7

**definitional** 151:17
**definitionally**
149:2
**definitive** 111:14
**degree** 175:18
230:16 232:1,7,10
287:11
**delay** 85:14
**deliberation** 82:23
**delta** 288:20
**delve** 54:18
**demand** 37:6,9
62:12 142:1
143:11 147:5,9
195:3,8,12,23,23
195:23 196:1,5
197:2,5,12 199:16
200:15 201:6,15
203:25 204:4
206:5 215:4
223:16 230:8,18
231:10 232:14
242:25 243:15,17
244:9,24 245:3,5
245:6,14,22,23,25
246:10,16 264:12
264:15,16,20,21
264:23
**demands** 243:5
**demonstrate**
101:16 146:6
206:8 288:16
**demonstrated**
78:24 85:24 140:6
**demonstrates** 82:2
**demonstrating**
198:10,11
**demonstrative**
35:17 194:25
**departed** 55:11
**departing** 129:4
**Department** 236:7
**depending** 303:4
**depends** 301:12
**depo** 280:10
**deposed** 63:15
69:19 70:2,10

149:19
**deposition** 22:21,25
26:12,16 29:15,20
50:8 69:19 70:14
70:19 71:10 84:12
152:20 161:1
213:16 290:2,8,10
297:17 301:4
303:22
**depositions** 20:7,8
29:4 72:7,11
**depth** 305:13
**derived** 220:21
**describe** 291:12
**described** 178:22
198:7 213:13
257:19
**describes** 55:9
113:12 115:12
176:16 178:24
238:9 241:24
278:4
**description** 131:19
210:25 241:20
**deserved** 286:12
**designed** 173:12
267:3 306:13
**desired** 65:25
**despite** 21:23
**detail** 55:7 115:24
184:20
**detected** 73:6,10
**determinant**
195:10
**determinants** 195:2
246:11,14,15
**determinations**
125:5
**determine** 3:3 34:4
126:14 133:5
138:24 171:7
201:1 214:3 243:1
275:15 300:10,11
306:16
**determined** 127:3
243:16,17 246:7
249:8

**determining** 127:3
146:5
**develop** 82:5
**developed** 2:18
92:15
**developing** 124:7
**development** 93:1
**developments**
129:11
**Diagnostics** 89:4
298:17
**dialogue** 251:13
**dictionary** 144:9
**didn't** 5:2 8:10
18:18 20:16,22,22
23:14,23 26:25
27:4,5 28:24
31:19,21 34:11
42:13,17 51:2
55:5 61:11 62:16
68:9 73:11 77:20
79:7 87:1 90:25
91:2 94:15,16
132:13 139:9
**difference** 2:19 3:7
14:17 41:14 63:1
80:2 86:15 106:25
136:4,6 153:3,6
160:22 164:12
166:12,13 170:13
171:6,20 176:25
177:4 180:11
181:1 222:11
223:25 232:23
233:1 242:13,22
244:17,18 245:3
245:11,15 271:24
**differences** 79:6
231:3,12 232:17
232:18 243:3
244:11 246:14
**different** 20:11,13
20:20,21 31:3,17
31:18 32:5 44:20
48:7 63:8,17
80:11 82:20 89:16
91:11 98:13 100:1

119:17 125:23
138:21 160:20
167:18 168:13
175:4 178:1
213:15 217:13,16
221:5 224:24
225:13,15,18
231:10 232:15
239:21 242:20
243:5,5 244:7,9
246:4 273:20
274:20 281:13,14
282:7 287:9
293:12
**differentiate** 45:6
45:21 178:17
**differentiated**
231:23 252:4
**differentiation**
162:21,24 163:10
163:23
**differently** 58:1
276:21 282:7
**difficult** 5:5 10:6
266:17,21 280:2
280:12 301:11
303:2
**difficulties** 129:17
**dig** 27:4 186:21
**diluted** 173:14,18
173:22
**direct** 9:5 62:18,20
78:22 154:24
209:4,5 216:2
306:22,22
**directing** 307:14
**directly** 9:4 10:9
28:7 141:4
**director** 65:21,22
65:23 237:6
257:12,24 258:2
**disagree** 87:22
88:18 101:15
114:18 120:9
122:22 123:8
145:2 155:7
213:24

**disagreeing** 145:3
**disagrees** 87:18
144:17 154:21
**disconnect** 19:7
**discount** 284:13
**discounted** 283:18
**discounts** 278:1
**discovery** 20:8
54:14,14 92:22
93:1 102:5 228:4
228:5 305:19
**discrepancy** 18:4
19:9 20:3,6,10,13
20:14 21:23
**discretion** 270:16
271:6
**discuss** 221:6
247:15 306:21
307:21
**discussed** 131:15
191:1 301:5
**discusses** 293:18
**discussing** 89:6,7
292:22 307:16,22
**discussion** 68:18
202:18 210:24
219:19 220:17
223:16 245:4
292:20 293:6,11
293:24 301:15
**discussions** 96:18
306:2,5
**disparaged** 283:8
**dispersion** 157:20
161:18,19,21
162:7 166:3 167:9
170:1,2,7,9 171:8
172:18,21 174:25
175:6,7,12 277:2
**displayed** 72:11
**disproportionately**
279:10
**dispute** 270:1 307:2
307:3
**disputed** 269:20,23
270:8
**disputes** 234:23

**disqualify** 105:20
106:3 112:12
**disregard** 100:25
**distill** 76:15
**distinction** 103:9
111:3 115:12
121:3 125:15
**distinguish** 81:11
282:21,25 283:9
290:6
**distinguishable**
218:10
**distortions** 198:20
**distributed** 109:16
110:17
**distribution** 109:17
**distributor** 83:5
110:23
**district** 1:1,1
185:17 214:23
270:15
**diverging** 85:10
88:9
**diversions** 277:24
**diverts** 60:18
**divided** 24:7
**docs** 82:15
**document** 10:22
15:21 16:3,6,13
17:7,16,23 18:7
18:20,22,23,24
19:2 20:22,25
21:5,7,20 24:16
24:25 31:14 35:18
38:5 57:1,6,10,14
57:22 58:8,19
59:7,23 60:9
116:8 124:23
125:11,13 126:11
127:1 130:1,2
131:16,25 132:7
132:10,20,21,21
132:22 133:2
163:2 187:6,9
192:2,22 193:12
220:3 223:23
238:25 239:7,11

240:11,15 241:13
257:16,17 258:15
259:1,11,22,23
260:5,6 283:12,13
284:1,3,5 298:25
**documents** 3:24
5:13 18:13 21:7
56:16,17,19,23
59:15,19,22 67:24
79:10,23 80:10,10
80:14 96:19 137:6
152:2 186:12
193:10 228:6
257:2,2 258:13
281:19 285:7
286:9,10 287:7
294:22 295:24
296:1 304:1
**doesn't** 12:5 19:24
29:9 33:9 34:2,24
37:4 39:17 41:9
57:7,11 72:15,15
79:14 98:16
100:22 101:10
102:23 104:25
111:16 116:7
118:9 139:13,17
140:19 142:1,23
143:10 146:6
**doing** 24:6 29:11
44:11 60:3 69:13
77:23 94:15 97:19
104:2,9,20 123:23
124:20 125:9,18
125:19 126:11
127:16 129:7
130:13 138:22
139:10 148:6
150:3 151:4,19
152:18 154:13
156:15 158:25
204:9 209:3
260:14
**dollar** 38:9
**dollars** 12:10 17:17
**donor** 243:21
**donors** 243:21,22

**Donuts** 267:20
**don't** 3:15 4:2 5:1
6:14 8:7,7,9,11
10:2 14:3 18:6
20:9 23:11 24:5
28:13,17,23 29:18
30:6 34:9 35:4
36:23 38:14,15
39:5 40:1,6,8,9,16
44:2 45:8,12
48:24 55:18 56:7
57:14,15 59:17
70:22 71:12,17,18
72:11,12,19,21
74:2 75:15,15
80:25 87:4 88:22
93:22 94:6 95:10
95:16,16 97:7
105:14 106:13,13
107:6 108:25
110:7 113:16
114:9,11,23
119:22 120:1,1
122:23 123:4
125:6,25 126:17
128:16 130:16
131:5,7 132:11,16
133:6 134:18
140:20,21 143:19
**door** 19:8,10 20:3
**doorknobs** 40:13
**doubt** 227:7,17
286:4 292:9
**Dr** 2:19,22,23 5:24
6:17 7:2,3,12 8:3
8:25 10:20,23
16:7,13,23 18:11
18:14,25 19:2,19
19:23 20:16 21:7
21:21 22:15,21
23:7,9,17 24:22
26:24 27:10,15
28:14 30:15 31:21
31:24 33:23 34:23
37:10 38:20,24
39:7,12 41:6,17
41:22 42:21,24

43:6,9,23 44:4,19
46:13 48:9,10
49:5,19 50:5 52:8
52:16,20 54:3,12
54:16,19 55:2
59:13,20 60:19
61:6 63:2 68:3,4
69:14,18,19,19
70:18,23 71:4,18
72:14,16,19,22,24
72:25 73:3 75:10
76:8 77:23 78:3
78:15,21,25 79:2
79:11 82:2 83:16
84:6,11,21 86:2
86:18 87:22 88:12
89:7,12,15,17,21
90:2,19 91:13,25
92:9 94:14 95:2
97:11 98:13,21
99:4,13,22 100:12
100:16 103:1,10
105:19 107:4
108:5,10 109:13
110:6 111:3,4,12
113:7 115:3,17,22
117:6,8 121:2
122:7 124:17
125:18 129:7
133:20 135:19
136:24 137:17
138:4 140:18,25
141:14 142:8,11
143:14 146:23
147:14 148:13,15
149:23 151:16,22
152:19 154:4,12
155:13,20 157:1,5
157:12 158:24
159:20,21 160:1
160:22 161:1,7,25
163:22 164:1,8,9
166:5,6 168:11,24
169:5,11,16,18
172:1,1,4 173:16
175:2 176:16,19
176:19,25 177:14

178:5,9,24 179:5
179:14,21 180:2
181:9,14 186:6
188:24 189:18
190:1,3,25 192:9
192:10,16,23
193:7,15 194:25
195:1 197:10
198:9,23 200:21
202:20 204:19
205:9,15 206:2,18
206:20,24,25
207:1,1,21 208:8
209:1,4,5,6,8,14
209:18 210:14,17
211:2,4,6,10,18
211:20,24 212:15
212:17,17,19
213:21,22 214:5,7
214:8,9 215:12,17
215:19 217:1
218:7,15 219:1,6
219:17,22 220:2
220:14,16 221:5
221:11 222:14
223:9,15 225:11
225:20 226:7,12
226:18,19 227:13
228:12 229:3,21
229:25 230:5,7,12
230:14 232:16,22
234:16,23 235:17
236:10 237:16,21
239:9 241:22
242:3,19,22 244:5
244:11,23 245:2
245:13,17 246:11
246:13 247:22
253:4,6,22,23
254:9,11 257:3
258:12 260:9,23
260:25 261:22
262:6 269:9,12,18
269:24 270:23
272:1,1,15,20
273:18 274:20,24
276:8,20 277:17

278:4,7 281:6
285:3,7,11,15,20
286:19 287:11
289:6,12,14,17,18
290:16,24 291:10
291:11 292:8
294:14 295:3,15
296:10 297:11,24
299:24 300:23
301:2,10,16,18,22
302:13 303:22
**dramatic** 8:6 64:25
67:10 116:20
117:3 130:3
131:20 132:23
160:8 175:15
**dramatically** 8:3
42:15 193:11
**drastic** 63:7
**drastically** 62:3
**drawing** 24:22
112:19
**drawn** 103:18,21
**driving** 284:24,25
**drop** 257:4
**dropped** 152:13
258:12
**drops** 47:17
**drove** 245:23
**drug** 235:11,12
**DUBOIS** 1:7
**due** 88:6 203:7
215:9
**Dunkin** 267:20
**duolopists** 289:16
290:18
**duopolies** 121:21
**duopolist** 142:13
**duopolists** 73:18
121:10,24
**duopoly** 53:9,10
60:23 62:2,7
73:14 91:12 99:8
99:15 104:19
140:15 142:23
143:2 147:21
149:3,5,12 152:5

152:9,22 153:5,7
153:9,25 154:7
202:25 203:19
209:9 216:23
222:2,22 233:14
233:17 250:14
260:25 261:9,10
261:21 262:3,25
263:11,15,15
266:5 279:18
282:6,9,24 283:1
284:17 289:7
291:20 294:1
**duopoly/conspir...**
266:6
**Dyke** 219:9,14
**D-408** 309:14

**E**

**E** 1:7 2:1,1
**earlier** 4:11 12:17
13:13 30:2,3 34:8
40:25 48:19 60:9
77:15 80:9 92:21
93:21 96:5 112:1
113:18 115:25
128:16 148:23
162:15 166:9
168:15 172:13
189:9,21 192:5
196:21 205:9
210:20 234:18
243:19 258:11
268:23 269:3
290:9 293:3,5,20
293:24 294:23
295:17 298:24
299:22
**early** 88:5 90:16
103:7 184:1
233:18
**earth** 69:14
**easier** 261:4,25
**Eastern** 1:1 185:17
214:23
**easy** 8:15 46:2
261:2 301:8

302:21,23 303:15
**eat** 140:14
**echoed** 155:3
**economic** 119:14
124:21 125:20,22
126:12,13 127:16
127:19 141:25
142:3 202:16
209:13 221:3,9
235:21 236:1,2
249:7 266:2
288:13 292:8
300:3
**economist** 94:7
105:1 139:25
183:14 212:7,12
221:9 235:20
**economists** 195:1,1
219:9
**Ed** 63:12,16 64:17
65:12 66:1,9,11
67:1,2,6 68:8 69:1
69:24 70:1,2 71:9
73:7 116:25
**effect** 22:6 66:1
129:22 197:20
**effective** 130:7
**effectively** 152:9
153:9 154:12
234:24 256:21
**effects** 149:10,17
154:25 282:25
283:1
**effort** 5:12 50:14
51:4 104:2 184:1
184:12,17 245:13
**efforts** 152:12
**eight** 217:10 270:12
270:13 281:2
**either** 21:9 93:25
129:20 147:5
218:21 245:13
252:24 262:6
295:18
**elaborate** 194:15
**elastic** 37:7
**Elcock** 270:10,11

270:12 271:5
**electronic** 309:5,14
**element** 289:2
291:13,23 292:25
293:1 294:11
295:23 296:8
**elements** 101:21
292:3 293:2,12
296:20
**eliminating** 172:11
172:13
**elimination** 242:1
**email** 279:2
**embodied** 210:6
**emphasis** 146:17
**emphasize** 147:17
**empirical** 125:22
125:25 287:5
294:11,14,22
**employed** 256:12
**employee** 149:19
149:24,25 206:10
**employment** 69:22
**enable** 161:8
**enclosed** 244:8
**ended** 105:15
306:19
**ends** 58:23
**enemy** 63:23 68:10
274:11
**enforcement** 236:6
**engage** 290:19
**engaged** 242:11
**engaging** 90:14
**engine** 283:17
**England** 269:8,11
**enjoyed** 304:25
305:13
**enjoying** 305:2
**entered** 152:8,9
**Enterprises** 185:15
**entire** 6:14 33:13
212:3 237:14
298:6
**entirely** 91:23
130:25 147:14
181:17 206:15,20

209:19 213:15
215:8 227:12
245:25 256:4
**entities** 282:5
**entitled** 74:18
200:11 202:19
219:15 230:12
304:7
**entry** 147:6 234:10
242:6 293:25
297:21 298:10
**environment**
127:21 225:25
**equal** 85:8,18 88:8
**equally** 106:17
**equation** 36:21
275:19
**equipment** 162:18
163:19
**equity** 238:19
299:4
**error** 218:6
**errors** 48:12
218:14
**especially** 37:4
183:15 255:23
**ESQ** 1:10,10,11,12
1:12,13,14,14,15
1:15,16,16,17,17
**ESR** 1:18
**essence** 123:14
**essential** 101:21
**essentially** 71:20
85:4 124:17,22
129:16 159:22
191:21,25 210:24
228:5 237:25
239:17 240:15
246:7
**establish** 291:25
293:22
**established** 55:21
295:4,14
**establishing** 133:21
**estimate** 60:10 82:7
127:9,12,12 136:2
136:8 140:23

158:18 168:12
178:11 180:22
222:24 265:13
273:19 288:18
291:7,19
**estimated** 157:2,4
251:8 288:14
**estimating** 158:16
203:19 220:10
**estimation** 157:25
276:9
**et** 301:13,13
**European** 219:9
**evaluate** 118:12
**evaluating** 71:4
126:6 217:6
**evaluation** 100:24
127:8
**eve** 65:9 67:9
**event** 56:9 202:14
202:16 211:15
213:18 233:5
234:10 249:6,8
**events** 117:11,13
**eventually** 43:22
217:15
**everything's** 21:16
**evidence** 34:22
43:9 45:10 54:1
54:15,19,20,25
55:2,3,13 60:6
61:23 67:12 68:3
72:13,15 74:3
75:9,13 77:4 79:8
89:10 92:14 94:7
95:4,11,15,18,20
96:7,12,15,22,23
97:3 98:6,7,18,24
100:15,16,17,22
101:2,8 102:5,6,7
102:8,12,21 103:5
103:6,10,12,15,18
104:23 105:2,25
108:7,14,16,22
109:3,4,6,19
110:11,11,17
111:18,22,23,25

112:1,4,21,25
113:16,18 114:18
114:19,20,21,22
115:25 116:12
117:1 118:8
119:10 123:12,13
123:15 129:24,24
133:4 137:4
139:11,14 183:25
184:16 186:3
188:6,9,22 189:24
190:23 202:11
214:4 227:21
232:25 247:6
249:4 255:14
256:2,9 261:1,4
261:24 262:8
269:12,24 274:11
274:13 281:7,14
282:3,15 283:6
287:10 288:24
289:1 291:17
295:3,14,15
303:11
**evidentiary** 83:18
**evolve** 227:21
**exact** 29:6 116:1
137:9 146:7 154:3
182:13 199:24
**exactly** 29:5 46:2
47:21 82:2 106:7
149:1 181:3
187:20 194:9,9
196:3 203:8
250:22 262:6,12
263:12 264:25
266:3 270:5,6
276:8 289:25
290:14 295:22
296:5 302:13
**exactness** 74:19
**examination** 209:4
209:5
**examined** 270:24
**example** 12:20 77:5
121:10 123:16
142:25 147:20

158:3 166:10
175:11 203:16
217:2 220:14
221:4,7,11 224:20
235:24 274:7
299:16
**examples** 219:25
**excerpt** 70:17,23
71:6 167:4 236:21
237:23,25 238:17
**excerpted** 227:6
**excerpts** 26:11
176:13
**excised** 75:6
**excluded** 125:16
**excludes** 255:9
**excluding** 206:20
**exclusion** 99:7
**exclusively** 137:19
**excuse** 27:1 115:18
169:11 213:17
214:21 226:11
**excused** 169:16
**executed** 67:22
**executive** 65:22,24
66:6 67:6 68:12
279:3 280:7
284:21
**executives** 147:3
**exhausted** 270:13
270:14
**exhaustive** 184:20
**exhibit** 4:21,23
6:10 7:20,22 9:22
11:3,8,10,11,14
11:15,15 12:7,18
13:19,21 22:1
28:8 35:19 57:18
159:20 162:19,23
175:8 179:6
182:14 185:19,24
186:12,14,16
187:1 188:15,16
189:4,13 191:14
191:14 194:20
215:15 223:22
239:1 240:20,22

247:12 258:24
259:4 285:17
286:2 287:6
298:24
**exhibits** 5:3,4,5,6,8
10:25 174:12
189:14 241:4
248:17 258:21
**exist** 255:7
**existed** 161:24
204:6
**existence** 89:22
97:17
**exists** 172:22 191:9
**exit** 82:15,17
**expand** 152:12
**expect** 180:23
**expected** 26:15
82:7
**expense** 69:9 73:8
233:9
**experience** 150:25
219:1,3 271:12
272:8
**experienced** 82:23
**expert** 6:16 10:14
13:16 23:9,12
28:10 45:24 74:4
83:16 90:3,19
100:21,24 103:12
118:11,12 119:6
120:21 124:25
125:16 145:7,8
146:25 149:25
155:13 202:3
217:2 218:7,10,12
218:17 227:17
229:2 235:25
256:21 272:5
300:3
**experts** 82:6 89:20
89:22 96:11 97:15
97:16 124:6,13
236:3
**expert's** 100:21
119:13 124:23
**expert's** 169:18

182:2 218:25
228:19 272:5
296:19
**explain** 13:4 27:9
29:12 54:23 108:2
114:3 118:23,25
148:12 181:17
206:12 212:9
220:14 229:18
245:25 288:8
294:18
**explained** 14:17
31:11 110:14
233:20 245:24
249:1 251:23
252:2 277:25
**explaining** 14:14
24:6 42:5 77:24
236:11
**explains** 19:9 116:6
151:16 153:11
245:17
**explanation** 22:20
86:21 87:25 163:9
212:5 213:18
227:13 241:20
280:13 302:12
**explicit** 67:22 79:3
**exponentially**
168:8
**exponentionally**
273:16
**express** 113:25
227:7
**expressed** 147:13
147:18 284:12
**extend** 139:8 141:3
245:9
**extended** 131:9
132:2 161:10
**extending** 59:13
77:5
**extension** 3:25
**extensively** 62:2
**extent** 8:9 92:1
146:25 231:5
281:15

**extra** 20:24
**extraordinary**
89:16 104:25
**eye** 83:2
**eyes** 118:16 120:23
122:13 199:8

---

## F

**FAA** 266:25 267:1
**face** 229:7
**fact** 43:11 47:4,11
47:13 49:1 53:13
56:7,15 57:6 93:1
98:8 102:22
104:23 116:25
123:23 124:24
129:7,11 130:25
133:20 134:25
188:23 209:20
215:24 220:25
221:7 225:12
244:6 269:10
270:21 288:10,19
292:13 294:8,9
303:13
**factor** 7:25 129:10
203:22 206:17
209:11 212:11
218:5,20 219:5
223:2 260:11,12
**factored** 22:15
264:16
**factors** 195:20
197:1,9,11,13
202:5 209:10,13
217:7,17,22,25
222:18 225:15
231:11 242:17,24
244:9 270:10,12
270:13 271:5
**facts** 72:20,21
110:3 147:1
228:19,22,25
269:20,24,25
270:1,8
**factual** 87:18
112:17 144:17

145:4,7 155:7,12
155:14,19
**fail** 269:15
**failing** 207:2
**fails** 197:11 246:13
281:6
**failure** 41:18
106:18 169:18
209:8 220:14
246:16 301:2
**fair** 55:22 134:2
137:4 144:22
145:1,15 153:13
153:20 194:12,17
229:4,7 255:11
256:1 290:24
302:21,25
**fairly** 116:19
176:10 245:11
**faithful** 131:1
**fall** 54:22 55:4
123:21 287:2
**fallacy** 216:21
**falling** 43:13 47:15
**falls** 120:14 287:4
**false** 61:7
**fame** 286:10,11
**familiar** 90:2 171:2
266:10 270:11
271:19 272:21
**far** 3:3 49:9 107:3
120:12 151:12
279:1 283:24
**farther** 287:16
**fashion** 25:25
**faster** 43:11 138:7
138:8 249:1
**fault** 5:17
**favor** 62:3 217:23
218:21 219:4
223:2
**favorable** 183:4
**favors** 214:3
**FDA** 137:3 147:5,7
233:13
**FDA's** 233:7
**featured** 274:2

**features** 267:7
**February** 234:11
**federal** 12:24 28:16
43:16 110:24
202:10 266:25
293:13
**fee** 212:12
**feel** 74:4,17 280:3
306:14
**feeling** 19:15
**feels** 279:23
**fell** 60:3 152:16
153:1
**fewer** 231:25
**field** 272:9
**fifth** 75:11 145:22
146:14 165:16
222:19
**figure** 53:4 57:3
79:17 93:24 164:9
**figured** 156:10
**figures** 7:19,19 8:3
12:3,6,15,19 18:4
18:6 20:7,10,13
21:12,13,16,17,25
32:1,13,14,14
35:1,2,3 37:21
39:14 41:8,21
48:19 99:1 157:22
189:3,4,6,7,17,25
**filed** 7:23 9:17
54:13 56:4 83:15
92:14
**files** 288:4
**filled** 267:18
**final** 143:19
**finally** 205:13
242:9 244:3 269:7
**financial** 11:20
12:23 43:15 46:23
82:22
**find** 8:4 60:25 67:4
96:14 100:23
104:2 119:22,24
120:6,13 139:17
141:13 145:23
146:9 192:1

223:18 270:16,17
277:9 294:13
**finder** 294:8
**finding** 5:17 68:1
87:17,18 88:18
97:4,20 99:16
101:18 135:4
144:17 145:7
155:19 158:14
293:21,23 294:13
296:3,12
**findings** 145:4
155:7,12,14
**finds** 95:15 98:18
101:8 118:8 135:5
139:18,19,20,21
**fine** 3:22 9:11,21
24:12 25:14 40:3
46:1 61:10 74:14
159:15,17 162:9
248:15 275:9
**finish** 37:12 40:4
171:13
**finished** 128:1
305:19
**firm** 147:15,16
149:12,12,16
152:20 238:20,21
240:3
**firms** 143:3,4 148:6
148:7,10 149:1,11
150:2 167:11,12
232:1,3 260:10
**first** 3:5,6 4:17 6:9
7:16 8:6 9:1
10:13,15 13:11,15
16:4 25:1,3 30:25
33:22,25 35:21
46:24 48:11,13,14
49:25 53:21 55:15
63:18 73:3 82:3
92:19 95:8 96:1,1
96:2 97:11 106:2
110:1 111:5
123:15,18 137:19
138:2 139:5
160:20 162:14

163:1,2 164:11
166:4,8 167:24
172:20 176:15,18
178:5,6 180:2,4
180:12 181:15
185:22 186:6,10
188:22 189:1
190:3,6,12,13,16
190:21,24 195:4
195:22 196:21
197:1 202:12,23
203:17 205:14,16
205:19 206:1,4,21
207:2 209:10,16
210:14 211:8,22
213:15,23,25
214:13 215:3
216:9 217:25
219:21 220:5,14
227:3 228:18
230:5,21 233:5
235:15 236:21
237:3 241:12,23
242:17 243:6
244:13 246:3
247:17 249:24
250:18 254:10,17
257:10 265:10
274:22 280:20
284:11 288:7
293:19 297:3
298:6 299:10
301:19 305:8
**fit** 72:19,21 100:12
223:3 250:14
269:10 300:19
**fitness** 158:7
**fits** 120:6 300:19
**five** 44:24 49:8 56:7
57:8 58:7,7,16
59:10 60:4,11,12
60:21 77:6 80:15
127:18 130:5,11
131:9,14,16,21
132:2,25 139:8
141:5,8 142:17
162:17 164:17

181:24 184:14
209:16 210:14
211:8,22 281:13
281:14 291:16,17
**fixed** 210:8,9
283:23
**fixing** 88:3 154:23
154:25 155:5
263:24
**flag** 26:9 30:3
252:21 253:4,4
**flagged** 18:8 30:1,4
**flat** 43:25 143:1,1,2
147:25 148:9
229:17 234:19
**flatten** 180:10
**flattened** 204:18
234:19
**flaws** 143:14
**Flonase** 274:15
**flow** 264:21
**fluctuation** 39:21
**fly** 24:21 259:21
**focus** 5:2 41:4
105:8 152:11
163:8 166:19
295:12
**focused** 2:18 8:11
52:4 96:6 107:2
150:18 184:18
227:22 271:1
**focuses** 278:24
**focusing** 187:4
**follow** 5:5 37:5
54:15 67:23 70:8
73:11 79:14 94:7
194:20 267:8
**followed** 55:2 80:4
248:24
**following** 192:7
242:10
**follows** 11:20 54:19
104:19
**follow-up** 27:1
124:3 131:12
**follow-ups** 109:25
**footnote** 10:21

11:13,18,19 12:1
13:1,1,4,5 18:15
18:16 19:3 21:21
31:25 32:9 37:11
38:21 39:12 42:3
42:16,23 43:6
46:22 47:3,5,17
136:16 142:6,7
216:12 218:2
244:15 253:18,22
254:17 274:23,25
276:25 277:6,9,16
**footnotes** 276:18,19
276:20,23
**forces** 307:19
**Ford** 185:8
**foregoing** 309:4
**foresee** 51:3
**forever** 141:14,16
143:6
**forget** 250:2
**forgot** 153:15
286:14
**forgotten** 56:3
130:4 138:5
304:18
**form** 121:9,23
144:18 267:1
307:2
**format** 191:12
**former** 169:23
240:6
**forms** 161:18
**formulation** 121:20
**forth** 3:9 20:18
194:7 217:10
221:12
**fortunately** 267:23
**forward** 101:25
144:3 175:5
199:18 210:23
292:10
**found** 22:18 35:3
102:12 105:24
135:3 136:18
141:18 158:23
162:15,19 168:6

170:6 222:3
228:21 273:23
274:1 304:5,9
**foundation** 111:3
113:21 115:9
117:21,24 129:13
**four** 19:4,21 21:1,3
32:3 33:3 42:19
62:17 163:20
165:16 166:12
172:2,16 196:12
197:18 198:19,22
199:1,3,4,12
201:19 217:13,24
240:1 259:12
**fourth** 3:22 165:23
176:16,20 196:23
243:20 284:11
295:23
**frame** 153:2 154:9
154:11 237:9
258:11 281:8
307:15,24
**framed** 121:22
201:14
**frames** 121:6
**Fran** 149:18 151:18
**frank** 219:14
263:12 281:12
**Frankly** 134:7
**fray** 260:2,6 298:18
**free** 96:15,17 97:21
**freeze** 162:16
**frequently** 82:6
**friend** 68:12
**front** 40:2 50:8
132:14 307:12
308:4
**frozen** 138:12,13
138:16,19 164:17
**FTC** 10:22 11:21
12:5,5 13:19
15:21 16:3,6 17:6
17:16,23 18:6
19:2 20:20,21,24
21:7 22:1 24:20
24:23 28:16 32:1

32:15,17,18 33:20
34:2,4,7 38:5
43:18 71:12
188:13 189:5
191:13,19 192:4
192:24 193:14,23
194:19 236:8
241:19 242:5,12
259:19,20,23
260:5
**FTC's** 241:20
**full** 39:17 129:3
228:8
**fully** 67:25 109:22
206:11 215:10
**fumbling** 81:20
**function** 118:12
**funny** 19:15
**further** 64:20
101:10 139:10
155:9 159:7 242:5
305:23
**Furthermore** 11:20
12:23 43:15
152:15
**future** 82:24
300:12
**fuzzy** 56:13
**F.2d** 185:10,14

— G —
**G** 2:1 309:3
**Gallup** 63:12,12,18
64:17,24 65:4,12
66:1,9,9,11,19,19
67:1,6 68:8 69:1
70:1,2 72:12 73:7
116:25
**Gallup's** 69:24
71:9
**Gallup/Burzik**
66:22
**game** 254:24
**gap** 160:9,12
161:20,24 162:2
162:10 172:14
**GASSMAN** 1:15

**gatekeeper** 270:20
**gatekeeping** 118:12
**gather** 4:2 150:9
**gears** 174:11
**Gendusa** 66:5,6,9
66:15,23 67:4
68:12 69:11 72:12
73:8 77:16
**Gendusa's** 71:15
**general** 55:19
111:7 124:4
194:18 279:14
**generally** 55:20
82:4 94:5 120:14
123:17 163:19
175:15 218:22
219:18 223:1
224:7 251:12
252:12
**generated** 83:14,19
**gentleman** 66:5
**gerrymander** 84:10
**gerrymandered**
88:13
**getting** 41:15 108:1
140:9 205:13
213:7 252:23
255:18
**give** 14:9 50:15
74:2 106:24 136:1
148:19 185:4
194:18 211:20
219:24 235:7
285:14 286:12
306:15
**given** 3:10 20:14
97:18 220:25
235:9 247:20
256:2 281:24
290:2 294:19
**gives** 16:2,25 60:15
221:4 284:23
**giving** 47:9 202:21
**glad** 23:16 29:8
197:24 286:14
**glass** 87:5
**glossed** 253:22

**go** 8:10,18 12:22
13:7 15:18 25:20
35:12 36:16 37:1
37:9,13,13,14
38:16 39:24 41:12
42:20 44:2,3 49:1
50:16 53:25 54:22
57:13 58:20 61:19
64:19 66:2 68:11
71:3 75:19 77:20
78:7 80:7,7 83:9
101:25 115:14
122:21 124:19
128:4 140:18,19
140:20 141:14,15
143:19 145:13,15
146:8 150:7
151:21 161:4
167:5 170:20,20
171:22 174:18,21
176:10 178:1,8,12
185:21 188:15
192:16,22 195:6
195:21,24 196:6
196:20 202:24
204:20 211:4
215:12 218:17
241:7,18 254:25
256:5 263:5 269:5
273:7 276:3
290:15 291:20
298:23,24 299:20
300:22
**goal** 5:17 31:2
190:10 192:11,13
192:16
**goes** 27:22 28:7
36:24,25 44:5
69:1 82:25 122:16
136:20 167:14
195:23 196:1,9
198:25 202:9
211:1 213:5
241:25 243:6
281:21 293:14
298:15
**going** 6:3,15,18 9:5

15:9,18 17:8,19
19:22,23,25 23:25
27:2,3,16 34:19
37:16,16 46:17,17
47:22,24 48:16,17
51:12 52:17 53:1
53:20 55:18 57:4
59:15 63:14 67:2
67:8 69:13 76:7
76:22 79:15 94:2
102:2,20 106:20
108:6 110:14
113:2 117:3
120:13 122:22
123:3 147:21
148:1 156:9 157:1
159:13 166:16
173:14,15,17,22
177:9,21,22 180:6
181:24 186:8
188:13 190:11,21
190:23 191:8
193:4 195:21,24
196:6 199:6,18
200:15,15,20
201:9 202:24
204:15,16 207:22
211:17 216:19
217:16 218:22
230:22 232:13,19
233:24 235:20
239:12 241:18
242:19 249:20
257:7 264:2,21
272:17 279:9,23
286:16 287:22
291:3,4,4 292:10
294:20 296:25
301:23 303:18
305:14,15,17
306:6
**good** 2:3,4 3:19
5:18 19:24 21:22
21:24 23:8,10,19
24:6,15 40:18
50:11 82:12 88:25
107:19 127:9

130:15,17 139:7,9
142:25 143:13
159:12 167:10
174:3 226:12,20
255:11 265:25
266:7 270:2,4
272:10,15,16
274:13,16 279:25
285:19 288:3
297:17 300:2
303:21 304:23
**goods** 40:16 41:9
183:3
**governing** 217:19
**government** 28:17
110:24 275:22
**GPO** 233:12 234:5
**graft** 153:11
**graph** 15:20 16:25
40:7,12 160:5
260:24
**great** 8:9 54:14
92:1 97:25 112:12
113:8 262:6
**green** 86:9,11
87:13 147:22
**gross** 7:14,17 31:1
31:22 44:11 49:6
192:11
**grossly** 16:15
**ground** 126:17
**grounds** 19:24
21:22,24 23:8,10
23:19 139:9
143:13 169:17
226:12,20 255:11
265:25 266:7
270:2,7 272:11,15
272:16
**growth** 299:2
**guess** 7:20 18:18
21:2,8 22:7 37:23
73:22 95:22 96:18
128:11 134:3
171:6 174:23
176:1 246:10
258:7 268:12

**guests** 83:1
**guidelines** 236:8
**guilt** 69:11
**gynecologists**
    235:11

### H

**hadn't** 63:16 68:18
    68:19
**Hafer** 218:9
**half** 25:24 33:23,25
    35:20 36:20 43:20
    43:25 44:1 45:3
    48:11,14 97:22,24
    160:19,20 166:4,8
    178:6,10,11 180:4
    180:8,12,13,13
    181:10,15 183:10
    185:22 186:10
    188:22 189:1
    190:3,6,13,18,21
    190:24 195:4
    204:19 205:5,11
    205:16,17 206:4
    207:3 213:23
    214:13 215:3,5
    229:17 234:25
    301:19
**hall** 286:10,11
**hallway** 63:6
**hammer** 132:11,16
**hand** 4:16 9:13
    173:19,21 229:25
    243:16
**handed** 7:11 28:8
    31:14 61:20
    192:23 219:12
    248:22,23
**handle** 4:18 53:20
    156:16 306:7
**handled** 256:22
**handling** 2:18,23
    53:2
**handy** 57:19
**hand-ups** 7:10
**hanging** 128:20
**happen** 51:25

173:15
**happened** 26:23
    34:4 64:4 117:18
    182:3 183:16
    196:24 233:1,16
    282:4,5,8,9 284:1
**happening** 210:13
**happens** 8:22 13:13
    13:14 29:4 69:1
    98:17 247:3,22
    278:19 284:1
**happy** 171:5
**hard** 12:19 23:17
    79:2 87:20 90:12
**harm** 200:17 202:6
    202:20
**harmful** 202:14
    249:6
**Hartzell** 226:14
    268:1,4,8
**Harvard** 268:25
**hasn't** 106:7
    118:18 127:18
    128:20
**hat** 128:20
**haven't** 8:8 18:10
    22:25 48:18 74:3
    76:16 93:11
    120:11 123:25
    133:16,17,18
**head** 38:16 191:14
**heading** 72:19
    81:25 82:9 144:16
    145:13 146:21
**heads** 148:19
**health** 59:3
**hear** 77:12 117:7
    248:11 249:22
    250:2
**heard** 10:15 49:23
    116:18 233:23
    234:23 306:11,12
**hearing** 5:15 6:11
    6:12 13:15 40:1
    56:8 70:4,6,7
    84:12 86:3 92:21
    92:21 93:8 101:13

111:9 116:16
    117:6 128:16
    164:11 166:6
    179:6 196:17
    201:13 225:16
    228:9 289:9,13,15
    289:17,18,21
    290:5,13
**heart** 5:17 6:4,7
    15:2
**heavily** 147:25
    149:13,15 279:7
**heavy** 223:23
**Helcot** 217:11
**hello** 67:7
**help** 13:4
**helped** 79:17 269:2
**helpful** 9:9
**helping** 271:1
**helps** 148:13
**Heplin** 284:21
**here's** 67:13 68:13
    72:5 84:21
**hey** 66:11
**he'd** 70:7 100:10
**he's** 22:7 23:8
    29:10,23 32:4,6
    32:20,25 42:4,5
    43:18 45:2 46:13
    47:21 63:13 64:3
    69:13 78:10 85:22
    85:23 89:17,18
    92:23 94:25 96:4
    96:6,10,12,25
    97:19 103:11,11
    103:17,22,23
    104:1,10,11,14,17
    104:20 105:20
    112:15 113:9,10
    113:11 115:5
    122:18 124:22,24
    125:1,3,7,9 126:4
    126:5,9 127:1,2,6
    127:7,12,15,16
    128:18,20 129:7
    130:6,12,13,20,23
    131:13 132:7

138:23 139:1,12
    140:4
**high** 12:4 67:5,5
    73:20 105:13
**higher** 25:7 26:15
    36:24 40:25 60:19
    87:24 167:11
    172:22,23 188:19
    193:14 226:3,6
    243:14 288:14
    294:6 298:20
**highest** 164:13
    166:12 170:10,13
    170:14 172:16
**highlight** 231:13
    239:12 260:1
    279:14
**highlighted** 64:19
    73:2 84:23 85:16
    152:4 221:15,16
    230:25 242:10
    259:24 263:5
    279:4,22 284:12
**highlighting** 298:4
**highlights** 220:19
    260:4
**highly** 67:23
    147:11 252:9
    260:15
**hindsight** 182:15
**hit** 122:25 156:19
**hodgepodge** 249:20
**HOF** 286:5
**hold** 63:5,11
    261:25 268:3
**holder** 47:10
**holding** 69:11 73:8
    295:18
**holdover** 286:8,13
**home** 226:18
**homework** 72:16
    74:2
**homogenous** 137:2
    147:7
**honest** 14:7
**Honor** 2:4,12,15
    3:18 4:5,19 5:10

5:19 9:3,12,20
    10:1,6,10,12 11:8
    11:25 12:16 13:3
    13:8 14:7,23
    15:15 18:5 19:12
    19:23 20:15 21:19
    22:3,14,17 23:15
    23:23 24:2,15
    25:2,11,19 26:5,7
    26:11,19,23 27:7
    27:12,22 28:8,13
    28:17 29:2,13,20
    30:9,23 31:5,8,15
    31:19 32:5,21
    33:10,18 34:9,21
    34:23 35:5,11,15
    36:1,6,17,22 37:2
    37:8,10,25 38:11
    38:16,23 39:3,6
    39:10,24 40:1,21
    41:5,11,12,22
    42:8,20 43:2
    44:19,25 45:9,13
    45:24 46:13,23
    47:3,6,21 48:4,8
    48:20,25 49:15,22
    52:25 53:20 54:11
    54:24 55:23 58:4
    58:9,14,18,24
    59:14 60:10 61:14
    61:15,24 63:20
    64:9 66:22 67:11
    67:18 68:7,17
    69:5,8 71:8 72:23
    74:6,12 75:18,24
    76:6,22 77:14,22
    78:6,18,20 80:17
    82:19 83:13,20
    84:4 86:6,24
    87:15 88:20 89:1
    89:17,22,24 90:7
    90:9,25 91:9,22
    92:19 93:8 94:19
    95:1,24,25 97:10
    97:23 100:12
    101:14,24 102:14
    103:9 104:6 105:7

105:17,17 106:7
106:14 107:14,23
107:25 110:1,5
111:2,4,6,12
113:14 114:16
115:1,21 116:10
116:17 118:2
119:2 120:5 121:1
122:2 123:7,20
124:4 125:15
126:17 127:24
128:3,17 130:14
131:11 132:4
133:9,25 134:24
135:14 137:7
138:9,12,17
142:10 143:13,14
143:22 144:2,2
145:10,14,24
146:14 147:1
148:16,18 149:1
150:3,5,12 151:21
153:11,21 154:16
154:20 155:10,16
155:22 156:2,5,10
156:19,23 157:11
159:9,12,14,19
160:6,25 161:13
161:17 162:2,5,15
162:24 163:24
164:1,12,14,20
165:13,20,21
166:18,23 167:1
167:16,20,22
168:4,23 169:9,16
169:25 170:5,12
170:20,25 171:4
171:12,20,23
172:5,17 173:24
174:1,4,18,22
175:1,6,19 176:3
176:6,9,18 177:15
177:19,21 178:16
178:19,23 179:3
179:10,15,17
180:15,20 181:4
181:12 182:5,9,18

182:21,25 183:10
183:22 184:6,19
185:5,11,18,20,22
186:11,13,17,21
187:4,7,17,20
188:19 189:8,19
190:2,7 191:3,8
191:19,21,24
192:6,21 193:8,13
193:20,22,23
194:1,14,20,22
195:16,18,23
196:3,9,11,13,20
197:17,25 198:7
198:14 199:4,7,10
199:15 200:5,24
201:8,17,24
202:18,23 203:9
204:10,14,25
205:14,18,22
206:24 207:6,15
208:16,25 210:11
211:4,18 213:4,20
214:18,24 216:10
216:14,21 217:1,8
217:9,11,14 218:4
218:21 219:10,12
219:20,22 220:4
221:25 222:18
223:2,7,11,14,19
223:24 224:6
226:1,18,23 227:1
227:4,5,8,12,13
227:18 228:7,9,10
228:16 229:1,5,12
229:23,25 230:4
230:11 231:14
232:14,18,19
233:6,20,25 234:2
234:14 235:14,19
236:3,7,15,18,25
237:3,15,25 238:5
238:15,16 239:4
239:18 240:11,14
240:23 241:2,5,8
241:21 242:17
243:7,10 244:9

246:18,20 247:8
247:14,23 248:6,9
248:14 249:15,19
249:23 250:11,16
251:1,18,25 252:8
252:18 253:10,16
253:25 254:7
255:18 258:10,23
261:14,18,19
262:5,9,15 264:6
264:25 265:23
266:8,20 267:12
268:2,23 269:4
270:9 271:23
272:17 273:14
275:1,8,11 276:1
276:4,7,22 278:15
278:21 279:2
280:14 281:9,11
282:4 283:11
284:7,7,10 285:1
285:18 286:3,8,18
287:20,22 288:6
289:10 293:4,20
294:10 295:6,9
296:24 297:20,24
298:8 299:10,21
300:12,18,21
301:10 302:1
303:20 304:13,19
304:22 305:21
306:7 307:10
308:3,11,16
**HONORABLE** 1:7
**Honor's** 10:10
107:7
**Honor's** 168:18
186:22 217:6
218:8 226:13
227:7 237:19
292:6 293:5
294:13 295:17
**hope** 23:22 246:21
271:11 283:4
**hopefully** 305:16
**horizontal** 154:23
154:25 155:5

236:8
**horse** 30:7 131:8,13
**Horticultural**
235:23
**hospital** 152:11,15
235:6,10,16
**hospitals** 153:18
235:9
**huge** 53:15,16
**humongous** 65:9
**hundred** 79:12,14
**hurdle** 29:25
**Hydrogen** 54:17
87:24 227:14
283:8 292:4,9,15
292:20
**HyperRho-D**
239:13
**HyperRho-S/D**
239:17 240:14
**hypothesis** 218:1
**hypothetical**
102:14 218:16,19

_____

**I**

**IBNTS** 224:17
**Ice** 185:15
**idea** 267:11
**Ideally** 230:15
**identical** 144:21
256:1
**identification**
106:15
**identified** 35:10
95:25 130:14
133:15 134:1
164:19 189:5
255:4 291:16
**identifies** 7:16 98:9
200:8
**identify** 100:10
293:20
**identifying** 111:13
**ignore** 48:10
190:22 212:18
215:4 246:1
301:19

**ignored** 44:22
48:13 178:5 190:3
195:8,11 204:4
232:17
**ignoring** 206:25
209:19 211:2,22
212:13
**II** 163:17
**illalics** 277:19
**illegal** 122:13
282:25
**illicit** 73:5,10
**illustrate** 89:24
178:4 181:13
205:19 231:18
**illustrated** 196:14
**illustrates** 210:18
**illustrating** 196:15
**illustration** 159:22
**imagine** 34:10
**immaterial** 57:10
244:21
**immediately** 62:18
**Immucor** 5:24
14:11 27:3 36:18
37:4 45:4,6,19,21
46:6 50:17 51:2
52:17,21 62:6
63:7,13,21 64:3
64:13 65:15,23
66:1 67:23 69:23
70:2 73:22 79:14
79:21 80:4 93:25
98:19 109:20,24
117:1,14 133:19
134:6 135:20
159:25 161:6,21
161:22 162:7,12
162:16 163:3,20
163:22 164:2
168:25 174:5
177:23 178:12,15
178:17,21,22
179:2,22 180:7,8
180:21 186:7
194:21 195:9,14
201:2 206:10

210:21 214:9
220:18 223:8
225:3,19 226:2,22
277:20 278:1,12
284:21,22 291:1
**Immucor's** 32:7
41:25 43:7,11,14
43:19,24 45:25
46:8,14,17 47:16
47:23,24 48:1
79:3,5,9,24 80:6
126:23 134:1
135:24 136:1
**Immucor's** 160:13
160:17 166:10
174:14 180:25
181:5,9,10 190:9
190:10 214:8,10
223:10 224:1,22
224:25 225:8,9,21
226:6 284:25
**impact** 8:3 75:2,10
75:11,12,13,14
83:17 84:24 85:6
86:5 88:4 90:20
97:15 101:17,21
102:2 108:4,11
112:10 113:21
136:6,7 138:21,24
149:5 152:21
173:1 198:10,22
199:3,13,24 200:3
201:20 202:16
203:19 247:6
249:7 281:7,13,21
281:23 282:1
283:3 284:19
285:1,5 286:10,20
286:24 287:14,15
288:8 291:14,17
292:13,23 293:1
293:22 295:2,3,14
296:2,8
**impacted** 173:20
282:16
**imperfect** 221:20
222:7,22 262:23

263:8,14 265:19
300:14
**implement** 125:13
**implementation**
96:21 111:1 129:3
129:21 130:8
131:3 233:7
**implemented** 36:11
62:18 68:20 96:21
109:23 110:7
131:5 162:12
163:23 164:2
175:22
**implicit** 264:22
**importance** 20:16
108:3
**important** 6:6 16:2
38:18,23 63:2
72:5 78:2 103:9
103:20 105:18
106:17 111:22
116:22 117:7
152:15 163:1
178:2,8 221:14
225:12 231:2
243:1 274:9 288:8
289:4 293:19
297:10,23 299:18
301:18
**importantly** 105:3
236:19
**imposed** 88:4
**imprecise** 51:17
**impression** 13:16
41:16 251:21
**improper** 108:22
**improve** 84:15
**improved** 84:21
**inability** 216:7
**inadmissible**
246:18
**inappropriate** 68:5
98:8 181:23
292:23
**incentives** 82:5
**incepted** 91:3 96:18
**incepting** 99:17

**inception** 91:12
93:5 104:24
183:20
**inches** 267:2
**include** 72:11,12
87:2 172:3 185:25
192:14,18 239:25
240:1
**included** 2:20 3:8
5:6 7:20,25 14:20
17:2 49:17 90:2
110:22,23,24
188:7 189:17,24
190:6 194:12
258:6 270:11
**includes** 7:15 27:17
40:16 130:7
**including** 63:8
89:21 110:12
124:10 170:23
172:10 195:1
241:16 256:3
**inconsistency**
137:16 205:15
**inconsistent** 182:3
183:16 213:11
274:19,19
**incorrect** 13:6
183:21
**incorrectly** 274:24
**increase** 21:3 22:6
25:5 33:7,21
34:21 36:11,14,15
36:18 37:5 39:16
42:15 47:19 53:5
58:6 60:16 64:25
65:9 67:10 79:13
79:14 85:3,13
116:20 117:3
125:11 128:23
129:6 130:4
131:20,21 132:23
132:24,25 140:21
163:3 174:18
180:22 188:23
196:24 197:6
201:3,5 203:2,21

203:23,25 204:2
205:11 209:22
216:7 222:4 234:3
234:8 236:5
279:11 290:21
291:4 299:6
**increased** 18:22
19:4 32:2 33:2,23
42:18 88:6 193:11
201:6 206:15
244:1
**increases** 11:21
12:25 26:13 30:16
43:17 44:24 49:8
49:11 53:15,16
57:9 58:16 60:5
60:11,19,21 73:15
73:18,21 79:12
80:15 85:14 88:5
110:15 130:5,15
130:17,18,23
138:22 140:16
141:3 142:17
175:20,21 179:22
179:24 180:11
181:10,16,17
203:6,7,24 205:5
206:11,12,15,17
210:3,22 211:7
212:2 216:1
229:19 260:16
284:17 289:8
294:2,5
**increasing** 59:11
126:5 245:5,7
**increasingly** 279:6
**incredibly** 73:20
**independent** 114:7
115:7 121:7 122:5
124:11,21 125:18
125:20 126:12
145:8 155:20
235:21 236:1
242:2
**independently**
143:11
**indiscernible** 83:6

138:8 147:5
172:12 231:24
256:15
**individualized**
273:4
**industries** 82:4
140:12,13 147:2,4
**industry** 140:14
**infamous** 15:21
40:10
**inference** 158:20
169:14 170:8
**inflation** 90:17
**influence** 203:23
206:6 222:11,12
245:15 308:6
**influenced** 209:13
225:15
**information** 6:20
13:10,16 16:5
18:3 27:24 67:4
68:11 89:13
126:18,24 137:1
151:8 207:23
212:23 220:9,23
302:2,10
**informed** 82:4
**ingredient** 226:3
**ingredients** 225:2,4
**initial** 16:24 84:6
84:20 96:18 251:6
256:5 278:14
286:8 287:12
294:23 295:1
**initially** 8:10
**initiations** 85:12
**injuries** 266:23
**injury** 74:25
288:11,12,19
294:9
**inner-dependence**
122:1
**inputs** 91:7
**inquiry** 227:23
228:2,8
**ins** 273:17
**insert** 272:1

**inserting** 74:17
**insignificant** 260:11
**instance** 136:13 260:3
**instruct** 267:24
**instructed** 54:17
**instructive** 68:4 270:18
**integrity** 129:12
**intended** 213:18
**intends** 254:20
**intense** 216:5
**interdependence** 290:19,20
**interest** 307:15,20
**interested** 83:1 252:11
**interesting** 262:10 270:19 299:22 305:6
**interfered** 129:3
**interpret** 299:23
**interpretation** 117:10 249:2
**interrogatory** 251:6
**interrupt** 40:6
**interviews** 218:11 218:13
**introduce** 66:8
**introduced** 64:14 67:5
**introduction** 247:9
**intuition** 272:4
**inventiveness** 58:17
**invest** 233:11 240:8
**investigation** 124:21 125:20 140:2,3 267:8
**investing** 239:20
**invited** 64:22
**invoice** 110:8
**involve** 263:24
**involved** 72:13 170:23 220:24

268:22
**involvement** 257:13
**involves** 87:16 220:7
**involving** 263:13
**ironic** 141:1 278:25
**ironically** 9:5
**irresponsible** 54:13
**isn't** 38:18 41:2 48:23 95:23 100:14 104:1,8,8 104:20 109:8 111:13,18 113:15 116:24 124:24 130:19 139:18
**issue** 3:6 5:18 8:6 8:24 15:17 26:6,9 26:13 28:25 30:1 30:2,4 42:9 51:5,5 51:7,7,8,14 54:9 56:11,13 76:7,24 77:7,7 87:17 95:16,17 96:9 100:19,19 101:1 108:3 109:1 111:22 112:5 113:1 120:1 122:16 128:15 133:14,23 134:11 134:15,23 137:14 137:15 143:19,20 159:13,16 184:24 227:6 229:10 230:9,19 231:7,20 231:22 232:12 247:2,7 256:10 272:20 274:17,18 278:18 280:24 281:8 300:17 304:5 307:14,20 308:8
**issued** 11:16
**issues** 2:8 4:15 6:5 6:7 53:2 71:3 108:23 109:13 122:25 123:25

128:7 131:3,7 155:25 156:16 176:8 201:14 214:17 219:13 249:6,17 250:6 281:2 307:11,17 307:17,19
**Italian** 185:15
**item** 281:4
**items** 281:3
**it's** 3:17 6:10,11 8:15 10:15 11:1,3 11:10,13 12:21 15:9,16,17,17 16:10,11 17:17,19 17:20 18:1,15 19:7,8 20:10 21:8 21:11,11 22:9 23:16,18 28:4,9 30:19 31:4 34:18 34:20 35:20 37:14 39:7,9 42:14 46:22 47:22 55:6 55:7,16 56:8 57:1 57:6,7,15,18,22 60:9,10,23 68:4 71:1 72:25 75:12 75:13,22 77:25 78:6 79:2 80:25 81:15,21,21 82:20 83:8 84:22 90:6 94:21 95:15,22 98:8 100:19 101:16 102:13,14 103:10 105:18 106:6,8,17,19 107:11 108:21 111:9,14,23,23 112:6,7,11,17,21 114:18 116:11,22 117:7,7,8,8,12,17 117:20 118:11 119:13,16 120:12 121:21,23 123:11 124:5 127:12 128:16 130:18 133:2,5,14,15

135:12,14 136:13 136:22 140:2,23 141:12,13,16 142:4,23 143:5,12 143:18 144:4 146:25 147:1
**it'll** 217:15 282:14
**I'd** 3:22 9:3,8 10:11 24:18 33:1 42:21 45:23 66:11 78:2 89:24 117:11 119:21 143:17 144:15
**I'll** 8:13 9:13 24:8 27:8 39:24 50:3 51:13 52:1 56:9 58:9 77:12 78:21 83:21 96:1 97:10 106:24 119:3 120:21 121:2,3 123:5,5 124:1 125:9 126:2 128:17 133:4 141:19 143:21
**I'm** 2:18,22 5:17 6:2,9,15 7:13 9:23 10:3 11:5,7,8,18 12:6,13 13:1 14:6 14:7,23,24 15:14 15:18 17:5 23:16 26:1 27:2,9,18 28:4,20 30:22 34:11 37:23 41:15 42:18 45:15 46:7 47:5,6,7 48:8 50:21 51:11,18,20 51:20 53:1,20 54:10 55:12,24 56:10 57:2 59:15 61:15,21 63:6 64:9 69:5 74:12 76:7,22,22,25 80:22,23 81:3,19 81:20,20 83:23 84:11 86:25,25 87:6 95:21 106:11 106:12,17,24

114:10 116:4 121:18 122:24 123:6 132:12 134:10 136:17 140:9 146:1
**I've** 10:24 29:22 33:19 35:17 41:13 50:20,20 56:3 59:15 61:16,20 66:20 69:8 76:15 80:17,18,24 108:15 116:5 122:23 123:14 130:3 134:5 138:5 144:8

---

J

**JAN** 1:7
**January** 55:10 84:1 84:1,7,9 85:4 92:3 92:8 94:2,12 95:18,21 97:1 98:10,20 99:17 101:11 127:14,15 128:22,22 130:9 130:21 160:4,10 160:12,14,15,17 162:11 163:13 166:1 175:20 195:17
**JAY** 1:11
**Jeff** 11:5
**JEFFREY** 1:10,14
**JEFREY** 1:10
**Jeremy** 279:3
**JEROME** 1:17
**Jersey** 236:9 248:25
**JMJ** 185:15
**JOANNE** 1:12
**job** 24:6 139:24 303:21 305:6
**Johnson** 299:16,16 299:18,18
**joint** 153:7 306:23 307:24
**JONATHAN** 1:14

**Joshu** 179:4 180:16
185:19 187:2
188:15 239:1,12
298:1
**judge** 70:5 93:15
101:8 132:12
154:21 156:18
169:21,23,23
170:6,23,23
201:10 214:23
274:15 307:8,9
**judgment** 6:6
183:14,15 269:3
**judicial** 202:10
249:11
**Judy** 65:13,19 68:9
68:11,24 69:21
70:13 77:16
**juggling** 248:16
**July** 1:4 6:12 25:17
70:12 90:16 116:5
175:5 176:1
179:14 290:2
309:7
**jumbled** 13:9
**jump** 107:6,9
**jumped** 61:16
193:11
**jumping** 24:4
273:12
**juncture** 83:3
**June** 90:16 237:6
248:25 257:11,23
257:25
**jury** 98:17,19
100:22,23,25
101:8,18,25
102:11 267:1,24
269:22
**Justice** 236:8
**justifications** 48:15
**justified** 84:22
**justify** 46:8 49:7
**justifying** 44:23
45:3
**J&J** 299:14

## K

**Karara** 173:9
**Kashen** 26:11
**keep** 15:18 19:11
32:15 83:7 93:19
114:23 116:22
138:20 180:24
184:5 200:4
221:19 262:22
265:6,18 266:13
300:13
**kept** 66:12 93:19
**key** 45:24 150:5,16
199:19 200:10
221:24 279:16
298:25 299:5
301:25
**kind** 74:1 125:6
126:13 131:13
157:7 159:13
166:7 205:10
227:22 259:21,22
263:23 270:8
278:22 280:11
**Kleinbard** 149:19
151:18 152:2,3,17
233:4,20 237:25
238:5 239:1
240:22 241:3
243:2,24 256:6,9
256:12 258:23
259:4,17 297:5
298:23
**Kleinbard's** 152:1
236:17,20 237:24
259:6 297:4
**knew** 19:25 44:19
66:9
**knobs** 19:8,10 20:3
**knock** 103:3
**know** 3:15 5:2 8:7
18:6 20:20 23:17
28:23 29:6,14
30:11,13 31:21
34:9 37:15 38:15
40:16 45:8,12

48:25 52:25 55:18
60:4 61:11 74:7
79:1,13 90:1
103:17 107:6
114:11 124:3
125:6 126:18
128:16 131:12,12
132:10 140:9
141:24 149:7
150:11,17 152:4
158:11 162:10
163:9 167:17
169:22 178:19
179:1 189:13
191:13,20 193:4
193:19 194:5
198:6 201:12
208:17 209:25
210:12 219:23
220:1 227:11
228:18 262:11
264:1 266:10
267:12 275:21,25
282:17 283:4
284:10 285:12
299:21 300:21
302:15 306:2
**knowing** 102:1
**knowledge** 102:19
**known** 73:23
192:19
**knows** 29:13
227:13
**KODROFF** 1:14
**KOPP** 1:15

## L

**label** 260:10,10
**labeled** 286:9
291:13
**labor** 225:7,7,10
226:5
**lack** 255:13
**laid** 198:5
**landscape** 239:25
**language** 64:20
72:20 75:6,7

81:12,13 87:23
136:13 141:13,19
208:22 270:19
271:25 279:5
285:13,19,25
**lap** 247:13
**large** 130:3 149:3
149:20 173:17
196:16 255:20
256:13,20
**largely** 75:10
153:18
**larger** 79:12 85:12
129:16 173:21
**lastly** 295:23
**late** 90:16 154:6
246:24
**latex** 239:19
**Laughter** 248:10
288:2 298:9
**Lauman** 214:22
**laundry** 255:21
**law** 51:21 55:19
59:15,18 80:20,20
80:22 81:5 142:6
219:14 236:18
266:24 267:5
270:4,11 272:22
274:16
**lawful** 99:15 114:2
121:10 203:6
282:21 294:2
**lawyer** 132:11
252:22 297:18
300:2
**layer** 36:17
**lead** 76:16
**leadership** 35:7
36:12 99:7,24
103:3 105:25
106:4 108:8
109:14,22 112:13
113:8 114:13
115:10 116:9
121:11,23 184:7
184:19 229:22
261:13 294:3,7

299:3
**leading** 174:13
**leads** 54:15,20
104:23 108:8
**leaning** 279:7
**learn** 117:15
**learned** 25:6
117:14 268:8
**lease** 162:18
**leased** 163:18
**leave** 8:13 121:2
166:2 203:20
247:19 288:3
**leaving** 246:1
304:24
**led** 48:12 90:16
**left** 147:12 164:23
165:17,23 198:4
219:5 241:12
286:6 288:5
**left-hand** 217:12,18
**legal** 98:10 122:14
122:15 202:13
249:5 283:1
292:19
**legend** 76:11
164:20
**legible** 285:9,23
**legit** 19:20
**legitimizing** 96:3
**LEGO** 196:16
**LEGOs** 287:24
288:1,4,6
**lend** 296:3
**length** 131:15
235:3
**lesser** 232:1
**lesson** 268:8
**letter** 3:9,11,13,14
3:16,17 4:16,20
5:18 10:18,19
14:14,16 28:8
29:17 50:19,21
68:18 191:23,25
194:19 226:8
252:2,16,23 304:1
**letters** 77:18,19

letting 101:25
let's 2:24 12:22
  17:11 32:24 35:12
  52:23 62:19 63:10
  63:10,18 65:10,12
  66:14 74:8 75:21
  75:22 78:15 86:1
  86:19 96:8 105:6
  105:8 109:9
  133:22 143:21
  145:10,12,15
let's 150:1 156:20
  156:21 158:10
  215:1 235:15
  238:8 242:24
  247:20 292:2
  307:21
level 65:24 142:19
  163:17,17 169:25
  170:2 202:2
levels 246:3
LEWERS 1:12
Lexis 185:16,17
  226:15
liability 6:4 198:13
  201:22 249:6
lien 183:3
life 185:3
light 67:9 87:21
  88:17 137:11
lightly 82:17
lights 275:23
Likewise 294:10
limit 28:24 171:8
limited 121:24
  216:24 227:23
  302:11
line 33:4 38:20 70:9
  86:8,9,10,11,13
  145:21 146:14
  148:9,11 165:8,22
  165:23,24,25
  166:19 183:2
  209:6 210:11
  211:5,19 237:14
  238:18,21 239:16
  241:16 267:13

297:10,14 301:2
  301:10,20
linerboard 90:1,10
  90:11,12,15 94:15
  107:1,6 158:2,4
  292:6,9
lines 86:7
list 3:24 69:12,14
  73:9 80:8 110:17
  110:21 165:25,25
  172:15 251:7,7
  255:21,21 259:23
  281:3 283:17,18
  283:21,23,24
  284:1,13,14,17,23
  303:25
listed 217:18 240:3
listen 238:8
literature 266:2
litigant 252:22,22
litigation 1:5 2:7
  83:2
little 5:16 32:24
  36:10 53:25 55:7
  58:7 61:16 65:10
  65:13 68:8 77:25
  79:2 123:23
  140:10 145:11
  147:18 148:12
  160:10 164:25
  166:9 174:24
  194:15 196:11
  204:17 235:7
  251:5 273:13
  285:15 286:11
  301:5
live 50:8 51:7,8
  280:8
Liz 2:24 176:11
  207:11
local 146:3
lock 197:18 283:21
  284:2,18 285:13
  285:24,24
Lofal 144:23
  228:13 229:6,9
logical 216:20

long 23:16 67:13
  106:8 116:19
  118:7 204:16
  252:9 255:20,21
  265:21 268:15
  300:9 303:24
longer 77:25 227:9
long-run 221:22
long-term 183:19
  183:20,23 185:1,2
look 16:9,23 17:4
  17:11,16,21 50:16
  52:22 63:10,11
  70:5 71:21,21
  72:8,18 73:2 86:1
  86:19 123:15
  133:13 135:16
  141:19 145:12
  147:19 148:5
  151:17,25 157:12
  158:10 160:13,15
  164:7 170:21
  171:23 174:12
  175:4 187:11
  195:19 217:13
  277:7 278:21
  285:16 300:11
looked 47:22 71:11
  79:12 96:11,15
  108:19 144:4,9
  183:8 184:2
  298:24
looking 6:10 12:6
  31:3,25 32:4 42:4
  80:23 114:10
  116:5 143:24
  144:3 164:22
  171:20 174:20
  175:8 179:13
  181:18 182:19
  186:6,7 187:3,16
  189:4,16 191:3,16
  191:18 193:20
  240:21 245:11
  249:12 251:2
  259:21 300:25
looks 46:24,25

148:11 165:10
  191:20 205:2
  222:12 245:11
  293:15
lose 36:18,21,23
  79:15 285:3
losing 49:19 129:12
  193:7
losses 21:9
lost 14:15,25 94:4
  146:5
lot 6:5 9:22 58:17
  62:13 72:13 79:15
  79:18 120:1 123:4
  137:1,4 176:19
  178:1 192:12
  238:6 287:9
low 238:2 242:8
  298:13
lower 43:13 47:15
  65:24 142:13
  167:13 173:3,4
  234:5 259:13
  291:25 294:21
lowered 192:12
lowest 164:13,15
  166:13,14 170:10
  170:11,14,15
  172:10,13,16
  238:3,7,12,15
loyalty 299:7
luck 300:22
ludicrous 263:24
lunch 69:2 106:21
  107:7,8

## M

magistrate 307:8,9
magnifying 87:5
maiden 65:14
main 10:11 30:13
  93:15
maintain 192:3
maintaining
  298:18 299:2
major 19:7 20:3
  59:10,22,24 77:7

93:22 132:1 147:2
  195:2 200:25
  203:12 239:21
  258:18 259:5
  280:17
making 33:20
  74:21 85:22 87:20
  89:5 129:23
  130:23 136:16,17
  148:25 182:11
  201:4,6
management
  220:23
mantra 155:4
manual 202:10
  249:11
manufacture
  136:25
manufactured
  135:22
manufacturer
  241:15 268:5
manufacturers
  149:7 233:9,10
  244:20
March 69:20 70:11
  301:4
margin 31:1,23
  49:7,10 52:16,20
  153:24 154:11
  192:11
marginal 221:23
  265:22
margins 44:6,10
mark 220:12,13,17
  264:18,18,20,22
  265:11 304:6
market 1:24 22:17
  58:11 59:4,9,10
  59:22,24 60:14,22
  61:1 62:12,14
  73:16 90:23 91:7
  91:15,20,22
  121:17 126:19
  140:11,22 141:21
  142:25 143:3,4,7
  143:8 147:15,16

147:25 148:4,7,9
149:2 150:2
151:10,11 152:3,4
152:9,12,13,22,24
153:5,6,13,17,24
157:20 163:3
165:8,22,24
167:10 182:1
195:3,7,11 196:19
196:20 197:1,5,12
199:14 200:16
201:4,15 204:3,7
209:9 215:11,20
215:25 216:3,22
222:1,1,4,11,13
228:21 229:5,10
229:20 230:9,9,15
230:19 231:6,6,19
231:20,21,22,25
232:6,10,11,15,16
233:2,14,17,17
234:10,21,25
235:21,25 236:14
237:13 238:10,11
239:9,14 240:2,4
240:5,19 241:17
241:21,24,25
242:4,6,21,21
245:22 246:4,5,15
250:7,10,14
253:21 256:3
257:1,4,7 258:11
260:15,18,19,20
260:23 263:13
281:18 282:2,15
285:6 287:4 289:7
291:5,20 292:21
293:18,21,24
294:4,15,19
298:11 299:3,5,11
299:13 300:9,10
300:20
**marketed** 235:8,10
**marketing** 238:6
239:3,4 251:10
**marketplace**
121:25 263:11

264:7 294:19
**markets** 145:15,17
146:22 153:19
231:23 242:18
245:1 299:4
**mark-up** 141:25
220:6 300:8 304:5
304:10
**match** 198:13
201:22 217:15
**matched** 214:1
302:12
**material** 11:21
12:25 26:15 43:17
224:25 243:20
**materials** 135:23
196:13 225:24
272:9
**math** 171:25
182:24 188:1
245:9
**matter** 111:16
158:19 169:14
171:9 175:18
193:1 309:6
**matters** 111:17,18
111:21 113:16
**McClay's** 198:9,23
**McDunna** 168:18
169:22 170:1,24
274:7,15
**McSwain** 269:18
**McSwain's** 269:9
269:12
**MDM** 307:6
**mean** 18:20 19:24
20:17 23:11 29:16
40:6,9 52:17
54:13 57:7 60:11
135:3 136:22
142:14,23 147:14
158:4 186:5
216:23 223:5
246:1 262:25
263:22 267:12
271:1 276:9
**means** 17:13 21:15

21:16 58:16 73:18
89:11 149:2
263:15 264:20
288:13
**meant** 173:11
264:13,18 283:19
**measure** 181:7
220:11 282:18
**measured** 21:17
74:19
**measures** 232:6
**measuring** 240:16
287:14
**mediation** 307:4,5
**meet** 66:11,19,20
67:3 68:11 80:7
105:22 247:4
255:11 296:14
**meeting** 55:15 64:4
64:5 77:16 116:21
116:23,24 117:14
117:15,17,18
**meetings** 67:21,25
106:2
**meets** 61:6
**member** 173:14
**members** 108:11
173:12,13
**memo** 271:8
**memorandum**
155:3
**memory** 165:4
**mention** 5:2 220:16
268:10
**mentioned** 51:10
71:5 83:12 146:23
148:23 238:17
241:3
**mentioning** 146:24
**mentions** 285:13
**mere** 83:1
**merely** 272:3
**merger** 236:8
241:19 242:10,12
**merit** 261:19
**Meritor** 80:23
81:12,25 82:10

124:12 125:15
**merits** 282:11
**message** 279:13
**messed** 80:24
**met** 68:8 110:13
192:15
**method** 60:24
118:3 141:24,25
142:2 146:4
219:24 220:6,7
221:18,25 222:10
223:4 230:6 238:4
250:8,9 262:14,22
263:14 264:16
265:5,17 300:8,13
300:17 304:10
**methodology** 16:17
38:25 75:11,14
98:21 101:20
142:3 143:8
169:12 176:25
177:14 198:10,17
198:24 200:7
202:21 203:12,19
214:22 217:4,5,6
218:7 219:7,18,19
220:15 221:11
222:20,23 245:17
264:23 265:25
266:3,5 272:2,4
281:20 282:1,19
282:20,25 283:5
285:3 286:19,19
286:21 287:12,13
**methods** 217:20
228:24
**MICHAEL** 1:18
**middle** 11:24 152:6
277:15
**Mid-Atlantic** 1:23
**mid-1990s** 233:6
**Mike** 64:2,2
**MILLER** 1:16
**milliliter** 159:24,25
160:2,14,16
**million** 16:10,11,11
17:7,12,14,17,17

17:18,22,23,24,25
18:1 34:19,20
38:6,9 40:23,24
157:24 158:8,25
167:18 168:12
169:7,11 182:15
183:9 187:13,24
188:3,4,5,19,20
273:20 274:20
275:5 276:15
**mind** 19:11 116:22
139:9 221:19
262:22 265:6,18
300:13
**minds** 98:18
**mine** 165:15 201:13
248:18
**minimal** 21:9
**minor** 50:5
**minus** 193:4
**minute** 15:9 27:9
55:8 75:23 142:23
160:18 166:14
196:1 218:23
229:18 263:1
305:13
**minutes** 78:24
174:7 247:25
**mirrors** 254:24
**mischaracterized**
236:20
**misconduct** 82:8
**missed** 46:11
**missing** 126:25
**misspoke** 31:6
**misspoken** 264:11
**Mitchell** 270:18,19
**mitigate** 53:12
**mixed** 219:3
**mode** 39:2,7
**model** 8:22,25 33:8
33:9,11,12 75:2
79:11 84:14,21
85:21 86:16 90:22
98:15 104:25
129:14 130:15,17
262:24 281:6

285:6 287:2 289:5
291:12,12,18
292:18 294:16
296:10,13 303:13
**modeling** 79:16
80:3 264:3
**models** 33:15
137:17
**moderate** 79:22
**modest** 21:1,3 32:2
33:3 38:22 42:19
47:19 73:15
**modify** 77:18
**moment** 4:4 24:3
24:11 97:11 105:7
203:20 270:10
**money** 49:19 193:7
238:6 239:20
240:8 275:22
**monopolist** 291:6
**monopoly** 154:12
154:15 290:23
291:1
**Monosarah-1**
159:25
**monstrator** 160:6
**months** 184:11
239:6
**moral** 285:4
**morning** 2:3,4
24:15 77:8 119:22
129:25 177:25
185:21 192:8,23
193:10 206:19
208:17 267:6,18
**motion** 11:4 83:15
175:9 228:16
**Motor** 185:8
**move** 50:3 52:1,23
83:21 121:3
143:17 175:24
194:21 226:24
242:24 247:13
248:8
**moved** 12:18 96:10
**moves** 218:3
**moving** 96:4

**mustard** 158:5
**mutual** 290:20
**MVM** 2:7

## N

**N** 2:1
**name** 59:6 65:14,14
239:17 240:7,9
299:18
**named** 66:5
**names** 163:17
234:13
**narrative** 191:18
**National** 1:23
**nature** 137:2
**necessarily** 37:17
91:21 185:2
272:19
**necessary** 20:23
56:8 158:9 270:14
287:18
**need** 14:10 39:14
39:25 42:6 49:10
87:4,5 121:13
154:5 223:15
227:15,19 231:11
236:11 245:21
264:12,14,15
274:20 275:4
295:19 305:18
**needed** 243:23
**needs** 39:13 97:24
112:9,10,16
113:24 133:7
169:10 197:9,10
246:8
**negative** 52:18,18
193:7
**neither** 88:4
**Neo** 248:23
**nerve** 73:20
**never** 3:9 26:19
102:19 193:25
229:2 261:24
263:25 264:1,5,5
267:3 282:6
**nevertheless**

120:23
**new** 9:15,16,24
15:5,6 24:23 30:9
109:23 149:13
151:8 163:18
236:9 248:19,24
259:15 269:8,11
299:5
**night** 8:11 16:9
**nine** 110:20,22
184:11
**Nino** 71:24
**nodding** 268:21
**nomination** 305:5
**non** 112:2 121:5
142:12
**non-collusive** 127:2
127:4 221:21
222:7 265:20
300:14
**non-conspiratorial**
99:23 104:14
108:9 127:20
130:22
**non-judicial**
217:21
**non-reliable** 253:1
**non-standard**
187:11 192:20
193:6 251:9
**non-transitory**
236:4
**noon** 108:19
**Nope** 226:25
**Norbridge** 79:17
187:8,10 224:23
224:24
**Norbridge's** 187:7
**normal** 192:3
283:22
**normally** 14:8 29:3
78:1 81:7 97:15
**note** 9:24 73:1
132:18 135:4,12
135:17 163:2
254:9 261:22
274:14 287:25

**noted** 7:10 174:12
**notes** 250:13
276:24
**notice** 160:4 174:22
**noticed** 308:2
**novel** 141:16
**November** 55:15
55:16,17 62:22
77:17 90:18 92:17
95:5,14,22 96:12
96:22 99:6,17,18
100:18 101:7,9
102:10,17,21
103:2,7,19,19
104:23 105:7,8,22
106:3 108:2,2
109:6,7,19,19
110:13,21 111:5
114:23 115:2
160:24 161:12
230:13
**number** 3:23,23
5:5,13 7:22 10:22
15:7 16:10 19:22
36:25 38:9 53:11
53:21 58:21 59:24
61:24 62:17 67:16
75:18,19,20 76:7
78:7,7,8,9,11,17
81:15 83:22 84:6
86:2,20 87:16
88:14 90:6 99:21
108:14,16,18
110:22 121:24
127:7,17 133:18
141:7,15 142:12
176:20 179:18
183:10 184:17
187:3,11,18
189:13 206:14
233:2,10 241:4,17
243:3,18 255:20
266:9 288:9
291:17 293:5,8
**numbered** 58:1
179:10
**numbers** 17:1

24:23,24 31:16
151:14 162:4
166:7 181:18
187:21 188:3
205:7
**numerous** 272:9
**nuts** 305:1
**nutshell** 23:19
284:19 285:1
286:18

## O

**O** 2:1 224:9
**OBGYN** 235:17
**objective** 299:1
**objectives** 298:25
**obligation** 84:18
**observation** 89:6
176:18
**observed** 294:23
**observing** 294:18
**obtained** 142:13
243:21
**obvious** 44:15
155:1 260:19
**obviously** 20:4
22:15 141:21
154:3 171:12
175:4,22 219:2
239:7 241:16
243:9,13 278:16
288:9
**OCB** 195:5 209:22
210:1,4
**occur** 99:20
**occurred** 34:12
53:15 109:6
114:22
**October** 90:18
109:15 110:12
191:22 239:5
279:4
**OCV** 4:1 56:15,16
56:21,25 57:5,10
57:23 59:13 60:20
62:3,15 63:1,3,9
68:4 76:8 77:12

77:24 79:9 80:2
80:10 83:25 95:19
96:16,24 111:20
112:1,2 114:11
116:7 123:17
126:15 128:10,14
130:8 131:23
132:1 133:3
137:23 139:6
**OD** 152:4
**odd** 12:10
**offensive** 136:20
254:21
**offered** 162:16
234:12 257:17
258:7 283:6
**offering** 200:3
238:3,12,15
**offers** 231:15
**office** 235:12
**officers** 83:3
**official** 64:3 309:4
**oft** 155:4
**oh** 11:9,15 31:4
36:20 43:3 47:6
50:22 86:25
113:11 127:11
130:16 156:3,4
160:7 165:15
167:2 186:19
196:10 197:23
215:15 223:13
224:10 247:20
267:16 271:15
280:9 284:7 286:7
304:15
**okay** 4:9 9:7 11:16
13:8 15:4,8,20,21
16:1,9,14 30:13
46:25 52:12 57:17
57:25 58:20 60:15
61:22 63:22 64:2
64:19 65:12 66:20
66:21,24 79:19
81:24 84:4 85:2
87:2 106:10,22
107:10 119:5

120:3 124:2
135:19 141:11
142:25 143:21
144:8,14 145:2,11
145:13 146:2,20
146:22 147:2
158:6,15 159:14
183:5 188:12
194:17 196:4
214:25 246:23
250:4,23 254:21
258:25 260:21
263:4,19 264:18
268:17 269:6,24
271:15,18 272:4
273:11 277:10,12
280:23 285:18
304:20
**old** 9:17,25 68:12
126:17 196:12,12
240:7
**oligolopies** 263:25
**oligopolies** 147:12
**oligopoly** 147:24
**once** 15:18 129:4
129:10
**ones** 10:7,8 149:3
205:8 212:15
**one-month** 161:11
**open** 162:11
**opening** 186:18,20
296:18
**operate** 82:5
**operated** 216:3
**operation** 92:2,5
96:2 97:25 105:23
112:12 113:8
128:19 178:7
180:4 184:2,13
187:8 188:25
203:17 206:3
223:21 245:20
**operational** 67:25
**Operator** 1:18
**opine** 108:10 112:9
235:20 262:7
**opined** 90:22

183:13 207:1
225:11 244:5
246:12 260:23
**opines** 91:13
100:21 161:9
**opining** 54:3
103:22 113:21
118:2 261:22
272:20 290:25
294:4
**opinion** 5:3,23 8:10
8:12 19:12 21:22
23:12 25:23 53:8
60:14 67:14,20
74:2 83:17 87:21
88:18 97:20
100:22 108:4
111:14 112:4
113:1,25 119:13
119:15,18 122:15
122:19 123:15,18
135:4,13 140:8
141:10 142:7,17
144:16 145:2,19
145:25 149:23
151:24 154:22
158:15,15,23
161:14 162:15
167:19,25 169:14
169:21 185:13
196:21 198:9
200:20 202:24
213:22 218:9
222:3 223:7
226:13 227:7,10
227:18,25 228:19
228:22 235:15,22
235:24 236:18
249:13 250:10
255:9,10 256:5
261:5,25 269:3,19
269:21 271:23
272:18 276:8
277:1,6 295:12
297:12
**opinions** 19:24
72:19,21 124:7

201:11 226:13,20
266:9 272:3,10
**opportunities**
240:13 299:5
**opportunity** 247:20
281:25
**opposed** 143:3
156:25 171:15
243:8 244:20
272:3
**opposite** 46:3
262:12 263:12
264:25 266:4
**opted** 73:15
**option** 57:8
**options** 58:2 59:7
82:15,17
**opts** 96:23
**oral** 1:7 2:8 29:10
306:12
**orange** 165:6,24
**oranges** 19:7
**order** 88:14 104:3
104:12 105:19
110:7 112:9
134:21 219:7
250:25 305:11
307:14,15,18,25
308:9
**ordinarily** 24:5
**organized** 305:9
**original** 5:9 7:23
8:8 12:7,8 22:1
26:1 30:21 81:18
115:23 116:1
143:25 186:17,18
241:2 281:3
**originally** 144:24
149:12
**Orms** 309:3
**Ortho** 5:25 6:21
7:14 10:22 11:14
13:11 14:13,23
16:12 17:3,13
18:23 20:17 25:5
27:12,25 28:9
34:7,15 35:6 38:8

43:12 47:14,18
48:1 49:9 50:19
52:16,17 59:19,21
62:1,15 63:6,21
64:1,15,23 66:2,6
66:8,10 67:3,5,20
68:13,22 72:24
73:22 74:18,18
79:4,22 82:13
84:9 85:25 87:17
87:20 89:4 92:3
94:1 98:19 104:15
109:18,18,20,23
110:12,17 111:1
112:3 117:3 124:6
125:7,10,12 126:2
126:8,15 129:16
130:2,18 132:7
135:21 136:19,19
141:1,2 144:16,23
144:25 145:21
147:1,3 149:14,19
149:22,24,24
150:22 151:11
152:5,24 154:10
154:21 157:21
159:24 161:6,21
162:13,19,23
163:3,5,15 164:3
167:25 168:7
173:6,7 180:19
181:24 182:14
183:25 187:9
188:3,7 191:13,19
192:2,5,9,11,15
192:16 200:14
203:2 207:24
212:19,24 216:21
223:22 225:2,18
239:3,6,24 240:17
243:21 251:6
254:17,19 260:1,6
273:9,12,15,22
277:21 278:12
279:4 280:7,8
281:15 282:5
283:15 291:1,22

298:17,21 301:24
302:3
**Ortho's** 6:19 7:7
11:15 17:1 18:21
19:3,20 23:4,10
23:18 27:4,16,20
28:15 31:1,20
32:7,10 42:2,3,4,6
42:17 43:8,10,20
44:5,9,10,13 46:2
46:7,9,15,16,24
47:18 51:23 52:21
59:14 62:8 63:14
64:6,21 73:16
77:17,20 79:8
82:15 88:11
120:17 126:21,23
127:1,12 134:2,6
134:25 135:25
137:11
**Ortho's** 152:11
153:1 155:2
160:15,16 180:22
181:1,1,6 182:5
185:21 186:6,12
186:16 188:10,23
188:25 189:12,14
189:20 190:23
192:1 193:1
206:25 207:22
208:12 217:23
218:3 219:4 223:2
223:10,25 224:21
224:24 225:7,9,22
226:2,3,5 229:15
253:5 256:21
257:24 278:24
284:23,25 299:1
302:10
**Ortho/Immucor**
162:2
**ought** 107:8 268:9
**outline** 61:22 78:9
157:8
**outlines** 61:23
**outrageous** 107:3
**overcharge** 169:2

177:3
**overhauled** 269:13
**overhead** 225:7,8
225:10 226:6
**overlap** 76:14 77:9
86:8
**overlaps** 92:11
191:4
**oversimplifies**
142:11
**owe** 300:4
**owed** 303:25
**owned** 238:19
257:9

---

**P**

**P** 2:1 164:24
**PA** 1:4,24
**packaging** 225:1,4
**Padova** 201:11
**page** 6:13 7:13,13
7:13,21 10:21
11:12 12:22 21:8
25:4 28:20 35:10
35:19 43:1 44:7
53:9 58:19,21
71:8 72:25 91:10
93:7 135:4,10
145:19,25 154:22
157:12,14 158:15
162:22 167:21,22
176:15 177:11
179:8,9,16,18
185:11,23 187:3,4
209:1 211:5 214:6
218:2 219:20
222:3 223:6,20,24
226:15 229:11
230:10,14 236:24
239:11,23 240:10
240:11 241:12,12
249:12 262:17
263:2,3 269:7
271:8 272:25
273:1 277:8
285:20 289:11
293:9,10 295:2

297:14 298:24
300:23 301:1,20
302:15
**pages** 44:4 176:13
179:10 198:8
225:16 227:17
244:6 289:10
**paid** 63:3 168:24
225:2,3
**papers** 102:16
**paragraph** 7:11
11:12,25 32:6
34:24 42:21,23
44:3,7 46:12,20
64:20 115:23,24
116:1 146:11
151:23 168:17
172:6 206:2
215:13,18 221:16
241:13,23 242:5,9
244:15,17 254:9
257:3,10 259:23
262:13,17 278:6
279:5 298:4
**paragraphs** 116:14
**parallelism** 121:19
261:8,11,23
**Parchment** 51:9,15
74:7 136:10,14
158:22 168:2
285:4 286:22
**pardon** 133:1
**parens** 298:13
**parenthesis** 73:13
**parenthetical**
146:3,17
**part** 4:23 6:14 9:4
13:19 23:3 35:9
76:23 78:21 79:16
104:2 107:3
118:11 122:7,15
132:17,24 134:8
140:2 175:1
181:16 213:15,25
214:2 247:21
258:6 259:24
260:1,12,13

273:21 277:25
279:12,23 303:11
**participant** 151:8
**participants**
260:14
**particular** 58:8
136:13 249:18
269:19 272:2
**particularly** 133:20
137:11 175:20
212:13 250:6
289:4
**parties** 161:8
**partly** 5:11 151:25
152:1,2 158:24
**parts** 23:1 272:6
**pass** 27:8 64:16
65:3 66:25 140:12
216:1,22 217:3,5
219:7,18,24
**passage** 171:23
199:19 201:7
**passed** 141:20
158:5
**passing** 216:24
**passive** 260:25
261:3,21
**patient** 299:6
**Paul** 1:12 89:3
306:6
**pause** 7:5 13:2
23:13,15 24:13
57:24 70:21
107:24 116:3
163:6 185:6
219:11 227:2
230:3 232:21
236:23 237:1
242:15 263:20
275:24 304:3
**pay** 238:21
**paying** 172:22,23
173:3,4
**peer** 217:18
**pencils** 83:11
**PENNSYLVANIA**
1:1

**people** 63:15 65:15
66:1 282:5 305:1
**peppered** 29:9
**percent** 18:22 19:4
19:21 21:1 22:6
31:2 32:3 33:3,7
39:15 42:19 47:20
49:8,9 53:5,14,19
57:9 58:6,16
59:11 60:2,5,11
60:12,16 62:3,4,8
73:24,25 79:12,14
80:13 124:19,19
126:5 128:23
129:6 133:1 139:8
141:3 142:16
148:1 152:14,14
152:16,16,25
153:1,1,24 154:11
163:3 170:3,4,9
170:14 177:7,8
179:25 180:1,14
180:15 191:2
192:10,11,12,15
203:21 205:10
209:22 211:10,12
211:14,14 212:2,9
240:2 245:6,7
299:3,11
**percentage** 125:19
126:7 163:14
169:2 177:3
210:21 211:12
215:23 284:12
**percentages** 180:17
**perfect** 88:11
138:19 164:4
222:21 255:16
263:23 264:2,4,8
265:25 272:13
274:11
**perfectly** 222:1
**perform** 20:23
**performed** 44:8
269:14
**period** 19:4 21:1,3
30:17 32:3,8,15

32:16,20 33:2,4,7
33:8,10,23 34:1
39:16,16 42:19
43:21,25 44:2
45:4 48:2,3,5,11
48:14 49:2 53:14
91:4,6,14 92:11
93:18 97:20 98:25
104:2,11,20
108:10 109:7,18
111:19,20 134:17
134:22 137:18,18
137:19,20 138:24
139:5 160:3,11,20
160:21,24 161:10
161:11 166:4,5,8
178:6,11 179:23
180:5,9,12,13,14
180:19 181:11,16
185:1,22 186:11
188:21,22 189:2
189:22 190:4,6,14
190:18,21,24
191:4 195:5,15
204:19 205:6,12
205:16,18 206:5
206:21 207:3
209:17 210:15,22
211:8,23 212:3
213:23 214:14
215:4,5 216:5
224:2 225:14
226:4 229:17
234:13,17 235:1,2
237:16,21 238:10
239:9 241:21
244:2 245:10,12
256:10 257:8
274:22,22,23
275:10,14 297:19
297:23 301:19
**periods** 22:10,10
275:8
**peripherally** 123:3
**permeations** 29:16
**permit** 24:8
**permitted** 269:18

**Peroxide** 54:18
87:24 227:14
283:8 292:4,9,15
292:20
**person** 65:24
**perspective** 92:16
155:19
**persuaded** 147:14
227:12,16
**persuasive** 87:23
87:25 294:15
**ph** 2:23 26:12 67:2
71:25 80:15 81:6
124:5 144:23
145:22 151:16
158:3 168:18,19
170:6 173:9
176:16 198:10
206:10 214:22
217:11 218:9
219:9,14 227:23
228:13 248:24
267:4 269:9 271:7
279:3 280:5
284:21
**pharmaceutical**
243:11 244:19
**phase** 2:17 9:1
**phases** 8:16
**Philadelphia** 1:4,24
**phone** 251:2
**phony** 280:13
**phonying** 73:7
**phrase** 28:20
121:19 123:22
261:10,10 290:18
**pick** 18:17 92:10
100:6 214:2 231:9
**picked** 100:9 205:3
238:16
**picking** 41:3
117:21,24
**picture** 39:18
**piece** 153:19
197:14,15 200:12
279:23 280:3
**pieces** 22:10 197:18

281:13
**piled** 247:12
**pilot** 110:20,23
**place** 22:14 41:21
47:9 77:16 111:5
122:6 158:22
163:8 217:16
245:19 253:12
**places** 41:23,24
261:13
**plain** 284:16
**plaintiff** 7:11,24
95:12 146:4
**plaintiffs** 1:10 6:3
55:13 56:22 88:6
90:20 91:5 92:7
102:1,4,15,19
103:6 105:5,14
110:3,20 116:6
117:5,8 155:3
168:12,14 184:12
188:2 192:11
193:25 196:22
197:13 199:9,23
200:2 202:22
203:3 217:1,22
218:1,6 219:16
227:24 228:4
229:6,18 232:22
236:22 273:19,24
283:22 288:16
291:7,12,24
292:17 297:5,11
**plaintiff's** 2:10
3:24,25 4:22,22
5:11 6:13 7:21
12:7,8 35:19
38:10 57:18 67:20
89:9 92:12,15,20
93:4 94:5,25 96:5
101:16
**plaintiff's** 166:17
175:9 182:13
184:3 185:24
188:16 189:14
191:14 218:21
219:6 223:14,17

227:4 236:25
247:5 296:14
300:3
**plan** 33:22 56:15
56:15,16,17,18,25
57:5,23 58:12
59:6,7,13 61:1
62:15 63:3 67:22
73:16 76:9,12,24
76:25 77:3,5,6,6
77:12,12 80:6
82:7 92:1,3,6
105:20 108:6
110:7 111:1
112:19 114:2,2,6
114:7 122:5
123:24 124:18
125:2,3,8,12,13
125:22,25 126:2
127:2,4,9,15
128:21,22 129:5,5
129:8,18,20,22
130:8,8,10,11,12
130:14,19,21,24
131:1,4,4,9,13,15
131:19,23 132:2,2
132:3 175:9
181:24 182:3
183:15,16,19,20
183:24 184:13,14
184:18,25 185:2
209:23 210:2,5,6
239:3,4
**planned** 126:15
**planning** 82:14
131:16
**plans** 100:5 109:15
110:12 124:4,6,9
124:10,14 129:10
129:15 130:6
239:6
**plaque** 286:11
**plasma** 243:23
**plausible** 67:23
139:7
**plausibly** 114:6,7
**play** 78:2 95:1,6

99:11 106:8
113:13 114:15
115:11 117:11
148:15 157:2,5
161:1 163:24
166:16 213:17
237:23
**played** 26:11 63:19
65:17 66:16 68:16
69:3,7 78:16,19
95:7 99:12 111:11
115:16 116:19
148:17,24 150:4
157:10 161:3
163:25 166:15
236:22 238:13
297:20
**players** 260:15
**pleadings** 54:18
55:11,19,20
**please** 2:5 66:15
68:25 78:3 107:20
148:15 156:21,22
158:11 174:10
226:25 257:21
268:3 285:14
**plus** 26:4 57:9
59:10 60:4,7,20
79:19 131:17
184:14 220:12
225:1,1 265:10
**point** 5:20 10:12,20
22:13 25:1,2 26:8
28:19 30:14,25
33:20 40:5,7,18
40:21 41:13 45:24
48:21 49:3,5,25
49:25 50:1,5
51:25 52:3 53:3
55:22 59:8 66:3
67:14 74:23 77:14
78:2,11 82:3
89:25 92:22 95:11
97:7,8,11 99:3
100:12 103:20
106:13,17 108:5
114:16,20,21

115:22 116:1
121:2,4 122:10,11
127:1 128:6,18
129:16 131:12
132:8 133:7,15
136:15,18 137:5
139:11 140:4
141:1,4 142:14,15
144:12 147:14
148:19,25 153:21
154:4 157:21
158:2 166:18
167:19 168:14,16
178:5 181:3,22,22
182:11 183:11,24
184:11,18 185:20
186:6 192:7,8,14
192:25 193:1
196:14 199:19
202:18 216:9
219:21 220:1,5,5
221:13 223:3,8,13
223:18 228:18
234:2 237:2 245:2
254:11,19 255:20
255:23 256:1
257:6,7 258:5
264:10 269:6
272:17 279:16
291:15 294:12
295:13 297:3,11
299:25 300:4,21
**pointed** 29:22
60:13 68:20 79:22
80:12 117:5 139:6
141:6,9 143:14
164:12 185:23
216:25 217:2
225:17 257:5
268:19 270:8
276:16 303:10
**pointing** 113:7,9,11
129:2,13 130:21
132:7 224:23
229:8 278:9
292:20
**points** 10:9,11

30:12,17 48:9
49:23 50:2 78:20
97:10 103:21
124:5 128:1
133:11 141:2
142:7 158:3 166:3
176:13 177:12
178:4 190:8 219:1
236:16 243:2
255:21 256:7,11
258:16 262:9
266:8 277:13,15
278:5 284:11
295:18 297:12
**policy** 180:22
219:14 250:6
**polluting** 55:4
**pool** 271:17
**portion** 73:3 84:23
85:16 152:4
220:19 272:19
295:1
**position** 3:25 65:20
91:18 92:20,23
93:3,4 102:20
120:17 124:5,8
252:21 255:8
256:16,25 262:7
298:19 299:3
308:1,8
**positions** 225:13
306:15
**possibility** 73:4
**possible** 14:25 15:1
37:14 74:20 85:23
230:22
**possibly** 172:25
200:17
**post** 32:8 62:2,7
134:22 138:24
186:9 275:13
**posture** 305:19
**post-2005** 133:15
133:18 134:17
137:18 156:16
176:8 180:19
195:15 274:23

275:12
**potential** 80:6
**power** 234:6
**Poynter** 64:2,2
66:24
**pre** 165:10
**preceded** 90:23
**precedes** 104:18
**precisely** 98:3
**precision** 74:20
**precludes** 296:14
**preclusive** 121:12
**predict** 36:4 51:11
181:24 232:9
**predicted** 25:8 38:9
40:25
**predicting** 34:15
36:1 130:22
182:14
**prediction** 35:5,9
35:25 36:10 37:22
40:22,24 182:5
184:15 185:24
**predictions** 183:19
**predicts** 209:15
**predominance**
293:23 296:4,15
**predominate**
249:10
**preface** 13:9
**Preference** 9:2
**pregnancies** 147:11
**pregnancy** 235:13
**pregnant** 235:9
**preliminary** 227:9
**Premier** 233:22
234:4,5,7
**premium** 298:20
298:22
**prepared** 83:1
**preparing** 16:6
18:6
**presence** 152:20
**present** 1:14
106:23 144:22
**presentation** 9:6
15:7 52:2 63:5,14

63:16,21 64:22,24
65:16,18,25 67:10
86:3 91:10 131:10
135:15 144:11
157:16 159:5,19
162:22 164:10
179:5 194:23
205:9 207:16
223:12,21 240:12
241:9 258:16
278:15,22 284:9
286:8 305:12
**presented** 5:4
11:21 12:24 27:17
43:16 95:11,15
100:15,16 102:5
102:15 103:12,15
108:16 109:5
116:6 305:7
**president** 63:12,21
64:1,6,15 65:6,8
66:2 67:3 70:2
80:7 117:1 305:3
**presidents** 66:18,23
67:6,8
**pressuredly** 9:5
**presume** 292:23
**presuming** 292:12
**presumption** 292:3
292:7,11,16 293:7
293:14
**pretty** 66:7 133:6
147:20 180:23
213:21 238:4
253:25 285:22
299:12
**prevailed** 230:19
**prevent** 235:13
**pre-2005** 133:22
274:22 275:10
**price** 25:5 26:13
30:15 36:10,15
37:5,15 44:24
49:8,11 53:5
59:11 60:5,11,16
60:20 65:1,9
67:10 69:12,14

73:9,15,20 77:17
80:8 84:25 85:3
85:12,14 86:11,14
87:8,10,14 88:5
89:7 99:8 100:4
105:20 108:6,9
110:15,17,21
111:1 112:19
116:20 117:3
121:10,22 122:5
124:10 125:19
128:23 129:6,10
129:15,18,19
130:4,5,15,17,18
130:22 131:20,21
132:23,23,25
134:12 138:22
140:21,21 142:12
148:10 150:20,22
153:10 154:23,25
155:5 156:25,25
157:3,20 158:4,16
159:6,16,22,23
160:2,13,15,16,17
161:18,19,20,23
161:24 162:2,10
162:14 163:11
164:5,13,15,16,24
165:5,22,24,25
166:1,3,9 167:9
169:17,19,25
170:7,13,14,14,15
171:8,21 172:3,9
172:11,13,14,15
172:16,16,18,21
172:23,24 173:3,4
175:6,21 177:1,2
177:2 180:11
181:17 195:2,24
196:2,6,24 197:6
197:11,16,18
201:1,5 203:2,6,7
203:21,23 204:2,5
204:6 206:6,12
209:14,22 212:2
212:11 215:9,22
216:7 220:10

221:22 222:7,8,12
222:12 229:15,16
229:22 231:19
232:4 233:16,19
233:24 234:4,4,5
234:7,7,19,19
236:5 238:3,7,12
238:15 239:22
240:5 242:8 243:1
245:15,23,25
246:6,11,14,15
258:18 259:5
260:16 261:12
263:24 265:14,21
273:13 274:5
275:3,16,20 277:2
278:2 279:10,12
279:17,18,19,21
283:17,18,21,23
283:24 284:1,13
284:14,17,23
288:14,15,21,23
289:1,8 290:22,23
291:1,3,5,6,9,19
294:2,2,5,7
297:23 298:13,21
299:2 300:10,11
300:15
**priced** 127:17
259:16 298:20
**prices** 36:18,23
37:13 43:13 47:15
53:13 60:2 68:18
73:24 85:5,8,8,9
85:10,17,18,19
86:9 88:6,8,8,9,9
88:15,15 90:17,22
91:7 104:5 105:13
109:23 124:19
140:19 142:18,20
148:1 149:5 157:4
157:18,24,24
158:25 161:6,9,21
162:17 163:21
164:17 166:10
167:12,13,18
168:13,24 169:8

169:11,20 172:2
172:10 178:12
180:10 181:8
185:21 199:6
202:2,24 203:5
204:18 206:15
209:15 210:8,9
211:13,16 222:4
222:24 229:14,14
232:9 233:1,18,21
234:2 237:17
242:4 244:7
273:20 274:21
275:5,21 276:14
276:15,21,21
277:15,18,21,24
278:10,11 283:21
283:25 284:2,15
284:18,22,25,25
288:17,18 290:21
291:3,20,25 292:1
294:6,7,21,21,24
296:9,9
**pricing** 62:2,4,7,11
63:7 68:21 86:10
88:2,3 99:8,15
108:7 109:14,21
110:10 115:10
122:1 127:10
128:13 129:9
147:3,21,22,23
153:3 161:5 162:7
162:20,24 163:9
163:23 169:1,3,6
174:13 175:22
242:11 259:14
260:25 261:21
274:2 278:3
281:18 282:6,8
283:15 284:12
285:8,22 287:5
290:20 294:11,14
294:18,22
**primary** 43:23
243:20
**principal** 152:11
**principals** 228:24

**prior** 99:5 110:13
199:23 216:4
224:1
**private** 238:19
306:25 307:9
**probably** 170:19
179:7 205:7 234:4
266:1
**problem** 19:1,5
20:2 92:4 93:23
96:2 111:2 172:18
173:2 175:1,19
214:19 222:19
256:8 275:19
**problems** 96:1
172:19 246:2
**proceed** 2:11,14,16
76:5 176:7 247:18
250:24
**proceeded** 132:16
**proceeding** 8:18
95:12 186:15
247:21 291:22
305:8 306:19
**proceedings** 305:23
308:20 309:5
**process** 233:8
255:3
**produce** 16:3
254:20,21,23
286:1
**produced** 43:12
47:14 67:4 198:18
210:17 254:18
255:6
**producing** 255:24
**product** 82:23
90:12 91:24 106:1
112:2 150:10,10
150:13,17 152:7
158:17 159:23
166:11 175:12
205:3,4 224:21,21
224:22 225:8
229:15 230:16
231:23 234:12
235:25 237:5

239:16,18,21
241:16 257:11,24
258:2 299:19
**production** 90:11
187:7 209:12
220:9 251:10
265:8
**products** 53:13
135:23 136:25
137:2,8 147:6,7
160:1,2 172:15
174:14,14 233:10
243:15
**professional** 272:7
299:6
**Professor** 168:19
**proffered** 103:11
291:7
**profit** 7:14,17 8:1
12:19 31:1,23
36:2 44:6,12 49:6
49:10 52:16,20
146:5 220:12,13
220:17 265:11
299:2
**profitable** 83:4
244:4
**profits** 16:19 21:8,9
52:4,4,5,14,19
82:7 244:7
**program** 35:7
36:12 68:21 99:24
103:3 106:1,4
108:9 109:22
112:13 113:9
114:13 116:9
162:20,25 163:4
164:2 184:7,19
307:4,5
**programs** 162:12
**project** 125:11
**projections** 82:6,18
82:22 83:1,6
124:10,17 125:17
**prominently** 267:7
**promo** 258:18
259:6,7,7,8

**promotion** 239:22
**pronounced** 144:4
175:23
**proof** 101:17,20
118:3 273:4,5
286:24 287:15
289:2 291:6,16
292:24 293:12
**proofs** 55:20,21
**propeller** 268:5
269:15
**proper** 55:6 61:6
69:15 122:20
253:7
**properly** 137:23
281:8
**proposed** 149:25
228:15 269:9
272:4 281:17
**proposes** 167:25
168:7 241:22
273:9,12,15
**proposition** 91:18
**prosecutor** 69:10
**prospect** 292:12
**protect** 173:11,12
240:5 299:1
**protected** 164:16
172:3,11
**protection** 162:14
270:21 278:2
**protector** 270:20
**prove** 247:5 261:20
281:21,23 282:13
282:14 296:2
**provide** 10:5,6
24:18 113:20
**provided** 3:9,13
6:21 9:19,23
13:10,17,18 14:2
14:24 23:20 27:24
75:9 115:9 152:3
187:10 200:7
207:24 212:23
213:12 302:2
**provider** 238:2
**provides** 87:23

**proving** 102:2
300:17
**proxy** 32:7 43:8,19
46:8,15 48:1
134:2,6 135:25
137:10 181:5
223:10 225:21,23
226:11
**Puget** 83:5
**pull** 90:4 180:16
236:21 239:1
298:1
**pulled** 238:24
241:13
**punchy** 255:18
**purchase** 110:9
**purchasers** 154:24
**pure** 68:3 151:3,13
**purple** 165:22,23
**purports** 291:7
**purpose** 7:2 163:4
223:5 267:3
**purposefully**
180:10
**purposes** 7:3 9:18
44:11 208:8 223:6
**put** 17:23 23:14
32:23 43:5 105:6
111:17 153:16
217:21 248:18
253:17,18,20
257:3 267:21
286:11 301:1
308:1
**putting** 57:2 240:17
252:21 307:25
**p.m** 1:5 76:1,2
107:17,17 174:9,9
248:2,2 308:20

**Q**

**qualifications**
119:14 218:25
219:2
**qualify** 112:10
**quantification**
219:15 250:21

304:7
**quantity** 288:20
**quarreling** 91:16
**quarter** 107:11
165:11 308:17
**quarters** 273:8
**quest** 274:10
**question** 8:21 27:15
29:2,14,19,22,24
34:21 38:14 53:21
59:18 69:17 76:13
76:18 77:2 84:13
93:9 100:15
117:23 118:24
119:2,3 137:16
138:6 145:6
167:17 184:25
186:22 189:9,20
191:9 193:2
207:19 209:24
210:11 214:2
228:12 237:3
239:7 247:16
256:19 280:15,17
282:10,11 288:20
296:7,9,11 301:18
302:17 305:17
307:24
**questionable**
219:25
**questioned** 306:17
**questioning** 237:14
297:10,14 301:2
**questions** 29:9
50:17 52:1 70:5
83:21 88:21
143:16 154:17
155:9 159:5,8
205:14 249:9
278:16 280:15
306:13,13
**quibble** 181:4,6
**quibbled** 204:17
**quick** 223:8
**quickly** 4:8 176:10
209:3 253:25
299:20 300:7

305:11,15
**quite** 25:24 46:5
110:4 118:18
132:14 149:9
180:18 211:14
251:16,17 260:19
274:17 287:9
**quote** 32:16 35:8,9
51:9 53:8 66:23
67:19 74:9,16
81:25 82:20 97:1
139:14 202:1,9
206:9 253:1
255:18 266:11
269:17 271:25
272:2,5 274:8
301:14
**quotes** 57:2 145:17
205:18 206:8
**quoting** 145:18,20
158:21,22 168:1
270:3

**R**

**R** 1:15 2:1 171:1
**RACHEL** 1:15
**raise** 26:6 60:2
**raised** 3:6 4:15 6:5
8:6,20,21 30:4
73:25 173:9 247:3
247:7 249:17
274:18 303:8
**raises** 8:24 137:16
**raising** 73:24
142:18 279:12
**ran** 243:22
**range** 12:14 179:25
180:14 291:3
**ranged** 170:3
**ranges** 166:11
**ranking** 67:5,5
**rarely** 264:6
**rate** 218:6
**rational** 143:12
**raw** 26:14 135:23
224:25 225:24
226:2 243:20

**reach** 59:19 123:12
**reached** 59:20 83:3
122:18 142:19
**reaction** 158:12
**read** 6:15 12:6,9,19
22:25 23:4 28:13
32:11 42:4 69:21
69:22,24 70:11,14
70:17,19 71:5,9
71:15,22,24 72:3
72:15 73:11 74:3
82:12 120:2 123:4
135:5 167:3 171:5
176:10,11 197:19
198:2,8,15 199:18
201:7 210:4
211:11 216:13
223:16 249:13
250:12,13 251:5
257:20,21 261:1,3
261:24 262:7,11
262:24 263:12,16
263:18 264:25
265:7 266:3,9
272:18 298:5
300:12 301:14
302:1,16 303:16
**reading** 13:1 47:5
124:22 126:11
168:20 176:12,24
200:4 237:24
262:18 265:2
295:11,16 300:7
**reads** 262:12
**ready** 2:10,13
**reagent** 154:1
157:3,18 162:16
**reagents** 1:5 2:7
88:14 91:23 145:1
153:4,7 163:14
188:11 206:6
216:3 224:4,5,7,7
224:12 227:10,25
229:5,20 232:15
236:12 237:17
242:21 243:4,8,13
243:17 244:1,5,8

245:1,7 246:5
251:11
**real** 169:4 170:18
171:16 177:17
182:4 183:12,17
185:2,3 274:3
276:21
**realistic** 85:21,23
192:13
**reality** 129:4 167:8
**really** 21:18 54:11
55:16 74:1 95:10
95:16 97:7 112:7
122:25 131:4
132:10 133:16
137:13 141:2
150:18 151:13
193:1 208:25
238:20 252:20
270:25 300:22
306:16
**realm** 97:12
**reason** 26:13 34:6
43:18 54:24 75:3
93:10,15 106:18
114:14 118:17,19
120:22 140:18
201:25 211:18,20
211:25 228:1,7
235:4 236:13
247:3 307:25
**reasonable** 59:20
60:23 123:19
133:20 135:5,25
136:2,7,7,18
137:10 139:7
141:19 142:4
143:12 145:16,17
145:22 146:6,7,18
146:21,22 153:14
158:19 169:14
170:8 220:12,13
220:17 265:11
**reasons** 118:5,6,8
118:19 119:7,9,17
120:22 122:19
129:21 140:17

141:7,15 142:12
167:10 223:1
235:4
**rebuttal** 7:12,12
**recalculate** 99:25
**recall** 5:1 8:7,9
71:18 90:10
164:12 184:23
201:14 252:18,18
252:19 261:7
268:25 274:24
276:23,24 304:19
**receive** 110:14
167:11,13 252:22
**received** 9:24 17:3
239:19
**recess** 75:22,23
106:20 107:12,16
108:19 174:7,12
247:11,15,24
**Recessed** 76:1
107:17 174:9
248:2
**recharactered**
208:2
**recharacterize**
302:3
**recharacterized**
6:22 27:25 212:24
213:14
**reclaim** 239:19
**recognition** 286:12
**recognize** 121:16
121:25 129:4
**recognized** 121:8
129:17 196:20
289:6
**recognizes** 37:10
103:1 110:6
289:15 290:17
**recollection** 93:4
**reconducted**
218:13
**reconsider** 99:7
**reconvened** 76:1
107:17 174:9
248:2

**record** 4:21,24,25
5:1 38:16 39:24
39:25 49:3 83:18
87:3 93:1 109:13
110:11 113:17
131:6 137:1,4,7
139:11 144:22
186:3 191:7 198:3
230:11 238:23
244:22 258:22
272:7 302:10
**recording** 309:5
**records** 290:3
**recovery** 173:13,18
173:22
**recreate** 164:14
**red** 86:8,9 87:10
164:24 252:21
253:4,4
**redo** 253:8,13
**reduce** 88:14 90:15
**reduction** 183:3
**Reed** 170:5,16,18
171:2,3,17 176:10
177:11
**reevaluate** 99:15
**refer** 42:6 57:5,7
132:20 166:16
**reference** 28:18,21
59:23 131:23
202:10 208:14,15
252:6 257:16
271:2 287:23
292:4
**referenced** 153:23
253:21 254:12
270:22 277:5
281:4 299:21
**references** 110:9
132:22
**referencing** 131:14
**referred** 7:21 13:23
59:8 108:20
110:20 163:12
249:12 250:19
261:8
**referring** 7:13

12:15 15:4 22:8
28:20 32:15 34:16
41:9 42:16 56:21
57:8,22 58:3,12
64:7 78:10 154:10
176:4 184:5 259:2
266:13 289:10
290:5 293:10
**refers** 32:9 44:17
47:18 57:2 66:18
78:11 132:24
133:1,2 254:8
**reflect** 55:21 95:4
140:11 164:4
230:16
**reflected** 22:17
37:17 109:15
**refresh** 93:4
**regard** 104:23
121:11 124:23
**regarding** 2:23
113:10 253:21
**regardless** 122:16
202:25 234:6
**regards** 111:14
**Region** 1:23
**regress** 301:7
**regression** 61:1
231:15 232:3
301:3,6,12,17
302:19 303:4,13
303:15
**regroup** 106:21
**regulation** 244:19
**regulations** 135:24
137:3 244:18
266:24,25 267:2
**regulatory** 225:25
226:4 243:12
**rehabilitate** 303:22
**REINFELD** 1:16
**reiterate** 296:6
**reject** 98:1 106:4
112:19 113:8
118:4,21 119:11
120:25 227:20
**rejected** 79:11

113:2,4 118:7
119:19 182:2
226:23 228:14
229:9
**rejecting** 117:21,25
235:24
**rejection** 122:21
**rejects** 94:25
137:18,22 269:16
**relate** 37:18 48:10
**related** 54:8 121:4
143:18 202:19,22
217:20
**relates** 56:14
253:17
**relating** 77:11
232:4 293:24
**relationship** 284:14
**relative** 202:7
255:16,17
**relatively** 147:9
298:13
**relaxed** 286:22
**relevant** 30:17
31:12 71:3 176:14
176:23 189:25
237:19 239:8
249:5 272:6
279:24
**reliability** 8:25
76:9,23 114:11
**reliable** 26:25
59:20 76:19 77:25
83:10 85:24 89:12
100:10 101:17
112:5 116:7,9
136:21 147:15
156:24 161:13
162:1 203:18
217:20 228:20,22
288:18 289:5
301:12 303:6,14
**reliably** 228:24
**reliance** 59:18
182:2 184:25
**relied** 21:14 54:12
71:6 77:3 105:3

149:23 276:19
**relies** 103:6 118:13
118:15 137:19
230:6
**rely** 6:18 27:16
56:16 59:21 91:14
110:3 181:23
184:12 207:22
292:16 299:25
301:23
**relying** 28:15 30:14
39:15 43:14 47:16
89:13 103:17,17
126:9 127:12
272:3 286:23
**remain** 83:4 145:4
198:20
**remand** 2:9 4:15
5:7 6:5 13:15
25:12,13 95:13
145:3 155:3,8
186:19 220:4
271:8 279:1
307:16,17
**remarks** 77:15
**remember** 26:10
37:5 66:10,13
154:3 187:2
255:17,17 261:6
**reminded** 132:12
**reminding** 267:25
**remotely** 148:2
**removal** 233:8
**removed** 288:1
**rendering** 272:2
**renders** 31:22
41:19 177:14
246:18 296:13
**repeat** 119:4
120:21 218:7
**repeated** 155:4
**repeating** 114:24
**replay** 166:18
**reply** 7:12 10:21
11:6,8,9,12 16:13
25:4,10 32:6
71:21 84:8 115:24

116:2 168:21,24
172:5 175:8,9
206:2 215:12
220:4 252:15
271:8 285:20
**report** 7:12 10:21
10:23,25 11:6,8
11:10,12 12:23
16:13,24 17:12
20:1 32:6,17,18
42:21 71:2,5,21
72:24 73:1 77:5
84:6,8,20,21
115:23,24 116:2,2
138:4 151:23
159:20,21 164:9
168:24 172:1,5
175:10 178:24
206:2 210:17
215:13 219:23
230:1,5 234:16
244:6,14,24
247:22 253:22
254:9,12 264:12
278:7 285:12,20
285:21 293:13
297:12 306:23
307:24
**reported** 20:13
**reporter** 23:15
**Reporting** 1:23
**reports** 10:14
116:15 189:18
**represented** 5:25
135:21
**request** 65:5
**requested** 6:24
28:5,22 208:4
213:2 255:1,2
302:6
**require** 168:11
235:20 273:19
306:25 307:1
**required** 136:3,3
162:4 226:12
233:12 245:16
250:7 255:6

273:24
**requirement**
228:23
**requirements**
173:10 226:5
233:13 243:12
247:4
**requiring** 169:7
**reread** 22:25 171:3
295:11
**research** 125:6
244:22 304:4
**researched** 62:2
120:11
**resolution** 307:2,3
**resolve** 101:1,12
266:18
**respect** 4:14,20 7:9
100:24 126:1
169:22 250:7
255:9 303:13
**respectfully** 101:15
**respective** 306:15
**respond** 24:1 56:10
227:4 246:25
247:15 249:17,24
280:20 296:24
**responded** 191:20
280:22
**responding** 29:1
46:13
**responds** 93:14
**response** 79:3,5,9
79:21,24 80:7
88:12 155:2
163:24 186:21
192:1,2 209:18
212:5 225:20
228:16 238:24
244:11
**responses** 92:19
**responsible** 5:11
74:21 147:3
**rest** 50:3 52:1
189:14 306:3
**restrictions** 137:3
**result** 6:23 28:3

38:21 43:13,14
47:15,16 169:13
197:6 200:9 201:3
201:5 203:2 208:3
212:25 229:20,22
233:11 243:5,14
243:24 255:24
261:2 290:21
302:5
**resulted** 105:13
233:8
**resulting** 266:23
**results** 84:10 85:20
218:18 294:15
**retained** 90:19
**retread** 126:17
**revenue** 17:14
31:19 36:24
138:21,24
**revenues** 31:17
36:23 193:3,14
**review** 145:9
146:22 272:6,8
**reviewed** 217:19
286:21
**revived** 82:10
**RhoGAM** 133:17
134:8,15,22
139:19,20 140:9
142:5,22,25 143:7
143:17 144:11,21
145:14 147:22
148:7 149:7,8,11
149:21,25 150:12
153:23 154:2,2,10
154:17 156:13
174:5 226:24
227:20 229:15,16
232:16 233:1
234:19 237:13,16
237:20 239:4,10
241:22 243:3,7,11
243:16,24 244:3,7
244:14,24 246:8
246:18 253:21
254:11,18 255:3
256:6,10,14,20,21

256:23,25 257:12
257:13,20,25
258:2,3,4,21
297:1,6 299:19
**RhoGAM's** 243:20
**Rhophylac** 234:12
241:14 297:21
**Rho-D** 145:1
151:10 153:4,9
233:2,10 234:21
234:25 235:8
241:17,21 242:8
242:20 243:15
244:20,25 245:5
245:22 246:4
298:14,16
**Richard** 1:13 280:4
**RICO** 8:15
**rid** 65:11
**riddled** 61:8
**right** 3:19 4:2 7:6
9:2,4,9 10:5 12:22
13:7 16:20 20:1
21:11,21 22:13,19
23:11,18,22 24:14
26:2 27:20 29:5
31:9 34:18 38:8
38:12 42:11 46:4
47:11 49:2,4
52:23 61:4,17,23
63:6 66:12 76:21
77:9 78:13 81:23
82:18 83:8 84:2
93:3 94:23 96:8
98:5 104:8 109:11
115:14 117:12
119:9 122:3,18
123:8,12 126:7
127:22 128:2
132:4,9 136:15
138:25 146:2
165:1,16 167:5
168:3 169:25
171:17,19 174:21
175:24 176:7
177:20 181:20
182:18 183:5,7

184:19 185:7
186:25 187:5
190:7 196:3,7,8
197:4 203:8
204:12 208:11,16
209:2 211:17
213:8,9 215:16
224:18 249:14
250:24 251:1,14
263:4,21 266:15
268:7,13,18 275:6
279:24 283:19
289:23,25 290:15
292:4 307:22
**right-hand** 38:10
217:25 259:13
**rise** 2:2 63:24 75:25
76:3 107:15,18
174:8 248:1
308:19
**rising** 43:10 62:15
211:13
**risk** 79:22
**risky** 79:13
**Robinson** 226:14
266:11,14 267:25
270:4 271:12
286:16
**rolling** 129:18
**room** 169:24
170:22 198:4
208:23 267:17
**rose** 53:13 152:25
216:8
**Rossi** 136:12
**rounds** 139:7
**Rouser** 176:19,25
**Rouser's** 176:16
177:14
**Rubenfeld** 230:7
230:12,14 245:17
**Rubenfeld's** 242:19
**rule** 292:12 296:15
296:20 305:22
307:16,17,23,23
**ruled** 227:5 267:4
**rules** 91:22

**ruling** 115:9 228:16
  303:19
**run** 12:3 125:22
  265:21 300:9
**rushing** 106:24

**S**

**S** 2:1 81:6
**sacrosanct** 155:14
**sale** 21:12 83:6
  257:6
**sales** 7:16 15:23,23
  16:1,10 17:1,2,4,6
  17:8,11,15,18,18
  17:21,25 18:1,4
  20:7,10,13 21:13
  21:16,17 32:1
  36:2,18,21 37:13
  44:9 64:3 65:22
  65:23 152:10
  193:11,15 251:10
**satisfactory** 245:24
**satisfied** 256:4
  296:21
**Saturday** 267:6,18
  267:21
**saves** 275:22
**savings** 183:3
**saw** 16:4 18:19
  23:13 52:15 60:9
  67:12 71:13 73:7
  73:8 74:17 78:23
  80:5,14 82:14
  115:25 234:15
  260:14 280:7
**sayeth** 56:22
**saying** 14:3,23,24
  15:18 23:9 32:25
  37:22 39:11 47:22
  54:11 58:15 62:14
  66:12 73:17 82:21
  96:24 101:7
  105:19 117:16
  118:21 119:10,18
  120:19,24 123:6
  124:13 146:3
  180:24 199:12,13

203:4 204:9
208:23 211:4
229:2 246:6
260:11,12 271:5
280:3 299:8
302:16
**says** 18:20 19:3,25
  23:12 28:4 32:2
  32:12 33:3 42:12
  43:6 44:6,7 46:16
  46:20,23 47:18,19
  51:15 58:5 59:3
  65:2,7,13 66:2
  68:22 70:12 73:3
  78:15 81:5 82:19
  94:8,12 105:9
  111:21 118:17
  122:12 125:9,10
  129:19,21 130:5
  131:3,5,8 132:6
  136:19,20 137:22
  138:18 140:7,11
  142:1 145:16
  149:22 158:6
  163:2 164:24
  167:7 176:21
  202:11 206:5
  211:9,11 212:21
  212:22 213:1
  215:4,5,17 220:7
  220:20 221:17
  223:15 224:4
  230:10,14 231:14
  234:24 236:13
  238:5,11 239:18
  242:3 244:13,17
  245:5,21 250:14
  254:11 257:22
  258:18 260:5
  262:13,13 270:11
  271:6 273:11
  275:19 279:5
  281:22 284:1,3,22
  297:15 301:3,11
  302:1 303:14,15
**scale** 175:2,3
**scenario** 100:4

101:18
**scent** 74:1
**schedule** 4:11
  305:23
**scheduled** 2:8
**Schiller** 214:24
**Schmidt's** 26:11
**SCHWARTZ** 1:14
**scientific** 202:11
  203:11 206:7
**scientist** 27:5
  226:17
**score** 112:22 113:1
**Scotts** 235:23
**scowling** 246:21
**scrap** 247:22
**screen** 24:17 31:4
  35:20 78:8 79:1
  80:18 84:5 135:13
  157:7 183:10
  221:15 271:5
**seated** 2:5 76:4
  107:20 174:10
  248:3
**second** 33:15,20
  36:20 43:20,24
  44:1,6 45:3 48:2,3
  48:5,20 49:5
  52:24 56:14 63:11
  81:5,7 82:11
  97:10,22,23
  137:20 151:9
  160:19 161:5,21
  162:20 163:6
  164:23 165:5
  178:10,11 180:8
  180:12,13 181:10
  181:22,22 187:18
  188:2 190:18
  193:12 195:25
  196:8,16 204:19
  205:5,11,17
  209:11,12 210:17
  215:1,5 217:24
  220:19,19 221:10
  221:16 229:17
  230:23 234:25

240:3 243:11
246:9 262:19
263:6 284:10
299:14
**Secondly** 10:16
  50:12 78:25
  150:19
**section** 75:8 273:3
  273:4
**see** 13:11 15:24
  20:9,16 21:10
  34:14 38:17 59:1
  62:25 63:14,18
  64:23 65:12 66:1
  66:9,14 67:3
  69:12 70:7 72:18
  78:15 79:2 81:13
  86:7,14 87:14
  95:10,16,17
  106:13,25 108:25
  120:25 133:22
  135:10 142:21
  143:21 144:9
  146:13,19 150:1
  154:6 156:20
  157:9 160:7 165:1
  165:6,18 168:5
  172:6 179:23
  180:10 183:6
  204:21,24 212:3
  212:14 215:15
  218:14,17 223:17
  238:9 245:14
  254:1 267:14,17
  271:22,23 279:2
**seeing** 65:16 139:7
**seek** 299:5
**seeking** 7:4 22:20
  208:9
**seen** 18:10,12 21:2
  50:20,20,21,24
  63:16 64:21 79:8
  136:25 144:8
  153:8 158:1
  193:21,22 229:13
  240:15,24,25
  279:25 283:13

**segment** 83:21
  152:16
**select** 77:19 139:4
  139:12,14 272:19
**selected** 68:4 99:22
  111:19 229:3
**selecting** 54:20
  72:17 74:5 89:14
  103:11 115:4
  117:9
**selection** 56:14
  63:2 77:11 89:8
  89:12 92:10 94:14
  98:22 104:12
  123:16 128:9
**selectively** 298:4
**selling** 36:25
**send** 110:8 252:6
  253:3
**sending** 173:23
**sends** 50:19
**sense** 16:2 50:18
  66:19 85:5 88:11
  124:25 138:19
  142:16 159:2
  161:12 169:9
  181:11 202:7
  212:5,6 238:21
**sent** 29:17 252:2,20
**sentence** 11:19
  42:22 44:6 47:3,4
  168:4,17,20
  200:10 216:16
  221:14,16,24
  230:24 254:17
  262:19 263:5,7
  265:3,4,10,15
  273:8 301:25
**sentences** 265:7
  298:6
**separate** 74:24 75:1
  101:21 121:4
  176:2 197:9,10
  199:2 201:19
  203:6 222:10,17
  235:16,21 236:14
  292:25 293:1

296:8
**separately** 222:18
    225:6
**September** 4:20
    35:18 58:13
    109:15 110:12
    130:1 131:10
    132:21 182:13
**serious** 266:23
    292:9
**set** 3:9 16:5 17:22
    20:11,11,17 33:15
    72:6,10,10 84:6
    123:25 155:25
    192:9,10,10
    197:18 217:10,24
    221:11 287:24
**SETH** 1:15
**sets** 18:2 161:23
    197:16
**setting** 85:17
    163:11
**settled** 79:18
    267:23
**settlement** 94:1
    306:2,4,23 307:16
    307:22 308:6
**settling** 306:20
**share** 73:14 151:11
    152:12,13,15,24
    152:25 153:1
    162:13 163:3
    240:5 257:4,7
    258:11 267:9
    299:3,11
**sharp** 180:11
**sharpen** 83:11
**sheer** 157:25 162:3
**sheets** 90:13,17
**Sheila** 309:3
**shift** 128:11,17
**shifted** 233:17
**Shifting** 83:25
**shocked** 298:7
**shopping** 108:21
    108:23 120:18
    123:22

**short** 96:16,17
    115:11 285:2
**shortcut** 281:20
    283:7,9,10,12
    284:3 285:7
    286:24
**shorted** 251:2
**shortly** 4:6 53:11
    53:15 180:6
    286:17
**shouldn't** 23:10
    51:24 54:3 123:2
    141:3
**should've** 68:22
**show** 10:11 12:25
    13:25 20:25 26:14
    30:19 46:10 48:17
    49:1 68:8 80:7
    99:9 103:19,24
    111:4,6 137:7
    151:9 164:6 166:8
    171:24 183:11
    198:3 204:20
    240:10 245:10
    260:24 283:10
    284:6 288:18,23
    289:2
**showed** 24:16
    31:16 54:25 55:14
    116:17 149:20
    170:12 172:12
    175:2 182:4
    185:23 205:8,10
    210:20 234:18
    256:13,14,20
**showing** 67:24
    89:25 257:4
    288:13 296:15
**shown** 21:5 35:19
    48:19 52:20 80:17
    80:18 157:12
    269:24
**shows** 11:21 24:24
    43:12,16 44:18
    47:14 111:23
    113:16 116:12
    123:12 143:7

168:24 175:12
    205:4 223:25
    244:7 260:7,24
    266:2,7 282:3
    283:16
**shuffle** 14:25
**sic** 123:24 132:25
**side** 2:10 3:11,15
    3:24 198:4 214:3
    217:12,18 247:5
    248:19 275:18
    308:7
**sides** 14:9 290:5
**Signature** 309:11
**significance** 98:11
    171:10,14 175:16
    193:17 232:25
**significant** 15:17
    19:9,21 30:2
    42:14 52:21 68:1
    79:6 80:1,4
    110:22 118:20
    133:5,6 153:18
    161:16 179:25
    212:15 228:3
    232:24 233:5,9
    234:9 236:4,4
    242:13 245:12,16
    283:6
**significantly** 25:7
    241:25
**signifying** 260:4
**signs** 280:1
**similar** 44:8 70:4
    135:23 136:14,25
    137:3 154:6
    225:24 226:5
    230:9 255:19,22
    255:22 277:22
**similarities** 145:16
    145:17 146:21,23
    153:14
**similarity** 145:22
    146:6,7,18 153:19
**simple** 14:11
    294:17
**simplistic** 141:12

141:13 143:6
**simply** 91:3 100:17
    114:1 121:13
    122:11 124:16
    126:10 127:16
    292:23 294:4
**single** 132:23
    158:16 172:15
    217:2 255:20
    256:1 273:13
**sir** 135:18
**situation** 51:23
    69:9 82:13 149:6
**situations** 4:13
    185:3
**six** 152:25 163:21
    166:13 180:14
    205:10
**size** 50:22 73:17
**skew** 84:10
**skip** 47:3 199:18
    210:23
**skipped** 156:13
**skipping** 27:18
**skirted** 54:2
**skyrocketing** 86:13
**slide** 5:23 6:13
    10:11 12:8,8,8
    13:4,25 15:5,7,7
    22:1 24:24 30:20
    30:21,23 31:4,4
    33:19 34:14,17
    35:10,20 39:22
    61:15,19 64:7
    66:21 67:15,16
    68:14,15 69:4
    70:6 71:8 72:22
    72:23 74:6,9,15
    78:7,9,9,10,17
    79:1 81:14,15,21
    84:5,5 86:2,20,20
    87:16,16 90:4,5
    91:10 94:18,22
    116:5 135:8,14
    143:22,23 144:13
    144:19 145:12,13
    145:14 147:19,20

148:16,19 150:3
    151:22,22 154:20
    156:20,21 157:6,7
    157:15 158:10,11
    159:18,19 161:4
    162:6,22 164:6,7
    164:8 166:17
    169:15 171:24
    174:22 176:3,5
    180:16 182:4
    188:14 192:17
    194:22 204:25
    205:4,23,24
    207:15 210:20,20
    210:25 216:19
    217:11,13,15,16
    223:11,11,20
    224:22 226:25
    227:1 229:11
    232:20 233:7
    234:18,18 236:7
    236:25 240:11
    241:7,8 243:10
    244:10 253:17,24
    254:8 258:16
    278:14,15,22,22
    283:11 284:7,8,9
    285:25 287:6
    298:2
**slides** 7:21 9:13,14
    9:15,16,24,25
    10:2 57:14,16
    61:2,9 64:11
    72:18 78:7,8
    81:18,20,22 116:5
    143:25 144:1
    166:6,17 239:1
    253:21,25 258:23
    297:15
**slightly** 19:25 82:20
    231:10 264:11,17
**slip** 249:13
**slow** 15:13
**slowly** 15:14
**small** 152:20 236:4
    245:11
**smaller** 52:18

149:3,4,16 166:10
167:11 172:24
173:19,23
**smile** 29:10
**smiling** 29:8,10
198:4
**smoke** 254:24
**Smulo** 218:9
**snip** 236:3,15
**snippet** 66:4 69:22
**sold** 40:16 41:9
152:16 183:3
238:18
**sole** 246:11
**solely** 292:10,13,16
**solid** 270:7
**somebody** 66:10
**somebody's** 126:24
**somewhat** 66:7
272:21 278:25
283:8 284:10
**soon** 106:21 138:16
**sophistication**
50:22
**sorry** 9:20 11:5,7,8
12:13 17:5 27:9
30:22 46:7 47:6
50:21 61:16,21
63:6 64:10 69:5
74:13 76:25 81:3
81:19 83:23 86:25
86:25 87:6 148:22
156:4,6,7,14
163:7 167:5
170:10 171:13
175:21 177:2
178:10 192:9,10
198:11 204:23
205:21 209:5
225:3 226:2,19
227:1 236:6 246:6
250:16 264:14
267:16 269:7
273:4 280:1,11,12
284:7 286:7
**sort** 14:14 22:10
49:25 53:1 61:23

66:13,21 76:22
77:24 106:15
132:12 135:5
151:23 152:6
153:24 263:25
280:12 281:25
**sound** 113:17 131:6
198:18 309:5
**source** 75:12
150:23 291:6
**speak** 24:8 64:18
65:5 67:1 252:8
**SPEAKER** 248:5,8
248:13,16,20
**speaking** 57:10
**specific** 29:22
111:13 113:9
197:20 252:6
258:4
**specifically** 8:20
114:12 141:22
142:2 194:11
250:8 269:11
289:10 292:11
293:24 294:1
**specifies** 140:1
**specify** 139:25
**SPECTOR** 1:10
**speculation** 43:10
157:25
**spend** 80:19 204:15
204:16 238:6
240:17
**spending** 51:4
183:25
**spent** 76:19 160:25
184:16 192:12
**spokesman** 267:9
**spread** 22:8
**Sprint** 201:10
**square** 164:24
**squares** 164:25
259:12
**squaring** 92:5
**squashed** 164:25
**St** 1:12 2:15 3:15
3:18,20 4:15,19

5:10 8:21 9:23
10:1 23:25 24:2,9
29:9 37:9 53:4
74:23 88:24,25
89:3,3 90:6,9
91:17 92:18,25
93:7 94:13,21,24
95:8,24 96:8 97:5
97:9,22 98:3,12
99:3,13,20 100:3
100:7,11 101:4,14
101:24 102:13,25
103:8,16 104:6,10
104:16,21 105:6
105:16 106:6,10
106:14,22 107:5
107:10,13,21,22
107:25 109:2,9,12
109:25 110:4,19
111:9,12 112:8,16
112:24 113:3,6,13
113:20,24 114:1,5
114:15,25 115:3
115:15,17,19
116:10,16 117:20
118:1,10,22 119:1
119:5,12,20,23
120:3,5,10,16
121:1,20 122:4
123:7,10,20 124:2
125:14 126:4,10
126:16,22 127:6
127:14,23 128:2,5
128:12,15,25
130:13,20 131:11
132:4,6 133:8,12
153:23 158:3
247:2,8 252:2
261:12,16 263:9
281:9 282:17
287:21,22 288:7
288:12,25 289:14
289:18,23,25
290:4,9,14,16
291:11 293:11,17
295:5,8,16,22
296:5 304:13,16

304:18,22 305:24
306:8 307:10
308:2,10,14
**stable** 147:9 243:25
245:1
**Stackowitz** 279:3
280:11
**stage** 113:22
199:22 227:15,20
261:20 281:23
**stand** 132:14
281:16
**standard** 2:20,21
3:7,8 5:24 7:16,17
7:18 8:1 14:18,21
25:7 26:14,24
27:11,12 28:9,13
28:21,24 29:18,23
32:7,8 34:18
40:10,11,20,22
41:10,14,24,25
42:3,13,14 43:11
43:24 44:9,13,17
44:20 45:6,22
46:21,24 47:13,22
47:23,25 48:1
49:17 50:23 75:4
75:17 87:25
135:20 136:1
138:1,3,4,10
159:2 169:1 178:9
178:12,14,15,18
178:21,23 179:1
179:11,20,22
180:8,21,22,25
181:1,5,9 182:14
182:22,25 185:24
185:25 186:4,7
187:10,13,19,22
188:7 189:25
190:10,10,11
194:12 206:25
208:14,21 210:21
212:19 214:8,10
214:10 217:19
221:7 226:9,15
251:8 252:5,6

255:11,25 266:22
266:23 272:12
281:21 285:4
286:22 291:23
296:13 302:11
**standards** 75:15
**standing** 97:6
213:25
**stark** 147:20
**start** 2:24 24:16
42:22 47:2,4 54:6
55:17 56:11 76:7
76:10 85:5,9
86:10,11,15 88:1
88:9,13 94:2
96:25 97:1 98:10
109:9 130:8
143:23 144:2,11
144:15,15 146:21
150:12 159:13
174:4 182:25
198:15 209:6
217:16,25 228:11
293:12
**started** 52:17 55:10
113:18 130:11
149:13 151:11
162:11 203:18
204:3 305:8
**starting** 70:9 87:11
87:14 99:25 100:1
160:9 163:13
195:17 273:8
301:1,9
**starts** 42:22,24
47:4 93:18 94:8
166:19 203:20
262:18
**state** 39:17 57:2
144:22
**statement** 11:20
12:18 30:15 39:12
43:15 46:10 110:2
120:9 124:18
130:1,2 131:24
132:24 141:13
144:20 150:16

184:5 194:12
197:20 206:19
214:5 215:2,13
216:11,14,20
226:17 229:8
244:21,25 246:2
250:8 258:7
276:11,12 308:5
**statements** 12:24
46:23 115:6
137:11 150:6
226:8 227:6
244:17 274:19
**STATES** 1:1
**stay** 56:24,24 57:8
57:13,23 58:5,16
60:8 129:25
131:24
**stayed** 198:23
260:1,6 298:17
**steal** 163:5
**step** 202:12 283:21
284:2,18 285:13
285:24,24
**stepping** 97:12
**stick** 133:17 140:10
146:4 147:16
**stonewalling** 255:8
**stop** 68:9 141:5,7
142:17 257:2,13
**stopped** 256:9
**story** 51:9,15 74:7
125:23 136:9,14
151:15 158:22
168:1 285:4
286:22
**straightforward**
154:23 155:5
169:2,5 275:2
**strategic** 167:12
173:16
**strategy** 58:2 62:2
62:7,9,11 162:15
162:21,25 163:10
163:23 239:22
240:4 258:19
259:6,7,8,17

285:22 299:5,15
**streamline** 5:13
**Street** 1:24
**strengths** 106:16
240:13 306:14
**stringent** 243:12
**strong** 132:19
**structural** 148:14
**structure** 22:17
60:14,22,22 62:4
62:12 91:16,20
140:11,22 141:21
143:9 151:17
152:22 195:3,7,12
196:19 197:1,5,12
199:14 200:16
201:4,15 204:3
209:15 215:11,20
215:25 222:13
246:16 250:7,14
256:3 281:18
282:2 285:6 287:5
289:7 292:21
293:18,21,25
294:5,20
**structure's** 222:11
**stuck** 259:22
**study** 202:12 206:7
**stuff** 305:5
**subcategory**
224:11
**subject** 114:7 115:7
115:8 135:24
137:2 150:2
156:24 225:24
231:23 243:12
**subjecting** 127:7
**submission** 28:16
32:2 189:6,12,15
191:19 192:24
193:23
**submit** 102:20
306:22
**submitted** 5:8
21:25 25:15,17
28:16 32:14 34:7
90:21 102:17

191:13 241:1,3
265:24
**subpoena** 191:20
192:1
**subsequent** 127:8
129:9,10
**substantial** 39:21
88:5 206:16
**substitute** 183:14
**substitutes** 147:4
255:16
**subtracting** 44:8
177:1
**subtracts** 275:15
**succeed** 146:12
**successfully** 152:24
**suffer** 140:20,21
**suffice** 296:1
**sufficient** 33:8
136:1 158:18
228:19 236:17
293:22
**suggest** 149:21
161:5 201:17
263:22 299:12
303:12 306:4
**suggested** 282:6
**suggests** 167:20
225:14 227:21
**suitable** 307:6
**Suite** 1:24
**suits** 307:5
**sum** 17:1 134:25
**summarize** 46:16
**summarized** 66:21
102:9 103:6
**summary** 269:3
279:25
**summed** 280:11
**supplement** 39:25
49:2
**supplier** 298:16,20
**suppliers** 242:8
298:14
**supply** 90:15
235:23
**support** 3:25 43:9

98:7 102:15
123:16 131:23
133:4 175:9 214:4
216:10,17 219:7
219:17 222:16
226:14 296:3
297:12
**supported** 118:8
119:10 244:21
**supporting** 293:23
**supports** 98:6
123:13 219:6
269:12
**suppose** 231:18,21
**supposed** 28:4
164:4
**supposedly** 44:23
**supposing** 307:14
**suppress** 227:16
**suppressed** 177:8
**Supreme** 198:8,15
200:11 201:21
223:4,6 249:3
**sure** 4:5 6:2 9:23
10:3,7 14:6,7 28:4
34:11 35:14 37:20
45:2,15 46:12
47:2 54:10 55:24
80:4,24 84:11
117:12 146:10
150:8 153:22
165:2 166:21
171:5,19 176:11
179:7 188:2
204:13 207:5
217:9 223:17
227:13 240:14
246:20 248:24
251:24 253:24
254:2 276:8 277:1
277:5
**surpass** 31:2
**surpassed** 49:9
**surprised** 125:2
**surprising** 75:8
**surrounded** 122:24
**surrounding** 78:23

**survive** 286:20
**survived** 83:16
**surviving** 247:16
**suspenders** 292:7
**SWINDELL** 1:17
**switch** 174:11
**switched** 33:19
**swoop** 60:3
**systems** 185:12
220:22,23

**T**

**table** 7:15,15 16:13
16:14,24,25 17:4
18:25 19:6 21:14
44:8,16,16 172:1
172:4 175:11
192:24
**tables** 52:15,20,21
**tacit** 121:16,22
261:13,23
**tainted** 112:1
**tainting** 55:4
**take** 4:14 13:14
14:9 15:9 22:22
44:13,21 50:16
54:4 63:10,11
70:5 75:21,22
86:1,19 90:11
95:14 96:9 97:17
123:24 124:9,16
126:22,23,24
129:22 143:11
145:12 147:19
156:19 157:11
158:10 162:12
194:18 203:5
204:1,4 207:11
231:2 236:12
246:24 247:11
278:21 291:21
296:10 305:14
**takeaways** 163:4
**taken** 26:17 38:24
41:6,18 54:15
70:20 102:20
124:18 125:21

126:4,5 159:21
162:22 206:8
223:23 265:12
291:24 303:23
**takes** 58:17 60:14
91:25 129:23
140:22 143:8,9
151:25
**Talecris** 152:5,6,10
152:13 235:5,18
238:2,11,19
239:16 240:3,14
241:15 242:2,3,7
242:10 257:6
258:17 259:16
297:13,22 298:11
**talk** 15:1 54:1 55:7
62:13,19 65:7
66:2 79:23 94:24
116:8 145:10
160:18 177:10
218:24 219:24
235:15 244:23
247:10 252:13
258:4 259:5
280:16 292:2
307:22
**talked** 26:12 31:18
41:23 44:12 54:2
60:16 80:14 91:11
92:1 114:12
133:16,18 181:25
184:24 193:10
206:19 223:9
235:2 239:5
243:18,25 251:19
262:13
**talking** 26:1,3
27:11 30:15 32:6
32:16 37:11 40:10
40:12 42:10,14,16
44:16 48:9 55:12
62:21 63:13,13
64:3,25 66:14
72:20 74:23 82:2
89:8,9 103:23
108:20,25 120:14

123:17 126:20
139:22 160:25
161:17 177:22,25
178:3 183:18
195:13,14 198:9
201:15 206:3
208:20 209:7
238:10 245:20
250:2 258:10
265:16 270:5
275:10,12 277:5
285:23 287:6
290:1 293:25
297:15 304:6
**talks** 34:25 58:1
79:2 131:16
141:24 151:18
157:17 161:2
230:6 233:7
285:21
**targeted** 228:2
**tasks** 217:6
**TBR** 53:13 143:4
144:21 145:14
147:21 148:9
154:24 260:19
**team** 29:8
**technically** 149:2,4
**technique** 217:20
**tell** 4:7 10:24 19:23
21:18 29:7 39:19
41:9 120:20 146:1
151:12,14 167:23
203:14 209:2
268:7 293:9
**telling** 39:4 117:19
144:3 179:1,4
224:19 279:20
305:9 306:23
**tells** 17:1 23:7 69:1
94:8 105:3,3
306:20
**Temple** 267:9
**tempted** 287:24
**ten** 75:22 161:10
174:7,13,14
247:24 260:18

**tends** 222:4
**tension** 205:19
**ten-year** 245:12
**Teresa** 284:21
**terms** 71:4 89:6,11
92:25 108:3
109:13 115:13
121:6,22 258:17
288:13
**terrible** 127:11
**test** 236:3,5,5,10,15
236:15,16
**testable** 218:1
**tested** 218:2
**testified** 6:9 112:17
117:1,2 168:11
273:18 289:21
**testifies** 65:15
78:10 154:5 238:1
**testify** 86:23 289:20
**testifying** 157:8,13
**testimony** 27:10
28:19,20 50:6,8
63:12 64:2 65:13
66:5,6,22 69:21
69:25 70:13,20
71:10,11,13,16,22
71:25 73:11,24
74:17 78:9,12,21
82:21,22 84:12
86:3 87:3 100:24
100:25 110:9
111:4,10 113:12
116:17 117:6
122:8 125:2,4
142:8 145:7,8,10
146:25 149:18,23
152:1,2 154:5
155:13 157:2,6,8
158:25 166:25
167:4 179:14
207:10 213:21,25
226:17 227:17
236:17,20 237:3
237:15,19,24
238:24 256:6
258:8,9,13 259:7

269:9 270:16
280:7 289:19
290:6 296:19
297:4 300:23
302:13,15 303:12
**testing** 224:8 281:6
**thank** 46:4,5 49:21
52:23 53:24 56:2
61:14 75:24 76:6
88:23 107:13,22
127:23,25 133:8
142:9 148:21
155:23,24 159:9
159:10 174:2
224:18 230:2
246:19 247:23
249:15 259:3
261:16,16 267:25
276:2,5 281:10
287:19,20 296:22
296:23 303:20
308:10,18
**Thanks** 148:22
**that's** 9:21 10:22
11:24 12:4,12,14
14:25 15:6 16:24
18:25 19:6,21,22
19:23 20:14 22:20
23:11 24:10 25:22
27:14 29:3 30:13
30:16 31:14 32:19
32:20 33:19,21
35:8,11,24,25
36:17 37:6 40:9
40:15,20 41:10,11
42:9 44:15,16
45:5,8,15,20
48:22 49:14 50:11
51:7,25 53:18
55:22 57:9 58:2
59:5,6,12,12 60:1
61:17 62:5 63:8
64:24 67:11 68:1
68:3 74:1,23,24
75:1,4,19 76:19
77:6 78:17,22
81:6 85:6,22 86:2

87:23 88:20 92:19
94:9 95:8 96:15
97:8 98:6,11
100:19,23,25
101:15 103:14
104:13 105:9,12
105:13 106:3
111:22 117:4
121:20 122:2,7
123:14,16 124:17
125:8 126:8,9,10
127:19 129:6,15
129:16 131:2
132:5,6 133:24
134:8 136:9,14
137:14 140:4,17
142:21 143:6
144:23 145:19
146:20 148:8,10
**Theon** 219:14
**theories** 198:22
199:2,3,12 201:19
201:22,23
**theory** 67:20 90:14
198:13 199:24
200:3,17 201:22
202:6,13 249:5
300:8
**there's** 14:8 20:12
24:16 28:18 45:10
45:11,18,25 46:19
58:14 62:13 63:15
67:11 68:7 76:14
81:5 85:2 86:8,21
92:18 93:22 97:9
98:24 99:9 101:2
103:2,9,21 105:11
105:25 108:22
109:12 111:18
114:19,21 121:17
121:24 123:25
124:11 128:5
131:22 133:3,4
136:4,5 137:1
139:14,17 140:23
146:16 148:4
**they'd** 73:23

**they're** 17:5 18:1,2
19:8 29:8 36:1
40:8,10 51:4
56:18 57:3,3
62:14 73:18 75:2
75:3 83:9 102:20
105:15 137:2
138:19
**they've** 51:1 54:2
61:5 82:10 114:11
137:22
**thick** 267:2
**thin** 86:8,8
**thing** 104:25
116:18 118:6
128:20 135:17
163:1 166:18
167:19 200:16
207:17 259:10
260:22 268:19
280:1 294:12
299:19
**things** 3:12 13:13
30:10 77:4 80:10
97:23 99:20 112:9
183:12 225:17
248:9 303:25
304:8
**think** 3:16,16 5:11
5:12,15 6:11,14
7:11 8:11,15,18
18:15 19:17,19
20:23 23:14 28:17
29:16 30:9,9,11
32:19 37:10 38:13
38:14 40:9 43:5
44:18 48:24,25,25
50:10,25 55:14
56:7,8 57:9,14,15
57:19 58:25 61:12
65:22,23 75:15
77:6 80:25 84:11
86:18 93:16,20,22
96:20 98:23
100:18 102:9
105:14 106:13

107:2 112:22
114:9,10,13
116:11,13 117:7
119:1,22,23
120:12,13,16
121:4,5,18 122:10
122:11,25,25
123:11,13,14,22
125:14 128:7,9,10
130:16 131:22
133:3,5,6,25
134:21 140:7
143:14 150:11
153:22 156:23
161:12,22,25
162:7 163:12
164:6 165:15
171:17 173:8
175:1,19 176:13
177:25 178:8
179:6 185:10
186:5 189:10,23
191:1 194:11
199:18 201:13
202:17 204:12,17
204:20 205:1,7,25
206:13 207:9,13
212:21 213:11,12
213:15,20,24
214:1,5,19 218:25
221:14 224:13,19
227:7 228:7,11
229:8,15 232:24
233:19 234:14
238:4,9 240:25
247:1 248:5,7
249:16,19 251:16
256:2 258:15,20
261:8,15 262:1,2
266:7 268:4 270:6
271:1,16 274:17
274:21 276:7,19
278:5,17,24
279:23 280:25
281:2 288:7 290:5
293:19 294:12,17
294:25 295:5,7,8

295:13 299:11,22
300:5 303:19
304:2 305:1,5,12
305:20 306:24,24
307:3,5,20
**thinking** 23:1
29:15 155:16
276:3
**thinks** 77:24
100:10 111:24
112:6,22 113:17
114:3 116:7
117:17 118:20
122:17 235:17
236:11 308:7
**third** 42:22 68:2
81:10 82:1 87:19
88:19 124:12,13
144:18 145:4
151:4 152:20
155:25 157:20
163:7 173:8 185:8
185:13 199:20,20
217:12 227:10,14
227:24 234:10
235:22 248:21
266:24 267:3
284:11,16 294:10
**Thorne** 65:13 68:9
68:11 72:12
**Thorne's** 65:19
69:21 70:13
**Thorne/David**
77:16
**thorough** 305:12
**thoroughly** 304:25
305:1
**thought** 11:11
23:16 31:7,12
36:2 40:6 51:6
53:24 58:1 63:4
72:7,8 76:13,23
77:22 78:1 92:13
112:3 153:15
182:23 184:12
186:8 190:9,20
196:14 262:4

270:8 280:23
286:12 301:7
302:19 305:3
**thousand** 12:12
56:4
**threat** 240:16,18
259:13
**threats** 240:13
259:12
**three** 25:22,24 26:4
30:5,8,10 37:25
62:10 72:11 98:3
98:14 104:11
108:1 147:15
148:4,7 149:7,11
151:3,4,14 153:12
165:11,16,20
178:4 180:14
195:2 196:21
197:1 200:25
203:12 205:10
209:10,13 225:9
232:23 234:21
238:10 240:2
241:18,24 242:14
242:17 243:15
244:23 245:7
246:14,15 260:4,7
260:9,10,15,17
267:2 268:25
273:7 286:9
290:12 296:25
297:21
**three-firm** 153:5
**three-week** 161:11
**throw** 19:22 33:8
74:1 81:21 246:8
**thrown** 99:1 229:6
**tie** 199:23
**tied** 200:12,13,17
**tier** 163:18 164:13
164:13,15 165:5,6
165:7,8,11 169:3
172:3,11
**tiering** 175:22
**tiers** 163:12,17,21
164:5,6,16 165:21

169:1,6 172:2
275:3,20,21 278:3
**ties** 29:17 151:23
169:8 202:17
**tight** 4:11 147:24
**time** 3:6 4:14 6:22
6:22 8:7 10:14,15
13:12,15 16:4
25:3 28:1,1 30:17
32:8,20 33:22
49:1 50:11 51:4
55:24 62:6 64:1
67:13,13 70:1
74:8 80:19 84:15
87:20 90:11 91:4
91:6 93:24 96:16
96:17,18 97:24
98:1,15 100:1
104:2,11 105:4
108:1,9,15 114:23
134:22 139:12
142:4 152:17
153:2 154:9,11
156:17 160:24,25
163:16,18 165:8
174:3,18 175:20
184:1,16 186:4
188:21 191:4
192:13 201:12
204:16 207:25,25
208:2,3 212:25,25
225:18 226:9
234:13,17 235:1
237:9,15,21 238:1
238:9 239:9
240:17 244:2
252:9 258:11
264:20,22 271:2,2
272:18 275:7
282:3,12 297:18
297:23 302:5,5
304:24
**timely** 25:25
**times** 7:22 50:6
144:19 155:17,22
159:24,25 163:20
166:12,13 170:11

170:15 172:16
204:2,5 225:9
229:7 270:22
288:9
**timetable** 89:18,25
94:17,18 107:7
**timing** 53:22,23
89:23 97:17
112:18 128:8
297:4 307:21
**title** 86:3 87:17
179:12
**today** 2:9 3:13 15:8
18:9,11 40:2
61:20 64:11 76:20
81:21 100:17
101:1 102:9,22
103:7 115:25
135:2 168:15
206:14 229:13
256:19 270:23
**today's** 5:14 9:17
81:20,22 135:14
143:25 144:1,14
**today's** 157:15
207:16
**told** 21:20,21 26:24
54:24 226:8
252:10
**Tollison** 83:17
**tomorrow** 119:22
304:21,24
**tool** 231:16
**top** 6:12 15:21
38:15 40:11 64:3
70:9 72:18 79:1
81:24 82:9 164:21
165:24 174:14
179:19 183:10
194:24 197:14,15
200:14 203:22,24
253:14 285:21
**topic** 173:25 226:25
**total** 12:2 17:1 33:2
36:5 37:17 47:19
181:2 182:20
187:12,15 193:15

197:3
**totaled** 17:14
**totally** 68:5
**totals** 14:2
**touch** 123:2,3
171:11
**touched** 124:3
**Toys** 171:1
**track** 27:10 249:1
**trade** 12:24 43:16
116:23
**traditional** 58:2
153:4,7 162:16
187:12,15 188:10
206:6 216:3 224:4
224:12 229:5,19
232:15 237:17
242:21 243:4,8,13
243:17 244:1,4,8
245:1,6 246:5
285:22
**train** 283:14,15,16
284:24 285:5,10
**transaction** 46:1
193:16
**transactional** 17:14
50:13,15
**Transcriber**
309:11,14
**transcript** 6:14
93:8 209:1 213:16
225:16 289:13,15
309:4
**transfer** 14:15
78:25
**transfusions**
147:10 243:18
**translate** 249:5
**translation** 193:21
202:13
**transmittal** 191:23
**transpired** 3:4 7:9
**trap** 198:5,7
**Trastinschmit**
280:5,6
**treat** 55:25 267:19
**treated** 276:20

292:7
**treating** 129:7
154:2
**treatise** 168:20
**treatment** 205:15
205:17
**trial** 101:12 102:1
110:25 271:16
282:13
**triangle** 165:7
**tried** 15:22 22:5
48:17 76:15 81:11
256:5
**trier** 104:23 124:24
**trouble** 288:5
**troubled** 56:10,10
56:11
**true** 75:12 124:13
169:10 175:15
226:1 279:24
280:3 298:5
303:15
**trump** 118:9
**trumps** 114:18
**try** 65:11 67:2 74:8
79:17 158:13
164:14 192:1
232:17 239:20
286:3 287:23
**trying** 23:14 30:18
51:11,23 57:3,4
75:3 104:10
121:18 138:23
165:4 171:7
181:13 192:25
238:7 267:21
272:18 299:23
300:22 303:21
**Tunis** 181:25 185:7
**turn** 94:18 159:18
162:6 181:21
183:20 184:21
209:1,11 215:16
230:10 239:11,23
241:8
**turning** 37:23
169:15 170:16

230:13 241:23
242:5 244:10
275:23
**turns** 69:25
**TVR** 153:12
**twice** 144:8 160:17
207:8 235:13
270:24
**two** 2:8 3:12,23 4:1
7:10 12:12 20:13
21:7 24:5 25:16
30:17 40:25 48:9
48:12 49:23 56:4
62:6 66:18,23
67:4,6,8 72:18
77:6 78:20 80:13
86:7 92:18 96:1
97:9 99:20,21
100:4 103:21,24
108:13,18 109:25
112:9 116:14
122:23 124:19
128:24,25 129:6
130:11 131:9
132:2 136:24
139:17,18 141:2,4
143:22 147:16
148:4,6,8,9 149:2
149:3,14 151:3,4
151:6,7,10,14
153:12,13 154:7
154:13 160:24
161:8,18 162:12
165:16,18 170:11
172:18 176:13,13
176:13 184:3
185:11 190:8
193:10 196:12
200:25 204:2,5,17
205:18 207:9
213:11 219:8,25
222:5 225:12
232:23 234:22,24
235:4,8 241:18
242:8,14,18,24
243:7 245:7 246:2
260:4,7,10,17

265:7 274:18
290:12 293:8
296:25 298:6,12
304:8,12,25 305:2
306:12
**two-day** 196:16
**two-year** 184:14
**type** 168:10 224:8,9
240:15 250:7
264:22 266:5
273:17 307:1
**types** 281:14
287:10 291:16
**typically** 96:11
220:21 235:8
239:6

---

**U**

**Uh-huh** 14:19,22
268:6
**Uh-oh** 198:1
248:20
**ultimate** 108:4
124:9 296:20
**ultimately** 10:8
**unable** 289:24
**unbelievably** 169:6
**uncertainty** 63:24
63:25 65:10,11
68:10
**unchallenged** 62:5
62:13
**unclear** 14:22
251:5 281:12
**uncomfortable**
279:7
**unconventional**
65:10
**undercut** 137:25
**underestimates**
172:9
**understand** 30:1
69:13 75:16 79:7
91:18 106:15
119:2 125:25
148:14 155:15,16
158:24 184:10

201:10 211:15
246:23 290:8
**understanding**
4:21 112:17
**Understood** 4:12
114:25 123:10
**undisputed** 62:9
**unfolded** 77:10
92:15
**unfortunate** 266:19
**unfortunately**
179:10
**UNIDENTIFIED**
58:23 67:17 80:25
81:2,16 248:5,8
248:13,16,20
**Unisys** 185:13
**unit** 37:15 220:11
262:18 265:8
**UNITED** 1:1
**units** 36:25 37:14
**unlawful** 88:7
101:8,10 114:3
121:11 122:2
199:9 282:21
**unnecessary** 159:3
**unpleasant** 271:11
**unrealistic** 169:12
**unreasonable**
169:12
**unrelated** 202:5
**unreliability** 23:4
114:13
**unreliable** 6:1 7:1
8:22 14:14 27:13
40:11 50:23 51:1
51:3,6,24 119:20
135:1,22 136:19
136:23 137:12
177:15 202:21
208:7 253:6
296:14,19 302:11
302:12
**unreported** 185:16
**unscientific** 27:2
158:1,8 159:1
178:8 202:20

214:22 276:16
**untainted** 91:7
**untouched** 68:2
75:10 87:19 88:19
144:18 145:4
**unusual** 282:24
**unworkable** 158:9
159:1
**upper** 286:6
**use** 8:15 19:12 27:3
32:7 34:4 42:6,13
42:17 43:19,24
45:3 46:8 47:25
51:2 52:5,13 55:5
61:12,13 75:10,12
76:12,24 82:6
91:22 92:5 95:19
96:24 108:6 124:4
124:6,14 133:19
133:21 134:1
136:21 143:22
147:15 154:14
156:24 169:17
177:10 180:7
181:5,7,9 190:15
190:17 193:5
201:16 202:2
212:19 214:8
217:21 219:6,17
221:9 223:9
225:23 226:11
229:2 239:21
241:22 245:16
249:22 250:8
252:25 253:5,6
254:20 256:10
278:24 290:18
301:3,16
**useful** 205:8 222:20
231:16
**users** 143:8
**uses** 32:3 41:23,24
41:25 42:1,3
135:19 146:4
178:10 190:9
237:16 297:24
**Usually** 264:6

**utilized** 130:6
**utilizing** 221:18
262:14,21 265:5
265:17
**U.S** 185:17 235:23
237:5 257:24
299:2

**V**

**v** 197:8 218:9
226:14
**Valbolon** 248:24
**valid** 117:13 223:5
223:5
**value** 92:2,5 96:3
98:1 105:23
112:12 113:8
128:19 178:7
180:4 184:2,13,15
187:9 189:1
203:17 206:3
223:21 245:20
**Van** 219:9,14
**variable** 169:20
195:10 274:2
**variables** 201:1
203:13 243:1
246:17
**variances** 183:4
**variation** 171:21,22
174:13
**various** 138:21
**Vaughn** 67:2
**VB** 285:22
**vendors** 116:24
**venture** 245:4
**Verboven** 219:9,15
**verification** 124:11
125:18
**verify** 226:7
**Veritext** 1:23
**version** 269:19,25
285:12,15,19
**versus** 29:23 46:20
55:19 59:10 121:5
121:7 130:4
131:21 132:25

148:14 151:3,4,14
185:8,12,15
235:23 248:23
261:20 268:1
273:4
**video** 63:19 65:17
66:16 68:16 69:3
69:7 78:16,19
95:1,3,7 99:12
111:11 115:16
148:17,24 150:4
157:10 161:3
163:25 238:13
**videotape** 11:16
**view** 89:9 111:7
133:20
**viewed** 285:4
**viewing** 21:4
**viral** 233:8
**VO** 185:15
**voice** 280:2
**volume** 244:24
299:1
**voluminous** 5:1
9:25
**voucher** 73:8

**W**

**wage** 177:5,5,6,7
177:13
**wages** 170:10,11,11
177:12
**wait** 55:8 196:1
248:4,11 263:1
289:17
**walk** 15:10,13
170:2 199:19
210:19 232:13
240:12
**walked** 164:9
**walking** 15:14
239:13
**walks** 65:6 233:4
239:24
**want** 3:24 4:8,8 6:7
8:13,14 9:13 15:1
19:12 30:6,12

41:4 50:10,14
53:3 55:6 57:12
66:2 68:7 72:8
89:5 94:18 103:24
108:2 111:4,6
113:16 114:23
115:21 119:25
120:1,1,2 121:1
122:23 123:4
124:3 126:17
131:6,8 132:14,16
142:24,24 144:2
145:9 148:18
157:5 166:2,19
167:3,19 168:16
176:11,11 181:14
181:21 183:24
184:9,11 188:15
194:21 201:17,19
206:14 209:10
213:19 216:9
219:21 228:6
236:21 237:2
247:17,17 249:21
250:2 251:4,5
252:13,24,25
253:16 262:10
266:11 271:20
276:25 280:15
288:4 293:3 298:5
300:22 306:20
307:13,23
**wanted** 4:5 25:1
64:17 67:1 68:10
77:20 147:17
171:24 177:24
178:1 192:8,14
220:5 227:4
229:24 249:24
251:18 297:3
305:4
**wants** 65:7 66:19
66:20
**wasn't** 2:25 4:5
6:18 27:16 29:5
29:21 30:1 41:7
50:7 65:24 69:25

85:3 99:16 125:3
137:14,25 147:13
**wasn't** 149:24
151:19 154:13
170:17 186:6
192:13 207:21
213:14 240:19
256:18,19 258:23
271:11 290:24
293:21 301:17,23
**watching** 63:21
**way** 5:3 16:16,18
16:21 45:12 50:12
50:18,23 60:24
77:23 80:23 85:15
100:23 101:25
111:17 114:2,6
122:10 129:12
136:22 148:3,3
158:13 161:15
195:19,20 200:22
218:17 242:23
245:13 249:3
262:6 263:13
265:1 266:4 273:8
279:17,21 286:5
290:22 294:17
305:9 306:2,16
307:17 308:6,7
**ways** 154:22 228:17
**weaknesses** 240:13
259:12 306:14
**wedge** 176:16,21
**week** 98:14 104:11
108:1
**weeks** 25:16 98:4
290:12
**weigh** 217:23
218:20 272:10
**weighs** 219:4
**weight** 269:20
**Weiss** 206:10
**welcome** 19:13
276:6
**went** 16:5,16,18,21
18:6 19:20 20:17
50:18 52:18,19

62:14 68:19 77:18
77:19 109:23
110:21 184:13
189:11 191:2
193:5 194:7
233:10,13,18
234:4 287:16
294:18,24
**weren't** 10:7,8
48:16,16
**weren't** 149:15
152:18 225:14
299:12
**West** 82:10,11,12
82:19 83:3
**we'd** 61:11
**we'll** 4:5,18 8:16
10:5 43:22 48:25
49:2 52:22 54:6
107:11 120:2,25
125:7 140:10
142:22
**we're** 4:11 6:3 20:5
24:4 26:3 27:3
31:3 32:16 42:9
42:15,15 44:16
48:21 49:19 52:6
56:1,6 72:20
79:15 89:7,8,9,11
91:17,21 94:2
98:12 106:20
107:16 108:20
123:17 139:22
146:23
**we've** 3:10 9:17
10:15 15:22 20:10
24:23 28:15 35:19
37:11 48:17 49:25
53:1 54:2 60:3,16
74:22 80:15 91:11
92:1 94:4 108:24
124:3 126:16
130:9 131:7,14
135:1,2 136:25
144:18
**we'll** 160:18 162:6
163:24 166:14

169:24 181:6
192:1 194:20
195:10 203:20
216:25 217:7
229:18 237:23
248:3 261:20
271:22,23 282:13
**we're** 158:6 159:13
161:17 171:20
174:6 176:2
177:21 179:13
180:6 181:4,13
187:4 193:20
205:13 206:13,21
217:16 219:5
227:1 229:1,2
232:13 238:10
240:21 247:24
252:11 260:11,12
265:16 270:5
271:4,6 277:14
279:12,17,21
287:6 293:25
304:6 308:18
**we've** 153:8 162:21
162:22 184:8,20
184:23 191:1
192:12 214:19
218:25 222:15
223:9,23 227:6
235:22 240:21,25
241:13 242:25
243:18,25 245:23
256:2,5 261:12
265:23 266:9
269:24 279:25
281:2 283:6 288:8
292:21 299:25
302:16 303:24
304:4 306:11,19
**whack** 16:16
**what's** 50:16 69:13
88:11 138:10
**who's** 115:4 117:8
**wider** 160:12
**wiggling** 208:23
**wilderness** 280:2

**window** 97:24
98:14 108:1
**wipe** 95:19
**wiped** 21:8
**witness** 256:17
**women** 235:10
**wonder** 18:1 148:2
**wondered** 16:8
**wondering** 16:5
283:19
**won't** 12:9 80:19
81:4
**word** 42:18 59:5
60:18 96:9 130:4
138:3,5,10 144:4
144:8 155:11
288:9
**words** 29:16 201:16
239:20 248:23
284:9
**work** 46:2 98:16
104:25 124:23
196:13 226:18
267:21 269:14
292:8
**worked** 20:18
198:24
**working** 122:10
138:7 187:8
201:11
**works** 50:13 98:15
221:25 250:9
252:12
**world** 44:10 49:20
52:11 60:15,17,19
84:7 85:21 89:9
99:25 130:22
140:19 142:19
161:25 164:4
169:4,9 170:17,18
171:15,16,16
172:21 177:13,14
177:17,17,18
182:4 183:12,17
185:3 193:8
196:25 200:23
218:16,19 221:19

231:8 262:11,22
263:7,13,17,23
264:4,8 265:18
274:3,6 275:2,4
275:15,20 276:21
291:2 300:14
**worldwide** 257:11
258:1
**worth** 94:4 229:8
**wouldn't** 6:24 9:13
21:4 28:5 33:18
38:21 41:3 66:17
73:19 137:21
**wouldn't** 150:19,20
203:13 208:4
213:2 302:7
**would've** 21:9
35:18 49:9 73:25
**wow** 268:5
**wrap** 278:17
**Wright's** 168:19
**written** 3:14,14
165:3
**wrong** 14:23 16:17
39:20 50:17 51:19
72:17 74:5 118:5
118:6,17 119:7
120:20,22 122:19
185:5 200:9,12,13
227:1 262:5
**wrongdoer** 51:16
74:16
**wrongful** 230:20
**wrote** 3:16

---
**X**
**X** 165:24

---
**Y**
**Y** 101:20
**yard** 133:17 146:4
147:16
**yardstick** 228:13
228:14,20,21
229:2,3,9 230:6,8
231:1,6,9,16,20
231:21,25 232:5,9

237:20,22 239:10
241:22 245:17
246:8,18
**yeah** 11:12 18:15
81:3 128:12 135:8
190:5 193:9 252:7
254:14 263:6
274:14 275:17
305:24
**year** 6:25,25 8:25
19:4 20:14 21:1,3
28:5,6 31:12 32:3
33:3 35:23 36:13
37:23,25 42:19
77:6,6 86:4 99:2
130:11,12 131:22
132:2,2 133:1,1
148:1 157:3,18,23
158:17 182:12
193:4 196:12,12
203:21 208:6
211:13 213:3,3
233:15 239:7
243:22,23 245:6,8
268:11,21,24,25
302:7,8
**years** 3:4 4:1 8:2,2
8:4 19:21 22:7,7
25:23 26:4 30:5,8
30:10 34:8 38:13
38:19 40:25 44:24
48:19 49:8 52:6,7
56:7 57:9 58:7,8
58:17 59:10 60:4
60:7,11,12,21
80:13 124:20
127:8,18 128:24
128:25 129:6,9
130:5 131:9,9,14
131:17,21 132:25
139:8 141:4,5,8
142:17 161:10
162:17 164:17
174:14 181:25
182:7 184:3,15
185:1 209:16
210:14 211:8,23

268:23 286:9
303:22 305:4
**year's** 94:4
**yellow** 200:14
**yesterday** 2:18 3:10
3:12 5:4 7:10
10:6,13 13:5,12
16:4 18:24 24:17
24:21 26:12 30:18
31:13 33:21 40:21
41:23 51:10 53:3
61:8 76:20 77:8
81:12 87:24 135:1
153:22 178:4
193:5 228:11
245:4 247:7
263:10 280:8
281:5
**yesterday's** 5:14
**yesterday's** 278:22
284:9
**you'd** 70:8 76:13
125:7
**you'll** 49:24 119:22
120:20
**you're** 12:15 14:3
15:4 17:18,24
19:12 20:15 29:8
29:11,14,15,16
32:13 34:16 36:25
37:22 39:1,4,11
41:8,20,21 48:6
49:2 58:3,12,15
62:21 64:7 76:21
77:9 91:16 96:24
98:5 101:7 102:11
107:1 108:25
117:16,19 119:18
120:12,13,24
122:3,9,22 123:3
126:20 128:2,8
129:12,23 132:9
138:22 145:20
**you've** 10:4 18:12
20:3 23:20 24:7
28:22 30:3 39:21
55:11 76:12 102:5

107:3 114:20,21
120:8 128:9,10
130:10 137:15,24

**Z**

**Zern** 227:23 228:1
**ZF** 80:23 81:12,25
82:9
**ZLB** 151:7,10,11
152:8,9,23 234:14
259:14,14,25
**ZLB/CSL** 234:16

**$**

**$10.2** 34:19 182:15
**$12** 225:9
**$12.47** 187:13
**$15.17** 233:18
**$20** 166:11
**$25,000** 130:4
131:21 132:25
**$3** 160:14
**$30** 225:4
**$300** 166:1
**$32** 225:8
**$33** 225:5
**$4** 40:24 225:1
**$47** 225:1
**$5** 166:11
**$51** 225:5
**$6** 160:16
**$79.14** 233:20
**$82.59** 234:8

**0**

**0.8** 245:5
**01** 93:18 94:3,9
**01/05** 140:1
**02** 189:7
**03** 11:22 17:5,6
22:9 152:14 257:2
257:4,8,13 258:14
**04** 16:10 17:16
151:10 152:8
257:6
**05** 16:11 17:21
140:2 152:25

257:1,11
**07** 22:9 152:14,25
257:4,8 258:14
266:12 268:16
**08** 11:22 257:1,11
**09-md-02081** 1:3
**09-2081** 2:7

**1**

**1** 57:8 92:8 96:12
98:20 99:17
195:17 273:3
**1st** 55:10 77:17
90:18 94:12 95:5
95:21,22 97:1
98:10 101:11
103:19 105:7
108:2 109:6
110:13 130:9
163:13
**1(b)** 134:1,5,6,11
134:21,24
**1-888-777-6690**
1:25
**1:30** 107:12
**1:45** 107:17
**10** 159:24,25,25
166:19 172:4
182:17 185:19
186:13,14 187:1
239:2 240:11,23
258:24 259:4
298:24
**10th** 25:17
**10,000** 73:25
**10.2** 38:9 183:6
**10.9** 182:23,25
**100** 212:2,9
**11** 17:17,17,18
75:22 142:7
145:21 146:13
**11,784** 36:5
**11.3** 177:6,8
**11:28** 76:1
**11:30** 75:22
**11:49** 76:1
**118** 42:23 216:12

**119** 47:3,5
**12** 30:4 135:4,12,17
152:16 218:2
**12th** 234:11
**12.47** 187:14
**12.474** 187:19
**12.74** 188:4
**12:42** 107:17
**120** 10:21 11:13,18
12:1 18:15,16
19:20 21:21 31:25
38:21 39:12 42:16
47:18 175:13
179:6
**124** 244:15 253:18
253:22 254:9
**13** 17:23 68:15
185:11
**135** 170:3
**138** 110:23
**14** 69:6,6 94:21,21
**14.1** 40:23
**14.694** 188:3,20
**143** 285:17
**1434** 198:8
**1435** 198:8
**148** 93:7
**1487** 187:4,5
**15** 67:17,18 159:24
211:5
**15th** 35:18 58:13
130:1 131:10
132:21 182:13
**150** 170:4
**16** 70:6 226:15
301:10
**16,415,000** 12:13
**165** 191:15 194:20
**17** 71:8 152:25
**17th** 191:22
**171** 7:20,22 12:7
22:1 188:16 189:4
191:16
**172** 4:22,23 28:8
**18** 25:4 72:23
152:14 172:6
179:25 223:22

**180** 110:24
**1800** 1:24
**1801** 1:24
**19** 74:12,15
**190** 170:9
**19103** 1:24
**195** 209:1 213:16
**196** 211:5
**1965** 83:2
**1970** 81:7 82:11
**1990s** 233:14,18,24
**1991** 185:9,13
**1993** 90:16,18
**1995** 90:18
**1997** 211:18 233:19
**1998** 185:16,18
**1999** 91:13 96:20
  166:11 181:23
  184:1 186:12
  188:4,10,20
  189:17,21,25
  190:5 191:10
  223:22 224:2

---

**2**
**2** 2:17,17 8:16 15:7
  16:24,25 17:4
  60:2 61:20 128:8
  133:11 134:11
  271:8 279:5
  301:20
**2nd** 95:22
**2,000** 53:4,14,18
  73:24
**2.22** 187:24 188:5
**20** 62:7 84:6 163:3
  210:11 267:20
**20th** 109:7
**20,751,000** 12:13
**20,965,000** 12:11
**200** 62:4 175:13
  225:16
**2000** 9:1 34:3,15,22
  35:2,6 36:1 37:22
  41:1 54:22 55:4
  55:10 58:13 64:4
  84:1,7 85:3,8,15

85:18,20 86:12,15
87:14 88:2,6,8,15
92:3,8,17 93:16
93:19 94:12 95:5
95:14,19,21,23
96:22 97:1 98:10
99:2,17,18 100:19
101:9 102:10
103:7 109:7,7
115:2 127:14,15
128:22,22 129:17
130:1,9,14,21
131:10 132:21
137:17 160:24
161:12 175:5
182:12,12,13
184:1 189:7,21
193:2 233:15,20
234:3
**2001** 8:5 9:1 33:14
  34:3,5 35:2,21
  36:3,4 84:2,9 85:1
  85:4,10,13,19
  86:10,15 87:11
  88:2,4,5,10,16
  98:20 101:11
  127:18 129:22
  131:4 179:24
  182:8 189:7 191:6
  193:2 237:6,15
  257:23 297:6,15
**2002** 8:5 34:3 35:2
  40:23 127:18
  179:24 182:8
**2003** 8:2 12:3,9,20
  12:25 15:23 25:8
  30:16 32:18 33:10
  34:20,25 38:2,5
  39:17 40:23,24
  43:17 179:24
  182:10,15,16
  183:8 189:6 191:4
  192:4 193:2 234:3
  234:3 237:7,15
  256:23 257:20,23
  268:23 292:11
  297:6,16

**2004** 12:11 15:24
  17:11,11 24:19
  25:6 31:2,12,20
  165:11 179:24
  215:21 234:11,20
  242:6 277:22,25
  298:11
**2005** 4:1 9:1 12:11
  15:24 24:19 25:5
  26:13 31:14,20
  33:14,22 34:5,22
  49:10,20 134:23
  137:17 138:24
  160:4,10 162:11
  163:13 168:25
  174:22 175:7,11
  175:14,21 188:18
  192:15,24 193:3
  238:20 243:25,25
  257:25 274:22
  297:9,21
**2006** 12:4,12 32:8
  33:15 175:15
  195:17,17,21
  235:1
**2007** 12:12 39:17
  176:1 195:22
  239:5 279:4
**2008** 12:13,20,25
  30:16 32:19 33:10
  34:25 43:17
  174:23 175:5
  189:6 191:4,23
  239:4 258:1 297:9
  299:1
**2009** 160:12,14,15
  160:17 166:1,13
  172:2 174:15,15
  175:15 230:13
  241:14,21
**201** 225:16
**2010** 33:15 56:5
  235:1 236:7
**2012** 6:12 26:17,18
  26:18 69:20 82:1
  93:6 164:11
  175:10 179:14

186:20 241:2
**2015** 1:4 309:7
**21** 86:2 99:18 244:6
**21st** 99:6 102:18,21
  103:2,19 104:23
  105:9,22 108:2
  109:7,19,20
  230:13
**21,987,000** 12:11
**21.987** 188:19
**22** 1:4 7:13 44:4,7
  70:9 86:20 87:16
  244:6 276:14
**22nd** 116:5
**22,250,000** 17:5
**22,530,000** 17:5
**2200** 157:4,17,23
  276:14
**23** 7:13,13 17:12,14
  21:8 43:1 44:4
  111:8 152:14
  207:16 292:12
  296:21
**23(b)(3)** 296:16
**23,605,000** 12:12
**2336** 219:20
**2337** 263:3
**235** 154:22 293:13
  295:2
**236** 53:10 293:15
**24** 11:12 12:23 38:6
  43:2 278:14,22
**24,8** 12:21 38:7
**24,880,000** 12:9
**24-A** 12:3
**24.88** 34:20 183:9
**241** 222:3
**242** 135:4,12,17
**243** 158:15 167:22
  168:1 273:1
**244** 300:23 301:1
  302:15
**245** 6:13 28:20
  145:19,25 214:6
  300:23,25 301:20
**25** 49:7 57:9 58:6
  58:16 59:11 60:4

60:11 62:3 79:19
  79:19 80:13
  124:18,19 126:5
  128:23 129:5
  133:1 135:14
  139:8 141:3
  142:16 143:5
  148:1 152:16
  159:18 179:25
  203:21 209:21
  211:10,14
**26** 156:21,22 157:6
  157:9 162:22
  166:17,22,24
  309:7
**26th** 6:12 179:14
  186:12
**27** 157:7,9,12,14,15
  164:7 174:22
  176:5
**270** 175:13
**28** 7:21 12:8,8 22:1
  158:11 175:13
**29** 143:23 144:14
**29th** 223:22

---

**3**
**3** 7:15 8:17 16:13
  16:15 21:14 44:8
  44:16 78:7,9 79:1
  79:1 116:5 133:13
  133:15 134:14
  298:25
**3rd** 26:18 95:22
**3-4** 31:5
**3.60** 225:3
**3:25** 174:9
**3:41** 174:9
**30** 72:25 145:13,14
**30th** 90:18
**30(b)(6)** 256:17
**300** 60:2,12,15,20
**31** 16:10 17:7 30:20
  30:21 31:7,8,9
  147:20,20
**32** 148:16,19
**321** 227:17

**323** 227:18
**33** 150:3 236:24
    297:14
**34** 16:10 30:22 31:5
    151:22 211:12
    258:16,20 285:20
**34,9** 17:17
**35** 33:19 34:17
    35:10,20 39:22
    180:16 182:4
    188:14
**36** 12:3 175:13
**37** 6:13 95:6
**38** 117:12 194:22
**384** 289:11
**39** 204:25 205:2

### 4

**4** 8:2 12:4 78:8,9,18
    209:6 230:10,14
**4th** 55:15 62:22
    95:22 100:19
    106:3 109:7
**4:10** 196:17
**40** 12:4,13 31:2
    49:9 192:10,12,15
    205:4
**41** 17:22,25 205:23
    205:24,25 216:19
**42** 115:15 217:11
    218:2 226:25
**43** 111:7,9
**44** 117:13 249:12
**45** 99:11 223:11,20
**47** 227:1
**48** 229:11 234:18
**48,8** 12:20
**49** 232:20

### 5

**5** 8:2 53:2 60:7
    75:20 76:7 78:8
    78:11 88:20
    239:11
**5:19** 248:2
**5:34** 248:2
**50** 192:11 236:7

**5098** 185:17
**51** 115:24 116:2
    241:7,8 298:2
**53** 243:10
**54** 16:11 17:23 18:1
    35:19 38:10 57:19
    182:14 185:24
    206:2 254:8
**55** 7:11 44:3,7
**56** 10:21 11:12,25
    34:24 42:23 46:13
    215:13,16,18
**58** 244:15 254:9
**585** 176:15
**59** 211:14 284:9
    287:6
**591** 177:11 223:6

### 6

**6** 12:12 53:2,21
    75:18,19 80:25
    81:2,16,17,21
    88:20 90:6 170:15
    175:11 276:25
    277:6,9
**6.4** 18:22 19:4,20
    21:1,3 22:6 32:2
    33:3,6 39:15
    42:19 47:20 191:2
**6:46** 1:5 308:20
**600** 170:14
**61** 151:23
**63** 244:17
**65** 153:1
**670** 185:14
**69** 162:23

### 7

**7** 53:2 61:15,19
    83:22 88:21 164:9
    179:9,17 211:19
    239:23
**7:00** 308:17
**70** 58:23 59:24
    153:1 162:19
    299:3,11
**71** 241:13,23

**715** 185:10
**72** 175:14 242:5
    259:23 298:4
**73** 241:13 242:9
**77** 278:6

### 8

**8th** 55:16 62:22
**83** 153:24 154:1,10
**84** 175:13
**85** 73:1 278:6

### 9

**9** 64:7 269:7
**9-A** 159:20
**9:46** 1:5
**90s** 154:6
**925** 185:14
**95** 175:14
**952** 185:10
**96** 213:16
**97** 213:16
**98** 115:23 116:1
**984,523** 157:22