## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
:
IN RE: BLOOD REAGENTS ANTITRUST     :    **MDL No. 09–2081**
LITIGATION     :
:    **ALL CASES**
:
_____:

**DuBOIS, J.**                                            **October 19, 2015**

# M E M O R A N D U M

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................2

II.     BACKGROUND .....................................................................................3

  A.   BACKGROUND ON BLOOD REAGENTS.....................................................3

  B.   CREATION OF DUOPOLY BY ORTHO AND IMMUCOR...............................5

  C.   POST–DUOPOLY PRICE INCREASES.......................................................6

     1.   Operation Create Value ...............................................................6

     2.   Blood Bank Leadership Program ...................................................7

  D.   THE ALLEGED PRICE–FIXING CONSPIRACY ............................................8

  E.   2005 Price Increases .......................................................................10

  F.   2008 PRICE INCREASES ...................................................................11

III.   APPLICATION OF DAUBERT ....................................................................13

  A.   DR. BEYER'S DAMAGES METHODOLOGIES ..........................................14

  B.   STANDARD OF REVIEW UNDER DAUBERT ............................................15

  C.   LEGAL STANDARD: ANTITRUST IMPACT AND DAMAGES ........................17

  D.   ANALYSIS OF ORTHO'S DAUBERT CHALLENGES .....................................19

  E.   DAUBERT CONCLUSION...................................................................47

IV.   RECERTIFICATION OF THE CLASS ..........................................................47

  A.   LEGAL STANDARD .........................................................................48

  B.   DISCUSSION .................................................................................49

     1.   Class Definition and Ascertainability .............................................49

     2.   Rule 23(a) Requirements ...........................................................51

     3.   Rule 23(b)(3) Requirements .......................................................54

     i.   Predominance ........................................................................54

     ii.   Superiority ...........................................................................71

V.    CONCLUSION ....................................................................................72

## I.    INTRODUCTION

In these consolidated antitrust actions, plaintiffs allege that the two leading producers of blood reagents — Immucor, Inc. ("Immucor") and Ortho Clinical Diagnostics, Inc. ("defendant" or "Ortho") — conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  By Order and Memorandum dated August 22, 2012, the Court granted plaintiffs' Motion for Class Certification.[1]  Plaintiffs thereafter finalized a settlement with Immucor.  By Order dated September 6, 2012, the Court granted plaintiffs' Motion for Final Approval of the Settlement with Immocur.

On September 5, 2012, Ortho filed a Petition for Permission to Appeal the Court's August 22, 2012 decision granting class certification, pursuant to Federal Rule of Civil Procedure 23(f), in the U.S. Court of Appeals for the Third Circuit.  Ortho's Petition was granted on October 25, 2012.

On April 8, 2015, the Third Circuit vacated and remanded this Court's Order granting plaintiffs' Motion for Class Certification on the ground that it relied on the decision of the U.S. Court of Appeals for the Third Circuit in Behrend v. Comcast Corp., 655 F.3d 182 (3d Cir. 2011), which was reversed by the Supreme Court, Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013).  On remand, the Third Circuit directed that the Court "decide in the first instance which of [defendant's] reliability attacks, if any, challenge those aspects of plaintiffs' expert testimony offered to satisfy Rule 23 and then, if necessary, to conduct a Daubert inquiry before assessing whether the requirements of Rule 23 have been met."  In re Blood Reagents Antitrust Litig., 783 F.3d 183, 188 (3d Cir. 2015).  Presently before the Court are the parties' post–remand briefs addressing plaintiffs' expert Dr. John C. Beyer's methodologies for calculating classwide

---

[1]      The response and surreply to Plaintiffs' Motion for Class Certification were filed in Ortho's name only because of ongoing settlement discussions between plaintiffs and Immucor.

damages under Daubert.  For the reasons set forth below, the Court rejects Ortho's Daubert

challenges, and recertifies the following class pursuant to Federal Rule of Civil Procedure 23(a)

and 23(b)(3):

> All individuals and entities who purchased traditional blood reagents in the United States directly from defendants Immucor, Inc., and Ortho–Clinical Diagnostics, Inc. at any time from November 4, 2000[2] through the present.  Excluded from the Class are defendants, and their respective parents, subsidiaries and affiliates, as well as any federal government entities.

## II.    BACKGROUND

Between 2000 and 2009, defendants increased the prices of their blood reagent products

by significant percentages.  Many products' prices rose by more than 2000% during that period.

(See Beyer Report, Pls.' Mot. Ex. 1, at 13, 14.)  The parties agree that some part of this increase

resulted from the creation of a duopoly in the blood reagents industry in 1999 as a result of the

acquisition of numerous manufacturers of blood reagents by defendants over a period of several

years.  However, plaintiffs allege that an unlawful horizontal price–fixing agreement that began

in November 2000 accounts for much of the increase.

### A.    BACKGROUND ON BLOOD REAGENTS

Blood reagents are used to identify properties of human blood.  Most large purchasers of

blood reagents are blood donor centers and hospitals, which use them to test whether the blood

of a potential donor is compatible with the blood of a potential recipient.  (See Report of Teresa

Harris ("Harris Report"), Pls.' Mot. Ex. 2, at 3.)  Under applicable FDA regulations, Blood Bank

and Transfusion Standards promulgated by the American Association of Blood Banks

---

[2]    Plaintiffs have asked the Court to certify a class of TBR purchasers "from January 1, 2000 through the present."  Since discovery was conducted, however, plaintiffs have consistently asserted that the communications between Ortho and Immucor executives at the AABB meeting, which began on November 4, 2000 initiated the alleged price-fixing conspiracy that followed.  Thus, "the court will exercise its discretion to amend the class definition, sua sponte," Rendler v. Gambone Bros. Dev. Co., 182 F.R.D. 152, 160 (E.D. Pa. 1998), and substitute the date "November 4, 2000" for the date "January 1, 2000."

("AABB"), and other rules, a blood donor center must test a donor's ABO group and Rh type and perform an antibody screen each time he or she donates.  (Id. at 9.)  A hospital must conduct similar tests on a recipient before providing a blood transfusion.  (Id.)

There are two basic categories of blood reagents: traditional and automated.  Although both Ortho and Immucor sold products in both categories throughout the class period, the putative class in this case includes only purchasers of traditional blood reagents ("TBR").  When using TBR, laboratory technicians test blood manually in test tubes and interpret the results.  (Id. at 6.)  "Automated" or "proprietary" blood reagents ("ABR"), on the other hand, are often used with specialized equipment.  (Id.)  They allow quicker testing while requiring less skill and decreasing the risk of technician error.  (See, e.g., Pls.' Mot. Ex. 22, at 13 (citing the benefits of ABR as "[s]ignificant labor reduction," "[i]ncreased productivity/efficiency," and "[i]ncreased patient safety").)  ABR tend to be more expensive than TBR.  (See, e.g., Weiss Decl., Pls.' Reply Ex. 149, ¶ 14.)  The parties dispute the extent to which defendants' customers were able to use TBR and ABR interchangeably.

During the class period, Ortho and Immucor each sold more than forty different TBR products.  (See, e.g., Harris Report Ex. C.)  A list provided by plaintiffs' industry expert, Teresa Harris, shows that most Ortho TBR products had an equivalent Immucor TBR product.  (See id.; see also, e.g., Poynter Decl. ¶ 29.)  Ms. Harris testified in her deposition that a few of the products that she paired in the list are not identical.  (See Harris Dep., Def.'s Opp. Ex. B, at 64–65, 143–44.)  However, she opines that those nonidentical pairs "perform exactly the same function."  (Harris Reply Report, Pls.' Reply Ex. B, at ¶ 3.)

The blood–reagents market features significant barriers to entry.  Most importantly, a prospective entrant must obtain FDA approval before beginning to market and sell blood

reagents.  This process takes several years.  (See, e.g., Pls.' Mot. Ex. 9, at 4 (2003 interview in

which Immucor CEO Edward Gallup stated, "[T]he FDA is very often our friend . . . . [S]ix

years is a long time — but, even if it were half that, it's still a huge barrier to entry."); Pls.' Mot.

Ex. 62, at 1 (Immucor strategy document stating that "[t]here are high barriers to entry.  To enter

the market, a company must meet FDA Regulations, which takes approximately five to six years

to gain approval.").)  Toward the end of the class period, in or around 2008, two new TBR

producers entered the market.  (See, e.g., Def.'s Opp. 18–19.)  The two new producers are not

involved in any of the post–remand issues.

## B.    CREATION OF DUOPOLY BY ORTHO AND IMMUCOR

In the 1980s and 1990s, the TBR market was highly competitive, with more than a dozen

competitors.  (Pls.' Mot. Ex. 9, at 2.)  During that period, there was intense price competition,

(see, e.g., id.; Pls.' Mot. Ex. 10, at 1), and TBR prices and profitability were low, (see, e.g., Pls.'

Mot. Ex. 5, at 4 (showing Immucor's gross profits declining steadily between 1995 and 2000)).

As a result, Immucor approached bankruptcy, (see, e.g., Pls.' Mot. Ex. 7), and Ortho considered

exiting the TBR industry, (see, e.g., Pls.' Mot. Ex. 12, at 12), in those years.

In the 1990s, Immucor began to acquire competing TBR producers.  (See, e.g., Pls.' Mot.

Ex. 9, at 3; Pls.' Mot. Ex. 19, at 1.)  After Immucor acquired Gamma Biological in 1998 and the

Biological Corporation of America in 1999, Immucor and Ortho had a duopoly in the United

States TBR market.  (See, e.g., Pls.' Mot. Ex. 10, at 1; Pls.' Mot. Exs. 22–24.)  Defendants

anticipated that this market consolidation would allow them to raise prices and increase their

profitability.  (See, e.g., Pls.' Mot. Ex. 19 (statement of Immucor CEO that "by buying up its

competition and consolidating the marketplace into two key players, Immucor can raise its

prices"); cf. Pls.' Mot. Ex. 21.)  Immucor's market share in North America was slightly larger

than Ortho's throughout the class period.  (See, e.g., Pls.' Mot. Exs. 22–24 (showing Immucor with a market share of approximately 55% and Ortho with a market share of approximately 45% in 1999 and 2007).)

### C.   POST–DUOPOLY PRICE INCREASES

#### 1.   Operation Create Value

Shortly after Ortho and Immucor created their duopoly, Ortho developed a pricing strategy it called "Operation Create Value" ("OCV").  (See, e.g., Pls.' Mot. Ex. 43, at 1.)  Ortho began work on OCV, with the assistance of a consulting firm, at least as early as October 1999. (Id.)  Pursuant to OCV, Ortho decided to increase the prices it charged all TBR customers by 25% in 2000 and by an additional 25% in 2001.  (Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 47, at 13.)  Ortho anticipated that it would impose additional "increases yearly thereafter until profitability achieved."  (Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 54, at 10 (describing OCV as consisting of "5+ years of annual 25% price increases").)  In developing the strategy, Ortho focused heavily on whether Immucor would follow its price increases and, if so, when the Immucor price increases would take place.  (See, e.g., Pls.' Mot. Ex. 47, at 20–22, 39.)  Ortho rejected larger proposed price increases — as large as 100% per year — because of the risk of customer loss.  (See, e.g., Def.'s Opp. Ex. 46.)

Ortho implemented the first 25% price increase under OCV in April 2000. (Pls.' Mot. Ex. 49, at 1; Pls.' Reply Ex. 156.)  Many customers did not actually experience a price increase at that time, however, because Ortho could not increase customers' prices until their existing contracts expired.  (See Beyer Reply Report, Pls.' Reply Ex. A, at ¶ 73; 7/26/12 Hr'g Tr. 97; Poynter Decl., Pls.' Reply Ex. 150, at ¶ 31.)  As a result, Ortho's average TBR prices increased by less than 25% in 2000. (See, e.g., 7/26/12 Hr'g Tr. 188–91 (testimony of Dr. Peter Bronsteen,

defendant's economic expert, that average prices of particular TBR products increased by about

10% between 1999 and 2000).)

Immucor implemented similar price increases around the same time.  For example, in an

October 2000 email, Immucor's CEO, Edward Gallup, told a shareholder that Immucor had

begun to increase customers' prices in June 2000 as their existing contracts ended.  (Pls.' Mot.

Ex. 50, at 1; see also Poynter Decl. ¶ 4 (stating that "Immucor implemented an approximately

20% price increase on traditional blood reagents in June 2000").)  Gallup wrote that it was

Immucor's goal "to affect [sic] a 10–20% price increase over the next 12 months to all domestic

customers." (Id.; see also Pls.' Mot. Exs. 51–52; Poynter Decl. ¶ 5 ("Immucor wanted to target

20% price increases on blood reagents over the next 12 months.").)  Gallup further explained,

"While there is always some risk of losing customers, early indications are that our only

competitor in the U.S.  (Ortho Clinical Diagnostics division of [Johnson & Johnson]) is doing the

same."  (Pls.' Mot. Ex. 50, at 1–2.)

## 2.    Blood Bank Leadership Program

In the fall of 2000, Ortho considered a different, more aggressive pricing strategy that

came to be known as the Blood Bank Leadership Program ("BBLP").  An internal Ortho

document dated September 15, 2000, enumerated three options: (1) "stay the course" by

continuing the 25% annual price increases planned under OCV, (2) exit the TBR market

altogether, or (3) enact the BBLP.  (Pls.' Mot. Ex. 54, at 2.)  Ortho hoped that the larger price

increases under the BBLP would increase gross profit margins on all of its TBR products to at

least 40%.  (Id. at 4.)  In considering whether to implement the BBLP, as with OCV, Ortho

focused on the risk that Immucor might not "follow aggressively." (Id. at 11.)  As early as

October 30, 2000, Ortho developed price lists under the BBLP and prepared to inform its

customers of the price increases.[3]  (Pls.' Mot. Ex. 56.)  The BBLP price increases varied by TBR

product but resulted in an overall increase of 200 to 300 percent in TBR prices between 2000 and

2002.  (Pls.' Mot. Ex. 11, at 3; see also Pls.' Mot. Ex. 56.)

### D.     THE ALLEGED PRICE–FIXING CONSPIRACY

Plaintiffs allege that defendants began to engage in unlawful pricing–related

communications at an annual meeting of the AABB.  The meeting took place in Washington,

D.C., between November 4, 2000, and November 8, 2000, and Ortho and Immucor executives

were in attendance.  (See, e.g., Pls.' Mot. Ex. 59, at 1.)

At the AABB meeting, Immucor executives watched a presentation in which Ortho

announced the BBLP price increases.  (See, e.g., Thorne Dep., Pls.' Mot. Ex. 60, at 206;

DeMezzo Dep., Pls.' Mot. Ex. 153, at 88.)[4]  Ortho's president, Catherine Burzik, also stopped

by the Immucor booth and introduced herself to Mike Poynter, an Immucor executive.  (Poynter

Decl. ¶ 7.)  She asked Poynter to "pass [her business card] along to Ed Gallup, [Immucor's

---

[3]     Plaintiffs presented evidence that Ortho did not charge the BBLP prices to any customer
until after it allegedly engaged in unlawful price–related conversations with Immucor.  At the
class certification hearing, the parties disputed the probative value of a slide contained in an
October 30, 2000, Ortho presentation regarding the BBLP.  The slide is labeled "Communication
with Customers," and it lists the names of seven major customers alongside dates ranging from
September 27, 2000, to October 20, 2000.  (Pls.' Mot. Ex. 56, at 5.)  The record contains no
evidence regarding the nature of any communications between Ortho and those customers.
Ortho contends that the slide establishes that it had already implemented the BBLP prior to the
alleged price–fixing conspiracy, which plaintiffs contend began in November 2000.  Plaintiffs
argue that, even if Ortho engaged in some kind of discussion with select customers in September
and October of 2000, Ortho did not finalize the BBLP until after its allegedly unlawful
communications with Immucor.  On the present state of the record, the Court finds that the slide
does not establish that Ortho implemented the BBLP before the American Association of Blood
Banks ("AABB") meeting, which began on November 4, 2000.

[4]     At the class certification hearing, Ortho provided the Court with the Supplemental
Declarations of Mike Poynter and Bill Weiss, two Immucor executives.  In those declarations,
Poynter and Weiss aver that they do not "remember anything being said during [Ortho's]
presentation about a 2001 price increases or anything about Ortho's future pricing plans."  (Supp.
Poynter Decl. ¶ 8; see also Supp. Weiss Decl. ¶ 5.)  However, other Immucor employees who
attended the AABB meeting testified to the contrary.  See supra.

CEO,] because she wanted to speak with him." (Id.) "Ms. Burzik told [Poynter] that she had recently joined Ortho, that Ortho's margins on traditional blood reagents were terrible, and that she wanted to understand the margin situation regarding traditional blood reagents. She also asked if [Poynter] had seen Ortho's presentation and invited [him] to come to the Ortho booth to see it," which he did. (Id. at ¶¶ 7, 10.)

In mid–November 2000, shortly after the AABB meeting, Gallup, Immucor's CEO, asked Judy Thorne, Immucor's Director of Marketing, to meet with an Ortho employee to "find out a range of where Ortho may be considering putting the pricing." (Thorne Dep. 206.) Shortly after Gallup made that request, Thorne had lunch with David Gendusa, a Regional Vice President for Ortho. (Id. at 206, 208.) At the lunch meeting, Gendusa "showed [Thorne] the range that [Ortho was] considering" for about twenty–five TBR products but did not give her a copy of the price list. (Id.) Thorne wrote down the prices for several categories of products, returned to the office, and gave the information to Gallup. (Id. at 207–09.) Gallup instructed Thorne to "expense the lunch as if he was the person [she] had lunch with," presumably to conceal her communications with Gendusa. (Cangiamilla Dep., Pls.' Reply Ex. 152, at 45–46.)

Immucor changed its pricing strategy drastically after learning of Ortho's plans. On November 17, 2000, Immucor's Vice–President of Sales sent an email stating, "We are going to increase prices around the first of the year so look out. We are going to piss off a lot of people, but Ortho is going to do the same!!! So maybe we will start getting profitable!" (Pls.' Mot. Ex. 64, at 1.) Ortho sent its customers a letter with the BBLP price list on November 21, 2000. (Def.'s Opp. Ex. 27, at ORTHOCD–0834002.) Immucor received a copy of the price list from a customer on December 1, 2000. (Def.'s Opp. Ex. 39.) In 2001 and 2002, Immucor raised prices on its TBR products by between 247% and 400%. (See, e.g., Pls.' Mot. Ex. 62, at 1.) Ortho

raised prices on its TBR products by between 200% and 300% during the same period.  (See, e.g., Pls.' Mot. Ex. 11, at 3, 5.)  The price increases became effective for different customers at different times, depending on when their existing contracts expired.  (See, e.g., Def.'s Opp. 27–28, 30–31.)

### E.    2005 PRICE INCREASES

Plaintiffs allege that the November 2000 communications initiated a lengthy conspiracy through which defendants colluded to impose substantial price increases throughout the class period.  While prices rose somewhat between 2002 and 2004, (see, e.g., Beyer Report figs.1–4), the next "major price increase initiative[]" was implemented in 2005, (id. ¶ 29).

Both firms increased the prices of their TBR products significantly in 2005.  (See, e.g., Pls.' Mot. Ex. 67 (12/20/04 email from Immucor sales representative stating that "Blood Bank reagents went up approximately 300% in 2001 and now they are rising another 125%"); Pls.' Mot. Ex. 88 (4/12/06 internal Ortho email referring to Ortho's 125% price increase in 2005 and "the fact that Immucor also followed"); Beyer Report tbl.7 (showing that the 2005 increase raised the prices of Immucor's top ten TBR products by 115% to 316%).)  Plaintiffs have presented evidence that each defendant was confident that the other would not deviate from this strategy.  (See, e.g., Pls.' Mot. Ex. 91.)

Plaintiffs also note that both defendants cancelled contracts with important group purchasing organizations ("GPOs") in order to implement the price increase.  (See, e.g., Pls.' Mot. Ex. 94, at 2.)  According to plaintiffs, the GPOs comprised a large share of sales for Immucor and Ortho, which would have made those cancellations highly risky absent collusion. (Pls.' Mot. 21–22; Beyer Report ¶ 36.)  The cancellations were nearly simultaneous: for example, both Ortho and Immucor decided to terminate their contracts with one GPO, Premier,

during the fall of 2004.  (Pls.' Mot. Ex. 94, at 2.)  The cancellations of the Premier contract by

Ortho and Immucor became effective on December 31, 2004, and January 26, 2005, respectively.

(Pls.' Mot. Ex. 96.)  Immucor also cancelled its contract with another GPO, Novation, around the

same time.  (Id.)

　　　With its 2005 price increases, Immucor introduced two new TBR pricing programs.

First, in October 2004, Immucor informed its remaining GPO customers that they could obtain

"price protection," freezing their TBR prices at 2004 levels for five years, if they purchased

Immucor's ABR instrument.  (Def.'s Opp. Ex. 70.)  Second, Immucor introduced a "Customer

Loyalty Program" that separated customers into three pricing tiers depending on their

"commitment" to purchasing Immucor's TBR.  (See Def.'s Opp. Ex. 71.)  Customers that

promised to purchase 90% of their TBR from Immucor received "Level II" prices.  (Id.)

Customers that promised to purchase 70% of their TBR from Immucor received "Level I" prices.

(Id.)  Customers that did not make such a commitment received "Base" prices.  (Id.)  In 2005,

Base, Level I, and Level II prices increased by 95%, 70%, and 58%, respectively.  (Def.'s Opp.

Ex. 72.)

### F.    2008 PRICE INCREASES

　　　In March 2008, Ortho implemented a final significant price increase, raising TBR prices

by an average of 100%.  (Def.'s Opp. Ex. 80, at 2.)  Ortho notified customers of the increase in

December 2007 and January 2008.  (Def.'s Opp. Ex. 81, at 7.)  In July 2008, Immucor

implemented its own price increase.  Having reconfigured its pricing tiers since 2004, Immucor

increased prices by 20% for customers in its "Automation" tier[5] and by 50% for customers in its

---

[5]      Automation tier pricing was awarded to facilities that adhered to the base pricing
guidelines, but had Immucor instrumentation.  (Def.'s Opp. Ex. 99.)

"Base" tier.  (Def.'s Opp. Ex. 99.)  Price increases varied for TBR products under the other

pricing tiers.  (<u>Id.</u>)  The price increase did not apply to GPOs.  (<u>Id.</u>)

### G.     PROCEDURAL HISTORY

Plaintiffs filed their Motion for Class Certification on September 16, 2011.  In opposition,

Ortho argued that plaintiffs had not satisfied Rule 23(b)(3)'s predominance requirement.[6]  Ortho

raised numerous reliability attacks against plaintiffs' proposed common proof demonstrating

antitrust impact and damages — namely the damages methodologies offered by plaintiffs'

economic expert, Dr. Beyer.  By Memorandum and Order dated August 22, 2012, the Court

granted plaintiffs' Motion for Class Certification.  After conducting a "rigorous analysis of the

evidence offered by both parties," <u>In re Blood Reagents Antitrust Litig.</u>, 283 F.R.D. 222, 240

(E.D. Pa. 2012), vacated and remanded, 783 F.3d 183 (3d Cir. 2015), the Court rejected

defendant's reliability challenges to Dr. Beyer's damages methodologies.

This Court's decision certifying the class was based, in part, on the Third Circuit's then–

controlling <u>Behrend v. Comcast Corp.</u>, 655 F.3d 182 (3d Cir. 2011), which was reversed by the

Supreme Court on March 27, 2013, <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426 (2013).

Specifically, this Court determined that plaintiffs had satisfied Rule 23(b)(3) in part by holding

that the expert testimony of Dr. Beyer "could evolve to become admissible evidence" at trial.

<u>See</u> <u>In re Blood Reagents Antitrust Litig.</u>, 283 F.R.D. at 243–45 (quoting <u>Behrend</u>, 655 F.3d at

204 n.13).  On September 5, 2012, Ortho filed a Petition for Permission to Appeal Pursuant to

Federal Rule of Civil Procedure 23(f), in the Third Circuit.  Ortho's Petition was granted on

October 25, 2012.

---

[6]     Ortho did not dispute that plaintiffs had satisfied the Rule 23(a) requirements or Rule
23(b)'s superiority requirement.

On April 8, 2015, the Third Circuit vacated and remanded this Court's August 22, 2012, Order granting plaintiffs' Motion for Class Certification, holding, in relevant part, as follows:

> Without foreclosing what other conclusions the District Court might reach regarding Comcast's ramifications for antitrust damages models or proving antitrust impact, we believe Behrend's "could evolve" formulation of the Rule 23 standard did not survive Comcast . . . We join certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in Daubert.

In re Blood Reagents Antitrust Litig., 783 F.3d at 186–87.

The Third Circuit directed the Court to "decide in the first instance which of [defendant's] reliability attacks, if any, challenge those aspects of plaintiffs' expert testimony offered to satisfy Rule 23 and then, if necessary, to conduct a Daubert inquiry before assessing whether the requirements of Rule 23 have been met." Id. at 188. On June 26, 2015, the parties filed post–remand opening briefs. Replies were filed on July 10, 2015. Oral argument was held on July 21, 2015 and July 22, 2015.

## III.    APPLICATION OF **DAUBERT**

Ortho's Daubert challenges before the Court on remand squarely attack Dr. Beyer's proposed methodologies for calculating the damages incurred by individual plaintiffs resulting from the alleged price–fixing conspiracy. Plaintiffs' proof of predominance with respect to antitrust impact and damages rests heavily, although not entirely,[7] on this evidence. Thus, the challenged testimony of Dr. Beyer is "critical to class certification," and must be analyzed under Daubert. See In re Blood Reagents Antitrust Litig., 783 F.3d at 186–87.

---

[7]     Plaintiffs also assert that they will prove antitrust impact using: (1) application of the so–called "Bogosian shortcut," (2) Dr. Beyer's analysis of the structure of the TBR market, (3) Dr. Beyer's empirical analysis of TBR prices during the class period, and (4) documents produced by defendants. See infra Section IV(B)(3)(i)(b). Defendant does not challenge Dr. Beyer's analysis of the structure of the TBR market, nor his empirical analysis of TBR prices during the class period in its post–remand briefs.

### A.    DR. BEYER'S DAMAGES METHODOLOGIES

Dr. Beyer's proposed methodologies for calculating damages distinguish between price increases resulting from the creation of a duopoly and price increases resulting from the alleged price–fixing conspiracy.  Specifically, Dr. Beyer utilizes a benchmark model to estimate the pricing that would have occurred in a lawful duopoly.  He concludes that any differences between those estimated prices and the actual prices charged by defendants resulted from the alleged price–fixing conspiracy.

For the period between 2001 and 2005, Dr. Beyer bases his benchmark on the price increases Ortho planned and partially implemented after the duopoly was created but before defendants allegedly formed their price–fixing conspiracy under the OCV pricing strategy.  For that period, Dr. Beyer assumes that both defendants' TBR prices would have increased by 25% per year, as Ortho had planned under OCV.

Dr. Beyer also presents a variation on this OCV benchmark methodology, in which he adjusts the increases in but–for prices, i.e. the estimated prices that "would have prevailed in the same period with no anti-competitive behavior,"  (Beyer Report ¶ 88), for individual TBR products to reflect the distribution of actual price increases for different TBR products.  (Beyer Reply ¶ 74.)  The weighted average but–for price increase, however, remains 25% per year from 2001 to 2005 under this benchmark variation.  (Id.; 7/26/12 Hr'g Tr. 309)

For the period between 2006 and the end of the damages period, Dr. Beyer proposes two alternative methods of estimating but–for prices.  The first option assumes that TBR prices would have risen at the same rate that Immucor's standard costs rose.  The second option makes use of a proposed non–TBR "yardstick" product, RhoGAM, Ortho's brand of Rho(D), a prescription pharmaceutical that is administered to pregnant women.

## B.    STANDARD OF REVIEW UNDER DAUBERT

Federal Rule of Evidence 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Faced with a proffer of expert scientific testimony . . . the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592 (1993).  This gatekeeping function extends beyond scientific testimony to testimony based on "technical" and "other specialized" knowledge.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

Rule 702 has "a liberal policy of admissibility." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Inter., Inc., 128 F.3d 802, 806 (3d Cir. 1997)).  As such, the "rejection of expert testimony is the exception and not the rule."  Fed. R. Evid. 702 Advisory Committee's Notes.

"Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.2000) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) ("Paoli II"))).  The party offering the expert must prove each of these requirements by a preponderance of the evidence.  In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

### 1.    Qualifications

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge'

regarding the area of testimony." Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 335 (3d Cir. 2002) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. See Waldorf, 142 F.3d at 625.  "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 855 (3d Cir. 1990) (quoting Fed. R. Evid. 702) ("Paoli I").

## 2. Reliability

The reliability requirement of Daubert "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." Paoli II, 35 F.3d at 742) (quoting Daubert, 509 U.S. at 590).  The Supreme Court held in Kumho Tire that the Daubert test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  526 U.S. at 141–42 (emphasis omitted).  In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non–judicial uses to which the method has been put.

United States v. Mitchell, 365 F.3d 215, 235 (3d Cir. 2004) (citing Paoli II, 35 F.3d at 742 n. 8).
These factors are neither exhaustive nor applicable in every case. Kannankeril, 128 F.3d at 806–07.

Under the Daubert reliability prong, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Paoli II, 35 F.3d at 744 (emphasis omitted). "The evidentiary requirement of reliability is lower than the merits standard of correctness." Id. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process — competing expert testimony and active cross–examination — rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Mitchell, 365 F.3d at 244 (quoting Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)).

### 3. Fit

For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non–helpful." Daubert, 509 U.S. at 591 (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985) (internal quotations omitted)). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id.

### C. LEGAL STANDARD: ANTITRUST IMPACT AND DAMAGES

"A consumer alleging antitrust violations cannot [recover] damages without showing that he actually paid more than he would have paid in the absence of the violation." City of

Pittsburgh v. West Penn Power Co., 147 F.3d 256, 265 (3d Cir. 1998) (citing Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law, at 200 (1995) (noting that "determining whether antitrust

injury is present necessarily involves examining whether there is a causal connection between

the violation alleged and the injury")).  Thus, "one pursuing antitrust recovery must establish that

the damages suffered were caused by the defendant's participation in a scheme repugnant to the

antitrust laws."  In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1176 (3d Cir.

1993) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 (1977)).  This is

referred to as antitrust impact.

   In price–fixing cases, "causation of injury may be found as a matter of just and

reasonable inference from proof of defendants' wrongful acts and their tendency to injure

plaintiffs, and from evidence of change in prices not shown to be attributable to other causes."

In re Indus. Silicon Antitrust Litig., 1998 WL 1031507, *4 (W. D. Pa. Oct.13, 1998) (citations

omitted).

   "Once causation is determined, . . . the actual amount of damages may result from a

'reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.'"

Lower Lake Erie, 998 F.2d at 1176 (citing MCI Communications Corp. v. Am. Tel. & Tel. Co.,

708 F.2d 1081, 1161 (7th Cir. 1983)).  "The relaxed measure of proof is afforded to the amount,

not the causation of loss-the nexus between the defendant's illegal activity and the injuries

suffered must be reasonably proven."  Id.  However, a plaintiff's "burden of proving the fact of

damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy;

inquiry beyond this minimum point goes only to the amount and not the fact of damage."  Danny

Kresky Enter. Corp. v. Magid, 716 F.2d 206, 209-10 (3d Cir. 1983).

### D.   ANALYSIS OF ORTHO'S <u>DAUBERT</u> CHALLENGES

In its Opening Post–Remand Class Certification Brief, Ortho raises numerous challenges to Dr. Beyer's methodologies for determining antitrust impact and damages under <u>Daubert</u> based on reliability and fit.[8]   Those challenges were all previously raised in objection to Plaintiffs' Motion for Class Certification.   Although the Court addressed the majority of Ortho's reliability challenges in its August 22, 2012 decision granting plaintiffs' Motion for Class Certification, the Court now assesses those challenges under <u>Daubert</u> in light of the Third Circuit's mandate.   The Court addresses each of Ortho's challenges in turn.

### 1.   Whether Dr. Beyer's OCV Benchmark Has Failed to Estimate "But– For" Prices Using Established Scientific Techniques

Ortho argues that the OCV benchmark[9] is not a reliable means of estimating but–for prices between 2001 and 2005 because it does not rely on what it contends to be more established scientific techniques, such as regression analysis, but rather is based on cherry-picked Ortho documents.   The Court rejects this argument.

Experts frequently use business plans in calculating damages.   <u>ZF Meritor, LLC v. Eaton Corp.</u>, 696 F.3d 254, 292 (3d Cir. 2012).   The Court "must perform a case–by–case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable."   <u>ZF</u>

---

[8]      Ortho does not challenge the qualifications of Dr. Beyer.   Dr. Beyer has more than 40 years of experience in applied micro–economics analysis in the United States, and has testified as an economic expert in numerous antitrust actions during his career.   (Beyer Report ¶¶ 2, 3.) He also holds several advanced degrees in economics, including a Ph.D. from the Fletcher School of Law and Diplomacy at Tufts University.   (<u>Id.</u> at App'x A.)   Upon review of Dr. Beyer's extensive credentials and experience, the Court concludes that plaintiffs have demonstrated by a preponderance of the evidence that Dr. Beyer is qualified in the field of economics.

[9]      Ortho does not dispute the use of a benchmark as a generally accepted methodology for proving antitrust impact and damages.   <u>See Nichols v. SmithKline Beecham Corp.</u>, No. 00–6222, 2003 WL 302352, at *4 (E.D. Pa. Jan. 29, 2003) (upholding expert's use of benchmark at class certification stage as a "generally accepted methodology for determining impact").

Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012).  After a comprehensive review of the record, the Court finds that Dr. Beyer's reliance on OCV business records in calculating damages for the first part of the class period was reasonable, and concludes that plaintiffs have proved by a preponderance of the evidence that the OCV benchmark is a reliable and fit methodology under Daubert.

First, the OCV benchmark, which provides for annual 25% increases from 2001 through 2005 — resulting in a 305% price increase over five years in the but–for world — accounts for the duopoly market structure.  The 25% OCV–based benchmark reflects plans Ortho formed and began to implement after the duopoly was created, thus reflecting its estimate of the prices it would be able to impose given the change in market structure.  In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 (citing (Beyer Report ¶ 95)); (7/26/12 Hr'g Tr. 312:14–16) (as OCV was planned after the duopoly was created, the OCV benchmark "holds constant the structure of this industry not from a competitive point of view, but as a duopoly").

Second, contrary to Ortho's assertion, OCV was not merely a consultant's recommendation or a select set of documents.  (See Pls. Mot. Ex. 46.)  To the contrary, OCV was a "concerted Ortho undertaking," (Beyer Reply ¶ 44 ), a corporate project, (7/26/12 Hr'g Tr. 311:25–312:2), in which defendant, with the assistance of the Norbridge consulting firm, "considered several price increase scenarios, conducted dozens of customer interviews, and drafted detailed communication plans."  (Beyer Reply ¶ 44; Pls. Mot. Exs. 23, 45, 46.)  The project was "designed," "acted upon," and subsequently "implemented" by "Senior Ortho employees."  (7/26/12 Hr'g Tr. 312:18–19, 310–12; Pls.' Mot. Ex. 23, at 38 (listing Ortho executives on OCV implementation team)); see also In re Actiq Sales & Mktg. Practices Litig., No. 07–4492, 2014 WL 3572932, at *6 (E.D. Pa. July 21, 2014) (rejecting similar challenge by

defendant against expert's use of defendant's internal documents in damages model because, inter alia, it was prepared by defendant company and produced to plaintiffs during discovery).

Third, OCV "demonstrated a prudent set of actions on the part of [Ortho] in the context of the duopoly. . . it accepted moderate risk" as it explicitly considered Immucor's response to the price increases and rejected larger price increases, (See, e.g., Pls.' Mot. Ex. 47, at 20–22, 39, 7/26/12 Hr'g Tr. 313–14). "[T]here was an attempt to quantify th[e] effect [of proposed price increases] and to demonstrate what the loss of revenue would be, and income." (7/26/12 Hr'g Tr. 314:3–5; 318:13–17 ("[I]t reflects an explicit consideration that I would expect as an economist, that a price increase may result in a loss of market share to a competitor and what the implication of that market share loss is . . . .").)

Finally, Dr. Beyer saw no evidence that OCV was tainted by cartel activity. As he explained, "I think most important is [that] I can find no business record, no deposition transcript . . . to suggest that this action taken beginning late 1999 and into early 2000 was anything but independent, not coordinated behavior." (7/26/12 Hr'g Tr. 314:19–25; Beyer Report ¶¶ 97, 98).)

Thus, the Court finds that the OCV plan was "the product of deliberation by experienced businessmen [within Ortho] charting their future course." See Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 566 (2d Cir. 1970) (holding that damages testimony was admissible because the financial projections that were the basis for the testimony were the product of deliberation by experienced businessmen charting their future course"). As such, it provides a reliable basis for Dr. Beyer's benchmark methodology for the first part of the class period.

Although Ortho criticizes Dr. Beyer for failing to apply regression analysis to calculate damages, Daubert does not mandate the use of such econometric tools. In fact, Dr. Beyer and Dr. Bronstein agreed that it would be difficult to apply regression analysis reliably in this case.

(Beyer Reply ¶¶ 52, 53; 7/26/12 H'rg Tr. 244.)  A reliable regression depends on "data with a reasonable degree of integrity."  (Id. at ¶ 53.)  As Dr. Beyer explained, there is no cost data available from Immucor prior to June 2001, and Ortho has only provided annual cost estimates, which it contends are unreliable.  (Id.; see also infra n. 12)  Furthermore, the demand measure relied upon by Dr.  Beyer is only available every three years, rendering it an "unsuitable measure of demand in an econometric study."  (Id.)  Dr. Beyer thus concluded that a reliable regression is "best not used" in this case.  (Id.)  As a consequence, he proposed a set of alternative methodologies that, based on his extensive experience, he believed to be the most reliable and scientific manner in which to calculate damages incurred by individual plaintiffs.  (7/26/12 Hr'g Tr. 310–15.)

The Court further concludes that this case is clearly distinguishable from the cases cited by Ortho in support of its argument.  In ZF Meritor, LLC, the Third Circuit affirmed the district court's conclusion that plaintiff's expert report on damages based on a one–page set of plaintiff's profit and volume projections for its newly formed business was unreliable.  696 F.3d at 293. The Court held that "although [plaintiff's expert] was generally aware of the circumstances under which the [business plan projections were] created and the purposes for which [they were] used, he lacked critical information that would be necessary for [defendant] to effectively cross– examine him."  Id.  In this case, Dr. Beyer has relied on a corporate project planned and partially implemented by defendant.  As this was Ortho's business plan, rather than an estimate based on plaintiffs' projections, Ortho certainly does not lack critical information necessary for Ortho to effectively cross–examine Dr. Beyer.  See In re Actiq Sales & Mktg. Practices Litig., 2014 WL 3572932, at *6.  Moreover, the 25% annual increase figure was not derived from a single

document, but was based on a corporate pricing strategy implemented after Ortho achieved its duopoly position in the TBR market.  (See Pls.' Mot. Exs. 23, 45, 46)

In Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P., the Court rejected Dr. Beyer's damages methodology in a highly complex monopoly case because it relied on mischaracterized price predictions in defendant's predictive strategy documents and ignored equally reliable predictions found in the same internal documents.  247 F.R.D. 156, 166 (C.D. Cal. 2007).  Again, in this case, Dr. Beyer does not rely on a few predictive strategy documents produced by Ortho, but a significant price increase plan, designed and implemented by senior Ortho executives.  He has not mischaracterized select statements from the documents upon which he relies — the record evidence demonstrates that after Ortho obtained its duopoly market position, the company planned and actually began to implement annual price increases of 25% in an effort to restore financial health to the company's TBR business.  (See Pls.' Mot. Ex. 45, at 1; see also Pls.' Mot. Ex. 47, at 13.)

For all these reasons, the Court finds that Dr. Beyer's OCV methodology "provides reliable, relevant, and reasonable support for the assertion that damages can be estimated and quantified on a class–wide basis."  In re Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 212 (M.D. Pa. 2012).

## 2.    Whether Dr. Beyer's OCV Benchmark is Premised on His "Ipse Dixit" About the Timing of Alleged Conspiracy

Defendant next argues that Dr. Beyer's OCV benchmark methodology is unreliable because, despite allegations in the Complaint that the conspiracy began "at least as early as January 1, 2000," it is premised on the conspiracy starting after November 1, 2000, but before November 21, 2000.  Defendant contends that Dr. Beyer "conveniently chose the start date of the alleged conspiracy" during this three–week window in November, rather than relying on

plaintiffs' allegations in the Complaint to "justify treating Ortho's OCV business plan as a benchmark for duopoly pricing."  (Def.'s Post–Remand Br. 16.)  The Court rejects this argument.

The Court concludes that this challenge implicates the weight a jury may give Dr. Beyer's testimony, not its admissibility.  See In re Urethane Antitrust Litig., 768 F.3d 1245, 1263 (10th Cir. 2014) (defendant's "benchmark–shopping argument does not implicate the reliability of [expert's] methodology"; refusing to reverse district court based on the defendants' argument that the plaintiffs' expert changed the class period start date to maximize damages); Kleen Products LLC v. International Paper, 306 F.R.D. 585, 603 (N.D. Ill. 2015) (concluding that defendants' argument that expert's damages model was unreliable because it relied on class period alleged in amended complaint, rather than the period initially alleged goes to weight of the testimony, not its admissibility).

Ortho cites no authority for excluding an expert's damages model because he assumed a conspiracy start date that was later than that which was initially alleged in the Complaint, and the Court declines to do so. [10]  "[I]it is consistent with sound economic practice to review the factual record and formulate a hypothesis that can then be tested using economic theory — the examination of the factual record is necessary . . . to confirm that the stories drawn from the data and from the factual record are consistent."  In re Processed Egg Products Antitrust Litig., No. 08–2002, 2015 WL 337224, at *11 (E.D. Pa. Jan. 26, 2015).  That is precisely what Dr. Beyer

---

[10]     The Court further notes that even if it were to accept defendant's challenge that OCV is an inappropriate benchmark because it was implemented after the initially alleged conspiracy start date in January 2000, Dr. Beyer's use of the OCV plan as a benchmark results in a more conservative estimate of damages.  In re Linerboard Antitrust Litig., 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007).  That is because if Dr. Beyer incorrectly assumed a later start date for the conspiracy, and thus, incorrectly assumed that the OCV benchmark was free of collusion, then Dr. Beyer's "but–for price estimate would be too high, causing his estimate of the overcharge (the difference between actual prices and but–for prices) to be too low."  Id.

has done.  Furthermore, his selection of the OCV benchmark is consistent with plaintiffs' theory of the case — that the November 2000 communications initiated the lengthy conspiracy that followed.  See infra Section III(C)(3).  By reason of this evidence, the Court amends the class definition to reflect the alleged start date of the conspiracy as November 4, 2000, the first day of the AABB meeting.  See supra n. 2.

### 3.    Whether Dr. Beyer's Selection of OCV Plan over BBLP Plan As Benchmark was Arbitrary

Ortho argues that the OCV benchmark is arbitrary and unscientific because "the timing of OCV and BBLP, in relationship to what Dr. Beyer considers to be the onset of the alleged conspiracy, does not justify his selection of the first Ortho price plan and his disregard of the second."  (Def.'s Post–Remand Br. 17.)  More specifically, Ortho argues that it finalized plans for BBLP by at least September 2000 and began communicating with customers about the increase prior to the end of September and through October 2000, prior to November, when Dr. Beyer admits there is no evidence of cartel activity.  (Id. at 18.)  Moreover, Ortho contends that Dr. Beyer's selection of the OCV benchmark is unreliable because he has no factual information upon which to opine that the conspiracy began during the three–week window in November.

The Court rejects this challenge.  Dr. Beyer's use of the OCV plan over the BBLP plan as a benchmark is not arbitrary and unscientific.  As discussed in its August 22, 2012 decision granting plaintiffs' Motion for Class Certification, Dr. Beyer's use of Ortho's OCV plan, rather than its BBLP plan aligns with "[p]laintiffs' theory — that Ortho began to consider the BBLP before the AABB meetings but would not have executed the plan without explicit assurance that

Immucor would follow," and "is consistent with documents showing that the BBLP only became fully operational after the meetings." [11] In re Blood Reagents Antitrust Litig., 283 F.R.D. at 243.

Although Ortho now recasts its argument as a Daubert challenge, the Court's prior ruling remains undisturbed by the Third Circuit's mandate.  The Court concludes that this alleged flaw in Dr. Beyer's methodology "may be explored at trial," and "the trier of fact may properly consider [any such] deficiencies in determining the weight to be accorded to his ultimate conclusions."  Poust v. Huntleigh Healthcare, 998 F. Supp. 478, 498 (D.N.J. 1998); see Fleischman v. Albany Med. Ctr., 728 F. Supp. 2d 130, 150 (N.D.N.Y. 2010) ("Differences in expert opinion as to which benchmark is more reliable does not render [expert's] opinions unreliable.").

### 4.       Whether Dr. Beyer Arbitrarily Shifted Start Date of OCV

Ortho contends that Dr. Beyer's OCV benchmark does not fit the facts of the case because he arbitrarily shifted the start date of OCV from 2000 to 2001 rendering his OCV benchmark arbitrary.  In his initial report, based on OCV, Dr. Beyer increased but–for prices by 25% in 2000, but in his Reply Report, Dr. Beyer shifted the initial 25% increase under OCV to 2001.  Ortho asserts that Dr. Beyer altered his calculation to reduce the number of TBR with actual prices below the but–for prices between 2000 and 2004.

The Court previously addressed this challenge, stating,

> Dr. Beyer provides a persuasive explanation for the change.  He explains that he shifted the first but–for price increase because the alleged price–fixing conspiracy did not begin to impact customers until 2001; neither defendant imposed its substantial price increases until early 2001. (Beyer Reply ¶ 73.) Thus, since plaintiffs do not allege that prices increased in 2000 due to unlawful collusion, "it is more accurate for but–for prices to

---

[11]      The Court previously ruled that the evidence presented by Ortho was insufficient to conclusively establish that the BBLP was implemented before the AABB meetings, which began on November 4, 2000.  In re Blood Reagents Antitrust Litig., 283 F.R.D. at 229 n. 2.  That factual finding, which did not rely on expert testimony, is unaffected by the Third Circuit's remand of this case.

equal actual prices in 2000 and to have but–for prices only start diverging from actual prices in 2001." (Id.)

In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 n.14.

Although the Court must now evaluate defendant's challenge through the lens of Daubert, it remains unavailing for the reasons previously stated.  To the extent this challenge is relevant, it goes to the probative value of Dr. Beyer's testimony, and may be challenged on cross–examination at trial.  See In re Urethane Antitrust Litig., 768 F.3d at 1263 (defendant's "benchmark–shopping argument does not implicate the reliability of [expert's] methodology"); see also Crowley v. Chait, 322 F.Supp.2d 530, 540 (D.N.J. 2004) (stating that "Daubert does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes," but rather, that such error correction "strengthens the quality of the expert [testimony]").

### 5.      Whether Dr. Beyer Arbitrarily Transformed OCV from a Two–Year to Five–Year Plan

Ortho next argues that the OCV benchmark is unreliable and does not fit the facts of the case because Dr. Beyer arbitrarily transformed OCV from a two–year to a five–year plan. Plaintiffs do not contest that the OCV plan was initially designed as a two–year plan.  Rather they assert that OCV was designed and implemented to position Ortho for additional price increases after 2001, and that by the Fall of 2000, Ortho contemplated additional 25% annual increases as an alternative to implementing a more substantial "market correction" under the BBLP plan.  Thus, they contend that Dr. Beyer's OCV benchmark, which provides for 25% annual increases through 2005, is reliable and fits the case under Daubert.

The Court finds that Dr. Beyer's use of the 25% annual increases from 2001 through 2005 as a benchmark is sufficiently reliable and fits the case, and thus satisfies Daubert.  Dr.

Beyer relied on several internal documents produced by Ortho that evidence that 1) the OCV plan was designed to position Ortho "for additional price increases" after 2001, (see Pls.' Mot. Ex. 23 ("The 25% + 25% price change balances risk, [and] positions OCD for additional price increases . . . ."); Pls.' Mot. Ex. 45, at 1 (memo from Ortho president describing OCV strategy as "[i]ncreas[ing] prices of traditional blood bank products across all customer segments by 25% in 2000 to be followed by an additional 25% increase in 2001 and tak[ing] increases yearly thereafter until profitability achieved"); and 2) that "5+ years of annual 25% price increases" was an alternative price increase strategy considered by Ortho prior to implementing the BBLP plan. (Pls.' Mot. Ex. 54, at 2–4, 10 (describing one strategy option as "stay the course," consisting of "5+ years of annual 25% price increases"); Pls. Mot. Ex. 55, at 5 (describing "upsides" of BBLP plan as "one major market correction vs. 5+ years of annual 25% price increases").)

The documentary evidence cited above is reinforced by the testimony of Ortho executives, which characterizes OCV as a "multi-year price increase strategy of approximately or targeted to near 25 percent year after year." (Hakanson Dep., Pls. Mot. Ex. 161, at 51:5–8; see also Kleinbard Dep., Pls. Mot. Ex. 162A, at 65:15–22 (OCV "was a price increase program that I believe was intended to occur over a number of years [ ] as opposed to, you know, a really, really big price increase. . . ."); Gendusa Dep., Pls. Mot. Ex. 186A, 219:17-21 (in comparing OCV to BBLP, "I think the analogy was pull the band–aid off quick . . . take one big adjustment and stop having to go to the customers over and over again for smaller increments").)

Plaintiffs need not, for purposes of Daubert, conclusively demonstrate that the OCV plan would have been implemented through 2005 but for the alleged conspiracy. Such a requirement sets the bar too high. See Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000). To satisfy

Daubert, "[a]n expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000) (citations and internal quotation marks omitted). Based on a thorough review of the record, the Court finds that there is sufficient support for Dr. Beyer's extrapolation of the 25% annual increases under OCV beyond 2001. See Id.; see also K.M.C. Co. v. Irving Trust Co., 757 F.2d 752, 765 (6th Cir. 1985) ("long–term projection based on profits annualized from [plaintiff's] operation over just a three month period" admissible where expert's "various figures and assumptions were not purely speculative, but were derived from financial data and competent testimony in the record and based on his personal experience and knowledge").

Ortho may test Dr. Beyer's assumptions and conclusions with respect to his use of the OCV benchmark beyond 2001 through cross examination at trial. See Aetna, Inc. v. Blue Cross Blue Shield of Michigan, No. 11–15346, 2015 WL 1497826, at *4 (E.D. Mich. Mar. 31, 2015) (reaching same conclusion where defendants argued that expert's long term projection of lost profits nine years into the future were unreliable where defendant had not made any business projections greater than three years).

### 6.    Whether Dr. Beyer's OCV Benchmark Fails to Account for Salient Economic Factors

Ortho next argues that Dr. Beyer's OCV benchmark does not adjust for cost and demand in calculating the but–for price of TBR between 2001 and 2005, and is therefore unreliable under Daubert. On this issue, it asserts that its standard costs[12] and demand for TBR rose from 2001

---

[12]    By letter dated September 9, 2011, counsel for Ortho explained, in relevant part, that the standard cost data produced by Ortho are estimates calculated on a cost per unit basis that are gathered "approximately four to six months prior to each fiscal year as part of [Ortho's]

through 2004, and that had Dr. Beyer accounted for those increases, it would have had a "huge

impact" on his conclusions regarding antitrust impact.  (7/26/12 Hr'g Tr. 195:4–14; 196:15–

197:6; Bronsteen Pres., 7/26/12 Hr'g, at 7.)  The Court addresses defendant's arguments with

respect to demand and costs in turn.[13]

---

budgeting process.  It does not reflect [Ortho's] actual costs of production but is a prediction of what [Ortho's] costs will be for the following fiscal year in a limited number of cost categories," including, for example, costs of raw materials.  (See Letter from Paul H. St. Antoine, Esq., Counsel for Ortho, to Jeffrey J. Corrigan, Esq., Counsel for plaintiffs (September 9, 2011).) "Standard cost data is not maintained in [Ortho's] financial accounting system for this entire time period [1998 through 2010], so [Ortho] searched its records and manually compiled the standard cost information to the extent it was readily available."  (Id.)

Ortho's counsel explained in the letter that the specific categories of costs included in standard costs changed over time, and the lists of said categories were not readily accessible. (Id.)  Thus, Ortho could not determine "whether the change in standard costs for a given year [was] a result of a change to the definition of standard costs, or a modification to [Ortho's] manufacturing process for a product."  (Id.)  The letter added that standard costs did not include "shipping to customers, selling, marketing, general administration, research, or capital improvements."  (Id.)  Those costs not included in the standard cost estimates are referred to by Ortho as "Costs Not in Standard" or "CNIS."

The Deputy Clerk shall docket a copy of the letter from Ortho's counsel dated September 9, 2011.

[13]     Ortho cites two cases in which courts have rejected economic analysis as unreliable in failing to account for market factors not attributable to the alleged misconduct.  See, e.g., Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic, 152 F.3d 588, 593 (7th Cir. 1998) (rejecting statistical study which failed to adjust for any other factor that could have affected the independent variable, price in clinical services, except for one, thus effectively attributing the "entire difference [in price] . . . to the [anticompetitive conduct.]"); Lantec, Inc. v. Novell, Inc., 2001 U.S. Dist. LEXIS 24816, *19 (D. Utah Feb. 13, 2001) (rejecting Dr. Beyer's methodology as "fail[ing] to address in sufficient manner or degree salient factors not attributable to the defendant's alleged wrongdoing that may have caused the harm alleged").

The Court finds those cases inapposite.  Neither case involved an alleged price fixing conspiracy, nor a proposed benchmark methodology for calculating damages.  In fact, the Lantec decision did not address expert testimony regarding a proposed damages model at all, but rather considered testimony provided by Dr. Beyer on the relevant product market definition in a non–class monopoly action involving software markets.  Moreover, Blue Cross is a summary judgment opinion, and thus the Court did not apply Daubert as the standard for reviewing the expert testimony.  In any event, this case is distinguishable because Dr. Beyer has considered and analyzed costs and demand.  See Patel v. Verde Valley Med. Ctr., No. 05–1129, 2009 WL

### i. Demand

Although Ortho argues that "[a]ccounting for growth in demand [ ] would have increased Dr. Beyer's but-for prices," (Def.'s Post–Remand Opening Br. 11), the Court concludes that Dr. Beyer's decision not to account for demand in the OCV benchmark is not "so important as to render his analysis unreliable." In re Processed Egg Products Antitrust Litig., 2015 WL 337224, at *16 (finding absent factors were not crucial to creation of reliable regression, and thus their absence did not render expert's damages model inadmissible).

First, there is record evidence that demonstrates that demand for TBR was "relatively stable" during the class period, and as such, accounting for demand would not impact Dr. Beyer's OCV benchmark methodology. (Beyer Reply ¶ 55 (citing Weiss Declaration ¶ 21).) Although there is evidence in the record showing that there was an annual growth rate of 2–3% for transfused and collected blood between 1999 and 2008, (Beyer Report ¶ 51), Dr. Beyer argues that defendants' transactional records show that demand for TBR during this period actually declined as large blood banks and hospitals switched to using ABR. (See 7/26/12 Hr'g Tr. 345:6–347:1.) Moreover, Dr. Beyer and Dr. Bronsteen agree that they saw no evidence in the record that TBR price increases were caused by increases in aggregate demand for blood. (Beyer Report, ¶ 54; 7/26/12 Hr'g Tr. 261:2–3 (Dr. Bronsteen: "I don't think I have seen any documents that talk about prices increasing due to aggregate demand in the industry. . . .").)

In any event, even assuming arguendo that demand for TBR increased 2–3% annually, the Court concludes that accounting for these minimal increases would not significantly impact Dr. Beyer's conclusions with respect to antitrust impact and damages in light of the substantial

---

5842049, at *4 (D. Ariz. Mar. 31, 2009) (distinguishing case from Lantec because "although flawed in some respects," for omitted certain data, expert's benchmark,  was not "totally without foundation").

difference between but–for prices, which already account for price increases of 25% annually, and prices in the actual world.  (See e.g. Beyer Pres., 7/26/12 Hr'g, at 28.)  Thus, the Court will not exclude Dr. Beyer's OCV benchmark methodology on this ground.

### ii.  Costs

Ortho argues that standard costs rose significantly from 2001 to 2004, and that accounting for those increases would have increased Dr. Beyer's predicted but–for prices. In support of its argument, Ortho cites to percentage increases in costs of raw materials of as much as 127% and 97% for different product lines from 2000 to 2004 as a reason for its 2005 price increases, (Def.'s Post–Remand Br. 10), and increases in average standard cost for certain TBR in certain years between 2002 and 2004 as greater than 25%, (Bronsteen Report Ex. 4A and 4B; Def.'s Opp. Ex. 120, at 7).  Dr. Bronsteen argues that Dr. Beyer should have accounted for such cost increases by adding the raw percentage average annual cost increase to the annual 25% price increases already accounted for under the OCV benchmark.  (7/26/12 Hr'g Tr. 196–97.) Accounting for cost increases in that way, according to Dr. Bronsteen, would result in decreasing gross profit margins in the but–for world, and raise but–for prices such that, in many cases, those prices would be higher than actual prices, thus eliminating impact.

In response, Dr. Beyer asserts that he has not ignored costs, as Dr. Bronsteen suggests. (7/26/12 Hr'g Tr. 323:11–14, 324–25.)  Rather, he states that he has accounted for costs under his OCV benchmark methodology and that it is unnecessary and inappropriate to further account for any such cost increases.  First, Dr. Beyer explains that under OCV, costs were held constant to evaluate each price increase and the resulting response by Immucor to the price increase on an "apples to apples" basis.  (7/26/12 Hr'g Tr. 327:5–18; 421:13–22.)  As the OCV plan already

accounted for costs in setting 25% annual increases, Dr. Beyer contends that he need not account

further for them under the OCV benchmark.  (Id.; 7/21/15 Hr'g 30.)

Dr. Beyer argues that even if he did further account for costs, it would not have a

significant impact on his calculations with respect to antitrust impact and damages.  Specifically,

he contends that Dr. Bronsteen has overstated the significance of any such cost increases by

proposing to adjust the benchmark based on raw percentage increases rather than analyzing the

incremental dollar amount increases in costs actually incurred.  (7/26/12 Hr'g Tr. 323–26.)  Put

simply, Dr. Beyer explains that "a percentage increase in costs may seem large," but when the

cost is at such a low level, as is the case for many TBR during the class period, those cost

increases remain dwarfed by price increases.  (7/26/12 Hr'g Tr. 324–25; Beyer Report figs. 1, 2,

3, 4.)  In his Reply Report, Dr. Beyer accounts for such cost increases on a dollar amount basis to

demonstrate that gross profit margins would still increase significantly in the but–for world,

achieving 72% for Immucor, and 62% for Ortho, by 2005, contrary to Dr. Bronsteen's assertion.

(7/26/12 Hr'g Tr. 336; Beyer Reply ¶ 55.)

The Court agrees with plaintiffs that Dr. Beyer has not ignored costs for the first part of

the damages period.  He has persuasively explained and analyzed[14] why such additional

increases may not be necessary, but that even if they are, they would not so significantly affect

his impact and damages calculations, such that his methodology should be stricken as

inadmissible.  (See Beyer Reply 23 tbls. 2, 3.)  Dr. Bronsteen, in contrast, proposes a method of

accounting for any such cost increases — a percentage cost adjustment from 2001 to 2005 that

would distort the extent of cost increases during those years.  (7/26/12 Hr'g Tr. 196; Beyer

---

[14]     Dr. Beyer uses the standard cost data produced by Ortho to calculate gross profit margins
for Ortho in the but–for world, but again notes that Ortho has represented that its standard cost
data is not reliable.  (Beyer Reply ¶ 55 n.116; see supra n.12)

Report figs. 1, 2, 3, 4 (showing dramatic differences between price and cost for top-selling Immucor and Ortho TBR).)  Moreover, as noted in the Court's August 22, 2012 decision, Dr. Bronsteen did not "perform any analysis to support his suspicion" that accounting for such costs would have increased but–for prices such that plaintiffs would be unable to prevail on the merits. In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 n.13.

At the post–remand hearing on July 22, 2015, Ortho raised, for the first time, an additional argument with respect to costs.  Ortho contends that it had significant "Costs Not in Standard," such that had Dr. Beyer relied on Ortho's actual cost data, rather than its standard cost data, Ortho's gross profit margins would have been in the negative in the but–for world he created.  In support of that assertion, defendant relies on one document dated October 17, 2008, that it submitted to the FTC showing that actual cost data between 2003 and 2008 is higher than its standard costs.  (See Pls.' Mot. Ex. 171.)

The Court is not persuaded that the October 17, 2008 document renders Dr. Beyer's methodology inadmissible.  First, the Court notes that Dr. Beyer did not have any way to analyze or verify the reliability of the data underlying that FTC document, as actual cost data has not been submitted to the Court, nor produced in discovery.  See Perma Research & Dev. Co. v. Singer Co., 402 F. Supp. 881, 899 (S.D.N.Y. 1975) ("It has been held repeatedly that where the defendant renders the determination of damages difficult, he must bear the risk of uncertainty created by his own conduct.") (citations omitted), aff'd sub nom., Perma Research & Dev. v. Singer Co., 542 F.2d 111 (2d Cir. 1976).  In fact, defendant's own economic expert, Dr. Bronsteen, testified that Dr. Beyer "made the right decision in not using Ortho's cost data."[15]

---

[15] The Court is concerned about defendant's use of its failure to produce reliable cost data as both a sword and shield in this case.  Ortho has represented since 2011 that the standard cost data it produced to plaintiffs is unreliable.  (See Letter from Paul H. St. Antoine, Esq., Counsel for Ortho, to Jeffrey J. Corrigan, Esq., Counsel for plaintiffs (September 9, 2011).)  At the same

(7/26/12 Hr'g 245:11–12.)  Moreover, as plaintiffs explained at the Post-Remand Hearing,

extracting actual cost figures from the FTC submission at issue and inputting them into Dr.

Beyer's but–for world is essentially comparing apples to oranges.  The figures submitted to the

FTC rely on different transactional data than the figures provided to plaintiffs, and relied upon by

Dr. Beyer in this case.  (Compare Pls.' Mot. Ex. 171 with Beyer Report tbl. 2).)  Finally, the

document provides no actual cost data at all for 2001 and 2002.

Thus, the Court will not exclude Dr. Beyer's OCV benchmark methodology on this basis,

and concludes that the question of whether certain "Costs Not in Standard" should have been

accounted for in Dr. Beyer's methodology is "more a question of the accuracy of [his] analysis,

not necessarily the methodology [he] used in conducting [his] analysis."  In re Actiq Sales &

Mktg. Practices Litig., 2014 WL 3572932, at *9 (rejecting defendant's argument that expert's

damages model should be excluded for failing to include certain categories of costs that

defendant asserted resulted in inaccurate representations of its profitability).

In sum, the Court finds that plaintiffs have met their burden in establishing that OCV is a

reliable and fit benchmark, and that further consideration of cost and demand from 2001 and

2005 would not impact Dr. Beyer's OCV benchmark methodology in such a way as to render his

_____

time, Ortho has repeatedly asserted that Immucor's cost data is not a reliable proxy for its own
cost data.  (See Def.'s Post–Remand Br. 32–33.)  Moreover, as noted above, Ortho's actual cost
data was never produced to plaintiffs, and it is unclear whether Ortho maintains actual cost data
at all.  (See Letter from Jeffrey J. Corrigan, Counsel for plaintiffs, to the Court (July 27, 2015)
(detailing Ortho's responses to cost data–related interrogatories).)  Thus, it is particularly
difficult to assess the extent of Ortho's cost increases during the class period — and based on the
standard cost data produced to plaintiffs, it appears that Ortho's standard costs may have even
been declining in certain years.  (See Beyer Reply 23, Tbls. 2, 3.)  Although the absence of
reliable cost data does not relieve plaintiffs of the burden of demonstrating by a preponderance
of the evidence that Dr. Beyer's expert testimony is reliable, it does undermine defendant's
argument that Dr. Beyer's OCV benchmark methodology should be excluded on this ground.

The Deputy Clerk shall docket a copy of the letter from plaintiffs' counsel dated July 27,
2015.

methodology inadmissible.  These alleged flaws are appropriate fodder for cross examination at

trial, and Ortho may argue to a jury that further accounting for cost and demand would have

resulted in a more precise model.   See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 580

("Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence.") (citation omitted); see also Edwards v. Nat'l Milk Producers Fed'n, No. 11–04766,

2014 WL 4643639, at *6 (N.D. Cal. Sept. 16, 2014) (holding that expert's failure to consider

relevant factors went to the weight of the evidence as opposed to admissibility).

### 7.    Whether Dr. Beyer's Use of One Annual But–For Price is Incompatible with Price Dispersion after 2004

Ortho next challenges Dr. Beyer's averaging of but–for prices for TBR after 2004,

despite price dispersion in the actual world.  Ortho asserts that instead of matching Ortho's price

increases, Immucor began to implement its "pricing differentiation strategy" and "price

protection plan" to gain additional market share from Ortho in 2004.  Ortho also avers that the

unreliability of Dr. Beyer's single but–for price is compounded by the fact that there was price

dispersion within Immucor's customer base.

In a recent decision addressing Daubert challenges in an antitrust action, Judge Pratter

explained with respect to averaging,

> The use of averages in a common impact analysis is controversial, and courts have come
> down on both sides of the issue at the class certification stage.  There is no binding Third
> Circuit precedent on point, but there are a number of district court opinions discussing the
> issue, albeit difficult to reconcile . . . Essentially, the case law seems to compel the court
> to view averages as at least somewhat suspect, but not as fatally flawed so long as (1) the
> differentiation among the data being averaged is not so great as to make the use of
> averages misleading; and (2) there are other indicia that the averages are not concealing
> the true story of the data.

In re Processed Egg Products Antitrust Litig., 2015 WL 337224, at *15.

Under these standards, the Court concludes that Dr. Beyer's use of averaging in the but–for world does not render his post-2005 damages methodologies inadmissible.  First, the Court concludes that the variance in pricing for TBR in the actual world was not so significant as to render the use of averages in the but–for world misleading.  Defendant cites to certain transactional data relied upon by Dr. Beyer to demonstrate that some Immucor customers paid six times what other customers paid for particular TBR in 2009.  (Beyer Reply 42, Tbl. 10.)  This variance, however, is not representative of variance among Immucor pricing overall for other TBR after 2005.  (See Beyer Reply, tbls. 6, 7, and 10.)  Pricing was significantly less varied prior to 2009.  (See Beyer Rep., figs. 7, 8, 9, 10.)  Moreover, most Ortho customers paid identical or nearly identical prices throughout the class period.  (Id. at 77 figs. 5–6.)

Second, in contrast to cases cited by defendant, Dr. Beyer's use of averaging is limited. Dr. Beyer has established a separate but–for price for each type of reagent for each year — constructing more than 2,100 but–for prices for the different TBR products during the class period.  (Beyer Reply ¶ 90.)  Moreover, he does not rely on averages in the actual world at all; Dr. Beyer has explained that he will utilize the prices actually paid by defendants' customers  in calculating the damages incurred by individual plaintiffs (Reply ¶¶ 90–93 ("Because the customer transaction data is contained in a single database for each defendant and because the formula is common for all class members, it will be straightforward to calculate class–wide damages at the merits stage of the litigation.")); Compare  Reed v. Advocate Health Care, 268 F.R.D. 573 (N.D. Ill.2009) (rejecting expert testimony where prices were averaged in both actual world and but-for world).  In sum, Dr. Beyer "did much more than simply compare a monthly average [TBR] price in the actual and 'but–for' worlds to demonstrate common impact."  In re Flonase Antitrust Litig., 284 F.R.D. 207, 229 (E.D. Pa. 2012) (rejecting similar challenge)).

Finally, as the Court explained in its August 22, 2012 decision, "[w]hat Ortho proposes would exponentially complicate the calculation of damages in this type of case.  As Dr. Beyer testified, it would require plaintiffs to estimate 'almost a million' different but–for prices. . . . ." In re Blood Reagents Antitrust Litig., 283 F.R.D. at 243 (internal citations omitted).  Although it may be possible to construct a benchmark that estimates a separate but–for price for every transaction, Dr. Beyer would have "no basis other than speculation to estimate [those prices] quantitatively." (7/26/12 Hr'g 492:18–20).  Such an approach would in fact be less reliable "due to the 'potential . . . arbitrariness of the assumptions' he would need to make and the resulting introduction of 'potential error that [he] wouldn't be able to quantify.'"  See Cason–Merenda v. Detroit Med. Ctr., No. 06–15601, 2013 WL 1721651, at *10 (E.D. Mich. Apr. 22, 2013) (rejecting same challenge by defendant).

Ortho again fails to cite any case in which plaintiffs were required to estimate a different but–for price for each and every individual transaction, as Ortho urges the Court to require in this case.  See In re Cathode Ray Tube (CRT) Antitrust Litig., No. 07–5944, 2015 WL 4127859, at *21 (N.D. Cal. July 8, 2015) ("[A]ttacking averaged data is a standard defense tactic in antitrust cases, so it is unsurprising that courts have often evaluated and approved the appropriate use of averages.").  Nor has defendant conducted any empirical analysis to confirm that averaging but–for prices for each TBR in each year "results in any significant bias."  In re Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1367 (N.D. Ga. 2000) (declining to find plaintiffs' damages model inadmissible due to their expert's aggregation of data because although defendant's expert was "'troubled' by this point, [he] ha[d] conducted no empirical analysis to determine if in fact the aggregation of quarterly transactions result[ed] in any significant bias").

For all these reasons, the Court concludes that Dr. Beyer's use of averaging is not an attempt to evade plaintiffs' burden of showing common impact and damages.  Compare Reed, 268 F.R.D. at 589 (rejecting use of averaging where in Court's view "plaintiffs ha[d] been coy about their theory of common impact and their proposed damages methodology").  Rather, the Court is persuaded that this is a reliable means of demonstrating that nearly all customers who purchased TBR paid more than they would have in the absence of the alleged conspiracy, and of measuring those overcharges.  (Beyer Reply ¶¶ 102–05); see In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 144 (E.D. Pa. 2011) ("The use of averages in this case does not mask meaningful variations in overcharges, and it provides a reliable method to provide a reasonable estimate of the damages based on relevant purchase data.").  Thus, the Court concludes that variance in pricing for TBR in the actual world does not render Dr. Beyer's methodologies, which use limited averaging, "inexorably unreliable or unhelpful for Daubert purposes."  In re Processed Egg Products Antitrust Litig., 2015 WL 337224, at *15.

### 8. Whether Dr. Beyer's Post-2005 Cost–Margin Benchmark is Unreliable

Ortho next challenges Dr. Beyer's use of the cost–margin benchmark to calculate damages incurred from 2006 through the end of the class period.  Under Dr. Beyer's cost–margin benchmark, "but–for price[s] change[ ] at the same percentage rate as cost of goods sold." (Beyer Report ¶ 101.)  Dr. Beyer relies on Immucor cost data to determine changes in costs under this methodology.  Ortho argues that Dr. Beyer's proposed Immucor cost benchmark is unreliable because it ignores other price determinants such as market structure and demand, and because Immucor costs are not a reliable proxy for Ortho costs.  The Court rejects these arguments.

Dr. Beyer's use of the cost–margin approach to establish but–for prices after 2005 is a reliable methodology for estimating damages.  See In re Online DVD Rental Antitrust Litig., No. 09–2029, 2010 WL 5396064, at *9 (N.D. Cal. Dec. 23, 2010) ("The proposed methodologies that Dr. Beyer sets forth in order to analyze the existence of impact upon the class members — the cost–margin analysis and benchmark approach — are also well–established and find support in the economic literature."), aff'd sub nom., In re Online DVD–Rental Antitrust Litig., 779 F.3d 934 (9th Cir. 2015); In re Dynamic Random Access Memory (DRAM) Antitrust Litig., No. 02–1486, 2006 WL 1530166, at *10 (N.D. Cal. June 5, 2006) (upholding cost–margin approach at the class certification stage); see also Theon van Dijk and Frank Verboven, Quantification of Damages, 3 Issues In Competition Law And Policy 2331 (ABA Section of Antitrust Law 2008) (discussing cost–markup method of quantifying damages in the absence of appropriate benchmark prices).

Dr. Beyer's cost–margin methodology accounts for market structure, i.e. the duopoly, by maintaining defendants' high gross profit margins achieved by 2005 in the but–for world — 62% for Ortho and 72% for Immucor —throughout the entirety of the class period.  (Beyer Report ¶ 101; Beyer Reply 23 tbls. 2, 3.)  Dr. Beyer's assumption under the cost–margin approach that "the full amount of variable costs of manufacturing blood reagents would be passed on to purchasers" directly contrasts "with how the traditional reagents market operated prior to the beginning of the Class Period, when there was intense competition and an inability to increase prices as costs rose."[16]  (Beyer Reply ¶ 56; see also In re Blood Reagents Antitrust Litig., 283 F.R.D. at 244 (citing Beyer Report ¶ 101).)

---

[16]    Despite the fact that costs actually decreased in certain years for particular Ortho products, Dr. Beyer did not alter the but–for price of those products to reflect those decreases. (Beyer Reply ¶ 56 n.118.)  This is another way in which Ortho's market power as a duopolist is accounted for under Dr. Beyer's cost-margin methodology.

Moreover, the failure to account for demand does not render plaintiffs' cost–margin methodology inadmissible.  As the Court discussed <u>supra</u>, there is record evidence demonstrating that the TBR market remained stable during the class period and both experts concede that there is no evidence in the record that TBR price increases were due to increases in demand.  <u>See supra</u> Section III(D)(6)(i).  Furthermore, even if demand for TBR increased between 2–3% annually, after 2005, which is not clearly demonstrated by the available data, accounting for any such marginal increases in demand in the but–for world would not significantly impact Dr. Beyer's conclusions with respect to antitrust impact and damages, and thus does not render Dr. Beyer's methodology unreliable under <u>Daubert</u>.  <u>Id.</u>[17]

Finally, the Court concludes that Dr. Beyer has sufficiently demonstrated that year–to–year changes in Immucor cost data are an adequate proxy for the year–to–year changes in Ortho's costs for purposes of calculating damages under the cost–margin approach after 2005 under <u>Daubert</u>.  Ortho and Immucor manufactured traditional blood reagents from similar raw materials and were subject to the same regulatory environment.  (Beyer Report ¶ 56.) Furthermore, there is no evidence to support Dr. Bronsteen's "speculation" that Ortho's costs

---

[17]     At the Post–Remand Hearing, Ortho raised the argument that the cost–margin approach is an unreliable method for establishing but–for prices in this case because the but–for world is a duopoly.  That argument is unavailing.  As Ortho's own economic expert Dr. Bronsteen has explained, the literature on duopoly includes "a wide range" of models, "and the predictions of the duopoly models range from situations where a duopoly could replicate perfect competition to models where the duopoly replicates a monopoly pricing . . . ."  (7/26/15 Hr'g Tr. 167:12–20; <u>see also</u> Id. at 387:6–11 (Dr. Beyer: "[W]hat oligopoly theory teaches us [is] that behavioral reactions, responses, by one or the other oligopolist, even in a duopoly, can mean that prices simply . . . can go to the competitive or to the monopoly level.").)  Thus, to argue that the cost–margin approach cannot be applied when the market structure is a duopoly merely because it is only appropriate in perfectly competitive marketplaces oversimplifies the range of behavior firms may exhibit in duopolies.  Furthermore, Ortho fails to cite to any cases rejecting the cost–margin approach to assessing damages based on the fact that the market structure is a duopoly, as it urges the Court do in this case.  Thus, the Court does not exclude Dr. Beyer's cost-approach methodology on this basis.

may have been rising faster than Immucor's costs after 2005.  (Id.)  In fact, Dr. Beyer notes that the standard cost data produced by Ortho actually shows costs falling during certain years, which would result in lower but–for prices.  (Id.)

Ortho again ignores the fact that the only reason Dr. Beyer relies on the year–to–year changes represented in Immucor's cost data as a proxy for Ortho's changes in cost is the fact that Ortho has not provided any reliable cost data upon which he can rely.  (See 7/26/12 Hr'g 245:11–12) (Dr. Bronsteen: "He [Dr. Beyer] made the right decision in not using Ortho's cost data.").)  It is unclear what alternative data Dr. Beyer could have used in applying the cost–margin approach, as defendant has not demonstrated that more reliable data is available.  See In re Actiq Sales & Mktg. Practices Litig., 2014 WL 3572932, at *7 (concluding that plaintiffs' expert had good grounds for relying on defendant's internal document with estimates of costs for particular products from after class period, to calculate product–level profitability, where, inter alia, "it was unclear" what better data existed, and "there ha[d] been no suggestion by [defendants] that better data was available").

The Court concludes, under these circumstances, Dr. Beyer has good grounds for employing the cost–margin approach for the latter half of the class period, using annual changes in Immucor costs as a proxy for changes in Ortho's costs.  Thus, Dr. Beyer's cost–margin methodology for calculating damages after 2005 is admissible.

### 9.    Whether Use of the RhoGAM Yardstick is Unreliable

Finally, Ortho challenges Dr. Beyer's use of RhoGAM as a yardstick to calculate damages after 2005.  Dr.  Beyer's yardstick methodology calculates but–for prices for TBR products based on the price behavior of RhoGAM, Ortho's brand of Rho(D) — a prescription

pharmaceutical that is administered to pregnant women — during the same period.  (Beyer Report ¶ 102.)

Defendant does not dispute the use of a non–TBR yardstick as a methodology for determining antitrust impact and quantifying antitrust damages.  See Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc., 213 F.3d 198, 207 (5th Cir. 2000) (noting that "the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures"); see also In re Linerboard Antitrust Litig., 305 F.3d 145, 153–55 (3d Cir. 2002) (accepting use of yardstick method for determining antitrust impact and damages on class–wide basis).  Ortho challenges the proposed use of the RhoGAM yardstick only on comparability grounds, asserting that there are significant differences in the markets, costs, and demand for TBR and RhoGAM. The Court disagrees, and concludes that Dr. Beyer's proposed RhoGAM yardstick methodology is reliable and fit under Daubert.

Plaintiffs bear the "burden of proving comparability" of their proposed RhoGAM yardstick.  Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1207 (1st Cir. 1987).  What is required with respect to comparability of a proposed yardstick product at the Daubert stage is unsettled.  Several courts, however, have ruled that under Daubert, "exact correlation is not necessary . . . the products need only be fair congeners."[18]  Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005).

---

[18]   The Court applied that standard in its August 22, 2012 decision, and concluded that RhoGAM and TBR were "fair congeners."  In re Blood Reagents Antitrust Litig., 283 F.R.D. at 245.
        Many courts, however, have held that the question whether plaintiffs have met their burden of proving comparability should be left to the trier of fact to resolve because comparability challenges generally involve weighing facts.  See In re Prograf Antitrust Litig., No. 11–02242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) (citing decisions that have declined to resolve factual issues underlying comparability analysis in the context of Rule 702 motions); see also 1 Am. Bar Ass'n, Antitrust Law Developments 786 (7th ed. 2012) ("Whether

The Court gleans from that decision, as well as others discussing the showing of comparability that is required under Daubert, that a proposed yardstick must be rejected as inadmissible where the expert testimony is so deficient that the "comparison is manifestly unreliable and cannot logically advance a material aspect of the proposing party's case." Loeffel Steel Products, Inc. 387 F. Supp. 2d 7 at 812 (internal quotation marks omitted). This generally occurs when an expert has failed to perform any substantive analysis of those factors most relevant to comparability. See e.g., Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 813 (N.D. Ill. 2005) (rejecting testimony on proposed yardstick where expert "admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability"); Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc., 213 F.3d 198 (5th Cir.2000), (rejecting different soccer arenas as comparable businesses at summary judgment where no evidence offered regarding geographical location, size or attractiveness of facilities, size and type of the market served, relative costs of operation, amounts charged, or the number years facilities were run). Ortho has not identified any such deficiencies with respect Dr. Beyer's RhoGAM analysis in this case, nor has the Court.

To the contrary, Dr. Beyer has adequately accounted for the relevant factors, such as "product, firm, and market comparability" in selecting the RhoGAM yardstick. Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1206 (1st Cir. 1987). Dr. Beyer selected RhoGAM because of the following: (1) the Rho(D) market is a "highly concentrated oligopoly," (2) RhoGAM is an Ortho product, and Ortho had significant market power in the Rho(D) market; (3) demand for Rho(D) is inelastic, (4) the Rho(D) market features high barriers

---

the plaintiff has met this burden of showing comparability ordinarily is a question for the trier of fact.").

to entry due to FDA regulation, (5) RhoGAM is interchangeable with other Rho(D) products, (6) the same hospitals that were the largest TBR customers also purchased Rho(D), in fact 74% of Ortho RhoGAM customers also purchased TBR, (7) demand for Rho(D) was relatively stable throughout the damages period, and (8) prices for Rho(D) were set based on "the level of competitiveness in the market rather than on cost or demand factors."  In re Blood Reagents Antitrust Litig., 283 F.R.D. at 242 (citing Beyer Reply ¶¶ 61–67); 7/26/12 Hr'g Tr. 329–34).

Ortho vigorously contests Dr. Beyer's conclusion that the demand and market for the two products were comparable during the latter half of the class period.[19]  With respect to demand, the Court is unpersuaded that any differences in demand render Dr. Beyer's RhoGAM yardstick inadmissible.  Although Ortho asserts that demand for blood reagents increased substantially during the class period, Dr. Beyer has pointed to evidence that demand was "relatively stable," or increased only incrementally, see supra Section III(D)(6)(ii),  just as demand for RhoGAM did during the class period.  (See Beyer Reply ¶ 66.)  In any event, one of the key factors that Dr. Beyer considered and relied upon in assessing comparability between the two products is the fact that prices for both products were primarily driven by competition in the market, not cost and demand.  (Beyer Reply ¶ 67 (and citations therein).  Thus, even if the demand for the two products differed, it would not render the RhoGAM yardstick so dissimilar as to be inadmissible.

With respect to differences in the market for the two products, Ortho contends that the presence of a third firm in the Rho(D) market renders RhoGAM an unreliable yardstick.  In support of that contention, Ortho relies on evidence that the average RhoGAM selling price

---

[19]     Ortho also asserts that Dr. Beyer has not compared costs between the two products.  The Court will not exclude Dr. Beyer's yardstick methodology on this ground because 1) Ortho has not produced RhoGAM cost data (Beyer Reply ¶ 58 fn.124)); 2) even if cost changes varied significantly for RhoGAM during the class period, it would support Dr. Beyer's contention that, like prices for TBR, RhoGAM prices were primarily driven by the level of competition, rather than cost and demand (Id. at ¶67); and 3) there are other significant reasons proffered by Dr. Beyer as to why RhoGAM is a reliable yardstick.  (See supra (citing Beyer Reply ¶¶ 61-67).)

increased substantially in the late 1990s when the market for Rho(D) became a duopoly, (see Def.'s Opp. Ex. 123, Kleinbard Decl. ¶ 16), but declined from more than $82.59 per dose in 2003 to an average price of $77.13 per dose by 2004, due to the entrance of a third competitor, Rhophylac, into the market. (Id. at ¶ 25). Dr. Beyer, in contrast, asserts that although the Rho(D) market was a three–firm oligopoly during the latter part of the class period, effectively, there were only two firms operating. (Id. at ¶ 61; 7/26/12 Hr'g 331:1–7.) Specifically, he states that when the third competitor entered the market in 2004, it acquired substantial market share by price competition; whereas Bayer, which had been one of the duopoly partners, became a passive participant, and its market share declined substantially. (Id. at 331:14–19; Beyer Reply ¶ 61.)

The Court concludes that, although there is some evidence in the record that undermines Dr. Beyer's conclusion that Bayer was a passive market participant, Dr. Beyer's comparability analysis passes muster under Daubert. Dr. Beyer has examined the discovery produced in this case, including underlying documents and relevant depositions, and defendants' transactional data for TBR and RhoGAM. Based on that examination, he has proffered a "number of bases upon which he builds his comparison," accounting for those factors most relevant to a comparison between RhoGAM and TBR. See Washington v. Kellwood Co., No. 05–10034, 2015 WL 2258098, at *17 (S.D.N.Y. Apr. 21, 2015) (rejecting comparability challenge under Daubert where plaintiffs' expert "proffer[ed] a number of bases upon which he builds his comparison," and "examined a number of underlying documents, including. . . relevant depositions and case documents"); see also R.F.M.A.S., Inc. v. So, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) ("Unless the information or assumptions that plaintiff's expert [ ] relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible.") (quoting

Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir.2009)).

"While defendant and its expert may take issue with the ultimate conclusions that can reasonably be drawn from the evidence, we leave it to [defendant's] no–doubt robust efforts at trial to call into question the weight that the jury should accord [Dr. Beyer's] testimony." Washington, 2015 WL 2258098, at *17.  The Court's intervention at this stage would be inappropriate.  Id.; Daubert, 509 U.S. at 596.

### E.    **DAUBERT** CONCLUSION

The Court concludes that Dr. Beyer reliably estimated the alleged overcharge caused by the defendants' alleged price–fixing conspiracy, and that his methodologies fit the facts of this case.  "[S]hould the jury find that defendants conspired to fix prices, [Dr. Beyer's] proffered testimony will assist the jury in determining the amount of damages, if any, that plaintiffs incurred as a result of that conspiracy."  In re Indus. Silicon Antitrust Litig., No. 95–1131, 1998 WL 1031507, at *4 (W.D. Pa. Oct. 13, 1998).  Thus, Dr. Beyer's testimony with respect to his proposed damages methodologies is admissible under Daubert.

## IV.    RECERTIFICATION OF THE CLASS

Ortho raises only one argument with respect to class certification in the post–remand proceedings — that plaintiffs cannot comply with Rule 23(b)(3)'s predominance requirement because Dr. Beyer's damages methodologies, which plaintiffs rely on as common proof of antitrust impact and damages, are inadmissible.  As the Court has determined that Dr. Beyer's damages methodologies are admissible under Daubert, Ortho's argument with respect to predominance is rejected.

The Third Circuit mandate only impacts the Court's August 22, 2012 decision granting plaintiffs' Motion for Class Certification to the extent it relied on Behrend v. Comcast. Nevertheless, because the Third Circuit vacated the Court's Order granting class certification, the Court analyzes all of the Rule 23(a) and Rule 23(b)(3) requirements under the evidence presented.  In doing so, the Court includes those parts of its previous analysis in the August 22, 22, 2012 decision that are not affected by the Third Circuit mandate.

### A.     LEGAL STANDARD

Subsection (a) of Federal Rule of Civil Procedure 23 sets out four prerequisites for a class action.  The Rule 23(a) requirements are known as numerosity, commonality, typicality, and adequacy.  Subsection (b) provides additional requirements for each type of class action.  To obtain certification under Rule 23(b)(3), as plaintiffs seek to do in this case, the moving party must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These requirements are known, respectively, as predominance and superiority.

A district court must conduct a "rigorous analysis" in deciding whether to certify a class. See, e.g., In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 306.  "[T]he decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met."  Id. at 307.  "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."  Id.

Moreover, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits — including disputes touching on elements of the cause of action."  Id. at 307.  However, "there is no 'claims' or 'merits' litmus test

incorporated into the predominance inquiry beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof." <u>Sullivan v. DB Invs., Inc.</u>, 667 F.3d 273, 305 (3d Cir. 2011). "[A] district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." <u>Id.</u> "Finally, the court's obligation to consider all relevant evidence and arguments extends to expert testimony, whether offered by a party seeking class certification or by a party opposing it." <u>Hydrogen Peroxide</u>, 552 F.3d at 307.

## B.    DISCUSSION

During the course of the litigation, Ortho has not disputed that the Rule 23(a) requirements and the Rule 23(b)(3) superiority requirement are satisfied. Nor has defendant challenged the closely tied preliminary inquiries of whether plaintiffs provide a proper class definition and whether the class is ascertainable. The Court thus addresses those issues only briefly and concentrates its analysis on the Rule 23(b)(3) predominance requirement — the focus of Ortho's opposition to plaintiffs' Motion for Class Certification. After a rigorous analysis of the evidence and argument offered by both parties, the Court concludes that plaintiffs have established all of the Rule 23(a) and Rule 23(b)(3) requirements by a preponderance of the evidence.

### 1.    Class Definition and Ascertainability

"There are two 'essential prerequisite[s]' to class certification under Rule 23(b)(3): (1) a 'clearly defined class and set of claims, issues, or defenses to be given class treatment'; and (2) 'the class must be currently and readily ascertainable based on objective criteria.'" <u>King Drug Co. v. Cephalon, Inc.</u>, No. 06– 1797, 2015 WL 4522855, at *3 n.6 (E.D. Pa. July 27, 2015)

(quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 592–93 (3d Cir. 2012)).  The class is

defined as follows:

> All individuals and entities who purchased traditional blood reagents in the United States directly from defendants Immucor, Inc., and Ortho–Clinical Diagnostics, Inc. at any time from November 4, 2000[20] through the present.  Excluded from the Class are defendants, and their respective parents, subsidiaries and affiliates, as well as any federal government entities.

Defendant has not challenged plaintiffs' class definition at any stage of the litigation, and the

Court concludes that the class is clearly defined.

With respect to ascertainability, the "inquiry is two–fold, requiring a plaintiff to show

that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and

administratively feasible mechanism for determining whether putative class members fall within

the class definition.'" Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015) (quoting Hayes v.

Wal–Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013)).  Defendant has not argued that

plaintiffs' class is not ascertainable.  The Court nevertheless concludes that class members can

be ascertained by means of defendants' purchase data files.  See In re Processed Egg Products

Antitrust Litig., 302 F.R.D. 339, 348 (E.D. Pa. 2014) ("Use of company databases constitutes a

reliable and feasible method for ascertaining Class Members. . . .")); King Drug Co., 2015 WL

4522855, at *3 (upholding class as ascertainable where plaintiffs identified all potential class

members using defendant's records).  Thus, the Court determines that the class members are

ascertainable from objective criteria by means of an administratively feasible mechanism.

---

[20]      The Court reiterates that it amends the class definition, sua sponte, to substitute the date "November 4, 2000" for the date "January 1, 2000."

### 2.    Rule 23(a) Requirements

#### i.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Satisfaction of this standard "does not require evidence of the exact number or identification of the members of the proposed class."  In re Linerboard Antitrust Litig., 203 F.R.D. 197, 205 (E.D. Pa. 2001).  "'Generally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met.'"  In re OSB Antitrust Litig., No. 06–826, 2007 WL 2253418, at *2 (E.D. Pa. Aug. 3, 2007) (quoting Ketchum v. Sunoco, Inc., 217 F.R.D. 354, 357 (E.D. Pa. 2003)).

In this case, transactional data produced by defendants shows that thousands of customers purchased TBR directly from defendants during the class period.  (See, e.g., Beyer Reply 54–55.) This renders joinder highly impracticable and satisfies the numerosity requirement.

#### ii.    Commonality

To satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class." Satisfaction of the commonality requirement requires that plaintiffs demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal–Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).  "Commonality does not require an identity of claims or facts among class members; instead, [t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 184 (3d Cir. 2011) (internal quotation marks omitted); see also Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 597 (3d Cir. 2012).

"Courts interpreting the commonality requirement in the antitrust area have held that allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement." Linerboard, 203 F.R.D. at 205 (internal quotation marks omitted); see also, e.g., In re Bulk (Extruded) Graphite Prods. Antitrust Litig., No. 02–6030, 2006 WL 891362, at *5 (D.N.J. Apr. 4, 2006).  In this case, plaintiffs' allegations include a number of common issues, including (1) whether defendants conspired to raise, fix, maintain and/or stabilize the price of blood reagents in the United States, (2) the duration of the conspiracy, and (3) the nature and character of the acts performed by defendants in furtherance of the conspiracy.  "Resolving the allegations surrounding" defendants' alleged conduct in conspiring to fix TBR prices "will resolve issues that are 'central to the validity of each one of the claims in one stroke.'"  In re Flonase Antitrust Litig., 2012 WL 2277840, at *8.  This suffices to satisfy the commonality requirement.

### iii.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  To conduct the typicality inquiry, the court must examine "whether the named plaintiffs' claims are typical, in common–sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  Beck v. Maximus, Inc., 457 F.3d 291, 295–96 (3d Cir. 2006).  "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees."  Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631 (3d Cir. 1996).  "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual

differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." Marcus, 687 F.3d at 598.

In this case, plaintiffs allege that the same unlawful conduct injured the class representatives and the absent class members. All members of the putative class are direct purchasers of TBR and allege that they made their purchases at supracompetitive prices. This is sufficient to satisfy the typicality requirement. See, e.g., In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 480 (W.D. Pa. 1999) ("[T]he named class members' claims, as well as the claims of the proposed classes, arise from the alleged price–fixing scheme perpetrated by defendants[,] [which is] the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid.").

### iv.   Adequacy of Representation

Rule 23(a)(4) requires plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" McDonough v. Toys R Us, Inc., 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (quoting New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007)). "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.'" Id. (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004)).

The first element — the qualification of plaintiffs' attorneys — is satisfied. Plaintiffs' lead counsel has extensive experience in complex antitrust class actions and has ably performed his duties as interim class counsel. The Court concludes that plaintiffs' counsel are "qualified,

experienced, and generally able to conduct the proposed litigation." <u>New Directions</u>, 490 F.3d at 313.

As to the second element, there is no evidence of any conflict of interest between the named plaintiffs and the absent members of the putative class. Each class member allegedly purchased TBR directly from Ortho or Immucor during the class period at a supracompetitive price. "Each class member holds a strong common interest in establishing [defendants'] liability for these alleged overcharges." <u>Flonase</u>, 2012 WL 2277840, at *9.

The Court thus finds that the adequacy requirement is satisfied.

### 3.      Rule 23(b)(3) Requirements

To obtain class certification under Rule 23(b)(3), plaintiffs must also demonstrate predominance and superiority by a preponderance of the evidence.

### i.      Predominance

Predominance is the only certification requirement contested by defendant. In the post–remand proceedings, Ortho only argues that plaintiffs' cannot satisfy Rule 23(b)(3)'s predominance requirement to the extent discussed <u>supra</u>. For the sake of completeness, the Court nevertheless addresses all the predominance challenges initially raised by defendant in opposition to plaintiffs' Motion for Class Certification.

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "This predominance test asks whether common issues of law or fact in the case predominate over non–common, individualized issues of law or fact." <u>Neale</u>, No. 2015 WL 4466919, at *13. "Rule 23(b)(3) requires a showing that <u>questions</u> common to the class predominate, not that

those questions will be answered, on the merits, in favor of the class."  Amgen Inc. v. Conn. Ret.

Plans & Trust Funds, 133 S.Ct. 1184, 1191 (2013) (emphasis in original).

"Predominance 'begins, of course, with the elements of the underlying cause of action.'"

Neale, 2015 WL 4466919, at *13 (quoting Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct.

2179, 2184 (2011)).  "That is '[b]ecause the nature of the evidence that will suffice to resolve a

question determines whether the question is common or individual' and that means that 'a

district court must formulate some prediction as to how specific issues will play out.'"  Id.

(quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)).  However,

Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element

of her claim is susceptible to classwide proof."  Amgen Inc., 133 S. Ct. at 1196 (internal

quotations and alternations omitted)).  The Court must engage in a qualitative analysis to

determine whether issues common to the class overwhelm individual issues.  If so, the

predominance requirement is satisfied.  Neale, 2015 WL 4466919, at *14 (citations omitted).

In order to prevail at trial, plaintiffs must prove that (1) that defendants violated § 1 of the

Sherman Act, (2) the fact of damages arising from the unlawful activity ("antitrust impact"), and

(3) the amount of damages sustained because of the unlawful activity.  In re Hydrogen Peroxide

Antitrust Litig., 552 F.3d at 311.  Although the predominance analysis is not simply "bean

counting," Butler v. Sears, Roebuck and Co., 727 F.3d 796, 801 (7th Cir.2013), the Court

analyzes each element in turn to clarify which questions are common to the class, and whether

such questions predominate.  See Kleen Products LLC, 306 F.R.D. at 593 ("[A]nalyzing each

element separately is useful in isolating what questions are common and determining whether

those questions predominate.").

### a.      Violation of § 1 of the Sherman Act

In horizontal price–fixing cases, courts routinely hold that common proof predominates in determining whether an unlawful conspiracy existed.  See, e.g., Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 105 (2d Cir. 2007); McDonough, 638 F.Supp.2d at 479–80; Lumco Indus., Inc. v. Jeld–Wen, Inc., 171 F.R.D. 168, 172 (E.D. Pa. 1997).  Ortho has not argued that evaluation of the particular allegations of concerted action in this case might require individual proof.  Thus, plaintiffs have established that common questions predominate with respect to proof of defendant's alleged antitrust violation.

### b.      Antitrust Impact

Antitrust impact is the "fact of damage" resulting from a violation of the antitrust laws. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977).  "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." Hydrogen Peroxide, 552 F.3d at 311.  "Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits each class member must do so.  Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members."  Id. at 311–12.  Resolving this issue requires the district court to rigorously assess the available evidence and methods by which plaintiffs propose to use the evidence at trial.  Id.

In this case, plaintiffs assert that they will prove antitrust impact using five elements of common proof: (1) application of the so–called "Bogosian shortcut," (2) Dr. Beyer's proposed methods of calculating the amount of damage each class member suffered, (3) Dr. Beyer's

analysis of the structure of the TBR market, (4) Dr. Beyer's empirical analysis of TBR prices during the class period, and (5) documents produced by defendants. The Court concludes that plaintiffs have established that common questions predominate over individual issues as to antitrust impact.

### 1.    Antitrust Impact: Bogosian Shortcut

In Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977), the Third Circuit recognized that under certain circumstances, a court considering a class certification motion may presume antitrust impact. Specifically, the Bogosian court held as follows:

> If . . . a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

Id. at 455.

Courts often apply this presumption in horizontal price–fixing cases. See, e.g., In re OSB Antitrust Litig., 2007 WL 2253418, at *4–5; In re Bulk (Extruded) Graphite Prods. Antitrust Litig., No. 02–6030, 2006 WL 891362, at *11–13 (D.N.J. Apr. 4, 2006). However, a court must rigorously analyze the evidence to determine whether Bogosian applies to a particular case. See Hydrogen Peroxide, 552 F.3d at 326 (expressing doubt about whether Bogosian applied where prices were "lower, not higher, at the end of the class period than at the beginning," production increased during the class period, and defendants presented evidence of "substantial price disparities among similarly situated customers"). Moreover, Bogosian alone does not suffice to satisfy the predominance requirement; plaintiffs must present additional evidence that they can

establish antitrust impact using common proof.  Id.; see also Am. Seed Co., Inc. v. Monsanto Co., 271 Fed. App'x. 138, 141 (3d Cir. 2008) ("[I]t is important that a putative class's presumption of impact under Bogosian be supported by some additional amount of empirical evidence.").

In many ways, this is a straightforward horizontal price–fixing case brought by direct purchasers of TBR.  The anticompetitive effects of horizontal price–fixing are obvious.  See, e.g., Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010).  Many cases in which courts reject application of Bogosian involve alleged conduct whose anticompetitive effect is less straightforward.  See, e.g., Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, No. 04–5898, 2010 WL 3855552, at *21–22 (E.D. Pa. Sept. 30, 2010) (refusing to apply Bogosian to the claims of indirect purchasers).

Ortho initially argued, however, that Bogosian is inapplicable for two reasons.  First, it relies on the fact that "the alleged conspiracy ... coincided with a substantial reduction in the number of competitors and the formation of a duopoly market."  (Def.'s Opp. 58.)  Therefore, while there were substantial price increases during the class period, those increases cannot be presumed to have resulted solely from collusion.  However, defendants' creation of a duopoly by the acquisition of a number of competitors shortly before the alleged conspiracy began does not undercut the fact that prices on many TBR products rose by more than 2000% during the class period, that those huge increases occurred very shortly after the alleged collusion began, and that those huge price increases applied to all customers.  Unlike in Hydrogen Peroxide, there is no evidence that prices decreased at any time during the class period.  Moreover, the damages methodologies detailed in Dr. Beyer's reports, see supra Section III(A), estimate the but–for

prices that would have been charged in a lawful duopoly market and calculate those additional

price increases that resulted from the alleged anticompetitive activity.

Second, Ortho argued that the conspiracy alleged in this case "encompass[es] dozens of

different products, each with different demand and cost factors."  (Def.'s Opp. 58–59.)

However, courts have applied <u>Bogosian</u> even in cases involving multiple varieties of products.

<u>See, e.g.</u>, <u>Bulk (Extruded) Graphite</u>, 2006 WL 891362, at *11.  In this case, where Ortho

manufactured an analogue of most TBR products manufactured by Immucor, it is logical that a

horizontal price–fixing conspiracy encompassing all of those products would impact all

purchasers.

There is thus a strong argument that <u>Bogosian</u> applies to the facts of this case.

Nevertheless, as set forth below, the Court concludes that other elements of common proof

offered by plaintiffs — most importantly, Dr. Beyer's market structure analysis and his damages

models — suffice to establish that plaintiffs can prove impact using common evidence regardless

of whether <u>Bogosian</u> applies.

### 2.        Antitrust Impact: Damages Methodologies

As discussed <u>supra</u>, plaintiffs offer Dr. Beyer's proposed methodologies for calculating

the damages incurred by individual plaintiffs as an element of common proof of impact.  Dr.

Beyer's methodologies estimate the pricing that would have occurred in a lawful duopoly.  He

concludes that any differences between those estimated prices and the actual prices charged by

defendants resulted from the alleged price–fixing conspiracy.  The important point for purposes

of the impact analysis at the class certification stage is that, by applying one variation of this

benchmark model to transactional data produced by defendants, Dr. Beyer has demonstrated that

"virtually all customers paid more for traditional reagents than they would have paid in the

absence of the alleged anticompetitive conduct." (Beyer Reply ¶ 102.) Dr. Beyer's calculations show that virtually all of defendants' customers purchased at least one TBR product for more than the but–for price during the class period. (Id. ¶¶ 105–106 & tbls. 18–19.) Thus, the Court concludes that the calculations serve as persuasive evidence of classwide impact.

In addition to Ortho's reliability attacks, which the Court previously rejected in its Daubert discussion, Ortho raised several arguments in opposition to plaintiffs' Motion for Class Certification, which were not reasserted after remand. For the sake of completeness, the Court reiterates its analysis of those arguments here.

First, Ortho argued that Dr. Beyer's conclusions are based on a faulty understanding of antitrust impact. Ortho asserted that it is not enough for plaintiffs to show that a customer paid more than the but–for price for at least one item in at least one transaction. Instead, according to Ortho, plaintiffs must analyze "whether the net effect of the alleged antitrust violation is positive or negative." (Def.'s Surreply 16 (emphasis added).) They must offset class members' losses from the alleged conspiracy against any benefits they received from it. (Id. at 17.) For example, Ortho contended that Dr. Beyer wrongly "overlooks the prospect that higher prices for traditional reagents led to lower prices or lower price increases for proprietary reagents and equipment." (Id.)

The Court rejects this argument. The case on which Ortho relies involved a merger, not a horizontal price–fixing conspiracy. See Kottaras v. Whole Foods Market, Inc., 281 F.R.D. 16 (D.D.C. 2012). Mergers frequently produce pro–competitive efficiencies that outweigh their anti–competitive harm, and courts routinely weigh these countervailing effects as an integral component of merger analysis. See, e.g., id. at 24; see also U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 10 (issued Aug. 19, 2010). It is far less plausible, on

the other hand, that a price–fixing conspiracy would have offsetting benefits to consumers.  See Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) ("Some categories of restraints, such as horizontal price–fixing . . . , 'because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable.'" (emphasis added) (quoting United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993))).  Ortho cites no case in which a court required plaintiffs to account for potential decreases in the price of some products as the result of an alleged horizontal price–fixing conspiracy.

At the class certification hearing, Dr. Bronsteen stated that the alleged conspiracy might have caused the prices of some TBR or ABR products to decrease because it gave defendants an incentive to "cheat" on the cartel by cutting prices on products not subject to the conspiracy. (7/26/12 Hr'g Tr. 218–19.)  He presented evidence that, while TBR prices were increasing sharply, the prices of some of defendants' leading ABR products were "essentially flat."  (Id. at 220.)  Moreover, he argued that defendants hoped that increases in the prices of TBR would induce customers to switch from TBR to ABR.  (Id.)

The argument that defendants were cheating on the cartel is speculative, at best.  Ortho has not persuaded the Court that the "essential flatness" of ABR prices resulted from its alleged conspiracy to fix TBR prices; Ortho has merely suggested that that is a possibility.  Second, as a practical matter, Ortho's theory — which could be raised in every price–fixing case — would be very difficult to model.  Without stronger evidence that a price–fixing conspiracy did, indeed, have offsetting benefits to consumers, plaintiffs in this type of case should not be saddled with analyzing whether a price–fixing conspiracy might possibly have had any negative effect on the price of any product sold by the defendants.  Ortho has not cited any nonmerger cases in which

courts imposed such a requirement, and this Court will not do so in this case.  The Court thus

accepts the results of the damages models as persuasive evidence of antitrust impact.

### 3.    Antitrust Impact: Market Structure Analysis[21]

Plaintiffs' third element of proof of impact is Dr. Beyer's analysis of the structure of the

TBR market.  Based on his review of relevant documents and deposition testimony in this case,

Dr. Beyer concludes that several features of the blood reagents industry gave "defendants ... the

incentive to form the alleged conspiracy" and made it impossible for individual purchasers to

"avoid [ ] impact from a conspiracy."  (Beyer Report 26.)  In particular, Dr. Beyer cites (1) the

consolidated market, (2) high barriers to entry, (3) inelastic demand for TBR, (4) the

interchangeability of defendants' TBR products, (5) defendants' ability to monitor each other's

pricing behavior by obtaining price lists from customers, and (6) defendants' unwillingness to

deviate from their pricing policies for particular customers.  (Id. at 26–35.)  Many of these

conclusions are supported by the reports of Ms. Harris, plaintiffs' industry expert.  (See Harris

Report ¶¶ 16, 20, 33.)

In its brief in opposition to plaintiffs' Motion for Class Certification, Ortho disputed

some of Dr. Beyer's conclusions regarding market structure, arguing that (1) TBR are not

interchangeable and, as such, are not commodity products, which consumers perceive to be

identical, (2) demand for TBR is not inelastic because TBR and ABR are interchangeable, and

(3) recent market entry shows that plaintiffs overstate their claims regarding barriers to entry.

However, the report of Ortho's expert, Dr. Bronsteen, does not dispute that the TBR market

possessed the structural features Dr. Beyer identifies.  Instead, Dr. Bronsteen argues that those

structural features are just as consistent with tacit coordination as with unlawful collusion.

---

[21]    Defendant has not challenged this expert testimony under Daubert in the post–remand
proceedings.

(Bronsteen Report 34.)  He opines that such a market structure "generally make[s] it easier for firms to refrain from aggressive competition and to coordinate their pricing either from an explicit cartel agreement or from tacit coordination." (Id. at 35.)  Dr. Bronsteen then concludes that firms often prefer to engage in tacit coordination because, unlike explicit collusion, it is not unlawful.  (Id. at 35–36.)

Many courts have accepted market–structure analyses in finding predominance with respect to antitrust impact.  See, e.g., In re Linerboard Antitrust Litig., 305 F.3d 145, 153–55 (3d Cir. 2002); In re Air Cargo Shipping Servs. Antitrust Litig., No. 06–1175, 2014 WL 7882100, at *48 (E.D.N.Y. Oct. 15, 2014), OSB, 2007 WL 2253418, at *4–7.  However, before accepting such an analysis, the Court must be persuaded that the market–structure factors identified by the plaintiffs' expert do, in fact, exist.  See, e.g., In re Plastics Additives Antitrust Litig., No. 03–2038, 2010 WL 3431837, at *7 (E.D. Pa. Aug. 31, 2010) ("While a market with the characteristics described by [the expert] may in theory be vulnerable to a price–fixing conspiracy, we find that the markets at issue in this case do not actually possess those characteristics.").  In this case, after weighing the evidence presented by both parties, the Court is persuaded by Dr. Beyer's conclusions regarding the structure of the TBR market.

First, Ortho has not disputed many of the market characteristics identified by Dr. Beyer. Dr. Bronsteen disputes even fewer; his primary argument is that the characteristics are consistent with lawful conduct as well as unlawful conduct.  However, the question for the Court at this stage is not whether defendants actually engaged in a price–fixing conspiracy but whether, once a conspiracy is established, plaintiffs will also be able to prove impact through predominantly common proof.  Dr. Bronsteen's testimony thus does not discredit Dr. Beyer's market–structure analysis at this stage of the litigation.

Second, the Court is persuaded that most customers viewed TBR products as commodity products during the class period.  (See, e.g., Gallup Dep., Pls.' Reply Ex. 151, at 59–60 (stating that most customers "believed that [TBR] [were] like plain white bread: all the products were the same"); Weiss Decl., Pls.' Reply Ex. 149, ¶¶ 11–12 (stating that customers can use TBR "interchangeably" as long as they have FDA approval and that TBR "are almost identical 'commodity' products").)  Ortho presented anecdotal evidence that a few purchasers preferred one defendant's TBR for nonprice reasons.  (See, e.g., Carbaugh Dep., Def.'s Opp. Ex. C, at 36; Fennema Dep., Defs.' Opp. Ex. D, at 57–59.)  The Court finds that isolated testimony less persuasive than the expert report and evidence that plaintiffs offered to the contrary.

Third, Ortho disputed Dr. Beyer's conclusions regarding the inelasticity of TBR demand because ABR constituted a "potential substitute product[ ]" for TBR.  (Def.'s Opp. 13.)  Ortho explained that, although ABR are more expensive than TBR, they are more efficient and more accurate, which gave customers an incentive to switch despite the increased expense.  (Id. at 15–16.)  Moreover, Ortho presented evidence that some class members did switch from TBR to ABR during the class period.  (Id. at 14–15.)  However, as plaintiffs' counsel argued persuasively at the certification hearing, the decision of some purchasers to switch from TBR to ABR when faced with enormous price increases does not establish elastic demand for TBR.  (See 7/26/12 Hr'g Tr. 30–31.)  Even where demand is highly inelastic, customers will eventually stop purchasing a product if there is a sufficiently large price increase.  See generally IIA Phillip E. Areeda et al., Antitrust Law ¶ 507 (3d ed. 2007).  The Court also credits Dr. Beyer's conclusion that, because Ortho and Immucor dominated both the TBR and ABR markets, the possibility that customers would switch from TBR to ABR did not threaten the success of the alleged conspiracy.  (See Beyer Report ¶ 63.)

Finally, the entry of two new TBR manufacturers in 2008 — eight years after the alleged price–fixing conspiracy began—does not discredit Dr. Beyer's conclusion that the TBR market features high barriers to entry.  A barrier to entry need not prevent competitors from ever entering the market.  See generally IIB Areeda et al., supra, at ¶ 420.  Dr. Bronsteen agrees with Dr. Beyer that FDA regulation delays entry to the TBR market.  (Bronsteen Dep., Pls.' Reply Ex. 148, at 56, 242–23.)  It is undisputed that it takes several years for a new competitor to obtain FDA approval and begin to sell TBR.  This is a substantial delay, sufficient to render the TBR market conducive to collusion that would impact all customers.

The Court thus accepts Dr. Beyer's analysis of the structure of the TBR market as persuasive evidence supporting a finding of predominance with respect to impact.

### 4.      Antitrust Impact: Empirical Pricing Analysis[22]

Fourth, plaintiffs rely on Dr. Beyer's empirical analysis of pricing patterns in the TBR industry during the class period.  There are two parts to this analysis.  First, Dr. Beyer observes that TBR prices "skyrocketed" during the class period.  (Beyer Report 29, tbls. 3–4.)  Second, he analyzes the prices defendants charged to individual customers and concludes that prices rose somewhat uniformly.  Most Ortho customers paid identical or nearly identical prices throughout the class period.  (Id. at 77 figs. 5–6.)  Because of Immucor's pricing tiers, Immucor prices exhibit more dispersion.  Moreover, some Immucor customers were able to obtain price protection, which locked their 2004 prices in place for five years.  Nonetheless, Dr. Beyer states that the prices for Immucors TBR tended to cluster at a handful of pricing points.  (Id. at 76.) Further, in his Reply Report, he demonstrates that customers in each of Immucor's pricing tiers and even its price–protected customers paid more than but–for prices.  (Beyer Reply 77–88.)

---

[22]      The Court reiterates that this expert testimony has not been challenged under Daubert in the post–remand proceedings.

Clearly, the fact that prices rose does not, in and of itself, demonstrate antitrust impact — at trial, plaintiffs must show that they experienced price increases that resulted from anticompetitive conduct.  However, a showing that prices behaved similarly across groups of customers contributes to a finding of predominance at the certification stage.  Because Ortho's prices were more uniform than Immucor's, this element of proof is more persuasive with respect to Ortho sales than Immucor sales.  (Compare Beyer Report fig. 5, with id. figs. 10–11.)  As described above, however, Dr. Beyer has showed that, despite price variation, he can demonstrate impact to Immucor purchasers using common proof.

The Court does not find Dr. Beyer's empirical pricing analysis as persuasive as his market analysis or the results of his damages models.  Nevertheless, the analysis provides additional support for his assertion that plaintiffs will be able to prove impact using common proof.

### 5. Antitrust Impact: Defendants' Documents

Fifth, plaintiffs rely on defendants' internal documents for the proposition that the price increases affected all customers.  Most importantly, the documents support plaintiffs' contention that defendants were generally unwilling to negotiate prices with their customers.  (See, e.g., Pls.' Mot. Ex. 138, at 4 (email from an Immucor sales representative stating that "[u]nfortunately, the pricing change is firm.  It was an increase that was shared with our entire customer base and at this time, there aren't any exceptions being made"); Pls.' Mot. Ex. 139 (email from an Ortho executive stating that "everyone pays the same" for TBR).)  Moreover, the documents provide evidence that even where defendants provided discounts from list prices, the discounts remained related to the list prices.  (See, e.g., Pls.' Reply Ex. 143 (Ortho document stating that "[a]s list price increases all customer prices change in lock step"); Heflin Decl. ¶ 16

(stating that Immucor's list prices and tiered pricing were set based on Ortho's list prices).)  This gives rise to an inference that anticompetitive increases in list prices would also impact customers who were purchasing TBR at a discount.  See, e.g., McDonough, 638 F. Supp. 2d at 486 ("[W]hen list prices have been artificially inflated, fixed or proportional discounts from them are equally inflated.").

The Ortho documents, standing alone, would not suffice to prove impact.  They do, however, lend support to a finding of predominance.

In summary, after a rigorous analysis of the evidence offered by both parties, the Court concludes that plaintiffs have shown by a preponderance of the evidence that they will be able to demonstrate antitrust impact using predominantly common proof.

### c.        Damages

As discussed supra, plaintiffs have offered Dr. Beyer's damages methodologies to show that damages are susceptible to measurement across the entire class.  Although Ortho has challenged the reliability and fit of those methodologies under Daubert, it has not argued that individual proof will predominate in calculating damages.  The Court concludes that plaintiffs have demonstrated by a preponderance of the evidence they will be able to measure antitrust damages using predominantly common proof.

Dr. Beyer's formula for calculating classwide damages involves the same steps, "[w]hether [used to calculate damages] for one plaintiff or a class of plaintiffs."  (Beyer Report ¶ 88.)  First, Dr. Beyer calculates the but–for price of each reagent by year based on the methodologies discussed supra, i.e. the OCV benchmark from 2001 through 2005, and either the cost–margin approach or the RhoGAM yardstick from 2006 through the end of the class period. (Beyer Reply ¶ 90.)  Second, Dr. Beyer calculates the but–for payments for each transaction by

applying the but–for price to the quantities purchased in each transaction.  (Id.)  Third, Dr. Beyer

subtracts the but–for payment from the actual payment to determine the damages for each

transaction.  (Id.)  Fourth, Dr. Beyer sums those differences, i.e. the damages amount for each

transaction, for each purchaser plaintiff to determine the damages incurred by that plaintiff.

"Because the customer transaction data is contained in a single database for each defendant and

because the formula is common for all class members, it will be straightforward to calculate class

wide damages at the merits stage of the litigation."  (Id. at ¶ 91.)

The Court further concludes that Dr. Beyer's damages methodologies match the sole

theory of liability asserted by plaintiffs in this case, and thus "[t]he unique liability/damages

disconnect in Comcast" does not defeat class certification.[23]  (Pls.' Post–Remand Br. 23.)  In

Comcast, the Supreme Court reversed the Third Circuit's decision affirming class certification

"where the [p]laintiffs only surviving claim alleged one theory of liability and the [p]laintiffs

expert based its damages calculations on multiple theories of liability."  Hurt v. Commerce

Energy, Inc., No. 12- 758, 2014 WL 3735460, at *3 (N.D. Ohio July 28, 2014) (summarizing

Comcast, 133 S.Ct. at 1433–34).  There is no such mismatch presented in this case.

In this case, plaintiffs assert a horizontal price–fixing conspiracy theory — that

defendants conspired to fix prices in violation of the Sherman Act, and that prices paid by

customers for blood reagents increased as a result.  Plaintiffs have set forth this single theory of

liability from the outset of the litigation, and Dr. Beyer's damages methodologies, which

measure the damages incurred as a result of the alleged price fixing conspiracy, match plaintiffs'

theory of liability.  See Hurt v. Commerce Energy, Inc., No. 12–758, 2014 WL 3735460, at *3

(N.D. Ohio July 28, 2014) ("[W]ithout assessing the validity of the damages calculations and

---

[23]     Ortho did not raise any additional challenges under Comcast beyond those discussed
supra.

methodology . . . this Court notes that the damages model was based on the single theory of liability alleged by the Plaintiffs.  As such, the Plaintiffs['] damages theory appears to be consistent with their liability theory, and Comcast does not require decertification."); see also In re Urethane Antitrust Litig., No. 04–1616, 2013 WL 2097346, at *4 (D. Kan. May 15, 2013) (concluding that plaintiffs' expert "provid[ed] causal link between the single price–fixing conspiracy alleged by plaintiffs at trial and the impact to plaintiffs"), amended, No. 04–1616, 2013 WL 3879264 (D. Kan. July 26, 2013), aff'd, 768 F.3d 1245 (10th Cir. 2014), and aff'd, 768 F.3d 1245 (10th Cir. 2014).

Thus, the Court concludes that plaintiffs have shown by a preponderance of the evidence that "common issues of law or fact in the case predominate over non–common, individualized issues of law or fact" with respect to measuring antitrust damages.  Neale, No. 2015 WL 4466919, at *13.  .

### d.      Fraudulent Concealment

Finally, in opposition to plaintiffs' Motion for Class Certification, Ortho argued that individual issues related to fraudulent concealment would predominate at trial.  That challenge was not reasserted in the post–remand proceedings.

To avoid the four–year statute of limitations on civil antitrust actions under 15 U.S.C. § 15b, plaintiffs must show "(1) fraudulent concealment; (2) failure on the part of the plaintiff to discover his cause of action notwithstanding such concealment; and (3) that such failure to discover occurred [notwithstanding] the exercise of due care on the part of the plaintiff." Linerboard, 305 F.3d at 160 (alteration in original) (internal quotation marks omitted).  The first of plaintiffs' class action complaints was filed on May 18, 2009.  Thus, claims for damages based on pre–May 18, 2005 purchases of TBR are time–barred unless the purchaser can establish

fraudulent concealment.  Ortho argued that a finding of predominance is barred by the myriad individual issues that would be involved in analyzing all three elements of fraudulent concealment.

The Court rejects this argument.  It is true that an action implicating fraudulent concealment raises some individual issues, including whether an individual plaintiff knew of the alleged violation and whether he exercised due diligence.  However, in <u>Linerboard</u>, the Third Circuit held that, in general, "[i]t is the fact of <u>concealment</u> that is the polestar in an analysis of fraudulent concealment."  <u>Linerboard</u>, 305 F.3d at 163.  The weight of authority is in accord with that holding.  <u>See, e.g.</u>, <u>In re Pressure Sensitive Labelstock Antitrust Litig.</u>, No. 03–1556, 2007 WL 4150666, at *21–22 (M.D. Pa. Nov. 19, 2007); <u>In re Flat Glass Antitrust Litig.</u>, 191 F.R.D. 472, 488 (W.D. Pa. 1999); <u>see also</u> <u>Newberg on Class Actions</u> § 4:26 (4th ed. 2002) ("Challenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance often are rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.").

Nonetheless, there is no <u>per se</u> rule that individual issues regarding fraudulent concealment can <u>never</u> defeat a finding of predominance.  If a case presented particularly complex or important individual issues, it might be appropriate to deny class certification. However, this is not such a case.  Ortho has not persuaded the Court that here, unlike the typical price–fixing case, individualized issues are the "polestar" of the fraudulent–concealment inquiry. In this case, the fraudulent–concealment issue involves the same mix of individualized and common proof that was present in <u>Linerboard</u> and other cases.  There is substantial common evidence that defendants took affirmative acts to conceal their alleged conspiracy — for

example, the acts of concealment that surrounded the Thorne/Gendusa lunch in November 2000.

Ortho cited evidence regarding individual plaintiffs' suspicions and due diligence. However,

that evidence is highly similar to, and no more complex than, the individual evidence that failed

to preclude certification in Linerboard. See Linerboard, 305 F.3d 161–62 & n.13. In this case,

as in many others, individual issues relating to fraudulent concealment "can be resolved at a later

damages phase" if necessary. Linerboard, 305 F.3d at 163. Such issues do not defeat a finding

of predominance.

Thus, for the reasons stated above, the Court concludes that plaintiffs have satisfied the

Rule 23(b)(3) predominance requirement with respect to fraudulent concealment.

### ii.    Superiority

With respect to superiority, Rule 23(b)(3) requires that a class action be "superior to other

available methods for the fair and efficient adjudication of the controversy." To determine

whether the requirement is satisfied, a court must "balance, in terms of fairness and efficiency,

the merits of a class action against those of 'alternative available methods' of adjudication."

Amchem, 83 F.3d at 632. "[S]imilar to the predominance requirement, the requirement of

superiority ensures that resolution by class action will 'achieve economies of time, effort, and

expense, and promote . . . uniformity of decision without sacrificing procedural fairness or

bringing about other undesirable results.'" Flonase, 2012 WL 2277840, at *25 (quoting

Amchem, 521 U.S. at 615).

The superiority requirement is satisfied in this case, and Ortho does not dispute that point.

Certification of the class will promote fairness and efficiency. If the class were not certified,

"the numerous individual class members would be forced to file suit individually, producing

numerous identical issues in each case that would waste judicial resources and leave all parties

vulnerable to unfair inconsistencies." <u>Id.</u> at *26.  Many courts have recognized that the cost of maintaining individual actions is frequently prohibitive in this type of antitrust litigation.  <u>See, e.g.</u>, <u>Wellbutrin</u>, 2011 WL 3563835, at *17; <u>Linerboard</u>, 203 F.R.D. at 223.  Due to the many common questions of law and fact involved in the class members' claims, class treatment will promote efficiency.  For these reasons, plaintiffs have satisfied the superiority requirement under Rule 23(b)(3).

## V.   CONCLUSION

For the reasons set forth above, the following class is recertified pursuant to Rule 23(a) and Rule 23(b):

> All individuals and entities who purchased traditional blood reagents in the United States directly from defendants Immucor, Inc., and Ortho–Clinical Diagnostics, Inc. at any time from November 4, 2000 through the present.  Excluded from the Class are defendants, and their respective parents, subsidiaries and affiliates, as well as any federal government entities.

An appropriate order follows.